**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NOKIA CORPORATION and NOKIA, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C. A. No. _____ ) |
| QUALCOMM INCORPORATED, | ) ) |
| Defendant. | ) |

## <u>NOTICE OF REMOVAL</u>

Richard L. Horwitz (#2246)
Matthew E. Fischer (#3092)
Kenneth L. Dorsney (#3726)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street, P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000

OF COUNSEL:

rhorwitz@potteranderson.com
mfischer@potteranderson.com
kdorsney@potteranderson.com

Evan R. Chesler
Richard J. Stark
CRAVATH, SWAINE & MOORE LLP        *Counsel for Defendant*
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated:  August 16, 2006

PLEASE TAKE NOTICE that defendant QUALCOMM Incorporated ("QUALCOMM"), by and through its undersigned counsel, and pursuant to Sections 1338, 1441, and 1446 of Title 28 of the United States Code, hereby removes this action presently pending in the Court of Chancery of the State of Delaware in and for New Castle County, to the United States District Court for the District of Delaware. As grounds for this removal, defendant states as follows:

1.     Plaintiffs Nokia Corporation and Nokia, Inc. (collectively, "plaintiffs") commenced this action on August 8, 2006, by the filing of a complaint in the Court of Chancery of the State of Delaware in and for New Castle County, under C.A. No. 2330-N. A copy of the complaint is attached hereto as Exhibit A.

2.     Plaintiffs purport to assert three claims against QUALCOMM related to alleged contractual obligations arising from QUALCOMM's agreement to "license its essential GSM and UMTS patents on FRAND terms". (See Compl. ¶¶ 46, 60, 70).

3.     Plaintiffs seek a declaration of the meaning of these alleged contractual obligations, an injunction against QUALCOMM's seeking certain relief in a prior-filed case for patent infringement currently pending in the United States District Court for the Southern District of California and in other actions, and specific performance.

4.     United States patent law is a necessary element of plaintiffs' claims. The alleged contractual obligations upon which plaintiffs rely allegedly arise out of QUALCOMM's commitments to the European Telecommunications Standardization

Institute ("ETSI") and that body's "IPR Policy".  (See Compl. ¶¶ 19-25, 28.)  That policy

provides – as quoted in the complaint – that:

> "When an ESSENTIAL IPR relating to a particular
> STANDARD or TECHNICAL SPECIFICATION is
> brought to the attention of ETSI, the Director-General of
> ETSI shall immediately request the owner to give within
> three months an undertaking in writing that it is prepared to
> grant irrevocable licenses on fair, reasonable and non-
> discriminatory terms and conditions under such IPR …."
> (Compl. ¶ 24 (quoting ETSI IPR Policy cl. 6.1).)

     5.     Thus, on its face, the ETSI IPR policy seeks a commitment to offer

licenses on fair, reasonable and non-discriminatory terms only as to essential patents.

Indeed, the form ETSI uses to record licensing commitments related to patents confirms

that such commitments are limited to patents that are, in fact, essential:

> "The SIGNATORY has notified ETSI that it is the
> proprietor of the IPRs listed in Annex 2 and has informed
> ETSI that it believes that the IPRs may be considered
> ESSENTIAL to the Standards listed above.
>
> The SIGNATORY and/or its AFFILIATES hereby declare
> that they are prepared to grant irrevocable licenses under
> the IPRs on terms and conditions which are in accordance
> with Clause 6.1 of the ETSI IPR Policy, in respect of the
> STANDARD, to the extent that the IPRs remain
> ESSENTIAL."  (ETSI IPR Information Statement and
> Licensing Declaration Forms, annex 1 (attached hereto as
> Exhibit E) (emphasis added).)

     6.     Plaintiffs allege that, consistent with the ETSI IPR policy,

QUALCOMM provided a commitment to ETSI that was limited to essential patents:

> "On June 25, 1999, Qualcomm submitted a letter to ETSI
> stating: 'Qualcomm hereby commits . . . to license its
> essential patents for each single CDMA standard or any of
> its modes [including UMTS] on a fair and reasonable basis
> free from unfair discrimination.'"  (Compl. ¶ 28 (alterations
> in original, emphasis added).)

7.    The ETSI IPR Policy contains the following definition of "essential":

> "'ESSENTIAL' as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD <u>without infringing that IPR</u>."  (ETSI IPR Policy cl. 15.6 (quoted in Compl. ¶ 23) (emphasis added).)[1]

8.    Resolution of plaintiffs' claims necessarily requires a determination under U.S. patent law as to whether certain patents are "ESSENTIAL" – that is, whether practicing the relevant standard is "not possible . . . without infringing" (Compl. ¶ 23) QUALCOMM's U.S. patents.  Plaintiffs seek to enjoin QUALCOMM from seeking injunctive relief in the United States District Court for the Southern District of California, and from seeking relief from the United States International Trade Commission, for plaintiffs' infringement of United States patents.  Plaintiffs' claims are predicated on the theory that those patents are essential to ETSI standards and subject to an ETSI licensing commitment.  (Compl. ¶¶ 46, 49, 55.)  Those claims cannot be resolved without determining whether the U.S. patents at issue are in fact essential to the ETSI standards – that is, whether the equipment and methods that comply with the standards necessarily infringe the patents.  That question of infringement is indisputably a substantial question of patent law.

9.    Where, as here, a determination of a purported state law claim requires application of the patent laws, the claim "arises under" the patent laws within the

---

[1] "IPR" is defined as "any intellectual property right conferred by statute law including applications therefor other than trademarks".  (ETSI IPR Policy cl. 15.7.) (Attached here to as Exhibit F).

meaning of 28 U.S.C. § 1338(a).  U.S. Valves, Inc. v. Dray, 212 F.3d 1368, 1372 (Fed. Cir. 2000); see also Highland Supply Co. v. Klerk's Flexible Packaging, B.V., No. 05-CV-482, 2006 WL 278164, at *1-2 (S.D. Ill. Feb. 1, 2006).  Thus, this action is removable to this Court pursuant to 28 U.S.C. § 1441(b) without regard to the citizenship or residence of the parties.

10.    QUALCOMM was served with the summons and complaint on August 8, 2006.  Thus, this Notice of Removal is timely filed under 28 U.S.C. § 1446(b).

11.    Because this District embraces the place where the action is pending, removal to this Court is appropriate under 28 U.S.C. §§ 1441(a) and 1446(a).

12.    Pursuant to 28 U.S.C. § 1446(d), a copy of this notice of removal is being filed with the Register in Chancery of the Court of Chancery of the State of Delaware in and for New Castle County.  Also pursuant to 28 U.S.C. § 1446(d), written notice of removal is being served on plaintiffs.

13.    Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings, and orders served on QUALCOMM in this case are attached hereto as Exhibits A through D.

WHEREFORE, QUALCOMM hereby removes this action, now pending in the Court of Chancery of the State of Delaware in and for New Castle County, to this Court, pursuant to 28 U.S.C. Section 1441(b), and respectfully request that this Court take cognizance, accept jurisdiction, and enter such orders or take such steps as may be necessary to effect a true record of such proceedings as may have been had in the Court of Chancery of the State of Delaware in and for New Castle County.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Evan R. Chesler
Richard J. Stark
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated:  August 16, 2006

By: _____
Richard L. Horwitz (#2246)
Matthew E. Fischer (#3092)
Kenneth L. Dorsney (#3726)
Hercules Plaza, 6th Floor
1313 N. Market Street, P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
rhorwitz@potteranderson.com
mfischer@potteranderson.com
kdorsney@potteranderson.com

*Counsel for Defendant*

746267

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on August 16, 2006, a true and correct copy of the within document was caused to be served on the attorney of record at the following addresses as indicated:

## VIA HAND DELIVERY

Lisa A. Schmidt
Jeffrey Moyer
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE  19899

By: _Kenneth L. Dorsney_

Richard L. Horwitz
Matthew E. Fischer
Kenneth L. Dorsney
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
mfischer@potteranderson.com
kdorsney@potteranderson.com

746355

# EXHIBIT A

EFiled: Aug 9 2006 9:53AM EDT
Transaction ID 12021331

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

NOKIA CORPORATION and NOKIA INC.,

     Plaintiffs,

  v.

QUALCOMM INC.,

     Defendant.

C.A. No. 2330

## COMPLAINT

  Plaintiffs Nokia Corporation and Nokia Inc. (collectively, "Nokia"), by and through their undersigned counsel, allege the following as and for their Complaint against defendant Qualcomm Inc. ("Qualcomm"):

## NATURE OF THE ACTION

  1.  Nokia seeks declaratory relief and specific performance to enforce the terms of contracts in which Qualcomm, a Delaware corporation, has licensed Nokia to practice Qualcomm essential patents on fair, reasonable, and non-discriminatory terms ("FRAND" terms). As hereinafter alleged, Qualcomm has induced various standard-setting organizations ("SSOs"), including the European Telecommunications Standardization Institute ("ETSI"), to incorporate Qualcomm's patented technology into industry standards for cellular phone products and equipment by contractually agreeing to license those patents on FRAND terms. However, Qualcomm has breached its contractual obligations by demanding a royalty rate that exceeds FRAND terms and by threatening to enjoin Nokia from manufacturing or selling products that Qualcomm alleges practice the licensed essential patents unless Qualcomm's demands for unfair and unreasonable royalties are

accepted. Qualcomm has further breached its contractual obligations by refusing to negotiate FRAND royalty rates in good faith.

2.    Nokia seeks a judicial declaration establishing that Qualcomm's FRAND commitments constitute binding and enforceable contractual obligations licensing its declared-essential patents to Nokia on FRAND terms, which includes a FRAND royalty, and setting forth the method by which the FRAND royalty is to be calculated.

3.    In addition, Nokia seeks a judicial declaration that, by contracting to license its declared-essential patents to Nokia on FRAND terms, Qualcomm has waived the right to seek injunctive relief to restrain the use of those declared-essential patents. In the event of a dispute between the parties (including the filing of any infringement action in any country), Qualcomm's remedy is limited to recovery of a FRAND royalty as determined by a court.

4.    Accordingly, Nokia seeks an order enjoining Qualcomm worldwide from seeking an injunction or an exclusionary order as a remedy for alleged infringement of any declared-essential patents which it has contractually agreed to license on FRAND terms.

5.    Finally, Nokia seeks an order compelling specific performance requiring that Qualcomm participate in a good faith negotiation on the amount of a FRAND royalty, recognizing the principles that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization, and such other factors as the court deems fair and proper under the circumstances.

## PARTIES AND JURISDICTION

6.      Plaintiff Nokia Corporation is a corporation organized under the laws of Finland, with its principal place of business located in Espoo, Finland.

7.      Plaintiff Nokia Inc. is a United States subsidiary of Nokia Corporation. Nokia Inc. is a corporation organized under the laws of the State of Delaware, with its headquarters located in Irving, Texas. Nokia Corporation and Nokia Inc. are collectively referred to herein as "Nokia."

8.      Nokia is a world leader in the field of mobile communications. Nokia's primary line of business is the manufacture and sale of cellular telephone handsets. Nokia also manufactures and sells infrastructure used in cellular telephone networks, and owns substantial intellectual property rights in cellular telephone technologies.

9.      Defendant Qualcomm Inc. ("Qualcomm") is a corporation organized under the laws of Delaware. One of Qualcomm's business units, called the Technology Licensing Segment, or "QTL," licenses intellectual property rights in cellular telephone technology. Qualcomm also manufactures and sells chipsets for use in cellular telephones through a separate business unit called the CDMA Technologies Segment, or "QCT."

10.     Both Qualcomm and Nokia are members of a European SSO, ETSI, which has standardized the technology needed for cellular telephones. In accordance with the terms of their agreement with ETSI (described further below), each company has licensed, by means of declarations to ETSI, its essential patents to the other on FRAND terms.

11.     ETSI's Rules of Procedure provide that any dispute regarding the interpretation or application of ETSI policies must be resolved in the national courts of the member parties, applying French law. Under French law, Qualcomm's undertaking to license its essential patents on FRAND terms creates a binding and enforceable license agreement between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. Additionally, Qualcomm's contractual obligation

3

includes a duty to negotiate in good faith to determine a FRAND royalty rate. Under ETSI rules, Nokia is entitled to enforce that contract against Qualcomm in this Court because Qualcomm is a Delaware corporation.

## DEVELOPMENT OF CELLULAR TELEPHONE TECHNOLOGY STANDARDS

12.    For a cellular telephone to work, it must be able to transmit and receive radio signals to and from cellular transmitting towers, and be able to maintain its signal as it is passed from one tower to the next. All components of a wireless system must be able to interact with each other seamlessly, regardless which company or companies manufacture the various components. This includes the transmitting towers, the switches, the telephones, the chipsets that allow the telephones to communicate with the towers, and the chipsets that allow the towers to receive and transmit data to the switches for retransmission to the landline network or other cellular networks and cellular telephones. To meet these requirements, all components in a single cellular system must be "interoperable" and work effectively and efficiently with all other components.

13.    In order to ensure that components from different companies can interact with one another and that products can be brought to the marketplace expeditiously, wireless carriers, telephone manufacturers, and chipset manufacturers must follow a common set of industry standards for wireless communication technology. Thus, for decades, cellular service providers and cellular product manufacturers have been members of SSOs that exist to create a common set of standards that all members can follow. In return, the SSOs demand that their members license patents that are essential to any standard on FRAND terms, rather than use the threat of injunction to exploit the existence of the standard to extort super-monopoly royalties.

14.    Once a given standard has been selected, the patents essential to that standard gain value because competing technologies are effectively eliminated from the marketplace. The technology monopoly granted to essential patent holders results in the establishment of a significant

base of royalty payers and insures a revenue stream to essential patent holders. Once capital
investments (on the order of billions of dollars) are made to comply with the standard, cellular
equipment manufacturers and network service providers are locked into the technology and into
paying royalties to holders of essential patents. This lock-in confers upon patent holders the ability,
if unrestrained, to extort super-monopoly royalties from prospective licensees using the threat of
lawsuit and injunction. SSOs protect their members and the public from such opportunistic behavior
by obligating patent holders to license their essential patents on FRAND terms. This obligation
prevents the patent holder from appropriating for itself (rather than consumers) the value of having
an industry standard.

15.    In simple terms, the standard-setting process involves:  (1) an evaluation of
competing technologies to determine which best suits the market need; (2) a patent clearance process
where the SSO's members unequivocally agree in writing that any patent that is essential to practice
the standard is licensed to all on FRAND terms; and (3) the approval and adoption of the standard.
The patent clearance process is always completed before the standard is adopted and implemented to
insure that no member may use its patents to impede competition (i.e., charge exorbitant royalty
rates for patents that must be used by all market participants because they are essential to practice the
standard) or exclude participants from the marketplace (i.e., by using injunctions and exclusionary
tactics to block a patent's use). If members do not agree to their license essential patents on FRAND
terms, SSOs look to alternative technologies where patent clearance is available.

16.    Cellular telephone standards have evolved through distinct "generations" as
consumers have demanded additional features and technology owners have developed new
innovations. The earliest cellular telephones operated on analog technology and allowed only voice
transmission and very slow transmission of data over analog cellular airwaves. These early analog

5

systems are typically referred to as first-generation ("1G") technology. 1G technology was characterized by inherent capacity limitations, minimal and slow data transfer capabilities, low security, inconsistent service levels, and significant power consumption.

17.    Consumers' increased demand for cellular service and for added performance drove the development of a second generation of cellular telephone technology ("2G"). 2G telephones, which are based on digital technology, provide significantly increased voice and data capacity and also support additional functions, such as paging and e-mail. 2G technology also offers greater privacy, greater fraud protection, and lower prices as compared to 1G technology. Most cellular telephones in use today are based on 2G technology standards.

18.    The three principal 2G standards in use today are called Global System for Mobility ("GSM"), Time Division Multiple Access ("TDMA"), and Code Division Multiple Access ("CDMA"). The technical parameters and specifications of each 2G technology were reviewed and approved by various SSOs. The three technologies are based on different underlying air interface and transmission regimes. Thus, as a general proposition, GSM-based hardware components will not work on a CDMA or TDMA system, TDMA components will not work on a GSM or CDMA system, and CDMA components will not work on a GSM or TDMA system. As more fully described below, a third generation of wireless technology ("3G"), which will allow significantly increased data speed and capacity, is currently being deployed and is one of the subjects of this action.

## THE FRAND CONTRACTS

19.    As set forth below, Qualcomm has entered into contractual agreements with ETSI and ETSI's members, including Nokia, that Qualcomm will license on FRAND terms any of its patents that are essential to the GSM standard or its third-generation successor, Universal Mobile Telephone System ("UMTS").

6

20.     ETSI is a non-profit European SSO headquartered in France. It was under ETSI's auspices that the GSM technology standard was developed, reviewed, and approved.

21.     Qualcomm is a member of ETSI because its affiliates Qualcomm Europe S.A.R.L. and Qualcomm UK Ltd are members and ETSI defines "member" to include affiliates. Thus, as described below, Qualcomm itself filed FRAND undertakings with ETSI. Nokia is also a member of ETSI.

22.     Like other SSOs, ETSI requires its members to identify all patents they hold that may be essential to compliance with a proposed technology standard—referred to as "essential patents"—before the standard is adopted. ETSI's Intellectual Property Rights ("IPR") Policy provides that "each MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 4.1. The purpose of this disclosure requirement is obvious: to avoid a "patent ambush" situation where a party that holds essential patents sits on the sidelines during the standard-setting process and then holds up industry participants for unexpected and unanticipated royalties for technology that is essential to practice the standard.

23.     ETSI's IPR Policy specifically defines an IPR as "essential" where "it is not possible on technical but not commercial grounds, taking into account normal technical practice and the state of art generally available at the time of standardization, to make, sell, lease, otherwise dispose of,

repair, use or operate equipment or methods which comply with a standard without infringing that

IPR." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 15.6.

24.    ETSI also requests that patent holders license their essential patents to other parties

on fair, reasonable, and non-discriminatory terms ("FRAND" terms). Article 6.1 of ETSI's IPR

Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or
> TECHNICAL SPECIFICATION is brought to the attention of ETSI,
> the Director-General of ETSI shall immediately request the owner to
> give within three months an undertaking in writing that it is prepared
> to grant irrevocable licenses on fair, reasonable and non-
> discriminatory terms and conditions under such IPR . . . .

25.    In short, to avoid the problems of creating market power by adopting an industry

standard, ETSI requires its members not only to disclose their essential patents, but agree to license

those patents on FRAND terms. If a patent holder will not agree to license its declared patents on

FRAND terms, ETSI can decide not to include that technology in an industry standard, and instead

use a non-infringing alternative. See ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 8. If

the patent holder does agree to license its essential patents on FRAND terms, other companies in the

industry can invest in and deploy the standard without concern that they will be enjoined from using

the technology or be forced to pay an unreasonably high royalty for a patent that is essential to

practice the standard.

26.    Qualcomm violated its disclosure obligations to ETSI by waiting to declare certain

Qualcomm patents as essential to GSM until the industry had made substantial investments in GSM

technology. Indeed, Qualcomm did not declare any of its patents essential to GSM until many years

after the standard had been set, and it has declared some as recently as this year. However, when

Qualcomm did belatedly declare its patents essential to the GSM standard, it expressly agreed in

writing to license those patents to all members of ETSI, including Nokia, on FRAND terms.

27.    In the late 1990s, ETSI began considering candidate technologies for the 3G UMTS standard that would have worldwide application. ETSI and its members considered a number of solutions, including WTDMA (which was based on TDMA technology that did not infringe any known Qualcomm patents), WCDMA (which Qualcomm claimed included some of its patents), and CDMA 2000 (which Qualcomm claimed relied almost completely on its patents). ETSI ultimately decided to adopt WCDMA technology as the 3G UMTS standard.

28.    At the outset of the ETSI standard-setting process, Qualcomm refused to license its patents on FRAND terms for 3G use. Subsequently, however, on March 25, 1999, as part of the settlement of a lawsuit between Ericsson and Qualcomm involving cross-claims of patent infringement, Qualcomm finally agreed to license its WCDMA patents that were allegedly essential to the ETSI-proposed UMTS standard on FRAND terms to the rest of the industry. On June 25, 1999, Qualcomm submitted a letter to ETSI stating: "Qualcomm hereby commits . . . to license its essential patents for each single CDMA standard or any of its of its modes [including UMTS] on a fair and reasonable basis free from unfair discrimination." This promise provided ETSI members with the patent clearance required to make the huge capital investment that would lock them into a UMTS standard that included Qualcomm's WCDMA technology.

29.    The ability to use standard-essential technology without threat of a technology "monopolist" royalty rate or the threat of an injunction that would stop sales or operations is an important characteristic of the cell phone industry: once a wireless carrier elects to deploy an SSO-approved standard, switching to another standard may cost hundreds of millions if not billions of dollars and cause substantial disruption to consumers. Thus, if Qualcomm had not agreed with ETSI to license its declared-essential WCDMA patents on FRAND terms, WTDMA or another technology

would have been selected in lieu of WCDMA. This underscores the importance of holding Qualcomm to its contractual FRAND obligation.

30.   Under French law, Qualcomm's agreement to license its declared-essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. ETSI's Rules of Procedure provide that any dispute concerning the interpretation or application of ETSI policies must be resolved by the national courts of its members. Both Nokia Inc. and Qualcomm are Delaware corporations. Nokia is therefore entitled to apply to this Court to enforce and resolve the current dispute as to Qualcomm's contractual commitment to FRAND.

## A COMMITMENT TO FRAND NECESSARILY WAIVES ANY RIGHT TO INJUNCTIVE RELIEF

31.   When Qualcomm contractually agreed in writing to license its declared-essential patents on FRAND terms, it granted irrevocable patent license rights to all other members of ETSI, and gave up the traditional patent holder's right to enjoin others from practicing the technology incorporated in those patents. The only remedy for the use of Qualcomm declared-essential patents is a FRAND royalty, to be determined *ex post* by a court in the event of a dispute between Qualcomm and the licensee.

32.   Allowing a patent holder who has exchanged a FRAND commitment for the benefits of having patented technology included in a standard to seek injunctive relief would defeat the entire purpose of FRAND and the ETSI IPR Policy. As set forth above, the patent holder would be able to use the threat of injunction to extort royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would be forced to comply with unjustified royalty demands or risk losing their substantial investments in complying with the standard. If injunctions were to be allowed, essential patent users would be reluctant to invest in and deploy technologies until and

unless specific royalty terms were reached with every alleged essential patent holder. The public interest would also suffer because roll-out of standard-compliant products and new technologies would be delayed, defeating one of the key purposes of standard-setting (to promote swift implementation).

33. The delays and impediments imposed on the industry by the threat of injunctions prohibiting use of technologies deemed essential for new services would also contravene Articles 81 and 82 of the European Community Treaty, which, as detailed below, are designed to assure that conduct that eliminates competition from the marketplace (such as an SSO's choice of one technology over other candidate technologies as the standard) has an overall public welfare benefit (i.e., passing the network benefits on to consumers rather than allowing patent owners appropriate the benefit for themselves by demanding excessive royalties). ETSI imposes FRAND obligations on its members specifically to preclude this kind of unequal *ex post* bargaining power.

## QUALCOMM HAS BREACHED ITS CONTRACTUAL OBLIGATION TO LICENSE ITS DECLARED-ESSENTIAL GSM AND UMTS PATENTS ON FRAND TERMS AND IS USING THE THREAT OF INJUNCTIONS TO EXTORT UNJUSTIFIED ROYALTIES IN VIOLATION OF THE TERMS OF ITS ETSI COMMITMENT

34. Despite having made numerous FRAND commitments to ETSI in connection with GSM and UMTS patents that Qualcomm has declared essential to those standards, Qualcomm has refused to honor its contract to license its patents on FRAND terms. Instead, it has used litigation and the threat of injunction to attempt to extort exorbitant royalty rates from cellular telephone manufacturers.

35. To date, Qualcomm has filed three separate patent infringement suits against Nokia seeking injunctive or exclusionary relief for alleged infringement of patents allegedly essential for the GSM standard: one in the United States District Court for the Southern District of California (San Diego division), one in the United Kingdom, and one in the United States International Trade

Commission (ITC). In the proceeding before the ITC the only relief requested is injunctive in nature, excluding Nokia from importing products that Qualcomm contends infringe on patents it has declared essential to the ETSI GSM standard. These requests for injunctive relief are wholly inconsistent with Qualcomm's unequivocal contractual commitment to ETSI to license these patents to Nokia on FRAND terms.

36.    Qualcomm has clearly indicated that additional injunction suits will follow. During Qualcomm's third-quarter 2006 earnings conference call with analysts, Qualcomm President Steve Altman asserted that in cases where Qualcomm patents are allegedly being infringed, "we would look and seek injunctions in a variety of markets . . . ." The current litigation and the assertions of future injunctive proceedings cause irreparable and immeasurable harm to Nokia by creating uncertainty regarding the ability of Nokia to continue to manufacture and sell GSM standard-compliant products.

37.    Nokia is also justifiably concerned about the potential that Qualcomm may leverage its standards-granted technology monopoly to obtain unjustified injunctive relief in violation of Qualcomm's ETSI commitments in jurisdictions that will not afford Nokia adequate due process. In a number of European jurisdictions there are procedures available to plaintiffs to seek preliminary injunctions without giving defendants (such as Nokia) an opportunity to be heard at the time the injunction is being sought. The plaintiff may not even be under a duty in certain jurisdictions to give the court full and frank information concerning the case at that initial stage. A preliminary injunction may be granted without there being any consideration of equities, or of whether the patentee could be adequately compensated by damages alone. Furthermore, a preliminary injunction may be granted without any bond or undertaking being required from the patentee to pay for the damage caused to Nokia by a preliminary injunction that is later determined to have been

erroneously granted. To the extent that Qualcomm is permitted to seek such relief in violation of its ETSI contract, Nokia would suffer irreparable and immeasurable harm because it would never be able to adequately determine in financial terms the extent of Nokia damage.

38.     These concerns are not merely a theoretical possibility. Certain European courts have granted preliminary injunctions even where the patent concerned was relevant to an industry standard and the defendant had indicated a willingness to enter into a license. In Germany, for example, the court is required, under section 139, paragraph 1 of the German Patents Act, to grant permanent injunctive relief where infringement is found. And even though the court must weigh the interests of the parties at the preliminary injunction stage, this can be conducted *ex parte* and therefore Nokia would not have any opportunity to be heard. Similarly, in the Netherlands, the court is not obligated to take the balance of convenience into account and it rarely does so.

39.     Qualcomm's injunction strategy, in contravention of its FRAND commitments, is an attempt to give it leverage to demand royalty rates wholly out of proportion to the number or value of its patents essential to a particular standard. For example, Qualcomm has generally demanded the same royalty rate for its patents essential to its initial proprietary Common Air Interface CDMA technology (where, in practice, it holds close to 100% of the essential patents), as it demands for its patents essential to the IS-95 CDMA standard (where it holds some 80% of the essential patents), as it demands for the CDMA2000 family of standards (where it holds less than 50% of the essential patents), and as it demands for UMTS (where studies show it holds at most 20% of the essential patents). Moreover, on information and belief, Qualcomm owns less than 3% of the essential patents for GSM. Nevertheless, Qualcomm demands that many of its licensees cross-license Qualcomm (giving rights to the licensee's intellectual property rights not only to Qualcomm but also to Qualcomm's chipset customers) for their declared-essential patents, even where the licensee holds a

much larger portfolio of essential patents for the standard. These positions by Qualcomm do not comply with their contractual FRAND commitment to ETSI.

## QUALCOMM'S CONTRADICTORY STATEMENTS AND ACTIONS CONCERNING FRAND

40.     Qualcomm has adopted multiple and conflicting views of its FRAND obligations. In a motion to dismiss antitrust and other claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its agreement to license its patents on FRAND terms is not legally enforceable.[1] Thus, according to Qualcomm, there is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance. In complaints filed before the International Trade Commission, the United States District Court for the Southern District of California, and an English court, Qualcomm has claimed that, despite its FRAND declarations (which constitute an irrevocable agreement to license its essential patents), it is entitled to an injunction if the initial terms it unilaterally offers are rejected. In negotiations with Nokia, Qualcomm has declared that, despite its contrary written commitments, unless it is paid a royalty that Nokia believes bears no relationship to a FRAND royalty, it will seek injunctions to bar Nokia from selling its products to consumers.

41.     Under French law, the terms and enforceability of Qualcomm's contractual commitments must be interpreted, as far as possible, in a manner consistent with Articles 81 and 82 of the European Community Treaty, which prohibit anticompetitive conduct. Specifically, even apart from its FRAND commitments, Article 81 imposes a duty on Qualcomm to license its patents essential to standards on FRAND terms. Article 81(3) provides that, in order to comply with Article

---

[1] *See Broadcom Corp. v. Qualcomm Inc.*, Civ. A. No. 05-3350(MLC) (D.N.J.), Memorandum in Support of Defendant's Motion to Dismiss (filed Dec. 12, 2005), at 15 (arguing that Broadcom's action to enforce FRAND should be dismissed because FRAND is "susceptible of multiple interpretations" and does not have one universally accepted meaning).

81, an agreement of this kind must confer a fair share of resulting benefits on consumers and should not create the possibility of eliminating competition in respect of a substantial proportion of the products in question. SSO members would be able to deny a fair share of benefits to consumers, and substantially to eliminate competition in the instant context, if one or more of them could withhold licenses from downstream competitors, or make such licenses available only on excessively onerous terms. That is why, in order to comply with Article 81, the FRAND commitment must be effective to prevent such serious economic consequences. If an SSO member could retain all or most of the benefits of the standard and simultaneously refuse fair, reasonable, and non-discriminatory treatment to competitors that it particularly wanted to disadvantage (especially after prospective licensees had made large investments in the standard and were locked in), Article 81 would have no practical effect.

42.     In 2005, Ericsson, NEC, Texas Instruments, Broadcom, Panasonic, and Nokia asked the Commission of the European Communities Directorate-General Competition to investigate Qualcomm's anticompetitive conduct, under Articles 81 and 82, in the markets for CDMA and WCDMA cellular telephone technology and chipsets, including its failure to comply with FRAND obligations. In its May 16, 2006 brief to the European Commission, to attempt to avoid claims under Articles 81 and 82, Qualcomm made a number of critical admissions regarding FRAND, which contradict its public statements in the United States (including in the three patent infringement suits discussed above) that its FRAND commitments are unenforceable:

- "Fair Reasonable and Non-Discriminatory ('FRAND') obligations are part of a private agreement, a binding contract that is enforceable against each patent owner."

- "[T]he aim of FRAND is to ensure that whatever standard is developed remains available. A FRAND commitment is intended to prevent an outright refusal to license or the setting of royalty rates so high that they have the effect of preventing licensing . . . ."

- "In the case of dispute, it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."

- "A court procedure would involve an assessment of the number of truly essential patents necessary to practice a given standard or the appropriate royalty base or even the general business conditions prevailing for the given licensed technology."

43.    Qualcomm's selective interpretations of its FRAND obligation that appear to be dependent upon Qualcomm's purpose in specific litigation would render FRAND meaningless and defeat the entire purpose of the ETSI's FRAND requirement. Because of these shifting, self-serving definitions, Nokia asks this court for an order defining the terms and conditions surrounding Qualcomm's FRAND commitment and for an order upholding and affirming Qualcomm's agreement to license patents declared essential on FRAND terms pursuant to its contract with ETSI. This courts intervention is required to stop Qualcomm from charging monopolistic prices to license its declared-essential patents.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*), and Injunctive Relief)

44.    Nokia repeats and realleges the allegations set forth in paragraphs 1-43 above as if set forth fully herein.

45.    An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to whether Qualcomm can obtain injunctive relief in light of its contractual agreement to license its declared-essential patents on FRAND terms.

46.    By entering into contracts with ETSI and ETSI's members to license its essential GSM and UMTS patents on FRAND terms, Qualcomm gave up any right to enjoin Nokia from the use of those patents. Pursuant to its FRAND declarations, Qualcomm granted an irrevocable license on FRAND terms to Nokia and all other members of ETSI and waived any right to seek injunctive

16

relief or an exclusionary order, which would bar Nokia from practicing those of Qualcomm's patents that Qualcomm has declared are essential in FRAND declarations submitted to ETSI.

47.     Allowing Qualcomm to seek injunctive relief would defeat the purpose of the FRAND commitment. ETSI requests that patent holders agree to FRAND license terms to prevent them from using an SSO-enabled patent monopoly to extort excessive royalty rates after a technological standard has been approved.  However, if Qualcomm were allowed to enjoin companies from using its patents, it could ignore its FRAND obligations with impunity, using the threat of injunction to obtain royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would have no choice but to comply or risk losing their substantial investments in complying with the standard.  Thus, injunctive relief would give patent holders exactly the kind of *ex post* bargaining power and super-monopoly profits that the FRAND undertaking was intended to prevent.

48.     By agreeing in advance to accept a FRAND royalty for patents declared essential, Qualcomm has agreed that a FRAND royalty (as determined by a court in the event of a dispute) is adequate compensation for the use of its patents.  Additionally, because the purpose of the FRAND commitment is to facilitate swift implementation of the standard for the benefit of consumers, a grant of injunctive relief barring practice of the standard would disserve the public interest

49.     This controversy between Nokia and Qualcomm is real and adverse.  In the Southern District of California case, ITC proceedings, and a proceeding in an English court, Qualcomm has sought injunctive relief against Nokia, which would bar Nokia from using patents on which Qualcomm, by virtue of its FRAND declaration, has already granted a license to Nokia  As noted above, upon information and belief, Qualcomm is likely soon to seek injunctive relief in lawsuits against Nokia in other European countries.  Qualcomm's conduct in threatening injunctive relief

17

against the use of its GSM patents is in direct violation of ETSI policies and Qualcomm's own contractual commitment to FRAND.

50.    If Qualcomm is permitted to continue to wield the sword of an injunction threat, it may coerce Nokia into entering a license at a royalty rate that far exceeds the FRAND rate; Nokia would thereafter be contractually committed under a specific license agreement and would have no redress for Qualcomm's FRAND violation. Alternatively, if Nokia stands firm and refuses to pay a non-FRAND royalty, and if Qualcomm persuades some court in some jurisdiction to enjoin Nokia's manufacture of cell phones, Nokia's business will be substantially harmed.

51.    An additional problem arises from the fact that Qualcomm has filed, and is likely to file, injunctive actions in numerous jurisdictions in the United States and Europe. This multiplicity of actions poses a substantial risk that Nokia could be subject to inconsistent adjudications to the extent that some courts rule that Qualcomm's FRAND obligation precludes it from seeking injunctive relief, while other courts rule that Qualcomm is entitled to seek injunctive relief. This highlights the need for a single and prompt adjudication by this Court of the FRAND contractual obligations of Delaware citizen Qualcomm.

52.    Relatedly, if Qualcomm is permitted to pursue injunctions in multiple jurisdictions, and if Nokia is obligated to advance the FRAND defense in each such jurisdiction, Nokia will be forced to incur substantial litigation costs that, in jurisdictions following the American rule, are generally not compensable even if Nokia prevails. Again, a single and prompt adjudication of Qualcomm's right to seek injunctive relief avoids this problem.

53.    The issue involved in this controversy is ripe for judicial determination. Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by

18

the national courts of the member parties. Section 4.2 of ETSI's Guide on IPRs regarding Dispute Resolution states:

> ETSI Members should attempt to resolve any dispute related to the application of the IPR Policy bilaterally in a friendly manner. Should this fail, the Members concerned are invited to inform the ETSI GA in case a friendly mediation can be offered by other ETSI Members and/or the ETSI Secretariat. However, it should be noted that once an IPR (patent) has been granted, in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes.

In addition, Qualcomm's May 16, 2006 brief to the European Commission admits that "[i]n the case of dispute [regarding FRAND], it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."

54.    Accordingly, Nokia seeks a declaratory judgment that Qualcomm is not entitled to injunctive or exclusionary relief for any alleged infringement of any GSM or UMTS patents that Qualcomm has declared essential and agreed to license on FRAND terms. Nokia further seeks a declaratory judgment that Qualcomm's sole remedy for any alleged infringement of such patents is limited to payment of a royalty on FRAND terms, as determined by a court if the parties cannot agree.

55.    Qualcomm's pursuit of injunctions in spite of its agreement that its only remedy is a FRAND royalty constitutes a breach of its contractual obligation for which Nokia has no adequate remedy at law. Accordingly, Nokia seeks an order enjoining Qualcomm from pursuing an injunction or exclusionary order as a remedy for alleged infringement of any patent it has declared essential to ETSI.

## SECOND CLAIM FOR RELIEF

(Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*))

56.    Nokia repeats and realleges the allegations set forth in paragraphs 1-55 above as if set forth fully herein.

57.    An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to the meaning of FRAND.

58.    Pursuant to its contracts with ETSI, Qualcomm has agreed to license on FRAND terms any patents that Qualcomm has declared are essential to the GSM or UMTS standards.

59.    Notwithstanding its FRAND commitments, Qualcomm has refused to offer a FRAND royalty rate to Nokia on any patents it has declared essential to the GSM standard. Further, Qualcomm has refused to offer Nokia a FRAND royalty rate for the use of its declared-essential UMTS patents after April 2007 (when Qualcomm's current agreement not to assert its UMTS patents against Nokia expires). Instead, Qualcomm has demanded that Nokia accept license terms that are neither fair, nor reasonable, nor non-discriminatory, backing its demands with the threat of injunction as discussed *supra*.

60.    Under French law, Qualcomm's agreement to license its essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members, including Nokia. Nokia is therefore entitled to enforce Qualcomm's contractual commitment to FRAND.

61.    Qualcomm contends that FRAND does not impose any specific and concrete obligations on the licensor with regard to the actual level of royalties (or any other terms and conditions for that matter). In its motion to dismiss claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its promise to license its patents on FRAND terms is not legally enforceable. Thus, according to Qualcomm, there

is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance.

62.    Qualcomm's empty characterization of FRAND cannot be correct.  In any given situation, evidence will be available to show that the terms "fair, reasonable, and non-discriminatory" are sufficiently certain to be capable of judicial interpretation and enforcement, and impose substantive limits on Qualcomm's ability to impose excessive royalty rates or other onerous terms in its patent licenses.  Qualcomm has violated these limits by refusing to license its patents to Nokia on FRAND terms.

63.    Qualcomm contends that, despite its FRAND obligation, it can charge a royalty as high as the fear of an injunction can create.  Nokia, on the other hand, contends that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

64.    This controversy between Nokia and Qualcomm is real and adverse.  Qualcomm has refused to offer Nokia a FRAND royalty rate for its declared-essential GSM patents, and has threatened to enjoin Nokia from using patents on which Nokia is contractually entitled to a FRAND license.  Qualcomm has also refused to negotiate a FRAND royalty rate for declared-essential UMTS patents for the period after April 2007.

65.    The issue involved in this controversy is ripe for judicial determination.  Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by the national courts of the member parties.  Section 4.2 of ETSI's Guide on IPRs regarding Dispute Resolution states:

> ETSI Members should attempt to resolve any dispute related to the
> application of the IPR Policy bilaterally in a friendly manner. Should
> this fail, the Members concerned are invited to inform the ETSI GA
> in case a friendly mediation can be offered by other ETSI Members
> and/or the ETSI Secretariat. However, it should be noted that once an
> IPR (patent) has been granted, <u>in the absence of an agreement
> between the parties involved, the national courts of law have the sole
> authority to resolve IPR disputes.</u>

In addition, Qualcomm's May 16, 2006 brief to the European Commission, in an attempt to avoid

liability under Article 81 and 82, acknowledges that "[i]n the case of dispute [regarding FRAND], it

would be for a Court or similar authoritative body to resolve the particular disputes in the given

situation."

66.     Accordingly, Nokia seeks a declaratory judgment that Qualcomm's FRAND

commitments constitute binding contractual obligations, and defining the principles by which a

FRAND royalty must be calculated.

<u>THIRD CLAIM FOR RELIEF</u>

(Specific Performance)

67.     Nokia repeats and realleges the allegations set forth in paragraphs 1-66 above as if set

forth fully herein.

68.     Qualcomm has declared numerous patents to be essential to the UMTS standard

promulgated by ETSI.

69.     In connection with its declarations to ETSI, Qualcomm has agreed to license each of

its essential UMTS patents to all members of ETSI, including Nokia, on FRAND terms.

70.     Under French law, Qualcomm's agreement to license its essential UMTS patents on

FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI

members, including Nokia. Nokia is therefore entitled to enforce Qualcomm's contractual

commitment to FRAND.

71.    Notwithstanding its contractual obligations to ETSI and Nokia, Qualcomm has refused to negotiate a FRAND royalty rate for its UMTS patents for the period after April 2007.

72.    Nokia has no adequate remedy at law for Qualcomm's breach of its contractual obligation to license its essential patents on FRAND terms or to negotiate a FRAND royalty rate in good faith.

73.    Accordingly, Nokia is entitled to an order of specific performance ordering Qualcomm to participate in a good faith negotiation with Nokia for license of Qualcomm's essential UMTS patents on FRAND terms for the period after April 2007, in light of this Court's resolution of the dispute between the parties as to the method for determining a FRAND royalty.

### PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that this Court:

A.    Adjudge and decree that, by virtue of its express and implied FRAND commitments, Qualcomm has waived any right to seek, or is otherwise barred from seeking injunctive relief, including an exclusion or cease-and-desist order by the ITC, to prevent Nokia from using technology encompassed by any patents which Qualcomm has declared essential to the GSM or UMTS standards established by ETSI;

B.    Permanently enjoin Qualcomm worldwide from seeking such injunctive relief related to patents Qualcomm has declared essential to any standard;

C.    Adjudge and decree that Qualcomm's commitment to license its essential GSM and UMTS patents on FRAND terms is a binding contractual obligation, enforceable by Nokia;

D.    Order that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-

infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

    E.    Order that Qualcomm specifically perform its contractual obligation to negotiate a FRAND royalty rate with Nokia for the period after April 2007 for any patents Qualcomm has declared essential to UMTS, in light of this Court's determination of the method for calculating FRAND terms; and

    F.    That Nokia have such other and further relief as this Court may deem just and proper.

Of Counsel:

A. William Urquhart
Frederick A. Lorig
Patrick M. Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-254
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Rick Werder
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100

Dated: August 8, 2006

Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Telephone:   (302) 651-7700
Facsimile:   (302) 651-7701

Attorneys for Plaintiffs
Nokia Corporation and Nokia Inc.

# EXHIBIT B

EFiled: Aug 9 2006 9:53AM EDT
Transaction ID 12021331

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

NOKIA CORPORATION and NOKIA, INC.,  )
                                 )
           Plaintiffs,  )
                                 )
        v.  )          C.A. No. 2330
                                 )
QUALCOMM INCORPORATED,  )
                                 )
          Defendant.  )

## MOTION TO EXPEDITE PROCEEDINGS

Plaintiffs Nokia Corporation and Nokia, Inc. (collectively, "Nokia"), by and through their undersigned counsel, hereby move pursuant to Court of Chancery Rules 4 and 12(a) for entry of an Order in the form attached hereto expediting discovery and scheduling an expedited trial on the merits within six months. The grounds for this motion are as follows:

## FACTUAL BACKGROUND

1. As set forth more fully in the Complaint, this is an action brought to resolve a dispute between Defendant Qualcomm Incorporated ("Qualcomm") and Nokia related to the interpretation of a binding contract between the parties. Nokia respectfully requests that the Court enter a judgment: (1) enjoining Qualcomm, worldwide, from seeking an injunction against Nokia for alleged infringement of any patent Qualcomm has declared essential for any cellular telephone technology standard and agreed to license on fair, reasonable and non-discriminatory terms ("FRAND"); (2) finding that Qualcomm's FRAND declarations are enforceable contractual obligations; (3) declaring that for a FRAND royalty to be fair and reasonable it must be based on the following factors: the number of essential patents owned by the patent holder relative to all patents essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of

standardization; and (4) declaring the rights and obligations of the parties and requiring Qualcomm to comply with its obligations under the contract. If this Court does not grant Nokia the requested relief on an expedited basis, Nokia will be irreparably harmed by Qualcomm's oppressive and continued pursuit of injunctive relief in multiple venues throughout the world in violation of the parties' binding contract.

2.      Because a number of cellular telephone providers and manufacturers all use the same cellular transmitting towers to transmit and receive radio signals, wireless carriers, telephone manufacturers, and chipset manufacturers agree to follow a common set of industry standards for wireless communication technology. Compl. ¶ 14. The standards are developed, approved and monitored by a number of different standard-setting organizations. Compl. ¶ 15. As explained more fully in the Complaint, cellular telephone technology has progressed through a number of distinct generations. Compl. ¶¶ 16-17. Most current cellular technology is considered second-generation ("2G") technology and includes at least two distinct standards, Global Systems for Mobility ("GSM") and Code Division Multiple Access ("CDMA"). Compl. ¶ 18. The technologies underlying GSM and CDMA are not compatible and, therefore, once a wireless carrier chooses a particular standard, it invests substantial amounts of money in the technology and switching from one to the other is cost prohibitive. *Id.* Accordingly, the standard-setting organizations play an important role in regulating each technology and ensuring that all manufacturers and carriers can practice their chosen technology without fear of a lawsuit for infringement or the fear of an injunction.

3      Qualcomm has filed declarations for the benefit of Nokia with various standard-setting organizations, including the European Telecommunications Standards Institution ("ETSI"). ETSI is a standard-setting organization based in France that developed the standard for GSM technology and its third-generation successor, Universal Mobile Telephone System

- 2 -

("UMTS"), to be followed by cellular technology companies, including all carriers and manufacturers. Compl. ¶ 19. ETSI has developed an Intellectual Property Rights ("IPR") Policy which is governed by French law and, pursuant to French law, constitutes a binding contract between ETSI and its members, enforceable in the national courts of its members, including this Court (since Qualcomm is a Delaware corporation). Compl. ¶ 30. It is the provisions of this binding contract that are at issue in this case.

4.      When an organization such as ETSI sets out to develop an industry standard for a certain technology, it requires that its members identify all patents they hold which are essential to compliance with a proposed technology standard before the standard is adopted. Compl. ¶ 22. The patents identified are considered "essential patents." *Id.* The designation of essential patents is significant because it allows ETSI's members to consider all the relevant technologies and to adopt a standard knowing which patents are implicated and with the ability to make determinations accordingly. Compl. ¶ 25. This early consideration of patents before adopting the technology is important to the ETSI member companies but also serves to protect the interests of consumers, who are then assured that they will be able to purchase cellular phones and related technologies at reasonable prices not driven by monopolistic pricing. Compl. ¶ 14.

5.      Once a party designates an essential patent, ETSI requires that the party agree to license its patents to other members of ETSI on terms that are fair, reasonable and non-discriminatory ("FRAND"). Compl. ¶ 24. Specifically, Article 6.1 of ETSI's IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR . . . .

Compl. ¶ 24. Under French law, this commitment by a party such as Qualcomm to license essential patents constitutes a binding contract among ETSI members and their affiliates.

Compl. ¶ 30. This obligation is extremely important to ETSI members because it allows members to invest in a given technology, such as GSM or UMTS, without having to fear that it will be subject to opportunistic royalty payments to those companies who hold patents essential to the operation of the technology. Compl. ¶¶ 25, 29. If a patent holder will not agree to license its declared patents on FRAND terms, ETSI can decide not to include that technology in an industry standard, and instead use a non-infringing alternative. Compl. ¶ 25.

6.    Qualcomm, who is a member of ETSI through its affiliates, has declared that a number of its patents related to GSM and UMTS technologies are "essential" to the ETSI-adopted standards. As a result, Qualcomm is bound by the terms of the ETSI policies and owes certain obligations to other members, including Nokia. Compl. ¶¶ 21, 26, 30.

7.    By declaring its patents as "essential" and agreeing to license them on FRAND terms, Qualcomm gave up the right to pursue an injunction against other member companies utilizing the standards set by ETSI. Compl. ¶ 31. The forfeit of the right to an injunction is one of the most important aspects of the ETSI policies and is necessary to further protect companies, and their customers, from the threat of unreasonably high monopolistic royalties. Compl. ¶ 32.

8.    Unfortunately, despite Qualcomm's clear declaration of certain patents as essential and agreement to license those patents on FRAND terms, Qualcomm has refused to offer Nokia a FRAND royalty rate and has commenced litigation against Nokia in the Southern District of California, England, and the International Trade Commission ("ITC") seeking injunctions against Nokia in violation of ETSI IPR policies. Compl. ¶¶ 34-35. In addition, Qualcomm has threatened to file additional lawsuits seeking injunctions in other countries. Compl. ¶ 36. In the Southern District of California, Qualcomm has sued Nokia alleging infringement of twelve patents related to GSM technology. In England, Qualcomm has sued Nokia alleging infringement of two patents related to GSM technology. In both of these

lawsuits, Qualcomm is seeking damages and an injunction in violation of binding obligations under the ETSI IPR policies. Finally, Qualcomm has commenced an action in the ITC against Nokia related to six GSM patents where the sole remedy is an exclusion order against Nokia. In addition to seeking injunctions in three different venues, Qualcomm has refused, in negotiations with Nokia, to offer a FRAND royalty rate for GSM or UMTS patents declared essential to ETSI.

9.     Despite its refusal to offer Nokia FRAND terms, Qualcomm has admitted in filings in the EU that the ETSI IPR policies constitute a binding contract. Compl. ¶ 42. Specifically, Qualcomm admitted that "Fair Reasonable and Non-Discriminatory ('FRAND') obligations are part of a private agreement, a binding contract that is enforceable against each patent owner." *Id.* However, Qualcomm has also argued that FRAND does not impose any specific obligations on the licensor with regard to the level of royalties or any other terms and conditions for that matter, and has told a federal judge in New Jersey that its FRAND declarations are unenforceable. Thus, while Qualcomm recognizes the binding contract, it has refused to adhere to the terms of the contract and instead is attempting to extort unreasonably high royalty rates from other members of ETSI, including Nokia.

10.     Nokia will be irreparably harmed if this Court does not act promptly to resolve the dispute between the parties and declare that Qualcomm is contractually precluded from seeking an injunction on patents it has declared as essential to ETSI. Qualcomm has already sought injunctions in three proceedings and, based on Qualcomm's public threats and other sources, plans to seek an injunction in additional venues. Compl. ¶¶ 35-36, 49. If any one of these cases proceeds and an injunction issues against Nokia on a sub-set of Qualcomm's alleged essential GSM patents, Nokia's business will be irreparably harmed and Nokia could lose valuable market share or be closed out of the GSM market completely. Compl. ¶¶ 36, 50. The ITC proceeding in

particular poses a risk of irreparable harm requiring expedited relief because, under the ITC's current scheduling order, the ITC's investigation must be completed by no later than September 12, 2007, and the only relief available in that proceeding is an exclusion order (*i.e.*, injunctive relief).

11.     Furthermore, the threat of irreparable harm to Nokia is clearly shown by the fact that Qualcomm will seek injunctions in foreign jurisdictions that allow little or no process before issuing an injunction. Compl. ¶ ¶ 37-38.

12.     Nokia is therefore asking this Court to issue a declaration that Qualcomm's agreement to license its declared-essential patents on FRAND terms constitutes a binding contract that prevents Qualcomm from pursuing injunctive relief against Nokia in any forum. In addition, Nokia seeks an order declaring that a FRAND royalty must be based on the number of essential patents owned by the patent holder relative to all patents essential to the standard, and must take into account the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization. Finally, Nokia requests that the Court order Qualcomm to specifically perform the terms of its FRAND contract, by negotiating a FRAND royalty with Nokia on terms set by the Court.

## ARGUMENT

13.     The standard for expedited proceedings is well-settled. Expedited proceedings will be ordered where "the plaintiff has articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened irreparable injury[.]" *Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994). In applying this standard, this Court "traditionally has acted with a certain solicitude for plaintiffs" and "has followed the practice of erring on the side of more [expedited] hearings rather than fewer." *Id.* As a result, "[a] party's

RLF1 3044151.1

request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted. Exceptions to that norm are rare." *In re Int'l Jensen Inc. S'holders Litig.*, 1996 WL 422345, at *1 (Del. Ch. July 13, 1996). The Delaware Supreme Court has observed that "Delaware courts are always receptive to expediting any type of litigation in the interests of affording justice to the parties." *Box v. Box*, 697 A.2d 395, 299 (Del. 1997).

14.    Furthermore, Delaware courts frequently expedite proceedings in cases involving important contractual issues. *See, e.g., In re IBP, Inc. S'holders Litig.*, 789 A.2d 14 (Del. Ch. 2001); *US West, Inc. v. Time Warner, Inc.*, 1996 WL 307445, at *3 (Del. Ch. June 6, 1996) (expedited trial conducted in dispute involving claims for declaratory and injunctive relief respecting parties' rights and obligations pursuant to a contract); *Warner Communications Inc. v. Chris-Craft Indus., Inc.*, 1989 WL 51662, at *6 (Del. Ch. May 15, 1989) (granting plaintiff's motion for an expedited trial on claim for a declaratory judgment concerning the rights and obligations of the parties arising out of a stockholder agreement). This Court has ordered an expedited trial on the merits where resolution of the dispute affects the rights of the parties going forward pursuant to a contract. *Pfizer Inc. v. Warner-Lambert Co., et al.*, 1999 WL 33236245, at *1 (Del. Ch. Dec. 3, 1999). More specifically, this Court has previously expedited cases seeking specific performance of contracts. *See, e.g., Gilmore Servs., Inc. v. Nichols*, 1994 WL 369528, at *1 (Del. Ch. June 23, 1994) (expediting trial in action seeking specific performance of a contract to sell a funeral home).

15.    The standard for expedition is clearly met in this circumstance. The Complaint sets forth colorable claims for both specific performance and declaratory judgment. Under Delaware law, a party seeking the equitable remedy of specific performance must prove the existence and terms of an enforceable contract by clear and convincing evidence and must

RLF1-3046181-1

demonstrate that there is no adequate remedy at law. *See Minnesota Invco of RSA # 7, Inc. v. Midwest Wireless Holdings LLC*, 2006 WL 1596675, at *5 (Del. Ch. 2006). As set forth above and in more detail in the Complaint, Qualcomm's FRAND declarations pursuant to the ETSI IPR Policy constitute a binding contract under French law between, among others, Nokia and Qualcomm. While Qualcomm currently refuses to abide by its terms, Qualcomm has itself previously admitted that its FRAND declarations constitute a binding contract.

16.    It is also clear that no amount of monetary relief could repair the harm that Qualcomm's oppressive business practices could cause Nokia. If Qualcomm is not forced to abide by the terms of its contractual obligation under the ETSI IPR Policy and its FRAND declarations, Nokia will suffer irreparable harm. Specifically, Nokia will be forced to continue litigating in at least three venues under the threat of an injunction. Compl. ¶ 35. In addition, on information and belief, Qualcomm intends to file lawsuits in additional European jurisdictions where the standard for receiving an injunction is substantially lower and Nokia may be subject to an injunction without having an opportunity to present its FRAND-related defenses. Compl. ¶¶ 37-38. The Supreme Court has recognized that a plaintiff can demonstrate that it will be irreparably harmed if it can demonstrate it is exposed to a real danger of multiple suits. *See Chateau Apartments Co. v. The City of Wilmington*, 391 A.2d 205, 208 (Del. 1978). Here, the threat of multiple suits has already been realized, and there is a genuine threat of additional suits that will multiply the risk of irreparable harm to Nokia. In such a circumstance, the Court should exercise jurisdiction to "shield the plaintiff from a litigation which is evidently vexatious." 1 *Pomeroy's Equity Jurisprudence* § 254 (1941); *see also Tull v. Turek*, 147 A.2d 658, 664 (Del. 1958) ("[E]quity will give full relief to avoid a multiplicity of suits.").

17.    In addition to the irreparable harm Nokia will suffer because of the sheer number of suits instituted by Qualcomm, Nokia also faces the risk of inconsistent decisions and lost

market share. If Qualcomm were to succeed in being awarded an injunction in even one of the jurisdictions in which it has filed suit against Nokia, Nokia's business will be substantially harmed and Nokia may be closed out of certain markets or be forced to stop manufacturing certain products.    Compl. ¶¶ 36, 50.    In an ever-evolving market such as wireless communications, no amount of monetary damages could compensate Nokia if it is essentially closed out of certain markets or forced to shut down certain product lines. *See Instituform Tech., Inc. v. Insitu, Inc.*, 1999 WL 240347, at *15 (Del. Ch. Apr. 19, 1999) (finding irreparable harm posed by damage to "long-term marketing and customer relations" caused by defendant (citing *Roso-Lino Beverage Distrib., Inc. v Coca Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124, 125-27 (2d Cir. 1984) (termination of plaintiffs' beverage distributorship after 11 years threatened irreparable harm which would not be fully remedied by monetary relief)); *Jannort Leasing, Inc. v Econo Car Int'l, Inc.*, 475 F. Supp. 1282, 1294 (E.D.N.Y. 1979) ("[L]oss or destruction of a going business constitutes irreparable harm."); *Dickinson Med. Group v. Foote*, 1984 WL 8208, at *3, (Del Ch. May 10, 1984) (when former employee took customer list and could have caused her former employer to lose business, the former employer was threatened by immediate irreparable harm).

18.    In addition, Nokia's request for declaratory relief is an independent basis for expedition. Court of Chancery Rule 57, entitled "Declaratory Judgments," provides that "[t]he Court may order a speedy hearing of an action for a declaratory judgment." The purpose of a declaratory judgment action "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." 10 *Del C.* § 6512. Section 6512 further provides that the Delaware Declaratory Judgment Act, 10 *Del. C.* §§ 6501-6513 (the "Act"), "is to be liberally construed and administered." This Court, in construing the Act, has observed that "the principal, salutary purpose of the declaratory judgment procedure is to provide a technique

for early resolution of disputes where a party is suffering practical consequences from uncertainty arising from the assertion by another of a legal claim." *Schick Inc.* v. *Amalgamated Clothing and Textile Workers Union,* 533 A.2d 1235, 1241 (Del. Ch. 1987).

19.     Nokia has demonstrated above, and in further detail in the Complaint, that it is entitled to declaratory relief. In order for the Court to exercise declaratory judgment jurisdiction, the following four factors must be present:

> (1) it must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; and (4) the issue involved in the controversy must be ripe for judicial determination.

*Korn v. New Castle County,* 2005 WL 2266590, at \*5 (Del. Ch. Sept. 13, 2005). The dispute between Nokia and Qualcomm affects Nokia's rights and obligations and is ripe for judicial determination. Specifically, Qualcomm has, in certain instances, taken the position that its FRAND declarations constitute a binding contract (Compl. ¶ 42) and, in other circumstances, insisted that FRAND is not legally enforceable and that it is entitled to an injunction if Nokia refuses to pay even a non-FRAND royalty unilaterally set by Qualcomm (Compl. ¶ 40). If the rights and obligations of the parties are not determined by this Court on an expedited basis, Nokia will suffer irreparable harm by Qualcomm's continued breaches of its FRAND contract with Nokia.

20.     Accordingly, viewing the Complaint in the light most favorable to Nokia, it is clear that Nokia has asserted colorable claims for both declaratory judgment and specific performance.

21.     Finally, Nokia's proposed schedule is very reasonable in light of the important issues at stake. Specifically, Nokia is not seeking any preliminary relief but rather is requesting a

full trial on the merits within six months. Furthermore, the resolution of the entire dispute centers on the interpretation of only a few key contractual provisions between the parties and it is essential to Nokia's business that it have resolution on these important issues as soon as possible. The parties will have ample opportunity to develop the record for the Court in the time frame requested by Nokia. Nokia's proposed schedule, while accelerated, will not pose any undue burden on Qualcomm and any burden is certainly outweighed by the threat to Nokia's business if Qualcomm's abusive tactics are not promptly addressed by this Court.

## CONCLUSION

This case warrants expedited treatment. In light of the need for prompt relief, and subject to the convenience of the Court, Nokia respectfully requests that the Court enter an Order requiring Qualcomm to respond to the Complaint on an expedited basis, ordering the parties to engage in expedited discovery and ordering an expedited trial on the merits of Nokia's claims within six months.

OF COUNSEL:

A. William Urquhart
Frederick Lorig
Patrick Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Rick Werder
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Dated: August 8, 2006

Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19899
(302) 651-7700

Attorneys for Plaintiffs Nokia Corporation
and Nokia, Inc.

RLF1-3046181-1

# EXHIBIT C

FROM RL&F                                (WED) 8. 9'06 19:50/ST. 19:49/NO. 4864902958 P   3

## RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
LISA A. SCHMIDT                WILMINGTON, DELAWARE 19801            DIRECT DIAL NUMBER
(302) 651-7700                302-651-7763
FAX (302) 651-7701            SCHMIDT@RLF.COM
WWW.RLF.COM

August 9, 2006

### VIA E-FILING & HAND DELIVERY

Honorable Leo E. Strine, Jr.
Court of Chancery
New Castle County Courthouse
500 N. King Street, Suite 11400
Wilmington, DE 19801

Re:    *Nokia Corporation and Nokia Inc. v. Qualcomm Incorporated,*
*C.A. No. 2330*

Dear Vice Chancellor Strine:

Enclosed please find the complaint (the "Complaint") and motion to expedite proceedings ("Motion to Expedite") filed in the above-referenced matter. We have been advised that Your Honor has been assigned to this matter. We are writing on behalf of plaintiffs Nokia Corporation and Nokia Inc. (collectively, "Nokia"), to request a time for plaintiffs to present their Motion to Expedite.

This action seeks declaratory relief and specific performance to enforce the terms of a contract in which Qualcomm Inc. ("Qualcomm"), a Delaware corporation, has agreed to license Nokia to practice Qualcomm patents on fair, reasonable, and non-discriminatory ("FRAND") terms. As set forth in the Complaint, Qualcomm has induced various standard-setting organizations including the European Telecommunications Standardization Institute ("ETSI") to incorporate Qualcomm's patented technology into industry standards for cellular phone products and equipment by contractually agreeing to license those patents on FRAND terms. Qualcomm has breached its contractual obligations by demanding a royalty rate that exceeds FRAND terms and by threatening to enjoin Nokia from manufacturing or selling products that Qualcomm alleges practice the essential patents. Nokia seeks: (1) a declaratory judgment that Qualcomm is not entitled to injunctive relief for any alleged infringement of patents that Qualcomm has committed to license on FRAND terms; (2) a declaratory judgment that Qualcomm's FRAND commitments constitute binding contractual obligations; (3) an order of specific performance ordering Qualcomm to participate in good faith negotiations with Nokia for license of Qualcomm's essential patents on FRAND terms; and (4) an order enjoining Qualcomm from pursuing injunctions in other jurisdictions for alleged infringement of any patents it has declared essential to ETSI.

FROM RL&F

Honorable William B. Chandler, III
August 9, 2006
Page 2

As set forth in the Motion to Expedite, Qualcomm has already initiated three proceedings seeking injunctive relief or an exclusionary order and has threatened further proceedings in additional jurisdictions. Nokia seeks to promptly present to this Court the issue of whether Qualcomm has contractually waived the right to seek such relief.

Accordingly, Nokia respectfully requests that Your Honor provide us with a time to present the Motion to Expedite at the Court's earliest convenience. We are available should Your Honor have any questions about the foregoing.

Respectfully submitted,

*Lisa A. Schmidt*

Lisa A. Schmidt (#3019)

LAS/lh

cc:    Register in Chancery
       The Prentice-Hall Corporation System, Inc.

RLF1-3046035-1

FROM RL&F

# EXHIBIT A

RLF1-2701998-1

FROM RL&F                                    (WED) 8. 9' 06 19:51/ST. 19:49/NO. 4864902958 P  6

EFiled: Aug 9 2006 9:53AM EDT
Transaction ID 12021331

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

NOKIA CORPORATION and NOKIA INC.,

        Plaintiffs,

      v.                        C.A. No. 2330

QUALCOMM INC.,

        Defendant.

## COMPLAINT

Plaintiffs Nokia Corporation and Nokia Inc. (collectively, "Nokia"), by and through their undersigned counsel, allege the following as and for their Complaint against defendant Qualcomm Inc. ("Qualcomm"):

## NATURE OF THE ACTION

1.    Nokia seeks declaratory relief and specific performance to enforce the terms of contracts in which Qualcomm, a Delaware corporation, has licensed Nokia to practice Qualcomm essential patents on fair, reasonable, and non-discriminatory terms ("FRAND" terms).  As hereinafter alleged, Qualcomm has induced various standard-setting organizations ("SSOs"), including the European Telecommunications Standardization Institute ("ETSI"), to incorporate Qualcomm's patented technology into industry standards for cellular phone products and equipment by contractually agreeing to license those patents on FRAND terms.  However, Qualcomm has breached its contractual obligations by demanding a royalty rate that exceeds FRAND terms and by threatening to enjoin Nokia from manufacturing or selling products that Qualcomm alleges practice the licensed essential patents unless Qualcomm's demands for unfair and unreasonable royalties are

RLF1-3046183-1

accepted. Qualcomm has further breached its contractual obligations by refusing to negotiate FRAND royalty rates in good faith.

2.      Nokia seeks a judicial declaration establishing that Qualcomm's FRAND commitments constitute binding and enforceable contractual obligations licensing its declared-essential patents to Nokia on FRAND terms, which includes a FRAND royalty, and setting forth the method by which the FRAND royalty is to be calculated.

3.      In addition, Nokia seeks a judicial declaration that, by contracting to license its declared-essential patents to Nokia on FRAND terms, Qualcomm has waived the right to seek injunctive relief to restrain the use of those declared-essential patents. In the event of a dispute between the parties (including the filing of any infringement action in any country), Qualcomm's remedy is limited to recovery of a FRAND royalty as determined by a court.

4.      Accordingly, Nokia seeks an order enjoining Qualcomm worldwide from seeking an injunction or an exclusionary order as a remedy for alleged infringement of any declared-essential patents which it has contractually agreed to license on FRAND terms.

5.      Finally, Nokia seeks an order compelling specific performance requiring that Qualcomm participate in a good faith negotiation on the amount of a FRAND royalty, recognizing the principles that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization, and such other factors as the court deems fair and proper under the circumstances.

2

## PARTIES AND JURISDICTION

6.    Plaintiff Nokia Corporation is a corporation organized under the laws of Finland, with its principal place of business located in Espoo, Finland.

7.    Plaintiff Nokia Inc. is a United States subsidiary of Nokia Corporation. Nokia Inc. is a corporation organized under the laws of the State of Delaware, with its headquarters located in Irving, Texas. Nokia Corporation and Nokia Inc. are collectively referred to herein as "Nokia."

8.    Nokia is a world leader in the field of mobile communications. Nokia's primary line of business is the manufacture and sale of cellular telephone handsets. Nokia also manufactures and sells infrastructure used in cellular telephone networks, and owns substantial intellectual property rights in cellular telephone technologies.

9.    Defendant Qualcomm Inc. ("Qualcomm") is a corporation organized under the laws of Delaware.  One of Qualcomm's business units, called the Technology Licensing Segment, or "QTL," licenses intellectual property rights in cellular telephone technology.  Qualcomm also manufactures and sells chipsets for use in cellular telephones through a separate business unit called the CDMA Technologies Segment, or "QCT."

10.    Both Qualcomm and Nokia are members of a European SSO, ETSI, which has standardized the technology needed for cellular telephones.  In accordance with the terms of their agreement with ETSI (described further below), each company has licensed, by means of declarations to ETSI, its essential patents to the other on FRAND terms.

11.    ETSI's Rules of Procedure provide that any dispute regarding the interpretation or application of ETSI policies must be resolved in the national courts of the member parties, applying French law. Under French law, Qualcomm's undertaking to license its essential patents on FRAND terms creates a binding and enforceable license agreement between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. Additionally, Qualcomm's contractual obligation

3

FROM RL&F

includes a duty to negotiate in good faith to determine a FRAND royalty rate. Under ETSI rules,

Nokia is entitled to enforce that contract against Qualcomm in this Court because Qualcomm is a

Delaware corporation.

## DEVELOPMENT OF CELLULAR TELEPHONE TECHNOLOGY STANDARDS

12.     For a cellular telephone to work, it must be able to transmit and receive radio signals

to and from cellular transmitting towers, and be able to maintain its signal as it is passed from one

tower to the next. All components of a wireless system must be able to interact with each other

seamlessly, regardless which company or companies manufacture the various components. This

includes the transmitting towers, the switches, the telephones, the chipsets that allow the telephones

to communicate with the towers, and the chipsets that allow the towers to receive and transmit data

to the switches for retransmission to the landline network or other cellular networks and cellular

telephones. To meet these requirements, all components in a single cellular system must be

"interoperable" and work effectively and efficiently with all other components.

13.     In order to ensure that components from different companies can interact with one

another and that products can be brought to the marketplace expeditiously, wireless carriers,

telephone manufacturers, and chipset manufacturers must follow a common set of industry standards

for wireless communication technology. Thus, for decades, cellular service providers and cellular

product manufacturers have been members of SSOs that exist to create a common set of standards

that all members can follow. In return, the SSOs demand that their members license patents that are

essential to any standard on FRAND terms, rather than use the threat of injunction to exploit the

existence of the standard to extort super-monopoly royalties.

14.     Once a given standard has been selected, the patents essential to that standard gain

value because competing technologies are effectively eliminated from the marketplace. The

technology monopoly granted to essential patent holders results in the establishment of a significant

4

base of royalty payers and insures a revenue stream to essential patent holders. Once capital investments (on the order of billions of dollars) are made to comply with the standard, cellular equipment manufacturers and network service providers are locked into the technology and into paying royalties to holders of essential patents. This lock-in confers upon patent holders the ability, if unrestrained, to extort super-monopoly royalties from prospective licensees using the threat of lawsuit and injunction. SSOs protect their members and the public from such opportunistic behavior by obligating patent holders to license their essential patents on FRAND terms. This obligation prevents the patent holder from appropriating for itself (rather than consumers) the value of having an industry standard.

15.    In simple terms, the standard-setting process involves: (1) an evaluation of competing technologies to determine which best suits the market need; (2) a patent clearance process where the SSO's members unequivocally agree in writing that any patent that is essential to practice the standard is licensed to all on FRAND terms; and (3) the approval and adoption of the standard. The patent clearance process is always completed before the standard is adopted and implemented to insure that no member may use its patents to impede competition (i.e., charge exorbitant royalty rates for patents that must be used by all market participants because they are essential to practice the standard) or exclude participants from the marketplace (i.e., by using injunctions and exclusionary tactics to block a patent's use). If members do not agree to their license essential patents on FRAND terms, SSOs look to alternative technologies where patent clearance is available.

16.    Cellular telephone standards have evolved through distinct "generations" as consumers have demanded additional features and technology owners have developed new innovations. The earliest cellular telephones operated on analog technology and allowed only voice transmission and very slow transmission of data over analog cellular airwaves. These early analog

systems are typically referred to as first-generation ("1G") technology. 1G technology was characterized by inherent capacity limitations, minimal and slow data transfer capabilities, low security, inconsistent service levels, and significant power consumption.

17.    Consumers' increased demand for cellular service and for added performance drove the development of a second generation of cellular telephone technology ("2G"). 2G telephones, which are based on digital technology, provide significantly increased voice and data capacity and also support additional functions, such as paging and e-mail. 2G technology also offers greater privacy, greater fraud protection, and lower prices as compared to 1G technology. Most cellular telephones in use today are based on 2G technology standards.

18.    The three principal 2G standards in use today are called Global System for Mobility ("GSM"), Time Division Multiple Access ("TDMA"), and Code Division Multiple Access ("CDMA"). The technical parameters and specifications of each 2G technology were reviewed and approved by various SSOs. The three technologies are based on different underlying air interface and transmission regimes. Thus, as a general proposition, GSM-based hardware components will not work on a CDMA or TDMA system, TDMA components will not work on a GSM or CDMA system, and CDMA components will not work on a GSM or TDMA system. As more fully described below, a third generation of wireless technology ("3G"), which will allow significantly increased data speed and capacity, is currently being deployed and is one of the subjects of this action.

## THE FRAND CONTRACTS

19.    As set forth below, Qualcomm has entered into contractual agreements with ETSI and ETSI's members, including Nokia, that Qualcomm will license on FRAND terms any of its patents that are essential to the GSM standard or its third-generation successor, Universal Mobile Telephone System ("UMTS").

6

FROM RL&F                                                (WED) 8. 9'06 19:52/ST. 19:49/NO. 4864902958 P 12

20.    ETSI is a non-profit European SSO headquartered in France. It was under ETSI's auspices that the GSM technology standard was developed, reviewed, and approved.

21.    Qualcomm is a member of ETSI because its affiliates Qualcomm Europe S.A.R.L. and Qualcomm UK Ltd are members and ETSI defines "member" to include affiliates. Thus, as described below, Qualcomm itself filed FRAND undertakings with ETSI. Nokia is also a member of ETSI.

22.    Like other SSOs, ETSI requires its members to identify all patents they hold that may be essential to compliance with a proposed technology standard—referred to as "essential patents"— before the standard is adopted. ETSI's Intellectual Property Rights ("IPR") Policy provides that "each MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 4.1. The purpose of this disclosure requirement is obvious: to avoid a "patent ambush" situation where a party that holds essential patents sits on the sidelines during the standard-setting process and then holds up industry participants for unexpected and unanticipated royalties for technology that is essential to practice the standard.

23.    ETSI's IPR Policy specifically defines an IPR as "essential" where "it is not possible on technical but not commercial grounds, taking into account normal technical practice and the state of art generally available at the time of standardization, to make, sell, lease, otherwise dispose of,

7

FROM RL&F

repair, use or operate equipment or methods which comply with a standard without infringing that IPR." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 15.6.

24.    ETSI also requests that patent holders license their essential patents to other parties on fair, reasonable, and non-discriminatory terms ("FRAND" terms).  Article 6.1 of ETSI's IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR . . . .

25.    In short, to avoid the problems of creating market power by adopting an industry standard, ETSI requires its members not only to disclose their essential patents, but agree to license those patents on FRAND terms.  If a patent holder will not agree to license its declared patents on FRAND terms, ETSI can decide not to include that technology in an industry standard, and instead use a non-infringing alternative  See ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 8.  If the patent holder does agree to license its essential patents on FRAND terms, other companies in the industry can invest in and deploy the standard without concern that they will be enjoined from using the technology or be forced to pay an unreasonably high royalty for a patent that is essential to practice the standard

26.    Qualcomm violated its disclosure obligations to ETSI by waiting to declare certain Qualcomm patents as essential to GSM until the industry had made substantial investments in GSM technology.  Indeed, Qualcomm did not declare any of its patents essential to GSM until many years after the standard had been set, and it has declared some as recently as this year.  However, when Qualcomm did belatedly declare its patents essential to the GSM standard, it expressly agreed in writing to license those patents to all members of ETSI, including Nokia, on FRAND terms.

27.    In the late 1990s, ETSI began considering candidate technologies for the 3G UMTS standard that would have worldwide application. ETSI and its members considered a number of solutions, including WTDMA (which was based on TDMA technology that did not infringe any known Qualcomm patents), WCDMA (which Qualcomm claimed included some of its patents), and CDMA 2000 (which Qualcomm claimed relied almost completely on its patents). ETSI ultimately decided to adopt WCDMA technology as the 3G UMTS standard.

28.    At the outset of the ETSI standard-setting process, Qualcomm refused to license its patents on FRAND terms for 3G use. Subsequently, however, on March 25, 1999, as part of the settlement of a lawsuit between Ericsson and Qualcomm involving cross-claims of patent infringement, Qualcomm finally agreed to license its WCDMA patents that were allegedly essential to the ETSI-proposed UMTS standard on FRAND terms to the rest of the industry. On June 25, 1999, Qualcomm submitted a letter to ETSI stating: "Qualcomm hereby commits . . . to license its essential patents for each single CDMA standard or any of its of its modes [including UMTS] on a fair and reasonable basis free from unfair discrimination." This promise provided ETSI members with the patent clearance required to make the huge capital investment that would lock them into a UMTS standard that included Qualcomm's WCDMA technology.

29.    The ability to use standard-essential technology without threat of a technology "monopolist" royalty rate or the threat of an injunction that would stop sales or operations is an important characteristic of the cell phone industry: once a wireless carrier elects to deploy an SSO-approved standard, switching to another standard may cost hundreds of millions if not billions of dollars and cause substantial disruption to consumers. Thus, if Qualcomm had not agreed with ETSI to license its declared-essential WCDMA patents on FRAND terms, WTDMA or another technology

9

would have been selected in lieu of WCDMA. This underscores the importance of holding Qualcomm to its contractual FRAND obligation.

30    Under French law, Qualcomm's agreement to license its declared-essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. ETSI's Rules of Procedure provide that any dispute concerning the interpretation or application of ETSI policies must be resolved by the national courts of its members. Both Nokia Inc. and Qualcomm are Delaware corporations. Nokia is therefore entitled to apply to this Court to enforce and resolve the current dispute as to Qualcomm's contractual commitment to FRAND.

## A COMMITMENT TO FRAND NECESSARILY WAIVES ANY RIGHT TO INJUNCTIVE RELIEF

31.    When Qualcomm contractually agreed in writing to license its declared-essential patents on FRAND terms, it granted irrevocable patent license rights to all other members of ETSI, and gave up the traditional patent holder's right to enjoin others from practicing the technology incorporated in those patents. The only remedy for the use of Qualcomm declared-essential patents is a FRAND royalty, to be determined *ex post* by a court in the event of a dispute between Qualcomm and the licensee.

32.    Allowing a patent holder who has exchanged a FRAND commitment for the benefits of having patented technology included in a standard to seek injunctive relief would defeat the entire purpose of FRAND and the ETSI IPR Policy. As set forth above, the patent holder would be able to use the threat of injunction to extort royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would be forced to comply with unjustified royalty demands or risk losing their substantial investments in complying with the standard. If injunctions were to be allowed, essential patent users would be reluctant to invest in and deploy technologies until and

unless specific royalty terms were reached with every alleged essential patent holder. The public interest would also suffer because roll-out of standard-compliant products and new technologies would be delayed, defeating one of the key purposes of standard-setting (to promote swift implementation).

33.    The delays and impediments imposed on the industry by the threat of injunctions prohibiting use of technologies deemed essential for new services would also contravene Articles 81 and 82 of the European Community Treaty, which, as detailed below, are designed to assure that conduct that eliminates competition from the marketplace (such as an SSO's choice of one technology over other candidate technologies as the standard) has an overall public welfare benefit (*i.e.*, passing the network benefits on to consumers rather than allowing patent owners appropriate the benefit for themselves by demanding excessive *royalties*). ETSI imposes FRAND obligations on its members specifically to preclude this kind of unequal *ex post* bargaining power.

## QUALCOMM HAS BREACHED ITS CONTRACTUAL OBLIGATION TO LICENSE ITS DECLARED-ESSENTIAL GSM AND UMTS PATENTS ON FRAND TERMS AND IS USING THE THREAT OF INJUNCTIONS TO EXTORT UNJUSTIFIED ROYALTIES IN VIOLATION OF THE TERMS OF ITS ETSI COMMITMENT

34.    Despite having made numerous FRAND commitments to ETSI in connection with GSM and UMTS patents that Qualcomm has declared essential to those standards, Qualcomm has refused to honor its contract to license its patents on FRAND terms. Instead, it has used litigation and the threat of injunction to attempt to extort exorbitant royalty rates from cellular telephone manufacturers.

35.    To date, Qualcomm has filed three separate patent infringement suits against Nokia seeking injunctive or exclusionary relief for alleged infringement of patents allegedly essential for the GSM standard: one in the United States District Court for the Southern District of California (San Diego division), one in the United Kingdom, and one in the United States International Trade

Commission (ITC). In the proceeding before the ITC the only relief requested is injunctive in nature, excluding Nokia from importing products that Qualcomm contends infringe on patents it has declared essential to the ETSI GSM standard. These requests for injunctive relief are wholly inconsistent with Qualcomm's unequivocal contractual commitment to ETSI to license these patents to Nokia on FRAND terms.

36.    Qualcomm has clearly indicated that additional injunction suits will follow. During Qualcomm's third-quarter 2006 earnings conference call with analysts, Qualcomm President Steve Altman asserted that in cases where Qualcomm patents are allegedly being infringed, "we would look and seek injunctions in a variety of markets . . . ." The current litigation and the assertions of future injunctive proceedings cause irreparable and immeasurable harm to Nokia by creating uncertainty regarding the ability of Nokia to continue to manufacture and sell GSM standard-compliant products.

37.    Nokia is also justifiably concerned about the potential that Qualcomm may leverage its standards-granted technology monopoly to obtain unjustified injunctive relief in violation of Qualcomm's ETSI commitments in jurisdictions that will not afford Nokia adequate due process. In a number of European jurisdictions there are procedures available to plaintiffs to seek preliminary injunctions without giving defendants (such as Nokia) an opportunity to be heard at the time the injunction is being sought  The plaintiff may not even be under a duty in certain jurisdictions to give the court full and frank information concerning the case at that initial stage. A preliminary injunction may be granted without there being any consideration of equities, or of whether the patentee could be adequately compensated by damages alone  Furthermore, a preliminary injunction may be granted without any bond or undertaking being required from the patentee to pay for the damage caused to Nokia by a preliminary injunction that is later determined to have been

FROM RL&F

erroneously granted. To the extent that Qualcomm is permitted to seek such relief in violation of its ETSI contract, Nokia would suffer irreparable and immeasurable harm because it would never be able to adequately determine in financial terms the extent of Nokia damage.

38.     These concerns are not merely a theoretical possibility. Certain European courts have granted preliminary injunctions even where the patent concerned was relevant to an industry standard and the defendant had indicated a willingness to enter into a license. In Germany, for example, the court is required, under section 139, paragraph 1 of the German Patents Act, to grant permanent injunctive relief where infringement is found. And even though the court must weigh the interests of the parties at the preliminary injunction stage, this can be conducted *ex parte* and therefore Nokia would not have any opportunity to be heard. Similarly, in the Netherlands, the court is not obligated to take the balance of convenience into account and it rarely does so.

39.     Qualcomm's injunction strategy, in contravention of its FRAND commitments, is an attempt to give it leverage to demand royalty rates wholly out of proportion to the number or value of its patents essential to a particular standard. For example, Qualcomm has generally demanded the same royalty rate for its patents essential to its initial proprietary Common Air Interface CDMA technology (where, in practice, it holds close to 100% of the essential patents), as it demands for its patents essential to the IS-95 CDMA standard (where it holds some 80% of the essential patents), as it demands for the CDMA2000 family of standards (where it holds less than 50% of the essential patents), and as it demands for UMTS (where studies show it holds at most 20% of the essential patents). Moreover, on information and belief, Qualcomm owns less than 3% of the essential patents for GSM. Nevertheless, Qualcomm demands that many of its licensees cross-license Qualcomm (giving rights to the licensee's intellectual property rights not only to Qualcomm but also to Qualcomm's chipset customers) for their declared-essential patents, even where the licensee holds a

much larger portfolio of essential patents for the standard. These positions by Qualcomm do not comply with their contractual FRAND commitment to ETSI.

## QUALCOMM'S CONTRADICTORY STATEMENTS AND ACTIONS CONCERNING FRAND

40.    Qualcomm has adopted multiple and conflicting views of its FRAND obligations. In a motion to dismiss antitrust and other claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its agreement to license its patents on FRAND terms is not legally enforceable.[1] Thus, according to Qualcomm, there is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance. In complaints filed before the International Trade Commission, the United States District Court for the Southern District of California, and an English court, Qualcomm has claimed that, despite its FRAND declarations (which constitute an irrevocable agreement to license its essential patents), it is entitled to an injunction if the initial terms it unilaterally offers are rejected. In negotiations with Nokia, Qualcomm has declared that, despite its contrary written commitments, unless it is paid a royalty that Nokia believes bears no relationship to a FRAND royalty, it will seek injunctions to bar Nokia from selling its products to consumers.

41.    Under French law, the terms and enforceability of Qualcomm's contractual commitments must be interpreted, as far as possible, in a manner consistent with Articles 81 and 82 of the European Community Treaty, which prohibit anticompetitive conduct. Specifically, even apart from its FRAND commitments, Article 81 imposes a duty on Qualcomm to license its patents essential to standards on FRAND terms. Article 81(3) provides that, in order to comply with Article

---

[1]    *See Broadcom Corp. v. Qualcomm Inc.*, Civ. A. No. 05-3350(MLC) (D.N.J.), Memorandum in Support of Defendant's Motion to Dismiss (filed Dec. 12, 2005), at 15 (arguing that Broadcom's action to enforce FRAND should be dismissed because FRAND is "susceptible of multiple interpretations" and does not have one universally accepted meaning).

81, an agreement of this kind must confer a fair share of resulting benefits on consumers and should not create the possibility of eliminating competition in respect of a substantial proportion of the products in question. SSO members would be able to deny a fair share of benefits to consumers, and substantially to eliminate competition in the instant context, if one or more of them could withhold licenses from downstream competitors, or make such licenses available only on excessively onerous terms. That is why, in order to comply with Article 81, the FRAND commitment must be effective to prevent such serious economic consequences. If an SSO member could retain all or most of the benefits of the standard and simultaneously refuse fair, reasonable, and non-discriminatory treatment to competitors that it particularly wanted to disadvantage (especially after prospective licensees had made large investments in the standard and were locked in), Article 81 would have no practical effect.

42.    In 2005, Ericsson, NEC, Texas Instruments, Broadcom, Panasonic, and Nokia asked the Commission of the European Communities Directorate-General Competition to investigate Qualcomm's anticompetitive conduct, under Articles 81 and 82, in the markets for CDMA and WCDMA cellular telephone technology and chipsets, including its failure to comply with FRAND obligations. In its May 16, 2006 brief to the European Commission, to attempt to avoid claims under Articles 81 and 82, Qualcomm made a number of critical admissions regarding FRAND, which contradict its public statements in the United States (including in the three patent infringement suits discussed above) that its FRAND commitments are unenforceable:

- "Fair Reasonable and Non-Discriminatory ('FRAND') obligations are part of a private agreement, a binding contract that is enforceable against each patent owner."

- "[T]he aim of FRAND is to ensure that whatever standard is developed remains available. A FRAND commitment is intended to prevent an outright refusal to license or the setting of royalty rates so high that they have the effect of preventing licensing . . . ."

- "In the case of dispute, it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."

- "A court procedure would involve an assessment of the number of truly essential patents necessary to practice a given standard or the appropriate royalty base or even the general business conditions prevailing for the given licensed technology."

43.    Qualcomm's selective interpretations of its FRAND obligation that appear to be dependent upon Qualcomm's purpose in specific litigation would render FRAND meaningless and defeat the entire purpose of the ETSI's FRAND requirement. Because of these shifting, self-serving definitions, Nokia asks this court for an order defining the terms and conditions surrounding Qualcomm's FRAND commitment and for an order upholding and affirming Qualcomm's agreement to license patents declared essential on FRAND terms pursuant to its contract with ETSI. This court's intervention is required to stop Qualcomm from charging monopolistic prices to license its declared-essential patents.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*), and Injunctive Relief)

44.    Nokia repeats and realleges the allegations set forth in paragraphs 1-43 above as if set forth fully herein.

45.    An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to whether Qualcomm can obtain injunctive relief in light of its contractual agreement to license its declared-essential patents on FRAND terms.

46.    By entering into contracts with ETSI and ETSI's members to license its essential GSM and UMTS patents on FRAND terms, Qualcomm gave up any right to enjoin Nokia from the use of those patents. Pursuant to its FRAND declarations, Qualcomm granted an irrevocable license on FRAND terms to Nokia and all other members of ETSI and waived any right to seek injunctive

relief or an exclusionary order, which would bar Nokia from practicing those of Qualcomm's patents that Qualcomm has declared are essential in FRAND declarations submitted to ETSI.

47. Allowing Qualcomm to seek injunctive relief would defeat the purpose of the FRAND commitment. ETSI requests that patent holders agree to FRAND license terms to prevent them from using an SSO-enabled patent monopoly to extort excessive royalty rates after a technological standard has been approved. However, if Qualcomm were allowed to enjoin companies from using its patents, it could ignore its FRAND obligations with impunity, using the threat of injunction to obtain royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would have no choice but to comply or risk losing their substantial investments in complying with the standard. Thus, injunctive relief would give patent holders exactly the kind of *ex post* bargaining power and super-monopoly profits that the FRAND undertaking was intended to prevent.

48. By agreeing in advance to accept a FRAND royalty for patents declared essential, Qualcomm has agreed that a FRAND royalty (as determined by a court in the event of a dispute) is adequate compensation for the use of its patents. Additionally, because the purpose of the FRAND commitment is to facilitate swift implementation of the standard for the benefit of consumers, a grant of injunctive relief barring practice of the standard would disserve the public interest

49. This controversy between Nokia and Qualcomm is real and adverse. In the Southern District of California case, ITC proceedings, and a proceeding in an English court, Qualcomm has sought injunctive relief against Nokia, which would bar Nokia from using patents on which Qualcomm, by virtue of its FRAND declaration, has already granted a license to Nokia As noted above, upon information and belief, Qualcomm is likely soon to seek injunctive relief in lawsuits against Nokia in other European countries. Qualcomm's conduct in threatening injunctive relief

against the use of its GSM patents is in direct violation of ETSI policies and Qualcomm's own contractual commitment to FRAND.

50.    If Qualcomm is permitted to continue to wield the sword of an injunction threat, it may coerce Nokia into entering a license at a royalty rate that far exceeds the FRAND rate; Nokia would thereafter be contractually committed under a specific license agreement and would have no redress for Qualcomm's FRAND violation. Alternatively, if Nokia stands firm and refuses to pay a non-FRAND royalty, and if Qualcomm persuades some court in some jurisdiction to enjoin Nokia's manufacture of cell phones, Nokia's business will be substantially harmed.

51.    An additional problem arises from the fact that Qualcomm has filed, and is likely to file, injunctive actions in numerous jurisdictions in the United States and Europe. This multiplicity of actions poses a substantial risk that Nokia could be subject to inconsistent adjudications to the extent that some courts rule that Qualcomm's FRAND obligation precludes it from seeking injunctive relief, while other courts rule that Qualcomm is entitled to seek injunctive relief. This highlights the need for a single and prompt adjudication by this Court of the FRAND contractual obligations of Delaware citizen Qualcomm.

52.    Relatedly, if Qualcomm is permitted to pursue injunctions in multiple jurisdictions, and if Nokia is obligated to advance the FRAND defense in each such jurisdiction, Nokia will be forced to incur substantial litigation costs that, in jurisdictions following the American rule, are generally not compensable even if Nokia prevails. Again, a single and prompt adjudication of Qualcomm's right to seek injunctive relief avoids this problem.

53.    The issue involved in this controversy is ripe for judicial determination. Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by

the national courts of the member parties. Section 4.2 of ETSI's Guide on IPRs regarding Dispute Resolution states:

> ETSI Members should attempt to resolve any dispute related to the application of the IPR Policy bilaterally in a friendly manner. Should this fail, the Members concerned are invited to inform the ETSI GA in case a friendly mediation can be offered by other ETSI Members and/or the ETSI Secretariat. However, it should be noted that once an IPR (patent) has been granted, <u>in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes.</u>

In addition, Qualcomm's May 16, 2006 brief to the European Commission admits that "[i]n the case of dispute [regarding FRAND], it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."

54.    Accordingly, Nokia seeks a declaratory judgment that Qualcomm is not entitled to injunctive or exclusionary relief for any alleged infringement of any GSM or UMTS patents that Qualcomm has declared essential and agreed to license on FRAND terms. Nokia further seeks a declaratory judgment that Qualcomm's sole remedy for any alleged infringement of such patents is limited to payment of a royalty on FRAND terms, as determined by a court if the parties cannot agree.

55.    Qualcomm's pursuit of injunctions in spite of its agreement that its only remedy is a FRAND royalty constitutes a breach of its contractual obligation for which Nokia has no adequate remedy at law. Accordingly, Nokia seeks an order enjoining Qualcomm from pursuing an injunction or exclusionary order as a remedy for alleged infringement of any patent it has declared essential to ETSI.

## SECOND CLAIM FOR RELIEF

**(Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*))**

56.    Nokia repeats and realleges the allegations set forth in paragraphs 1-55 above as if set forth fully herein.

57.    An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to the meaning of FRAND.

58.    Pursuant to its contracts with ETSI, Qualcomm has agreed to license on FRAND terms any patents that Qualcomm has declared are essential to the GSM or UMTS standards.

59.    Notwithstanding its FRAND commitments, Qualcomm has refused to offer a FRAND royalty rate to Nokia on any patents it has declared essential to the GSM standard. Further, Qualcomm has refused to offer Nokia a FRAND royalty rate for the use of its declared-essential UMTS patents after April 2007 (when Qualcomm's current agreement not to assert its UMTS patents against Nokia expires). Instead, Qualcomm has demanded that Nokia accept license terms that are neither fair, nor reasonable, nor non-discriminatory, backing its demands with the threat of injunction as discussed *supra*.

60.    Under French law, Qualcomm's agreement to license its essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members, including Nokia. Nokia is therefore entitled to enforce Qualcomm's contractual commitment to FRAND.

61.    Qualcomm contends that FRAND does not impose any specific and concrete obligations on the licensor with regard to the actual level of royalties (or any other terms and conditions for that matter). In its motion to dismiss claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its promise to license its patents on FRAND terms is not legally enforceable. Thus, according to Qualcomm, there

20

is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance.

62.    Qualcomm's empty characterization of FRAND cannot be correct. In any given situation, evidence will be available to show that the terms "fair, reasonable, and non-discriminatory" are sufficiently certain to be capable of judicial interpretation and enforcement, and impose substantive limits on Qualcomm's ability to impose excessive royalty rates or other onerous terms in its patent licenses. Qualcomm has violated these limits by refusing to license its patents to Nokia on FRAND terms.

63.    Qualcomm contends that, despite its FRAND obligation, it can charge a royalty as high as the fear of an injunction can create. Nokia, on the other hand, contends that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

64.    This controversy between Nokia and Qualcomm is real and adverse. Qualcomm has refused to offer Nokia a FRAND royalty rate for its declared-essential GSM patents, and has threatened to enjoin Nokia from using patents on which Nokia is contractually entitled to a FRAND license. Qualcomm has also refused to negotiate a FRAND royalty rate for declared-essential UMTS patents for the period after April 2007.

65.    The issue involved in this controversy is ripe for judicial determination. Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by the national courts of the member parties. Section 4.2 of ETSI's Guide on IPRs regarding Dispute Resolution states:

> ETSI Members should attempt to resolve any dispute related to the
> application of the IPR Policy bilaterally in a friendly manner. Should
> this fail, the Members concerned are invited to inform the ETSI GA
> in case a friendly mediation can be offered by other ETSI Members
> and/or the ETSI Secretariat. However, it should be noted that once an
> IPR (patent) has been granted, <u>in the absence of an agreement
> between the parties involved, the national courts of law have the sole
> authority to resolve IPR disputes.</u>

In addition, Qualcomm's May 16, 2006 brief to the European Commission, in an attempt to avoid

liability under Article 81 and 82, acknowledges that "[i]n the case of dispute [regarding FRAND], it

would be for a Court or similar authoritative body to resolve the particular disputes in the given

situation."

66.    Accordingly, Nokia seeks a declaratory judgment that Qualcomm's FRAND

commitments constitute binding contractual obligations, and defining the principles by which a

FRAND royalty must be calculated.

## THIRD CLAIM FOR RELIEF

### (Specific Performance)

67.    Nokia repeats and realleges the allegations set forth in paragraphs 1-66 above as if set

forth fully herein.

68.    Qualcomm has declared numerous patents to be essential to the UMTS standard

promulgated by ETSI.

69.    In connection with its declarations to ETSI, Qualcomm has agreed to license each of

its essential UMTS patents to all members of ETSI, including Nokia, on FRAND terms.

70.    Under French law, Qualcomm's agreement to license its essential UMTS patents on

FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI

members, including Nokia.  Nokia is therefore entitled to enforce Qualcomm's contractual

commitment to FRAND.

71.    Notwithstanding its contractual obligations to ETSI and Nokia, Qualcomm has refused to negotiate a FRAND royalty rate for its UMTS patents for the period after April 2007.

72.    Nokia has no adequate remedy at law for Qualcomm's breach of its contractual obligation to license its essential patents on FRAND terms or to negotiate a FRAND royalty rate in good faith.

73.    Accordingly, Nokia is entitled to an order of specific performance ordering Qualcomm to participate in a good faith negotiation with Nokia for license of Qualcomm's essential UMTS patents on FRAND terms for the period after April 2007, in light of this Court's resolution of the dispute between the parties as to the method for determining a FRAND royalty.

## PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that this Court:

A.    Adjudge and decree that, by virtue of its express and implied FRAND commitments, Qualcomm has waived any right to seek, or is otherwise barred from seeking injunctive relief, including an exclusion or cease-and-desist order by the ITC, to prevent Nokia from using technology encompassed by any patents which Qualcomm has declared essential to the GSM or UMTS standards established by ETSI;

B.    Permanently enjoin Qualcomm worldwide from seeking such injunctive relief related to patents Qualcomm has declared essential to any standard;

C.    Adjudge and decree that Qualcomm's commitment to license its essential GSM and UMTS patents on FRAND terms is a binding contractual obligation, enforceable by Nokia;

D.    Order that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-

infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

      E.    Order that Qualcomm specifically perform its contractual obligation to negotiate a FRAND royalty rate with Nokia for the period after April 2007 for any patents Qualcomm has declared essential to UMTS, in light of this Court's determination of the method for calculating FRAND terms; and

      F.    That Nokia have such other and further relief as this Court may deem just and proper.

Of Counsel:

A. William Urquhart
Frederick A. Lorig
Patrick M. Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-254
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

Rick Werder
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Dated: August 8, 2006

Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Richards, Layton & Finger, P.A.   (#3188)
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701

Attorneys for Plaintiffs
Nokia Corporation and Nokia Inc.

24

FROM RL&F

(WED) 8. 9' 06 19:57/ST. 19:49/NO. 4864902958 P 30

# EXHIBIT B

FROM RL&F

EFiled: Aug  9 2006 9:53AM EDT
Transaction ID 12021331

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

NOKIA CORPORATION and NOKIA, INC.,   )
                                    )
            Plaintiffs,       )
                                    )
           v.             )     C.A. No. 2330
                                    )
QUALCOMM INCORPORATED,       )
                                    )
            Defendant.      )
                                    )

## MOTION TO EXPEDITE PROCEEDINGS

     Plaintiffs Nokia Corporation and Nokia, Inc. (collectively, "Nokia"), by and through their

undersigned counsel, hereby move pursuant to Court of Chancery Rules 4 and 12(a) for entry of

an Order in the form attached hereto expediting discovery and scheduling an expedited trial on

the merits within six months. The grounds for this motion are as follows:

### FACTUAL BACKGROUND

    1.    As set forth more fully in the Complaint, this is an action brought to resolve a

dispute between Defendant Qualcomm Incorporated ("Qualcomm") and Nokia related to the

interpretation of a binding contract between the parties. Nokia respectfully requests that the

Court enter a judgment:  (1) enjoining Qualcomm, worldwide, from seeking an injunction

against Nokia for alleged infringement of any patent Qualcomm has declared essential for any

cellular telephone technology standard and agreed to license on fair, reasonable and non-

discriminatory terms ("FRAND"); (2) finding that Qualcomm's FRAND declarations are

enforceable contractual obligations; (3) declaring that for a FRAND royalty to be fair and

reasonable it must be based on the following factors:  the number of essential patents owned by

the patent holder relative to all patents essential to the standard, the cumulative royalty charged

by all holders of essential patents, the existence of non-infringing alternatives at the time a

standard is adopted, the extent to which the patents could be exploited in the absence of

standardization; and (4) declaring the rights and obligations of the parties and requiring Qualcomm to comply with its obligations under the contract. If this Court does not grant Nokia the requested relief on an expedited basis, Nokia will be irreparably harmed by Qualcomm's oppressive and continued pursuit of injunctive relief in multiple venues throughout the world in violation of the parties' binding contract.

2.      Because a number of cellular telephone providers and manufacturers all use the same cellular transmitting towers to transmit and receive radio signals, wireless carriers, telephone manufacturers, and chipset manufacturers agree to follow a common set of industry standards for wireless communication technology. Compl. ¶ 14. The standards are developed, approved and monitored by a number of different standard-setting organizations. Compl. ¶ 15. As explained more fully in the Complaint, cellular telephone technology has progressed through a number of distinct generations. Compl. ¶¶ 16-17. Most current cellular technology is considered second-generation ("2G") technology and includes at least two distinct standards, Global Systems for Mobility ("GSM") and Code Division Multiple Access ("CDMA"). Compl. ¶ 18. The technologies underlying GSM and CDMA are not compatible and, therefore, once a wireless carrier chooses a particular standard, it invests substantial amounts of money in the technology and switching from one to the other is cost prohibitive. *Id.* Accordingly, the standard-setting organizations play an important role in regulating each technology and ensuring that all manufacturers and carriers can practice their chosen technology without fear of a lawsuit for infringement or the fear of an injunction.

3      Qualcomm has filed declarations for the benefit of Nokia with various standard-setting organizations, including the European Telecommunications Standards Institution ("ETSI"). ETSI is a standard-setting organization based in France that developed the standard for GSM technology and its third-generation successor, Universal Mobile Telephone System

- 2 -

("UMTS"), to be followed by cellular technology companies, including all carriers and manufacturers. Compl. ¶ 19. ETSI has developed an Intellectual Property Rights ("IPR") Policy which is governed by French law and, pursuant to French law, constitutes a binding contract between ETSI and its members, enforceable in the national courts of its members, including this Court (since Qualcomm is a Delaware corporation). Compl. ¶ 30. It is the provisions of this binding contract that are at issue in this case.

4.    When an organization such as ETSI sets out to develop an industry standard for a certain technology, it requires that its members identify all patents they hold which are essential to compliance with a proposed technology standard before the standard is adopted. Compl. ¶ 22. The patents identified are considered "essential patents." *Id.* The designation of essential patents is significant because it allows ETSI's members to consider all the relevant technologies and to adopt a standard knowing which patents are implicated and with the ability to make determinations accordingly. Compl. ¶ 25. This early consideration of patents before adopting the technology is important to the ETSI member companies but also serves to protect the interests of consumers, who are then assured that they will be able to purchase cellular phones and related technologies at reasonable prices not driven by monopolistic pricing. Compl. ¶ 14.

5.    Once a party designates an essential patent, ETSI requires that the party agree to license its patents to other members of ETSI on terms that are fair, reasonable and non-discriminatory ("FRAND"). Compl. ¶ 24. Specifically, Article 6.1 of ETSI's IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR . . . .

Compl. ¶ 24. Under French law, this commitment by a party such as Qualcomm to license essential patents constitutes a binding contract among ETSI members and their affiliates.

- 3 -

RLF1-3040151-1

Compl. ¶ 30. This obligation is extremely important to ETSI members because it allows members to invest in a given technology, such as GSM or UMTS, without having to fear that it will be subject to opportunistic royalty payments to those companies who hold patents essential to the operation of the technology. Compl. ¶¶ 25, 29. If a patent holder will not agree to license its declared patents on FRAND terms, ETSI can decide not to include that technology in an industry standard, and instead use a non-infringing alternative. Compl. ¶ 25.

6.      Qualcomm, who is a member of ETSI through its affiliates, has declared that a number of its patents related to GSM and UMTS technologies are "essential" to the ETSI-adopted standards. As a result, Qualcomm is bound by the terms of the ETSI policies and owes certain obligations to other members, including Nokia. Compl. ¶¶ 21, 26, 30.

7.      By declaring its patents as "essential" and agreeing to license them on FRAND terms, Qualcomm gave up the right to pursue an injunction against other member companies utilizing the standards set by ETSI. Compl. ¶ 31. The forfeit of the right to an injunction is one of the most important aspects of the ETSI policies and is necessary to further protect companies, and their customers, from the threat of unreasonably high monopolistic royalties. Compl. ¶ 32.

8.      Unfortunately, despite Qualcomm's clear declaration of certain patents as essential and agreement to license those patents on FRAND terms, Qualcomm has refused to offer Nokia a FRAND royalty rate and has commenced litigation against Nokia in the Southern District of California, England, and the International Trade Commission ("ITC") seeking injunctions against Nokia in violation of ETSI IPR policies. Compl. ¶¶ 34-35. In addition, Qualcomm has threatened to file additional lawsuits seeking injunctions in other countries. Compl. ¶ 36. In the Southern District of California, Qualcomm has sued Nokia alleging infringement of twelve patents related to GSM technology. In England, Qualcomm has sued Nokia alleging infringement of two patents related to GSM technology. In both of these

lawsuits, Qualcomm is seeking damages and an injunction in violation of binding obligations under the ETSI IPR policies. Finally, Qualcomm has commenced an action in the ITC against Nokia related to six GSM patents where the sole remedy is an exclusion order against Nokia. In addition to seeking injunctions in three different venues, Qualcomm has refused, in negotiations with Nokia, to offer a FRAND royalty rate for GSM or UMTS patents declared essential to ETSI.

9.    Despite its refusal to offer Nokia FRAND terms, Qualcomm has admitted in filings in the EU that the ETSI IPR policies constitute a binding contract. Compl. ¶ 42. Specifically, Qualcomm admitted that "Fair Reasonable and Non-Discriminatory ("FRAND") obligations are part of a private agreement, a binding contract that is enforceable against each patent owner." *Id.* However, Qualcomm has also argued that FRAND does not impose any specific obligations on the licensor with regard to the level of royalties or any other terms and conditions for that matter, and has told a federal judge in New Jersey that its FRAND declarations are unenforceable. Thus, while Qualcomm recognizes the binding contract, it has refused to adhere to the terms of the contract and instead is attempting to extort unreasonably high royalty rates from other members of ETSI, including Nokia.

10.    Nokia will be irreparably harmed if this Court does not act promptly to resolve the dispute between the parties and declare that Qualcomm is contractually precluded from seeking an injunction on patents it has declared as essential to ETSI. Qualcomm has already sought injunctions in three proceedings and, based on Qualcomm's public threats and other sources, plans to seek an injunction in additional venues. Compl. ¶¶ 35-36, 49. If any one of these cases proceeds and an injunction issues against Nokia on a sub-set of Qualcomm's alleged essential GSM patents, Nokia's business will be irreparably harmed and Nokia could lose valuable market share or be closed out of the GSM market completely. Compl. ¶¶ 36, 50. The ITC proceeding in

particular poses a risk of irreparable harm requiring expedited relief because, under the ITC's current scheduling order, the ITC's investigation must be completed by no later than September 12, 2007, and the only relief available in that proceeding is an exclusion order (*i.e.*, injunctive relief).

11.    Furthermore, the threat of irreparable harm to Nokia is clearly shown by the fact that Qualcomm will seek injunctions in foreign jurisdictions that allow little or no process before issuing an injunction. Compl. ¶¶ 37-38.

12.    Nokia is therefore asking this Court to issue a declaration that Qualcomm's agreement to license its declared-essential patents on FRAND terms constitutes a binding contract that prevents Qualcomm from pursuing injunctive relief against Nokia in any forum. In addition, Nokia seeks an order declaring that a FRAND royalty must be based on the number of essential patents owned by the patent holder relative to all patents essential to the standard, and must take into account the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization. Finally, Nokia requests that the Court order Qualcomm to specifically perform the terms of its FRAND contract, by negotiating a FRAND royalty with Nokia on terms set by the Court.

## ARGUMENT

13.    The standard for expedited proceedings is well-settled. Expedited proceedings will be ordered where "the plaintiff has articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened irreparable injury[.]" *Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del. Ch Nov. 15, 1994). In applying this standard, this Court "traditionally has acted with a certain solicitude for plaintiffs" and "has followed the practice of erring on the side of more [expedited] hearings rather than fewer." *Id.* As a result, "[a] party's

request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted. Exceptions to that norm are rare." *In re Int'l Jensen Inc. S'holders Litig.*, 1996 WL 422345, at *1 (Del. Ch. July 13, 1996). The Delaware Supreme Court has observed that "Delaware courts are always receptive to expediting any type of litigation in the interests of affording justice to the parties." *Box v. Box*, 697 A.2d 395, 299 (Del. 1997).

14.    Furthermore, Delaware courts frequently expedite proceedings in cases involving important contractual issues. *See, e.g., In re IBP, Inc. S'holders Litig.*, 789 A.2d 14 (Del. Ch. 2001); *US West, Inc. v. Time Warner, Inc.*, 1996 WL 307445, at *3 (Del. Ch. June 6, 1996) (expedited trial conducted in dispute involving claims for declaratory and injunctive relief respecting parties' rights and obligations pursuant to a contract); *Warner Communications Inc. v. Chris-Craft Indus., Inc.*, 1989 WL 51662, at *6 (Del. Ch. May 15, 1989) (granting plaintiff's motion for an expedited trial on claim for a declaratory judgment concerning the rights and obligations of the parties arising out of a stockholder agreement). This Court has ordered an expedited trial on the merits where resolution of the dispute affects the rights of the parties going forward pursuant to a contract. *Pfizer Inc. v. Warner-Lambert Co., et al*, 1999 WL 33236245, at *1 (Del. Ch. Dec. 3, 1999). More specifically, this Court has previously expedited cases seeking specific performance of contracts. *See, e.g., Gilmore Servs., Inc. v. Nichols*, 1994 WL 369528, at *1 (Del. Ch. June 23, 1994) (expediting trial in action seeking specific performance of a contract to sell a funeral home).

15.    The standard for expedition is clearly met in this circumstance. The Complaint sets forth colorable claims for both specific performance and declaratory judgment. Under Delaware law, a party seeking the equitable remedy of specific performance must prove the existence and terms of an enforceable contract by clear and convincing evidence and must

- 7 -

demonstrate that there is no adequate remedy at law. *See Minnesota Invco of RSA # 7, Inc. v. Midwest Wireless Holdings LLC*, 2006 WL 1596675, at *5 (Del. Ch. 2006). As set forth above and in more detail in the Complaint, Qualcomm's FRAND declarations pursuant to the ETSI IPR Policy constitute a binding contract under French law between, among others, Nokia and Qualcomm. While Qualcomm currently refuses to abide by its terms, Qualcomm has itself previously admitted that its FRAND declarations constitute a binding contract.

16.    It is also clear that no amount of monetary relief could repair the harm that Qualcomm's oppressive business practices could cause Nokia. If Qualcomm is not forced to abide by the terms of its contractual obligation under the ETSI IPR Policy and its FRAND declarations, Nokia will suffer irreparable harm. Specifically, Nokia will be forced to continue litigating in at least three venues under the threat of an injunction. Compl. ¶ 35. In addition, on information and belief, Qualcomm intends to file lawsuits in additional European jurisdictions where the standard for receiving an injunction is substantially lower and Nokia may be subject to an injunction without having an opportunity to present its FRAND-related defenses. Compl. ¶¶ 37-38. The Supreme Court has recognized that a plaintiff can demonstrate that it will be irreparably harmed if it can demonstrate it is exposed to a real danger of multiple suits. *See Chateau Apartments Co. v. The City of Wilmington*, 391 A.2d 205, 208 (Del. 1978). Here, the threat of multiple suits has already been realized, and there is a genuine threat of additional suits that will multiply the risk of irreparable harm to Nokia. In such a circumstance, the Court should exercise jurisdiction to "shield the plaintiff from a litigation which is evidently vexatious." 1 *Pomeroy's Equity Jurisprudence* § 254 (1941); *see also Tull v. Turek*, 147 A.2d 658, 664 (Del. 1958) ("[E]quity will give full relief to avoid a multiplicity of suits.").

17.    In addition to the irreparable harm Nokia will suffer because of the sheer number of suits instituted by Qualcomm, Nokia also faces the risk of inconsistent decisions and lost

market share. If Qualcomm were to succeed in being awarded an injunction in even one of the jurisdictions in which it has filed suit against Nokia, Nokia's business will be substantially harmed and Nokia may be closed out of certain markets or be forced to stop manufacturing certain products.    Compl. ¶¶ 36, 50.    In an ever-evolving market such as wireless communications, no amount of monetary damages could compensate Nokia if it is essentially closed out of certain markets or forced to shut down certain product lines. *See Instituform Tech., Inc. v. Insitu, Inc.,* 1999 WL 240347, at \*15 (Del. Ch. Apr. 19, 1999) (finding irreparable harm posed by damage to "long-term marketing and customer relations" caused by defendant (citing *Roso-Lino Beverage Distrib., Inc. v. Coca Cola Bottling Co. of N.Y., Inc.,* 749 F.2d 124, 125-27 (2d Cir. 1984) (termination of plaintiffs' beverage distributorship after 11 years threatened irreparable harm which would not be fully remedied by monetary relief)); *Janmort Leasing, Inc. v. Econo Car Int'l, Inc.,* 475 F. Supp. 1282, 1294 (E.D.N.Y. 1979) ("[L]oss or destruction of a going business constitutes irreparable harm."); *Dickinson Med. Group v. Foote,* 1984 WL 8208, at \*3, (Del. Ch. May 10, 1984) (when former employee took customer list and could have caused her former employer to lose business, the former employer was threatened by immediate irreparable harm).

18.    In addition, Nokia's request for declaratory relief is an independent basis for expedition. Court of Chancery Rule 57, entitled "Declaratory Judgments," provides that "[t]he Court may order a speedy hearing of an action for a declaratory judgment." The purpose of a declaratory judgment action "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." 10 *Del. C.* § 6512. Section 6512 further provides that the Delaware Declaratory Judgment Act, 10 *Del. C.* §§ 6501-6513 (the "Act"), "is to be liberally construed and administered." This Court, in construing the Act, has observed that "the principal, salutary purpose of the declaratory judgment procedure is to provide a technique

- 9 -

for early resolution of disputes where a party is suffering practical consequences from uncertainty arising from the assertion by another of a legal claim." *Schick Inc.* v. *Amalgamated Clothing and Textile Workers Union*, 533 A.2d 1235, 1241 (Del. Ch. 1987).

19.    Nokia has demonstrated above, and in further detail in the Complaint, that it is entitled to declaratory relief. In order for the Court to exercise declaratory judgment jurisdiction, the following four factors must be present:

> (1) it must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; and (4) the issue involved in the controversy must be ripe for judicial determination.

*Korn v. New Castle County*, 2005 WL 2266590, at *5 (Del. Ch. Sept. 13, 2005). The dispute between Nokia and Qualcomm affects Nokia's rights and obligations and is ripe for judicial determination. Specifically, Qualcomm has, in certain instances, taken the position that its FRAND declarations constitute a binding contract (Compl. ¶ 42) and, in other circumstances, insisted that FRAND is not legally enforceable and that it is entitled to an injunction if Nokia refuses to pay even a non-FRAND royalty unilaterally set by Qualcomm (Compl. ¶ 40). If the rights and obligations of the parties are not determined by this Court on an expedited basis, Nokia will suffer irreparable harm by Qualcomm's continued breaches of its FRAND contract with Nokia.

20.    Accordingly, viewing the Complaint in the light most favorable to Nokia, it is clear that Nokia has asserted colorable claims for both declaratory judgment and specific performance.

21.    Finally, Nokia's proposed schedule is very reasonable in light of the important issues at stake. Specifically, Nokia is not seeking any preliminary relief but rather is requesting a

full trial on the merits within six months. Furthermore, the resolution of the entire dispute centers on the interpretation of only a few key contractual provisions between the parties and it is essential to Nokia's business that it have resolution on these important issues as soon as possible. The parties will have ample opportunity to develop the record for the Court in the time frame requested by Nokia. Nokia's proposed schedule, while accelerated, will not pose any undue burden on Qualcomm and any burden is certainly outweighed by the threat to Nokia's business if Qualcomm's abusive tactics are not promptly addressed by this Court.

CONCLUSION

This case warrants expedited treatment. In light of the need for prompt relief, and subject to the convenience of the Court, Nokia respectfully requests that the Court enter an Order requiring Qualcomm to respond to the Complaint on an expedited basis, ordering the parties to engage in expedited discovery and ordering an expedited trial on the merits of Nokia's claims within six months.

OF COUNSEL:

A. William Urquhart
Frederick Lorig
Patrick Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Rick Werder
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Dated: August 8, 2006

Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Richards, Layton & Finger, P.A.    (# 3188)
920 North King Street
Wilmington, DE 19899
(302) 651-7700

Attorneys for Plaintiffs Nokia Corporation and Nokia, Inc.

## FAX TRANSMITTAL SHEET

## RICHARDS, LAYTON & FINGER

One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Fax (302) 651-7701
Fax Confirmation (302) 651-7796

**CONFIDENTIALITY NOTE:** Richards, Layton and Finger, P.A. is not providing any advice with respect to any federal tax issue in connection with this matter.

The information contained in this fax transmission is intended only for the use of the individual or entity named below and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of this communication is strictly prohibited by law. If you have received this communication in error, please immediately notify us by return fax, e-mail or telephone (302-651-7700) and destroy the original message. Thank you.

Date:        August 9, 2006
From:        Lisa A. Schmidt
Number of Pages (including cover):   41

| | TO | COMPANY | PHONE # | FAX # |
|---|---|---|---|---|
| 1. | Louis M. Lupin | Qualcomm Incorporated | 858-658-4808 | 858-658-2503 |

CLIENT/MATTER NAME:

RL&F MATTER NUMBER:   148886

TELECOMMUNICATOR:

MESSAGE/REMARKS:
Please deliver immediately to the person(s) listed above who is/are in your office. Thank you.

IF YOU DO NOT RECEIVE ALL THE PAGES OR FIND THEM TO BE ILLEGIBLE, PLEASE CALL (302) 651-7796 AS SOON AS POSSIBLE.

QUALCOMM

AUG 1 0 2006

Corp. Legal Dept.

# EXHIBIT D

EFiled:  Aug 11 2006 10:50AM EDT
Transaction ID 12050366



**Potter
Anderson
Corroon LLP**

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson com

Matthew E. F
Partner
Attorney at Law
mfischer@potteranderson com
302  984-6153  Direct Phone
302  658-1192  Fax

August 10, 2006

## VIA EMAIL

The Honorable Vice Chancellor Leo E. Strine, Jr.
State of Delaware
Court of Chancery
500 King Street
Wilmington, DE    19801

Re:    *Nokia Corporation and Nokia, Inc , v
        QUALCOMM Incorporated,* C.A. No. 2330

Dear Vice Chancellor Strine:

        We write on behalf of defendant QUALCOMM Incorporated in opposition to
Nokia's motion to expedite this proceeding. We submit that not only should the motion be
denied, but this case should not proceed at all in this Court. When the relevant background is
disclosed, the reasons are quite clear.

        In this case, Nokia essentially asks this Court to declare the validity of affirmative
defenses it has raised or will raise in patent infringement suits filed against Nokia Corporation
and Nokia Inc. (collectively, "Nokia") by QUALCOMM in the United States District Court for
the Southern District of California (San Diego division), in the United Kingdom, and before the
United States International Trade Commission.

        The San Diego suit was filed against Nokia in November 2005, asserting 12
patents against Nokia products that practice only the GSM family of standards (several of those
patents have been declared standards-essential to ETSI and several are not standards-essential
and therefore not even subject to the "FRAND" commitment which is the centerpiece of Nokia's
defense recast as an affirmative claim in this Court). In December 2005, Nokia moved to
dismiss or stay the action pending arbitration of Nokia's affirmative defenses, claiming
QUALCOMM's claims had to be arbitrated based on a 2001 agreement between Nokia and
QUALCOMM. The federal district court denied Nokia's motion in March, and Nokia responded
by requesting that the district court stay the litigation pending appeal of the denial of its stay
motion. The federal district court entered a stay pending appeal, and the appeal was argued to
the U S. Court of Appeals for the Federal Circuit last month. A decision is expected soon.
Despite the passage of over nine months since QUALCOMM filed suit, Nokia has not yet

August 10, 2006
Page 2

answered the complaint in the San Diego suit. Meanwhile, arbitration between Nokia and QUALCOMM has proceeded in California over QUALCOMM's objection to the arbitrability of Nokia's affirmative defenses. Through the arbitration, Nokia, despite its express admission that the parties' 2001 agreement does not extend to GSM products, is seeking to derail QUALCOMM's infringement claims by arguing, among other things, that QUALCOMM is estopped from asserting its patents against Nokia's GSM products, effectively entitling Nokia to a royalty free license. QUALCOMM has filed a motion before the arbitrator to dismiss Nokia's estoppel claim, and the parties are awaiting a hearing date on that motion.

QUALCOMM's U.K. suit was filed in May 2006, asserting two patents against Nokia's products that practice only the GSM family of standards. Shortly before Nokia's answer was due in this suit in mid-July (Nokia having secured from QUALCOMM an extension to answer), it moved to dismiss or stay the proceeding, again based on the same arbitrability theories it advanced in the San Diego action. Nokia requested a late November hearing date on its motion. Although it is anticipated that a hearing will be held sooner than Nokia has requested, the motion has essentially stalled the U.K. action for three to four months.

Third QUALCOMM filed a complaint with the U.S. International Trade Commission in June 2006, and the ITC instituted an investigation concerning Nokia's infringement of six Qualcomm patents by Nokia products that practice only the GSM family of standards. One patent at issue in the ITC is a U.S. counterpart to one of the patents asserted in the U.K. proceeding, and three patents asserted in the ITC are also asserted in the San Diego action. Nokia's answer was filed with the ITC yesterday. As the attached will demonstrate (Ex. A hereto), Nokia's SIXTEENTH affirmative defense is the same FRAND claim it is asking this Court to adjudicate, and several of its other affirmative defenses correspond to the issues it has raised in the California arbitration.

Asserting that this Court is a "national court"[1] under the ETSI Rules of Procedure, Nokia seeks to leap frog the QUALCOMM actions it has stalled by asking this Court to declare -- in advance of any of the pending infringement cases -- that its FRAND affirmative defense is valid and effective to prevent QUALCOMM from pursuing the injunctive relief it seeks in these earlier-filed actions.[2] Nokia cannot dispute that the relief it seeks from this Court can be (and is

---

[1]    This is a dubious assertion, considering that the ETSI's procedures deal with IPRs (intellectual property rights) and infringement issues. One would naturally think that ETSI's rules referencing "national courts" would refer to courts in the host country that have jurisdiction over patent infringement suits. These would be the federal courts in the U.S., not state courts.

[2]    Among the relief Nokia seeks is a declaration that QUALCOMM is "barred from seeking injunctive relief" and a permanent injunction "enjoin[ing] Qualcomm worldwide from seeking such injunctive relief related to patents Qualcomm has declared essential to any standard." (Comp, WHEREFORE clauses A and B). As Nokia should know, this Court is unable to grant such relief *See General Atomic Co v Felter*, 434 U.S. 12, 16 (1977) ("[T]he rights conferred by Congress to bring *in personam* actions in federal court are not subject to

August 10, 2006
Page 3

being) pursued in these other actions. In effect, this is a typical "second-filed" action in which Nokia seeks to avoid application of *McWane*[3] by focusing the Court on an affirmative defense and Nokia's alleged fear of "unjustified injunctive relief" being issued against it in "jurisdictions that will not afford Nokia adequate due process." (Comp. ¶37). Nokia's purported concerns do nothing to justify its request that this Court run an unprecedented level of interference with a federal court, a federal agency, and a U.K. court. It is clear that this Court should at least dismiss this case in favor of the other, first-filed actions, and it is possible that this action raises issues arising under federal law, which would form a basis to remove this action.

In any event, as Nokia's own dilatory efforts in the San Diego and U.K. actions demonstrate, there is no need for expedition here, and Nokia's motion to expedite must be denied. Indeed, it appears that Nokia's new-found supposed need for expedition results primarily from the fact that it is running out of options in the other suits, and now faces what it apparently sought to avoid: confronting QUALCOMM's infringement claims on the merits. While Nokia, putting the cart before the horse, would prefer an adjudication of its affirmative defense before having to confront QUALCOMM's infringement claims, this does not implicate threatened irreparable harm. *See Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994).

For the foregoing reasons, defendant QUALCOMM respectfully submits that Nokia's motion to expedite should be denied. We look forward to discussing this matter more fully with Your Honor at the 11 a.m. hearing.

Respectfully,

Matthew E. Fischer (I.D. No. 3092)

rc/745643

cc:    Lisa A. Schmidt, Esq
       Register in Chancery

---

abridgment by state-court injunctions, regardless of whether the federal litigation is pending or prospective."); *Donovan v. City of Dallas*, 377 U.S. 408 (1964); *Zeneca v. Monsanto*, 1996 WL 104254, at *4 n.3 (Del. Ch.) (V.C. Jacobs acknowledging the well established holding from *Donovan* that "a state court is without power to enjoin a litigant from litigating a claim in federal court."); *Paul N. Gardner Defined Plan Trust v. Draper*, 1993 WL 125517 (Del. Ch.); *cf Maldonado v. Flynn*, 1979 WL 4632, at *3 (Del. Ch.) (holding that it was a violation of Court of Chancery Rule 11 to file a motion to enjoin a defendant from proceeding in federal court)

[3] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281 (Del. 1970).

EFiled:  Aug 11 2006 10:50AM EDT
Transaction ID 12050366

# EXHIBIT A

➢ PUBLIC VERSION ➢

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

### Before the Honorable Robert L. Barton, Jr.

| | |
|---|---|
| IN THE MATTER OF<br><br>CERTAIN MOBILE TELEPHONE<br>HANDSETS, WIRELESS<br>COMMUNICATION DEVICES, AND<br>COMPONENTS THEREOF | Investigation No. 337-TA-578 |

### RESPONSE OF NOKIA CORPORATION AND NOKIA INCORPORATED TO THE COMPLAINT, AS SUPPLEMENTED, OF QUALCOMM INCORPORATED AND NOTICE OF INVESTIGATION

Pursuant to Commission Rule of Practice 210.13 (19 C.F.R. § 210.13), Respondents Nokia Corporation and Nokia Inc. ("Nokia" or "Respondent") hereby respond to the Complaint under Section 337 of the Tariff Act of 1930 filed by Qualcomm Incorporated ("Qualcomm" or "Complainant") on June 9, 2006, and supplemented on June 27, 2006, pursuant to which an investigation was instituted by the Commission on July 12, 2006.

It is Nokia's position that, among other things, Qualcomm is estopped from asserting the claims set forth in the Complaint and that the issue of estoppel is subject to arbitration under the arbitration clause of the Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 between Qualcomm and Nokia. Nokia contends, therefore, that the ITC lacks subject matter jurisdiction to conduct this investigation. Nokia's response to the Complaint and the Notice of Investigation is made pursuant to the Commission Rules of Practice without waiving or intending to waive Nokia's right to arbitrate its estoppel defense and to seek dismissal of this investigation pursuant to 19 U.S.C. § 1337(c).

Nokia denies it has engaged in acts of unfair competition or violated Section 337 by importing, selling for importation, and/or selling within the United States after importation any products that infringe, directly, contributorily, and/or by inducement, any valid claim of United States Patent Nos. 5,452,473 ("the '473 patent"), 5,590,408 ("the '408 patent"), 5,655,220 ("the

'220 patent"), 5,576,767 ("the '767 patent"), 5,452,104 ("the '104 patent"), 6,453,182 B1 ("the '182 patent") (collectively the "Qualcomm Patents-In-Suit"). Nokia further denies that the patents are valid. Except as specifically admitted herein, Nokia denies all allegations of the Complaint, as supplemented.

Nokia has not had sufficient time and opportunity to collect and review all of the information that may be relevant and necessary to respond to the matters raised in Qualcomm's Complaint. Specifically, Nokia has not received all of the information requested in its discovery requests to Qualcomm. To the extent that any allegations of the Complaint refer to or rely upon such information not previously supplied to Nokia, Nokia is without information sufficient to admit or deny such allegations, and therefore denies same. Moreover, Nokia reserves the right to take such further positions and raise additional defenses as may become apparent as a result of further information which may be discovered subsequent to the filing of this Response.

## ADMISSIONS AND DENIALS OF QUALCOMM'S SPECIFIC ALLEGATIONS

### I.    INTRODUCTION

1.1    Nokia admits that Qualcomm has requested that the United States International Trade Commission (the "ITC") commence an investigation pursuant to section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337.

1.2    Nokia denies each and every allegation to the extent that it alleges, directly or by implication, that any acts of Nokia constitute unfair acts and/or infringement of Qualcomm's patents. Nokia further denies that any of the Qualcomm Patents-In-Suit are valid. Nokia admits that it entered into a Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 with Qualcomm. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph 1.2, and therefore denies the same.

➢ PUBLIC VERSION ◄

1.3    Nokia denies that any of the Qualcomm patents are valid. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph 1.3, and therefore denies the same.

1.4    Nokia denies that a domestic industry exists in the United States relating to any products covered by the Qualcomm patents. Nokia denies that Qualcomm United States' investments and expenditures in the engineering, research and development directed to the utilization and exploitation of the inventions claimed in the asserted patents exist as required by Section 337(a). Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph 1.4, and therefore denies the same.

1.5    Nokia admits that Qualcomm seeks relief from the ITC in the form of a limited exclusion order concerning the importation into the United States of all handsets and components thereof which Qualcomm alleges violate the Qualcomm Patents-In-Suit. Nokia also admits that Qualcomm seeks from the ITC a cease and desist order prohibiting the importation, marketing, advertising, demonstration, warehousing of inventory for distribution, sale and use of handsets in the United States pursuant to section 337(f) that Qualcomm alleges infringe the Qualcomm Patents-In-Suit. Nokia admits that it entered into a Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 with Qualcomm. Except as expressly admitted herein, Nokia denies each and every allegation contained in paragraph 1.5.

## II.    COMPLAINANT

2.1    Nokia admits that Qualcomm Incorporated is a Delaware corporation. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations contained in paragraph 2.1, and therefore denies the same.

3

2.2    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 2.2, and therefore denies the same.

2.3    Nokia denies that any of the Qualcomm patents are valid.  Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 2.3, and therefore denies the same.

## III.    PROPOSED RESPONDENTS

3.1    Nokia admits that the contact address for its head office is at Keilalahdentie 2-4, P.O. Box 226, FIN-00045 Nokia Group, Finland.  Nokia further admits that its mobile phone business group is involved in the design, development and manufacture of handsets.

3.2    Nokia admits the allegations of paragraph 3.2 of the Complaint.

3.3    Nokia admits that it provides its customers with equipment, services and solutions for network operators.  Nokia admits that it does not have a mobile phone manufacturing facility in the United States, although it does have a customization and logistics centre in the United States.  Nokia further admits that the United States is one of Nokia's largest markets in terms of net sales, and that the United States was Nokia's largest market in terms of net sales in 2004.  Except as expressly admitted above, Nokia denies the remaining allegations of paragraph 3.3.

## IV.    THE PRODUCTS AT ISSUE

4.1    Nokia admits that Qualcomm's complaint concerns certain wireless communication devices, and components thereof.

4.2    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 4.2, and therefore denies the same.

4.3    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 4.3, and therefore denies the same.

4

➤ PUBLIC VERSION ◄

4.4    Nokia denies the allegations in paragraph 4.4, including the allegation that Nokia infringes any valid claim of the asserted patents.

## V.    THE PATENTS-IN-SUIT

### A.    The '473 Patent

#### 1.    Identification of the Patent and Ownership by Qualcomm

5.1    Nokia admits that the '473 patent entitled "Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System," was issued on September 19, 1995, to Qualcomm as assignee, naming Ana L. Weiland, Richard K. Kornfeld, Richard J. Kerr, John E. Maloney and Nathaniel B. Wilson as inventors. Nokia further admits that Exhibit 1 attached to the Complaint appears to be a copy of the '473 patent. Nokia further admits that Exhibit 7 attached to the Complaint appears to be copy of the assignment of the '473 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.2    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.2, and therefore denies the same.

#### 2.    Non-Technical Description of the Patented Invention

5.3    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.3, and therefore denies the same.

5.4    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.4, and therefore denies the same.

#### 3.    Foreign Counterparts to the '473 Patent

5.5    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.5, and therefore denies the same.

➢ PUBLIC VERSION ➤

**B.**    The '408 Patent

    **1.**    Identification of the Patent and Ownership by Qualcomm

    5.6    Nokia admits that the '408 patent, entitled "Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System," was issued on December 31, 1996, to Qualcomm as assignee, naming Ana L. Weiland, Richard K. Kornfeld and John E. Maloney as inventors. Nokia further admits that Exhibit 2 appears to be copy of the '408 patent. Nokia further admits that Exhibit 8 appears to be a copy of the assignment of the '408 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

    5.7    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.7, and therefore denies the same.

    **2.**    Non-Technical Description of the Patented Invention

    5.8    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.8, and therefore denies the same.

    5.9    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.9, and therefore denies the same.

    **3.**    Foreign Counterparts to the '408 Patent

    5.10    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.10, and therefore denies the same.

**C.**    The '220 Patent

    **1.**    Identification of the Patent and Ownership by Qualcomm

    5.11    Nokia admits that the '220 patent, entitled "Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System," was issued on August 5, 1997, to Qualcomm as assignee, naming Ana L. Weiland, Richard K. Kornfeld and John E. Maloney as inventors. Nokia further admits that Exhibit 3 appears to be a copy of the '220 patent. Nokia further admits that Exhibit 9 appears to be a copy of the assignment of the '220 patent to

Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

     5.12    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.12, and therefore denies the same.

     **2.    Non-Technical Description of the Patented Invention**

     5.13    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.13, and therefore denies the same.

     5.14    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.14, and therefore denies the same.

     **3.    Foreign Counterparts to the '220 Patent**

     5.15    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.15, and therefore denies the same.

     **D.    The '767 Patent**

     **1.    Identification of the Patent and Ownership by Qualcomm**

     5.16    Nokia admits that the '767 patent, entitled "Interframe Video Encoding and Decoding System," was issued on November 19, 1996, to Qualcomm as assignee, naming Chong U. Lee and Donald Pian as inventors. Nokia further admits that Exhibit 4 appears to be a copy of the '767 patent. Nokia further admits that Exhibit 10 appears to be a copy of the assignment of the '767 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

     5.17    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.17, and therefore denies the same.

     **2.    Non-Technical Description of the Patented Invention**

     5.18    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.18, and therefore denies the same.

7

5.19    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.19, and therefore denies the same.

5.20    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.20, and therefore denies the same.

### 3.    Foreign Counterparts to the '767 Patent

5.21    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.21, and therefore denies the same.

## E.    The '104 Patent

### 1.    Identification of the Patent and Ownership by Qualcomm

5.22    Nokia admits that the '104 patent, entitled "Adaptive Block Size Image Compression Method and System," was issued on September 19, 1995, to Qualcomm as assignee, naming Chong U. Lee as the inventor.  Nokia further admits that Exhibit 5 appears to be a copy of the '104 patent.  Nokia further admits that Exhibit 11 appears to be a copy of the assignment of the '104 patent to Qualcomm.  As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.23    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.23, and therefore denies the same.

### 2.    Non-Technical Description of the Patented Invention

5.24    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.24, and therefore denies the same.

5.25    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.25, and therefore denies the same.

5.26    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.26, and therefore denies the same.

➤ PUBLIC VERSION ◄

### 3.    Foreign Counterparts to the '104 Patent

5.27    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.27, and therefore denies the same.

### F.    The '182 Patent

#### 1.    Identification of the Patent and Ownership by Qualcomm

5.28    Nokia admits that the '182 patent, entitled "Wireless Telephone Airplane and Alarm Clock Modes," was issued on September 17, 2002, to Qualcomm as assignee, naming Stephen A. Sprigg and James A. Hutchison, IV as inventors. Nokia further admits that Exhibit 6 appears to be a copy of the '182 patent. Nokia further admits that Exhibit 12 appears to be a copy of the assignment of the '182 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.29    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.29, and therefore denies the same.

#### 2.    Non-Technical Description of the Patented Invention

5.30    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.30, and therefore denies the same.

5.31    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.31, and therefore denies the same.

#### 3.    Foreign Counterparts to the '182 Patent

5.32    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.32, and therefore denies the same.

## VI.    UNFAIR ACTS OF THE RESPONDENTS

6.1    Nokia denies each and every allegation contained in paragraph 6.1, except Nokia admits that it entered into a Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 with Qualcomm.

➢ PUBLIC VERSION ◄

6.2     Nokia denies that it directly or through its affiliates or third-parties exports to and imports into the United States handsets and components thereof that are covered by any of the claims of the Qualcomm Patents-In-Suit. Nokia denies each and every allegation to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit. Nokia admits that on September 9, 2005 Qualcomm provided Nokia with a list of certain patents and that on November 4, 2005 Qualcomm filed the complaint in Case No. 05 CV 2063 B(BLM) in the United States District Court for the Southern District of California. Except as expressly admitted above, Nokia denies the remaining allegations of paragraph 6.2.

6.3     Nokia denies each and every allegation contained in paragraph 6.3, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '473 patent.

6.4     Nokia denies each and every allegation contained in paragraph 6.4, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '408 patent.

6.5     Nokia denies each and every allegation contained in paragraph 6.5, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '220 patent.

6 6     Nokia denies each and every allegation contained in paragraph 6.6, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '767 patent.

6.7     Nokia denies each and every allegation contained in paragraph 6.7, including the referenced claim charts, to the extent that it alleges, directly or by implication, that

10

➢ PUBLIC VERSION ◄

any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '104 patent.

6.8    Nokia denies each and every allegation contained in paragraph 6.8, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '182 patent.

## VII.    SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

7.1    Nokia admits that a subset of its handsets and components thereof are sold for importation into the United States, imported into the United States or sold after importation into the United States. Nokia denies that it directly or through its affiliates or third-parties exports to and imports into the United States any handsets and components thereof that are covered by any of the claims of the Qualcomm Patents-In-Suit.

7.2    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 41 and therefore denies the same. Nokia admits that Exhibit 42 appears to be a photograph of the packaging for the Nokia 6101 phone

7.3    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 43 and therefore denies the same. Nokia admits that Exhibit 44 appears to be a photograph of the packaging for the Nokia 6682 phone.

7.4    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 45 and therefore denies the same. Nokia admits that Exhibit 46 appears to be a photograph of the packaging for the Nokia 9300 phone.

7.5    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 47 and therefore denies the same. Nokia admits that Exhibit 48 appears to be a photograph of the packaging for the Nokia 6010 phone. Nokia admits that Exhibit 49 appears to be a photograph of the packaging for the Nokia 6102 phone. Nokia admits

➢ PUBLIC VERSION ◁

that Exhibit 50 appears to be a photograph of the packaging for the Nokia 6061 phone. Nokia admits that Exhibit 51 appears to be a photograph of the packaging for the Nokia 6030 phone.

      7.6    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 52 and therefore denies the same. Nokia admits that Exhibit 53 appears to be a photograph of the packaging for the Nokia 3220 phone. Nokia admits that Exhibit 54 appears to be a photograph of the packaging for the Nokia 3120 phone.

      7.7    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 55 and therefore denies the same. Nokia admits that Exhibit 56 appears to be a photograph of the packaging for the Nokia 6111 phone. Nokia admits that it does not have any manufacturing facilities for mobile phones in the United States. Except as expressly admitted herein, Nokia denies each and every allegation contained in paragraph 7.7.

## VIII.  CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

      8.1    Nokia denies each and every allegation of paragraph 8.1, including  to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit. Nokia also denies that cell phone products covered by the investigation are classified under the headings set forth in paragraph 8.1. See Additional information, paragraph 2, infra.

## IX.    LICENSEES

      9.1    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in paragraph 9.1, and therefore denies the same.

      9.2    Nokia admits that it has entered into a license agreement with Qualcomm. Nokia further admits that Qualcomm has, in paragraph 1.2 of its Complaint, defined the products at issue in its Complaint as excluding those products allegedly licensed under the 2001 license agreement between Qualcomm and Nokia. Except as expressly admitted herein, Nokia denies each and every allegation contained in paragraph 9.2.

➢ PUBLIC VERSION ➢

## X.   THE DOMESTIC INDUSTRY

10.1    Nokia denies that Qualcomm satisfies any or all of the statutory criteria for finding a domestic industry under section 337(a)(2) and (3) or otherwise. As to the balance of the allegations contained in paragraph 10.1, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations, and therefore denies same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

### A.   Qualcomm's Engineering, Research and Development is Directed toUtilization/Exploitation of the Asserted Patents

10.2    Nokia denies that Qualcomm satisfies any or all of the statutory criteria for finding a domestic industry under section 337(a)(2) and (3) or otherwise. As to the balance of the allegations contained in paragraph 10.2, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations, and therefore denies same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.3    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.3, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

➤ PUBLIC VERSION ◄

10.4    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.4, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.5    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.5, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.6    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.6, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.7    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.7, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.8    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.8, and therefore denies the same. Further,

with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

**B.    Qualcomm has Significant U.S. Investment in Engineering, Research and Development**

10.9    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.9, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.10    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.10, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

**XI.    RELATED LITIGATION**

11.1    Nokia admits the allegations in paragraph 11.1 concerning the pending lawsuit among Qualcomm and Snaptrack, Inc., as plaintiffs, and Nokia Corp. and Nokia Inc., as defendants, including the fact that three of the patents being asserted in that case are also being asserted by Qualcomm in the present investigation. Except as expressly admitted above, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 11.1, and therefore denies same.

11.2    Nokia admits the allegations set forth in paragraph 11.2 of the Complaint.

➢ PUBLIC VERSION ◄

11.3    Nokia admits that it is currently arbitrating issues relating to the Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001, including whether Qualcomm is estopped from asserting patents that Qualcomm now claims relate to GSM technology, including the patents in suit in this investigation. There is no hearing on the merits scheduled. Except as expressly admitted above, Nokia denies the allegations contained in paragraph 11.3.

11.4    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 11.4, and therefore denies the same.

## XII.    RELIEF REQUESTED

12.1    In its Complaint, Qualcomm requests certain relief from the ITC. Nokia does not believe that any response to this prayer for relief is required. If a response is required, however, Nokia specifically denies that it currently infringes or has ever infringed any valid claim of any Qualcomm patent and further denies that Qualcomm is entitled to any relief from the ITC whether or not requested. Nokia further denies each and every factual allegation in this prayer for relief, including subparagraphs thereof.

### RESPONSE TO THE NOTICE OF INVESTIGATION

Nokia denies that there is a violation of Section 337 by reason of the alleged infringement of any asserted claim of the '473 patent, the '408 patent, the '220 patent, the '767 patent, the '104 patent, and the '182 patent ("the patents-in-suit") insofar as these allegations pertain to the importation or sale of any products manufactured by or on behalf of Nokia. Nokia denies that there is a protectable domestic industry, as required by Section 337(a)(2) and defined by Section 337(a)(3), with respect to any of the patents-in-suit. Nokia further denies that it is in the public interest to grant any relief to Qualcomm in connection with this Investigation. Nokia denies that Qualcomm is entitled to the specific relief it requests. Except as expressly admitted herein, Nokia denies the allegations contained in the Notice of Investigation.

16

➤ PUBLIC VERSION ◄

## ADDITIONAL INFORMATION REQUIRED UNDER RULE 210.13(b)

By providing the following information, Nokia intends only to supply data required by 19 C.F.R. § 210.13(b). Nokia specifically denies that any of the information or data supplied below relates to or supports any allegations of infringement against Nokia or any violation of 19 U.S.C. § 1337.

Pursuant to Rule 210.13(b), Nokia provides the following additional information:

1.    The quantity and value of Nokia's products accused of infringement imported into the United States in calendar year 2005 is provided in Confidential Exhibit 1 to this response.

2.    Between 1989-1996, the Harmonized Tariff Schedule item numbers for the Nokia products accused of infringement were 8525.20.6060 and 8525.20.6070. During 1997, the Harmonized Tariff Schedule item number for a Nokia product accused of infringement was 8525.20.9070. Since 1998, the Harmonized Tariff Schedule item numbers for the Nokia products accused of infringement are 8525.20.9070 and 9504.90.4000.

3.    Nokia's capacity to manufacture the products identified by Qualcomm in its Complaint is provided in Confidential Exhibit 1 to this response. In calendar year 2005, the United States constituted a substantial market for Nokia.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

#### (Invalidity)

1.    The patents-in-suit are invalid because they each fail to comply with the requirements of 35 U.S.C. § 101 et seq., including, without limitation §§ 102,103 and/or 112.

17

➢ PUBLIC VERSION ◄

## SECOND AFFIRMATIVE DEFENSE

### (Noninfringement)

2.    Nokia has not directly infringed, indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the patents-in-suit, and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

## THIRD AFFIRMATIVE DEFENSE

### (Lack of Unfair Act)

3.    Nokia has committed no unfair acts.

## FOURTH AFFIRMATIVE DEFENSE

### (Lack of Domestic Industry)

4.    Qualcomm has not adequately alleged and cannot prove the existence of a domestic industry, as required by Section 337(a)(2) and defined by Section 337(a)(3), in connection with any of the patents-in-suit, or that a such domestic industry is in the process of being established.

## FIFTH AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

5.    Qualcomm's complaint fails to state a claim upon which relief can be granted.

## SIXTH AFFIRMATIVE DEFENSE

### (Express or Implied License)

6.    Qualcomm's claims are barred in whole or in part pursuant to an actual license or under the doctrine of implied license. Nokia's assertion of this defense is made without waiving or intending to waive its right to arbitrate this issue.

18

➢ PUBLIC VERSION ➤

## SEVENTH AFFIRMATIVE DEFENSE

### (Unenforceability – Estoppel, Acquiescence, Waiver, and *In Pari Delicto*)

7.    Qualcomm is barred in whole or in part by the doctrines of estoppel, acquiescence, waiver, and/or in pari delicto from enforcing the patents-in-suit against Nokia. Nokia's assertion of this defense is made without waiving or intending to waive its right to arbitrate this issue.

## EIGHTH AFFIRMATIVE DEFENSE

### (Equitable Estoppel)

8.    Qualcomm is barred in whole or in part by the doctrine of equitable estoppel based, among other things, on its failure to mention any of the patents-in-suit during development and approval of certain standards related to GSM, its failure to mention the patents-in-suit during negotiations and execution of the parties' Subscriber Unit and Infrastructure Equipment License Agreement, its failure to promptly declare any patents-in-suit to the relevant standard setting organizations, and its commitment to make some or all of the patents-in-suit available to Nokia and others for a fair, reasonable, and non-discriminatory royalty rate.  Nokia's assertion of this defense is made without waiving or intending to waive its right to arbitrate this issue.

## NINTH AFFIRMATIVE DEFENSE

### (Unenforceability - Patent Exhaustion/First Sale Doctrine)

9.    Qualcomm is barred in whole or in part by the doctrine of patent exhaustion/first-sale doctrine from enforcing the patents-in-suit against Nokia.

## TENTH AFFIRMATIVE DEFENSE

### (Unenforceability - Prosecution Laches)

10.    Qualcomm is barred in whole or in part by delay in prosecuting the patent applications resulting in the patents-in-suit.

19

➢ PUBLIC VERSION ◄

## ELEVENTH AFFIRMATIVE DEFENSE

### (Prosecution History Estoppel)

11.    By reason of the prosecution before the United States Patent and Trademark Office ("USPTO") leading to the patents-in-suit and any applications or patents related to the patents-in-suit, and by reason of admissions made by or on behalf of the applicant for these patents and related applications and patents, Qualcomm is estopped from claiming infringement by Nokia of one or more of the claims of such patents-in-suit.

## TWELFTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

12.    The patents-in-suit are void and unenforceable by reason of the equitable doctrine of unclean hands.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Patent Misuse)

13.    Qualcomm is barred from asserting the patents-in-suit by the equitable doctrine of patent misuse.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Lack of Jurisdiction)

14.    The Commission lacks jurisdiction pursuant to § 337.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Relief Not in the Public Interest)

15.    The relief sought by Qualcomm does not and would not further the public interest and there are strong public policy reasons for denying Qualcomm the relief sought.

➢ PUBLIC VERSION ◄

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Breach of Contract)

16.    The relief sought by Qualcomm breaches Qualcomm's commitments and enforceable contracts with the relevant Standard Setting Organizations and their members, including Nokia, which license all or some of the patents-in-suit for a fair, reasonable and non-discriminatory royalty.

Respectfully submitted,

Louis S. Mastriani
Michael G. McManus
Tali L. Alban
ADDUCI MASTRIANI & SCHAUMBERG LLP
1200 Seventeenth Street, N.W., Fifth Floor
Washington, D.C. 20036
(202) 467-6300

Frederick A. Lorig
Bruce R. Zisser
Patrick M. Shields
Erica P. Taggart
QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Keith E. Broyles
John D. Haynes
Matthew J. Urbanawiz
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000

*Counsel for Nokia Corporation and Nokia, Inc.*

Dated:  August 10, 2006

NOK701706-PUB.DOC

21

## VERIFICATION OF RESPONSE TO THE COMPLAINT AND
## NOTICE OF INVESTIGATION INCLUDING AFFIRMATIVE DEFENSES

I, Richard W. Stimson, declare, in accordance with 19 C.F.R. §§ 210.4 and 210.13, under penalty of perjury under the laws of the United States of America, that the following statements are true:

1.    I am legal counsel for Nokia, Inc. and am duly authorized to sign this Response on behalf of Nokia Corporation and Nokia, Inc.;

2.    I have read the foregoing Response;

3.    To the best of my knowledge, information and belief, based upon reasonably inquiry, the foregoing is well founded in fact and is warranted by existing law or a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; and

4.    The foregoing Response is not being filed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of August 2006

Richard W. Stimson

20148/1935834.1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **RESPONSE OF NOKIA CORPORATION AND NOKIA INCORPORATED TO THE COMPLAINT, AS SUPPLEMENTED, OF QUALCOMM INCORPORATED AND NOTICE OF INVESTIGATION (PUBLIC)** was served as indicated, to the parties listed below, this 10th day of August 2006:

The Honorable Marilyn R. Abbott
SECRETARY
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W., Room 112A
Washington, DC 20436
**(VIA HAND DELIVERY – Original + 6 copies)**

The Honorable Robert L. Barton, Jr.
ADMINISTRATIVE LAW JUDGE
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W., Room 317
Washington, DC 20436
**(VIA HAND DELIVERY – 2 copies)**

David Lloyd, Esq.
INVESTIGATIVE ATTORNEY
OFFICE OF UNFAIR IMPORT INVESTIGATIONS
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W., Room 401
Washington, DC 20436
**(VIA HAND DELIVERY)**

ON BEHALF OF COMPLAINANTS
QUALCOMM INCORPORATED

James R. Batchelder, Esq.
DAY CASEBEER MADRID & BATCHELDER LLP
20300 Stevens Creek Boulevard, Suite 400
Cupertino, California 95014
**(VIA ELECTRONIC MAIL AND FEDERAL EXPRESS)**

Cecilia H. Gonzalez, Esq.
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
**(VIA ELECTRONIC MAIL AND HAND DELIVERY)**

David Dolkas, Esq.
MCDERMOTT, WILL & EMERY LLP
3150 Porter Drive
Palo Alto, California 94304
**(VIA ELECTRONIC MAIL AND FEDERAL EXPRESS)**

_____
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, DC 20036

NO100006.doc

**Chestang, Rosemary**

| | |
|---|---|
| **From:** | LexisNexis File & Serve [eFile@fileandserve.lexisnexis.com] |
| **Sent:** | Friday, August 11, 2006 11:43 AM |
| **To:** | Chestang, Rosemary |
| **Subject:** | Case: 2330-N; Transaction: 12050366 Accepted w/Edits |

To: Rosemary Chestang

Subject: Notice of Accepted and Edited Transaction

DE Court of Chancery has accepted a transaction in 2330-N with edits.

The details for this transaction are listed below.

Court:                         DE Court of Chancery
Case Name:                 Nokia Corp et al vs Qualcomm Inc
Case Number:             2330-N
Transaction ID:           12050366
Authorized Date/Time:     Aug 11 2006 10:50AM EDT
Authorizer:                Matthew E. Fischer
Authorizer's Organization:   Potter Anderson & Corroon LLP
Sending Parties:
       Qualcomm, Incorporated
       Qualcomm, Incorporated

If you are a subscriber, you can view the changes the clerk has elected to make to the documents filed in this case online at https://fileandserve.lexisnexis.com/Login/Login.aspx . You may see the details regarding the review status by clicking the Search tab to the right of the screen and searching for Transaction ID 12050366. The clerks comments are listed below.

The filing fees were increased by $0.00.

Document Title(s):

Letter to Vice Chancellor Strine from Matthew Fischer, esq., dated 8-10-06; regarding Qualcomm, Inc.'s opposition to Plaintiff's Motion to Expedite

    Status:    Accepted

    Reason:   Document Title Edited

   Exhibit A as attachment to letter to Vice Chancellor Strine.

    Status:    Accepted


Thank you for using LexisNexis File & Serve.

Questions? For prompt, courteous assistance please contact LexisNexis Customer Service by phone at 1-888-529-7587 (24/7).

# EXHIBIT E

# ETSI Guide on Intellectual Property Rights (IPRs)

**(As endorsed by the ETSI GA#46 on 23 November 2005)**

© European Telecommunications Standards Institute 2005. All rights reserved.

## Annex B     ETSI IPR Information Statement and Licensing Declaration Forms

### ANNEX 1

**IPR Holder/Organisation**

Legal Name: _____

**Signatory**

Name: _____

Position: _____

Department: _____

Address: _____

_____

Tel.: _____

Fax: _____

E-mail: _____

**IPR information statement**

In accordance with the ETSI IPR Policy, Article 4.1, I hereby inform ETSI that,

with reference to the technical proposal identified as _____

and/or

in relation to Work Item No. _____

and/or

with reference to ETSI Standard No. _____

it is my belief that the IPRs listed in Annex 2 are, or are likely to become, Essential IPRs in relation to that Standard.

**IPR licensing declaration**

The SIGNATORY has notified ETSI that it is the proprietor of the IPRs listed in Annex 2 and has informed ETSI that it believes that the IPRs may be considered ESSENTIAL to the Standards listed above.

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

The construction, validity and performance of this DECLARATION shall be governed by the laws of France.

**Place, Date:**                                    **Signature:**

_____                    _____

                                                         (Signed for and on behalf of the SIGNATORY)

Please return this form duly signed to:
ETSI Director General - Karl Heinz Rosenbrock

ETSI - 650, route des Lucioles - F-06921 Sophia Antipolis Cedex - FRANCE
Fax. +33 (0) 4 93 65 47 16

# EXHIBIT F

# ETSI Directives

## Version 20
## July 2006

CONFIDENTIAL INFORMATION incorporated in a STANDARD or TECHNICAL SPECIFICATION shall be regarded as non-confidential by ETSI and its MEMBERS, from the date on which the STANDARD or TECHNICAL SPECIFICATION is published.

## 11    Reproduction of Standards Documentation

MEMBERS may make copies of STANDARDS and TECHNICAL SPECIFICATIONS documentation produced by ETSI for their own use free of charge but may not distribute such copies to others.

## 12    Law and Regulation

The POLICY shall be governed by the laws of France. However, no MEMBER shall be obliged by the POLICY to commit a breach of the laws or regulations of its country or to act against supranational laws or regulations applicable to its country insofar as derogation by agreement between parties is not permitted by such laws.

Any right granted to, and any obligation imposed on, a MEMBER which derives from French law and which are not already contained in the national or supranational law applicable to that MEMBER is to be understood as being of solely a contractual nature.

## 13    Policy Decisions

Without prejudice to ETSI's Statutes and Rules of Procedure, no decisions shall be taken by ETSI in relation to implementation of the POLICY unless supported by a 71 % majority of the weighted individual votes cast by MEMBERS.

## 14    Violation of Policy

Any violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI. The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach, in accordance with the ETSI Statutes.

## 15    Definitions

1    **"AFFILIATE"** of a first legal entity means any other legal entity:

- directly or indirectly owning or controlling the first legal entity, or

- under the same direct or indirect ownership or control as the first legal entity, or

- directly or indirectly owned or controlled by the first legal entity,

    for so long as such ownership or control lasts.

Ownership or control shall exist through the direct or indirect:

- ownership of more than 50 % of the nominal value of the issued equity share capital or of more than 50 % of the shares entitling the holders to vote for the election of directors or persons performing similar functions, or

- right by any other means to elect or appoint directors, or persons who collectively can exercise such control. A state, a division of a state or other public entity operating under public law, or any legal entity, linked to the first legal entity solely through a state or any division of a state or other public entity operating under public law, shall be deemed to fall outside the definition of an AFFILIATE.

2    **"COMMITTEE"** shall mean any Technical Body of ETSI and shall include ETSI Projects, Technical Committees, ETSI Partnership Projects, and their Working Groups

3    **"CONFIDENTIAL INFORMATION"** shall mean all information deemed to be confidential pursuant to Clause 10 of the POLICY disclosed directly or indirectly to the MEMBER.

4    **"EQUIPMENT"** shall mean any system, or device fully conforming to a STANDARD.

5    **"METHODS"** shall mean any method or operation fully conforming to a STANDARD

6    **"ESSENTIAL"** as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

7    **"IPR"** shall mean any intellectual property right conferred by statute law including applications therefor other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

8    **"MANUFACTURE"**, shall mean production of EQUIPMENT.

9    **"MEMBER"** shall mean a member or associate member of ETSI. References to a MEMBER shall wherever the context permits be interpreted as references to that MEMBER and its AFFILIATES.

10    **"POLICY"** shall mean ETSI's Intellectual Property Rights Policy.

JS 44  (Rev 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Nokia Corporation and Nokia, Inc. | QUALCOMM Incorporated |

| (b) County of Residence of First Listed Plaintiff New Castle | County of Residence of First Listed Defendant New Castle |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED |

| (c)  Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Richards, Layton & Finger, P.A.<br>One Rodney Square, P.O. Box 551<br>Wilmington, DE  19899 | Potter Anderson & Corroon LLP<br>1313 North Market Street, 6th Floor<br>P.O. Box 951<br>Wilmington, DE  19801 |

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question (U.S. Government Not a Party)
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[x] 190 Other Contract<br>[ ] 195 Contract Product Liability | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury | **PERSONAL INJURY**<br>[ ] 362 Personal Injury— Med. Malpractice<br>[ ] 365 Personal Injury — Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 610 Agriculture<br>[ ] 620 Other Food & Drug<br>[ ] 625 Drug Related Seizure of Property 21 USC<br>[ ] 630 Liquor Laws<br>[ ] 640 R.R. & Truck<br>[ ] 650 Airline Regs.<br>[ ] 660 Occupational Safety/Health<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[x] 830 Patent<br>[ ] 840 Trademark | [ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce/ICC Rates/etc<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 810 Selective Service<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 875 Customer Challenge 12 USC 3410 |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | [ ] 891 Agricultural Acts<br>[ ] 892 Economic Stabilization Act<br>[ ] 893 Environmental Matters<br>[ ] 894 Energy Allocation Act |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 444 Welfare<br>[ ] 440 Other Civil Rights | [ ] 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Mgmt. Relations<br>[ ] 730 Labor/Mgmt Reporting & Disclosure Act<br>[ ] 740 Railway Labor Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Empl. Ret. Inc. Security Act | [ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | [ ] 895 Freedom of Information Act<br>[ ] 900 Appeal of Fee Determination Under Equal Access to Justice<br>[ ] 950 Constitutionality of State Statutes<br>[ ] 890 Other Statutory Actions |

## V. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

- [ ] 1  Original Proceeding
- [x] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from another district (specify)
- [ ] 6  Multidistrict Litigation
- [ ] 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

35 U.S.C.  § 101, et seq. and 28 U.S.C. §§ 1333, 1941 and 1446

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  [ ] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE  08/16/2006

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____

JS 44 Reverse (Rev. 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**      **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

     **(b )** County of Residence. For each civil case filed, except U S plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

     **(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)"

**II.**      **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U S C 1345 and 1348 Suits by agencies and officers of the United States, are included here

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U S C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U S is a party, the U S plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship (4) This refers to suits under 28 U S C 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**      **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party

**IV.**      **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**      **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U S C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U S C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers

Multidistrict Litigation (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U S C Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision

**VI.**      **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause

**VII.**      **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F R Cv P

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded

**VIII.**      **Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases

**Date and Attorney Signature.** Date and sign the civil cover sheet

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 6 - 5 0 9 _____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ 1 _____ COPIES OF AO FORM 85.

_____ 8-16-06 _____

(Date forms issued)

_____

(Signature of Party or their Representative)

JOHN D. RITTER

(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action