## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and NOKIA, INC.,  )
    )
              Plaintiffs,  )
    )
    v.      )
    )  C. A. No. 06-509
QUALCOMM INCORPORATED,  )
    )
              Defendant  )
    )

## QUALCOMM'S OPENING BRIEF IN SUPPORT OF ITS
## MOTION TO TRANSFER VENUE

Richard L. Horwitz (#2246)
Mathew E. Fischer (#3092)
Kenneth L. Dorsney (#3726)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000

OF COUNSEL:

Evan R. Chesler
Richard J. Stark
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
*QUALCOMM Incorporated*

Dated: August 16, 2006

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     NATURE AND STAGE OF PROCEEDING ....................................................1

III.    SUMMARY OF ARGUMENT .........................................................................2

IV.     FACTS ................................................................................................................3

V.      ARGUMENT ......................................................................................................5

        A.      TRANSFER TO THE SAN DIEGO DISTRICT COURT IS
                APPROPRIATE UNDER SECTION 1404(a)...................................5

                1.      Venue Is Proper In The San Diego District Court ...............6

                2.      Transfer Would Serve Both The Convenience Of The
                        Parties And The Interests Of Justice ....................................8

                        a.      The Private Interests Strongly Favor Transfer
                                To The San Diego District Court..............................9

                        b.      The Public Interest Strongly Favors Transfer To
                                The San Diego District Court.................................10

                2.      Other Factors Favor Transfer In Accordance With
                        Section 1404(a) ...................................................................12

                        a.      Nokia's Delaware Claims Are Defenses Or
                                Counterclaims To The Already Pending Action
                                In The San Diego District Court ...........................12

                        b.      Adjudication In Delaware Risks
                                Inconsistent Judicial Decisions..............................14

        B.      ALTERNATIVELY, THIS COURT SHOULD TRANSFER
                BECAUSE PREFERENCE BELONGS TO QUALCOMM'S
                FIRST-FILED SAN DIEGO SUIT ...............................................14

VI.     CONCLUSION..................................................................................................16

i

# TABLE OF AUTHORITIES

**Cases**                                                                page (s)

*Affymetrix, Inc. v. Synteni, Inc.*,
    28 F. Supp. 2d 192 (D. Del. 1998) ................................................................8, 9

*Alltrade, Inc. v. Uniweld Prods, Inc.*,
    946 F.2d 622 (9th Cir. 1991) ....................................................................15

*American Bio Medica Corp. v. Peninsula Drug Analysis Co.*,
    1999 WL 615175 (D. Del. Aug. 3, 1999) ..................................................11

*Arrow Commc'n Labs, Inc. v. John Mezzalingua Assocs*,
    2005 WL 2786691 (D. Del. Oct. 26, 2005) ..............................................15

*Asten Inc. v. Weavexx Corp.*,
    2000 WL 1728354 (D. Del. Feb. 11, 2000) ..............................................15

*BBDova, LLC v. Automotive Techs, Inc.*,
    358 F. Supp. 2d 387 (D. Del. 2005) ...........................................................5

*Cont'l Cas. Co. v. Am. Home Assurance Co.*,
    61 F. Supp. 2d 128 (D. Del. 1999) .............................................................8

*Dippold-Harmon Enters, Inc. v. Lowe's Cos.*,
    2001 WL 1414868 (D. Del. Nov. 13, 2001) .........................................15, 16

*EEOC v. Univ. of Pa.*,
    850 F.2d 969 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990) ...................10, 16

*Ferens v. John Deere Co.*,
    494 U.S. 516 (1990) .................................................................................10

*Fields v. Rockdale County*,
    785 F.2d 1558 (11th Cir.), *cert. denied*, 479 U.S. 984 (1986) .................14

*Genentech, Inc. v. Eli Lilly & Co.*,
    998 F.2d 931 (Fed. Cir. 1993) ..................................................................15

*Glick v. White Motor Co.*,
    458 F.2d 1287 (3d Cir. 1972) .....................................................................7

*Great Lakes Rubber Corp. v. Herbert Cooper Co.*,
    286 F.2d 631 (3d Cir. 1961) .....................................................................13

*Guidant Corp. v. St. Jude Med., Inc.*,
    2004 WL 1925466 (D. Del. Aug. 27, 2004) ............................................................. 15

*Jumara v. State Farm Ins. Co.*,
    55 F.3d 873 (3d Cir. 1995) ................................................................ 8, 10, 11

*Schlumberger Industries, Inc. v. National Surety Corp.*,
    36 F.3d 1274 (4th Cir. 1994) ........................................................................ 14

*Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*,
    292 F.3d 384 (3d Cir. 2002) ........................................................................ 13

*Tuff Torq Corp. v. Hydro-Gear Ltd. P'ship*,
    882 F. Supp. 359 (D. Del. 1994) ..................................................................... 6

*U.S. Valves, Inc. v. Dray*,
    212 F.3d 1368 (Fed. Cir. 2000) ...................................................................... 6

*Van Dusen v. Barrack*,
    376 U.S. 612 (1964) .................................................................................. 6

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*,
    751 F.2d 721 (5th Cir. 1985) ....................................................................... 15

## Rules

28 U.S.C. § 1338(a) ............................................................................................ 6

28 U.S.C. § 1404(a) .................................................................................... *passim*

35 U.S.C. § 282(1) ........................................................................................... 12

Fed. R. Civ. P. 8(c) .......................................................................................... 12

Fed. R. Civ. P. 13(a) .................................................................................... 12, 13

## I.    INTRODUCTION

By this action, plaintiffs Nokia Corporation and Nokia Inc. (collectively,

"Nokia") seek to enjoin QUALCOMM Incorporated ("QUALCOMM") from seeking

certain remedies in a prior-filed patent infringement case currently pending in the United

States District Court for the Southern District of California (San Diego Division) (the

"San Diego District Court"). Nokia also seeks declaratory relief to compel a license to

the patents at issue in that case from QUALCOMM and to prevent QUALCOMM from

pursuing additional infringement actions against Nokia in the United States International

Trade Commission and in foreign jurisdictions. QUALCOMM submits this

memorandum of law in support of its motion to transfer the instant action to the San

Diego District Court for consolidation in the interest of justice and convenience of the

parties and witnesses pursuant to 28 U.S.C. § 1404(a). Alternatively, QUALCOMM

seeks transfer pursuant to the first-filed rule.   The claims Nokia raises in the instant

action may be and should be brought in the San Diego District Court, which is the forum

best suited to entertain Nokia's claims.

## II.    NATURE AND STAGE OF PROCEEDING

QUALCOMM sued Nokia in the United States for patent infringement in the San

Diego District Court in November 2005.[1] Before answering the complaint, Nokia moved

to stay the suit pending the results of arbitration it had commenced, which motion the

District Court denied. Nokia then sought, and obtained, a stay of the action pending an

appeal of the District Court's denial of its motion to stay. That appeal was argued on an

expedited basis, and a decision is expected shortly.

---

[1] *QUALCOMM Inc. v. Nokia Corp.*, No. 05-CV-2063 (S.D. Cal. Filed Nov. 4, 2005.)

On August 9, 2006, Nokia brought the instant action in the Court of Chancery of the State of Delaware in and for New Castle County (the "Delaware Court")[2], seeking on an expedited basis to have the Delaware Court declare that QUALCOMM has licensed many of its United States and foreign country cellular phone technology patents to Nokia and to enjoin QUALCOMM from filing further civil actions in the various venues to enforce those patents.[3]  On August 11, 2006, the Delaware Court held a telephonic conference to address Nokia's request for expedited treatment at which time QUALCOMM raised objection to Nokia's suit proceeding in the Delaware Court and indicated that QUALCOMM may seek to remove the case.  On August 16, 2006, QUALCOMM removed the case to this Court.  Currently before the Court is QUALCOMM's motion to transfer and consolidate this action with the first-filed San Diego suit pursuant to Section 1404(a) or, alternatively, the first-filed rule.

## III.    SUMMARY OF ARGUMENT

Transferring this action to the San Diego District Court best serves the interest of justice and convenience of the parties and witnesses involved.  QUALCOMM initiated suit in the United States in San Diego by asserting Nokia's infringement of several of QUALCOMM patents.  Before answering, Nokia moved unsuccessfully for a stay pending arbitration and then successfully for a stay pending appeal and thereafter initiated the instant action against QUALCOMM in Delaware.  Nokia's Delaware suit raises claims that are, in reality, affirmative defenses and/or compulsory counterclaims in

---

[2] The Delaware Complaint is dated August 8, 2006, but is dated as being filed on August 9, 2006.

[3] QUALCOMM holds many cellular phone technology patents issued by foreign countries that QUALCOMM may only enforce in those countries pursuant to the law of the issuing country.

the San Diego suit and necessitate substantive resolution of many of the same patent law

issues raised by that case. No bar precludes adjudicating Nokia's Delaware claims in San

Diego. Significant weight should favor QUALCOMM's original choice of forum.

QUALCOMM filed the first action in San Diego, several QUALCOMM witnesses reside

there, and QUALCOMM maintains its headquarters in that venue. Nokia should not be

allowed to circumvent that first-filed action. Transfer pursuant to Section 1404(a) is just.

Alternatively, the first-filed rule warrants transfer.

## IV.    FACTS

In November 2005, QUALCOMM brought suit against Nokia in the U.S. District

Court for the Southern District of California. In the First Amended Complaint, which is

attached as Exhibit A, QUALCOMM alleges that certain of Nokia's products sold or

used in the United States infringed twelve QUALCOMM United States patents.

QUALCOMM seeks a judicial declaration of infringement under federal law as well as

injunctive and monetary relief. The patents at issue relate generally to the transmission,

reception, and processing of communication signals, including radio signals and/or

signals for wireless telephony under the GSM family of standards. GSM, or "Global

System for Mobile," was developed primarily in Europe and standardized under the

auspices of ETSI (the European Telecommunications Standards Institute).[4]   Some, but

not all, of the twelve United States patents asserted in the Southern District of California

---

[4]   Technologically, GSM is based on increasing the capacity of cellular networks through
a combination of time division (TDMA) and frequency division (FDMA). Time division
increases capacity by permitting separate phones to "take turns," by dividing a time frame
into eight smaller slots and assigning a different call to each slot (later developments of
the GSM and successor technologies permit a single call to occupy more than one slot at
a time). Frequency division similarly divides up the allocated radio spectrum into smaller
sub-bands, to permit "sharing" among multiple callers.

action are patents that QUALCOMM has informed ETSI may be essential to the GSM standards adopted by ETSI.[5]  In December 2005, Nokia filed a confidential demand for arbitration and a motion to stay the Southern District of California action pending arbitration.  After two rounds of briefing and two separate hearings, the San Diego District Court denied Nokia's motion in an order dated March 14, 2006.  Nokia then moved for a stay pending appeal of the denial of its motion to stay pending arbitration.  The San Diego District Court granted the stay pending appeal, and the Court of Appeals for the Federal Circuit granted an expedited review of Nokia's appeal.  Briefing was completed in April 2006, and oral argument was heard on July 14, 2006.  A ruling is expected shortly.

Having stalled the San Diego proceedings, and on the heels of the oral argument in the Federal Circuit, Nokia filed a Complaint and a Motion to Expedite in the Delaware Court of Chancery on August 8, 2006.  In this action, Nokia alleges that QUALCOMM has licensed Nokia to practice QUALCOMM patents that are standards-essential to ETSI on fair, reasonable, and non-discriminatory ("FRAND") terms.  Compl. ¶1, attached hereto as Exhibit B.  Nokia requested that the Delaware state court declare the terms of alleged licensing contracts between QUALCOMM and Nokia to be binding contractual obligations and enjoin QUALCOMM from seeking injunctive relief worldwide as a remedy for infringement of its essential patents.

Although Nokia attempts to cast these ETSI-related FRAND allegations as contract issues independent of the pending patent infringement action in the Southern

_____

[5] QUALCOMM also has sought to protect its interests with regard to patents issued in foreign jurisdictions.  QUALCOMM has filed parallel infringement actions against Nokia in the U.S. International Trade Commission ("ITC"), the United Kingdom, and Germany.

District of California, its claims are nothing more than affirmative defenses (or

compulsory counterclaims) to QUALCOMM's claims for which Nokia seeks a ruling in a

forum it believes may be more favorable to its position. In fact, in its First Set of

Interrogatories Directed to Defendant QUALCOMM in the instant action (served August

10, 2006; attached hereto as Exhibit E), Nokia seeks specific information concerning U.S.

Patent No. 5,590,408 (the "'408 patent"). The '408 patent is one of the twelve patents

that QUALCOMM claims Nokia has infringed. Ex. A ¶¶ 13; 22; 25. Indeed, Nokia's

counsel acknowledged the true nature of its claims as being defenses or counterclaims to

QUALCOMM's suit at the parties' scheduling conference on August 11, 2006, before the

Delaware Chancery Court. *See* Transcript of Scheduling Conference Hearing at 34-35,

attached hereto as Exhibit C (Nokia's counsel acknowledging its Delaware claims could

be raised in the San Diego District Court).[6] Despite this admission, Nokia has attempted

to circumvent defending QUALCOMM's infringement claims on the merits by filing the

instant case.

## V.    ARGUMENT

### A.    TRANSFER TO THE SAN DIEGO DISTRICT COURT IS APPROPRIATE UNDER SECTION 1404(a)

"For the convenience of parties and witnesses, in the interest of justice, a district

court may transfer any civil action to any other district or division where it might have

been brought." 28 U.S.C. § 1404(a); *see also BBDova, LLC v. Automotive Techs., Inc.*,

---

[6] That Nokia intends to use its ETSI-related FRAND claims as affirmative defenses in the Southern District of California is evidenced by its responses to QUALCOMM's ITC infringement claims. See Response of Nokia Corporation and Nokia Incorporated to the Complaint, As Supplemented, of QUALCOMM Incorporated and Notice of Investigation, attached hereto as Exhibit D. As the attached will demonstrate, Nokia's sixteenth affirmative defense is the same FRAND claim it is asking the Delaware Court of Chancery to adjudicate.

358 F. Supp. 2d 387, 390 (D. Del. 2005) (§ 1404(a) "allows a district court to transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interest of justice"). The purpose of Section 1404(a) is "to prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal citations omitted). These principles underlying §1404(a) weigh heavily in favor of transferring this matter to the San Diego District Court.

### 1.    Venue Is Proper In The San Diego District Court

As a threshold matter, this case may only be transferred to a district where the action could have been brought. *See Tuff Torq Corp. v. Hydro-Gear Ltd. P'ship*, 882 F. Supp. 359, 361 (D. Del. 1994). As explained in QUALCOMM's Notice of Removal, subject matter jurisdiction is proper in federal district court, as the resolution of this case necessarily turns on substantial questions of patent law, as to which there is exclusive federal jurisdiction. *See U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1372 (Fed. Cir. 2000); 28 U.S.C. § 1338(a). Venue and personal jurisdiction are also proper and undisputed in the San Diego suit.

Indeed, all of the San Diego and Delaware claims can reasonably be brought before the San Diego District Court for full and complete resolution. The San Diego District Court is fully capable of adjudicating both QUALCOMM patent infringement claims and Nokia's patent/contract defenses and rendering a decision that will bind both parties. Allowing both actions to proceed simultaneously will cause needless waste of

party and judicial resources and duplication of effort in multiple venues. Justification

does not exist to bar the transfer QUALCOMM seeks here.

Furthermore, there is no dispute that the issues raised in the instant action could

be fully resolved in the San Diego suit. Nokia admitted that its claims could be brought

as defenses or counterclaims before Vice Chancellor Strine during the August 11, 2006,

hearing:

> MR. LORIG [counsel for Nokia]: We could seek the same
> injunction from the Federal Court we are seeking from this
> court, except for the fact that it's again not a federal
> question –
>
> THE COURT: It's not a Delaware law question either.
>
> MR. LORIG: It's a contract question, Your Honor. It's
> strictly contract.
>
> THE COURT: What I'm saying is, you would have every
> right, given that they brought you into Federal Court, for
> you now to raise this as a counterclaim and an affirmative
> defense and seek an injunction. It would not be a
> jurisdictional problem on the part of the Federal Court.
>
> MR. LORIG: It wouldn't be, except that the case is stayed
> pending arbitration.

(Ex. C, Court of Chancery Hr. Tr. at 34:21 to 35:12); *see also Glick v. White Motor Co.*,

458 F.2d 1287, 1291 (3d Cir. 1972) (noting that unequivocal "judicial admissions are

binding for the purpose of the case in which the admissions are made[,] including

appeals"). The stay Mr. Lorig references is a non-issue. Nokia sought the stay to appeal

denial of its stay motion and can seek its lifting immediately if it so chooses.

QUALCOMM already expressed agreement to have the stay lifted. (Ex. C, Court of

Chancery Hr. Tr. at 35:18-20 ("We will stipulate to the lifting of that stay immediately, if

Nokia would agree.")). Alternatively, Nokia can wait the short interval to receive a

decision on appeal, as QUALCOMM must before resolving its own infringement claims against Nokia.

###        2.        Transfer Would Serve Both The Convenience Of The Parties And The Interests Of Justice

Since this action could have been brought in the San Diego District Court, the Court next examines "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995) (citations omitted). In *Jumara*, the Third Circuit has identified a nonexclusive list of private and public factors to guide a court in determining whether transfer is appropriate. The private interests include: (1) the plaintiff's forum preference; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses; and (6) the location of books and records. *Jumara*, 55 F.3d at 879; *see also Cont'l Cas. Co. v. Am. Home Assurance Co.*, 61 F. Supp. 2d 128, 131 n.4 (D. Del. 1999); *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 197 (D. Del. 1998). The public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the trial judge's familiarity with applicable state law in diversity cases. *Jumara*, 55 F.3d at 879-80; *Cont'l Cas.* 61 F. Supp. 2d at 131 n.4; *Affymetrix*, 28 F. Supp. 2d at 197.

An application of these public and private factors to this case demonstrates that this action should properly be transferred to the San Diego District Court.

8

a.    **The Private Interests Strongly Favor Transfer To The San Diego District Court**

This Court has held that the weaker the connection between the chosen forum and either the plaintiff or the lawsuit, the greater the ability of the defendant to demonstrate sufficient inconvenience to warrant transfer. *Affymetrix*, 28 F. Supp. 2d at 199. Here, the private factors pertaining to the forum preferences and where the claims arose weigh heavily in favor of transfer. First, and most importantly, the fact that the San Diego suit involves virtually the same issues (infringement vs. defense to infringement) means that the parties will save an enormous amount of time and expense by having this case tried there, rather than in Delaware on the defense and in San Diego on the infringement. The facts and substantive patent issues involved in both cases will likely be the same and require a claim interpretation and technical understanding to determine infringement as well as to determine Nokia's purported defense under the "essential" patent provisions of the ETSI policy. Moreover, Nokia's claims can be said to have arisen in the San Diego venue (not Delaware) by virtue of QUALCOMM's prosecution of infringement claims there.

Second, QUALCOMM's principal place of business and its physical location is in San Diego where many of its employees reside. By contrast, neither QUALCOMM nor Nokia is headquartered in Delaware. Third, many of QUALCOMM's employees will be required to participate in the legal proceedings in this case, should it proceed, including testifying at trial. Requiring them to travel cross-country to Delaware after QUALCOMM filed suit originally in San Diego months ago seems at odds with notions of comity and fairness.

9

Other expenses, including costs associated with travel and accommodations and litigating in two forums will also be reduced if this matter is transferred to San Diego. Furthermore, with respect to the convenience of the parties in terms of witnesses and discoverable records, litigating this case in the San Diego District Court as opposed to Delaware would considerably reduce the expense to the parties in both time and money. Most, if not all, of QUALCOMM's witnesses, relevant records, and other documents are located in San Diego, while Nokia would be no more inconvenienced or prejudiced by having this matter litigated there, as opposed to Delaware.

In sum, given the paucity of connections with Delaware and the strong connections with San Diego, it appears that the only reason Nokia brought this matter here is to escape litigating in the San Diego District Court, which has previously rebuffed Nokia's request for a stay pending arbitration. This is precisely the type of "forum shopping" that the courts have rejected by granting motions to transfer. *See, e g , Ferens v. John Deere Co*, 494 U.S. 516, 527 (1990); *EEOC v. Univ of Pa.*, 850 F.2d 969, 972 (3d Cir. 1988*), aff'd*, 493 U.S. 182 (1990).

> **b.    The Public Interest Strongly Favors Transfer To The San Diego District Court**

The public interest factors set out by the *Jumara* court favor the transfer of this case to San Diego. In particular, as noted above, Nokia's defense of the prior-filed San Diego infringement action will undoubtedly involve the issues raised in the instant litigation. Consequently, the interests of justice and of judicial economy would be far better served by transferring this matter from this Court to the San Diego District Court, which is fully capable of resolving both the infringement claims and the FRAND claims in a single action. Indeed, this Court recently has recognized that "[m]otions to transfer

venue are granted ... if there is a related case which has been filed first or otherwise is the more appropriate vehicle to litigate the issues between the parties." *American Bio Medica Corp. v. Peninsula Drug Analysis Co.*, 1999 WL 615175, at *5 (D. Del. Aug. 3, 1999).[7] Trying this matter in Delaware would be a needless waste of time and expense given the San Diego court's ability to address each of Nokia's ETSI-related claims in conjunction with QUALCOMM's infringement claims.

As to the fourth *Jumara* factor, there is considerably more local interest in resolving this matter in California, where QUALCOMM is headquartered, than in Delaware. *Jumara*, 55 F.3d at 879-80. Nokia Corporation is a Finnish entity, headquartered in Finland. The fact that Nokia Inc. is incorporated in Delaware (as is QUALCOMM) should not support any preference for Delaware as a forum for this dispute, as Nokia Inc. is merely a wholly owned and controlled U.S. subsidiary of the real party, the Finnish parent. Nokia maintains hundreds of employees in the San Diego area. Nokia's FRAND claims do not rely upon any aspect of law or practice unique to Delaware (indeed, Nokia premises its claims on French law) Delaware has little or no interest in a suit in which none of the events giving rise to the matter occurred and where none of the parties maintain their principal places of business, and local law is not at issue.

---

[7] Unpublished decisions are attached hereto as Exhibits F through J.

2.    **Other Factors Favor Transfer In Accordance With Section 1404(a)**

a.    **Nokia's Delaware Claims Are Defenses Or Counterclaims To The Already Pending Action In The San Diego District Court**

Nokia's FRAND claims must be pleaded as affirmative defenses in the San Diego District Court. Federal Rule of Civil Procedure 8(c) explicitly states: "(c) Affirmative Defenses. In pleading to a preceding pleading, a party shall set forth affirmatively . . . license, and any other matter constituting an avoidance or affirmative defense." Fed. R. Civ. P. 8(c) (emphasis added). Further, section 282 of the Patent Act confirms that a license must be pleaded as an affirmative defense in patent cases. 35 U.S.C. § 282(1) ("The following shall be defenses in any action involving the . . infringement of a patent and shall be pleaded: (1) . . . absence of liability for infringement . . . .") (emphasis added). Nokia's assertion that QUALCOMM has licensed essential patents to Nokia (Ex. B ¶ 1) is an affirmative defense to infringement of any essential patent. As such, the Federal Rules of Civil Procedure and the Patent Act require Nokia to plead the existence of these licenses as an affirmative defense to QUALCOMM's Southern District of California infringement claims.

Moreover, Rule 13(a) of the Federal Rules of Civil Procedure provides that:

> [a] pleading shall state as a counterclaim any claim, which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

12

Fed. R. Civ. P. 13(a). "The policy underlying this rule is judicial economy." *Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389 (3d Cir. 2002).

"For a claim to qualify as a compulsory counterclaim, there need not be precise identity of issues and facts between the claim and the counterclaim; rather, the relevant inquiry is whether the counterclaim 'bears a logical relationship to an opposing party's claim.'" *Id.* at 389 (citation omitted) (emphasis added). Whether two claims have a "'logical relationship' has been viewed liberally," and is found "when claims involve the same factual issues, the same factual and legal issues, or are offshoots of the same basic controversy between the parties." *Id.* at 389-90. Put another way, "a counterclaim is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts." *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3d Cir. 1961).

The filing of the instant action in Delaware is precisely what Fed. R. Civ. P. 13(a) was intended to avoid. There can be no question that the claims raised by Nokia in the instant action bear a logical relationship to the QUALCOMM's claims in the San Diego District Court. Perhaps the best evidence of the compulsory nature of the Nokia Delaware claims is the factual similarity to the affirmative defenses and counterclaims raised by Nokia in the ITC proceeding, a proceeding involving similar QUALCOMM cellular phone technology patents. *See* footnote 5, *supra.*

No doubt, Nokia will attempt to argue that its Delaware claims bear no relationship to QUALCOMM's San Diego claims. Logic, however, suggests the

opposite. Nokia's Delaware claims, should they prevail, could operate to provide Nokia with a license to the very same QUALCOMM patents at issue in San Diego and, thus, preclude QUALCOMM's recovery in that suit. Indeed, Nokia's ETSI-related claims are inextricably intertwined with the infringement claims asserted in San Diego, as evidenced by Nokia's First Set of Interrogatories in the instant case, which inquire about a patent QUALCOMM in the federal action alleges Nokia infringed. Moreover, in the ITC proceeding, an action involving other similar QUALCOMM cellular telephone technology patents, Nokia has already asserted as an affirmative defense the FRAND issue it assert in the instant action. Ex. D.

### b.    Adjudication In Delaware Risks Inconsistent Judicial Decisions

Finally, because the San Diego suit addresses the same or similar issues as those in controversy in this action, a disposition of this case in Delaware presents the potential for inconsistent judicial outcomes. *See, e.g.*, *Schlumberger Industries, Inc. v. National Surety Corp.*, 36 F.3d 1274, 1286 (4th Cir. 1994) (noting potential for different interpretations of law, different findings of fact, and ultimately inconsistent judgments when two different courts handle the same case separately); *Fields v. Rockdale County*, 785 F.2d 1558, 1562 (11th Cir.), *cert. denied*, 479 U.S. 984 (1986) (holding that concurrent proceedings in different courts on the same issue "present[s] a comparable threat of inconsistent outcomes and attendant friction.").

### B.    ALTERNATIVELY, THIS COURT SHOULD TRANSFER BECAUSE PREFERENCE BELONGS TO QUALCOMM'S FIRST-FILED SAN DIEGO SUIT

Nokia's assertion of claims in Delaware is the epitome of forum shopping and the claims should be transferred in favor of QUALCOMM's first-filed San Diego suit. "A

14

motion to transfer venue may also be granted if there is a related case which has been first filed or otherwise is the more appropriate venue in which to litigate the issues between the parties." *E.g., Arrow Commc'n Labs., Inc. v. John Mezzalingua Assocs.*, 2005 WL 2786691 at *1 (D. Del. Oct. 26, 2005) (Slip Copy) (citing *Am. Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc*, 1999 WL 615175, at *5 (D. Del. Aug. 3, 1999)); *Guidant Corp. v. St. Jude Med., Inc*, 2004 WL 1925466, at *3 (D. Del. Aug. 27, 2004) ("[T]he caselaw reflects the overwhelming preference toward the first-filed case."). This first-filed rule serves to avoid "trench[ing] upon the authority of sister courts," *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985), and prevents multiplicity of actions to achieve resolution in a single suit of all disputes arising out of common matters, *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993); *see also Alltrade, Inc. v. Uniweld Prods, Inc.*, 946 F.2d 622, 625 (9th Cir. 1991). Thus, a district court should transfer an action where the issues presented can be resolved in an earlier filed action pending in another district court. *See Alltrade*, 946 F.2d at 623.

Departure from this rule of judicial comity is not warranted by the nature of Nokia's Delaware claims. The thrust of Nokia's claims in the instant action sound exclusively in defense of QUALCOMM's patent rights, an issue currently pending in the San Diego District Court. Any variance between QUALCOMM's San Diego claims and Nokia's Delaware claims does not justify maintenance of dual litigations in different federal districts. *Dippold-Harmon Enters., Inc. v. Lowe's Cos.*, 2001 WL 1414868, at *4-*5 (D. Del. Nov. 13, 2001) (rejecting argument that different issues precluded transfer where "[b]oth actions . . . concern[ed] different facets of the same business relationship between the parties."); *cf. Asten Inc. v. Weavexx Corp.*, 2000 WL 1728354, at *2 (D. Del.

15

Feb. 11, 2000) ("[T]he rule has been described as giving priority to 'the court which first has possession *of the subject*.") (quoting *EEOC*, 850 F.2d at 971) (emphasis in original). As was the case in *Dippold*, Nokia's Delaware claims, if they do not present identical issues as the San Diego suit, surely involve the same business relationship between the parties – and the same operative facts – concerning ETSI and QUALCOMM's cellular phone technology patents and do not warrant departure from the first-filed rule.

## VI.    CONCLUSION

For the reasons expressed herein, QUALCOMM respectfully requests a transfer of this action to the United States District Court for the Southern District of California (San Diego Division) pursuant to 28 U.S.C. § 1404(a) or the first-filed rule.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Evan R. Chesler
Richard J. Stark
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: August 16, 2006
746285/30592

By: _____
Richard L. Horwitz (#2246)
Matthew E. Fischer (#3092)
Kenneth L. Dorsney (#3726)
Hercules Plaza, 6th Floor
1313 N. Market Street, P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
rhorwitz@potteranderson.com
mfischer@potteranderson.com
kdorsney@potteranderson.com

*Counsel for Defendant*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on August 16, 2006, the foregoing document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading:

Lisa A. Schmidt
Jeffrey Moyer
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE  19899

By:  _____
      Richard L. Horwitz
      Matthew E. Fischer
      Kenneth L. Dorsney
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, Delaware 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      mfischer@potteranderson.com
      kdorsney@potteranderson.com

746337

# EXHIBIT A

1 | Gerald L. McMahon (CSB# 36050)
David J. Zubkoff (CSB# 149488)
2 | SELTZER CAPLAN McMAHON VITEK
2100 Symphony Towers
3 | 750 B Street
San Diego, CA 92101
4 | (619) 685-3003

5 | Lloyd R. Day, Jr. (CSB# 090875)
James R. Batchelder (CSB# 136347)
6 | DAY CASEBEER MADRID & BATCHELDER LLP
20300 Stevens Creek Blvd., Suite 400
7 | Cupertino, CA 95014
(408) 873-0110
8

9 | Louis M. Lupin (CSB# 120846)
Alexander H. Rogers (CSB# 131879)
Roger Martin (CSB# 195003)
10 | Byron Yafuso (CSB # 225210)
QUALCOMM Incorporated
11 | 5775 Morehouse Drive
San Diego, CA 92121
12 | (858) 658-1121

13 | Attorneys for Plaintiffs
QUALCOMM Incorporated
14 | and SnapTrack, Inc.

15 |                     UNITED STATES DISTRICT COURT

16 |                   SOUTHERN DISTRICT OF CALIFORNIA

17 | QUALCOMM INCORPORATED          Case No. 05 CV 2063 B (BLM)
and
18 | SNAPTRACK, INC.,

19 |              Plaintiffs,       **FIRST AMENDED COMPLAINT FOR
                                    PATENT INFRINGEMENT, SPECIFIC
20 |        v.                      PERFORMANCE AND BREACH OF
                                    CONTRACT**
21 | NOKIA CORPORATION
and                                 **DEMAND FOR JURY TRIAL**
22 | NOKIA INC.

23 |              Defendants.

24 |

25 |

26 |

27 |

28 |

21_1 doc | FIRST AMENDED COMPLAINT FOR PATENT
INFRINGEMENT, SPECIFIC PERFORMANCE AND
BREACH OF CONTRACT

1    Plaintiff QUALCOMM Incorporated ("QUALCOMM") and SnapTrack, Inc. ("SnapTrack")

2    (collectively, "Plaintiffs") for their complaint herein state:

3    **I.    PARTIES**

4        1.    Plaintiff QUALCOMM is a corporation organized and existing under the laws of the

5    state of Delaware, with its principal place of business at 5775 Morehouse Drive, San Diego,

6    California, 92121. QUALCOMM develops, manufactures, markets, licenses and operates advanced

7    communications systems based on proprietary technology.

8        2.    Plaintiff SnapTrack, Inc. ("SnapTrack") is a corporation organized and existing under

9    the laws of the State of California, with its principal place of business at 675 Campbell Technology

10   Parkway, Suite 200, Campbell, CA  95008. SnapTrack is a wholly-owned subsidiary of

11   QUALCOMM.

12       3.    Defendant Nokia Corporation ("Nokia Corp.") is a public limited liability company

13   incorporated under the laws of the Republic of Finland, with its principal executive office at

14   Keilalahdentie 4, P.O. Box 226, FIN-00045 Nokia Group, Espoo, Finland. Nokia Corp. operates

15   throughout the United States, individually and through its wholly-owned indirect subsidiary, Nokia

16   Inc.

17       4.    Defendant Nokia Inc. is a Delaware corporation with its principal place of business at

18   6000 Connection Drive, Irving, Texas 75039, and is a wholly-owned indirect subsidiary of Nokia

19   Corp.

20       5.    In this Complaint, Nokia Corp. and Nokia Inc. are collectively referred to as "Nokia."

21       6.    Plaintiffs are informed and believe and thereon allege that Nokia Corp. and Nokia

22   Inc. are doing business in California and in this district.

23   **II.    JURISDICTION AND VENUE**

24       7.    Plaintiffs' claims for patent infringement arise under the patent laws of the United

25   States, Title 35 U.S.C. §§ 1 *et seq.* This Court has subject matter jurisdiction over these claims

26   pursuant to 28 U.S.C. §§ 1331 and 1338(a).

27   ///

28   ///

FIRST AMENDED COMPLAINT FOR PATENT            1
INFRINGEMENT, SPECIFIC PERFORMANCE AND
521_1 doc    BREACH OF CONTRACT

1    8.    Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b) and/or (c), and

2  1400(b), as Nokia resides and/or conducts substantial business in this district and has committed, and

3  is continuing to commit, acts of infringement in this district.

### III.   GENERAL ALLEGATIONS

5    9.    This action arises out of, in part, Nokia's infringement of eleven (11) patents assigned

6  to QUALCOMM, and one (1) patent assigned to SnapTrack.

### IV.   QUALCOMM'S PATENTS

8    10.    On October 26, 1993, United States Patent No. 5,257,283 ("the '283 Patent"), entitled

9  "Spread Spectrum Transmitter Power Control Method and System," was duly and legally issued to

10  QUALCOMM as assignee of the inventors, Klein S. Gilhousen, Roberto Padovani, and Charles E.

11  Wheatley, III.  A true and correct copy of the '283 Patent is attached hereto as Exhibit 1.

12    11.    On October 22, 1996, United States Patent No. 5,568,483 ("the '483 Patent"), entitled

13  "Method and Apparatus for the Formatting of Data for Transmission," was duly and legally issued to

14  QUALCOMM as assignee of the inventors, Roberto Padovani, Edward G. Tiedemann, Jr., Joseph P.

15  Odenwalder, Ephraim Zehavi, and Charles E. Wheatley, III.  A true and correct copy of the '483

16  Patent is attached hereto as Exhibit 2.

17    12.    On July 7, 1998, United States Patent No. 5,778,338 ("the '338 Patent"), entitled

18  "Variable Rate Vocoder," was duly and legally issued to QUALCOMM as assignee of the inventors,

19  Paul E. Jacobs, William R. Gardner, Chong U. Lee, Klein S. Gilhousen, S. Katherine Lam, and

20  Ming-Chang Tsai.  A true and correct copy of the '338 Patent is attached hereto as Exhibit 3.

21    13.    On December 31, 1996, United States Patent No. 5,590,408 ("the '408 Patent"),

22  entitled "Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System,"

23  was duly and legally issued to QUALCOMM as assignee of the inventors, Ana L. Weiland, Richard

24  K. Kornfeld, and John E. Maloney.  A true and correct copy of the '408 Patent is attached hereto as

25  Exhibit 4.

26    14.    On August 5, 1997, United States Patent No. 5,655,220 ("the '220 Patent"), entitled

27  "Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System," was duly

28  and legally issued to QUALCOMM as assignee of the inventors, Ana L. Weiland, Richard K.

1  Kornfeld, and John E. Maloney. A true and correct copy of the '220 Patent is attached hereto as
2  Exhibit 5.

3      15.    On June 10, 1997, United States Patent No. 5,638,412 ("the '412 Patent"), entitled
4  "Method for Providing Service and Rate Negotiation in a Mobile Communication System," was duly
5  and legally issued to QUALCOMM as assignee of the inventors, Robert D. Blakeney, II and Edward
6  G. Tiedemann, Jr. A true and correct copy of the '412 Patent is attached hereto as Exhibit 6.

7      16.    On December 17, 2002, United States Patent No. 6,496,543 ("the '543 Patent"),
8  entitled "Method and Apparatus for Providing High Speed Data Communications in a Cellular
9  Environment," was duly and legally issued to QUALCOMM as assignee of the inventor Ephraim
10  Zehavi. A true and correct copy of the '543 Patent is attached hereto as Exhibit 7.

11      17.    On June 3, 2003, United States Patent No. 6,574,211 ("the '211 Patent"), entitled
12  "Method and Apparatus for High Rate Packet Data Transmission," was duly and legally issued to
13  QUALCOMM as assignee of the inventors Roberto Padovani, Paul E. Bender, Peter J. Black,
14  Matthew S. Grob, Jurg K. Hinderling, Nagabhushana T. Sindhushayana, and Charles E. Wheatley,
15  III. A true and correct copy of the '211 Patent is attached hereto as Exhibit 8.

16      18.    On April 21, 1998, United States Patent No. 5,742,734 ("the '734 Patent"), entitled
17  "Encoding Rate Selection in a Variable Rate Vocoder," was duly and legally issued to
18  QUALCOMM as assignee of the inventors Andrew P. Dejaco and William R. Gardner. A true and
19  correct copy of the '734 patent and an associated certificate of correction is attached hereto as
20  Exhibit 9.

21      19.    On March 15, 2005, United States Patent No. 6,868,267 ("the '267 Patent"), entitled
22  "Apparatus, Method, and Article of Manufacture Used to Invoice for Services Consumed in a
23  Communications Network," was duly and legally issued to QUALCOMM as assignee of the
24  inventors Robert D. Briggs, Jason Kenagy, Gina Lombardi, Stephen A. Sprigg, Kent D. Baker, and
25  Marc S. Phillips. A true and accurate copy of the '267 Patent is attached hereto as Exhibit 10.

26      20.    On September 17, 2002, United States Patent No. 6,453,182 ("the '182 Patent"),
27  entitled "Wireless Telephone Airplane and Alarm Clock Modes," was duly and legally issued to
28  QUALCOMM as assignee of the inventors Stephen A. Sprigg and James A. Hutchison, IV. A true

1  and accurate copy of the '182 Patent is attached hereto as Exhibit 11.

2  **V.    SNAPTRACK'S PATENT**

3      21.    On January 13, 2004, United States Patent No. 6,677,894 ("the '894 Patent"), entitled

4  "Method and Apparatus for Providing Location-Based Information Via a Computer Network," was

5  duly and legally issued to SnapTrack, Inc. as assignee of the inventors Leonid Sheynblat and

6  Norman F. Krasner.  A true and correct copy of the '894 Patent is attached hereto as Exhibit 12.

7  **VI.    NOKIA'S INFRINGEMENT OF THE PATENTS**

8      22.    The Patents described in paragraphs 10 through 21 above, copies of which are

9  attached hereto as Exhibits 1 through 12, are referred to collectively herein as the "patents-in-suit."

10  The patents-in-suit relate generally to the transmission, reception, and processing of communication

11  signals, including radio signals and/or signals for wireless telephony.

12      23.    On information and belief, Nokia manufactures, uses, sells, offers for sale, and/or

13  imports into the United States products that comply with the GSM family of standards and technical

14  specifications promulgated, published and/or adopted by the 3rd Generation Partnership Project

15  ("3GPP") and/or manufactures, uses, sells, offers for sale, and/or imports into the United States

16  products intended to be used with or incorporated into products or systems that comply with the

17  GSM family of standards and technical specifications promulgated, published and/or adopted by the

18  3rd Generation Partnership Project ("3GPP")("Nokia's Products").

19      24.    Nokia's Products accused of infringement by this Complaint exclude any Nokia

20  product that is licensed under the Subscriber Unit and Infrastructure Equipment License Agreement

21  dated July 2, 2001, including any amendments thereto, between QUALCOMM Incorporated and

22  Nokia Corporation.

23      25.    Plaintiffs are informed and believe and thereon allege that, by manufacturing, using,

24  selling, offering for sale, and/or importing into the United States Nokia's Products, Nokia has been

25  and is infringing, literally and/or under the doctrine of equivalents, one or more claims of each of the

26  patents-in-suit – directly and/or indirectly pursuant to 35 U.S.C. § 271(a), (b), (c) and/or (f).

27  ///

28  ///

FIRST AMENDED COMPLAINT FOR PATENT
INFRINGEMENT, SPECIFIC PERFORMANCE AND      4
BREACH OF CONTRACT

# FIRST CAUSE OF ACTION

## PATENT INFRINGMENT

### (35 U.S.C. §§ 271 et seq.)

26.     Plaintiffs refer to and incorporate paragraphs 1 through 25, as though fully set forth herein.

27.     Plaintiffs are informed and believe and thereon allege that Nokia has been and is infringing, literally and/or under the doctrine of equivalents, one or more claims of each of the patents-in-suit – directly and/or indirectly pursuant to 35 U.S.C. § 271(a), (b), (c) and/or (f).

28.     By reason of Nokia's acts alleged herein, Plaintiffs have suffered, are suffering, and, unless such acts are enjoined by the Court, will continue to suffer injury to their business and property rights, for which they are entitled to damages pursuant to 35 U.S.C. § 284 in an amount to be proved at trial.

29.     By reason of Nokia's acts alleged herein, Plaintiffs have suffered, are suffering, and, unless such acts are enjoined by the Court, will continue to suffer irreparable harm for which there is no adequate remedy at law, and for which Plaintiffs are entitled to permanent injunctive relief pursuant to 35 U.S.C. § 283.

30.     Nokia's acts of infringement as alleged herein have been, and continue to be willful, entitling QUALCOMM to treble damages pursuant to 35 U.S.C. § 284, and qualifying this as an exceptional case under 35 U.S.C. § 285.

## PRAYER FOR RELIEF

a)     For judgment that Nokia has infringed, directly and/or indirectly, the patents-in-suit;

b)     For a preliminary and/or permanent injunction prohibiting Nokia, and all persons or entities acting in concert with Nokia, from infringing, directly and/or indirectly, one or more of the patents-in-suit;

c)     For an award to Plaintiffs of all compensatory damages resulting from the direct and/or indirect infringement by Nokia of the patents-in-suit, including pre-judgment and post-judgment interest;

d)     For an award of treble damages pursuant to 35 U.S.C. § 284;

1    e)    For judgment and an order directing Nokia to pay Plaintiffs' reasonable attorneys'

2  fees, expenses and costs due to this being an "exceptional" case within the meaning of 35 U.S.C. §

3  285;

4    f)    For judgment directing Nokia to pay costs of suit; and

5    g)    For an award to Plaintiffs of such other and further relief as the court deems

6  equitable, just and proper.

7  Dated:  March 27, 2006                    DAY CASEBEER
                                            MADRID & BATCHELDER LLP
8

9

10                                 By: _____
                                            James R. Batchelder
11

12                                          Attorneys for Plaintiffs
                                            QUALCOMM Incorporated and
13                                          SnapTrack, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### DEMAND FOR JURY TRIAL

2    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury

3    on all issues triable of right by a jury.

4    Dated:  March 27, 2006                          DAY CASEBEER
                                                      MADRID & BATCHELDER LLP
5

6

7                                                     By: _____
                                                          James R. Batchelder
8

9                                                     Attorneys for Plaintiffs
                                                      QUALCOMM Incorporated and
10                                                    SnapTrack, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

EFiled: Aug 9 2006 9:53AM EDT
Transaction ID 12021331

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

NOKIA CORPORATION and NOKIA INC.,

Plaintiffs,

v.

QUALCOMM INC.,

Defendant.

C.A. No. _2330_

## COMPLAINT

Plaintiffs Nokia Corporation and Nokia Inc. (collectively, "Nokia"), by and through their undersigned counsel, allege the following as and for their Complaint against defendant Qualcomm Inc. ("Qualcomm"):

## NATURE OF THE ACTION

1.      Nokia seeks declaratory relief and specific performance to enforce the terms of contracts in which Qualcomm, a Delaware corporation, has licensed Nokia to practice Qualcomm essential patents on fair, reasonable, and non-discriminatory terms ("FRAND" terms).  As hereinafter alleged, Qualcomm has induced various standard-setting organizations ("SSOs"), including the European Telecommunications Standardization Institute ("ETSI"), to incorporate Qualcomm's patented technology into industry standards for cellular phone products and equipment by contractually agreeing to license those patents on FRAND terms.  However, Qualcomm has breached its contractual obligations by demanding a royalty rate that exceeds FRAND terms and by threatening to enjoin Nokia from manufacturing or selling products that Qualcomm alleges practice the licensed essential patents unless Qualcomm's demands for unfair and unreasonable royalties are

accepted. Qualcomm has further breached its contractual obligations by refusing to negotiate FRAND royalty rates in good faith.

2.      Nokia seeks a judicial declaration establishing that Qualcomm's FRAND commitments constitute binding and enforceable contractual obligations licensing its declared-essential patents to Nokia on FRAND terms, which includes a FRAND royalty, and setting forth the method by which the FRAND royalty is to be calculated.

3.      In addition, Nokia seeks a judicial declaration that, by contracting to license its declared-essential patents to Nokia on FRAND terms, Qualcomm has waived the right to seek injunctive relief to restrain the use of those declared-essential patents. In the event of a dispute between the parties (including the filing of any infringement action in any country), Qualcomm's remedy is limited to recovery of a FRAND royalty as determined by a court.

4.      Accordingly, Nokia seeks an order enjoining Qualcomm worldwide from seeking an injunction or an exclusionary order as a remedy for alleged infringement of any declared-essential patents which it has contractually agreed to license on FRAND terms.

5.      Finally, Nokia seeks an order compelling specific performance requiring that Qualcomm participate in a good faith negotiation on the amount of a FRAND royalty, recognizing the principles that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization, and such other factors as the court deems fair and proper under the circumstances.

## PARTIES AND JURISDICTION

6.     Plaintiff Nokia Corporation is a corporation organized under the laws of Finland, with its principal place of business located in Espoo, Finland.

7.     Plaintiff Nokia Inc. is a United States subsidiary of Nokia Corporation. Nokia Inc. is a corporation organized under the laws of the State of Delaware, with its headquarters located in Irving, Texas. Nokia Corporation and Nokia Inc. are collectively referred to herein as "Nokia."

8.     Nokia is a world leader in the field of mobile communications. Nokia's primary line of business is the manufacture and sale of cellular telephone handsets. Nokia also manufactures and sells infrastructure used in cellular telephone networks, and owns substantial intellectual property rights in cellular telephone technologies.

9.     Defendant Qualcomm Inc. ("Qualcomm") is a corporation organized under the laws of Delaware. One of Qualcomm's business units, called the Technology Licensing Segment, or "QTL," licenses intellectual property rights in cellular telephone technology. Qualcomm also manufactures and sells chipsets for use in cellular telephones through a separate business unit called the CDMA Technologies Segment, or "QCT."

10.     Both Qualcomm and Nokia are members of a European SSO, ETSI, which has standardized the technology needed for cellular telephones. In accordance with the terms of their agreement with ETSI (described further below), each company has licensed, by means of declarations to ETSI, its essential patents to the other on FRAND terms.

11.     ETSI's Rules of Procedure provide that any dispute regarding the interpretation or application of ETSI policies must be resolved in the national courts of the member parties, applying French law. Under French law, Qualcomm's undertaking to license its essential patents on FRAND terms creates a binding and enforceable license agreement between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. Additionally, Qualcomm's contractual obligation

includes a duty to negotiate in good faith to determine a FRAND royalty rate. Under ETSI rules,

Nokia is entitled to enforce that contract against Qualcomm in this Court because Qualcomm is a

Delaware corporation.

## DEVELOPMENT OF CELLULAR TELEPHONE TECHNOLOGY STANDARDS

12.    For a cellular telephone to work, it must be able to transmit and receive radio signals

to and from cellular transmitting towers, and be able to maintain its signal as it is passed from one

tower to the next. All components of a wireless system must be able to interact with each other

seamlessly, regardless which company or companies manufacture the various components. This

includes the transmitting towers, the switches, the telephones, the chipsets that allow the telephones

to communicate with the towers, and the chipsets that allow the towers to receive and transmit data

to the switches for retransmission to the landline network or other cellular networks and cellular

telephones. To meet these requirements, all components in a single cellular system must be

"interoperable" and work effectively and efficiently with all other components.

13.    In order to ensure that components from different companies can interact with one

another and that products can be brought to the marketplace expeditiously, wireless carriers,

telephone manufacturers, and chipset manufacturers must follow a common set of industry standards

for wireless communication technology. Thus, for decades, cellular service providers and cellular

product manufacturers have been members of SSOs that exist to create a common set of standards

that all members can follow. In return, the SSOs demand that their members license patents that are

essential to any standard on FRAND terms, rather than use the threat of injunction to exploit the

existence of the standard to extort super-monopoly royalties;

14.    Once a given standard has been selected, the patents essential to that standard gain

value because competing technologies are effectively eliminated from the marketplace. The

technology monopoly granted to essential patent holders results in the establishment of a significant

4

base of royalty payers and insures a revenue stream to essential patent holders. Once capital investments (on the order of billions of dollars) are made to comply with the standard, cellular equipment manufacturers and network service providers are locked into the technology and into paying royalties to holders of essential patents. This lock-in confers upon patent holders the ability, if unrestrained, to extort super-monopoly royalties from prospective licensees using the threat of lawsuit and injunction. SSOs protect their members and the public from such opportunistic behavior by obligating patent holders to license their essential patents on FRAND terms. This obligation prevents the patent holder from appropriating for itself (rather than consumers) the value of having an industry standard.

15. In simple terms, the standard-setting process involves: (1) an evaluation of competing technologies to determine which best suits the market need; (2) a patent clearance process where the SSO's members unequivocally agree in writing that any patent that is essential to practice the standard is licensed to all on FRAND terms; and (3) the approval and adoption of the standard. The patent clearance process is always completed before the standard is adopted and implemented to insure that no member may use its patents to impede competition (*i.e.*, charge exorbitant royalty rates for patents that must be used by all market participants because they are essential to practice the standard) or exclude participants from the marketplace (*i.e.*, by using injunctions and exclusionary tactics to block a patent's use). If members do not agree to their license essential patents on FRAND terms, SSOs look to alternative technologies where patent clearance is available.

16. Cellular telephone standards have evolved through distinct "generations" as consumers have demanded additional features and technology owners have developed new innovations. The earliest cellular telephones operated on analog technology and allowed only voice transmission and very slow transmission of data over analog cellular airwaves. These early analog

systems are typically referred to as first-generation ("1G") technology. 1G technology was characterized by inherent capacity limitations, minimal and slow data transfer capabilities, low security, inconsistent service levels, and significant power consumption.

17.  Consumers' increased demand for cellular service and for added performance drove the development of a second generation of cellular telephone technology ("2G"). 2G telephones, which are based on digital technology, provide significantly increased voice and data capacity and also support additional functions, such as paging and e-mail. 2G technology also offers greater privacy, greater fraud protection, and lower prices as compared to 1G technology. Most cellular telephones in use today are based on 2G technology standards.

18.  The three principal 2G standards in use today are called Global System for Mobility ("GSM"), Time Division Multiple Access ("TDMA"), and Code Division Multiple Access ("CDMA"). The technical parameters and specifications of each 2G technology were reviewed and approved by various SSOs. The three technologies are based on different underlying air interface and transmission regimes. Thus, as a general proposition, GSM-based hardware components will not work on a CDMA or TDMA system, TDMA components will not work on a GSM or CDMA system, and CDMA components will not work on a GSM or TDMA system. As more fully described below, a third generation of wireless technology ("3G"), which will allow significantly increased data speed and capacity, is currently being deployed and is one of the subjects of this action.

## THE FRAND CONTRACTS

19.  As set forth below, Qualcomm has entered into contractual agreements with ETSI and ETSI's members, including Nokia, that Qualcomm will license on FRAND terms any of its patents that are essential to the GSM standard or its third-generation successor, Universal Mobile Telephone System ("UMTS").

20.     ETSI is a non-profit European SSO headquartered in France. It was under ETSI's auspices that the GSM technology standard was developed, reviewed, and approved.

21.     Qualcomm is a member of ETSI because its affiliates Qualcomm Europe S.A.R.L. and Qualcomm UK Ltd are members and ETSI defines "member" to include affiliates. Thus, as described below, Qualcomm itself filed FRAND undertakings with ETSI. Nokia is also a member of ETSI.

22.     Like other SSOs, ETSI requires its members to identify all patents they hold that may be essential to compliance with a proposed technology standard—referred to as "essential patents"—before the standard is adopted. ETSI's Intellectual Property Rights ("IPR") Policy provides that "each MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 4.1. The purpose of this disclosure requirement is obvious: to avoid a "patent ambush" situation where a party that holds essential patents sits on the sidelines during the standard-setting process and then holds up industry participants for unexpected and unanticipated royalties for technology that is essential to practice the standard.

23.     ETSI's IPR Policy specifically defines an IPR as "essential" where "it is not possible on technical but not commercial grounds, taking into account normal technical practice and the state of art generally available at the time of standardization, to make, sell, lease, otherwise dispose of,

repair, use or operate equipment or methods which comply with a standard without infringing that IPR." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 15.6.

24.    ETSI also requests that patent holders license their essential patents to other parties on fair, reasonable, and non-discriminatory terms ("FRAND" terms). Article 6.1 of ETSI's IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR . . . .

25.    In short, to avoid the problems of creating market power by adopting an industry standard, ETSI requires its members not only to disclose their essential patents, but agree to license those patents on FRAND terms. If a patent holder will not agree to license its declared patents on FRAND terms, ETSI can decide not to include that technology in an industry standard, and instead use a non-infringing alternative. See ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 8. If the patent holder does agree to license its essential patents on FRAND terms, other companies in the industry can invest in and deploy the standard without concern that they will be enjoined from using the technology or be forced to pay an unreasonably high royalty for a patent that is essential to practice the standard.

26.    Qualcomm violated its disclosure obligations to ETSI by waiting to declare certain Qualcomm patents as essential to GSM until the industry had made substantial investments in GSM technology. Indeed, Qualcomm did not declare any of its patents essential to GSM until many years after the standard had been set, and it has declared some as recently as this year. However, when Qualcomm did belatedly declare its patents essential to the GSM standard, it expressly agreed in writing to license those patents to all members of ETSI, including Nokia, on FRAND terms.

27.    In the late 1990s, ETSI began considering candidate technologies for the 3G UMTS standard that would have worldwide application. ETSI and its members considered a number of solutions, including WTDMA (which was based on TDMA technology that did not infringe any known Qualcomm patents), WCDMA (which Qualcomm claimed included some of its patents), and CDMA 2000 (which Qualcomm claimed relied almost completely on its patents). ETSI ultimately decided to adopt WCDMA technology as the 3G UMTS standard.

28.    At the outset of the ETSI standard-setting process, Qualcomm refused to license its patents on FRAND terms for 3G use. Subsequently, however, on March 25, 1999, as part of the settlement of a lawsuit between Ericsson and Qualcomm involving cross-claims of patent infringement, Qualcomm finally agreed to license its WCDMA patents that were allegedly essential to the ETSI-proposed UMTS standard on FRAND terms to the rest of the industry. On June 25, 1999, Qualcomm submitted a letter to ETSI stating: "Qualcomm hereby commits . . . to license its essential patents for each single CDMA standard or any of its of its modes [including UMTS] on a fair and reasonable basis free from unfair discrimination." This promise provided ETSI members with the patent clearance required to make the huge capital investment that would lock them into a UMTS standard that included Qualcomm's WCDMA technology.

29.    The ability to use standard-essential technology without threat of a technology "monopolist" royalty rate or the threat of an injunction that would stop sales or operations is an important characteristic of the cell phone industry: once a wireless carrier elects to deploy an SSO-approved standard, switching to another standard may cost hundreds of millions if not billions of dollars and cause substantial disruption to consumers. Thus, if Qualcomm had not agreed with ETSI to license its declared-essential WCDMA patents on FRAND terms, WTDMA or another technology

would have been selected in lieu of WCDMA. This underscores the importance of holding Qualcomm to its contractual FRAND obligation.

30.      Under French law, Qualcomm's agreement to license its declared-essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. ETSI's Rules of Procedure provide that any dispute concerning the interpretation or application of ETSI policies must be resolved by the national courts of its members. Both Nokia Inc. and Qualcomm are Delaware corporations. Nokia is therefore entitled to apply to this Court to enforce and resolve the current dispute as to Qualcomm's contractual commitment to FRAND.

## A COMMITMENT TO FRAND NECESSARILY WAIVES ANY RIGHT TO INJUNCTIVE RELIEF

31.      When Qualcomm contractually agreed in writing to license its declared-essential patents on FRAND terms, it granted irrevocable patent license rights to all other members of ETSI, and gave up the traditional patent holder's right to enjoin others from practicing the technology incorporated in those patents. The only remedy for the use of Qualcomm declared-essential patents is a FRAND royalty, to be determined *ex post* by a court in the event of a dispute between Qualcomm and the licensee.

32.      Allowing a patent holder who has exchanged a FRAND commitment for the benefits of having patented technology included in a standard to seek injunctive relief would defeat the entire purpose of FRAND and the ETSI IPR Policy. As set forth above, the patent holder would be able to use the threat of injunction to extort royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would be forced to comply with unjustified royalty demands or risk losing their substantial investments in complying with the standard. If injunctions were to be allowed, essential patent users would be reluctant to invest in and deploy technologies until and

unless specific royalty terms were reached with every alleged essential patent holder. The public interest would also suffer because roll-out of standard-compliant products and new technologies would be delayed, defeating one of the key purposes of standard-setting (to promote swift implementation).

33. The delays and impediments imposed on the industry by the threat of injunctions prohibiting use of technologies deemed essential for new services would also contravene Articles 81 and 82 of the European Community Treaty, which, as detailed below, are designed to assure that conduct that eliminates competition from the marketplace (such as an SSO's choice of one technology over other candidate technologies as the standard) has an overall public welfare benefit (i.e., passing the network benefits on to consumers rather than allowing patent owners appropriate the benefit for themselves by demanding excessive royalties). ETSI imposes FRAND obligations on its members specifically to preclude this kind of unequal *ex post* bargaining power.

## QUALCOMM HAS BREACHED ITS CONTRACTUAL OBLIGATION TO LICENSE ITS DECLARED-ESSENTIAL GSM AND UMTS PATENTS ON FRAND TERMS AND IS USING THE THREAT OF INJUNCTIONS TO EXTORT UNJUSTIFIED ROYALTIES IN VIOLATION OF THE TERMS OF ITS ETSI COMMITMENT

34. Despite having made numerous FRAND commitments to ETSI in connection with GSM and UMTS patents that Qualcomm has declared essential to those standards, Qualcomm has refused to honor its contract to license its patents on FRAND terms. Instead, it has used litigation and the threat of injunction to attempt to extort exorbitant royalty rates from cellular telephone manufacturers.

35. To date, Qualcomm has filed three separate patent infringement suits against Nokia seeking injunctive or exclusionary relief for alleged infringement of patents allegedly essential for the GSM standard: one in the United States District Court for the Southern District of California (San Diego division), one in the United Kingdom, and one in the United States International Trade

Commission (ITC). In the proceeding before the ITC the **only** relief requested is injunctive in nature, excluding Nokia from importing products that Qualcomm contends infringe on patents it has declared essential to the ETSI GSM standard. These requests for injunctive relief are wholly inconsistent with Qualcomm's unequivocal contractual commitment to ETSI to license these patents to Nokia on FRAND terms.

36.    Qualcomm has clearly indicated that additional injunction suits will follow. During Qualcomm's third-quarter 2006 earnings conference call with analysts, Qualcomm President Steve Altman asserted that in cases where Qualcomm patents are allegedly being infringed, "we would look and seek injunctions in a variety of markets . . . ." The current litigation and the assertions of future injunctive proceedings cause irreparable and immeasurable harm to Nokia by creating uncertainty regarding the ability of Nokia to continue to manufacture and sell GSM standard-compliant products.

37.    Nokia is also justifiably concerned about the potential that Qualcomm may leverage its standards-granted technology monopoly to obtain unjustified injunctive relief in violation of Qualcomm's ETSI commitments in jurisdictions that will not afford Nokia adequate due process. In a number of European jurisdictions there are procedures available to plaintiffs to seek preliminary injunctions without giving defendants (such as Nokia) an opportunity to be heard at the time the injunction is being sought. The plaintiff may not even be under a duty in certain jurisdictions to give the court full and frank information concerning the case at that initial stage. A preliminary injunction may be granted without there being any consideration of equities, or of whether the patentee could be adequately compensated by damages alone. Furthermore, a preliminary injunction may be granted without any bond or undertaking being required from the patentee to pay for the damage caused to Nokia by a preliminary injunction that is later determined to have been

erroneously granted. To the extent that Qualcomm is permitted to seek such relief in violation of its
ETSI contract, Nokia would suffer irreparable and immeasurable harm because it would never be
able to adequately determine in financial terms the extent of Nokia damage.

38.     These concerns are not merely a theoretical possibility. Certain European courts have
granted preliminary injunctions even where the patent concerned was relevant to an industry
standard and the defendant had indicated a willingness to enter into a license. In Germany, for
example, the court is required, under section 139, paragraph 1 of the German Patents Act, to grant
permanent injunctive relief where infringement is found. And even though the court must weigh the
interests of the parties at the preliminary injunction stage, this can be conducted *ex parte* and
therefore Nokia would not have any opportunity to be heard. Similarly, in the Netherlands, the court
is not obligated to take the balance of convenience into account and it rarely does so.

39.     Qualcomm's injunction strategy, in contravention of its FRAND commitments, is an
attempt to give it leverage to demand royalty rates wholly out of proportion to the number or value
of its patents essential to a particular standard. For example, Qualcomm has generally demanded the
same royalty rate for its patents essential to its initial proprietary Common Air Interface CDMA
technology (where, in practice, it holds close to 100% of the essential patents), as it demands for its
patents essential to the IS-95 CDMA standard (where it holds some 80% of the essential patents), as
it demands for the CDMA2000 family of standards (where it holds less than 50% of the essential
patents), and as it demands for UMTS (where studies show it holds at most 20% of the essential
patents). Moreover, on information and belief, Qualcomm owns less than 3% of the essential patents
for GSM. Nevertheless, Qualcomm demands that many of its licensees cross-license Qualcomm
(giving rights to the licensee's intellectual property rights not only to Qualcomm but also to
Qualcomm's chipset customers) for their declared-essential patents, even where the licensee holds a

13

much larger portfolio of essential patents for the standard. These positions by Qualcomm do not comply with their contractual FRAND commitment to ETSI.

## QUALCOMM'S CONTRADICTORY STATEMENTS AND ACTIONS CONCERNING FRAND

40.    Qualcomm has adopted multiple and conflicting views of its FRAND obligations. In a motion to dismiss antitrust and other claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its agreement to license its patents on FRAND terms is not legally enforceable.[1] Thus, according to Qualcomm, there is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance. In complaints filed before the International Trade Commission, the United States District Court for the Southern District of California, and an English court, Qualcomm has claimed that, despite its FRAND declarations (which constitute an irrevocable agreement to license its essential patents), it is entitled to an injunction if the initial terms it unilaterally offers are rejected. In negotiations with Nokia, Qualcomm has declared that, despite its contrary written commitments, unless it is paid a royalty that Nokia believes bears no relationship to a FRAND royalty, it will seek injunctions to bar Nokia from selling its products to consumers.

41.    Under French law, the terms and enforceability of Qualcomm's contractual commitments must be interpreted, as far as possible, in a manner consistent with Articles 81 and 82 of the European Community Treaty, which prohibit anticompetitive conduct. Specifically, even apart from its FRAND commitments, Article 81 imposes a duty on Qualcomm to license its patents essential to standards on FRAND terms. Article 81(3) provides that, in order to comply with Article

---

[1]  *See Broadcom Corp. v. Qualcomm Inc.*, Civ. A. No. 05-3350(MLC) (D.N.J.), Memorandum in Support of Defendant's Motion to Dismiss (filed Dec. 12, 2005), at 15 (arguing that Broadcom's action to enforce FRAND should be dismissed because FRAND is "susceptible of multiple interpretations" and does not have one universally accepted meaning).

81, an agreement of this kind must confer a fair share of resulting benefits on consumers and should not create the possibility of eliminating competition in respect of a substantial proportion of the products in question. SSO members would be able to deny a fair share of benefits to consumers, and substantially to eliminate competition in the instant context, if one or more of them could withhold licenses from downstream competitors, or make such licenses available only on excessively onerous terms. That is why, in order to comply with Article 81, the FRAND commitment must be effective to prevent such serious economic consequences. If an SSO member could retain all or most of the benefits of the standard and simultaneously refuse fair, reasonable, and non-discriminatory treatment to competitors that it particularly wanted to disadvantage (especially after prospective licensees had made large investments in the standard and were locked in), Article 81 would have no practical effect.

42.     In 2005, Ericsson, NEC, Texas Instruments, Broadcom, Panasonic, and Nokia asked the Commission of the European Communities Directorate-General Competition to investigate Qualcomm's anticompetitive conduct, under Articles 81 and 82, in the markets for CDMA and WCDMA cellular telephone technology and chipsets, including its failure to comply with FRAND obligations. In its May 16, 2006 brief to the European Commission, to attempt to avoid claims under Articles 81 and 82, Qualcomm made a number of critical admissions regarding FRAND, which contradict its public statements in the United States (including in the three patent infringement suits discussed above) that its FRAND commitments are unenforceable:

> • "Fair Reasonable and Non-Discriminatory ('FRAND') obligations are part of a private agreement, a binding contract that is enforceable against each patent owner."

> • "[T]he aim of FRAND is to ensure that whatever standard is developed remains available. A FRAND commitment is intended to prevent an outright refusal to license or the setting of royalty rates so high that they have the effect of preventing licensing . . . ."

> • "In the case of dispute, it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."

> • "A court procedure would involve an assessment of the number of truly essential patents necessary to practice a given standard or the appropriate royalty base or even the general business conditions prevailing for the given licensed technology."

43.     Qualcomm's selective interpretations of its FRAND obligation that appear to be dependent upon Qualcomm's purpose in specific litigation would render FRAND meaningless and defeat the entire purpose of the ETSI's FRAND requirement. Because of these shifting, self-serving definitions, Nokia asks this court for an order defining the terms and conditions surrounding Qualcomm's FRAND commitment and for an order upholding and affirming Qualcomm's agreement to license patents declared essential on FRAND terms pursuant to its contract with ETSI. This courts intervention is required to stop Qualcomm from charging monopolistic prices to license its declared-essential patents.

### FIRST CLAIM FOR RELIEF

(Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*), and Injunctive Relief)

44.     Nokia repeats and realleges the allegations set forth in paragraphs 1-43 above as if set forth fully herein.

45.     An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to whether Qualcomm can obtain injunctive relief in light of its contractual agreement to license its declared-essential patents on FRAND terms.

46.     By entering into contracts with ETSI and ETSI's members to license its essential GSM and UMTS patents on FRAND terms, Qualcomm gave up any right to enjoin Nokia from the use of those patents. Pursuant to its FRAND declarations, Qualcomm granted an irrevocable license on FRAND terms to Nokia and all other members of ETSI and waived any right to seek injunctive

relief or an exclusionary order, which would bar Nokia from practicing those of Qualcomm's patents that Qualcomm has declared are essential in FRAND declarations submitted to ETSI.

47.    Allowing Qualcomm to seek injunctive relief would defeat the purpose of the FRAND commitment. ETSI requests that patent holders agree to FRAND license terms to prevent them from using an SSO-enabled patent monopoly to extort excessive royalty rates after a technological standard has been approved.  However, if Qualcomm were allowed to enjoin companies from using its patents, it could ignore its FRAND obligations with impunity, using the threat of injunction to obtain royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would have no choice but to comply or risk losing their substantial investments in complying with the standard.  Thus, injunctive relief would give patent holders exactly the kind of *ex post* bargaining power and super-monopoly profits that the FRAND undertaking was intended to prevent.

48.    By agreeing in advance to accept a FRAND royalty for patents declared essential, Qualcomm has agreed that a FRAND royalty (as determined by a court in the event of a dispute) is adequate compensation for the use of its patents.  Additionally, because the purpose of the FRAND commitment is to facilitate swift implementation of the standard for the benefit of consumers, a grant of injunctive relief barring practice of the standard would disserve the public interest.

49.    This controversy between Nokia and Qualcomm is real and adverse.  In the Southern District of California case, ITC proceedings, and a proceeding in an English court, Qualcomm has sought injunctive relief against Nokia, which would bar Nokia from using patents on which Qualcomm, by virtue of its FRAND declaration, has already granted a license to Nokia.  As noted above, upon information and belief, Qualcomm is likely soon to seek injunctive relief in lawsuits against Nokia in other European countries.  Qualcomm's conduct in threatening injunctive relief

against the use of its GSM patents is in direct violation of ETSI policies and Qualcomm's own contractual commitment to FRAND.

50. If Qualcomm is permitted to continue to wield the sword of an injunction threat, it may coerce Nokia into entering a license at a royalty rate that far exceeds the FRAND rate; Nokia would thereafter be contractually committed under a specific license agreement and would have no redress for Qualcomm's FRAND violation. Alternatively, if Nokia stands firm and refuses to pay a non-FRAND royalty, and if Qualcomm persuades some court in some jurisdiction to enjoin Nokia's manufacture of cell phones, Nokia's business will be substantially harmed.

51. An additional problem arises from the fact that Qualcomm has filed, and is likely to file, injunctive actions in numerous jurisdictions in the United States and Europe. This multiplicity of actions poses a substantial risk that Nokia could be subject to inconsistent adjudications to the extent that some courts rule that Qualcomm's FRAND obligation precludes it from seeking injunctive relief, while other courts rule that Qualcomm is entitled to seek injunctive relief. This highlights the need for a single and prompt adjudication by this Court of the FRAND contractual obligations of Delaware citizen Qualcomm.

52. Relatedly, if Qualcomm is permitted to pursue injunctions in multiple jurisdictions, and if Nokia is obligated to advance the FRAND defense in each such jurisdiction, Nokia will be forced to incur substantial litigation costs that, in jurisdictions following the American rule, are generally not compensable even if Nokia prevails. Again, a single and prompt adjudication of Qualcomm's right to seek injunctive relief avoids this problem.

53. The issue involved in this controversy is ripe for judicial determination. Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by

the national courts of the member parties. Section 4.2 of ETSI's Guide on IPRs regarding Dispute

Resolution states:

> ETSI Members should attempt to resolve any dispute related to the
> application of the IPR Policy bilaterally in a friendly manner. Should
> this fail, the Members concerned are invited to inform the ETSI GA
> in case a friendly mediation can be offered by other ETSI Members
> and/or the ETSI Secretariat. However, it should be noted that once an
> IPR (patent) has been granted, <u>in the absence of an agreement
> between the parties involved, the national courts of law have the sole
> authority to resolve IPR disputes.</u>

In addition, Qualcomm's May 16, 2006 brief to the European Commission admits that "[i]n the case

of dispute [regarding FRAND], it would be for a Court or similar authoritative body to resolve the

particular disputes in the given situation."

54.    Accordingly, Nokia seeks a declaratory judgment that Qualcomm is not entitled to

injunctive or exclusionary relief for any alleged infringement of any GSM or UMTS patents that

Qualcomm has declared essential and agreed to license on FRAND terms. Nokia further seeks a

declaratory judgment that Qualcomm's sole remedy for any alleged infringement of such patents is

limited to payment of a royalty on FRAND terms, as determined by a court if the parties cannot

agree.

55.    Qualcomm's pursuit of injunctions in spite of its agreement that its only remedy is a

FRAND royalty constitutes a breach of its contractual obligation for which Nokia has no adequate

remedy at law. Accordingly, Nokia seeks an order enjoining Qualcomm from pursuing an injunction

or exclusionary order as a remedy for alleged infringement of any patent it has declared essential to

ETSI.

## SECOND CLAIM FOR RELIEF

(Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*))

56.    Nokia repeats and realleges the allegations set forth in paragraphs 1-55 above as if set forth fully herein.

57.    An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to the meaning of FRAND.

58.    Pursuant to its contracts with ETSI, Qualcomm has agreed to license on FRAND terms any patents that Qualcomm has declared are essential to the GSM or UMTS standards.

59.    Notwithstanding its FRAND commitments, Qualcomm has refused to offer a FRAND royalty rate to Nokia on any patents it has declared essential to the GSM standard. Further, Qualcomm has refused to offer Nokia a FRAND royalty rate for the use of its declared-essential UMTS patents after April 2007 (when Qualcomm's current agreement not to assert its UMTS patents against Nokia expires). Instead, Qualcomm has demanded that Nokia accept license terms that are neither fair, nor reasonable, nor non-discriminatory, backing its demands with the threat of injunction as discussed *supra*.

60.    Under French law, Qualcomm's agreement to license its essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members, including Nokia. Nokia is therefore entitled to enforce Qualcomm's contractual commitment to FRAND.

61.    Qualcomm contends that FRAND does not impose any specific and concrete obligations on the licensor with regard to the actual level of royalties (or any other terms and conditions for that matter). In its motion to dismiss claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its promise to license its patents on FRAND terms is not legally enforceable. Thus, according to Qualcomm, there

is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance.

62.    Qualcomm's empty characterization of FRAND cannot be correct. In any given situation, evidence will be available to show that the terms "fair, reasonable, and non-discriminatory" are sufficiently certain to be capable of judicial interpretation and enforcement, and impose substantive limits on Qualcomm's ability to impose excessive royalty rates or other onerous terms in its patent licenses. Qualcomm has violated these limits by refusing to license its patents to Nokia on FRAND terms.

63.    Qualcomm contends that, despite its FRAND obligation, it can charge a royalty as high as the fear of an injunction can create. Nokia, on the other hand, contends that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

64.    This controversy between Nokia and Qualcomm is real and adverse. Qualcomm has refused to offer Nokia a FRAND royalty rate for its declared-essential GSM patents, and has threatened to enjoin Nokia from using patents on which Nokia is contractually entitled to a FRAND license. Qualcomm has also refused to negotiate a FRAND royalty rate for declared-essential UMTS patents for the period after April 2007.

65.    The issue involved in this controversy is ripe for judicial determination. Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by the national courts of the member parties. Section 4.2 of ETSI's Guide on IPRs regarding Dispute Resolution states:

21

> ETSI Members should attempt to resolve any dispute related to the
> application of the IPR Policy bilaterally in a friendly manner. Should
> this fail, the Members concerned are invited to inform the ETSI GA
> in case a friendly mediation can be offered by other ETSI Members
> and/or the ETSI Secretariat. However, it should be noted that once an
> IPR (patent) has been granted, in the absence of an agreement
> between the parties involved, the national courts of law have the sole
> authority to resolve IPR disputes.

In addition, Qualcomm's May 16, 2006 brief to the European Commission, in an attempt to avoid

liability under Article 81 and 82, acknowledges that "[i]n the case of dispute [regarding FRAND], it

would be for a Court or similar authoritative body to resolve the particular disputes in the given

situation."

66.     Accordingly, Nokia seeks a declaratory judgment that Qualcomm's FRAND

commitments constitute binding contractual obligations, and defining the principles by which a

FRAND royalty must be calculated.

## THIRD CLAIM FOR RELIEF

### (Specific Performance)

67.     Nokia repeats and realleges the allegations set forth in paragraphs 1-66 above as if set

forth fully herein.

68.     Qualcomm has declared numerous patents to be essential to the UMTS standard

promulgated by ETSI.

69.     In connection with its declarations to ETSI, Qualcomm has agreed to license each of

its essential UMTS patents to all members of ETSI, including Nokia, on FRAND terms.

70.     Under French law, Qualcomm's agreement to license its essential UMTS patents on

FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI

members, including Nokia. Nokia is therefore entitled to enforce Qualcomm's contractual

commitment to FRAND.

71.    Notwithstanding its contractual obligations to ETSI and Nokia, Qualcomm has refused to negotiate a FRAND royalty rate for its UMTS patents for the period after April 2007.

72.    Nokia has no adequate remedy at law for Qualcomm's breach of its contractual obligation to license its essential patents on FRAND terms or to negotiate a FRAND royalty rate in good faith.

73.    Accordingly, Nokia is entitled to an order of specific performance ordering Qualcomm to participate in a good faith negotiation with Nokia for license of Qualcomm's essential UMTS patents on FRAND terms for the period after April 2007, in light of this Court's resolution of the dispute between the parties as to the method for determining a FRAND royalty.

### PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that this Court:

A.    Adjudge and decree that, by virtue of its express and implied FRAND commitments, Qualcomm has waived any right to seek, or is otherwise barred from seeking injunctive relief, including an exclusion or cease-and-desist order by the ITC, to prevent Nokia from using technology encompassed by any patents which Qualcomm has declared essential to the GSM or UMTS standards established by ETSI;

B.    Permanently enjoin Qualcomm worldwide from seeking such injunctive relief related to patents Qualcomm has declared essential to any standard;

C.    Adjudge and decree that Qualcomm's commitment to license its essential GSM and UMTS patents on FRAND terms is a binding contractual obligation, enforceable by Nokia;

D.    Order that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-

infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

      E.     Order that Qualcomm specifically perform its contractual obligation to negotiate a FRAND royalty rate with Nokia for the period after April 2007 for any patents Qualcomm has declared essential to UMTS, in light of this Court's determination of the method for calculating FRAND terms; and

      F.     That Nokia have such other and further relief as this Court may deem just and proper.

Of Counsel:

A. William Urquhart
Frederick A. Lorig
Patrick M. Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-254
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

Rick Werder
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Dated: August 8, 2006

Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Richards, Layton & Finger, P.A.
(# 3188)
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701

Attorneys for Plaintiffs
Nokia Corporation and Nokia Inc.

# EXHIBIT C

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

NOKIA CORPORATION and NOKIA,          :
INC.
                                      :
                                      :
              Plaintiffs              :
                                      :
        vs.                           :    Civil Action
                                      :    No. 2330-N
QUALCOMM INCORPORATED,                :
                                      :
              Defendant               :

                        -  -  -

                        Chancery Court Chambers
                        New Castle County Courthouse
                        Wilmington, Delaware
                        Friday, August 11, 2006
                        11:00 a.m.


BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.

                        -  -  -



                  SCHEDULING CONFERENCE

                        -  -  -


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

              CHANCERY COURT REPORTERS
        500 North King Street - Suite 11400
          Wilmington, Delaware 19801-3759
                  (302) 255-0525

2

```
 1   APPEARANCES:

 2           LISA SCHMIDT, ESQ.
             JEFFREY L. MOYER, ESQ.
 3           ELIZABETH C. TUCKER, ESQ.
             Richards, Layton & Finger
 4                   -and-
             FREDERICK LORIG, ESQ.
 5           A. WILLIAM URQUHART, ESQ.
             of the California Bar
 6           Quinn Emanuel Urquhart Oliver & Hedges, LLP
                     -and-
 7           JANE MUTIMEAR, ESQ.
             Of the United Kingdom Bar
 8           Bird & Bird
               for Plaintiffs Nokia Corporation and
 9               Nokia, Inc.

10
             MATTHEW E. FISCHER, ESQ.
11           RICHARD L. HORWITZ, ESQ.
             Potter, Anderson & Corroon LLP
12                   -and-
             RICHARD J. STARK, ESQ.
13           of the New York Bar
             Cravath Swaine & Moore
14                   -and-
             CHRISTIAN E. MAMMEM, ESQ.
15           of the California Bar
             Day Casebeer Madrid & Batchelder
16             for Defendant QUALCOMM Incorporated

17   ALSO PRESENT:

18           RICHARD W. STIMSON, ESQ.
             ARI LAAKKONEN, ESQ.
19             In-house counsel for Nokia

20
                     - - -
21

22

23

24
```

CHANCERY COURT REPORTERS

3

1          THE COURT:  We have someone on the

2    phone?

3          MR. FISCHER:  Yes.  We have

4    Chris Mammem from the Day Casebeer firm in California

5    for QUALCOMM.  Richard Stark of Cravath for QUALCOMM,

6    and Rich Horowitz of my firm.

7          MS. SCHMIDT:  Your Honor, this is

8    Fred Lorig and William Urquhart from the

9    Quinn Emmanuel Urquhart firm for Nokia, and

10   Elizabeth Tucker of Richards Layton, Jane Mutimear

11   from Bird & Bird, and Ari Laakkonen and

12   Richard Stimson of Nokia, Inc.

13          THE COURT:  Good morning.

14          I've read all the papers.  I'm happy

15   to consider, you know, whether to -- this Court has a

16   role to play in this dispute.  But I do think the

17   first thing that needs to be done is essentially brief

18   up whether this is a proper place to bring this

19   dispute, especially given the pending actions.  And

20   I'm influenced by the fact that I don't gainsay the

21   importance of this to Nokia.  I'm sure this is a very

22   important thing and you've got multiple litigations

23   going on.  You have multiple litigation going on.  I

24   mean, it wasn't like it all popped up and you said we

4

1   got to get going on this and we're going to shut this
2   down entirely right away.
3                    Now, I understand you've got sort of a
4   whack-a-mole situation going on, or you think that
5   there's proliferating injunction actions from QUALCOMM
6   everywhere.
7                    The reality is, though, that doesn't
8   necessarily mean you don't have to put your marker
9   down somewhere where the cases are pending.  I'm not
10  prejudging that, but I'm at least interested in that
11  notion.  I'm at least interested in the notion in
12  whether or not this would be considered the national
13  court.
14                   Delaware courts are rightly concerned
15  when Federal Court's intrude in issues of state law.
16  Frankly, Delaware doesn't particularly like it when
17  some states have gotten creative and dishonor the
18  contract rights of securities holders.  And the
19  corporations sell securities by trying to intrude on
20  the internal affairs of corporations through all kinds
21  of interesting statutes, which don't seem to honor
22  those contracts or give full faith and credit to the
23  laws of other states.  What comes about consideringly
24  with that sort of concern to protect one less

5

1  legitimate territory is to also recognize that there

2  are areas in which we don't have the same legitimacy

3  as the federal courts.  I don't know if this is one.

4  I'm not prejudging it.  When I see something -- a

5  reference to national courts -- I have to say it

6  doesn't occur to me immediately that it's necessarily

7  the case that any court within a nation qualifies for

8  that.  It might have been rationally thought by

9  whatever the entity was.

10           What that means is that we're a bunch

11  of nations bringing together -- coming together.

12  We're trying to work together.  We're going to presume

13  on the part of the nations involved in this that the

14  judicial system in those nations will responsibly

15  adjudicate the disputes and that ultimately those

16  systems will culminate in some national court which

17  will bless whatever rulings are done at the lowest

18  level of the system.  It's not necessarily clear to

19  me -- it is true that you could possibly get a writ of

20  certiorari from the Delaware Supreme Court to the

21  United States Supreme Court.  It's not immediately

22  clear to me that that's what they meant.

23           I don't know anything about Germany.

24  I know more about soccer and beer from Germany than

6

1   the German courts, but some of them have federal
2   governments or different local governments where they
3   may have court systems that aren't part of the nation.
4   You know, I just don't know.

5                    What I also know is that this is
6   clearly no more a court -- a national court of the
7   United States than any of the federal district courts,
8   and it's not clear to me why the request for
9   injunctive relief that's sought here could not have
10  been sought in those other pending cases, which is not
11  only can, you know, QUALCOMM not get an injunction,
12  Your Honor, we are moving affirmatively for you to
13  issue an injunction against them because of what
14  they're trying to do to us worldwide by dishonoring
15  their obligations to us under this essentially -- this
16  contract that arises by virtue of this and present
17  that to a federal judge.

18                   I had not known the federal courts
19  were without authority to issue injunctions with
20  nationwide effect and perhaps international effect
21  with the party before it who's invoked their
22  jurisdiction.

23                   Without going on about it, I mean,
24  those are the things I'm going to be interested in.

1    We've got the first-filed doctrine, we've got the

2    notion of what this is.  When I first got the case and

3    I read -- this is a classic joint venture.  Somebody

4    has got to leave it in Delaware law.  What you've got

5    is a de facto contract by virtue of something going on

6    in France, and QUALCOMM happens to be a Delaware

7    corporation.  I'm happy to entertain a tighter

8    briefing schedule.  I would ask Nokia -- not Nokia --

9    I would ask QUALCOMM to commit to when they could file

10   its motion to dismiss.

11                   When do you think, Mr. Fischer, you

12   could get a brief in, or something like that?

13                   MR. FISCHER:  I think we'd like at

14   least a couple of weeks.  Is that asking for too much?

15                   THE COURT:  They'll tell you that it

16   is.  I think a couple weeks is not too much.

17                   MR. FISCHER:  Well, in light of what's

18   going on in the other litigations, I don't think two

19   weeks -- there's nothing immediately pending that we

20   need to -- I think two weeks is reasonable.

21                   MR. LORIG:  If I can respond.  Two

22   weeks normally, I think, would be reasonable, even if

23   you're the other party.  The problem we have is we're

24   dealing with an injunction-case-of-the-day.  Yesterday

8

1    they filed another case in Germany asking for an

2    injunction.  If we're going to take time and brief

3    this matter for a couple of weeks, can we at least get

4    a stipulation from QUALCOMM that, until the courts

5    jurisdiction is decided, they won't file any more

6    patent infringement suits in foreign countries.  I'm

7    not talking about the United States.  That's already

8    done.  I'm talking about outside of the United States.

9              Will QUALCOMM agree, in return for a

10   civilized briefing schedule so we can air the issues,

11   not to file any further patent infringement actions in

12   countries outside of the United States?

13             MR. FISCHER:  I'd have to discuss that

14   with people, Your Honor.

15             THE COURT:  I do think it is -- one of

16   the things -- if these suits are going to arise on the

17   map, I assume they're like red dots and start looking

18   like some global infection.  We'll get the guy from

19   house to diagnose -- I mean, I think that is a

20   problem, Mr. Fischer, that he we have to deal with

21   here.  I hadn't known there was a suit filed

22   yesterday.

23             MR. FISCHER:  I didn't know that

24   either, Your Honor.

9

1                    MR. LORIG:  We were notified by

2    European counsel.

3                    MR. URQUHART:  And by QUALCOMM.

4                    MR. LORIG:  And by QUALCOMM.

5                    Just to let Your Honor know what's

6    going on beyond the surface.  Yesterday there was a

7    meeting between QUALCOMM and Nokia.  As a Nokia

8    representative walked into the room to discuss issues,

9    they agreed to the news of another, we believe,

10   vexatious lawsuit, this time filed to Germany.  That's

11   the pattern we're in.  That's why we're seeking the

12   Court's injunctive relief.

13                   THE COURT:  Look, I'm a fairly direct

14   person.  That kind of behavior is not going to aid

15   QUALCOMM with any -- when I consider at least the

16   McWane issue -- McWane being our first-filed case

17   doctrine, which is, you know, if QUALCOMM wants to

18   bring an injunction action and say, "Look, we want to

19   have a fair fight.  It's basically the same issue all

20   over the world.  We shouldn't litigate it in 17

21   different courts.  We should pick one good forum.  You

22   know, we want it in the Federal Court that we first

23   filed in.  Let's agree.  Let's get it done.  Let's

24   have a trial, and let's make this be the template."

1   You know, that's a fairly strong position to be in

2   when you've got a first-filed doctrine.

3                On the other hand, if QUALCOMM says,

4   "No, what we really do want is some sort of

5   international infection of lawsuits to afflict Nokia,

6   we want the possibility of inconsistent adjudications,

7   we want them to get lawyers and master all these

8   different intricacies, put aside civil code versus

9   common law.  Why don't we get a sampling of common law

10  nations?  Why don't we get Australia, UK, the United

11  States, and then we'll get, frankly, former

12  dictatorships, which are still arguably that way but

13  have court systems and we'll see, you know, how that

14  kind of goes."  And then, if that's the situation,

15  that really cuts very strongly against worrying about

16  first-filed doctrine.

17                MR. FISCHER:  Your Honor, I don't

18  think that's what's going on.  I think it's a matter

19  of taking protective actions in the areas where it's

20  appropriate to take it, in light of the nature of the

21  patents at issue and where they are and where the

22  patents are protected.

23                THE COURT:  Am I wrong to think that

24  this is essentially a European-wide dispute or is it

11

1    maybe even also extends to the continental United

2    States?

3                MR. LORIG:  Your Honor, it's really

4    worldwide.  They filed their action in San Diego the

5    end of last year.  It's stayed at the moment.  They

6    filed actions before our last settlement negotiation.

7    They greeted us with filing an action in the UK.  Now,

8    before this one, they greeted us with filing an action

9    in Germany.  If we have another settlement

10   negotiation, we'll probably have another patent action

11   in another European or Asian country.

12                The idea that they're trying to

13   protect their interests, if you'll pardon me, is, I

14   think, based on the fact that perhaps counsel is not

15   aware of how old these patents are.  Most of them have

16   priority dates of 1990, 1994, 1995.  There's severe

17   laches on past damages.  QUALCOMM publicly announced

18   that the only reason they have filed these actions

19   under GSM patents is to try to pressure Nokia into

20   signing.  QUALCOMM's management publicly announced to

21   the investment community that they weren't pursuing

22   any other company on their GSM patents, that they're

23   only trying to enforce them against Nokia in order to

24   pressure Nokia to sign an agreement on third

12

1  generation, meaning nonGSM patents.  And they told the

2  rest of the industry they didn't have to worry about

3  these GSM patents.

4          So I don't -- there's a lot of details

5  and facts.  I don't believe my opposing counsel is

6  familiar with them yet.  Certainly what he says on the

7  surface seems reasonable.  But the facts are quite

8  different, and that's why we thought about where to

9  go.  QUALCOMM is a Delaware corporation.  Nokia Inc.

10 is a Delaware corporation.  This is pure

11 interpretation of contract issue.  It's a valuation of

12 patent rights -- how to value what a FRAND royalty is

13 as compared to a normal royalty.  What is fair?  Yes,

14 the obligation is interpreted under French law, but

15 the rule is you go to your national courts.

16          In the United States we have a

17 different situation than we do in Europe.  In Europe

18 you have one unified court system.  Here, because we

19 are a federation of states, you have both a state

20 system and a federal system.  There is no federal

21 question here.  You've got two Delaware corporations,

22 you've got an issue of interpreting and enforcing a

23 contract, and there is not a federal question here.

24          THE COURT:  It is an interesting -- I

1   mean, I understand what you're saying.  There's no

2   federal question of federal law what view the federal

3   courts would take of their jurisdiction, given the

4   terms of -- I forget the European entities.  What's

5   it's called?

6                  MR. LORIG:  ETSI.  E-T-S-I.

7                  THE COURT:  Whatever ETSI says.  What

8   the federal courts would view their obligation as

9   being is it may not be -- intuitively it's not as

10  relevant to me for this reason, which is the reason

11  why Nokia is here is because QUALCOMM is filing patent

12  infringement actions which it believes are improper

13  and at a time when what Nokia says should be going on

14  is, frankly, we ought to be getting so-called FRAND

15  rates and this should not be an issue at all.

16                  When they filed their patent

17  infringement action in the U.S. District Court in San

18  Diego -- it's clearly a defense.  It may be even a

19  counterclaim, and it would seem to get around the

20  jurisdictional issues.  From what I read in the letter

21  from Potter Anderson today, you were fighting about

22  going to arbitration.  And no one teed up, you know,

23  this question.  And it may have been because that was

24  the first of the actions.

14

1              I also don't know what's before the

2   U.S. International Trade Commission, whether that is a

3   forum that would qualify under ETSI.  I don't know

4   whether anybody has worked --

5              MR. LORIG:  May I respond, Your Honor?

6   The ITC, as Your Honor may know, only has the power to

7   grant injunctive relief.  It doesn't have the power to

8   define a reasonable royalty or a fair and reasonable

9   royalty.  Moreover, by law, it's determinations are

10  not -- don't give rise to collateral estoppel,

11  res judicata issues, preclusion issues because of the

12  nature of the Court system.

13             To go back to Your Honor's point about

14  San Diego.  As we understood the law, if somebody has

15  filed an action which triggers an arbitration right,

16  you waive that right.  The first thing you don't do is

17  ask for arbitration.  We asked for that.  The judge

18  denied it.  The arbitration went forward anyway.  The

19  federal circuit has heard the appeal.  But we have not

20  teed up in that case the right to an injunction or how

21  to define fair, reasonable --

22             THE COURT:  What's happening with

23  arbitration?

24             MR. LORIG:  It's ongoing.

CHANCERY COURT REPORTERS

15

1    Mr. Casebeer is on the phone.  We both participated.

2                        MR. MAMMEM:  In the arbitration right

3    now is pending QUALCOMM's motion to dismiss the main

4    claim in the arbitration on Rule 12(b)(6) grounds.

5    We're awaiting a hearing date on that motion.

6                        MR. LORIG:  Your Honor, the issues do

7    not include a right to an injunction --

8                        THE COURT:  I guess what I'm saying

9    is, who brought the action in the U.S. District Court

10   in California?

11                       MR. MAMMEM:  QUALCOMM did.

12                       THE COURT:  Right.  For patent

13   infringement?

14                       MR. MAMMEM:  Yes.

15                       THE COURT:  And why wouldn't Nokia say

16   that that was -- you know, that one of the reasons why

17   that action is not viable is because QUALCOMM is

18   acting in violation of ETSI?

19                       MR. MAMMEM:  Your Honor, we think

20   that's exactly the right question.  As we've seen from

21   the response that Nokia filed yesterday, they appear

22   to have asserted both the issues that they raised --

23   that Nokia raised -- before the arbitrator, as well as

24   this ETSI issue as affirmative defenses in that

16

1   action.  In the district court action, Nokia has not

2   yet been required to file an answer because of the

3   procedural posture of that action.  That would be the

4   appropriate forum for these issues to be aired.

5                MR. LORIG:  One would have thought, as

6   Your Honor has said, that the reasonable thing to do

7   would be for QUALCOMM to have filed this action in

8   San Diego, which after all is its home base, tee up

9   the issues there.

10               What happened is, after the case was

11  stayed and the arbitration started going forward, they

12  didn't like some of the things that were happening in

13  the arbitration.  They then filed an action in the ITC

14  on several of the same patents that were at issue in

15  San Diego.  When they didn't like the way things were

16  going, they filed the UK action.  You see the problem?

17               THE COURT:  I understand that.  As a

18  litigator will, you changed my words around to put the

19  onus on QUALCOMM.

20               I don't know what gave rise to the

21  arbitration right.  Was it a contract between QUALCOMM

22  and Nokia?

23               MR. LORIG:  Yes, it is a contract.

24  Unfortunately, because we don't have a protective

17

1   order, without permission of my opposing counsel I
2   can't discuss its contents because --
3                   THE COURT: Would it sweep within it
4   arguably the ETSI claim?
5                   MR. LORIG: I don't believe so, Your
6   Honor.
7                   THE COURT: I'll give you my standard
8   pitch on American -- not American businesses in
9   general. No one whines more about the cost of
10  litigation than businesses and doctors. In my
11  experience as a judge, no source of litigation delay
12  or complexity or a waste are more common than
13  businesses and doctors. I say doctors because anybody
14  who has had a doctor practice break up, where people
15  go under tables and pull out plugs, steal records, do
16  things -- doctors love litigation when they're playing
17  offense; they hate it when they're playing defense.
18  Businesses whine all the time, you know, but they
19  spend a gazillion amount of dollars and human energy
20  every year fighting about what forum to be in.
21                  You know, it may be you all think I
22  can do it well on both sides and that you can
23  stipulate that I'll do it. You probably can't because
24  you know you just hate each other. Your clients hate

18

1   each other and they're going to fight about anything.

2   You could have the best -- universally conceded --

3   best judge in the world by both sides in a blind taste

4   test.  If they happen to agree on that person, they

5   would then back away.

6               What I'm getting at and what we're

7   going to get to quickly -- I mean, I will say this to

8   QUALCOMM.  If I find out tomorrow there's an action in

9   Belgium and an action in the Netherlands, then I'm

10  going to set a trial date.  And we'll go, you know,

11  hell bent for leather with all the discovery in the

12  world to get this tried wherever it has to be,

13  including in my court, if I conclude that it's going

14  to be here.  But because it's going to be somewhere,

15  there will be no waste in the discovery.

16              What was done in Germany was done in

17  Germany.  We'll start with QUALCOMM having a brief in

18  two weeks.

19              What would Nokia want in terms of

20  answering?

21              MR. LORIG:  I think we'll get our

22  response in one week, Your Honor, since they are not

23  stipulating to stay their hand on filing future --

24              THE COURT:  You only want a week?

19

1   Okay.  Get on the books quick.

2                    MR. STARK:  Your Honor, may I speak

3   briefly?

4                    THE COURT:  Yes.

5                    MR. STARK:  Your Honor, to your point

6   that a number of suits have been filed by QUALCOMM for

7   patent infringement, I just wanted to make clear for

8   the record that there are patents of different nations

9   involved in these different actions, and each patent

10  of a different nation gives rise to a separate and

11  completely distinct set of rights.  For example, the

12  U.S. patents that are at issue in the San Diego

13  litigation give rise to the right to potentially

14  exclude products from being offered, sold, made or

15  used in the United States, but do not extend

16  necessarily to other nations.  The same would be true

17  of patents of other nations that are at issue in other

18  litigation.

19                    So I just wanted to make the point,

20  Your Honor, that it's not a simple case of

21  proliferating litigation, but rather there are quite

22  distinct rights at issue.  In order to protect those

23  rights, QUALCOMM may need to seek to bring cases in

24  different jurisdictions.

20

1          THE COURT:  As I understand your

2  friend's point, that I guess in the territories

3  governed by ETSI, which would be essentially the

4  European union -- is that correct?

5          MR. LORIG:  Yes, Your Honor.

6          MR. STARK:  That's correct, Your

7  Honor.

8          THE COURT:  -- that there is an

9  overriding issue of whether essentially what QUALCOMM

10 is limited to is essentially making, you know, sure

11 that Nokia pays FRAND rights for the technologies in

12 all those territories, and that the overarching issue

13 that Nokia seeks is that essentially the European

14 unionwide -- instead of charging folks like Nokia

15 FRAND rights for these essential technologies, it's

16 essentially trying to create a hostage situation

17 where, instead of charging FRAND rights, it charges

18 something way too expensive or keeps people out of the

19 market all together.  That's what I understand is the

20 issue.

21         MR. STARK:  That is potentially a

22 common issue.  Your Honor, we would submit that

23 Nokia's position is utterly without merit on that.  I

24 just wanted to make sure that the record was clear.

21

```
1                    THE COURT:  Right.

2                    What I'm saying is, if it is an

3    overarching issue and I can't at this point judge

4    whether it's just without merit, whether it's utterly

5    without merit -- you know, whatever adverbial tag line

6    we want to put on it -- I can't judge that.  But if

7    it's possibly a good defense and you all can't figure

8    out where to fight about it and it looks like the

9    infection is spreading throughout the European union,

10   then I am going to set a trial date and at least get

11   the issue -- get discovery going.

12                    What I would strongly advise that you

13   do -- one of the things I would say to Nokia, don't

14   be, you know, day foolish here and say we'll do our

15   brief in a week.  Let's just be careful about that.

16   All I'm saying is, maybe you can anticipate all the

17   arguments that they're going to have and you're going

18   to look -- maybe you're going to get the stuff in

19   ETSI.  I don't know if there's an official English

20   version of ETSI.

21                    MR. URQUHART:  The website.

22                    THE COURT:  The history of ETSI and

23   what it means.  I'll just -- why don't you figure out

24   a place to have this fight.
```

22

1        MR. LORIG:  On behalf of Nokia, we
2   would stipulate that the Delaware Chancery Court can
3   resolve this dispute and each side stay their hand on
4   other litigations until this issue is resolved.
5   Because these are two large mature companies and there
6   is an honest dispute, apparently, between what the
7   FRAND obligation means, and it should be resolved.  We
8   would stipulate to jurisdiction here.  And I would
9   hope counsel would ask their clients before rejecting
10  it so that can be decided.  Because the problem that
11  we're going to get into is we can literally have
12  scores of lawsuits around the world, not just in
13  Europe, with differing interpretations of what the
14  FRAND obligation means.  Here, where there is
15  jurisdiction over QUALCOMM and there isn't
16  jurisdiction in the national courts in Europe, here's
17  the one place it can be decided.
18        THE COURT:  What I'm saying is, if
19  they had thought of this court first, you know, I
20  expect that what Nokia would be saying is, we're a
21  Finnish corporation.  And the fact that a few of our
22  cell phones come into Delaware doesn't mean why are we
23  the heck in the Delaware Court of Chancery.  Now,
24  Strine's got a great hairstyle and we dig that; but,

23

1   you know, aside from that, you know, you just can't
2   really get it.

3                      Now I understand there is a Nokia --
4   that the U.S. subsidiary is here.  What I'm saying
5   is -- I would say to both sides -- I realize -- and
6   even in something just with the dispute -- the fact
7   that one side or the other picked the forum first
8   becomes, you know, some sort of psychological barrier
9   to rationality.  I could as easily say to Nokia, "Why
10  not agree to go back to the U.S. District Court in
11  San Diego, lift the stay with respect to this issue
12  and have it out there."  I think your friends from
13  QUALCOMM would be in a very difficult position to say
14  that a U.S. District Court is not a national quorum.
15  That would deprive me and our Delaware friends of the
16  ability to participate in this.

17                      I'm happy to do the work.  This
18  court -- one of the advantages of Delaware is, you
19  know, we have to play fair.  That's the nature of our
20  business.  We can't play favorites and have it work
21  for our state.  It just doesn't work.

22                      The Nokia subsidiary's a Delaware
23  subsidiary; QUALCOMM is a Delaware corporation.
24  Probably neither of your corporations have as many of

24

1  your operations here as my former boss and a U.S.

2  senator would like.  So it's not like we could favor

3  the headquarters versus anything.  Usually people --

4  we're indifferent to that.  We're trying to come with

5  a fair outcome.

6               If you can agree that I'm the place,

7  you know, that becomes easier.  Then you can enter

8  into a stipulation that's binding.

9               My concern about that is, again, the

10 psychic notion, which is that QUALCOMM has been

11 brought and it didn't choose this place.  You know, if

12 what Nokia's objective is is to get a decision, what

13 I'm saying to you, I am going to set a trial date and

14 I am going to make you all have your depositions taken

15 and do all that kind of stuff if these things keep

16 coming up.

17               It may that be what you can agree on,

18 even though it deprives me of the fun, is that the

19 forum that QUALCOMM chose as its first American court,

20 which might even be more convenient for some of the

21 litigators working for Nokia, since, you know, you're

22 out there in the land of Gwyneth and stuff, would be

23 that, you know, you do it in San Diego.

24               MR. LORIG:  One of the problems is the

25

1   judge in San Diego -- Judge Brewster -- is a senior

2   judge, just had an operation for prostate cancer, has

3   announced he's going to retire in September of next

4   year.  Some of these European cases won't be tried and

5   decided by the middle of next summer.  The timing,

6   frankly, isn't good.

7                  You know, one of the reasons, as I

8   said we're here, is for exactly the reasons Your Honor

9   enunciated: this is a neutral court.

10                 MR. MAMMEM:  The response to that is

11  that, if we had started litigating the San Diego

12  action back in November when we filed, we would be

13  well-advanced in the San Diego forum at this point.

14                 THE COURT:  Well, Mr. Mammem, you

15  represent --

16                 MR. MAMMEM:  QUALCOMM.

17                 THE COURT:  You're at what firm?

18                 MR. MAMMEM:  The Day Casebeer firm.

19                 THE COURT:  I guess what I'm saying

20  is, you know, things like Judge Brewster -- if

21  Judge Brewster is genuinely retiring, he probably

22  knows that.  And I would assume that he -- you know,

23  as I would assume about most of my judicial

24  colleagues -- that he cares deeply about doing

1  justice.  And that to the extent that the time frame
2  that's involved here doesn't comport with his
3  retirement plans, that there is this thing called
4  reassignment.
5                     I would say to Mr. Stark and
6  Mr. Mammem, you know, this court is fair.  We do
7  things pretty well.  I think I know that the Cravath
8  firm has once in a while gotten a decent result here.
9  And so -- certainly the Potter Anderson firm has.
10                    So I think the question becomes
11 whether it's really like you just want to hurt each
12 other, and you just want to have this sort of
13 uncertainty.  That may be a business decision that
14 none of the lawyers have anything to do with.  It's
15 just simply we want to hurt each other, and nobody
16 needs to respond to that because each side is going to
17 say, "Of course we wouldn't do that.  We wouldn't have
18 just 17 lawsuits just because it gives us business
19 leverage."  And the other side say, "Of course we
20 wouldn't do the same either.  We wouldn't duck a
21 particular forum just to come here and make it" -- you
22 know, in Delaware we have that phrase, we don't -- we
23 say it about every other day -- we didn't just fall
24 off the turnip truck, which I think can also be

27

1   interpreted to mean I didn't just fall off the turnip

2   truck.  Everybody knows I fell off it five years ago,

3   without a helmet, and I've suffered permanent damage

4   ever since.  I have never fallen off the turnip truck.

5   I know there's jousting going on.  I know this means a

6   lot to your clients.

7              What we're going to do is, I want a

8   tight briefing schedule.  Think about that week.  I'm

9   not going -- I want a briefing schedule to me by next

10  Wednesday.

11             MR. FISCHER:  We'll do that, Your

12  Honor.

13             THE COURT:  Think about your time

14  frame.  If there are other lawsuits, then discovery is

15  going to go forth and it's going to be on an expedited

16  basis.  So QUALCOMM, to some extent, is going to be in

17  control about whether expedited discovery begins;

18  otherwise discovery is not stayed but it will go under

19  the usual deadlines.  I would like a report back at

20  the same time I get a schedule about whether you've

21  conferred about whether there is a forum you could

22  agree on to go first about these threshold issues and,

23  frankly, to stay the other litigations.  There may be

24  some complexity there.

28

1              I heard Mr. Stark say it's a good

2    point.  There may have to be some sort of tolling

3    agreement between QUALCOMM and Nokia to indicate that

4    QUALCOMM is not -- if its time has already lapsed,

5    it's lapsed.  But that during the nothing -- simply

6    the pendency of any stay to get done in the first

7    things won't be -- that part of the delay won't be

8    attributed as laches and that sort of thing.

9              MR. LORIG:  Your Honor, we'd stipulate

10   to that on the record right now.  That's not a

11   problem.  The problem is, again, the fact that we're

12   getting an injunction action in a week.

13             THE COURT:  Mr. Stark, can you take

14   that back to your client?

15             MR. STARK:  Yes, Your Honor.

16             THE COURT:  It also gives me a chance

17   and will create a little record here, which will help

18   other courts to flesh out really whether this is --

19   these people are acting like children in a way that's

20   unfair or they simply, you know -- because I think if

21   you can get -- at some point, when you've got the idea

22   that QUALCOMM will be able to protect its interest in

23   all the jurisdictions, we'll get a fair shot in a good

24   forum of presenting its side in one of the national

29

1    controversies, but yet Nokia will get to advance this

2    overarching thing and it could be done in a good

3    quality forum that's neutral in a prompt way.

4                    If one side or the other is objecting,

5    then they suggested, frankly, this is a situation

6    where counsel have a duty to step into your clients

7    and say, "No, you can't act in a vexatious way."

8    Let's have a fair fight on the merits.  We may win or

9    lose, but we have that opportunity, and we're not

10   going to afflict 13 different countries with a case.

11                   MR. LORIG:  May I respond, Your Honor?

12                   THE COURT:  Yes.

13                   MR. LORIG:  That's exactly what the

14   problem is and why we're here.  They have asked for a

15   July 2007 trial date in England, but the FRAND issues

16   would not be decided until after that.  You decide the

17   patent issues first, injunction first, the other

18   issues second.

19                   Same in Germany.  You're going to get

20   the patent issues decided within a year.  You're not

21   going to get to the other issues.

22                   THE COURT:  Right.

23                   What I'm saying is, I'm sensitive to

24   the need -- I understand what Nokia is saying.  I

1    think the vulnerability that Nokia has is are we a

2    national court and the fact that could these -- this

3    defense be presented in prior pending actions.  That's

4    why I'm suggesting to QUALCOMM it ought to think very

5    hard about the other options it brings and whether

6    it's willing to stipulate in somewhere else.  If it

7    prefers -- San Diego is a lovely place.  I actually

8    never spent any time in the city.  I only spent my

9    time on Coronado.  It has sufficient proximity to the

10   ocean and to fish tack companies that I never

11   actually -- except driving to the airport -- spending

12   any time there, other than the Padres are an awesome

13   team.  You know, you've heard me on that.  I want to

14   hear about the fight and I want a briefing schedule.

15                  MR. FISCHER:  By Wednesday?

16                  THE COURT:  Yes.

17                  MR. LORIG:  Should that briefing

18   schedule be for an expedited proceeding so that this

19   matter will be decided before these various midsummer

20   problems we're going to have?  We've got European

21   decisions by the middle of next year.

22                  THE COURT:  No.  I think I've been

23   pretty clear.

24                  What I've said is, I want a schedule

1  for the completion of briefing on a motion to dismiss

2  or stay, essentially on the forum issue writ large.  I

3  am not staying discovery in any case.  But if there

4  are actions -- if QUALCOMM files an action anywhere

5  else than it's already done, then I'm going to set a

6  trial date.  And I will turn what is discovery that's

7  going to be ongoing and on a normal basis, I will turn

8  that into expedited discovery.

9               I've got plenty of time to set a trial

10  date for early next year.  One thing we are capable of

11  doing in this court is I have no doubt in the first --

12  well, the first half of August 2006 -- that we can be

13  to trial in early 2007, you know, if we have to.

14               I'm also assuming there's been some

15  discovery done between the parties somewhere.  Not

16  even in the arbitration?

17               MR. LORIG:  Not on these issues, Your

18  Honor.

19               THE COURT:  Not on FRAND?

20               MR. LORIG:  Not on FRAND.  Not under

21  right to injunction.  Those aren't the issues in

22  arbitration.  There's four discrete issues and these

23  are not among them because the contract in question,

24  which I'm not allowed to discuss on pain of blowing a

32

1   confidentiality clause because QUALCOMM filed two

2   cases against TI saying they lost their license by

3   talking about the agreement --

4                    THE COURT:  Are you telling me that

5   this dispute is entirely -- that dispute is entirely

6   separate from ETSI?

7                    MR. LORIG:  Yes, Your Honor.  I'm

8   saying that that is entirely separate from ETSI and

9   FRAND.

10                   THE COURT:  Mr. Stark, would you --

11  who is handling that for --

12                   MR. MAMMEM:  This is Chris Mammem.

13                   Your Honor, as I believe I mentioned

14  earlier, the dispute that's currently pending in the

15  California arbitration does appear to be a separate

16  set of arguments from the ETSI argument.  However, as

17  we've seen in the ETSI action, where Nokia filed its

18  answer yesterday, they have raised both issues as

19  affirmative defenses.  Nokia has not yet filed its

20  answer in the San Diego action, and we would have

21  every reason to believe that they would in the due

22  exercise of care for their client to assert both sets

23  of issues as defenses in that action once they're

24  required to answer there as well.

33

```
 1              THE COURT:  Okay.  But that implies
 2   that the ETSI provision will somehow extend to --
 3              MR. MAMMEM:  Several of the patents
 4   that are asserted in the San Diego action have been
 5   declared standards essential under ETSI.  That's the
 6   triggering event, as I understand it, for Nokia to be
 7   raising this issue.
 8              THE COURT:  Okay.  But is what's at
 9   issue in San Diego have to deal with what happens in
10   the United States or in Europe, which is, the duty --
11   the so-called duty, if it exists under ETSI to allow
12   people to use your technology on a FRAND basis, does
13   that extend outside the European union?
14              MR. MAMMEM:  That is an issue that I'm
15   not prepared to speak to today.
16              THE COURT:  Is that Nokia's position?
17              MR. LORIG:  Our position is the ETSI
18   obligation extends throughout the world, Your Honor.
19              THE COURT:  So that it would be a fair
20   response to the injunction action in California to say
21   ETSI says you can't do it.
22              MR. LORIG:  Except it's not an
23   injunction action.  They're primarily seeking damages.
24              THE COURT:  But they can't get damages
```

1   if they're breaching their ETSI rights; right?  Then

2   they're denying you the chance to use the technology

3   on the basis that they're supposed to; right?

4              MR. LORIG:  No, Your Honor.  I think

5   that's the whole issue.

6              Looking at the San Diego action apart

7   from an injunction, they sue and they say you're

8   infringing on our patent, we're entitled to damages.

9   And the response would be, yes, you're entitled to a

10  royalty, not as --

11             MR. MAMMEM:  We pled in the San Diego

12  action seeking both damages and injunctive relief.

13             MR. LORIG:  Yes, it could be teed up

14  there.

15             THE COURT:  And it could also be teed

16  up more broadly, which is not only as a defense and

17  that the royalty -- whatever royalty you should pay is

18  a FRAND rate, but more generally as an affirmative --

19  as a counterclaim you could be seeking an injunction.

20  Is that right?

21             MR. LORIG:  We could seek the same

22  injunction from the Federal Court we are seeking from

23  this court, except for the fact that it's again not a

24  federal question --

35

1              THE COURT:  It's not a Delaware law

2   question either.

3              MR. LORIG:  It's a contract question,

4   Your Honor.  It's strictly contract.

5              THE COURT:  What I'm saying is, you

6   would have every right, given that they brought you

7   into Federal Court, for you now to raise this as a

8   counterclaim and an affirmative defense and seek an

9   injunction.  It would not be a jurisdictional problem

10  on the part of the Federal Court.

11             MR. LORIG:  It wouldn't be, except

12  that case is stayed pending arbitration.

13             THE COURT:  That case is stayed.  This

14  case didn't exist; right?

15             MR. LORIG:  Right.

16             THE COURT:  The great thing about

17  stays is they can be lifted.

18             MR. MAMMEM:  We will stipulate to the

19  lifting of that stay immediately, if Nokia would

20  agree.

21             MR. FISCHER:  It was filed by Nokia.

22             MR. LORIG:  The issue is, you can't --

23  are they stipulating that we can pursue the

24  arbitration issues in arbitration and that the

36

1   San Diego case will be dismissed, we win in

2   arbitration, and then we come back to Delaware and

3   have this decided, because the issues in arbitration

4   are such that no San Diego case could have been filed,

5   would have been filed?  If we win the arbitration, the

6   San Diego case must be dismissed with prejudice on all

7   issues.

8                MR. MAMMEM:  That's the nature of an

9   affirmative defense, and they ought to be litigated in

10  due course as affirmative defenses in the patent

11  infringement case.

12               MR. LORIG:  Your Honor, with all

13  deference, I don't think I heard an answer to my

14  question.

15               THE COURT:  I don't think I did

16  either.  What I'm hearing is the kind of jousting that

17  I'm going to stop, because it's one of my law clerk's

18  last day and I'm not going to miss lunch with her

19  over -- because it's not helpful.

20               You all need to take a deep breath and

21  with a cool head and warm heart think about this

22  rationally, which is what I just heard Mr. Mammem.

23  It's a need answer.  But the fact is that Nokia is now

24  seeking to raise more than an affirmative defense.

37

1    It's seeking to obtain an injunction that goes further

2    to that.  The question is: are they going to get a

3    forum -- if you come to me and say you can do it in

4    the U.S. District Court for the District of San Diego

5    but not until this arbitration is completed, and then

6    you say that's not unfair to them because they're the

7    ones that raised the arbitration issue -- I haven't

8    seen the contract.  It sounds like you've got a lot

9    mixed up in there.  It sounds like you're suing in

10   Germany and the UK.  It's probably not under the same

11   contract that has the arbitration clause.

12                   MR. LORIG:  I would like to ask

13   QUALCOMM's permission to submit to the Judge -- the

14   Court -- a copy of the -- the contract at issue.  We

15   have QUALCOMM's permission?

16                   MR. MAMMEM:  I believe that would be

17   fine to submit it under seal, or under whatever

18   confidentiality agreement.

19                   THE COURT:  Don't submit it to me

20   until next Wednesday in the context of something.

21                   How far along in the arbitration --

22   this will be the last line of questioning -- how far

23   along are you in this arbitration?

24                   MR. LORIG:  I would say we're halfway

CHANCERY COURT REPORTERS

1    along.   We've teed up a proffer on how we're going to

2    prove the issues that we've raised in arbitration.

3    They filed a motion to dismiss.   The arbitrator's

4    currently considering them.   We think the motions are

5    going to be denied and we'll tee up the arbitration

6    hearing.   It should be within the next couple three

7    months.

8                      THE COURT:   Then would you do some

9    discovery?

10                     MR. LORIG:   There's going to be a

11   little discovery.   One of the key witnesses is

12   unfortunately dying of cancer and we're having a

13   little difficulty getting opposing counsel to agree on

14   a way of taking his deposition -- a way that doesn't

15   aggravate his health.   There may be a little

16   additional discovery after that.

17                     MR. MAMMEM:   Mr. Lorig is correct.

18   The motion to dismiss is pending.   We believe that

19   motion will be granted, obviously.   If it's denied,

20   then there will be some amount of discovery to be

21   taken before the merits issue is teed up.

22                     THE COURT:   Is the arbitrator somebody

23   really super special that Nokia loves?

24                     MR. LORIG:   No.   The arbitrator was

1    somebody jointly picked by both sides.  His name is

2    Les Weinstein.  He's a retired trial lawyer.  He

3    doesn't have Your Honor's economic background but he's

4    got a lot of common sense.

5              THE COURT:  You may have to go over

6    what my economic background is.  Sort of lower middle

7    class.

8              Good.  I'm glad to know that his folks

9    had some money.

10             I guess what I'm wondering here is,

11   you know, it doesn't sound to me like you're all

12   that -- the arbitration is always a murky process.

13   You sit here about halfway through, struck me as

14   you're not -- I wouldn't call that halfway through.  I

15   wouldn't even call it halfway through the first phase

16   of anything.

17             Part of what you all should be

18   thinking about is -- maybe it's this fellow with a

19   better economic background than I have, maybe he does

20   it all.  Maybe you get through the motion and say,

21   "Well, we'll live by what the dismissal thing is.  But

22   if the claims go forward, we'll go back to the judge,

23   lift the stay, and we'll do it all in the District

24   Court of San Diego.  But we'll do it promptly."  What

1   Nokia gets out of that is it gets a chance to present

2   its FRAND-ETSI argument.  But you do it all in one

3   expedited trial before someone, especially since you

4   haven't really taken the discovery or anything.

5                    That would involve Nokia obviously

6   giving up something, which is it loves this judge or

7   loves this arbitrator or loves arbitration.  More

8   likely what it had is, it had -- it was sued by

9   QUALCOMM.  And then the first thing you do is you

10  figure out how can you defeat the suit.  And if you

11  have a contract that says, "Well, we can decide or

12  dispute somewhere else," even if you don't even

13  necessarily think that somewhere else is better, you

14  tend to cling to that at that point in time.  I mean,

15  I hate to say it's that primitive, but I do think a

16  lot of times it's that primitive and that, you know,

17  it's there so we will use it.  If we can get a punter

18  over here, worrying about it delays them playing

19  offense.  Now Nokia wants to play offense.  And it

20  wants something that probably an arbitrator doesn't

21  have any prayer of being able to give it, which is an

22  injunction that would have a collateral effect in

23  other nations.

24                    And one of the responsible trade-offs

41

1   might be to go to Judge Brewster and say, "We're going
2   to put this all in the U S. District Court.  Your
3   Honor, you're a great judge.  You had a great career.
4   You're leaving next September.  Our time frame is
5   something else.  Let's get it reassigned mutually to
6   somebody who can handle it."  The parties stipulate to
7   expedite this and have this be the case that goes
8   forward, put all your claims before him and go.  That
9   sounds like a fairly -- you know, that sounds like you
10  would all look like pretty sensible business people
11  and lawyers if you did that.

12              MR. LORIG:  May I respond?  That would
13  be about as I think acceptable as a suggestion to
14  QUALCOMM.  We could litigate this in Helsinki court.
15  I think the whole advantage of being here is, one, you
16  can get something resolved quickly in the Delaware
17  Chancery Court; two, you have a neutral forum; three,
18  it's a place where companies from around the world
19  know they're going to get a fair, neutral --

20              THE COURT:  It's making us -- our head
21  is going to explode here in Chancery because we feel
22  so good and that you love us.  I don't know any reason
23  why a judge -- a federal district judge in
24  San Diego -- you know, is going to favor QUALCOMM over

42

1  Nokia.  I don't know if the stadium is named after

2  anybody out there.

3              MR. LORIG:  QUALCOMM Stadium.

4              MR. MAMMEM:  Not anymore.

5              THE COURT:  And it's a federal

6  district judge.  But you know, you may be just sort of

7  stuck with that.

8              I would say on the other hand to

9  Nokia -- as I said, I'm willing to do the work.  This

10  Court will do the work.  But again, I would say that

11  to QUALCOMM -- it may be QUALCOMM -- you sent them to

12  arbitration.  They may want to get all their claims

13  before one thing.  Maybe you agree it's the Southern

14  District of New York.  There are courts -- there are

15  judges in federal courts who will take this very

16  seriously.  I'm not implying that the Court that it's

17  in isn't.  If it needs to be done within the next five

18  or six months, we'll do that.

19              I had the Oracle case and Judge Walker

20  had the Oracle antitrust thing.  He did that antitrust

21  trial just as promptly as any of us in Chancery would

22  and he pumped out a decision.

23              Again, I didn't realize -- you can see

24  how big a Padre fan I am.  I still -- the idea that a

1  federal judge is going to rule for QUALCOMM --

2              MR. LORIG:  Judge Brewster's fair, and

3  I wouldn't want to indicate anything other than that.

4  It's the difficulties when you have an international

5  problem like this.  You know, clients are

6  understandably hesitant to go into the other company's

7  home court.  It has nothing to do with individuals,

8  Your Honor.

9              THE COURT:  I understand.  Part of the

10 problem is, you all picked this court now.  As a

11 result, if you had gone to them and said, "Why don't

12 we have Chancery" -- "why don't we think about

13 Chancery?  Our operations are Delaware, you're

14 Delaware.  Why don't we have Chancery do it."  You

15 might not have a reflex.  But now they chose a forum,

16 you chose a forum.  And what it tends to mean is it's

17 got to be some other forum.

18              You know, you all need to read the

19 transcript.  Think about whether what I'm saying is

20 true or not.  I think it is about psychologically how

21 you deal with it.  Talk to your clients rationally and

22 think about, you know, what you're going to do.  If

23 you can't, we'll finish the motion practice and we'll

24 worry about that then.  Okay?

44

1            So I'll hear from you next Wednesday.

2           (Court adjourned at 1:22:50 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

45

1                          CERTIFICATE

2                     I, DIANE G. McGRELLIS, Official Court

3       Reporter of the Chancery Court, State of Delaware, do

4       hereby certify that the foregoing pages numbered 3

5       through 44 contain a true and correct transcription of

6       the proceedings as stenographically reported by me at

7       the hearing in the above cause before the Vice

8       Chancellor of the State of Delaware, on the date

9       therein indicated.

10                    IN WITNESS WHEREOF I have hereunto set

11      my hand at Wilmington, this 14th day of August, 2006.

12

13

14      _____
                        Official Court Reporter
15                        of the Chancery Court
                            State of Delaware
16

17
        Certification Number: 108-PS
18      Expiration:  Permanent

19

20

21

22

23

24

CHANCERY COURT REPORTERS

# EXHIBIT D

➢ PUBLIC VERSION ◄

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### WASHINGTON, D.C.

#### Before the Honorable Robert L. Barton, Jr.

| | |
|---|---|
| IN THE MATTER OF<br><br>CERTAIN MOBILE TELEPHONE<br>HANDSETS, WIRELESS<br>COMMUNICATION DEVICES, AND<br>COMPONENTS THEREOF | Investigation No. 337-TA-578 |

## RESPONSE OF NOKIA CORPORATION AND NOKIA INCORPORATED TO THE COMPLAINT, AS SUPPLEMENTED, OF QUALCOMM INCORPORATED AND NOTICE OF INVESTIGATION

Pursuant to Commission Rule of Practice 210.13 (19 C.F.R. § 210.13), Respondents Nokia Corporation and Nokia Inc. ("Nokia" or "Respondent") hereby respond to the Complaint under Section 337 of the Tariff Act of 1930 filed by Qualcomm Incorporated ("Qualcomm" or "Complainant") on June 9, 2006, and supplemented on June 27, 2006, pursuant to which an investigation was instituted by the Commission on July 12, 2006.

It is Nokia's position that, among other things, Qualcomm is estopped from asserting the claims set forth in the Complaint and that the issue of estoppel is subject to arbitration under the arbitration clause of the Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 between Qualcomm and Nokia. Nokia contends, therefore, that the ITC lacks subject matter jurisdiction to conduct this investigation. Nokia's response to the Complaint and the Notice of Investigation is made pursuant to the Commission Rules of Practice without waiving or intending to waive Nokia's right to arbitrate its estoppel defense and to seek dismissal of this investigation pursuant to 19 U.S.C. § 1337(c).

Nokia denies it has engaged in acts of unfair competition or violated Section 337 by importing, selling for importation, and/or selling within the United States after importation any products that infringe, directly, contributorily, and/or by inducement, any valid claim of United States Patent Nos. 5,452,473 ("the '473 patent"), 5,590,408 ("the '408 patent"), 5,655,220 ("the

➢ PUBLIC VERSION ◄

'220 patent"), 5,576,767 ("the '767 patent"), 5,452,104 ("the '104 patent"), 6,453,182 B1 ("the '182 patent") (collectively the "Qualcomm Patents-In-Suit"). Nokia further denies that the patents are valid. Except as specifically admitted herein, Nokia denies all allegations of the Complaint, as supplemented.

Nokia has not had sufficient time and opportunity to collect and review all of the information that may be relevant and necessary to respond to the matters raised in Qualcomm's Complaint. Specifically, Nokia has not received all of the information requested in its discovery requests to Qualcomm. To the extent that any allegations of the Complaint refer to or rely upon such information not previously supplied to Nokia, Nokia is without information sufficient to admit or deny such allegations, and therefore denies same. Moreover, Nokia reserves the right to take such further positions and raise additional defenses as may become apparent as a result of further information which may be discovered subsequent to the filing of this Response.

## ADMISSIONS AND DENIALS OF QUALCOMM'S SPECIFIC ALLEGATIONS

### I.    INTRODUCTION

1.1    Nokia admits that Qualcomm has requested that the United States International Trade Commission (the "ITC") commence an investigation pursuant to section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337.

1.2    Nokia denies each and every allegation to the extent that it alleges, directly or by implication, that any acts of Nokia constitute unfair acts and/or infringement of Qualcomm's patents. Nokia further denies that any of the Qualcomm Patents-In-Suit are valid. Nokia admits that it entered into a Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 with Qualcomm. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph 1.2, and therefore denies the same.

2

1.3    Nokia denies that any of the Qualcomm patents are valid. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph 1.3, and therefore denies the same.

1.4    Nokia denies that a domestic industry exists in the United States relating to any products covered by the Qualcomm patents. Nokia denies that Qualcomm United States' investments and expenditures in the engineering, research and development directed to the utilization and exploitation of the inventions claimed in the asserted patents exist as required by Section 337(a). Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph 1.4, and therefore denies the same.

1.5    Nokia admits that Qualcomm seeks relief from the ITC in the form of a limited exclusion order concerning the importation into the United States of all handsets and components thereof which Qualcomm alleges violate the Qualcomm Patents-In-Suit. Nokia also admits that Qualcomm seeks from the ITC a cease and desist order prohibiting the importation, marketing, advertising, demonstration, warehousing of inventory for distribution, sale and use of handsets in the United States pursuant to section 337(f) that Qualcomm alleges infringe the Qualcomm Patents-In-Suit. Nokia admits that it entered into a Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 with Qualcomm. Except as expressly admitted herein, Nokia denies each and every allegation contained in paragraph 1.5.

## II.    COMPLAINANT

2.1    Nokia admits that Qualcomm Incorporated is a Delaware corporation. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations contained in paragraph 2.1, and therefore denies the same.

3

➢ PUBLIC VERSION ◄

2.2    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 2.2, and therefore denies the same.

2.3    Nokia denies that any of the Qualcomm patents are valid. Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 2.3, and therefore denies the same.

## III.    PROPOSED RESPONDENTS

3.1    Nokia admits that the contact address for its head office is at Keilalahdentie 2-4, P.O. Box 226, FIN-00045 Nokia Group, Finland. Nokia further admits that its mobile phone business group is involved in the design, development and manufacture of handsets.

3.2    Nokia admits the allegations of paragraph 3.2 of the Complaint.

3.3    Nokia admits that it provides its customers with equipment, services and solutions for network operators. Nokia admits that it does not have a mobile phone manufacturing facility in the United States, although it does have a customization and logistics centre in the United States. Nokia further admits that the United States is one of Nokia's largest markets in terms of net sales, and that the United States was Nokia's largest market in terms of net sales in 2004. Except as expressly admitted above, Nokia denies the remaining allegations of paragraph 3.3.

## IV.    THE PRODUCTS AT ISSUE

4.1    Nokia admits that Qualcomm's complaint concerns certain wireless communication devices, and components thereof.

4.2    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 4.2, and therefore denies the same.

4.3    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 4.3, and therefore denies the same.

4.4    Nokia denies the allegations in paragraph 4.4, including the allegation that Nokia infringes any valid claim of the asserted patents.

## V.    THE PATENTS-IN-SUIT

### A.    The '473 Patent

#### 1.    Identification of the Patent and Ownership by Qualcomm

5.1    Nokia admits that the '473 patent entitled "Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System," was issued on September 19, 1995, to Qualcomm as assignee, naming Ana L. Weiland, Richard K. Kornfeld, Richard J. Kerr, John E. Maloney and Nathaniel B. Wilson as inventors. Nokia further admits that Exhibit 1 attached to the Complaint appears to be a copy of the '473 patent. Nokia further admits that Exhibit 7 attached to the Complaint appears to be copy of the assignment of the '473 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.2    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.2, and therefore denies the same.

#### 2.    Non-Technical Description of the Patented Invention

5.3    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.3, and therefore denies the same.

5.4    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.4, and therefore denies the same.

#### 3.    Foreign Counterparts to the '473 Patent

5.5    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.5, and therefore denies the same.

➢ PUBLIC VERSION ◄

**B.    The '408 Patent**

    **1.    Identification of the Patent and Ownership by Qualcomm**

    5.6    Nokia admits that the '408 patent, entitled "Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System," was issued on December 31, 1996, to Qualcomm as assignee, naming Ana L. Weiland, Richard K. Kornfeld and John E. Maloney as inventors. Nokia further admits that Exhibit 2 appears to be copy of the '408 patent. Nokia further admits that Exhibit 8 appears to be a copy of the assignment of the '408 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

    5.7    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.7, and therefore denies the same.

    **2.    Non-Technical Description of the Patented Invention**

    5.8    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.8, and therefore denies the same.

    5.9    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.9, and therefore denies the same.

    **3.    Foreign Counterparts to the '408 Patent**

    5.10    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.10, and therefore denies the same.

**C.    The '220 Patent**

    **1.    Identification of the Patent and Ownership by Qualcomm**

    5.11    Nokia admits that the '220 patent, entitled "Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System," was issued on August 5, 1997, to Qualcomm as assignee, naming Ana L. Weiland, Richard K. Kornfeld and John E. Maloney as inventors. Nokia further admits that Exhibit 3 appears to be a copy of the '220 patent. Nokia further admits that Exhibit 9 appears to be a copy of the assignment of the '220 patent to

Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.12    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.12, and therefore denies the same.

### 2.    Non-Technical Description of the Patented Invention

5.13    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.13, and therefore denies the same.

5.14    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.14, and therefore denies the same.

### 3.    Foreign Counterparts to the '220 Patent

5.15    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.15, and therefore denies the same.

## D.    The '767 Patent

### 1.    Identification of the Patent and Ownership by Qualcomm

5.16    Nokia admits that the '767 patent, entitled "Interframe Video Encoding and Decoding System," was issued on November 19, 1996, to Qualcomm as assignee, naming Chong U. Lee and Donald Pian as inventors. Nokia further admits that Exhibit 4 appears to be a copy of the '767 patent. Nokia further admits that Exhibit 10 appears to be a copy of the assignment of the '767 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.17    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.17, and therefore denies the same.

### 2.    Non-Technical Description of the Patented Invention

5.18    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.18, and therefore denies the same.

➢ PUBLIC VERSION ◄

5.19    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.19, and therefore denies the same.

5.20    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.20, and therefore denies the same.

### 3.    Foreign Counterparts to the '767 Patent

5.21    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.21, and therefore denies the same.

### E.    The '104 Patent

#### 1.    Identification of the Patent and Ownership by Qualcomm

5.22    Nokia admits that the '104 patent, entitled "Adaptive Block Size Image Compression Method and System," was issued on September 19, 1995, to Qualcomm as assignee, naming Chong U. Lee as the inventor.  Nokia further admits that Exhibit 5 appears to be a copy of the '104 patent.  Nokia further admits that Exhibit 11 appears to be a copy of the assignment of the '104 patent to Qualcomm.  As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.23    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.23, and therefore denies the same.

#### 2.    Non-Technical Description of the Patented Invention

5.24    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.24, and therefore denies the same.

5.25    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.25, and therefore denies the same.

5.26    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.26, and therefore denies the same.

➤ PUBLIC VERSION ◄

### 3.   Foreign Counterparts to the '104 Patent

5.27   Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.27, and therefore denies the same.

### F.   The '182 Patent

#### 1.   Identification of the Patent and Ownership by Qualcomm

5.28   Nokia admits that the '182 patent, entitled "Wireless Telephone Airplane and Alarm Clock Modes," was issued on September 17, 2002, to Qualcomm as assignee, naming Stephen A. Sprigg and James A. Hutchison, IV as inventors. Nokia further admits that Exhibit 6 appears to be a copy of the '182 patent. Nokia further admits that Exhibit 12 appears to be a copy of the assignment of the '182 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.29   Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.29, and therefore denies the same.

#### 2.   Non-Technical Description of the Patented Invention

5.30   Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.30, and therefore denies the same.

5.31   Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.31, and therefore denies the same.

#### 3.   Foreign Counterparts to the '182 Patent

5.32   Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.32, and therefore denies the same.

## VI.   UNFAIR ACTS OF THE RESPONDENTS

6.1   Nokia denies each and every allegation contained in paragraph 6.1, except Nokia admits that it entered into a Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 with Qualcomm.

6.2    Nokia denies that it directly or through its affiliates or third-parties exports to and imports into the United States handsets and components thereof that are covered by any of the claims of the Qualcomm Patents-In-Suit. Nokia denies each and every allegation to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit. Nokia admits that on September 9, 2005 Qualcomm provided Nokia with a list of certain patents and that on November 4, 2005 Qualcomm filed the complaint in Case No. 05 CV 2063 B(BLM) in the United States District Court for the Southern District of California. Except as expressly admitted above, Nokia denies the remaining allegations of paragraph 6.2.

6.3    Nokia denies each and every allegation contained in paragraph 6.3, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '473 patent.

6.4    Nokia denies each and every allegation contained in paragraph 6.4, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '408 patent.

6.5    Nokia denies each and every allegation contained in paragraph 6.5, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '220 patent.

6.6    Nokia denies each and every allegation contained in paragraph 6.6, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '767 patent.

6.7    Nokia denies each and every allegation contained in paragraph 6.7, including the referenced claim charts, to the extent that it alleges, directly or by implication, that

➢ PUBLIC VERSION ◁

any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '104 patent.

6.8    Nokia denies each and every allegation contained in paragraph 6.8, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '182 patent.

## VII.    SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

7.1    Nokia admits that a subset of its handsets and components thereof are sold for importation into the United States, imported into the United States or sold after importation into the United States. Nokia denies that it directly or through its affiliates or third-parties exports to and imports into the United States any handsets and components thereof that are covered by any of the claims of the Qualcomm Patents-In-Suit.

7.2    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 41 and therefore denies the same. Nokia admits that Exhibit 42 appears to be a photograph of the packaging for the Nokia 6101 phone.

7.3    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 43 and therefore denies the same. Nokia admits that Exhibit 44 appears to be a photograph of the packaging for the Nokia 6682 phone.

7.4    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 45 and therefore denies the same. Nokia admits that Exhibit 46 appears to be a photograph of the packaging for the Nokia 9300 phone.

7.5    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 47 and therefore denies the same. Nokia admits that Exhibit 48 appears to be a photograph of the packaging for the Nokia 6010 phone. Nokia admits that Exhibit 49 appears to be a photograph of the packaging for the Nokia 6102 phone. Nokia admits

that Exhibit 50 appears to be a photograph of the packaging for the Nokia 6061 phone. Nokia admits that Exhibit 51 appears to be a photograph of the packaging for the Nokia 6030 phone.

7.6    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 52 and therefore denies the same. Nokia admits that Exhibit 53 appears to be a photograph of the packaging for the Nokia 3220 phone. Nokia admits that Exhibit 54 appears to be a photograph of the packaging for the Nokia 3120 phone.

7.7    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 55 and therefore denies the same. Nokia admits that Exhibit 56 appears to be a photograph of the packaging for the Nokia 6111 phone. Nokia admits that it does not have any manufacturing facilities for mobile phones in the United States. Except as expressly admitted herein, Nokia denies each and every allegation contained in paragraph 7.7.

## VIII.    CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

8.1    Nokia denies each and every allegation of paragraph 8.1, including to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit. Nokia also denies that cell phone products covered by the investigation are classified under the headings set forth in paragraph 8.1. See Additional information, paragraph 2, infra.

## IX.    LICENSEES

9.1    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in paragraph 9.1, and therefore denies the same.

9.2    Nokia admits that it has entered into a license agreement with Qualcomm. Nokia further admits that Qualcomm has, in paragraph 1.2 of its Complaint, defined the products at issue in its Complaint as excluding those products allegedly licensed under the 2001 license agreement between Qualcomm and Nokia. Except as expressly admitted herein, Nokia denies each and every allegation contained in paragraph 9.2.

➢ PUBLIC VERSION ◁

## X.    THE DOMESTIC INDUSTRY

10.1    Nokia denies that Qualcomm satisfies any or all of the statutory criteria for finding a domestic industry under section 337(a)(2) and (3) or otherwise.  As to the balance of the allegations contained in paragraph 10.1, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations, and therefore denies same.  Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

### A.    Qualcomm's Engineering, Research and Development is Directed toUtilization/Exploitation of the Asserted Patents

10.2    Nokia denies that Qualcomm satisfies any or all of the statutory criteria for finding a domestic industry under section 337(a)(2) and (3) or otherwise.  As to the balance of the allegations contained in paragraph 10.2, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations, and therefore denies same.  Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.3    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.3, and therefore denies the same.  Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.4    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.4, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.5    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.5, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.6    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.6, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.7    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.7, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.8    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.8, and therefore denies the same. Further,

➤ PUBLIC VERSION ◄

with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

**B.    Qualcomm has Significant U.S. Investment in Engineering, Research and Development**

10.9    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.9, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.10   Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.10, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

**XI.    RELATED LITIGATION**

11.1    Nokia admits the allegations in paragraph 11.1 concerning the pending lawsuit among Qualcomm and Snaptrack, Inc., as plaintiffs, and Nokia Corp. and Nokia Inc., as defendants, including the fact that three of the patents being asserted in that case are also being asserted by Qualcomm in the present investigation. Except as expressly admitted above, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 11.1, and therefore denies same.

11.2    Nokia admits the allegations set forth in paragraph 11.2 of the Complaint,

≻ PUBLIC VERSION ≺

11.3    Nokia admits that it is currently arbitrating issues relating to the Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001, including whether Qualcomm is estopped from asserting patents that Qualcomm now claims relate to GSM technology, including the patents in suit in this investigation. There is no hearing on the merits scheduled. Except as expressly admitted above, Nokia denies the allegations contained in paragraph 11.3.

11.4    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 11.4, and therefore denies the same.

## XII.    RELIEF REQUESTED

12.1    In its Complaint, Qualcomm requests certain relief from the ITC. Nokia does not believe that any response to this prayer for relief is required. If a response is required, however, Nokia specifically denies that it currently infringes or has ever infringed any valid claim of any Qualcomm patent and further denies that Qualcomm is entitled to any relief from the ITC whether or not requested. Nokia further denies each and every factual allegation in this prayer for relief, including subparagraphs thereof.

### RESPONSE TO THE NOTICE OF INVESTIGATION

Nokia denies that there is a violation of Section 337 by reason of the alleged infringement of any asserted claim of the '473 patent, the '408 patent, the '220 patent, the '767 patent, the '104 patent, and the '182 patent ("the patents-in-suit") insofar as these allegations pertain to the importation or sale of any products manufactured by or on behalf of Nokia. Nokia denies that there is a protectable domestic industry, as required by Section 337(a)(2) and defined by Section 337(a)(3), with respect to any of the patents-in-suit. Nokia further denies that it is in the public interest to grant any relief to Qualcomm in connection with this Investigation. Nokia denies that Qualcomm is entitled to the specific relief it requests. Except as expressly admitted herein, Nokia denies the allegations contained in the Notice of Investigation.

➢ PUBLIC VERSION ➢

## ADDITIONAL INFORMATION REQUIRED UNDER RULE 210.13(b)

By providing the following information, Nokia intends only to supply data required by 19 C.F.R. § 210.13(b). Nokia specifically denies that any of the information or data supplied below relates to or supports any allegations of infringement against Nokia or any violation of 19 U.S.C. § 1337.

Pursuant to Rule 210.13(b), Nokia provides the following additional information:

1.      The quantity and value of Nokia's products accused of infringement imported into the United States in calendar year 2005 is provided in Confidential Exhibit 1 to this response.

2.      Between 1989-1996, the Harmonized Tariff Schedule item numbers for the Nokia products accused of infringement were 8525.20.6060 and 8525.20.6070. During 1997, the Harmonized Tariff Schedule item number for a Nokia product accused of infringement was 8525.20.9070. Since 1998, the Harmonized Tariff Schedule item numbers for the Nokia products accused of infringement are 8525.20.9070 and 9504.90.4000.

3.      Nokia's capacity to manufacture the products identified by Qualcomm in its Complaint is provided in Confidential Exhibit 1 to this response. In calendar year 2005, the United States constituted a substantial market for Nokia.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

### (Invalidity)

1.      The patents-in-suit are invalid because they each fail to comply with the requirements of 35 U.S.C. § 101 et seq., including, without limitation §§ 102,103 and/or 112.

17

➤ PUBLIC VERSION ◄

### SECOND AFFIRMATIVE DEFENSE

#### (Noninfringement)

2.    Nokia has not directly infringed, indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the patents-in-suit, and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

### THIRD AFFIRMATIVE DEFENSE

#### (Lack of Unfair Act)

3.    Nokia has committed no unfair acts.

### FOURTH AFFIRMATIVE DEFENSE

#### (Lack of Domestic Industry)

4.    Qualcomm has not adequately alleged and cannot prove the existence of a domestic industry, as required by Section 337(a)(2) and defined by Section 337(a)(3), in connection with any of the patents-in-suit, or that a such domestic industry is in the process of being established.

### FIFTH AFFIRMATIVE DEFENSE

#### (Failure to State a Claim)

5.    Qualcomm's complaint fails to state a claim upon which relief can be granted.

### SIXTH AFFIRMATIVE DEFENSE

#### (Express or Implied License)

6.    Qualcomm's claims are barred in whole or in part pursuant to an actual license or under the doctrine of implied license. Nokia's assertion of this defense is made without waiving or intending to waive its right to arbitrate this issue.

18

➢ PUBLIC VERSION ➤

## SEVENTH AFFIRMATIVE DEFENSE

### (Unenforceability – Estoppel, Acquiescence, Waiver, and In Pari Delicto)

7.    Qualcomm is barred in whole or in part by the doctrines of estoppel, acquiescence, waiver, and/or in pari delicto from enforcing the patents-in-suit against Nokia. Nokia's assertion of this defense is made without waiving or intending to waive its right to arbitrate this issue.

## EIGHTH AFFIRMATIVE DEFENSE

### (Equitable Estoppel)

8.    Qualcomm is barred in whole or in part by the doctrine of equitable estoppel based, among other things, on its failure to mention any of the patents-in-suit during development and approval of certain standards related to GSM, its failure to mention the patents-in-suit during negotiations and execution of the parties' Subscriber Unit and Infrastructure Equipment License Agreement, its failure to promptly declare any patents-in-suit to the relevant standard setting organizations, and its commitment to make some or all of the patents-in-suit available to Nokia and others for a fair, reasonable, and non-discriminatory royalty rate. Nokia's assertion of this defense is made without waiving or intending to waive its right to arbitrate this issue.

## NINTH AFFIRMATIVE DEFENSE

### (Unenforceability – Patent Exhaustion/First Sale Doctrine)

9.    Qualcomm is barred in whole or in part by the doctrine of patent exhaustion/first-sale doctrine from enforcing the patents-in-suit against Nokia.

## TENTH AFFIRMATIVE DEFENSE

### (Unenforceability – Prosecution Laches)

10.    Qualcomm is barred in whole or in part by delay in prosecuting the patent applications resulting in the patents-in-suit.

19

➢ PUBLIC VERSION ➤

### ELEVENTH AFFIRMATIVE DEFENSE
#### (Prosecution History Estoppel)

11.    By reason of the prosecution before the United States Patent and Trademark Office ("USPTO") leading to the patents-in-suit and any applications or patents related to the patents-in-suit, and by reason of admissions made by or on behalf of the applicant for these patents and related applications and patents, Qualcomm is estopped from claiming infringement by Nokia of one or more of the claims of such patents-in-suit.

### TWELFTH AFFIRMATIVE DEFENSE
#### (Unclean Hands)

12.    The patents-in-suit are void and unenforceable by reason of the equitable doctrine of unclean hands.

### THIRTEENTH AFFIRMATIVE DEFENSE
#### (Patent Misuse)

13.    Qualcomm is barred from asserting the patents-in-suit by the equitable doctrine of patent misuse.

### FOURTEENTH AFFIRMATIVE DEFENSE
#### (Lack of Jurisdiction)

14.    The Commission lacks jurisdiction pursuant to § 337.

### FIFTEENTH AFFIRMATIVE DEFENSE
#### (Relief Not in the Public Interest)

15.    The relief sought by Qualcomm does not and would not further the public interest and there are strong public policy reasons for denying Qualcomm the relief sought.

➢ PUBLIC VERSION ◄

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Breach of Contract)

16.     The relief sought by Qualcomm breaches Qualcomm's commitments and enforceable contracts with the relevant Standard Setting Organizations and their members, including Nokia, which license all or some of the patents-in-suit for a fair, reasonable and non-discriminatory royalty.

Respectfully submitted,

Louis S. Mastriani
Michael G. McManus
Tali L. Alban
ADDUCI MASTRIANI & SCHAUMBERG LLP
1200 Seventeenth Street, N.W., Fifth Floor
Washington, D.C. 20036
(202) 467-6300

Frederick A. Lorig
Bruce R. Zisser
Patrick M. Shields
Erica P. Taggart
QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Keith E. Broyles
John D. Haynes
Matthew J. Urbanawiz
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000

*Counsel for Nokia Corporation and Nokia, Inc.*

Dated: August 10, 2006

NOK701706-PUB.DOC

21

## VERIFICATION OF RESPONSE TO THE COMPLAINT AND
## NOTICE OF INVESTIGATION INCLUDING AFFIRMATIVE DEFENSES

I, Richard W. Stimson, declare, in accordance with 19 C.F.R. §§ 210.4 and 210.13, under penalty of perjury under the laws of the United States of America, that the following statements are true:

1.      I am legal counsel for Nokia, Inc. and am duly authorized to sign this Response on behalf of Nokia Corporation and Nokia, Inc.;

2.      I have read the foregoing Response;

3.      To the best of my knowledge, information and belief, based upon reasonably inquiry, the foregoing is well founded in fact and is warranted by existing law or a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; and

4.      The foregoing Response is not being filed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of August 2006

Richard W. Stimson

20148/1935834.1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **RESPONSE OF NOKIA CORPORATION AND NOKIA INCORPORATED TO THE COMPLAINT, AS SUPPLEMENTED, OF QUALCOMM INCORPORATED AND NOTICE OF INVESTIGATION (PUBLIC)** was served as indicated, to the parties listed below, this 10th day of August 2006:

The Honorable Marilyn R. Abbott
SECRETARY
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W., Room 112A
Washington, DC 20436
**(VIA HAND DELIVERY – Original + 6 copies)**

The Honorable Robert L. Barton, Jr.
ADMINISTRATIVE LAW JUDGE
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W., Room 317
Washington, DC 20436
**(VIA HAND DELIVERY – 2 copies)**

David Lloyd, Esq.
INVESTIGATIVE ATTORNEY
OFFICE OF UNFAIR IMPORT INVESTIGATIONS
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W., Room 401
Washington, DC 20436
**(VIA HAND DELIVERY)**

ON BEHALF OF COMPLAINANTS
QUALCOMM INCORPORATED

James R. Batchelder, Esq.
DAY CASEBEER MADRID & BATCHELDER LLP
20300 Stevens Creek Boulevard, Suite 400
Cupertino, California 95014
**(VIA ELECTRONIC MAIL AND FEDERAL EXPRESS)**

Cecilia H. Gonzalez, Esq.
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
**(VIA ELECTRONIC MAIL AND HAND DELIVERY)**

David Dolkas, Esq.
McDERMOTT, WILL & EMERY LLP
3150 Porter Drive
Palo Alto, California 94304
**(VIA ELECTRONIC MAIL AND FEDERAL EXPRESS)**

ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, DC 20036

NO100006.doc

# EXHIBIT E

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

NOKIA CORPORATION and NOKIA, INC.,    )
                                       )
            Plaintiffs,                )
                                       )
    v.                                 )          C.A. No. 2330-N
                                       )
QUALCOMM INCORPORATED,                 )
                                       )
            Defendant.                 )

## NOTICE OF SERVICE

PLEASE TAKE NOTICE that on August 10, 2006, true and correct copies of

Plaintiffs' First Set of Interrogatories Directed to Defendant Qualcomm, Inc., and this Notice of

Service were caused to be served on the following by hand delivery:

Qualcomm Incorporated
c/o The Prentice-Hall Corporation System, Inc.
2711 Centerville Road, Suite 400
Wilmington, DE 19808

Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19899
(302) 651-7700

OF COUNSEL:
A. William Urquhart
Frederick Lorig
Patrick Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Attorneys for Plaintiffs Nokia Corporation
and Nokia, Inc.

Rick Werder
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Dated: August 10, 2006

RLF1-3041733-1

IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| NOKIA CORPORATION and NOKIA INC , | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No  2330-N |
| | ) | |
| QUALCOMM INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' FIRST SET OF INTERROGATORIES DIRECTED TO DEFENDANT

## QUALCOMM, INC.

Pursuant to Court of Chancery Rule 33, Nokia Corporation and Nokia Inc (collectively "Nokia" or "Plaintiff"), by and through their attorneys, hereby demand that defendant Qualcomm Inc. ("Qualcomm" or "Defendant"), answer the following interrogatories under oath and deliver its responses to the Plaintiffs within 20 days of service thereof

### DEFINITIONS

1      Unless otherwise defined herein, capitalized terms herein have the meanings assigned to them in the Complaint

2.      The terms "Defendant," "you," "your," or "Qualcomm" mean and refer to Qualcomm Inc , and each predecessor, successor, division, subsidiary, parent, or related company thereof, including, but not limited to, Qualcomm Europe S.A R.L  and Qualcomm UK Ltd., whether or not organized under the laws of the United States, and their affiliates, each of their present and former executives, offices, directors, consultants, advisors, representatives,

agents, attorneys, employees and all persons acting or purporting to act on behalf of any of the foregoing.

    3      The term "Action" means the above-captioned action

    4.    The term "Complaint", when not otherwise qualified, means the Plaintiffs' Complaint in this Action

    5      "Identify," "identity," or "identification":

        (a)    When used in reference to a natural person, the terms "identify," "identity," or "identification" mean provide the following information:

                i      Full name;

                ii.    Present or last known business and residential address and telephone numbers for each such address;

                iii.   Present or last known business affiliation; and

                iv    Present or last known business positions (including job title and a description of job functions, duties, and responsibilities)

        (b)    When used with reference to any entity other than a natural person, the terms "identify," "identity," or "identification" mean provide the following information:

                i.     Its full name;

                ii.    The address and telephone number of its principal place of business;

                iii.   The jurisdiction under the laws of which it has been organized or incorporated and the date of such organization or incorporation;

                iv    The identity of all individuals who acted and/or who authorized another to act on its behalf in connection with the matters referred to;

                v.     In the case of a corporation, the names of its directors and principal officers; and

                vi.    In the case of an entity other than a corporation, the identities of its partners or principals or all individuals who acted or who authorized another to act on its behalf in connection with the matters referred to

    (c)    When used in reference to a document, the terms "identify," "identity," or "identification" mean provide the following information:

    i.    The nature of the document (e.g., letter, contract, memorandum) and any other information (i.e., its title, index, or file number) which would facilitate in the identification thereof;

    ii.    Its date of preparation;

    iii.    Its present location and the identity of its present custodian or, if its present location and custodian are not known, a description of its last known disposition;

    iv    Its subject matter and substance, or, in lieu thereof, annex a legible copy of the document to the answers to these Interrogatories;

    v.    The identity of each person who performed any function or had any role in connection therewith (i.e., author, contributor of information, recipient, etc.) or who has any knowledge thereof, together with a description of each such person's function, role, or knowledge; and

    vi    If the document has been destroyed or is otherwise no longer in existence or cannot be found, the reason why such document no longer exists, the identity of the people responsible for the document no longer being in existence and of its last custodian.

    (d)    When used in connection with an oral communication, the terms "identify," "identity," and "identification" mean provide the following information:

    i.    Its general nature;

    ii    The time and place thereof;

    iii.    A detailed chronological account setting forth each element thereof, what such element consisted of, and what transpired as a part thereof;

    iv.    The identity of each person who performed any function or had any role in connection therewith (i.e., speaker, participant, contributor of information, witness, etc.) or who has any knowledge thereof, together with a description of each such person's function, role, or knowledge; and

    v.    The identity of each document which refers thereto, or which was used, referred to, or prepared in the course or as a result thereof.

    6    "Describe" or "description":

(a)    When used with respect to any act, action, accounting, activity, audit, practice, process, occurrence, occasion, course of conduct, happening, negotiation, relationship, scheme, communication, conference, discussion, development, service, transaction, instance, incident, or event, the terms "describe" or "description" mean provide the following information:

 i. Its general nature;

 ii The time and place thereof;

 iii. A detailed chronological account setting forth each element thereof, what such element consisted of, and what transpired as a result thereof;

 iv. The identity of each person (as defined below) who performed any function or had any role in connection therewith or who has any knowledge thereof, together with a description of each such person's function, role or knowledge;

 v. The identity of each document (as defined below) which refers thereto or which was used, referred to, or prepared in the course or as a result thereof; and

 vi The identity of each oral communication which occurred in the course of the preparation thereof or which referred thereto.

(b)    When used in connection with any calculation, computation, amount, or figure, the terms "describe" or "description" mean provide the following information:

 i. A detailed explanation of its meaning;

 ii. A detailed explanation of the manner in which it was derived, including an itemization of all subcategories included therein;

 iii. The identity of each person (as defined below) who performed any function or had any role in connection therewith or who has any knowledge thereof, together with a description of each such person's function, role or knowledge;

 iv. The identity of each document (as defined below) which refers thereto or which was used, referred to or prepared in the course or as a result thereof; and

 v The identity of each oral communication which occurred in the course of the preparation thereof or which referred thereto.

7.    The term "document" shall have the broadest meaning permitted by the Court of Chancery Rules and includes, without limitation, all originals, copies (if the originals are not

available), non-identical copies (whether different from the original because of underlining, editing marks, notes made on or attached to such copy, or otherwise) and drafts of the following items, whether printed or recorded (through a sound, video or other electronic, magnetic or digital recording system) or reproduced by hand, whether or not claimed to be privileged or confidential, including but not limited to letters, correspondence, telegrams, telexes, memoranda, records, diaries, summaries of personal conversations or interviews, expressions or statements of policy, lists of persons attending meetings or conferences, reports or summaries of meetings, minutes or records or notes of meetings or conferences, reports or summaries of investigations, opinions of counsel, reports or summaries of either negotiations within or without the corporation or preparations for such, note pads, notebooks, postcards, "Post-It" notes, stenographic notes, notes, notebooks, opinions or reports of financial advisors or consultants, opinions or reports of experts, projections, financial or statistical statements or compilations, contracts, agreements, appraisals, analyses, purchase orders, bills of sale, confirmations, publications, articles, books, pamphlets, circulars, microfilm, microfiche, reports, studies, logs, surveys, reports to shareholders, instruments, circulars, press releases, drafts of any document, accounts, diaries, calendars, appointment books, maps, charts, graphs, bulletins, photostats, speeches, brochures, manuals, data sheets, pictures, photographs, illustrations, blueprints, films, drawings, plans, tape recordings, videotapes, disks, diskettes, data tapes or readable computer-produced interpretations or transcriptions thereof, electronic communications including but not limited to email and/or text messages, voice mail messages, telegraphic messages, faxes, interoffice communications, advertising, packaging and promotional materials and any other writings, papers and tangible things of whatever description whatsoever, including but not limited to any information contained in any computer, server, mainframe, or other storage device

(including (i) information on or in computer memory, (ii) information on or in computer or network backup files, and (iii) information which has been "deleted" or "erased" but is recoverable) whether located on-site or at an off-site facility, within your possession, custody or control  Any comment or notation appearing on any document, and not a part of the original text, is to be considered a separate "document."

8.    "Communication" means any written, oral, telephonic or other inquiry, examination, notice, representation, discussion, conversation, correspondence, e-mail, memorandum, telegram, pleading, negotiation, review, claim, agreement, understanding, meeting or interview.  Communications between any individual or entity and any other individual or entity includes communications going in either direction between such individuals or entities.

9.    The verb "relate" and its variants encompasses the terms "refer," "reflect," and "concern," and shall be construed to bring within the scope of the request all documents that comprise, evidence, constitute, describe, explicitly or implicitly refer to, were reviewed in conjunction with, or were generated as a result of the subject matter of the request, including but not limited to all documents that reflect, record, memorialize, discuss, evaluate, consider, review, report, support, demonstrate, show, study, describe, analyze, embody, mention, contradict or result from the matter specified, or otherwise evidence the existence of the subject matter of the request

10.    The term "person" means and refers to both natural persons and legal entities, without limitation, including all predecessors in interest, groups, associations, partnerships, corporations, agencies, or any other legal, business, or governmental entity.

11    Whenever the term "including" is used herein, it shall be construed to mean "including, but not limited to."

12.   The connectives "and" and "or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of the interrogatory all information that might otherwise be construed to be outside of its scope.

13   The term "ITC Complaint" means and refers to the complaint that Qualcomm filed against Nokia with the United States International Trade Commission, Washington D.C. that has resulted in United States International Trade Commission Investigation No. 337-TA-578

14   The term "date" means and refers to the exact day, month and year, if ascertainable, and if the exact day, month and year are not ascertainable, then the best approximation thereof.

15   The term "FRAND" means and refers to a royalty rate for a license that is fair, reasonable and non-discriminatory, as that term is defined by the European Telecommunication Standards Institute IPR Policy Section 6.1

16.   The term "market," as a verb, mean and refers to sell, lease, license, exhibit, promote, advertise or distribute, or to offer to sell, lease, license, exhibit, promote, advertise, or distribute.

17.   The terms "Plaintiff" or "Nokia" means and refers to, collectively and individually, Plaintiffs Nokia Corporation and Nokia Inc.

18.   The term "sale" means and refers to any exchange of goods, services or other property for value and includes transferring goods to another party on a consignment basis, regardless of whether title has passed

19.    The term "standard(s)" means and refers to a technical specification promulgated by an organization relating to a practice or product that is widely recognized or employed by those in the industry

20.    The term "Standard-Setting Organization" or "SSO" means and refers to any organization that proposes or implements standards for use in the telecommunications industry, including but not limited to the International Telecommunications Union ("ITU"), Association of Radio Industries and Businesses ("ARIB"), European Telecommunication Standards Institute ("ETSI"), Telecommunications Technology Committee, Japan ("TTA"), Telecommunications Technology Association, Korea ("TTC"), American National Standards Institute ("ANSI"), the Telecommunications Industry Association ("TIA"), the Alliance for Telecommunications Industry Solutions ("ATIS"), and 3rd Generation Partnership Project ("3GPP")

21.    "GSM" means and refers to the Global System for Mobile Communications standard, a digital cellular technology standard that uses linear predictive coding to transmit mobile voice and data services by dividing each cellular channel into multiple time-slots.

22.    "EDGE" means and refers to "Enhanced Data GSM Environment," a high-speed mobile data standard, intended to enable second-generation GSM and time division multiple access ("TDMA") networks to transmit data at up to 384 kilobits per second (Kbps).

23.    "GPRS" means and refers to "General Packet Radio Service," a mobile data service available to users of GSM mobile phones, which is a technology between the second and third generations of mobile telephony that provides moderate speed data transfer, by using unused TDMA channels in the GSM network.

24.    "UMTS" means and refers to Universal Mobile Telephone System, a third-generation cellular technology standard that is based in part on Wideband CDMA technology.

25    "Your alleged GSM patents" refers to each, any, and collectively all patents that Qualcomm claims cover any technology implemented in the GSM, EDGE, and/or GPRS standards.

26.    "Your alleged UMTS patents" refers to each, any, and collectively all patents that Qualcomm claims cover any technology implemented in the UMTS standard.

## INSTRUCTIONS

1    Singular and masculine forms of any nouns or pronouns shall embrace and be applied as the plural or as the feminine or neutral, as appropriate to the context, and vice-versa.

2.    "Any" includes "all" and vice versa.

3    The terms "all" and "each" shall be construed as all and each

4    Whenever a verb is used in one tense it shall also be taken to include all other tenses, so as to bring within this request documents that might otherwise be excluded

5.    With respect to the answer to each interrogatory or subpart thereof state the source of the information given therein with as much particularity as is reasonably possible, including, without limitation, the nature and designation of any files that contain such information and the identification of each person who provided any information included in such answer    In addition, identify each other person known or believed to have some or all of the information sought in such interrogatory or subpart thereof.

6.    Where an identified document has been destroyed or is alleged to have been destroyed, state the reasons for its destruction, the names of the persons having any knowledge of its destruction, and the names of the persons responsible for its destruction.

7    Where an identified document is not in your possession, custody or control, state the names of the persons who have possession, custody or control of such document    If such

document was in your possession, custody or control in the past but is no longer in your possession, custody or control, state what disposition was made of it, the reasons for such disposition, identify any persons having any knowledge of such disposition, and identify the persons responsible for such disposition.

8.    In addition to original and final versions of documents, all drafts, alterations, modifications, changes and amendments of documents should be identified, as well as all copies non-identical to the original in any respect, including any copy bearing non-identical markings or notations of any kind.

9.    If the answer to any question is "none," or if a section is not applicable, so indicate rather than leave the space blank.

10.    If any information called for by an interrogatory is withheld on the basis of a claim of privilege, set forth the nature of the claim of privilege and the nature of the information in respect of which it is claimed.  Where the claimed privileged subject matter forms only part of the response, indicate that such is the case.

11.    If you object to any part of an interrogatory and refuse to answer that part, state your objection and answer the remaining portion of that interrogatory.  If you object to the scope or time period of an interrogatory and refuse to answer for that scope or time period, state your objections and answer the interrogatory for the scope or time period you believe is appropriate (include in your answer a specific statement as to why you believe the scope or time period is inappropriate).

12.    Unless otherwise specified, supply all annual data requested on a calendar-year basis; if any basis other than a calendar-year basis is used, such as to accommodate a fiscal-year basis, state as part of the response the nature and type of the basis so used.

13    If any of the following interrogatories cannot be answered in full after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying your inability to answer the remainder and stating whatever information you have concerning the unanswered portions  If your answer is qualified in any way, set forth the details of such qualification.

14.    Unless otherwise indicated by the context of the request, all information requested is for the period from January 1, 1989 to the present

15.    These interrogatories are continuing in nature   If further information or documents come into your possession or are brought to your attention during preparation for trial, supplementation of your response is hereby requested

## INTERROGATORIES

### INTERROGATORY NO. 1.

Describe in detail Qualcomm's understanding of the meaning of FRAND as it applies to licenses or royalty rates, including how a FRAND license or royalty differs from a license or royalty that is not offered on FRAND terms

### INTERROGATORY NO. 2.

Describe in detail Qualcomm's understanding of what Qualcomm meant by its statement in the letter from Louis M. Lupin to Mr. Rosenbrook of ETSI on June 25, 1999 that it was prepared to license the patents described in that letter on a "fair and reasonable basis free from unfair discrimination."

**INTERROGATORY NO. 3.**

Describe in detail Qualcomm's understanding of what Qualcomm meant by its declaration to ETSI on October 14, 2005 regarding Patent No. 5,590,408, as described in Exhibit A to these interrogatories, stating that Qualcomm is "prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL."

**INTERROGATORY NO. 4.**

Identify and describe each and every public statement that Qualcomm, or any of its employees, officers or directors, has made that refers or relates to FRAND or to FRAND licensing of patents. For each such public statement, list the name of the person making the statement, identify the time, manner, form, and forum of the statement, and identify any document that contains the statement in any way, including but not limited to correspondence, press reports, press statements, shareholder reports, videotapes, or audiotapes.

**INTERROGATORY NO. 5.**

Identify every declaration, submission, or communication made to any Standard-Setting Organization that refers or relates to any of your alleged UMTS or GSM patents, including the date of the communication, the substance of the communication, and the Standard-Setting Organization to which the communication was made.

**INTERROGATORY NO. 6.**

For each of your alleged UMTS and GSM patents, identify any standard to which you contend the patent is essential, the Standard-Setting Organization that issued the standard, the earliest date that Qualcomm claimed that the patent was essential to that standard or

standards, and any document communicating to any person your belief that the patent was essential to the standard.

## INTERROGATORY NO. 7.

Do you contend that WB-CDMA is superior to WB-TDMA as those terms are used in the article entitled "Comparison of Multiple Access Schemes for UMTS," attached as Exhibit B? If so, describe in detail all factual and/or legal bases for Qualcomm's belief, and identify all documents or communications reflecting or evidencing such facts.

## INTERROGATORY NO. 8.

Describe with specificity each and every patent owned by Qualcomm that Qualcomm has ever agreed to license on FRAND terms.

## INTERROGATORY NO. 9.

For each patent identified in response to Interrogatory No. 8, identify every license agreement that Qualcomm has entered into with any party with respect to such patents, and describe with specificity the terms of each license.

## INTERROGATORY NO. 10.

For each of your alleged GSM patents not identified in response to Interrogatory No. 8, identify every license agreement that Qualcomm has entered into with any party with respect to such patents, and describe with specificity the terms of each license.

**INTERROGATORY NO. 11.**

For each of your alleged UMTS patents not identified in response to Interrogatory No. 8, identify every license agreement that Qualcomm has entered into with any party with respect to such patents, and describe with specificity the terms of each license.

**INTERROGATORY NO. 12.**

Identify all licensing negotiations relating to your alleged GSM patents, including a description of the parties or the persons involved in the substance of such negotiations; all agreements proposed or entered into relating to the licensing of your alleged GSM patents and state separately for each agreement the royalty rate or other payment agreed to, the amount of royalties paid or to be paid, received, or to be received by Qualcomm for each year during the term of such agreement; and identify all documents relating to the foregoing and persons having knowledge thereof.

**INTERROGATORY NO. 13.**

Identify all licensing negotiations relating to your alleged UMTS patents, including a description of the parties or the persons involved in the substance of such negotiations; all agreements proposed or entered into relating to the licensing of your alleged UMTS patents and state separately for each agreement the royalty rate or other payment agreed to, the amount of royalties paid or to be paid, received, or to be received by Qualcomm for each year during the term of such agreement; and identify all documents relating to the foregoing and persons having knowledge thereof.

**INTERROGATORY NO. 14.**

Do you contend that Qualcomm has offered to license any of your alleged GSM patents to Nokia for a FRAND royalty? If so, identify the royalty rate offered for each of your alleged GSM patents, the date of the offer, any documents evidencing the offer, the person or persons who made the offer, and the person or persons at Nokia who received the offer

**INTERROGATORY NO. 15.**

For each license offer identified in response to Interrogatory No. 14, describe in detail all facts on which Qualcomm bases its contention that the royalty rate offered was a FRAND royalty.

**INTERROGATORY NO. 16.**

Do you contend that Qualcomm has offered to license any of your alleged UMTS patents to Nokia for a FRAND royalty? If so, identify the royalty rate offered for each of your alleged UMTS patents, the date of the offer, any documents evidencing the offer, the person or persons who made the offer, and the person or persons at Nokia who received the offer.

**INTERROGATORY NO. 17.**

For each license offer identified in response to Interrogatory No. 16, describe in detail all facts on which Qualcomm bases its contention that the royalty rate offered was a FRAND royalty

**INTERROGATORY NO. 18.**

For each of your alleged GSM patents, identify the lowest royalty rate that you contend constitutes a FRAND rate

**INTERROGATORY NO. 19.**

For each of your alleged UMTS patents, identify the lowest royalty rate that you contend constitutes a FRAND rate

**INTERROGATORY NO. 20.**

Do you contend that Qualcomm is entitled to seek injunctive relief against Nokia for alleged infringement of patents that Qualcomm has agreed to license to Nokia on FRAND terms? If so, describe in detail all factual and/or legal bases for Qualcomm's belief that it is entitled to injunctive relief, and identify all documents or communications reflecting or evidencing such facts

**INTERROGATORY NO. 21.**

Identify every person, including but not limited to Qualcomm employees, independent contractors, or experts, that Qualcomm has asked to give any opinion or conduct any analysis concerning the meaning of FRAND or the calculation of any FRAND royalty

**INTERROGATORY NO. 22.**

Identify every document you intend to rely upon at any trial or hearing in this matter.

**INTERROGATORY NO. 23.**

Identify all fact witnesses that you expect to call at trial in this action and for each witness further describe:

      a      the subject matter on which the witness is expected to testify;

      b      the substance of the facts as to which the witness is expected to testify; and

c.    all documents concerning the facts which the witness is expected to testify.

## INTERROGATORY NO. 24.

Identify every person whom you expect to call as an expert witness at trial and for each expert witness further describe:

a.    the subject matter of which the proposed expert is expected to testify;

b.    the substance of the facts and opinions as to which the expert is expected to or may testify;

c.    a summary of the basis or grounds for the opinion;

d.    any data considered by the expert in forming such opinion;

e.    any exhibits to be used as a summary of or in support of the opinions;

f.    the qualifications of the expert, including a list of all publications authored by the expert within the preceding ten years;

g.    the compensation to be paid for the expert's services and testimony; and

h.    a list of all other cases in which the expert testified as an expert witness at trial or by deposition within the preceding four years.

## INTERROGATORY NO. 25.

With respect to each of the foregoing interrogatories, identify:

(a)    The person or persons believed to be most knowledgeable with respect to the matter about which the inquiry is made;

(b)    the person or persons who furnished the information on which Qualcomm's response is based;

(c)    the person or persons who prepared the answer to the interrogatory; and

(d)    insofar as any of the individuals named in the response to the interrogatory are in the employ of Qualcomm, state the present title or position and most recent business and home address of each such individual, and insofar as such individual has been previously but is not now in the employ of Qualcomm, state the title or position at the time of leaving Qualcomm's employ, the period of employment by Qualcomm and the last known business and home address of each such individual

Respectfully submitted,

Dated: August 10, 2006

RICHARDS, LAYTON & FINGER, P.A.

_Jeffrey L. Moyer/by Elizabeth C. Tucker (#4468)_
Frederick L. Cottrell III (#2555)
Lisa Schmidt (#3019)
Jeffrey L. Moyer (#3309)
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Telephone:     (302) 651-7700
Facsimile:      (302) 651-7701

Attorneys for Plaintiffs
Nokia Corporation and Nokia Inc.

Of Counsel:

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  A. William Urquhart (CA Bar No. 140996)
  Frederick A. Lorig (CA Bar No. 057645)
  Patrick M. Shields (CA Bar No. 204739)
  Erica Taggart (CA Bar No. 215817)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-254
Telephone:     (213) 443-3000
Facsimile:      (213) 443-3100


QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Rick Werder
  Sanford I. Weisburst
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:     (212) 849-7000
Facsimile:      (212) 849-7100

# EXHIBIT A

TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
DIRECTED TO DEFENDANT QUALCOMM, INC.

IPR in ETSI Deliverables                                                        Page 1 of 2

### Search IPR Declarations

THE ETSI IPR DATABASE contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards. Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Article 6 1 of the ETSI IPR POLICY (Annex 6 of the Rules of Procedure).

The present database provides data that is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI Standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation, or IPR searches, have been carried out by ETSI and therefore no guarantee can be given concerning the existence of other IPRs which are, or may become, essential

Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

Please note that when using the work item/projects field for your search you might obtain duplicate entries  This results from the fact that IPR declarations made to ETSI may be relevant to one and/or several projects/work item

| Selected by | • Patent No : 5,590,408 | | Sorted by | Project (ascending) |
|---|---|---|---|---|

1 IPR Declaration found

| ▶ Company | ▶ Patent No.<br>▶ Application No. | ▶ Work Item OR<br>ETSI Deliverable<br>No. | Section | Version | ▶ Project(s) | ▶ Declaration date | ▼ ▲ |
|---|---|---|---|---|---|---|---|
| Qualcomm Inc | 5,590,408 | 3GPP TS 45 008<br>ETSI TS 145 008 | | | GERAN | 2005-10-14 | |

▶ Patent title
Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System

▶ Country of registration                     Countries applicables to App./Patent
  UNITED STATES

Other Patents / Applications in same family

| 5,452,473 | UNITED STATES |
|---|---|
| 674475 | AUSTRALIA |
| PI9505674-2 | BRAZIL |
| 2168577 | CANADA |
| 2275155 | CANADA |
| 69520812 8 | GERMANY |
| 0695482 | European Patent Office, SPAIN, FRANCE, UNITED KINGDOM, ITALY, SWEDEN |
| FI112564 | FINLAND |
| HK1011124 | HONG KONG |
| 187815 | INDIA |
| 3462930 | JAPAN |
| 208455 | KOREA (REPUBLIC OF) |
| 190441 | MEXICO |
| ZL95190118.4 | CHINA |
| 2134018 | RUSSIAN FEDERATION |
| 520 | VIET NAM |

Notes
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6 1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

DOWNLOAD FORMAT   COPYRIGHT

IPR in ETSI Deliverables

| ▶ Company | ▶ Patent No.<br>▶ Application No | ▶ Work Item OR<br>ETSI Deliverable<br>No. | Ⓐ Project(s) | ▶ Declaration<br>date | ☒ ☒ |
|---|---|---|---|---|---|
| Qualcomm Inc. | 5,655,220 | 3GPP TS 45.008<br>ETSI TS 145 008 | GERAN | 2005-10-14 | |

▶ Patent title

Reverse Link, Transmit Power Correction and Limitation In a Radiotelephone System

▶ Country of registration                    Countries applicables to App./Patent
    UNITED STATES

Other Patents / Applications in same family

| | |
|---|---|
| 674475 | AUSTRALIA |
| PI9505674-2 | BRAZIL |
| 2158577 | CHINA |
| 2275156 | CHINA |
| 69520812 8 | GERMANY |
| 0695482 | European Patent Office, SPAIN, FRANCE, UNITED KINGDOM, ITALY, SWEDEN |
| FI112564 | FINLAND |
| HK1011124 | HONG KONG |
| 187616 | INDIA |
| 3452930 | JAPAN |
| 208456 | KOREA (REPUBLIC OF) |
| 190441 | MEXICO |
| ZL95190118.4 | CHINA |
| 2134018 | RUSSIAN FEDERATION |
| 520 | VIET NAM |

Notes

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

# EXHIBIT B

TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
DIRECTED TO DEFENDANT QUALCOMM, INC.

# COMPARISON OF MULTIPLE ACCESS SCHEMES FOR UMTS

Tero Ojanperä[1], Johan Sköld[2], Jonathan Castro[3], Laurent Girard[4], Anja Klein[5]

[1] NOKIA Research Center, P O Box 45, FIN-00211 Helsinki, FINLAND
Tel +358-0-4376 6485, Fax +358-0-4376 6856, E-mail: tero.ojanpera@research nokia com
[2] Ericsson Radio Systems AB, Torshamnsgatan 23, S-16480 Stockholm, SWEDEN
[3] CSEM, Jaquet-Droz 1, CH-2007 Neuchatel, SWITZERLAND
[4] France Telecom CNET, 38-40 rue du General-Leclerc, 92131 Issy-les-Moulineaux Cedex, FRANCE
[5] SIEMENS AG Mobile Networks, ÖN MN P36, Hofmannstrasse 51, D-81359, Munich, GERMANY

**Abstract** - An assessment of several multiple access schemes against UMTS criteria has been carried out within the FRAMES project Based on this comprehensive evaluation, an harmonized multiple access platform has been designed consisting of two modes, a wideband TDMA with and without spreading and a wideband CDMA, which is presented hereafter. Both modes are compared against UMTS criteria In general, they can both fulfill the UMTS objectives and will form the FRAMES input into UMTS standardization. However, Mode 1 seems more suitable for bursty type of traffic and in addition to FDD for asymmetric TDD operation while Mode 2 suits better for moderately varying circuit switched data in public radio environments.

## I. INTRODUCTION

The European Research Program ACTS (Advanced Communication Technologies and Services) started in the end of 1995 to support collaborative mobile research and development Within ACTS the project FRAMES (Future Radio Wideband Multiple Access System) has been set up with an objective to define an UMTS radio access system The first goal of FRAMES was to investigate different multiple access technologies and based on a thorough evaluation of several candidate schemes to select the best combination as a basis for further detailed development of UMTS radio access system

CDMA and TDMA based technologies have been studied extensively for 3rd generation mobile radio systems The RACE II projects CODIT [8] and ATDMA [9] have created system concepts based on DS-CDMA and advanced TDMA techniques, respectively. These concepts have been validated with trial systems Comparison between CODIT and ATDMA radio interfaces was carried out in SIG5 [10] The main results of this comparison have shown that there is no fundamental difference between these concepts from a performance point of view Other issues related e g to implementation will play a more important role when selecting 3rd generation multiple access technology Thus, in addition to the evaluation of spectrum efficiency FRAMES has considered a number of other criteria covering the main UMTS objectives like full coverage and mobility for bit rates up to 144 kbit/s, limited coverage and mobility for bit rates up to 2 Mbit/s and high flexibility to introduce new services to all radio operating environments [1,2]

The rest of the paper is organized as follows In Chapter II a summary of the multiple access comparison results is presented together with some reasoning for the selection of the FRAMES Multiple Access (FMA) In Chapter III a description of FMA is presented and in Chapter IV evaluation results of the two FMA modes against UMTS criteria are presented Finally, conclusions are drawn in Chapter V

## II. MULTIPLE ACCESS COMPARISON

FRAMES Multiple Access evaluation consisted of two stages. At the first stage several candidate schemes were compared and schemes with similar characteristics combined. The results of this stage were two multiple access schemes with three options for both[3,4]:

- multicarrier TDMA (multiples of 200 kHz), single wideband TDMA (WB-TDMA, bandwidth 1-2 MHz) and hybrid CDMA/TDMA (bandwidth 1 6 MHz)

- asynchronous CDMA (WB-CDMA, bandwidth 6 MHz), OFDM/CDMA and synchronous CDMA

At the second stage these schemes were extensively evaluated with respect to the following criteria :

- Radio related properties which covered aspects like provision of various data rates in different environments and bearer service flexibility, Spectrum efficiency (capacity), Coverage, Support for adaptive antennas, Hierarchical Cell Structures (HCS), Duplex method, support for public and private environments, Handover

- Terminal impacts (Power consumption and complexity, GSM/UMTS dual mode terminals)

- BSS impacts (Evolution from existing systems, BSS complexity and cost)

In the following the main results of the analysis are presented. WB-TDMA is flexible for TDD with asymmetric services and it is optimized for high bit rate services. Main concern is the complexity of the equalizer in large cells Hybrid CDMA/TDMA provides good performance both for voice and data The spreading eases somewhat delay spread handling in tough radio propagation conditions. However, it has high complexity due to joint detection for low bit rate services WB-CDMA is flexible for circuit switched variable rate services due to its good multirate capabilities. The

0-7803-3659-3/97 $10 00 ©1997 IEEE

unpredictable nature of packet switched services will cause some problems e g for power control  A drawback of WB-CDMA is that it requires large chunks of spectrum even for low bit rate services. It also seems less suitable WB-CDMA for asymmetric services in TDD mode.

The above considerations led us to combine WB-TDMA and hybrid CDMA/TDMA into Mode 1 (WB-TDMA with and without spreading) and to harmonize WB-CDMA parameters with that to form the Mode 2 of the FRAMES Multiple Access (FMA)  In addition, backwards compatibility with GSM/DCS was kept as a key cornerstone of FMA concept facilitating easy implementation of GSM/UMTS dualmode terminals

Three multiple access options were dropped from further consideration due to complexity and performance reasons Multicarrier TDMA has too complex RF  OFDM/CDMA considered only for downlink had low performance with reuse one [11] but could be considered as a modulation method for Mode 1  Synchronous CDMA had low performance due to the lack of fast power control

Even though multicarrier TDMA was considered too complex, a single carrier enhanced GSM, i e  a 200 kHz carrier with linear modulation instead of GMSK, was considered as a viable option  An enhanced GSM  can offer higher data rates 150-200 kbit/s with binary modulation and 300-400 kbit/s with quaternary modulation  Advantages are:

• Can co-exist on GSM carriers - Easy evolution
• Easy dual mode terminals implementation
• Well harmonized with GSM *and* FMA
• Low spectrum granularity - Efficient with hierarchical cell structures (HCS)

### III   FRAMES MULTIPLE ACCESS (FMA)

In accordance with the general purpose of UMTS as a third-generation mobile telecommunications system encompassing a wide range of application areas, communication services and different deployment scenarios, FMA must offer a multi-level and open platform i e  a concept to cater for current and future developments of UMTS radio interface standards  FMA

supports the two modes
• wideband TDMA with and without spreading, and
• WB-CDMA

where Mode 1 consists of two options; wideband TDMA optimized for high bit rate packet data, and wideband TDMA with spreading

The main features of the FMA modes are presented in Table 1 In Mode 1 users are separated orthogonally into time slots, and within each slot an additional separation by spreading codes can be used. In Mode 2, wideband direct sequence CDMA is used, i e , users are separated by different spreading codes, while continuous transmission is used  In Mode 1 the basic transmission unit is one slot  This basic unit is then divided into smaller units, either subslots or spreading codes if the spreading feature is used  In this way, we achieve a smaller granularity, i e  step size in bit rate, and a higher flexibility in service provision from low to high bit rates  Note that high bit rates can also be implemented by this fine structure, in order to obtain higher multiplexing gain and flexibility  In Mode 2 the basic transmission unit in the resource space is code  On the downlink, parallel multicode transmission is used, which means that higher bit rates can be supplied by allocating more codes to one user  On the uplink, transmission resources are adaptively allocated by varying the spreading ratio. In addition to the basic resource allocation by slots and codes, the data rates of both modes are further adjusted by puncturing the basic channel code rates or by repetition coding.

FRAMES Multiple Access has a discrete wideband carrier selection which means that e g  in the Mode 1, the carrier spacing B could equal 1 6 MHz, while in the Mode 2, B could equal 6.4 MHz, i e , four times the carrier spacing as in the former mode  Both modes will allow for two carrier bandwidths (3 2 and 12.8 MHz respectively) to make the bandwidth selection flexible depending on the service and/or environment. For Mode 1 a bandwidth of 3 2 MHz provides a trade-off between larger bandwidth with QPSK modulation

*Table 1  Main features of FMA Mode 1 and 2 (N/A= not applicable, DL =downlink, UL= uplink)*

|  | Mode 1: WB-TDMA with and without spreading | Mode 2: WB-CDMA |
|---|---|---|
| Multiple-access method | TDMA or TDMA/CDMA | Direct-Sequence CDMA |
| Channel spacing | 1.6 MHz | 6.4 MHz |
| Carrier chip/bit rate | 1.55 - 4.74 Mbit/s or Mchip/s | 5.2 Mchips/s |
| Interference reduction | Both intra and intercell with joint detection | Only intra cell with multiuser detection in the uplink |
| Spreading codes | Orthogonal spreading codes of length 16 chips | Short codes from 2 chips up to 512 chips |
| Multirate concept | DL & UL: Multislot and Multicode | DL: Multicode UL: Variable spreading |
| Variable bit rates | Supported | Supported on a frame-by-frame (10 ms) basis |
| Detection | Coherent, based on Midamble | DL: Coherent detection (pilot-code based) UL: Coherent detection (reference-symbol-based) |
| Handover | Mobile assisted | Mobile controlled soft handover |
| Interfrequency handover | same as normal handover | Burst transmission mode (uplink) Dual receiver structure (downlink) |
| Frequency hopping | Frame-by-frame/slot-by-slot | N/A |

491

and smaller bandwidth with multilevel 16-QAM modulation and for Mode 2 the larger bandwidth of 12 8 MHz offers better performance for 2 Mbit/s users.

The harmonization of bandwidths presented above, together with a careful selection of the basic parameters, enables the derivation of the fundamental frequencies of both FMA modes from a single 26 MHz clock which is also used as a GSM mobile station reference clock. This makes backwards compatibility to GSM easier and reduces implementation costs as well since only one reference oscillator is needed whatever the access scheme.

An important new feature of the FMA proposal is joint detection[1] capability (i.e., of more than one transmission link in the radio system), which increases the spectrum efficiency of a cellular network Joint detection is used to remove either intracell or intercell co-channel interference or both For wideband TDMA with spreading joint detection is used both in the uplink and the downlink to cancel intracell interference and for wideband TDMA to cancel intercell interference For wideband CDMA (Mode 2), multi-user detection is used only for the uplink in order to avoid undue complexity of hand-portable terminals; moreover, the additional gain from multi-user detection would not be very high due to the high processing gain and orthogonal spreading codes in the downlink.

Both modes use coherent detection Mode 1 uses midambles for channel estimation and Mode 2 a varying number of reference symbols in the uplink and a continuous pilot channel in the downlink

Mode 1 is based on a fundamental TDMA structure with spreading feature with time frame length of 4 615 ms Depending on the radio environment and service, the frame and burst structure can be dynamically adapted via link adaptation The training sequences need to be optimized to fully support adaptive-antenna techniques and interference cancellation techniques The frame structure of wideband TDMA without spreading is described in Figure 1 It has two slot sizes : 1/16 slot and 1/64 slot For the 1/64 slot there are two burst formats



*Figure 1  Wideband TDMA frame structure*

---

[1] Note: the terms 'multi-user detection' and 'interference cancellation' are also sometimes used.



*Figure 2  Frame structure of WB- TDMA with spreading*

The frame and burst structures of wideband TDMA with spreading are presented in Figure 2.

In Mode 2, the frame structure is based on a frame length of 10 ms as depicted in Figure 3 for the uplink The multirate scheme facilitates multiplexing of different services with different quality of service and adding as well as dropping services during a call.



*Figure 3. Mode 2 Wideband CDMA uplink frame structure and service multiplexing example*

In Mode 1, the data modulation is Binary Offset QAM, or Quarternary Offset QAM for the 2 Mbit/s service in the non-spread case The spreading modulation for Mode 1 is linearized GMSK In Mode 2, dual-channel O-QPSK is used. At the initial stage of investigation, both modes have used traditional coding techniques (such as convolutional coding) with code rates from 0.4 to 0.7 and an inner CRC code for error detection capability. For higher Quality-of-Service requirements, concatenated coding (e g. Reed-Solomon and convolutional codes) will be used. Novel coding schemes like Turbo-codes and combined coding and modulation will be investigated in the next phases of the FRAMES project. Interleaving for Mode 1 is either done on a frame-by-frame basis for low rate services or on a slot-by-slot basis for higher-rate services In Mode 2, interleaving can span over one or several 10 ms frames

Mode 1 has slow power control, with a 50 dB dynamic range, with an option to use faster power control on a burst basis Mode 2 has fast power control, with 80 dB dynamic range based on open and closed loop control. The power control command rate is adaptable from 0 5 to 2 kbit/s.

## IV  EVALUATION AGAINST UMTS CRITERIA

Both modes can support the UMTS bit rates from low bit rates up to 2 Mbit/s. In Mode 1 variable bit rates with low granularity is supported by DTX or resource re-assignment together with adaptive coding. The slotted structure of Mode 1 suits well for bursty packet type of services. In Mode 2 variable bit rates are supported by adaptive coding and power assignments. Due to this power sharing and long initial synchronization Mode 2 is more suitable for moderately varying circuit switched services. For both modes different operating points for the services are obtained by different combinations of coding and link adaptation. In Mode 1 mixed bearer services can be provided to one user by packing them into different slots/codes while in Mode 2 mixed bearer services for one user can be multiplexed and have different operating points. For both modes bearers/services can be added and dropped during a call

The spectrum efficiency for Mode 1 is presented in Table 2 and for Mode 2 in Table 3. Conditions prevailing for the spectrum efficiency simulations are summarized below :

- Hexagonal cell layout
- Uniformly distributed mobile stations
- 5% outage probability
- Path loss law with a decay factor of 3 6
- 10 dB shadowing parameter
- Power control used (except for Mode 1 mixed services)
- Errors due to power control and handover taken into account
- Mode 1 with spreading evaluated (orthogonal codes)
- For Mode 1 frequency re-use is optimized for each case
- In Mode 2 frequency re-use with cluster size 1

Spectrum efficiency figures in the downlink are very close to each other. Poor performance of mixed service in Mode 1 is

*Table 2 Spectrum Efficiency of Mode 1*

| Service | Spectrum efficiency (kbps/MHz/cell), load/cluster order | |
|---|---|---|
| | downlink | uplink |
| 12 kbps, BER = 10-3, 40 ms | 124 77%/3 | 250 52%/1 |
| 144 kbps, BER = 10-3, 40 ms | 126 70%/4 | 240 33%/7 |
| Mixed services 90%/ 10% 12 kbps / 144 kbps | 57 (no power control) | 95(no power control) |
| 2 Mbps, BER 10-3,100 ms | Downlink is limiting direction Spectrum efficiency 100 - 150 kbps/MHz/s. | |

*Table 3 Spectrum Efficiency of Mode 2*

| Service | Spectrum efficiency (kbps/MHz/cell) | |
|---|---|---|
| | Downlink | Uplink (with Multiuser detection) |
| speech/low rate data 12 kbps, $10^{-3}$, 40 ms | 108 | 192 |
| Medium data 144 kbps, $10^{-3}$, 100 ms | 108 | 389 |
| Mixed services (12 kbps/144 kbps) | 115 | 322 |
| 2 Mbps, $10^{-3}$, 100 ms | Downlink is limiting direction. Spectrum efficiency 100 - 150 kbps/MHz/s. | |

due to missing power control which was not used due to modeling difficulties. For both modes downlink is the limiting direction since uplink receiver antenna diversity was used The better performance of Mode 2 in the uplink is due to multiuser detection. Multiuser detection efficiency i e the amount of own cell interference that can be removed varies in different environments and here it was assumed to be 60 %

Coverage evaluation was carried out for the same services and conditions as for spectrum efficiency. The access scheme dependent parameters determining range are :
- Link level performance Eb/N0
- The amount of overhead transmission

En/No figures taking into account the overhead transmission due to power control and training bits are presented in Table 4 The differences are very small and the uplink in the limiting direction due to lower transmission power. For low bit rate services Mode 1 has a slight advantage while for 144 kbit/s service Mode 2 has an advantage.

Non access scheme dependent parameters are
- Power, propagation conditions, planning margins, etc

*Table 4 Eb/No results*

| Mode 1 | | |
|---|---|---|
| $E_b/N_0$ | Downlink | Uplink |
| Speech/low rate data 12 kbps, $10^{-3}$, 40 ms | 7 3 dB | 3 4 dB |
| Medium rate data 144 kbps, $10^{-3}$, 40 ms | 5 9 dB | 4 4 dB |
| Mode 2 | | |
| $E_b/N_0$ | Downlink | Uplink |
| Speech/low rate data 12 kbps, $10^{-3}$, 40 ms | 6.9 dB | 7 2 dB |
| Medium data 144 kbps, $10^{-3}$, 100 ms | 6 5 dB | 3.1 dB |

Both Modes support adaptive antenna techniques. In Mode 1 capacity gains are realized through smaller cluster sizes and in



# EXHIBIT F



Not Reported in F.Supp.2d                                                                      Page 1

Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
AMERICAN BIO MEDICA CORPORATION,
Plaintiff,
v.
PENINSULA DRUG ANALYSIS CO., INC.;
James T. Ramsey; Phamatech, Inc.; Dipro
Diagnostic Products, Inc.; Dipro Diagnostic
Products of North America, Inc., Defendants.
**No. Civ.A. 99-218-SLR.**

Aug. 3, 1999.

Daniel F. Wolcott, Jr., Gregory A. Inskip, and
Joanne Ceballos, of Potter, Anderson & Corroon
LLP, Wilmington, Delaware, and Charles Michael
Tobin, of Hopkins & Sutter, Washington, D.C., for
plaintiff.
Matthew B. Lehr, and Maryellen Noreika, of
Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware, and Edward W. Moore, of Dallas, Texas,
for defendants Peninsula Drug Analysis Co., Inc.;
James T. Ramsey; DiPro Diagnostic Products, Inc.;
and DiPro Diagnostic Products of North America,
Inc., Doreen L. Costa, Neil P. Sirota, and Steven R.
Gustavson, of Baker & Botts, L.L.P., New York,
New York, of counsel.
Kevin W. Goldstein, of Ratner & Prestia,
Wilmington, Delaware, for defendant Phamatech,
Inc., Steele N. Gillaspey, of Gillaspey, Harms &
Associates, San Diego, California, of counsel.

MEMORANDUM OPINION
ROBINSON, J.

### I. INTRODUCTION

*1 Pending before the court are motions to dismiss
or transfer venue filed by defendants Dipro
Diagnostic Products of North America, Inc. ("Dipro
"), Phamatech, Inc. ("Phamatech"), and Peninsula

Drug Analysis Co., Inc. and James T. Ramsey ("
Peninsula" and "Ramsey," respectively). (D.I. 17,
25 and 49) Plaintiff American Bio Medica
Corporation ("ABMC") opposes said motions.
ABMC owns the rights to U.S. Design Patent No.
D404812, which patent issued on January 26, 1999.
ABMC is a New York corporation engaged in the
manufacture, worldwide distribution and sale of the
Rapid Drug Screen, a product covered by the patent
at issue. According to ABMC, when the Rapid Drug
Screen was developed in 1995, it was the first
vertical, hands free test for the detection of the
presence of drug residue in urine. Until February
1999, ABMC purchased test strips from defendant
Phamatech for incorporation into the Rapid Drug
Screen. ABMC alleges that Phamatech initiated
production of its own vertical test kit (Quick
Screen) in 1998 or earlier, using proprietary
information it acquired by reason of its supply
relationship with ABMC.

Defendant Phamatech is a California corporation.
According to ABMC, Phamatech distributes Quick
Screen through the auspices of defendants Peninsula
and Ramsey, among others. Defendant Dipro is a
Delaware corporation that, according to ABMC,
acquires directly or indirectly from Phamatech an
accused product called Rapid Response and
distributes that product through Peninsula and
Ramsey, among others. Peninsula is a Virginia
corporation and Ramsey is the sole stockholder and
an employee of Peninsula.

Plaintiff ABMC initiated this lawsuit on April 7,
1999 against defendants for design patent
infringement, violation of the Lanham Act, and
other acts of unfair competition. A day later, on
April 8, 1999, Phamatech filed suit in the United
States District Court for the Southern District of
California seeking a declaratory judgment that
ABMC's design patent is invalid, and joining other
federal and state claims essentially mirroring the
claims and operative facts at issue. By decision
issued June 21, 1999, Judge Keep of the Southern

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

District of California found that the California court could exercise specific personal jurisdiction over ABMC; however, applying the "first-filed" rule, she stayed the California case pending disposition of the instant motions.

## II. FACTS

The facts are essentially undisputed. Prior to the filing of the complaint, none of the accused products had been sold to a Delaware resident. In the fall of 1998, defendant Peninsula did ship an order of ABMC's Rapid Drug Screen to a Delaware resident, Pace Electric of New Castle, Delaware. Sometime thereafter and prior to January 1999, Peninsula stopped handling ABMC's product. In January 1999, defendant Ramsey and a third party met with a representative of Pace to discuss a possible business relationship for the sale and distribution of the Phamatech/Dipro product, Rapid Response, in Delaware. These discussions took place in Hawaii and Maryland. Although there are averments of record indicating that some agreement was reached (D.I.32), it is the court's understanding that no actual sales or movement of defendants' products occurred in Delaware prior to the filing of the complaint.

**\*2** Prior to April 1999, Peninsula sent direct mail postcards to Delaware as part of a mass mailing to potential customers in more than 20 states.[FN1] Both Ramsey and Phamatech maintain national Internet websites that can be accessed from Delaware. It is the court's understanding that these websites include promotional material about the allegedly infringing products, including information on ordering and shipping; however, orders cannot be consummated directly through the websites.

> FN1. Approximately 60 out of a total of 6,000 postcards were directed to Delaware residents. No responses are recorded.

## III. DISCUSSION

### A. Personal Jurisdiction

ABMC, as plaintiff, bears the burden of establishing that this court may exercise personal jurisdiction over defendants. When personal jurisdiction is contested without the benefit of discovery, the plaintiff need only establish a *prima facie* case with the record viewed in the light most favorable to the plaintiff. *See Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1462 (D.Del.1991); *Computer People, Inc. v. Best Int'l Group, Inc.,* No. Civ. A. 16648, 1999 WL 288119, at \*4 & n. 5 (Del. Ch. Apr 27, 1999). There is no question but that this court can exercise personal jurisdiction over defendant Dipro, a Delaware corporation. The focus of the following discussion, therefore, is whether the exercise of personal jurisdiction over the remaining defendants comports with the law of the Federal Circuit.[FN2]

> FN2. According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. *Akro Corp. v. Luker,* 45 F.3d 1541, 1543 (Fed.Cir.1995).

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a suit for "lack of jurisdiction over the person." According to the United States Supreme Court,
before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 104 (1987). The principle pronounced above is traditionally described in this court as a two-step analysis. The court will determine, first, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendants' rights to due process.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

Rule 4(e)(1) of the Federal Rules of Civil Procedure states that service of a summons may be effected " pursuant to the law of the state in which the district court is located." The Delaware long-arm statute, 10 Del. C. § 3104(c), has been construed "broadly ... to confer jurisdiction to the maximum extent possible under the due process clause." *LaNuova D & B S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). As noted by this court in *Intel Corp. v. Silicon Storage Tech., Inc.,* 20 F.Supp.2d 690, 694 (D.Del.1998), "[t]he Delaware Supreme Court has not determined that § 3104(c) is coextensive with federal due process, nor does it substitute federal due process analysis for state long-arm analysis." *Accord Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* 611 A.2d 476, 480-81 (Del.1992); *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods. Inc.,* Civ. A. No. 12036, 1991 WL 129174, at *3 (Del. Ch. July 10, 1991); *Ramada Inns v. Drinkhall,* No. Civ. A. 83C-AU-56, 1984 WL 247023, at *2 (Del.Super. May 17, 1984). Therefore, the court must determine that the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendants' constitutional rights to due process.[FN3]

> FN3. The Federal Circuit has instructed that, "in interpreting the meaning of state long-arm statutes, we ... defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." *Graphic Controls Corp v. Utah Med. Prods., Inc.,* 149 F.3d 1382, 1386 (Fed.Cir.1998). Thus, in *Luker,* the Federal Circuit's analysis followed that of the Sixth Circuit's holding in *R.L. Lipton Distrib. Co. v. Dribeck Importers, Inc.,* 811 F.2d 967 (6th Cir.1987): " 'This Ohio [long-arm] statute has been construed to extend to the outer limits of due process, and thus an Ohio personal jurisdiction analysis becomes an examination of constitutional limitations.' " *Luker,* 45 F.3d at 1544 (quoting *Dribeck,* 811 F.2d at 969). By contrast, as noted

above, the Delaware state courts do not collapse the long-arm inquiry into the due process inquiry and neither shall this court.

*3 Delaware's long-arm statute provides:
(c) As to a cause of action brought by a person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-resident, or his personal representative, who in person or through an agent:
(1) Transacts any business or performs any character of work or service in the State;
(2) Contracts to supply services or things in this State;
(3) Causes tortious injury in the State by an act or omission in this State;
(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State....

Del.Code Ann. tit. 10, § 3104(c)(1)-(4).

As explained by the Delaware Supreme Court in *LaNuova,*
[t]he conduct embraced in subsections (1) and (2), the transaction of business or performance of work and contracting to supply services or things in the State, may supply the jurisdictional basis for suit only with respect to claims which have a nexus to the designated conduct. Where personal jurisdiction is asserted on a transactional basis, even a single transaction is sufficient if the claim has its origin in the asserted transaction.

Similarly, where the claim is one for tortious injury under subsection (c)(3),
a single "act or omission" in the State in which the injury was caused will suffice. Such a claim may also be viewed as transactional.

*LaNuova,* 513 A.2d at 768. Therefore, in order to establish transactional or specific jurisdiction, plaintiff must demonstrate not only that an act or acts occurred in Delaware but also that its causes of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

action arise from those act or acts. According to relevant caselaw, plaintiff also must demonstrate that the act or acts occurring in Delaware actually constitute "transacting business" in Delaware, i.e., that defendants "purposefully avail[ed themselves] of the privileges and benefits of Delaware law." *Computer People, Inc.,* 1999 WL 288119, at *8; *see also Thorn EMI N. Am. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993) (stating that the designated conduct "must be directed at residents of the State of Delaware and the protection of its laws" ). With this requirement in mind, courts have concluded that "[m]ere solicitation does not arise to transacting business, nor does the isolated shipment of goods into Delaware." *Id.* (citing *Moore v. Little Giant Indus., Inc.,* 513 F.Supp. 1043, 1047 (D.Del.1981); *Waters v. Deutz Corp.,* 460 A.2d 1332, 1335 (Del.Super.1983). The distinction between isolated business activities and those giving rise to personal jurisdiction has been explained on the basis of whether the conduct is " part of a general business plan ... to solicit business in Delaware and deliver products to customers in Delaware." *Thorn EMI,* 821 F.Supp. at 274.

*4 Plaintiff alleges in its complaint seven causes of action, including unlawful use of the trademarks and service marks of the Rapid Drug Screen in violation of the Lanham Act and common and state law trademark rights; violation of the design patent " by making, using and/or selling the ABMC design ... "; and engaging in unfair competition and deceptive trade practices. (D.I.1) Although the products at issue have not been made, used, or sold in Delaware, plaintiff asserts that, "[t]hrough offers and extensive planning to sell the infringing product in Delaware, defendants have engaged in a course of conduct that readily meets the nexus requirements of sections 3104(c)(1), (2), and (3)." (D.I. 57 at 7-8)

The record demonstrates that defendants Peninsula and Ramsey have offered to sell [FN4] allegedly infringing products to Delaware residents through what appears to be a concerted marketing effort. The marketing effort includes national advertisements accessible to Delaware residents (the internet website), out-of-state sales negotiations with a Delaware resident,[FN5] and the mailing of

promotional materials to Delaware residents. Given the history of these defendants' relationship with plaintiff, the record adequately demonstrates that these activities are directed at Delaware residents, constitute "transacting business," and are sufficiently related to plaintiff's causes of action to satisfy the requirements of 10 Del. C. § 3104(c)(1). [FN6] *Cf. Computer People, Inc.,* 1999 WL 288119, at *8.[FN7]

> FN4. Plaintiff did not specifically allege such in its complaint; however, 35 U.S.C. § 271(a) reads "whoever without authority makes, uses, offers to sell, or sells any patented invention ... infringes the patent." (Emphasis added)

> FN5. The out-of-state sales negotiations with Pace Electric are viewed in tandem with defendants' other conduct as evidence of a general business plan directed at Delaware residents and the protection of its laws.

> FN6. As noted, the court is satisfied that the activities described above are "part of a general business plan" and not isolated, unrelated events. In the past, this court has demanded as well proof that the activities have had a "tangible effect" in Delaware. *See,* e.g., *Intel Corp.,* 20 F.Supp. at 696 ( "... SST's solicitations in Delaware [have not] been shown to have had any tangible effect on Intel's sales here."). Sales are lost generally because of the sale of competing products. Given the fact that liability under 35 U.S.C. § 271(a) can now rest on mere " offers to sell," the court is reluctant to require proof of actual sales and is not sure what other "tangible effect" is contemplated. Therefore, the court will not require evidence of "tangible effects" in this case.

> FN7. Although the court noted that, "as a general matter telephone calls and an e-mail [to a Delaware resident] do not, in and of themselves, automatically constitute

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

'transacting business' within Delaware sufficient to invoke jurisdiction under § 3104(c)(1)," the court looked at the specific factual context and held that these contacts were insufficient because they could not be a basis for the plaintiff's causes of action.

The court further finds that the exercise of personal jurisdiction over these defendants comports with federal due process considerations. The Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), held that

due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintainance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id.* at 316 (citation omitted). The Court in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), added the further requirement that the minimum contacts be "purposeful" contacts, noting that "even a single act can support jurisdiction" so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation." *Id.* at 475 n. 18. Therefore, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477. In *Luker*, the Federal Circuit suggested a three-prong jurisdictional analysis: 1) has the defendant purposefully directed its activities at residents of the forum?; 2) do the claims arise out of or relate to those activities?; 3) is the assertion of personal jurisdiction reasonable and fair? *See Luker*, 45 F.3d at 1545-46. The court has already answered the first two inquiries in the affirmative and has not discovered in the record any compelling evidence which suggests that the exercise of personal jurisdiction over these defendants would be unreasonable.

**\*5** The court concludes otherwise with respect to defendant Phamatech. The conduct attributed to Phamatech includes the following: 1) Phamatech manufactures allegedly infringing products; 2)

Phamatech arranges for the distribution of its product through defendants Peninsula and Ramsey; and 3) Phamatech advertises its product through an Internet website accessible to Delaware residents. As noted previously, however, there had been no actual sales of infringing product in Delaware prior to the filing of the complaint. Neither is there evidence relating Phamatech to Peninsula and Ramsey's marketing efforts directed at Delaware residents. Although plaintiff asserts that " Phamatech intentionally established a chain of distribution that it knew, or reasonably could have foreseen, had a termination point in Delaware" (D.I. 62 at 11), the record does not demonstrate the existence of ongoing commercial relationships with retailers and customers in Delaware.

The facts of record are distinguishable, therefore, from the facts in *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564 (Fed.Cir.1994) , cited by plaintiff. In that case, the court concluded that the alleged infringers were placing accused products into the chain of commerce, which included shipping products into the forum for sale to customers through an intermediary. Because the commercial relationship with the intermediary was ongoing and the accused products in fact had been shipped into the forum, the court found the defendant amenable to the exercise of personal jurisdiction: "From these ongoing relationships, it can be presumed that the distribution channel formed by defendants and [the intermediary] was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was [the forum]." *Royal Sovereign*, 21 F.3d at 1564. Instantly, there is no evidence demonstrating that Phamatech directed Peninsula and Ramsey's sales efforts at Delaware residents; there certainly is no evidence of any ongoing commercial relationships between Phamatech, Peninsula/Ramsey, and Delaware residents. The final conduct designated is Phamatech's Internet website. Assuming for purposes of this motion that a website with product information constitutes an "offer to sell," in the absence of evidence that Delaware residents actually accessed this website, the court declines to find that Phamatech transacted business in Delaware, consistent with 10 Del. C. § 3104(c)(1)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

and (3).[FN8]

> FN8. Plaintiff does not assert general jurisdiction under § 3104(c) (4).

### B. Venue

Generally, in reviewing a motion for transfer of venue, this court gives great deference to a plaintiff's choice of forum and only transfers venue if the defendants truly are regional (as opposed to national) in character. Motions to transfer venue are granted as well if there is a related case which has been filed first or otherwise is the more appropriate vehicle to litigate the issues between the parties. Given the court's conclusion that it cannot exercise personal jurisdiction over defendant Phamatech, the manufacturer of the accused products, transfer of this case to the Southern District of California is warranted.

### IV. CONCLUSION

**\*6** For the reasons stated, defendants' motions to dismiss are granted in part and denied in part. Defendants' motions to transfer venue are granted.

An appropriate order shall issue.

D.Del.,1999.
American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:99CV00218 (Docket) (Apr. 07, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G



Slip Copy                                                                                                    Page 1

Slip Copy, 2005 WL 2786691 (D.Del.)
**(Cite as: Slip Copy)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ARROW COMMUNICATION LABORATORIES,
INC., Plaintiff,
v.
JOHN MEZZALINGUA ASSOCIATES, INC.,
Defendant.
JOHN MEZZALINGUA ASSOCIATES, INC.,
Counterclaim Plaintiff,
v.
ARROW COMMUNICATION LABORATORIES,
INC., and Tresness Irrevocable Patent Trust,
Counterclaim Defendants.
**No. Civ. 05-357-SLR.**

Oct. 26, 2005.

Richard D. Kirk, of the Bayard Firm, Wilmington,
Delaware. for Arrow Communication Laboratories,
Inc., and Tresness Irrevocable Patent Trust. R.
Terrance Rader, Charles W. Bradley, Glenn E.
Forbis, Linda D. Kennedy, and Shelly L. Hokenstad
, of Rader, Fishman & Grauer PLLC, Bloomfield
Hills, Michigan, and Lawrence P. Trapani, of
Manlius, New York, of Counsel.
Jeffrey B. Bove, and Kevin M. Baird, of Connolly
Bove Lodge & Hutz LLP, Wilmington, Delaware.
for John Mezzalingua Associates, Inc. James R.
Muldoon, and John A. Wasleff, of Wall, Marjama
& Bilinski, LLP, Syracuse, New York. of Counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1   On   June   3,   2005,   plaintiff   Arrow
Communication   Laboratories,   Inc.   ("plaintiff")
filed a complaint in the United States District Court
for   the   District   of   Delaware   alleging   patent

infringement   by   defendant   John   Mezzalingua
Associates, Inc. ("defendant"). (D.I.1) Plaintiff
claims to be the lawful owner of all right, title and
interest in U.S. Patent No. 5,745,838 ("the '838
patent"). (Id.) Plaintiff alleges that defendant is
infringing the '838 patent by manufacturing, selling
and offering for sale in the United States, and by
importing into the United States, electronic filters
covered by one or more of the claims of the '838
patent. (Id.) Plaintiff further alleges that defendant
is actively inducing others to infringe the '838 patent
. (Id.)

On June 6, 2005, defendant filed an action for
declaratory judgment of patent non-infringement
and invalidity in the United States District Court for
the Northern District of New York. (D.I.9, ex. A)
On August 11, 2005, plaintiff's infringement suit
was referred to the Magistrate Judge of the District
of Delaware for the purpose of exploring alternative
dispute resolution. (D.I.29) Trial is scheduled for
November 2006. (Id.)

II. BACKGROUND

Plaintiff is a corporation organized under the laws
of the State of New York with its principal place of
business in Syracuse, New York. Defendant is a
corporation organized under the laws of the State of
Delaware with its principal place of business in East
Syracuse, New York.

III. STANDARD OF REVIEW

Defendant moves the court to transfer this matter,
pursuant to 28 U.S.C. § 1404(a), to the United
States District Court for the Northern District of
New York. (D.I.6) Section 1404(a) provides: "For
the convenience of the parties and witnesses, in the
interests of justice, a district court may transfer any
civil action to any other district or division where it
might have been brought." 28 U.S.C. § 1404(a)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                            Page 2

Slip Copy, 2005 WL 2786691 (D.Del.)
**(Cite as: Slip Copy)**

(2003). A plaintiff's choice of forum is to be accorded substantial weight and courts should only transfer venue if the defendant is truly regional in character. *See Bergman v. Brainin,* 512 F.Supp. 972, 973 (D.Del.1981) (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970)). A defendant has the burden of establishing that "the balance of convenience of the parties and witnesses strongly favors" transfer. *Id.* Accordingly, "defendants brought into suit in Delaware must prove that litigating in Delaware would pose a 'unique or unusual burden' on their operations" for a Delaware court to transfer venue. *See Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.,* 157 F.R.D. 215 (D.Del.1993). A motion to transfer venue may also be granted if there is a related case which has been first filed or otherwise is the more appropriate venue in which to litigate the issues between the parties. *See American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.,* 1999 WL 615175, *5 (D.Del.1999).

**\*2** In reviewing a motion to transfer venue, courts have not limited their consideration to the three factors enumerated in § 1404(a) (i.e., convenience of parties, convenience of witnesses, and interests of justice). The Third Circuit, in fact, has indicated that the analysis for transfer is very broad and has urged consideration of "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995) (internal quotations and citation omitted). These factors entail six private and five public interests. Private interests include: (1) the plaintiff's forum preference as manifested by the plaintiff's original forum choice; (2) the defendant's forum preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of the books and records to the extent that the files could not be produced in the alternative forum. *Id.* Public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy,

expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; and (5) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

In considering the private interest factors under *Jumara,* the court, consistent with Third Circuit precedent, adheres to the notion that transfer is not to be liberally granted and plaintiff's choice of forum is a paramount consideration. The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp.,* 997 F.Supp. 556, 562 (D.Del.1998); *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc.,* 2001 WL 1617186 (D.Del. Nov. 28, 2001); *Cont'l Cas. Co. v. Am. Home Assurance Co.,* 61 F.Supp.2d 128, 131 (D.Del.1999). Although transfer of an action is usually regarded as less inconvenient to a plaintiff if the plaintiff has not chosen its "home turf" or a forum where the alleged wrongful activity or injury occurred, the "plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re ML-Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 976 (D.Del.1993).


IV. DISCUSSION

As an initial matter, the court notes that venue is proper in Delaware as defendant is incorporated under the laws of the State of Delaware. Nevertheless, the District of Delaware is not plaintiff's "home turf," since it maintains its principal place of business in New York. In this sense, it appears to be more convenient to both the plaintiff and defendant to try the instant litigation in the Northern District of New York. Indeed, this court previously recognized that,
**\*3** [w]hen the plaintiff has chosen to bring suit in a district that is not plaintiff's "home turf" and that has no connection to any acts giving rise to the lawsuit, convenience to the plaintiff is not as great as it would be were plaintiff litigating at or near

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2786691 (D.Del.)
**(Cite as: Slip Copy)**

plaintiff's principal place of business or at the site of activities at issue in the lawsuit.

*Burstein v. Applied Extrusion Techs. Inc.*, 829 F.Supp. 106, 110 (D.Del.1992) (citing *Sports Eye, Inc. v. Daily Racing Form, Inc.*, 565 F.Supp. 634, 637 (D.Del.1983) (internal citations omitted)). Moreover, the locus of the alleged infringement occurred in Syracuse, New York. If defendant has infringed the '838 patent, such infringement was done primarily in Syracuse, where the accused products were developed, manufactured and sold. Based on the evidence offered, the majority of the witnesses with discoverable information also are located in and around Syracuse, New York. In addition, most of defendant's documents relating to the production, promotion, marketing and sales of the accused product are maintained in central New York. On this basis, the court concludes that the private factors under *Jumara* weigh in favor of transferring the case at bar to the United States District Court for the Northern District of New York.

One of the public interest factors under *Jumara* involves the administrative considerations of the courts. More than fifty years ago, the Third Circuit Court of Appeals adopted the "first-filed rule" where "in all cases of federal concurrent jurisdiction the court which first had possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir.1941) (quoting *Smith v. M'Iver*, 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)). Consequently, the second-filed action is usually stayed or transferred to the court where the first-filed action is pending. *Peregrine Corp. v. Peregrine Indus., Inc.*, 769 F.Supp. 169, 171 (E.D.Pa.1991); *Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc.*, 2001 U.S. Dist. LEXIS 18547, Civil Action No. 01-532-GMS, 2001 WL 1414868 (D.Del.2001). The rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." *E.E.O.C. v. University of Pennsylvania*, 850 F.2d 969, 971 (3d Cir.1988). The decision to transfer or stay the second action is within the discretion of the trial court. *Id.* at 972, 977. Invocation of the rule will usually be the norm, not the exception. Courts presented with exceptional circumstances may

exercise their discretion to depart from the first-filed rule. *Id.* at 979. In this case, it is undisputed that the present patent infringement suit in the District of Delaware was first filed and involves the same patent and the same issues as the declaratory judgment action filed thereafter by defendant in the Northern District of New York. Therefore, the burden is on defendant to present some exceptional circumstances why the court should depart from the first-filed rule.

**\*4** In support of its argument supporting transfer, defendant states that all of its relevant witnesses reside in New York, all the documents and records related to the accused product are in New York, and the subject matter of the lawsuit has significant local interest in New York. (D.I. 7 at 1-3) In contrast, evidence suggests that the District of Delaware has no connection to the subject matter of plaintiff's lawsuit, except that defendant is incorporated there. Defendant contends that pursuing the lawsuit in the District of Delaware will generate "significant expenses and other burdens" to the parties. (*Id.* at 3-4) Given this evidence and noting the regional character of the parties, with the primary business operations of each party located in the Northern District of New York, there are exceptional circumstances present which require the court to depart from the first-filed rule.

In considering the other public interest factors under *Jumara*, the court notes that the parties have taken significant steps to advance the instant litigation in the District of Delaware. The parties have exchanged initial disclosures, are set to explore settlement with the magistrate judge, and have arranged a schedule for litigation, with trial set to occur in about one year. These factors weigh in favor of maintaining the litigation in the District of Delaware. However, factors are also present which weigh in favor of transferring the case to the Northern District of New York. First, defendant's declaratory judgment action, which involves the same subject matter as this case, is currently pending in the United States District Court for the Northern District of New York.[FN1] In addition, both parties are regional in character and operate their businesses out of central New York, suggesting that the Northern District of New York

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 4

Slip Copy, 2005 WL 2786691 (D.Del.)
**(Cite as: Slip Copy)**

is the most appropriate venue for the parties to litigate. Although a suit in this matter was first filed in Delaware, the public interest factors weighing in favor of keeping the litigation in the District of Delaware are not compelling. The court, therefore, concludes that the public interest factors under *Jumara* favor transferring venue to the Northern District of New York.

> FN1. By stipulation of the parties, that case has been stayed pending this court's decision on defendant's motion to transfer venue. (N.D. N.Y., Case No. 05-CV-703 (NAM/DEP), D.I. 6) The court has no reason to believe that, once the stay is lifted, the declaratory judgment action in the Northern District of New York will move forward with any less swiftness than that with which the instant case has progressed in the District of Delaware. The familiarity with the parties and subject matter possessed by the Northern District of New York will certainly promote expeditiousness in handling the case.

### V. CONCLUSION

On balance, the court finds that the public interest factors and private interest factors weigh strongly in favor of transferring venue in this case. The court, as a result, concludes that defendant has sufficiently proven that litigating in the District of Delaware would pose a unique burden which merits transfer of venue. For the reasons stated, defendant's motion to transfer is granted. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 26th day of October, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendant's motion to transfer (D.I.6) is granted.

2. The above-captioned action shall be transferred to the United States District Court for the Northern District of New York.

D.Del.,2005.
Arrow Communication Laboratories, Inc. v. John Mezzalingua Associates, Inc.
Slip Copy, 2005 WL 2786691 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3667196 (Trial Pleading) Plaintiff Arrow Communication Laboratories, Inc.'s and Counterclaim Defendant Tresness Irrevocable Patent Trust'S (Oct. 25, 2005) Original Image of this Document (PDF)
• 2005 WL 3667190 (Trial Pleading) Answer to First Amended Complaint of Arcom and Counterclaims (Oct. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 3667193 (Trial Pleading) Reply to the First Amended Counterclaims of Tresness Irrevocable Patent Trust (Oct. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 2868155 (Trial Motion, Memorandum and Affidavit) Supplemental Brief in Further Support of Defendant's Motion to Transfer Venue Pursuant to 28 U.S.C. | 1404(a) (Oct. 5, 2005) Original Image of this Document (PDF)
• 2005 WL 2868149 (Trial Pleading) First Amended Complaint (Oct. 3, 2005) Original Image of this Document (PDF)
• 2005 WL 2868151 (Trial Pleading) Tresness Irrevocable Patent Trust's First Amended Counterclaim (Oct. 3, 2005) Original Image of this Document (PDF)
• 2005 WL 2868153 (Trial Pleading) Second Amended Answer and Counterclaims (Oct. 3, 2005) Original Image of this Document (PDF)
• 2005 WL 1529914 (Trial Pleading) Complaint (Jun. 3, 2005) Original Image of this Document (PDF)
• 1:05cv00357 (Docket) (Jun. 03, 2005)
• 2005 WL 3667183 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant's Motion to Dismiss State Law Claims under ¢yFed. R. Civ. P. 12(b)(6)¢y¢ r;0001;;LQ;USFRCPR12;1004365;¢r      (2005) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 5

Slip Copy, 2005 WL 2786691 (D.Del.)
**(Cite as: Slip Copy)**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H



Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 1925466 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
GUIDANT CORPORATION, Cardiac Pacemakers,
Inc., Guidant Sales Corporation and Mirowski
Family Ventures, L.L.C., Plaintiffs,
v.
ST. JUDE MEDICAL, INC. and Pacesetter, Inc.,
Defendants.
**No. Civ. 04-067-SLR.**

Aug. 27, 2004.

Frederick L. Cottrell, III, Richards, Layton &
Finger, Wilmington, DE, for Plaintiffs and
Counter-Defendants.
John W. Shaw, Young, Conaway, Stargatt &
Taylor, Wilmington, DE, for Defendants and
Counter-Claimants.

MEMORANDUM ORDER

ROBINSON, J.
**\*1** At Wilmington this 27th day of August, 2004,
having reviewed defendants' motion to transfer and
the papers submitted in connection therewith;

IT IS ORDERED that said motion to transfer
(D.I.27) is denied, for the reasons that follow:

1. Introduction. On February 2, 2004, Guidant
Corporation, Cardiac Pacemakers, Inc., Guidant
Sales Corporation and Mirowski Family Ventures,
L.L.C. (collectively, "plaintiffs"), filed this action
for declaratory judgment of patent infringement
against St. Jude Medical, Inc. and Pacesetter, Inc.
(collectively,      "defendants").     (D.I.1)    The
patent-in-suit is United States Patent Number
RE38,119 ("the '119 patent").[FN1] This patent is "
directed to a new way to treat congestive heart
failure ("CHF"), which occurs when the heart
muscle is too weak to pump blood effectively

through the body." (D.I. 34 at p. 3) Plaintiffs allege
that defendants infringe the '119 patent by making
and selling congestive therapy products that provide
cardiac resynchronization therapy ("CRT") to treat
CHF.[FN2] (D.I.28)

> FN1. The '119 patent is the subject of
> litigation presently before the court in
> *Medtronic     v.     Guidant,*     Civ.     No.
> 03-848-SLR (D.Del.). Although both sides
> expend much energy arguing the relevance
> of the *Medtronic* case to the issue of
> transfer at bar, the court is unimpressed by
> these considerations.

> FN2. The accused devices are St. Jude's
> Epic0      HF       implantable     cardioverter
> defibrillator,    Atlas0     HF      implantable
> cardioverter defibrillator,     and    Frontier0
> pacemaker device. (D.I.28)

On February 24, 2004, Cardiac Pacemakers, Inc.
filed a second patent infringement action in the
District of Minnesota against defendants St. Jude
Medical, Inc. and Pacesetter, Inc. ("the Minnesota
Action"). (D.I. 29, Ex. 5, *Cardiac Pacemakers, Inc.
v. St. Jude Medical, Inc.,* C.A. No. 04-1016
JMR/FLN) The patent-in-suit is United States
Patent No. 5,755,766 ("the '766 patent").[FN3] The
'766 patent is directed to cardiac leads that travel
though veins to the heart. (D.I.34)

> FN3. The accused products are St. Jude's
> QUICKSITE0 1056 K pacing lead used
> with St. Jude's Epic HF, Atlas HF and
> Frontier devices. (D.I. 28)

Defendants moved to transfer this case to the
United States District Court for the Southern
District of Indiana on March 9, 2004. (D.I.11)
Defendants argued that the interests of justice
strongly favored having all cases relating to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2004 WL 1925466 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

accused products heard before the United States District Judge David F. Hamilton. Defendants argued that Judge Hamilton was "particularly well-suited to fill that role because he had recently presided over the lengthy trial of a prior suit brought by plaintiff Guidant involving four other patents issued to Dr. Morton Mower, the alleged inventor of the '119 patent in suit." [FN4] (D.I. 28 at 8)

> FN4. According to defendants:
> The judgment of invalidity as to one of the four patents is the subject of an appeal currently pending before the Federal Circuit. With respect to the other three patents, one was voluntarily dismissed before trial, Judge Hamilton's finding as to the invalidity of one has been conceded, and Judge Hamilton's summary judgment holding of invalidity of the third was affirmed by the Federal Circuit.
> (D.I.28, fn.2)

On April 7, 2004, plaintiffs filed their first amended complaint. (D.I.22) Defendants' withdrew their motion to transfer to the Southern District of Indiana on April 13, 2004.[FN5] (D.I.23) Defendants filed their answer to the amended complaint along with counterclaims on April 21, 2004. (D.I.25) Defendants filed a second motion to transfer this case to the District of Minnesota on May 6, 2004. (D.I.27, 28, 29) The matter is fully briefed. (D.I.34, 35, 36, 38, 39)

> FN5. Apparently, under the Southern District of Indiana local rules, defendants' case was not considered a related case, thereby assignment to Judge Hamilton was not possible.

2. Background. Plaintiff Guidant Corporation ("GC") is an Indiana corporation having its principal place of business in Indianapolis, Indiana. GC has an exclusive license to the '119 patent. Plaintiff Cardiac Pacemakers, Inc. ("CPI") is organized under the laws of Minnesota and has a principal place of business in St. Paul, Minnesota. Guidant

Sales Corporation ("GSC") is an Indiana corporation with its principal place of business in Indianapolis, Indiana. GS and its subsidiaries CPI and GSC make and sell cardiac rhythm management devices. (D.I.22) Mirowski Family Ventures, L.L.C. is a Maryland limited liability corporation that has been assigned title to the '119 patent. (*Id.*)

**\*2** 3. Defendant St. Jude Medical, Inc. ("SJM") is a Minnesota corporation with its principal place of business in St. Paul, Minnesota. Defendant Pacesetter, Inc. ("Pacesetter") is a Delaware corporation with its principal place of business in Sylmar, California. (*Id.*) Pacesetter is a subsidiary of SJM.

4. Standard of Review. Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice. Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988); *Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 208 (D.Del.1998).

The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin,* 512 F.Supp. 972, 973 (D.Del.1981) (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970). " Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". *ADE Corp. v. KLA-Tencor Corp.,* 138 F.Supp.2d 565, 567 (D.Del.2001); *Shutte,* 431 F.2d at 25.

The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp.,* 997 F.Supp. 556, 562 (D.Del.1998); *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc.,* 2001 WL 1617186 (D.Del. Nov.28, 2001); *Continental Cas. Co. v. American Home Assurance Co.,* 61 F.Supp.2d 128, 131 (D.Del.1999)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1925466 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

. Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its " 'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re M.L.-Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 976 (D.Del.1993).

The Third Circuit Court of Appeals has indicated the analysis for transfer is very broad. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995) . Although emphasizing that "there is no definitive formula or list of factors to consider," *id.,* the Court has identified potential factors it characterized as either private or public interests. The private interests include: "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Id.* (citations omitted).

\*3 The public interests include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." *Id.* (citations omitted).

5. Discussion. Defendants assert that this case and the Minnesota Action belong together. Both actions involve cardiac rhythm management (CRM) products used to provide cardiac resynchronization therapy (CRT). According to defendants, judicial resources would be conserved by adjudicating the cases in the same forum. Since both sides have

corporate headquarters in Minnesota, it would be convenient to litigate there. Defendants, also, advise that the District of Minnesota is considered to have special expertise in the technology at issue.[FN6]

> FN6. In support, defendants reference this court's 1996 memorandum order in *Pacesetter, Inc. v. Cardiac Pacemakers,* Civ. No. 96-232-SLR (D.Del.1996). In addressing a motion to transfer in the case between some of the same litigants at bar, the court granted the motion:
> The court, however is persuaded that transfer of this case to the District of Minnesota is warranted because of Minnesota's familiarity with the technology at issue through past and pending litigation. It is the court's understanding that the District of Minnesota is in a posture to accept such a complex case without prejudice to plaintiffs' interest in a prompt resolution of the matter. Under these unusual circumstances, the court finds that transfer will conserve judicial resources and, therefore, further the interest of justice.
> (*Id.,* emphasis added)

6. Plaintiffs argue that defendants are forum shopping and clearly do not wish to be before this court. (D.I.34) Its first motion was to move this case before a particular judge and, when that was not possible, they withdrew the motion. Plaintiffs assert that defendants have failed to present legitimate reasons to transfer from its choice of forum. Plaintiffs also request that fees and costs associated with the preparation of its response to the motions be awarded.

7. Weighing the arguments against the *Jumara* balancing test, the court finds that the asserted public and public advantages of moving the case to the District of Minnesota are insufficient. Although two of the parties are headquartered in Minnesota, there is also evidence that all parties conduct business on a nationwide basis and are not restricted in any way from traveling to Delaware. Defendants argue that the public and private factors favor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 1925466 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

transfer yet offer nothing particularly burdensome or fact specific. Instead, they contend that their concern for conserving judicial resources is the most compelling factor. In the absence of any particular or unusual circumstances, the concern for judicial economy does not warrant a transfer of the case.

Moreover, defendants' concern for judicial economy actually operates against a transfer. Assuming, *arguendo,* that the technology at issue in the Minnesota and the Delaware actions involve essentially the same parties and patents and involve the same legal theories, under the "first filed rule", this court, where the first case was filed, would not be compelled to transfer the case. Instead, the second filed Minnesota Action would be ripe for transfer to this court.

More than fifty years ago, the Third Circuit adopted the "first-filed rule" where "[i]n all cases of federal concurrent jurisdiction the court which first had possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir.1941) (quoting *Smith v. McIver,* 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)). Consequently, the second filed action should be stayed or transferred to the court where the first filed action is pending. *Peregrine Corp. Peregrine Indus., Inc.,* 769 F.Supp. 169, 171 (E.D.Pa.1991); *Genfoot, Inc. v. Payless Shoesource, Inc.,* Civ. No. 03-398-SLR, 2003 WL 22953183 (D.Del.2003). The rule " encourages sound judicial administration and promotes comity among federal courts of equal rank. " *E.E.O.C. v. University of Pennsylvania,* 850 F.2d 969, 971 (3d Cir.1988). The decision to transfer or stay the second action is within the discretion of the trial court. *Id.* at 972, 977. While the issue of transfer of the Minnesota Action is obviously not before the court, the caselaw reflects the overwhelming preference toward the first-filed case.

**\*4** Plaintiffs, however, have not succeeded on all issues. Specifically, plaintiffs have failed to demonstrate to the court's satisfaction that an award of attorney's fees and costs is warranted at this time. Although defendants' strategic filing of motions is suspect, it does not rise to the conduct necessitating a fee award, especially when plaintiffs' own

conduct, wherein the Minnesota Action was filed within weeks of this filing, suggests similar posturing.

8. Conclusion. For the reasons stated, defendants' motion to transfer (D.I.27) is denied.

D.Del.,2004.
Guidant Corp. v. St. Jude Medical, Inc.
Not Reported in F.Supp.2d, 2004 WL 1925466 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2603767 (Trial Pleading) Answer to Second Amended Complaint and Counterclaims (Aug. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 3676522 (Trial Motion, Memorandum and Affidavit) Defendants' Opening Brief in Support of their Motion for Summary Judgment of Invalidity Based on Recapture (May. 10, 2005)
• 1:04cv00067 (Docket) (Feb. 02, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I



Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
DIPPOLD-HARMON ENTERPRISES, INC.,
Plaintiff,
v.
LOWE'S COMPANIES, INC., Defendant.
**No. 01-532-GMS.**

Nov. 13, 2001.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

*1 On May 23, 2001, Lowe's Home Centers, Inc. (" Home Centers"), filed a complaint against the defendant Dippold-Harmon Enterprises, Inc. (" Dippld-Harmon") in the General Court of Justice, Superior Court Division, located in North Carolina. On July 27, 2001, Dippold-Harmon removed that action to the United States District Court for the Western District of North Carolina. On August 8, 2001, Dippold-Harmon filed the above-captioned action against Lowe's Companies, Inc. ("Lowe's"), the parent corporation of Home Centers, in Delaware.

Before the court is Lowe's' motion to dismiss, or alternatively, to transfer this case to the Western District of North Carolina, or to stay this case pending the outcome of that litigation. Lowe's argues that the court should dismiss this action because the court lacks personal jurisdiction over it. It further argues that, should the court not dismiss this action, the case should be transferred to North Carolina pursuant to the "first-filed" rule and 28 U.S.C. § 1404(a). For the reasons that follow, the court will deny Lowe's motion to dismiss for lack of personal jurisdiction, but will grant Lowe's motion

to transfer.

II. BACKGROUND

Dippold-Harmon is a Delaware corporation, with its principle place of business in Delaware. Lowe's is a North Carolina corporation with its principal place of business in North Carolina. It is the world's second largest home improvement retailer, serving more than five million customers weekly. Lowe's maintains that it is not, and has never been, registered or qualified to do business in Delaware. It further asserts that it does not have a registered agent for the service of process in Delaware.

Home Centers is a wholly-owned subsidiary corporation of Lowe's. It is a North Carolina corporation registered to conduct business in Delaware, although its principle place of business is in North Carolina. Lowe's maintains significant control over its subsidiary. Lowe's sends its corporate representatives to its retail stores, including Home Centers, and then directs the stores to take certain actions in accordance with Lowe's policies. Other Lowe's high-level executives admit that they "supervise" and "oversee" the retail stores and travel to these stores on almost a daily basis. Furthermore, in Lowe's advertising materials, it proudly announces that *it* has more than six-hundred and fifty store in forty states, including four in Delaware. In actuality, the four stores in Delaware are its subsidiary Home Centers.

On April 3, 1998, Home Centers entered into a written contract with Dippold-Harmon. The contract specified that Dippold-Harmon would install granite countertops for Home Centers' customers. In approximately 1998, Lowe's also hired Dippold-Harmon as a vendor for the sale and installation of granite kitchen countertops. At that time, Dippold-Harmon was one of several vendors that Lowe's utilized for the installation of these countertops. As Lowe's continued to open

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

additional stores, it was faced with the costly proposition of installing countertop displays at each of these new stores. To ensure that the countertop displays were properly installed in a uniform manner, Lowe's representatives sought to hire a single vendor to install these displays. It also sought to hire a single vendor to install countertops for its individual customers.

**\*2** Dippold-Harmon maintains that the parties engaged in subsequent telephone negotiations aimed at making Dippold-Harmon the exclusive vendor for the installation of Lowe's countertop displays, as well as for countertops it sold to individual customers. Some of these discussions were initiated by Lowe's and were directed to Dippold-Harmon in Delaware. At a December 20, 1999 meeting with Dippold-Harmon, Lowe's executives Michael Gettler and Tammy Edson purportedly offered to make Dippold-Harmon its exclusive national vendor for the installation of granite countertops. Dippold-Harmon contends that, during the meeting, it accepted Lowe's' offer and entered into an oral "Exclusivity Agreement." The two companies also exchanged numerous letters and e-mails during this time concerning their vendor agreement.

On May 23, 2001, Home Centers filed the North Carolina complaint against Dippold-Harmon. In its complaint, Home Centers alleges that Dippold-Harmon breached their April 3, 1998 written contract. Specifically, Home Centers contended that Dippold-Harmon failed to comply with their written contract's standards in the installation of countertops in the homes of individual customers.

Dippold-Harmon filed this action against Lowe's on August 8, 2001, alleging that Lowe's breached their Exclusivity Agreement and acted fraudulently and with bad faith.

Because the court concludes that exercising personal jurisdiction over Lowe's in this instance comports with traditional notions of fair play and substantial justice as required by the Due Process Clause, and that Lowe's falls within the reach of Delaware's long-arm statute, the court will deny

Lowe's' motion to dismiss. *See International Shoe Co. v. Washington,* 326 U.S. 310 (1945); DEL. CODE. ANN. tit. 10 § 3104(c) (2001). However, because the "balance of convenience" tips in favor of Lowe's, the court will grant its motion to transfer.

### III. DISCUSSION

#### A. Jurisdiction

The essence of Lowe's' argument is that, since it has not purposefully directed its activities to Delaware, the assertion of personal jurisdiction by the courts of this forum would violate the Due Process Clause. Lowe's further contends that its activities do not bring it within the reach of Delaware's long-arm statute. While Lowe's correctly frames the inquiry the court must make, the court disagrees with its analysis and reaches a different conclusion.

#### 1. Due Process

The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "ha[s] certain minimum contacts with [the forum] state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe* 326 U.S. at 316 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)). In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985). In other words, the defendant's contacts must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). Finally, "even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

process requires that jurisdiction be denied." *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1568 (Fed.Cir.1994).

**\*3** Lowe's argues that its only contacts with Delaware are through Dippold-Harmon, which is a Delaware corporation. Specifically, Lowes' contends that its Home Centers contract with a Delaware corporation is, by itself, an insufficient basis to establish personal jurisdiction. The court agrees. *See Blue Ball Properties, Inc. v. McClain,* 658 F.Supp. 1310, 1316-17 (D.Del.1987). However, the court finds that Lowe's has many more purposeful contacts with Delaware than it discloses in its brief.

First, with regard to the Exclusivity Agreement in issue, Lowe's communicated regularly with Dippold-Harmon by sending numerous letters and e-mails from North Carolina to Delaware. It also placed telephone calls to Dippold-Harmon in Delaware. These contacts alone would be sufficient to satisfy the minimum contacts analysis. *See Hide Power and Equip. Co. v. Strates Enters., Inc.,* 1993 WL 258701, at \*1 (Del.Super. June 15, 1993) (finding jurisdiction over a nonresident defendant based on a single visit to Delaware and two or three letters sent to Delaware); *see also Mid-Atlantic Mach. & Fabric, Inc. v. Chesapeake Shipbuilding, Inc.,* 492 A.2d 250, 255 (Del.Super.1985) (extending jurisdiction over a nonresident defendant where the negotiation and execution of the contract occurred entirely outside of Delaware, and the defendant's contacts with Delaware were limited to " an unspecified number of trips.")

However, in addition to these direct contacts with Dippold-Harmon in Delaware, Lowe's is the world's second largest home improvement retailer. This fact alone would provide a sufficient basis for the court to seriously question the legitimacy of Lowe's' position. However, as previously noted, Lowe's has a wholly-owned subsidiary; that subsidiary, Home Centers, is registered to do business in Delaware, and operates four stores in this jurisdiction. Neither in its advertising material, nor in its internal communications, does Lowe's distinguish between its corporate stores and Home Centers stores. In fact, Lowe's announces the opening of new Home

Centers stores as new *Lowe's* locations. Lowe's also maintains strict controlover its Home Centers operations. It sends its representatives to the Home Centers stores and then directs those stores not in compliance with Lowe's policies to take certain actions to come into compliance. Such representatives have visited the Delaware stores. Lowe's also publically admits to otherwise " supervising and overseeing" its stores, and sending Lowe's personnel to those stores, including Delaware locations.

These facts support the conclusion that Lowe's should reasonably have anticipated being brought into court here. However, due process requires that the court make one more inquiry.

Notwithstanding the existence of Lowe's purposeful minimum contacts with this forum, the court must consider whether the "minimum requirements inherent in the concept of 'fair play and substantial justice...' defeat the reasonableness of [the assertion of] jurisdiction, even [if] the defendant has purposefully engaged in forum activities." *Asahi Metal Indust. Co. v. Superior Court,* 480 U.S. 102, 116 (1987). This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendant to litigation within the forum. *See Beverly Hills Fan,* 21 F.3d at 1568.

**\*4** Here, the answer is plainly, no. Delaware has an interest in this action. Dippold-Harmon is a Delaware corporation. Clearly this forum's interests extend to corporate citizens that have sought the protection of Delaware's laws. Moreover, Delaware has an interest in addressing those purposeful activities conducted within its borders that result in allegations of injury. That interest extends to breaches of contract, such as that alleged here. Finally, Lowe's clearly has, through its Home Centers subsidiaries, significantly more than minimal contacts with this forum. Accordingly, the court concludes that the burden on Lowe's is not so onerous as to run afoul of traditional notions of fair play and substantial justice.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### 2. Delaware's Long-Arm Statute

The second step in the court's analysis into the propriety of subjecting Lowe's to personal jurisdiction in this forum is the determination of whether any of the provisions of Delaware's long-arm statute apply. *See* DEL. CODE. ANN. tit. 10 § 3104 (2001). While Lowe's contends that it does not fall within the grasp of any of Section 3104 's provisions, Dippold-Harmon contends that at least two of the provisions apply here. For purposes of this order, the court need only discuss one.

Under subsection (c)(4), the court may exercise personal jurisdiction over anyone who causes injury either inside or outside of this State "by an act or omission outside of the State" if that individual " regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." DEL. CODE. ANN. tit. 10, § 3104(c) (2001).[FN1] The court will interpret this language broadly, as reaching the " maximum parameters of the due process clause." *See Jeffreys v. Exten,* 784 F.Supp. 146, 151 (D.Del.1992).

> FN1. This subsection provides general jurisdiction over the nonresident defendant. *See Mendelson v. Delaware River and Bay Auth.,* 56 F.Supp.2d 436, 439 (D.Del.1999). Accordingly, it is immaterial whether the jurisdictional contact is related to the claim. *See id.*

As discussed above, Lowe's directed telephone calls and numerous items of correspondence to Delaware in relation to the disputed Exclusivity Agreement. Through its wholly-owned subsidiary, Home Centers, Lowe's also operated, maintained, and directly supervised four stores in Delaware. Finally, Lowe's has not in any way publically differentiated itself from the Home Centers locations in Delaware. Consequently, it cannot now complain that it should not be sued here.

Finding sufficient contacts to subject Lowe's to personal jurisdiction under both the State's long-arm

statute and the Due Process Clause, the court will now move to a discussion of whether this action should be transferred to the Western District of North Carolina.[FN2]

> FN2. In its motion to dismiss, Lowe's also alleges that this action should be dismissed for lack of venue and insufficient service of process. However, both of these claims are based solely on its argument that the court lacked personal jurisdiction. As the court has found personal jurisdiction, these arguments too must fail.

### B. Venue

As previously noted, Lowe's seeks to transfer this action pursuant to the "first-filed" rule and 28 U.S.C. § 1404(a).

### 1. The "First-Filed" Rule

The "first-filed" rule is a judicially-created doctrine that is designed to avoid concurrent litigation of the same issues, between the same parties, in more than one federal court. *See EEOC v. University of Pennsylvania,* 850 F.2d 969, 971-72 (3d Cir.1988). As its name implies, the rule generally provides that a later-filed action should be stayed pending the resolution of an earlier filed action, or transferred to the court in which the earlier-filed action is pending. *See Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169, 171 (E.D.Pa.1991).

**\*5** While Dippold-Harmon does not dispute that the North Carolina action was filed first, it argues that this rule should not apply to the present case because different parties and different issues are presented in the Delaware and North Carolina actions. The court finds this argument unpersuasive. First, Dippold-Harmon itself aggressively argued that Lowe's and Home Centers should be considered one and the same party for purposes of establishing personal jurisdiction. The court will not now find that Lowe's and Home Centers are different parties for the purposes of the "first-filed" rule. For the reasons stated in Section A. 1, *supra,* the court is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

satisfied that Lowe's and Home Centers are effectively the same party.

Second, with regard to Dippold-Harmon's argument that different issues are presented in the Delaware and North Carolina actions, the court again disagrees. The North Carolina action concerns the breach of a written agreement between Home Centers and Dippold-Harmon. The written agreement provided that Dippold-Harmon would install granite countertops for its customers in a certain fashion. The Delaware action concerns the breach of an alleged oral agreement between Lowe's and Dippold-Harmon. This alleged oral agreement provided that Dippold-Harmon would be the exclusive distributor of those granite countertops. Both actions thus concern different facets of the same business relationship between the parties. Specifically, both actions relate to Dippold-Harmon's status as a fabricator and installer of granite countertops for Lowe's and Home Centers' customers. A decision by the North Carolina court on the validity, or breach, of the written agreement will bear directly on the alleged oral agreement concerning the same type of services. To have two separate trials on these issues would defeat the purposes of the "first-filed" rule, namely sound judicial administration and comity among federal courts of equal rank. *See EEOC,* 850 F.2d at 971. Accordingly, the court finds that the application of this rule weighs heavily in favor of transferring this case to North Carolina.

### 2. Section 1404(a)

Transfer to North Carolina is also mandated under a section 1404(a) analysis. Section 1404(a) provides that "[f]or the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). The parties agree that this action could have been filed in the Western District of North Carolina as a diversity action. The court will, therefore, move on with the inquiry as directed by the Third Circuit. *See Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995).

In *Jumara,* the Third Circuit provided a list of factors to assist the district courts in determining " whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court should consider. *See id.*

#### a. The Private Interests

**\*6** The private interests most relevant to this case include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent these files cannot be produced in the alternate forum.[FN3] *See id.*

> FN3. For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 197-201 (D.Del.1998). In not affording weight to these factors, the court avoids the risk of double-counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court will consider whether the Western District of North Carolina is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See* 28 U.S.C. § 1404(a).

#### 1. The Convenience of the Parties

Physically, North Carolina is moderately inconvenient for Dippold-Harmon, which is headquartered in Delaware. Thus, in order to litigate this matter in North Carolina, it must travel several hours. However, modern communication and transportation capabilities make this moderate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

journey far less burdensome than it would have been at one time. *See Beverly Hills Fan,* 21 F.3d at 1569 (noting that it is not unduly burdensome for a defendant organized under the laws of the People's Republic of China to litigate in Virginia.). Because it is a national distributor of granite and stone kitchen fixtures, Dippold-Harmon is also financially capable of shouldering this burden. As such, it is doubtful that litigating in North Carolina would be an undue financial burden.

Furthermore, transfer to North Carolina would reduce the overall inconvenience to all parties involved. Dippold-Harmon must already travel to North Carolina to defend itself in the first-filed action pending in the Western District of North Carolina. Bringing witnesses and relevant documents to only one location, here North Carolina, minimizes the level of disruption caused to both parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time.

### 2. The Convenience of Witnesses

Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience " analysis since each party is able, indeed obligated, to procure the attendance of its own employees for trial. *See Affymeytrix,* 28 F.Supp.2d at 203. Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are " usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any. *See id* (internal citations omitted). Fact witnesses who posses first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id*

Dippold-Harmon argues that Lowe's has failed to demonstrate that transfer to North Carolina would be more convenient for potential non-party fact witnesses. The court agrees, and notes that Lowe's' bare allegations of witness inconvenience, without more, are insufficient to tip the balance in its favor However, all the material witnesses in this dispute, party or otherwise, will be in North Carolina already to litigate the first-filed action. Requiring that they then come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. Accordingly, the court finds that this factor also weighs in favor of transferring the action to North Carolina.

### 3. The Location of Records and Other Documents

**\*7** The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id.* at 205. Furthermore, the relevant documents will already be in North Carolina for the litigation of the first-filed action. The court thus sees no need to require that Lowe's, Home Centers, and Dippold-Harmon move the same documents from North Carolina to Delaware. Rather, it would be much more efficient to litigate these related actions in one location.

### b. The Public Factors

As other courts have noted, depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role in the "balance of convenience." *See id* at 205. The court thus elects to discuss only the three factors which the parties deem relevant to the pending case.

### 1. Practical Considerations Making Trial Easy, Expeditious, or Inexpensive

This factor appears to substantially repeat the " first-filed" analysis advanced by Lowe's, and accepted by the court, in Section 2 .B, *supra.* As such, the court declines to further address this issue here, since it has already taken this argument into consideration.

### 2. Delaware's Interest in Deciding This Action

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Dippold-Harmon claims that Delware has a far stronger interest in resolving this action since Dippold-Harmon is a Delaware corporation. While the court is mindful of Delaware's interest, that alone will not tip the "balance of convenience" in its favor. This is so because the court can hardly describe the alleged Exclusivity Agreement as a local controversy unique to Delaware. *See Affymetrix*, 28 F.Supp.2d at 207. Instead, this alleged agreement concerns Dippold-Harmon's status as Lowe's' exclusive, national distributor. By its very nature then, the agreement is not local and unique to only Delaware, but rather, affects every state included in the alleged Exclusivity Agreement. Furthermore, the court notes that Dippold-Harmon appears to concede that the alleged Exclusivity Agreement was not formed in Delware and would not be governed by Delaware law. Accordingly, this factor does not weigh in favor of denying Lowe's motion to transfer.

### 3. Collective Travel Time and Cost

The final public interest factor identified by Lowe's concerns the time and cost allegedly associated with the potential witnesses' travel time to Delaware. This factor, however, duplicates other factors necessary to the court's transfer analysis, namely the private factors considering the convenience and availability of witnesses and the location of documents. The court has already rejected these arguments in its earlier discussion of the "private" factors in the "balance of convenience" analysis.

### IV. CONCLUSION

For the foregoing reasons, the court concludes that Lowe's is subject to personal jurisdiction in Delaware, however, the "balance of convenience" tips strongly in favor of transferring this action to the Western District of North Carolina.

**\*8** For these reasons, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:
1. Lowe's motion to dismiss for lack of personal jurisdiction (D.I. 8) is DENIED, and Lowe's alternative motion to transfer this action to the

Western District of North Carolina (D.I.8) is GRANTED; and
2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Western District of North Carolina.

D.Del.,2001.
Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc.
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:01CV00532 (Docket) (Aug. 07, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J



Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
ASTEN INC., Plaintiff,
v.
WEAVEXX CORPORATION, Defendant.
**No. 99-593 GMS.**

Feb. 11, 2000.

George H. Seitz, III, Seitz, Van Ogtrop & Green, P.A., Wilmington, for Asten Inc., plaintiffs.
Thomas C. Grimm, Morris, Nichols, Arsht & Tunnell, Wilmington, for Weavexx Corporation, defendants.

ORDER

SLEET, J.

### I. INTRODUCTION

**\*1** On September 3, 1999, Plaintiff Asten, Inc. (" Asten") filed a complaint alleging patent infringement by Defendant Weavexx Corp. (" Weavexx") The complaint was not served until September 24, 1999. In the interim, on September 10, 1999, Weavexx filed and served a "mirror image " action in the United States District Court for the Eastern District of North Carolina. In that action, Weavexx seeks a declaration that Asten's patent is invalid and/or not infringed by Weavexx.

Before the court is Weavexx's motion to transfer this case to the Eastern District of North Carolina, or in the alternative, to stay proceedings here pending resolution of the North Carolina declaratory judgment action. Weavexx argues that the case should be transferred pursuant to the "first filed" rule, or, alternatively, pursuant to 28 U.S.C. § 1404.[FN1] For the reasons that follow, the court will deny Weavexx's motion.

FN1. Weavexx's motion requests a transfer pursuant to § 1404 or a stay pursuant to the first-filed rule. *See* Mot. to Transfer or Stay, at 1. In its briefing, however, Weavexx appears to request only a transfer, pursuant to either § 1404 or the first-filed rule. *See* Opening Br. at 2, 5, 18. As discussed below, the court has concluded that the first-filed rule does not operate in Weavexx's favor. The rule, therefore, provides no more basis for a stay than it does for a transfer.

### II. BACKGROUND

Asten and Weavexx both design and manufacture certain fabrics used on papermaking machines. Both companies are incorporated in Delaware, but neither company maintains a physical presence in this state. Asten is headquartered in Charleston, South Carolina and maintains its primary manufacturing facility in Appleton, Wisconsin. Weavexx is headquartered and maintains a major manufacturing facility in Wake Forest, North Carolina. It also has manufacturing facilities in several other southern states and in Canada, [FN2] and sells its products in the United States, Canada, and Mexico.

FN2. In addition to its Wake Forest location, Weavexx maintains U.S. manufacturing facilities in Florida, Tennessee, Mississippi and Virginia, and Canadian facilities in Ontario (administrative offices), Nova Scotia and Quebec. *See* Opp'n Br. at Ex. B.

Asten is the assignee of U.S. Patent No. 5,025,839 ( "the '839 patent"), entitled "Two-Ply Papermakers Forming Fabric with Zig-Zagging MD Yarns." Asten contends that Weavexx's "Design 2895" forming fabrics infringe the '839 patent. Weavexx states that it "principally designed" these fabrics at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

its Wake Forest plant, and that it markets and sells these products out of that facility. The products are manufactured, however, by a "sister-company" of Weavexx that is located in Brazil.

The inventor of the '839 patent, Walter Wright, is employed by Asten at its Appleton, Wisconsin facility. Asten manufactures its "Style 866" forming fabric, based on the '839 patent, at the Appleton plant. The documents relating to the design and development of the '839 patent are also located in Appleton.

### III. DISCUSSION

As previously noted, Weavexx seeks to transfer this action pursuant to the "first-filed" rule, or, alternatively, pursuant to 28 U.S.C. § 1404(a).

#### A. The First-Filed Rule

The first-filed rule is a judicially created doctrine that is designed to avoid concurrent litigation of the same issues, between the same parties, in more than one federal court. *See EEOC v. University of Pennsylvania,* 850 F.2d 969, 971-72 (3d Cir.1988). As its name implies, the rule generally provides that a later filed action should be stayed pending resolution of an earlier filed action, or transferred to the court in which the earlier filed action is pending. *See Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169 (E.D.Pa.1991).

**\*2** Since Asten filed its complaint in this court seven days before Weavexx filed its federal declaratory judgment action in North Carolina, the rule would not seem to provide a basis for transfer. Weavexx, however, claims that in the Third Circuit, the "first-filed" rule would more accurately be described as the "first-served" rule. It contends that under Third Circuit case law, "the 'first-filed' of two parallel actions is the one in which the district court first obtains jurisdiction of the parties and issues." Opening Br. at 6. Weavexx argues that in Delaware, personal jurisdiction over a defendant does not arise until a complaint is served. Consequently, Weavexx contends that the earlier-

served North Carolina action should have priority over this earlier-*filed* Delaware action. The court disagrees.

Weavexx correctly notes that the Third Circuit Court of Appeals has at times articulated the rule as giving priority to the court "first obtaining jurisdiction of the parties and issues." *See, e.g., Crosley Corp. v. Westinghouse Elec. & Mfg. Co.,* 130 F.2d 474, 475 (3d Cir.1942). But Weavexx places too much significance on this language. In applying the rule, the Third Circuit has never focused on the dates that complaints were served, or, more generally, the dates on which personal jurisdiction was established. In this court's view, the "parties and issues" language just quoted was merely intended to signify that the first-filed rule should only apply when the competing actions involve the same parties and issues. *See University of Pennsylvania,* 850 F.2d at 971-72 (noting that the rule gives a court the power to enjoin the " subsequent prosecution of *proceedings involving the same parties and the same issues* already before another district court" (emphasis added)).

Indeed, the rule is often articulated without language that might suggest a focus on personal jurisdiction. For example, the rule has been described as giving priority to "the court which first has possession *of the subject.* " *University of Pennsylvania,* 850 F.2d at 971 (emphasis added) (citing *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir.1941)). In first adopting the rule, the Third Circuit explained that the party who "first *brings a controversy into a court of competent jurisdiction* for adjudication should ... be free from the vexation of subsequent litigation over the same subject matter." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 930 (3d Cir.1941) (emphasis added). The *Hazeltine* court, therefore, concluded that the lower court had erred in refusing to enjoin later-filed patent infringement actions in the Southern District of Ohio, "when the *jurisdiction of the district court of Delaware has already been invoked* to determine the validity and infringement of all of these patents." *Id.* at 930 (emphasis added). These articulations suggest that the inquiry should focus on the date on which the jurisdiction of *the court* is invoked-i.e., through the filing of a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 3

Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

complaint-rather than the date on which personal jurisdiction over the parties is perfected.

**\*3** The only case from this circuit to squarely address the issue concluded that the first-filed rule gives priority to an earlier filed complaint even if a later filed complaint is first served. *See Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169, 171-72 (E.D.Pa.1991); *but see Osteotech, Inc. v. Gensci Regeneration Sciences, Inc.,* 6 F.Supp.2d 349, 357 n. 4 (D.N.J.1998) (stating, *in dicta,* that a " persuasive argument can be made" that a later filed but first served complaint takes priority in this circuit).[FN3] This court agrees with the conclusion reached in *Peregrine,* which also appears to be the majority view in other circuits.[FN4]

> FN3. Though not addressing the "first-filed " vs. "first-served" issue, the court in *Jefferson Ward Stores, Inc. v. Doody Co.,* 560 F.Supp. 35 (E.D.Pa.1983), also placed great emphasis on the "first obtaining jurisdiction of the parties and the issues" language quoted above. *See id.* at 36-37. That court permitted a later filed Pennsylvania action to proceed because personal jurisdiction was being contested in an earlier filed Ohio action. Because the district court in Ohio had not yet ruled on a motion to dismiss for lack of personal jurisdiction, the district court in Pennsylvania concluded that the Ohio court had not yet "obtained jurisdiction of the parties." *See id.* The Pennsylvania court did, however, note that it would reconsider the question of transfer if the Ohio court were to rule that it did have jurisdiction over the parties. *Id.*
> Despite its focus on personal jurisdiction, however, *Jefferson Ward* is not helpful to Weavexx's position. In Weavexx's declaratory judgment action in North Carolina, Asten moved for dismissal based on, *inter alia,* lack of personal jurisdiction. As that motion is still outstanding, it might be said that the district court in North Carolina has not yet "obtained jurisdiction" over the parties. Because personal

jurisdiction is not contested in the instant action, transfer might be inappropriate even if the court were to construe the rule as focusing on the time at which personal jurisdiction is established.

> FN4. *See, e.g., Pacesetter Sys., Inc. v. Medtronic, Inc.,* 678 F.2d 93, 96 n. 3 (9th Cir.1982), *Hospah Coal Co. v. Chaco Energy Co.,* 673 F.2d 1161, 1163 (10th Cir.1982); *Barber-Greene Co. v. Blaw-Knox Co.,* 239 F.2d 774, 778 (6th Cir.1957); *Med-Tec Iowa, Inc. v. Nomos Corp.,* 1999 WL 1084253, at \*6 (N.D.Iowa 1999); *Fat Possum Records Ltd. v. Capricorn Records, Inc.,* 909 F.Supp. 442, 446 (N.D.Miss.1995); *but see Northwest Airlines, Inc. v. Astraea Aviation Serv., Inc.,* 930 F.Supp. 1317, 1327 n. 9 (suggesting that first-served action may take priority).

In the present case, this conclusion is fully consistent with the concerns that gave rise to the rule. In *University of Pennsylvania,* the court noted that the rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." 850 F.2d at 971. In Weavexx's declaratory judgment action in North Carolina, the district court recently granted Asten's motion to stay proceedings pending this court's consideration of the instant motion. In so doing, the court stated: "Moreover, the Delaware complaint was filed, if not served, first. This Court sees no reason why the Delaware Court should not be allowed to determine whether to retain jurisdiction before the instant action is allowed to proceed." In light of that ruling, allowing this case to proceed in Delaware would not result in duplicative litigation, and would not undermine comity between federal courts of equal rank.

Finally, it should be noted that in response to the court's inquiry, counsel for Weavexx conceded that at the time Weavexx filed its declaratory judgment action in North Carolina, it was aware that Asten had already filed its complaint here in Delaware. Weavexx offers no explanation as to what function its declaratory judgment action could serve that a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 4

Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

counterclaim in the instant action could not. Under these circumstances, the court concludes that the first-filed rule does not provide a basis for staying these proceedings or transferring this case to the Eastern District of North Carolina.

### B. Transfer Pursuant to 28 U.S.C. § 1404

The first-filed rule does not, of course, preclude Weavexx's motion for transfer pursuant to 28 U.S.C. § 1404. That section provides as follows:
For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it may have been brought.

Although the decision to transfer a case is subject to the court's discretion, a plaintiff's choice of forum is a "paramount" consideration that is not to be " lightly disturbed." *Schutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970); *see also Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879-80 (3d Cir.1995). As such, Weavexx has a heavy burden to carry. The court should not grant a transfer unless the "balance of convenience" weighs strongly in favor of transfer. *See Schutte,* 431 F.2d at 25.[FN5]

> FN5. Weavexx attempts to incorporate its position regarding the first-filed rule into its § 1404 analysis, arguing that Asten has the burden of establishing that the balance of convenience strongly favors Delaware. Opening Br. at 9. Since the court has already rejected Weavexx's position that the North Carolina action was "first-filed," it need not decide whether a contrary conclusion would have reversed the burden of persuasion in a § 1404 analysis, as Weavexx contends. The court does note, however, that the case Weavexx cites for that proposition, *Ballard Medical Products v. Concord Lab., Inc.,* 700 F.Supp. 796 (D.Del.1988), does not support Weavexx's view. Rather, the earlier filed action in *Ballard* was simply considered as a factor favoring transfer-it did not reverse the burden of persuasion. *See id.* at 800-01.

**\*4** In *Jumara,* the Third Circuit Court of Appeals identified a nonexclusive list of factors that have been used to guide courts in the exercise of their discretion in ruling on requests for transfer. *See Jumara,* 55 F.3d at 879-80; *see also Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 196-97 (D.Del.1998). The factors most relevant to this case are discussed below.[FN6]

> FN6. As a threshold matter, this action could have been brought in the Eastern District of North Carolina. *See* 28 U.S.C. § § 1391(b), 1400(b). The court can, therefore, proceed to weighing the factors for and against transfer.

### 1. The Convenience of the Parties

Litigating this case in North Carolina would be more convenient for Weavexx. Weavexx is headquartered in Wake Forest, which is within the Eastern District of North Carolina. Weavexx has identified six employees likely to testify at trial, each of whom resides within the Eastern District. The accused product was designed in Wake Forest, and Weavexx contends that the vast majority of its documents and records relating to the accused product are maintained at its Wake Forest headquarters.

Weavexx also claims that litigating this case in North Carolina would be more convenient for Asten. The entirety of Weavexx's "proof" in this regard is the fact that Asten is headquartered in Charleston, South Carolina. Asten does not vigorously contend, however, that Delaware is more convenient. Although Asten notes that its relevant documents and at least one of its testifying employees are located in Appleton, Wisconsin, it has done little to establish that these facts make Delaware any less inconvenient than North Carolina.

The court, therefore, concludes that North Carolina would be more convenient than Delaware for Weavexx, and no more inconvenient than Delaware for Asten. While this factor therefore favors transfer, it does so only slightly. Weavexx concedes that it is financially able to shoulder the expense of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

litigating this case in Delaware. Further, Weavexx has not established that its business would be disrupted if the employees that are expected to testify at trial must do so in Delaware. Weavexx maintains manufacturing facilities in several southern states and in Canada. It is likely that the six employees Weavexx identifies-upper level management including the company's president and three vice-presidents-are sometimes called upon to travel for company business. Finally, Weavexx has managed to survive two previous lawsuits filed in Delaware *by Weavexx* against Asten.

### 2. The Convenience and Availability of the Witnesses

The convenience of witnesses is often an important factor in a transfer inquiry. *See* 15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS § 3851, at 415 (2d ed.1986) [hereinafter WRIGHT & MILLER] (describing this factor as "[p]robably the most important factor, and the factor most frequently mentioned, in passing on a motion to transfer"). The convenience of witnesses is only considered, however, "to the extent that the witnesses may actually be unavailable for trial in one of the fora." *Jumara*, 55 F.3d at 879 (citing WRIGHT & MILLER § 3851, at 420-22). Thus, for example, the convenience of witnesses that are employees of a party carries no weight because the parties are obligated to procure their attendance at trial. *See Affymetrix*, 28 F.Supp.2d at 203.

**\*5** Weavexx claims that North Carolina is a more convenient forum than Delaware for most of both parties' witnesses. But Weavexx has failed to sufficiently identify any witnesses that "may actually be unavailable for trial" in Delaware. Indeed, the six "primary anticipated fact witnesses" that Weavexx identifies are all upper level Weavexx employees. As such, Weavexx should be able to assure their attendance at trial.[FN7]

FN7. Weavexx appears to contend that one

of its employee witnesses-the inventor of the accused product-should be treated as a non-party witness because he is scheduled to retire from Weavexx before the anticipated trial date. Opening Br. at 11. Weavexx, however, provides no information-by affidavit or otherwise-to suggest that this witness may be unavailable for trial in Delaware (or, for that matter, that he plans to remain within the subpoena power of the Eastern District of North Carolina after his retirement). The court is, therefore, not persuaded that this employee's anticipated retirement should have a significant impact on the transfer inquiry.

Weavexx also claims that three of the four "major domestic manufacturers of papermaking fabric" are headquartered in either North or South Carolina. Therefore, it asserts that "it is clearly more likely that witnesses having knowledge regarding relevant prior art would be within the subpoena power of the North Carolina Court." Opening Br. at 11. While this may or may not be a reasonable assumption,[FN8] such unsupported speculation about unspecified witnesses does not carry much weight in a transfer analysis. *Affymetrix*, 28 F.Supp.2d at 205. Further, two of the three "major domestic manufacturers" headquartered in the Carolinas are Asten and Weavexx themselves. As already noted, the convenience of party witnesses generally receives no weight in a transfer analysis. *Id.* at 203.

FN8. For example, although Asten is headquartered in South Carolina, its employee that is apparently most knowledgeable about the prior art of the '839 patent is located at Asten's manufacturing facility in Appleton, Wisconsin.

As such, to the extent that the convenience and availability of witnesses weighs at all in favor of transfer, it does so only slightly.

### 3. Other Factors

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 6

Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Although Weavexx principally relies on the two factors discussed above, it recites several other factors that supposedly favor transfer. For example, Weavexx notes that since 1996, the average time from filing to trial for civil actions is 19.3 months in Delaware as compared to 16.5 months in North Carolina. But for the most recent period-the year ending June 30, 1999-Weavexx's statistics show that the average time to trial was one month longer in North Carolina than in Delaware. Virtually all of the other statistics provided by Weavexx (but not cited in its brief) suggest that court congestion is actually worse in the Eastern District of North Carolina than in the District of Delaware. Moreover, Magistrate Judge Thynge of this district served as a mediator in both of the prior Delaware actions between the parties. Judge Thynge will again be available in the present action. It appears, therefore, that administrative considerations and judicial economy actually weigh against transfer. [FN9]

> FN9. As already noted, the district court in North Carolina has granted Asten's motion to stay proceedings in the declaratory judgment action pending this court's decision on Weavexx's motion to transfer. Therefore, there does not appear to be a risk of duplicative litigation if this motion is denied.

Next, Weavexx attempts to characterize this action as a "local controversy" that should be decided close to home. *See Jumara*, 55 F.3d at 879. The court fails to see how a patent infringement action involving two large companies that (1) are incorporated in Delaware; (2) are headquartered in different states; and (3) maintain manufacturing facilities in various states and Canada can be considered a "local" North Carolina controversy. Such characterization seems particularly inappropriate where, as here, the competing products at issue are manufactured in Wisconsin and Brazil.

**\*6** The court finds that the other factors referred to by Weavexx, including those not discussed herein, do not weigh significantly, if at all, in favor of

transfer.

### 4. Weighing of Factors

The court recognizes that the ties between this litigation and the state of Delaware are not substantial. Nevertheless, Asten's choice of this forum is a "paramount" consideration that is not to be "lightly disturbed." *Schutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir.1970). After weighing the factors discussed above, the court finds that Weavexx has failed to meet its heavy burden of establishing that the "balance of convenience" tips strongly in favor of transfer. As such, Weavexx has failed to establish that transfer is appropriate pursuant to 28 U.S.C. § 1404.

### IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Weavexx's motion to transfer this case to the United States District Court for the Eastern District of North Carolina is DENIED; and

2. Weavexx's alternative request to stay these proceedings pending resolution of Weavexx's declaratory judgment action in the Eastern District of North Carolina is DENIED.

D.Del.,2000.
Asten Inc. v. Weavexx Corp.
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.