**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NOKIA CORPORATION and NOKIA, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-509 |
| | ) | |
| QUALCOMM INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS NOKIA CORPORATION AND**
**NOKIA INC.'S OPENING BRIEF IN**
**SUPPORT OF THEIR MOTION TO REMAND**

OF COUNSEL:

A. William Urquhart
Frederick Lorig
Patrick Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Richard I. Werder, Jr.
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Dated: August 18, 2006

Thomas A. Beck (#2086)
beck@rlf.com
Lisa A. Schmidt (#3019)
schmidt@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Steven J. Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19899
(302) 651-7700

Attorneys for Plaintiffs Nokia Corporation and Nokia, Inc.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................................... ii

NATURE AND STAGE OF THE PROCEEDINGS ...................................................................... 2

STATEMENT OF FACTS ............................................................................................................. 3

    A.    THE EUROPEAN TELECOMMUNICATIONS STANDARDIZATION
         INSTITUTE. ................................................................................................................. 3

    B.    QUALCOMM'S BREACHES OF THE ETSI IPR POLICIES. ................................... 4

    C.    THE CHANCERY COURT ACTION. ........................................................................ 5

ARGUMENT .................................................................................................................................. 6

CONCLUSION ............................................................................................................................. 12

## TABLE OF AUTHORITIES

### CASES

*Ballard Med. Prods. v. Wright,*
823 F.2d 527 (Fed. Cir. 1987)..................................................................................................10

*Beghin-Say Int'l, Inc. v. Ole-Bendt Rasmussen,*
733 F.2d 1568 (Fed. Cir. 1984)..........................................................................................1, 7, 10

*Caterpillar Inc. v. Williams,*
482 U.S. 386 (1987)..................................................................................................................6

*Christianson v. Colt Indus. Operating Corp.,*
486 U.S. 800 (1988)..............................................................................................................6, 7

*Commercial Sales Network v. Sadler-Cisar, Inc.,*
755 F. Supp. 756 (N.D. Ohio 1991)........................................................................................10

*Consolidated World Housewares, Inc. v. Finkle,*
831 F.2d 261 (Fed. Cir. 1987)................................................................................................10

*DML Associates Inc. v. Mattel, Inc.,*
2003 WL 1798559 (D. Del. Apr. 7, 2003)................................................................................9

*Franchise Tax Bd. v. Construction Laborers Vacation Trust,*
463 U.S. 1 (1983).....................................................................................................................6

*Gupta v. Avanta Orthopaedics, Inc.,*
No. 3:03CV-617S, 2005 U.S. Dist. LEXIS 14728 (W.D. Ky. July 20, 2005) ...............................10

*Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.,*
535 U.S. 826 (2002)..................................................................................................................6

*Lear Siegler, Inc. v. Sargent Industries, Inc.,*
374 A.2d 273 (Del. Super. Ct. 1977) ........................................................................................7

*Licursi v. Jamison Plastic Corp.,*
No. 98-5262, 1998 U.S. Dist. LEXIS 18554 (E.D. Pa. Nov. 20, 1998) ........................................10

*Shamrock Holdings of California, Inc. v. Arenson,*
2005 WL 400198 (D. Del. Jan. 27, 2005)..................................................................................6

*Uncommon USA, Inc. v. Weise,*
No. 05-975, 2005 U.S. Dist. LEXIS 17594 (D. Minn. Aug. 19, 2005)..........................................10

ii

*Warrington v. Allen Family Foods,*
2004 WL 2730215 (D. Del. Nov. 30, 2004) ...................................................................................6

## STATUTES

28 U.S.C. § 1338(a) ........................................................................................................................6

28 U.S.C. § 1441.............................................................................................................................6

28 U.S.C. § 1447(c) ........................................................................................................................6

iii

Defendant has improperly removed a case that merely asks the Delaware Court of Chancery to determine the respective contractual obligations of the parties. There was and is no federal question. No patent need be construed, much less evaluated for infringement or validity, and the Complaint does not even identify any patent. Defendant's purported basis for removal is that the contractual obligations at issue involve a patent license. But it has long been the law that interpreting or enforcing a contract covering patent rights does not raise a federal question. This case therefore falls squarely within the well-settled rule that an action based on a contract, which involves underlying patent rights, does not arise under the federal patent law. *See, e.g.*, *Beghin-Say Int'l, Inc. v. Ole-Bendt Rasmussen*, 733 F.2d 1568, 1570-71 (Fed. Cir. 1984).

Defendant incorrectly argues that plaintiffs' breach of contract claim will require the court to determine whether defendant's declared-essential patents are in fact essential and infringed. Defendant is wrong. The Chancery Court has not been asked to evaluate essentiality or infringement of any patent or to determine any royalty for any patent. The infringement of any patent is not at issue. Instead, the Chancery Court has been asked to hold defendant to its contractual commitment not to seek injunctive or exclusionary relief with respect to any patent defendant has declared essential to a standard and to resolve a dispute over the interpretation of defendant's commitment to license its declared-essential patents for a "fair, reasonable, and non-discriminatory royalty." Defendant has filed patent infringement cases involving its declared-essential patents in England, France, Germany, and the United States seeking the contractually prohibited injunctive relief. Interpretation of defendant's contractual commitment will control defendant's ability to seek such relief.

Simply stated, this case does not involve a federal patent question. As alleged in the Complaint, the case seeks to enforce the parties' contract and define the parties' contractual rights and obligations. It is nothing more and nothing less.

Defendant sought removal shortly after the Chancery Court stated that it could try this case by the early part of next year. Removal and transfer will stall that trial. Defendant's imaginative effort to insert a non-existent federal question of federal patent law into this breach of contract action to divest the proper court of jurisdiction should be rejected, and the case should be promptly remanded to the Chancery Court.

## NATURE AND STAGE OF THE PROCEEDINGS

On August 8, Nokia Inc. (a Delaware corporation) and Nokia Corporation (hereafter jointly referred to as "Nokia") filed a Complaint against a Delaware corporation, Qualcomm Incorporated ("Qualcomm"), in the Delaware Chancery Court. Nokia seeks a declaratory judgment, injunctive relief, and specific performance arising from Qualcomm's breaches of a binding contract between the parties. Although the Complaint raises very serious contract issues, it presents no questions of federal patent law. Nokia also filed a Motion to Expedite Proceedings seeking a trial on the merits within 6 months.

On August 11, Vice Chancellor Strine held a Scheduling Conference. A copy of the hearing transcript is attached as Exhibit A. The Vice Chancellor reviewed the parties' positions and indicated that the court could provide an expedited trial. Qualcomm indicated it would move to dismiss or stay the action, and the Vice Chancellor instructed the parties to agree to an expedited briefing schedule, ordered that discovery served by Nokia proceed, and indicated that, if the court retained jurisdiction, a trial date would be set for early 2007. The Vice Chancellor also advised Qualcomm that if any other infringement actions were initiated, the Court would immediately schedule a trial on the merits.

2

The Chancery Court requested that the parties submit a status report and a final briefing schedule on August 16. On August 16, Qualcomm instead filed a Notice of Removal. Nokia respectfully submits this Opening Brief in Support of its Motion to Remand to the Chancery Court.

**STATEMENT OF FACTS**

**A.    The European Telecommunications Standardization Institute.**

Nokia and Qualcomm are both members of the European Telecommunications Standardization Institute ("ETSI"), a standard setting organization ("SSO") based in France that is responsible for standardizing technology for cellular telephones. (Ex. B at ¶10). SSOs establish a common set of industry standards that allow for the interoperability of cellular telephone equipment — fostering competition by allowing the products of various cellular handset manufacturers and cellular equipment manufacturers to interact together in a common cellular network. (*Id.* at ¶14). Cellular telephone technology has been through a number of generations, with multiple standards for each generation.

ETSI is responsible for developing and maintaining the second-generation standard known as Global Systems for Mobility ("GSM") and its third-generation successor, Universal Mobile Telephone System ("UMTS"). Before a standard is adopted, ETSI requires its members to identify all patents they hold that would be "essential" to the standard if adopted. (Ex. B at ¶22). Under the ETSI Intellectual Property Rights ("IPR") Policies, ETSI then requests the owners of these patents to agree contractually to grant irrevocable licenses to other members on terms that are fair, reasonable, and non-discriminatory ("FRAND" terms). (*Id.* at ¶24). If an

3

owner refuses to make this commitment, ETSI may reject this candidate's technology in favor of a non-infringing alternative.[1]

In agreeing to license on FRAND terms, ETSI members necessarily give up the right to pursue injunctive relief against other members. The agreement to license on FRAND terms and to forfeit the right to seek injunctive relief is critical because it prevents a member, like Qualcomm, from unfairly exploiting the market power created when a standard utilizing its patented technology is adopted. Furthermore, the requirement to license on FRAND terms allows other members to invest in utilizing the standard without fear of being enjoined or forced to pay an unreasonably high monopolistic royalty. (Ex. B at ¶25).

## B.    Qualcomm's Breaches of the ETSI IPR Policies.

Qualcomm has declared unequivocally in writing that numerous Qualcomm patents are essential to the GSM and/or UMTS standards and that it will license those patents on FRAND terms. (Ex. B at ¶34). However, despite its contractual obligations to ETSI and Nokia, Qualcomm has refused to offer Nokia FRAND license terms for its declared-essential patents and has, in violation of its contractual commitment, pursued injunctions against Nokia with respect to declared-essential patents. (*Id.* at ¶34).

---

[1] A patent holder like Qualcomm derives substantial benefits from having its intellectual property declared essential to an ETSI standard. Incorporation of the patent holder's technology into a standard eliminates the competing technology and grants the patent holder a *de facto* monopoly in the standard. Any party that is practicing an adopted standard is by definition infringing patents that are essential to its operation. This provides a patent holder with a defined universe of royalty payers for truly essential patents. Industry participants often spend huge sums developing networks that operate on the standards, locking themselves into the standard and to paying royalties to those who hold essential patents. Requiring a commitment to license on FRAND terms is the only way to prohibit an essential patent holder from improperly exploiting the technology monopoly granted by the standard.

4

When Nokia filed its Complaint, it was aware that Qualcomm had filed three patent infringement actions against Nokia in which Qualcomm violated its contractual commitments and sought injunctions with respect to patents it had declared essential to ETSI standards: in the federal court in San Diego, in the International Trade Commission (asserting a number of the same patents covered by the San Diego suit), and in England. (Ex. B at ¶35). The day before the Scheduling Conference, Nokia was informed of yet another suit, this one in Germany. Shortly after the conference, Qualcomm informed Nokia that it had also filed suit in France. Qualcomm declined Nokia's request that it disclose other jurisdictions in which it has filed suit.

## C. The Chancery Court Action.

In its Complaint in this action, Nokia requested that the Chancery Court: (i) enjoin Qualcomm from seeking an injunction against Nokia for alleged infringement of any patent Qualcomm has declared essential for an ETSI standard; (ii) declare that Qualcomm's FRAND declarations are enforceable contractual obligations; (iii) declare that a FRAND royalty must be based on certain specified factors; and (iv) declare the rights and obligations of the parties and require that Qualcomm comply with its obligations under the contract.

On August 11, the Chancery Court held a Scheduling Conference. Vice Chancellor Strine advised the parties that the court had time available in early 2007 for an expedited trial and directed the parties to submit an agreed-upon expedited schedule for Qualcomm's contemplated motion to dismiss or stay by August 16. On August 16, in lieu of submitting the requested briefing schedule, Qualcomm filed a Notice of Removal.

5

## ARGUMENT

Qualcomm's removal was improper because this Court lacks subject matter jurisdiction over Nokia's breach of contract claims. There is no diversity and no federal question. 28 U.S.C. § 1447(c); *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (removal of an action from state court is only permissible for "actions that originally could have been filed in federal court"). Qualcomm, as the moving party, bears the burden of proving that removal was proper. *Shamrock Holdings of California, Inc. v. Arenson*, 2005 WL 400198, at *3 (D. Del. Jan. 27, 2005). In determining whether Qualcomm has met that burden, this Court must narrowly construe the removal statute, 28 U.S.C. § 1441, and any doubts are to be resolved in favor of remand. *Warrington v. Allen Family Foods*, 2004 WL 2730215, at *1 (D. Del. Nov. 30, 2004).

Qualcomm's claimed basis for removing this case is that "United States patent law is a necessary element of plaintiff's claims." (Ex. C at ¶4). That is plainly false. Nokia's claims are based on breach of contract. They involve no federal patent law question, and require no interpretation of any patent and no determination that any patent has been infringed.

In order for removal to be proper under this Court's federal question jurisdiction, the causes of action, must "arise under" the Constitution, laws or treaties of the United States. *See Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 8 (1983). This Court has federal question jurisdiction only in cases in which a well-pleaded complaint establishes either that: (1) federal law creates the cause of action or (2) the plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal law. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808 (1988). As further elaborated by the Supreme Court, patent jurisdiction exists only where "a plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law." *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 830 (2002). When applied to 28 U.S.C. § 1338(a), whether

6

a claim "arises under" the patent laws is determined from what necessarily appears in the plaintiff's statement of his own claim, unaided by anything the defendant might allege in defense of the plaintiff's claim. *Christianson*, 486 U.S. at 809. In other words, patent law jurisdiction "extends only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Id.* at 801.

It is clear from the face of Nokia's Complaint that this is an action for specific performance of a contract and for declaratory relief, unrelated to the patent laws. All of Nokia's claims relate to patents that Qualcomm has "declared" essential and to Qualcomm's refusal to license its "declared-essential patents to Nokia on FRAND terms," as required by Qualcomm's written commitment to ETSI and ETSI's members. (Ex. B at ¶¶ 26, 30-31, 34, 45, 54-55, 58-59, 64, 68, A, B, E). Specifically, Nokia's claims are premised on the irreparable harm arising from Qualcomm's breach of a contractual agreement — governed by French law and enforceable in the courts of an ETSI member's country — that Qualcomm has made to license on FRAND terms patents that it has declared essential. This case therefore falls squarely within the well-settled rule that an action based on a contract, which involves underlying patent rights, does not arise under the patent law. *See e.g.*, *Beghin-Say Int'l, Inc.*, 733 F.2d at 1570-71; *see also Lear Siegler, Inc. v. Sargent Industries, Inc.*, 374 A.2d 273, 275-276 (Del. Super. Ct. 1977) (where a complaint is "one for recovery of royalties under a contract of license or assignment, or for damages for a breach of its covenants, or for a specific performance thereof . . . [it] does not give the federal district court jurisdiction of the cause as one arising under the patent laws"). Nokia's Complaint does not raise any question of patent validity, construction, or infringement; indeed, it

7

does not even identify a single Qualcomm patent. Since this action is not about any particular patent that has been declared essential by Qualcomm, but rather relates to all declared-essential patents, the question whether any particular patent is or is not essential is irrelevant to the relief Nokia requests from the Chancery Court.

To avoid this obvious conclusion, Qualcomm misstates Nokia's claims and argues that "[r]esolution of plaintiffs' claims necessarily requires a determination under the U.S. patent law as to whether certain patents are 'ESSENTIAL' — that is, whether practicing the relevant standard is 'not possible . . . without infringing.'" (Ex. C at ¶8). Qualcomm asserts that Nokia's breach of contract claims will require the court to determine whether Qualcomm's declared-essential patents are in fact essential, which — Qualcomm asserts — in turn will require an assessment of whether they are infringed. Qualcomm is wrong. The Chancery Court has not been asked to determine the essentiality, validity, infringement, or royalty payment for any Qualcomm patent. Instead, it has been asked to enforce Qualcomm's contractual commitment not to seek injunctive relief for patents Qualcomm has declared essential and to provide a contract interpretation for FRAND terms that are arguably in dispute. Qualcomm has filed cases in England, France, Germany, and the United States where interpretation of this contractual commitment will control the relief Qualcomm, a Delaware corporation, can seek. Nokia's breach of contract claims with respect to Qualcomm's declared-essential patents do not require any determination of whether any particular patent is in fact essential.

Because the Complaint requests relief only with respect to patents "which Qualcomm has declared essential to the GSM or UMTS standards established by ETSI" (Ex. B at ¶A) (emphasis added), the Complaint plainly does not place in issue the federal patent law questions posited by Qualcomm, and the cases on which Qualcomm relies in its Notice of Removal are irrelevant. In

8

each of those cases resolution of a state-law claim required interpretation of patents and a determination that the products in issue were covered by a patent. That is not the case here. Nowhere in the Delaware Complaint has Nokia challenged the propriety of Qualcomm's declaration of certain patents as essential nor will it do so. Instead, Nokia's claims are premised on the fact that Qualcomm has contractually agreed to license all patents it has declared essential to the relevant ETSI standards. Qualcomm may desire to raise defensively the proposition that patents that it has declared essential (including some that it declared essential as late as 2005) may or may not be essential. But that is irrelevant to the issues raised in the Complaint and to the existence of federal question jurisdiction, which is evaluated solely on the basis of Nokia's well-pleaded Complaint.[2]

Because Nokia challenges only Qualcomm's failure to license its declared essential patents on FRAND terms, its claims present no more than a licensing dispute of the sort this Court and other courts have previously held should proceed in state court. In *DML Associates, Inc. v. Mattel, Inc.*, for example, this Court recognized that "[t]he fact that [a license agreement] relates in part to patents, or that patent issues could arise, does not make the case removable." 2003 WL 1798559, at *2 (D. Del. Apr. 7, 2003). Furthermore, whether patent issues may arise in this case as ancillary to the breach of contract issues that dominate the Complaint should be of no moment to this Court:

> [T]he fact that patent law issues might arise in the state court
> provides no basis for removal because state courts may decide
> patent questions that bear on claims in those courts. As the Federal
> Circuit has recognized, "the statutory limits on the jurisdiction of
> this court and the federal district courts, in conjunction with the

---

[2] Qualcomm's apparent position that it has declared patents essential that may later be proven not to be essential does not affect the contractual commitment to license Qualcomm declared essential patents on FRAND terms. That also does not present a federal patent issue.

9

> well-pleaded complaint rule, can and do result in state courts
> resolving patent issues."

*Id.* at \*3 (citing *Speedco, Inc. v. Estes*, 853 F.2d 909, 913 (Fed. Cir. 1988)). Consistent with this

holding, the Federal Circuit has also held that while "the scope of a licensed patent may control

the scope of a license agreement, [the] rule of contract law cannot possibly convert a suit for

breach of contract into one 'arising under' the patent laws." *Ballard Med. Prods. v. Wright*, 823

F.2d 527, 530 (Fed. Cir. 1987); *see also Consolidated World Housewares, Inc. v. Finkle*, 831

F.2d 261, 265 (Fed. Cir. 1987) ("[T]he mere presence of a patent issue cannot of itself create a

cause of action arising under the patent laws. . . .  That a contract action may involve a

determination of the true inventor does not convert that action into one 'arising under' the patent

laws."); *Beghin-Say Int'l*, 733 F.2d at 1570-71.[3]  As was the case in *Mattel*, the claims asserted

by Nokia here do not "arise under" the patent laws because Nokia has not raised any patent law

issues such as infringement or validity and, therefore, there is no basis for removal.

Qualcomm's Notice of Removal is nothing more than an attempt to divest the Chancery

Court of its Constitutional jurisdiction to resolve a contractual dispute between two Delaware

corporations. Qualcomm obviously fears a prompt resolution that could require it to abide by its

---

[3] Numerous district courts are in accord. *See Uncommon USA, Inc. v. Weise*, No. 05-975, 2005 U.S. Dist. LEXIS 17594 at \*11-13 (D. Minn. Aug. 19, 2005) (remanding breach of contract case removed on basis of need to determine whether certain flagpoles arise from or are related to certain patents; defendant failed to show that the patent law issues he identified "will be essential to the determination of whether his alleged actions breached" the contract); *Gupta v. Avanta Orthopaedics, Inc.*, No. 3:03CV-617S, 2005 U.S. Dist. LEXIS 14728, at \*7-8 (W.D. Ky. July 20, 2005) (remanding case asserting state law claims that had been removed on basis of need to resolve patent inventorship issue; fact that claims involve a contract or license relating to a patent do not make the case a patent suit); *Commercial Sales Network v. Sadler-Cisar, Inc.*, 755 F. Supp. 756, 758-59 (N.D. Ohio 1991) (remanding breach of contract case involving patent rights on ground that patent issues are merely "incidentally implicated"); *Licursi v. Jamison Plastic Corp.*, No. 98-5262, 1998 U.S. Dist. LEXIS 18554, at \*6-11 (E.D. Pa. Nov. 20, 1998) (remanding breach of contract case removed on basis of need to resolve inventorship — a question of federal patent law — in order to resolve contract claim).

10

contractual commitment and license its declared-essential patents on FRAND terms. Qualcomm contracted away its current course of action and that is what the underlying suit is about. Qualcomm cannot carry its burden of demonstrating that this Court has federal question jurisdiction because there is no federal question raised in this litigation. As a result, this case should be promptly remanded to the Chancery Court where it properly belongs.

11

## CONCLUSION

For the foregoing reasons, Nokia respectfully requests that this Court grant its Motion to Remand and remand this action to the Court of Chancery so it can be promptly adjudicated on the merits.

OF COUNSEL:

A. William Urquhart
Frederick Lorig
Patrick Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Richard I. Werder, Jr.
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Dated: August 18, 2006

Thomas A. Beck (#2086)
beck@rlf.com
Lisa A. Schmidt (#3019)
schmidt@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Steven J. Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19899
(302) 651-7700

Attorneys for Plaintiffs Nokia Corporation and Nokia Inc.

12

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2006, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and by hand

delivery to the following:

> Matthew E. Fischer, Esquire
> Potter Anderson & Corroon LLP
> 1313 North Market Street
> P.O. Box 951
> Wilmington, Delaware 19899

Steven J. Fineman (#4025)

RLF1-3049400-1

# EXHIBIT A

81106scs.txt

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| NOKIA CORPORATION and NOKIA, INC. | : | |
| | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | Civil Action |
| | : | No. 2330-N |
| QUALCOMM INCORPORATED, | : | |
| | : | |
| Defendant | : | |

- - -

Chancery Court Chambers
New Castle County Courthouse
Wilmington, Delaware
Friday, August 11, 2005
11:00 a.m.

BEFORE:   HON. LEO E. STRINE, JR., Vice Chancellor.

- - -

SCHEDULING CONFERENCE

- - -

----------------------------------------------------------

CHANCERY COURT REPORTERS
500 North King Street - Suite 11400
Wilmington, Delaware 19801-3759
(302) 255-0525

2

1   APPEARANCES:

2           LISA SCHMIDT, ESQ.
            JEFFREY L. MOYER, ESQ.
3           ELIZABETH C. TUCKER, ESQ.
            Richards, Layton & Finger
4                 -and-
            FREDERICK LORIG, ESQ.
5           A. WILLIAM URQUHART, ESQ.
            of the California Bar
                      Page 1

81106scs.txt

 6          Quinn Emanuel Urquhart Oliver & Hedges, LLP
                              -and-
 7          JANE MUTIMEAR, ESQ.
            Of the United Kingdom Bar
 8          Bird & Bird
               for Plaintiffs Nokia Corporation and
 9             Nokia, Inc.

10

            MATTHEW E. FISCHER, ESQ.
11          RICHARD L. HORWITZ, ESQ.
            Potter, Anderson & Corroon LLP
12                       -and-
            RICHARD J. STARK, ESQ.
13          of the New York Bar
            Cravath Swaine & Moore
14                       -and-
            CHRISTIAN E. MAMMEM, ESQ.
15          of the California Bar
            Day Casebeer Madrid & Batchelder
16             for Defendant QUALCOMM Incorporated

17    ALSO PRESENT:

18          RICHARD W. STIMSON, ESQ.
            ARI LAAKKONEN, ESQ.
19             In-house counsel for Nokia

20
                              - - -
21

22

23

24
                                                    3


 1                 THE COURT:  We have someone on the

 2    phone?

 3                 MR. FISCHER:  Yes.  We have

 4    Chris Mammem from the Day Casebeer firm in California

 5    for QUALCOMM.  Richard Stark of Cravath for QUALCOMM,

 6    and Rich Horwitz of my firm.

 7                 MS. SCHMIDT:  Your Honor, this is

 8    Fred Lorig and William Urquhart from the

 9    Quinn Emmanuel Urquhart firm for Nokia, and

10    Elizabeth Tucker of Richards Layton, Jane Mutimear

11    from Bird & Bird, and Ari Laakkonen and

12    Richard Stimson of Nokia, Inc.
                           Page 2

81106scs.txt

13                    THE COURT:  Good morning.

14                    I've read all the papers.  I'm happy

15   to consider, you know, whether to -- this Court has a

16   role to play in this dispute.  But I do think the

17   first thing that needs to be done is essentially brief

18   up whether this is a proper place to bring this

19   dispute, especially given the pending actions.  And

20   I'm influenced by the fact that I don't gainsay the

21   importance of this to Nokia.  I'm sure this is a very

22   important thing and you've got multiple litigations

23   going on.  You have multiple litigation going on.  I

24   mean, it wasn't like it all popped up and you said we
                                                        4

1    got to get going on this and we're going to shut this

2    down entirely right away.

3                    Now, I understand you've got sort of a

4    whack-a-mole situation going on, or you think that

5    there's proliferating injunction actions from QUALCOMM

6    everywhere.

7                    The reality is, though, that doesn't

8    necessarily mean you don't have to put your marker

9    down somewhere where the cases are pending.  I'm not

10   prejudging that, but I'm at least interested in that

11   notion.  I'm at least interested in the notion in

12   whether or not this would be considered the national

13   court.

14                    Delaware courts are rightly concerned

15   when Federal Court's intrude in issues of state law.

16   Frankly, Delaware doesn't particularly like it when

17   some states have gotten creative and dishonor the

18   contract rights of securities holders.  And the

                         Page 3

81106scs.txt

19    corporations sell securities by trying to intrude on
20    the internal affairs of corporations through all kinds
21    of interesting statutes, which don't seem to honor
22    those contracts or give full faith and credit to the
23    laws of other states.  What comes about consideringly
24    with that sort of concern to protect one less
                                                        5

1     legitimate territory is to also recognize that there
2     are areas in which we don't have the same legitimacy
3     as the federal courts.  I don't know if this is one.
4     I'm not prejudging it.  When I see something -- a
5     reference to national courts -- I have to say it
6     doesn't occur to me immediately that it's necessarily
7     the case that any court within a nation qualifies for
8     that.  It might have been rationally thought by
9     whatever the entity was.
10                  What that means is that we're a bunch
11    of nations bringing together -- coming together.
12    We're trying to work together.  We're going to presume
13    on the part of the nations involved in this that the
14    judicial system in those nations will responsibly
15    adjudicate the disputes and that ultimately those
16    systems will culminate in some national court which
17    will bless whatever rulings are done at the lowest
18    level of the system.  It's not necessarily clear to
19    me -- it is true that you could possibly get a writ of
20    certiorari from the Delaware Supreme Court to the
21    United States Supreme Court.  It's not immediately
22    clear to me that that's what they meant.
23                  I don't know anything about Germany.
24    I know more about soccer and beer from Germany than
                                                        6

81106scs.txt

1  the German courts, but some of them have federal
2  governments or different local governments where they
3  may have court systems that aren't part of the nation.
4  You know, I just don't know.
5              What I also know is that this is
6  clearly no more a court -- a national court of the
7  United States than any of the federal district courts,
8  and it's not clear to me why the request for
9  injunctive relief that's sought here could not have
10 been sought in those other pending cases, which is not
11 only can, you know, QUALCOMM not get an injunction,
12 Your Honor, we are moving affirmatively for you to
13 issue an injunction against them because of what
14 they're trying to do to us worldwide by dishonoring
15 their obligations to us under this essentially -- this
16 contract that arises by virtue of this and present
17 that to a federal judge.
18              I had not known the federal courts
19 were without authority to issue injunctions with
20 nationwide effect and perhaps international effect
21 with the party before it who's invoked their
22 jurisdiction.
23              Without going on about it, I mean,
24 those are the things I'm going to be interested in.
                                                    7

1  We've got the first-filed doctrine, we've got the
2  notion of what this is.  When I first got the case and
3  I read -- this is a classic joint venture.  Somebody
4  has got to leave it in Delaware law.  What you've got
5  is a de facto contract by virtue of something going on
6  in France, and QUALCOMM happens to be a Delaware

                    Page 5

81106scs.txt
```
 7  corporation.  I'm happy to entertain a tighter
 8  briefing schedule.  I would ask Nokia -- not Nokia --
 9  I would ask QUALCOMM to commit to when they could file
10  its motion to dismiss.
11              when do you think, Mr. Fischer, you
12  could get a brief in, or something like that?
13              MR. FISCHER:  I think we'd like at
14  least a couple of weeks.  Is that asking for too much?
15              THE COURT:  They'll tell you that it
16  is.  I think a couple weeks is not too much.
17              MR. FISCHER:  Well, in light of what's
18  going on in the other litigations, I don't think two
19  weeks -- there's nothing immediately pending that we
20  need to -- I think two weeks is reasonable.
21              MR. LORIG:  If I can respond.  Two
22  weeks normally, I think, would be reasonable, even if
23  you're the other party.  The problem we have is we're
24  dealing with an injunction-case-of-the-day.  Yesterday
                                                 8

 1  they filed another case in Germany asking for an
 2  injunction.  If we're going to take time and brief
 3  this matter for a couple of weeks, can we at least get
 4  a stipulation from QUALCOMM that, until the courts
 5  jurisdiction is decided, they won't file any more
 6  patent infringement suits in foreign countries.  I'm
 7  not talking about the United States.  That's already
 8  done.  I'm talking about outside of the United States.
 9              will QUALCOMM agree, in return for a
10  civilized briefing schedule so we can air the issues,
11  not to file any further patent infringement actions in
12  countries outside of the United States?
13              MR. FISCHER:  I'd have to discuss that
                        Page 6
```

81106scs.txt

14    with people, Your Honor.
15                    THE COURT:  I do think it is -- one of
16    the things -- if these suits are going to arise on the
17    map, I assume they're like red dots and start looking
18    like some global infection.  We'll get the guy from
19    house to diagnose -- I mean, I think that is a
20    problem, Mr. Fischer, that he we have to deal with
21    here.  I hadn't known there was a suit filed
22    yesterday.
23                    MR. FISCHER:  I didn't know that
24    either, Your Honor.
                                                        9

1                    MR. LORIG:  We were notified by
2     European counsel.
3                    MR. URQUHART:  And by QUALCOMM.
4                    MR. LORIG:  And by QUALCOMM.
5                    Just to let Your Honor know what's
6     going on beyond the surface.  Yesterday there was a
7     meeting between QUALCOMM and Nokia.  As a Nokia
8     representative walked into the room to discuss issues,
9     they agreed to the news of another, we believe,
10    vexatious lawsuit, this time filed to Germany.  That's
11    the pattern we're in.  That's why we're seeking the
12    Court's injunctive relief.
13                    THE COURT:  Look, I'm a fairly direct
14    person.  That kind of behavior is not going to aid
15    QUALCOMM with any -- when I consider at least the
16    McWane issue -- McWane being our first-filed case
17    doctrine, which is, you know, if QUALCOMM wants to
18    bring an injunction action and say, "Look, we want to
19    have a fair fight.  It's basically the same issue all

                              Page 7

81106scs.txt
20  over the world. We shouldn't litigate it in 17

21  different courts. We should pick one good forum. You

22  know, we want it in the Federal Court that we first

23  filed in. Let's agree. Let's get it done. Let's

24  have a trial, and let's make this be the template."
                                                    10

1   You know, that's a fairly strong position to be in

2   when you've got a first-filed doctrine.

3                   On the other hand, if QUALCOMM says,

4   "No, what we really do want is some sort of

5   international infection of lawsuits to afflict Nokia,

6   we want the possibility of inconsistent adjudications,

7   we want them to get lawyers and master all these

8   different intricacies, put aside civil code versus

9   common law. Why don't we get a sampling of common law

10  nations? Why don't we get Australia, UK, the United

11  States, and then we'll get, frankly, former

12  dictatorships, which are still arguably that way but

13  have court systems and we'll see, you know, how that

14  kind of goes." And then, if that's the situation,

15  that really cuts very strongly against worrying about

16  first-filed doctrine.

17                  MR. FISCHER: Your Honor, I don't

18  think that's what's going on. I think it's a matter

19  of taking protective actions in the areas where it's

20  appropriate to take it, in light of the nature of the

21  patents at issue and where they are and where the

22  patents are protected.

23                  THE COURT: Am I wrong to think that

24  this is essentially a European-wide dispute or is it
                                                    11

1   maybe even also extends to the continental United
                    Page 8

81106scs.txt

2   States?

3           MR. LORIG:  Your Honor, it's really
4   worldwide.  They filed their action in San Diego the
5   end of last year.  It's stayed at the moment.  They
6   filed actions before our last settlement negotiation.
7   They greeted us with filing an action in the UK.  Now,
8   before this one, they greeted us with filing an action
9   in Germany.  If we have another settlement
10  negotiation, we'll probably have another patent action
11  in another European or Asian country.

12          The idea that they're trying to
13  protect their interests, if you'll pardon me, is, I
14  think, based on the fact that perhaps counsel is not
15  aware of how old these patents are.  Most of them have
16  priority dates of 1990, 1994, 1995.  There's severe
17  laches on past damages.  QUALCOMM publicly announced
18  that the only reason they have filed these actions
19  under GSM patents is to try to pressure Nokia into
20  signing.  QUALCOMM's management publicly announced to
21  the investment community that they weren't pursuing
22  any other company on their GSM patents, that they're
23  only trying to enforce them against Nokia in order to
24  pressure Nokia to sign an agreement on third
                                                    12

1   generation, meaning nonGSM patents.  And they told the
2   rest of the industry they didn't have to worry about
3   these GSM patents.

4           So I don't -- there's a lot of details
5   and facts.  I don't believe my opposing counsel is
6   familiar with them yet.  Certainly what he says on the
7   surface seems reasonable.  But the facts are quite

81106scs.txt
8   different, and that's why we thought about where to
9   go.  QUALCOMM is a Delaware corporation.  Nokia Inc.
10  is a Delaware corporation.  This is pure
11  interpretation of contract issue.  It's a valuation of
12  patent rights -- how to value what a FRAND royalty is
13  as compared to a normal royalty.  What is fair?  Yes,
14  the obligation is interpreted under French law, but
15  the rule is you go to your national courts.
16                    In the United States we have a
17  different situation than we do in Europe.  In Europe
18  you have one unified court system.  Here, because we
19  are a federation of states, you have both a state
20  system and a federal system.  There is no federal
21  question here.  You've got two Delaware corporations,
22  you've got an issue of interpreting and enforcing a
23  contract, and there is not a federal question here.
24                    THE COURT:  It is an interesting -- I
                                                    13

1   mean, I understand what you're saying.  There's no
2   federal question of federal law what view the federal
3   courts would take of their jurisdiction, given the
4   terms of -- I forget the European entities.  What's
5   it's called?
6                    MR. LORIG:  ETSI.  E-T-S-I.
7                    THE COURT:  Whatever ETSI says.  What
8   the federal courts would view their obligation as
9   being is it may not be -- intuitively it's not as
10  relevant to me for this reason, which is the reason
11  why Nokia is here is because QUALCOMM is filing patent
12  infringement actions which it believes are improper
13  and at a time when what Nokia says should be going on
14  is, frankly, we ought to be getting so-called FRAND
                        Page 10

81106scs.txt

15    rates and this should not be an issue at all.

16                    When they filed their patent

17    infringement action in the U.S. District Court in San

18    Diego -- it's clearly a defense.  It may be even a

19    counterclaim, and it would seem to get around the

20    jurisdictional issues.  From what I read in the letter

21    from Potter Anderson today, you were fighting about

22    going to arbitration.  And no one teed up, you know,

23    this question.  And it may have been because that was

24    the first of the actions.

                                                        14

1                    I also don't know what's before the

2     U.S. International Trade Commission, whether that is a

3     forum that would qualify under ETSI.  I don't know

4     whether anybody has worked --

5                    MR. LORIG:  May I respond, Your Honor?

6     The ITC, as Your Honor may know, only has the power to

7     grant injunctive relief.  It doesn't have the power to

8     define a reasonable royalty or a fair and reasonable

9     royalty.  Moreover, by law, it's determinations are

10    not -- don't give rise to collateral estoppel,

11    res judicata issues, preclusion issues because of the

12    nature of the Court system.

13                    To go back to Your Honor's point about

14    San Diego.  As we understood the law, if somebody has

15    filed an action which triggers an arbitration right,

16    you waive that right.  The first thing you don't do is

17    ask for arbitration.  We asked for that.  The judge

18    denied it.  The arbitration went forward anyway.  The

19    federal circuit has heard the appeal.  But we have not

20    teed up in that case the right to an injunction or how

                              Page 11

81106scs.txt
21   to define fair, reasonable --

22                    THE COURT:  What's happening with

23   arbitration?

24                    MR. LORIG:  It's ongoing.
                                                        15

 1   Mr. Casebeer is on the phone.  We both participated.

 2                    MR. MAMMEM:  In the arbitration right

 3   now is pending QUALCOMM's motion to dismiss the main

 4   claim in the arbitration on Rule 12(b)(6) grounds.

 5   We're awaiting a hearing date on that motion.

 6                    MR. LORIG:  Your Honor, the issues do

 7   not include a right to an injunction --

 8                    THE COURT:  I guess what I'm saying

 9   is, who brought the action in the U.S. District Court

10   in California?

11                    MR. MAMMEM:  QUALCOMM did.

12                    THE COURT:  Right.  For patent

13   infringement?

14                    MR. MAMMEM:  Yes.

15                    THE COURT:  And why wouldn't Nokia say

16   that that was -- you know, that one of the reasons why

17   that action is not viable is because QUALCOMM is

18   acting in violation of ETSI?

19                    MR. MAMMEM:  Your Honor, we think

20   that's exactly the right question.  As we've seen from

21   the response that Nokia filed yesterday, they appear

22   to have asserted both the issues that they raised --

23   that Nokia raised -- before the arbitrator, as well as

24   this ETSI issue as affirmative defenses in that
                                                        16

 1   action.  In the district court action, Nokia has not

 2   yet been required to file an answer because of the
                       Page 12

81106scs.txt

3    procedural posture of that action.  That would be the

4    appropriate forum for these issues to be aired.

5                    MR. LORIG:  One would have thought, as

6    Your Honor has said, that the reasonable thing to do

7    would be for QUALCOMM to have filed this action in

8    San Diego, which after all is its home base, tee up

9    the issues there.

10                   What happened is, after the case was

11   stayed and the arbitration started going forward, they

12   didn't like some of the things that were happening in

13   the arbitration.  They then filed an action in the ITC

14   on several of the same patents that were at issue in

15   San Diego.  When they didn't like the way things were

16   going, they filed the UK action.  You see the problem?

17                   THE COURT:  I understand that.  As a

18   litigator will, you changed my words around to put the

19   onus on QUALCOMM.

20                   I don't know what gave rise to the

21   arbitration right.  Was it a contract between QUALCOMM

22   and Nokia?

23                   MR. LORIG:  Yes, it is a contract.

24   Unfortunately, because we don't have a protective
                                                    17

1    order, without permission of my opposing counsel I

2    can't discuss its contents because --

3                    THE COURT:  Would it sweep within it

4    arguably the ETSI claim?

5                    MR. LORIG:  I don't believe so, Your

6    Honor.

7                    THE COURT:  I'll give you my standard

8    pitch on American -- not American businesses in

                          Page 13

81106scs.txt
 9  general.  No one whines more about the cost of
10  litigation than businesses and doctors.  In my
11  experience as a judge, no source of litigation delay
12  or complexity or a waste are more common than
13  businesses and doctors.  I say doctors because anybody
14  who has had a doctor practice break up, where people
15  go under tables and pull out plugs, steal records, do
16  things -- doctors love litigation when they're playing
17  offense; they hate it when they're playing defense.
18  Businesses whine all the time, you know, but they
19  spend a gazillion amount of dollars and human energy
20  every year fighting about what forum to be in.
21            You know, it may be you all think I
22  can do it well on both sides and that you can
23  stipulate that I'll do it.  You probably can't because
24  you know you just hate each other.  Your clients hate
                                                        18

 1  each other and they're going to fight about anything.
 2  You could have the best -- universally conceded --
 3  best judge in the world by both sides in a blind taste
 4  test.  If they happen to agree on that person, they
 5  would then back away.
 6            What I'm getting at and what we're
 7  going to get to quickly -- I mean, I will say this to
 8  QUALCOMM.  If I find out tomorrow there's an action in
 9  Belgium and an action in the Netherlands, then I'm
10  going to set a trial date.  And we'll go, you know,
11  hell bent for leather with all the discovery in the
12  world to get this tried wherever it has to be,
13  including in my court, if I conclude that it's going
14  to be here.  But because it's going to be somewhere,
15  there will be no waste in the discovery.
                    Page 14

81106scs.txt

16                What was done in Germany was done in

17     Germany.  We'll start with QUALCOMM having a brief in

18     two weeks.

19                What would Nokia want in terms of

20     answering?

21                MR. LORIG:  I think we'll get our

22     response in one week, Your Honor, since they are not

23     stipulating to stay their hand on filing future --

24                THE COURT:  You only want a week?
                                                      19

1     Okay.  Get on the books quick.

2                MR. STARK:  Your Honor, may I speak

3     briefly?

4                THE COURT:  Yes.

5                MR. STARK:  Your Honor, to your point

6     that a number of suits have been filed by QUALCOMM for

7     patent infringement, I just wanted to make clear for

8     the record that there are patents of different nations

9     involved in these different actions, and each patent

10    of a different nation gives rise to a separate and

11    completely distinct set of rights.  For example, the

12    U.S. patents that are at issue in the San Diego

13    litigation give rise to the right to potentially

14    exclude products from being offered, sold, made or

15    used in the United States, but do not extend

16    necessarily to other nations.  The same would be true

17    of patents of other nations that are at issue in other

18    litigation.

19                So I just wanted to make the point,

20    Your Honor, that it's not a simple case of

21    proliferating litigation, but rather there are quite

                         Page 15

81106scs.txt
22   distinct rights at issue.  In order to protect those
23   rights, QUALCOMM may need to seek to bring cases in
24   different jurisdictions.
                                                      20

1                    THE COURT:  As I understand your
2    friend's point, that I guess in the territories
3    governed by ETSI, which would be essentially the
4    European union -- is that correct?
5                    MR. LORIG:  Yes, Your Honor.
6                    MR. STARK:  That's correct, Your
7    Honor.
8                    THE COURT:  -- that there is an
9    overriding issue of whether essentially what QUALCOMM
10   is limited to is essentially making, you know, sure
11   that Nokia pays FRAND rights for the technologies in
12   all those territories, and that the overarching issue
13   that Nokia seeks is that essentially the European
14   unionwide -- instead of charging folks like Nokia
15   FRAND rights for these essential technologies, it's
16   essentially trying to create a hostage situation
17   where, instead of charging FRAND rights, it charges
18   something way too expensive or keeps people out of the
19   market all together.  That's what I understand is the
20   issue.
21                   MR. STARK:  That is potentially a
22   common issue.  Your Honor, we would submit that
23   Nokia's position is utterly without merit on that.  I
24   just wanted to make sure that the record was clear.
                                                      21

1                    THE COURT:  Right.
2                    What I'm saying is, if it is an
3    overarching issue and I can't at this point judge
                       Page 16

81106scs.txt

4      whether it's just without merit, whether it's utterly
5      without merit -- you know, whatever adverbial tag line
6      we want to put on it -- I can't judge that. But if
7      it's possibly a good defense and you all can't figure
8      out where to fight about it and it looks like the
9      infection is spreading throughout the European union,
10     then I am going to set a trial date and at least get
11     the issue -- get discovery going.
12                     What I would strongly advise that you
13     do -- one of the things I would say to Nokia, don't
14     be, you know, day foolish here and say we'll do our
15     brief in a week. Let's just be careful about that.
16     All I'm saying is, maybe you can anticipate all the
17     arguments that they're going to have and you're going
18     to look -- maybe you're going to get the stuff in
19     ETSI. I don't know if there's an official English
20     version of ETSI.
21                     MR. URQUHART:  The website.
22                     THE COURT:  The history of ETSI and
23     what it means.  I'll just -- why don't you figure out
24     a place to have this fight.
                                                          22

1                      MR. LORIG:  On behalf of Nokia, we
2      would stipulate that the Delaware Chancery Court can
3      resolve this dispute and each side stay their hand on
4      other litigations until this issue is resolved.
5      Because these are two large mature companies and there
6      is an honest dispute, apparently, between what the
7      FRAND obligation means, and it should be resolved.  We
8      would stipulate to jurisdiction here.  And I would
9      hope counsel would ask their clients before rejecting

                           Page 17

81106scs.txt
10    it so that can be decided.  Because the problem that

11    we're going to get into is we can literally have

12    scores of lawsuits around the world, not just in

13    Europe, with differing interpretations of what the

14    FRAND obligation means.  Here, where there is

15    jurisdiction over QUALCOMM and there isn't

16    jurisdiction in the national courts in Europe, here's

17    the one place it can be decided.

18              THE COURT:  What I'm saying is, if

19    they had thought of this court first, you know, I

20    expect that what Nokia would be saying is, we're a

21    Finnish corporation.  And the fact that a few of our

22    cell phones come into Delaware doesn't mean why are we

23    the heck in the Delaware Court of Chancery.  Now,

24    Strine's got a great hairstyle and we dig that; but,
                                                        23

1     you know, aside from that, you know, you just can't

2     really get it.

3              Now I understand there is a Nokia --

4     that the U.S. subsidiary is here.  What I'm saying

5     is -- I would say to both sides -- I realize -- and

6     even in something just with the dispute -- the fact

7     that one side or the other picked the forum first

8     becomes, you know, some sort of psychological barrier

9     to rationality.  I could as easily say to Nokia, "Why

10    not agree to go back to the U.S. District Court in

11    San Diego, lift the stay with respect to this issue

12    and have it out there."  I think your friends from

13    QUALCOMM would be in a very difficult position to say

14    that a U.S. District Court is not a national quorum.

15    That would deprive me and our Delaware friends of the

16    ability to participate in this.
                    Page 18

81106scs.txt

17                 I'm happy to do the work.   This

18    court -- one of the advantages of Delaware is, you

19    know, we have to play fair.   That's the nature of our

20    business.   We can't play favorites and have it work

21    for our state.   It just doesn't work.

22                 The Nokia subsidiary's a Delaware

23    subsidiary; QUALCOMM is a Delaware corporation.

24    Probably neither of your corporations have as many of
                                                          24

 1    your operations here as my former boss and a U.S.

 2    senator would like.   So it's not like we could favor

 3    the headquarters versus anything.   Usually people --

 4    we're indifferent to that.   We're trying to come with

 5    a fair outcome.

 6                 If you can agree that I'm the place,

 7    you know, that becomes easier.   Then you can enter

 8    into a stipulation that's binding.

 9                 My concern about that is, again, the

10    psychic notion, which is that QUALCOMM has been

11    brought and it didn't choose this place.   You know, if

12    what Nokia's objective is is to get a decision, what

13    I'm saying to you, I am going to set a trial date and

14    I am going to make you all have your depositions taken

15    and do all that kind of stuff if these things keep

16    coming up.

17                 It may that be what you can agree on,

18    even though it deprives me of the fun, is that the

19    forum that QUALCOMM chose as its first American court,

20    which might even be more convenient for some of the

21    litigators working for Nokia, since, you know, you're

22    out there in the land of Gwyneth and stuff, would be

Page 19

81106scs.txt
23  that, you know, you do it in San Diego.

24                    MR. LORIG:  One of the problems is the
                                                           25

1   judge in San Diego -- Judge Brewster -- is a senior
2   judge, just had an operation for prostate cancer, has
3   announced he's going to retire in September of next
4   year.  Some of these European cases won't be tried and
5   decided by the middle of next summer.  The timing,
6   frankly, isn't good.

7                    You know, one of the reasons, as I
8   said we're here, is for exactly the reasons Your Honor
9   enunciated: this is a neutral court.

10                    MR. MAMMEM:  The response to that is
11  that, if we had started litigating the San Diego
12  action back in November when we filed, we would be
13  well-advanced in the San Diego forum at this point.

14                    THE COURT:  Well, Mr. Mammem, you
15  represent --

16                    MR. MAMMEM:  QUALCOMM.

17                    THE COURT:  You're at what firm?

18                    MR. MAMMEM:  The Day Casebeer firm.

19                    THE COURT:  I guess what I'm saying
20  is, you know, things like Judge Brewster -- if
21  Judge Brewster is genuinely retiring, he probably
22  knows that.  And I would assume that he -- you know,
23  as I would assume about most of my judicial
24  colleagues -- that he cares deeply about doing
                                                           26

1   justice.  And that to the extent that the time frame
2   that's involved here doesn't comport with his
3   retirement plans, that there is this thing called
4   reassignment.
                           Page 20

81106scs.txt

5              I would say to Mr. Stark and
6   Mr. Mammem, you know, this court is fair. We do
7   things pretty well. I think I know that the Cravath
8   firm has once in a while gotten a decent result here.
9   And so -- certainly the Potter Anderson firm has.
10             So I think the question becomes
11  whether it's really like you just want to hurt each
12  other, and you just want to have this sort of
13  uncertainty. That may be a business decision that
14  none of the lawyers have anything to do with. It's
15  just simply we want to hurt each other, and nobody
16  needs to respond to that because each side is going to
17  say, "Of course we wouldn't do that. We wouldn't have
18  just 17 lawsuits just because it gives us business
19  leverage." And the other side say, "Of course we
20  wouldn't do the same either. We wouldn't duck a
21  particular forum just to come here and make it" -- you
22  know, in Delaware we have that phrase, we don't -- we
23  say it about every other day -- we didn't just fall
24  off the turnip truck, which I think can also be
                                                    27

1   interpreted to mean I didn't just fall off the turnip
2   truck. Everybody knows I fell off it five years ago,
3   without a helmet, and I've suffered permanent damage
4   ever since. I have never fallen off the turnip truck.
5   I know there's jousting going on. I know this means a
6   lot to your clients.
7              What we're going to do is, I want a
8   tight briefing schedule. Think about that week. I'm
9   not going -- I want a briefing schedule to me by next
10  Wednesday.

81106scs.txt
11                    MR. FISCHER:  We'll do that, Your

12   Honor.

13                    THE COURT:  Think about your time

14   frame.  If there are other lawsuits, then discovery is

15   going to go forth and it's going to be on an expedited

16   basis.  So QUALCOMM, to some extent, is going to be in

17   control about whether expedited discovery begins;

18   otherwise discovery is not stayed but it will go under

19   the usual deadlines.  I would like a report back at

20   the same time I get a schedule about whether you've

21   conferred about whether there is a forum you could

22   agree on to go first about these threshold issues and,

23   frankly, to stay the other litigations.  There may be

24   some complexity there.

                                                   28

1                    I heard Mr. Stark say it's a good

2    point.  There may have to be some sort of tolling

3    agreement between QUALCOMM and Nokia to indicate that

4    QUALCOMM is not -- if its time has already lapsed,

5    it's lapsed.  But that during the nothing -- simply

6    the pendency of any stay to get done in the first

7    things won't be -- that part of the delay won't be

8    attributed as laches and that sort of thing.

9                    MR. LORIG:  Your Honor, we'd stipulate

10   to that on the record right now.  That's not a

11   problem.  The problem is, again, the fact that we're

12   getting an injunction action in a week.

13                    THE COURT:  Mr. Stark, can you take

14   that back to your client?

15                    MR. STARK:  Yes, Your Honor.

16                    THE COURT:  It also gives me a chance

17   and will create a little record here, which will help

                         Page 22

81106scs.txt

18   other courts to flesh out really whether this is --
19   these people are acting like children in a way that's
20   unfair or they simply, you know -- because I think if
21   you can get -- at some point, when you've got the idea
22   that QUALCOMM will be able to protect its interest in
23   all the jurisdictions, we'll get a fair shot in a good
24   forum of presenting its side in one of the national
                                                        29

1    controversies, but yet Nokia will get to advance this
2    overarching thing and it could be done in a good
3    quality forum that's neutral in a prompt way.
4              If one side or the other is objecting,
5    then they suggested, frankly, this is a situation
6    where counsel have a duty to step into your clients
7    and say, "No, you can't act in a vexatious way."
8    Let's have a fair fight on the merits. We may win or
9    lose, but we have that opportunity, and we're not
10   going to afflict 13 different countries with a case.
11                     MR. LORIG:   May I respond, Your Honor?
12                     THE COURT:   Yes.
13                     MR. LORIG:   That's exactly what the
14   problem is and why we're here. They have asked for a
15   July 2007 trial date in England, but the FRAND issues
16   would not be decided until after that. You decide the
17   patent issues first, injunction first, the other
18   issues second.
19                     Same in Germany.  You're going to get
20   the patent issues decided within a year. You're not
21   going to get to the other issues.
22                     THE COURT:   Right.
23                     What I'm saying is, I'm sensitive to
                          Page 23

81106scs.txt
24   the need -- I understand what Nokia is saying.  I
                                                        30

1   think the vulnerability that Nokia has is are we a
2   national court and the fact that could these -- this
3   defense be presented in prior pending actions.  That's
4   why I'm suggesting to QUALCOMM it ought to think very
5   hard about the other options it brings and whether
6   it's willing to stipulate in somewhere else.  If it
7   prefers -- San Diego is a lovely place.  I actually
8   never spent any time in the city.  I only spent my
9   time on Coronado.  It has sufficient proximity to the
10   ocean and to fish tack companies that I never
11   actually -- except driving to the airport -- spending
12   any time there, other than the Padres are an awesome
13   team.  You know, you've heard me on that.  I want to
14   hear about the fight and I want a briefing schedule.
15                 MR. FISCHER:  By Wednesday?
16                 THE COURT:  Yes.
17                 MR. LORIG:  Should that briefing
18   schedule be for an expedited proceeding so that this
19   matter will be decided before these various midsummer
20   problems we're going to have?  We've got European
21   decisions by the middle of next year.
22                 THE COURT:  No.  I think I've been
23   pretty clear.
24                 What I've said is, I want a schedule
                                                        31

1   for the completion of briefing on a motion to dismiss
2   or stay, essentially on the forum issue writ large.  I
3   am not staying discovery in any case.  But if there
4   are actions -- if QUALCOMM files an action anywhere
5   else than it's already done, then I'm going to set a
                        Page 24

81106scs.txt

6    trial date.  And I will turn what is discovery that's
7    going to be ongoing and on a normal basis, I will turn
8    that into expedited discovery.
9                    I've got plenty of time to set a trial
10   date for early next year.  One thing we are capable of
11   doing in this court is I have no doubt in the first --
12   well, the first half of August 2006 -- that we can be
13   to trial in early 2007, you know, if we have to.
14                   I'm also assuming there's been some
15   discovery done between the parties somewhere.  Not
16   even in the arbitration?
17                   MR. LORIG:  Not on these issues, Your
18   Honor.
19                   THE COURT:  Not on FRAND?
20                   MR. LORIG:  Not on FRAND.  Not under
21   right to injunction.  Those aren't the issues in
22   arbitration.  There's four discrete issues and these
23   are not among them because the contract in question,
24   which I'm not allowed to discuss on pain of blowing a
                                                      32

1    confidentiality clause because QUALCOMM filed two
2    cases against TI saying they lost their license by
3    talking about the agreement --
4                    THE COURT:  Are you telling me that
5    this dispute is entirely -- that dispute is entirely
6    separate from ETSI?
7                    MR. LORIG:  Yes, Your Honor.  I'm
8    saying that that is entirely separate from ETSI and
9    FRAND.
10                   THE COURT:  Mr. Stark, would you --
11   who is handling that for --

                            Page 25

81106scs.txt

12              MR. MAMMEM:  This is Chris Mammem.

13              Your Honor, as I believe I mentioned

14    earlier, the dispute that's currently pending in the

15    California arbitration does appear to be a separate

16    set of arguments from the ETSI argument.  However, as

17    we've seen in the ETSI action, where Nokia filed its

18    answer yesterday, they have raised both issues as

19    affirmative defenses.  Nokia has not yet filed its

20    answer in the San Diego action, and we would have

21    every reason to believe that they would in the due

22    exercise of care for their client to assert both sets

23    of issues as defenses in that action once they're

24    required to answer there as well.
                                                        33

1               THE COURT:  Okay.  But that implies

2     that the ETSI provision will somehow extend to --

3               MR. MAMMEM:  Several of the patents

4     that are asserted in the San Diego action have been

5     declared standards essential under ETSI.  That's the

6     triggering event, as I understand it, for Nokia to be

7     raising this issue.

8               THE COURT:  Okay.  But is what's at

9     issue in San Diego have to deal with what happens in

10    the United States or in Europe, which is, the duty --

11    the so-called duty, if it exists under ETSI to allow

12    people to use your technology on a FRAND basis, does

13    that extend outside the European union?

14              MR. MAMMEM:  That is an issue that I'm

15    not prepared to speak to today.

16              THE COURT:  Is that Nokia's position?

17              MR. LORIG:  Our position is the ETSI

18    obligation extends throughout the world, Your Honor.
                              Page 26

81106scs.txt

19                    THE COURT:  So that it would be a fair
20  response to the injunction action in California to say
21  ETSI says you can't do it.
22                    MR. LORIG:  Except it's not an
23  injunction action.  They're primarily seeking damages.
24                    THE COURT:  But they can't get damages
                                                        34

1   if they're breaching their ETSI rights; right?  Then
2   they're denying you the chance to use the technology
3   on the basis that they're supposed to; right?
4                    MR. LORIG:  No, Your Honor.  I think
5   that's the whole issue.
6                    Looking at the San Diego action apart
7   from an injunction, they sue and they say you're
8   infringing on our patent, we're entitled to damages.
9   And the response would be, yes, you're entitled to a
10  royalty, not as --
11                    MR. MAMMEM:  We pled in the San Diego
12  action seeking both damages and injunctive relief.
13                    MR. LORIG:  Yes, it could be teed up
14  there.
15                    THE COURT:  And it could also be teed
16  up more broadly, which is not only as a defense and
17  that the royalty -- whatever royalty you should pay is
18  a FRAND rate, but more generally as an affirmative --
19  as a counterclaim you could be seeking an injunction.
20  Is that right?
21                    MR. LORIG:  We could seek the same
22  injunction from the Federal Court we are seeking from
23  this court, except for the fact that it's again not a
24  federal question --
                                                        35

81106scs.txt

```
 1                    THE COURT:   It's not a Delaware law
 2    question either.
 3                    MR. LORIG:   It's a contract question,
 4    Your Honor.   It's strictly contract.
 5                    THE COURT:   What I'm saying is, you
 6    would have every right, given that they brought you
 7    into Federal Court, for you now to raise this as a
 8    counterclaim and an affirmative defense and seek an
 9    injunction.   It would not be a jurisdictional problem
10    on the part of the Federal Court.
11                    MR. LORIG:   It wouldn't be, except
12    that case is stayed pending arbitration.
13                    THE COURT:   That case is stayed.   This
14    case didn't exist; right?
15                    MR. LORIG:   Right.
16                    THE COURT:   The great thing about
17    stays is they can be lifted.
18                    MR. MAMMEM:   We will stipulate to the
19    lifting of that stay immediately, if Nokia would
20    agree.
21                    MR. FISCHER:   It was filed by Nokia.
22                    MR. LORIG:   The issue is, you can't --
23    are they stipulating that we can pursue the
24    arbitration issues in arbitration and that the
                                                      36

 1    San Diego case will be dismissed, we win in
 2    arbitration, and then we come back to Delaware and
 3    have this decided, because the issues in arbitration
 4    are such that no San Diego case could have been filed,
 5    would have been filed?   If we win the arbitration, the
 6    San Diego case must be dismissed with prejudice on all
                           Page 28
```

81106scs.txt

     7  issues.

     8                   MR. MAMMEM:   That's the nature of an
     9  affirmative defense, and they ought to be litigated in
    10  due course as affirmative defenses in the patent
    11  infringement case.

    12                   MR. LORIG:   Your Honor, with all
    13  deference, I don't think I heard an answer to my
    14  question.

    15                   THE COURT:   I don't think I did
    16  either.   what I'm hearing is the kind of jousting that
    17  I'm going to stop, because it's one of my law clerk's
    18  last day and I'm not going to miss lunch with her
    19  over -- because it's not helpful.

    20                   You all need to take a deep breath and
    21  with a cool head and warm heart think about this
    22  rationally, which is what I just heard Mr. Mammem.
    23  It's a need answer.  But the fact is that Nokia is now
    24  seeking to raise more than an affirmative defense.
                                                         37

     1  It's seeking to obtain an injunction that goes further
     2  to that.  The question is: are they going to get a
     3  forum -- if you come to me and say you can do it in
     4  the U.S. District Court for the District of San Diego
     5  but not until this arbitration is completed, and then
     6  you say that's not unfair to them because they're the
     7  ones that raised the arbitration issue -- I haven't
     8  seen the contract.  It sounds like you've got a lot
     9  mixed up in there.  It sounds like you're suing in
    10  Germany and the UK.  It's probably not under the same
    11  contract that has the arbitration clause.

    12                   MR. LORIG:   I would like to ask

Page 29

81106scs.txt
13   QUALCOMM's permission to submit to the Judge -- the

14   Court -- a copy of the -- the contract at issue.  We

15   have QUALCOMM's permission?

16              MR. MAMMEM:  I believe that would be

17   fine to submit it under seal, or under whatever

18   confidentiality agreement.

19              THE COURT:  Don't submit it to me

20   until next wednesday in the context of something.

21              How far along in the arbitration --

22   this will be the last line of questioning -- how far

23   along are you in this arbitration?

24              MR. LORIG:  I would say we're halfway
                                                  38

1    along.  We've teed up a proffer on how we're going to

2    prove the issues that we've raised in arbitration.

3    They filed a motion to dismiss.  The arbitrator's

4    currently considering them.  we think the motions are

5    going to be denied and we'll tee up the arbitration

6    hearing.  It should be within the next couple three

7    months.

8              THE COURT:  Then would you do some

9    discovery?

10             MR. LORIG:  There's going to be a

11   little discovery.  One of the key witnesses is

12   unfortunately dying of cancer and we're having a

13   little difficulty getting opposing counsel to agree on

14   a way of taking his deposition -- a way that doesn't

15   aggravate his health.  There may be a little

16   additional discovery after that.

17             MR. MAMMEM:  Mr. Lorig is correct.

18   The motion to dismiss is pending.  We believe that

19   motion will be granted, obviously.  If it's denied,
                          Page 30

81106scs.txt

20  then there will be some amount of discovery to be

21  taken before the merits issue is teed up.

22                  THE COURT:  Is the arbitrator somebody

23  really super special that Nokia loves?

24                  MR. LORIG:  No.  The arbitrator was
                                                    39

1  somebody jointly picked by both sides.  His name is

2  Les Weinstein.  He's a retired trial lawyer.  He

3  doesn't have Your Honor's economic background but he's

4  got a lot of common sense.

5                  THE COURT:  You may have to go over

6  what my economic background is.  Sort of lower middle

7  class.

8                  Good.  I'm glad to know that his folks

9  had some money.

10                 I guess what I'm wondering here is,

11  you know, it doesn't sound to me like you're all

12  that -- the arbitration is always a murky process.

13  You sit here about halfway through, struck me as

14  you're not -- I wouldn't call that halfway through.  I

15  wouldn't even call it halfway through the first phase

16  of anything.

17                 Part of what you all should be

18  thinking about is -- maybe it's this fellow with a

19  better economic background than I have, maybe he does

20  it all.  Maybe you get through the motion and say,

21  "Well, we'll live by what the dismissal thing is.  But

22  if the claims go forward, we'll go back to the judge,

23  lift the stay, and we'll do it all in the District

24  Court of San Diego.  But we'll do it promptly."  What
                                                    40

81106scs.txt
1  Nokia gets out of that is it gets a chance to present
2  its FRAND-ETSI argument. But you do it all in one
3  expedited trial before someone, especially since you
4  haven't really taken the discovery or anything.
5              That would involve Nokia obviously
6  giving up something, which is it loves this judge or
7  loves this arbitrator or loves arbitration. More
8  likely what it had is, it had -- it was sued by
9  QUALCOMM. And then the first thing you do is you
10 figure out how can you defeat the suit. And if you
11 have a contract that says, "Well, we can decide or
12 dispute somewhere else," even if you don't even
13 necessarily think that somewhere else is better, you
14 tend to cling to that at that point in time. I mean,
15 I hate to say it's that primitive, but I do think a
16 lot of times it's that primitive and that, you know,
17 it's there so we will use it. If we can get a punter
18 over here, worrying about it delays them playing
19 offense. Now Nokia wants to play offense. And it
20 wants something that probably an arbitrator doesn't
21 have any prayer of being able to give it, which is an
22 injunction that would have a collateral effect in
23 other nations.
24              And one of the responsible trade-offs
                                                    41

1  might be to go to Judge Brewster and say, "We're going
2  to put this all in the U S. District Court. Your
3  Honor, you're a great judge. You had a great career.
4  You're leaving next September. Our time frame is
5  something else. Let's get it reassigned mutually to
6  somebody who can handle it." The parties stipulate to
7  expedite this and have this be the case that goes
                    Page 32

81106scs.txt

8    forward, put all your claims before him and go.  That
9    sounds like a fairly -- you know, that sounds like you
10   would all look like pretty sensible business people
11   and lawyers if you did that.

12              MR. LORIG:  May I respond?  That would
13   be about as I think acceptable as a suggestion to
14   QUALCOMM.  We could litigate this in Helsinki court.
15   I think the whole advantage of being here is, one, you
16   can get something resolved quickly in the Delaware
17   Chancery Court; two, you have a neutral forum; three,
18   it's a place where companies from around the world
19   know they're going to get a fair, neutral --

20              THE COURT:  It's making us -- our head
21   is going to explode here in Chancery because we feel
22   so good and that you love us.  I don't know any reason
23   why a judge -- a federal district judge in
24   San Diego -- you know, is going to favor QUALCOMM over
                                                        42

1    Nokia.  I don't know if the stadium is named after
2    anybody out there.

3              MR. LORIG:  QUALCOMM Stadium.

4              MR. MAMMEM:  Not anymore.

5              THE COURT:  And it's a federal
6    district judge.  But you know, you may be just sort of
7    stuck with that.

8              I would say on the other hand to
9    Nokia -- as I said, I'm willing to do the work.  This
10   court will do the work.  But again, I would say that
11   to QUALCOMM -- it may be QUALCOMM -- you sent them to
12   arbitration.  They may want to get all their claims
13   before one thing.  Maybe you agree it's the Southern

Page 33

81106scs.txt
14  District of New York.  There are courts -- there are

15  judges in federal courts who will take this very

16  seriously.  I'm not implying that the Court that it's

17  in isn't.  If it needs to be done within the next five

18  or six months, we'll do that.

19              I had the Oracle case and Judge Walker

20  had the Oracle antitrust thing.  He did that antitrust

21  trial just as promptly as any of us in Chancery would

22  and he pumped out a decision.

23              Again, I didn't realize -- you can see

24  how big a Padre fan I am.  I still -- the idea that a
                                                      43

1  federal judge is going to rule for QUALCOMM --

2              MR. LORIG:  Judge Brewster's fair, and

3  I wouldn't want to indicate anything other than that.

4  It's the difficulties when you have an international

5  problem like this.  You know, clients are

6  understandably hesitant to go into the other company's

7  home court.  It has nothing to do with individuals,

8  Your Honor.

9              THE COURT:  I understand.  Part of the

10  problem is, you all picked this court now.  As a

11  result, if you had gone to them and said, "Why don't

12  we have Chancery" -- "why don't we think about

13  Chancery?  Our operations are Delaware, you're

14  Delaware.  Why don't we have Chancery do it."  You

15  might not have a reflex.  But now they chose a forum,

16  you chose a forum.  And what it tends to mean is it's

17  got to be some other forum.

18              You know, you all need to read the

19  transcript.  Think about whether what I'm saying is

20  true or not.  I think it is about psychologically how
                        Page 34

81106scs.txt

21    you deal with it.  Talk to your clients rationally and
22    think about, you know, what you're going to do.  If
23    you can't, we'll finish the motion practice and we'll
24    worry about that then.  Okay?

44

1                    So I'll hear from you next Wednesday.
2                    (Court adjourned at 1:22:50 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

45

1                         CERTIFICATE

Page 35

81106scs.txt

2                    I, DIANE G. MCGRELLIS, Official Court

3    Reporter of the Chancery Court, State of Delaware, do

4    hereby certify that the foregoing pages numbered 3

5    through 44 contain a true and correct transcription of

6    the proceedings as stenographically reported by me at

7    the hearing in the above cause before the Vice

8    Chancellor of the State of Delaware, on the date

9    therein indicated.

10                   IN WITNESS WHEREOF I have hereunto set

11   my hand at Wilmington, this 14th day of August, 2006.

12

13

14        ----------------------------
               Official Court Reporter
15               of the Chancery Court
                   State of Delaware
16

17
     Certification Number: 108-PS
18   Expiration:  Permanent

19

20

21

22

23

24

Page 36

# EXHIBIT B

EFiled: Aug 9 2006 9:53AM EDT
Transaction ID 12021331

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

NOKIA CORPORATION and NOKIA INC.,

                  Plaintiffs,

      v.

QUALCOMM INC.,

                  Defendant.

C.A. No. _____

## COMPLAINT

Plaintiffs Nokia Corporation and Nokia Inc. (collectively, "Nokia"), by and through their undersigned counsel, allege the following as and for their Complaint against defendant Qualcomm Inc. ("Qualcomm"):

## NATURE OF THE ACTION

1.     Nokia seeks declaratory relief and specific performance to enforce the terms of contracts in which Qualcomm, a Delaware corporation, has licensed Nokia to practice Qualcomm essential patents on fair, reasonable, and non-discriminatory terms ("FRAND" terms). As hereinafter alleged, Qualcomm has induced various standard-setting organizations ("SSOs"), including the European Telecommunications Standardization Institute ("ETSI"), to incorporate Qualcomm's patented technology into industry standards for cellular phone products and equipment by contractually agreeing to license those patents on FRAND terms. However, Qualcomm has breached its contractual obligations by demanding a royalty rate that exceeds FRAND terms and by threatening to enjoin Nokia from manufacturing or selling products that Qualcomm alleges practice the licensed essential patents unless Qualcomm's demands for unfair and unreasonable royalties are

accepted. Qualcomm has further breached its contractual obligations by refusing to negotiate FRAND royalty rates in good faith.

2.    Nokia seeks a judicial declaration establishing that Qualcomm's FRAND commitments constitute binding and enforceable contractual obligations licensing its declared-essential patents to Nokia on FRAND terms, which includes a FRAND royalty, and setting forth the method by which the FRAND royalty is to be calculated.

3.    In addition, Nokia seeks a judicial declaration that, by contracting to license its declared-essential patents to Nokia on FRAND terms, Qualcomm has waived the right to seek injunctive relief to restrain the use of those declared-essential patents. In the event of a dispute between the parties (including the filing of any infringement action in any country), Qualcomm's remedy is limited to recovery of a FRAND royalty as determined by a court.

4.    Accordingly, Nokia seeks an order enjoining Qualcomm worldwide from seeking an injunction or an exclusionary order as a remedy for alleged infringement of any declared-essential patents which it has contractually agreed to license on FRAND terms.

5.    Finally, Nokia seeks an order compelling specific performance requiring that Qualcomm participate in a good faith negotiation on the amount of a FRAND royalty, recognizing the principles that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization, and such other factors as the court deems fair and proper under the circumstances.

2

RLF1-3046183-1

## PARTIES AND JURISDICTION

6.    Plaintiff Nokia Corporation is a corporation organized under the laws of Finland, with its principal place of business located in Espoo, Finland.

7.    Plaintiff Nokia Inc. is a United States subsidiary of Nokia Corporation. Nokia Inc. is a corporation organized under the laws of the State of Delaware, with its headquarters located in Irving, Texas. Nokia Corporation and Nokia Inc. are collectively referred to herein as "Nokia."

8.    Nokia is a world leader in the field of mobile communications. Nokia's primary line of business is the manufacture and sale of cellular telephone handsets. Nokia also manufactures and sells infrastructure used in cellular telephone networks, and owns substantial intellectual property rights in cellular telephone technologies.

9.    Defendant Qualcomm Inc. ("Qualcomm") is a corporation organized under the laws of Delaware. One of Qualcomm's business units, called the Technology Licensing Segment, or "QTL," licenses intellectual property rights in cellular telephone technology. Qualcomm also manufactures and sells chipsets for use in cellular telephones through a separate business unit called the CDMA Technologies Segment, or "QCT."

10.    Both Qualcomm and Nokia are members of a European SSO, ETSI, which has standardized the technology needed for cellular telephones. In accordance with the terms of their agreement with ETSI (described further below), each company has licensed, by means of declarations to ETSI, its essential patents to the other on FRAND terms.

11.    ETSI's Rules of Procedure provide that any dispute regarding the interpretation or application of ETSI policies must be resolved in the national courts of the member parties, applying French law. Under French law, Qualcomm's undertaking to license its essential patents on FRAND terms creates a binding and enforceable license agreement between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. Additionally, Qualcomm's contractual obligation

RLF1-3046183-1

includes a duty to negotiate in good faith to determine a FRAND royalty rate. Under ETSI rules, Nokia is entitled to enforce that contract against Qualcomm in this Court because Qualcomm is a Delaware corporation.

## DEVELOPMENT OF CELLULAR TELEPHONE TECHNOLOGY STANDARDS

12.    For a cellular telephone to work, it must be able to transmit and receive radio signals to and from cellular transmitting towers, and be able to maintain its signal as it is passed from one tower to the next. All components of a wireless system must be able to interact with each other seamlessly, regardless which company or companies manufacture the various components. This includes the transmitting towers, the switches, the telephones, the chipsets that allow the telephones to communicate with the towers, and the chipsets that allow the towers to receive and transmit data to the switches for retransmission to the landline network or other cellular networks and cellular telephones. To meet these requirements, all components in a single cellular system must be "interoperable" and work effectively and efficiently with all other components.

13.    In order to ensure that components from different companies can interact with one another and that products can be brought to the marketplace expeditiously, wireless carriers, telephone manufacturers, and chipset manufacturers must follow a common set of industry standards for wireless communication technology. Thus, for decades, cellular service providers and cellular product manufacturers have been members of SSOs that exist to create a common set of standards that all members can follow. In return, the SSOs demand that their members license patents that are essential to any standard on FRAND terms, rather than use the threat of injunction to exploit the existence of the standard to extort super-monopoly royalties.

14.    Once a given standard has been selected, the patents essential to that standard gain value because competing technologies are effectively eliminated from the marketplace. The technology monopoly granted to essential patent holders results in the establishment of a significant

4

base of royalty payers and insures a revenue stream to essential patent holders. Once capital investments (on the order of billions of dollars) are made to comply with the standard, cellular equipment manufacturers and network service providers are locked into the technology and into paying royalties to holders of essential patents. This lock-in confers upon patent holders the ability, if unrestrained, to extort super-monopoly royalties from prospective licensees using the threat of lawsuit and injunction. SSOs protect their members and the public from such opportunistic behavior by obligating patent holders to license their essential patents on FRAND terms. This obligation prevents the patent holder from appropriating for itself (rather than consumers) the value of having an industry standard.

15.    In simple terms, the standard-setting process involves: (1) an evaluation of competing technologies to determine which best suits the market need; (2) a patent clearance process where the SSO's members unequivocally agree in writing that any patent that is essential to practice the standard is licensed to all on FRAND terms; and (3) the approval and adoption of the standard. The patent clearance process is always completed before the standard is adopted and implemented to insure that no member may use its patents to impede competition (*i.e.*, charge exorbitant royalty rates for patents that must be used by all market participants because they are essential to practice the standard) or exclude participants from the marketplace (*i.e.*, by using injunctions and exclusionary tactics to block a patent's use). If members do not agree to their license essential patents on FRAND terms, SSOs look to alternative technologies where patent clearance is available.

16.    Cellular telephone standards have evolved through distinct "generations" as consumers have demanded additional features and technology owners have developed new innovations. The earliest cellular telephones operated on analog technology and allowed only voice transmission and very slow transmission of data over analog cellular airwaves. These early analog

systems are typically referred to as first-generation ("1G") technology. 1G technology was characterized by inherent capacity limitations, minimal and slow data transfer capabilities, low security, inconsistent service levels, and significant power consumption.

17.    Consumers' increased demand for cellular service and for added performance drove the development of a second generation of cellular telephone technology ("2G"). 2G telephones, which are based on digital technology, provide significantly increased voice and data capacity and also support additional functions, such as paging and e-mail. 2G technology also offers greater privacy, greater fraud protection, and lower prices as compared to 1G technology. Most cellular telephones in use today are based on 2G technology standards.

18.    The three principal 2G standards in use today are called Global System for Mobility ("GSM"), Time Division Multiple Access ("TDMA"), and Code Division Multiple Access ("CDMA"). The technical parameters and specifications of each 2G technology were reviewed and approved by various SSOs. The three technologies are based on different underlying air interface and transmission regimes. Thus, as a general proposition, GSM-based hardware components will not work on a CDMA or TDMA system, TDMA components will not work on a GSM or CDMA system, and CDMA components will not work on a GSM or TDMA system. As more fully described below, a third generation of wireless technology ("3G"), which will allow significantly increased data speed and capacity, is currently being deployed and is one of the subjects of this action.

### THE FRAND CONTRACTS

19.    As set forth below, Qualcomm has entered into contractual agreements with ETSI and ETSI's members, including Nokia, that Qualcomm will license on FRAND terms any of its patents that are essential to the GSM standard or its third-generation successor, Universal Mobile Telephone System ("UMTS").

6

20.    ETSI is a non-profit European SSO headquartered in France. It was under ETSI's auspices that the GSM technology standard was developed, reviewed, and approved.

21.    Qualcomm is a member of ETSI because its affiliates Qualcomm Europe S.A.R.L. and Qualcomm UK Ltd are members and ETSI defines "member" to include affiliates. Thus, as described below, Qualcomm itself filed FRAND undertakings with ETSI. Nokia is also a member of ETSI.

22.    Like other SSOs, ETSI requires its members to identify all patents they hold that may be essential to compliance with a proposed technology standard—referred to as "essential patents"—before the standard is adopted. ETSI's Intellectual Property Rights ("IPR") Policy provides that "each MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 4.1. The purpose of this disclosure requirement is obvious:  to avoid a "patent ambush" situation where a party that holds essential patents sits on the sidelines during the standard-setting process and then holds up industry participants for unexpected and unanticipated royalties for technology that is essential to practice the standard.

23.    ETSI's IPR Policy specifically defines an IPR as "essential" where "it is not possible on technical but not commercial grounds, taking into account normal technical practice and the state of art generally available at the time of standardization, to make, sell, lease, otherwise dispose of,

repair, use or operate equipment or methods which comply with a standard without infringing that

IPR." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 15.6.

24.    ETSI also requests that patent holders license their essential patents to other parties

on fair, reasonable, and non-discriminatory terms ("FRAND" terms).  Article 6.1 of ETSI's IPR

Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or
> TECHNICAL SPECIFICATION is brought to the attention of ETSI,
> the Director-General of ETSI shall immediately request the owner to
> give within three months an undertaking in writing that it is prepared
> to grant irrevocable licenses on fair, reasonable and non-
> discriminatory terms and conditions under such IPR . . . .

25.    In short, to avoid the problems of creating market power by adopting an industry

standard, ETSI requires its members not only to disclose their essential patents, but agree to license

those patents on FRAND terms.  If a patent holder will not agree to license its declared patents on

FRAND terms, ETSI can decide not to include that technology in an industry standard, and instead

use a non-infringing alternative. See ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 8. If

the patent holder does agree to license its essential patents on FRAND terms, other companies in the

industry can invest in and deploy the standard without concern that they will be enjoined from using

the technology or be forced to pay an unreasonably high royalty for a patent that is essential to

practice the standard.

26.    Qualcomm violated its disclosure obligations to ETSI by waiting to declare certain

Qualcomm patents as essential to GSM until the industry had made substantial investments in GSM

technology.  Indeed, Qualcomm did not declare any of its patents essential to GSM until many years

after the standard had been set, and it has declared some as recently as this year.  However, when

Qualcomm did belatedly declare its patents essential to the GSM standard, it expressly agreed in

writing to license those patents to all members of ETSI, including Nokia, on FRAND terms.

27.    In the late 1990s, ETSI began considering candidate technologies for the 3G UMTS standard that would have worldwide application. ETSI and its members considered a number of solutions, including WTDMA (which was based on TDMA technology that did not infringe any known Qualcomm patents), WCDMA (which Qualcomm claimed included some of its patents), and CDMA 2000 (which Qualcomm claimed relied almost completely on its patents). ETSI ultimately decided to adopt WCDMA technology as the 3G UMTS standard.

28.    At the outset of the ETSI standard-setting process, Qualcomm refused to license its patents on FRAND terms for 3G use. Subsequently, however, on March 25, 1999, as part of the settlement of a lawsuit between Ericsson and Qualcomm involving cross-claims of patent infringement, Qualcomm finally agreed to license its WCDMA patents that were allegedly essential to the ETSI-proposed UMTS standard on FRAND terms to the rest of the industry. On June 25, 1999, Qualcomm submitted a letter to ETSI stating: "Qualcomm hereby commits . . . to license its essential patents for each single CDMA standard or any of its of its modes [including UMTS] on a fair and reasonable basis free from unfair discrimination." This promise provided ETSI members with the patent clearance required to make the huge capital investment that would lock them into a UMTS standard that included Qualcomm's WCDMA technology.

29.    The ability to use standard-essential technology without threat of a technology "monopolist" royalty rate or the threat of an injunction that would stop sales or operations is an important characteristic of the cell phone industry: once a wireless carrier elects to deploy an SSO-approved standard, switching to another standard may cost hundreds of millions if not billions of dollars and cause substantial disruption to consumers. Thus, if Qualcomm had not agreed with ETSI to license its declared-essential WCDMA patents on FRAND terms, WTDMA or another technology

would have been selected in lieu of WCDMA. This underscores the importance of holding Qualcomm to its contractual FRAND obligation.

30.    Under French law, Qualcomm's agreement to license its declared-essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. ETSI's Rules of Procedure provide that any dispute concerning the interpretation or application of ETSI policies must be resolved by the national courts of its members. Both Nokia Inc. and Qualcomm are Delaware corporations. Nokia is therefore entitled to apply to this Court to enforce and resolve the current dispute as to Qualcomm's contractual commitment to FRAND.

## A COMMITMENT TO FRAND NECESSARILY WAIVES ANY RIGHT TO INJUNCTIVE RELIEF

31.    When Qualcomm contractually agreed in writing to license its declared-essential patents on FRAND terms, it granted irrevocable patent license rights to all other members of ETSI, and gave up the traditional patent holder's right to enjoin others from practicing the technology incorporated in those patents. The only remedy for the use of Qualcomm declared-essential patents is a FRAND royalty, to be determined *ex post* by a court in the event of a dispute between Qualcomm and the licensee.

32.    Allowing a patent holder who has exchanged a FRAND commitment for the benefits of having patented technology included in a standard to seek injunctive relief would defeat the entire purpose of FRAND and the ETSI IPR Policy. As set forth above, the patent holder would be able to use the threat of injunction to extort royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would be forced to comply with unjustified royalty demands or risk losing their substantial investments in complying with the standard. If injunctions were to be allowed, essential patent users would be reluctant to invest in and deploy technologies until and

unless specific royalty terms were reached with every alleged essential patent holder. The public interest would also suffer because roll-out of standard-compliant products and new technologies would be delayed, defeating one of the key purposes of standard-setting (to promote swift implementation).

33.    The delays and impediments imposed on the industry by the threat of injunctions prohibiting use of technologies deemed essential for new services would also contravene Articles 81 and 82 of the European Community Treaty, which, as detailed below, are designed to assure that conduct that eliminates competition from the marketplace (such as an SSO's choice of one technology over other candidate technologies as the standard) has an overall public welfare benefit (*i.e.*, passing the network benefits on to consumers rather than allowing patent owners appropriate the benefit for themselves by demanding excessive royalties). ETSI imposes FRAND obligations on its members specifically to preclude this kind of unequal *ex post* bargaining power.

### QUALCOMM HAS BREACHED ITS CONTRACTUAL OBLIGATION TO LICENSE ITS DECLARED-ESSENTIAL GSM AND UMTS PATENTS ON FRAND TERMS AND IS USING THE THREAT OF INJUNCTIONS TO EXTORT UNJUSTIFIED ROYALTIES IN VIOLATION OF THE TERMS OF ITS ETSI COMMITMENT

34.    Despite having made numerous FRAND commitments to ETSI in connection with GSM and UMTS patents that Qualcomm has declared essential to those standards, Qualcomm has refused to honor its contract to license its patents on FRAND terms. Instead, it has used litigation and the threat of injunction to attempt to extort exorbitant royalty rates from cellular telephone manufacturers.

35.    To date, Qualcomm has filed three separate patent infringement suits against Nokia seeking injunctive or exclusionary relief for alleged infringement of patents allegedly essential for the GSM standard: one in the United States District Court for the Southern District of California (San Diego division), one in the United Kingdom, and one in the United States International Trade

Commission (ITC). In the proceeding before the ITC the **only** relief requested is injunctive in nature, excluding Nokia from importing products that Qualcomm contends infringe on patents it has declared essential to the ETSI GSM standard. These requests for injunctive relief are wholly inconsistent with Qualcomm's unequivocal contractual commitment to ETSI to license these patents to Nokia on FRAND terms.

36.    Qualcomm has clearly indicated that additional injunction suits will follow. During Qualcomm's third-quarter 2006 earnings conference call with analysts, Qualcomm President Steve Altman asserted that in cases where Qualcomm patents are allegedly being infringed, "we would look and seek injunctions in a variety of markets . . . ." The current litigation and the assertions of future injunctive proceedings cause irreparable and immeasurable harm to Nokia by creating uncertainty regarding the ability of Nokia to continue to manufacture and sell GSM standard-compliant products.

37.    Nokia is also justifiably concerned about the potential that Qualcomm may leverage its standards-granted technology monopoly to obtain unjustified injunctive relief in violation of Qualcomm's ETSI commitments in jurisdictions that will not afford Nokia adequate due process. In a number of European jurisdictions there are procedures available to plaintiffs to seek preliminary injunctions without giving defendants (such as Nokia) an opportunity to be heard at the time the injunction is being sought. The plaintiff may not even be under a duty in certain jurisdictions to give the court full and frank information concerning the case at that initial stage. A preliminary injunction may be granted without there being any consideration of equities, or of whether the patentee could be adequately compensated by damages alone. Furthermore, a preliminary injunction may be granted without any bond or undertaking being required from the patentee to pay for the damage caused to Nokia by a preliminary injunction that is later determined to have been

12

erroneously granted. To the extent that Qualcomm is permitted to seek such relief in violation of its ETSI contract, Nokia would suffer irreparable and immeasurable harm because it would never be able to adequately determine in financial terms the extent of Nokia damage.

38.    These concerns are not merely a theoretical possibility. Certain European courts have granted preliminary injunctions even where the patent concerned was relevant to an industry standard and the defendant had indicated a willingness to enter into a license. In Germany, for example, the court is required, under section 139, paragraph 1 of the German Patents Act, to grant permanent injunctive relief where infringement is found. And even though the court must weigh the interests of the parties at the preliminary injunction stage, this can be conducted *ex parte* and therefore Nokia would not have any opportunity to be heard. Similarly, in the Netherlands, the court is not obligated to take the balance of convenience into account and it rarely does so.

39.    Qualcomm's injunction strategy, in contravention of its FRAND commitments, is an attempt to give it leverage to demand royalty rates wholly out of proportion to the number or value of its patents essential to a particular standard. For example, Qualcomm has generally demanded the same royalty rate for its patents essential to its initial proprietary Common Air Interface CDMA technology (where, in practice, it holds close to 100% of the essential patents), as it demands for its patents essential to the IS-95 CDMA standard (where it holds some 80% of the essential patents), as it demands for the CDMA2000 family of standards (where it holds less than 50% of the essential patents), and as it demands for UMTS (where studies show it holds at most 20% of the essential patents). Moreover, on information and belief, Qualcomm owns less than 3% of the essential patents for GSM. Nevertheless, Qualcomm demands that many of its licensees cross-license Qualcomm (giving rights to the licensee's intellectual property rights not only to Qualcomm but also to Qualcomm's chipset customers) for their declared-essential patents, even where the licensee holds a

13

much larger portfolio of essential patents for the standard. These positions by Qualcomm do not comply with their contractual FRAND commitment to ETSI.

## QUALCOMM'S CONTRADICTORY STATEMENTS AND ACTIONS CONCERNING FRAND

40. Qualcomm has adopted multiple and conflicting views of its FRAND obligations. In a motion to dismiss antitrust and other claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its agreement to license its patents on FRAND terms is not legally enforceable.[1] Thus, according to Qualcomm, there is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance. In complaints filed before the International Trade Commission, the United States District Court for the Southern District of California, and an English court, Qualcomm has claimed that, despite its FRAND declarations (which constitute an irrevocable agreement to license its essential patents), it is entitled to an injunction if the initial terms it unilaterally offers are rejected. In negotiations with Nokia, Qualcomm has declared that, despite its contrary written commitments, unless it is paid a royalty that Nokia believes bears no relationship to a FRAND royalty, it will seek injunctions to bar Nokia from selling its products to consumers.

41. Under French law, the terms and enforceability of Qualcomm's contractual commitments must be interpreted, as far as possible, in a manner consistent with Articles 81 and 82 of the European Community Treaty, which prohibit anticompetitive conduct. Specifically, even apart from its FRAND commitments, Article 81 imposes a duty on Qualcomm to license its patents essential to standards on FRAND terms. Article 81(3) provides that, in order to comply with Article

---

[1] *See Broadcom Corp. v. Qualcomm Inc.*, Civ. A. No. 05-3350(MLC) (D.N.J.), Memorandum in Support of Defendant's Motion to Dismiss (filed Dec. 12, 2005), at 15 (arguing that Broadcom's action to enforce FRAND should be dismissed because FRAND is "susceptible of multiple interpretations" and does not have one universally accepted meaning).

81, an agreement of this kind must confer a fair share of resulting benefits on consumers and should not create the possibility of eliminating competition in respect of a substantial proportion of the products in question. SSO members would be able to deny a fair share of benefits to consumers, and substantially to eliminate competition in the instant context, if one or more of them could withhold licenses from downstream competitors, or make such licenses available only on excessively onerous terms. That is why, in order to comply with Article 81, the FRAND commitment must be effective to prevent such serious economic consequences. If an SSO member could retain all or most of the benefits of the standard and simultaneously refuse fair, reasonable, and non-discriminatory treatment to competitors that it particularly wanted to disadvantage (especially after prospective licensees had made large investments in the standard and were locked in), Article 81 would have no practical effect.

42.    In 2005, Ericsson, NEC, Texas Instruments, Broadcom, Panasonic, and Nokia asked the Commission of the European Communities Directorate-General Competition to investigate Qualcomm's anticompetitive conduct, under Articles 81 and 82, in the markets for CDMA and WCDMA cellular telephone technology and chipsets, including its failure to comply with FRAND obligations. In its May 16, 2006 brief to the European Commission, to attempt to avoid claims under Articles 81 and 82, Qualcomm made a number of critical admissions regarding FRAND, which contradict its public statements in the United States (including in the three patent infringement suits discussed above) that its FRAND commitments are unenforceable:

- "Fair Reasonable and Non-Discriminatory ('FRAND') obligations are part of a private agreement, a binding contract that is enforceable against each patent owner."

- "[T]he aim of FRAND is to ensure that whatever standard is developed remains available. A FRAND commitment is intended to prevent an outright refusal to license or the setting of royalty rates so high that they have the effect of preventing licensing . . . ."

- "In the case of dispute, it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."

- "A court procedure would involve an assessment of the number of truly essential patents necessary to practice a given standard or the appropriate royalty base or even the general business conditions prevailing for the given licensed technology."

43.    Qualcomm's selective interpretations of its FRAND obligation that appear to be dependent upon Qualcomm's purpose in specific litigation would render FRAND meaningless and defeat the entire purpose of the ETSI's FRAND requirement. Because of these shifting, self-serving definitions, Nokia asks this court for an order defining the terms and conditions surrounding Qualcomm's FRAND commitment and for an order upholding and affirming Qualcomm's agreement to license patents declared essential on FRAND terms pursuant to its contract with ETSI. This courts intervention is required to stop Qualcomm from charging monopolistic prices to license its declared-essential patents.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*), and Injunctive Relief)

44.    Nokia repeats and realleges the allegations set forth in paragraphs 1-43 above as if set forth fully herein.

45.    An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to whether Qualcomm can obtain injunctive relief in light of its contractual agreement to license its declared-essential patents on FRAND terms.

46.    By entering into contracts with ETSI and ETSI's members to license its essential GSM and UMTS patents on FRAND terms, Qualcomm gave up any right to enjoin Nokia from the use of those patents. Pursuant to its FRAND declarations, Qualcomm granted an irrevocable license on FRAND terms to Nokia and all other members of ETSI and waived any right to seek injunctive

relief or an exclusionary order, which would bar Nokia from practicing those of Qualcomm's patents that Qualcomm has declared are essential in FRAND declarations submitted to ETSI.

47.    Allowing Qualcomm to seek injunctive relief would defeat the purpose of the FRAND commitment. ETSI requests that patent holders agree to FRAND license terms to prevent them from using an SSO-enabled patent monopoly to extort excessive royalty rates after a technological standard has been approved. However, if Qualcomm were allowed to enjoin companies from using its patents, it could ignore its FRAND obligations with impunity, using the threat of injunction to obtain royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would have no choice but to comply or risk losing their substantial investments in complying with the standard. Thus, injunctive relief would give patent holders exactly the kind of *ex post* bargaining power and super-monopoly profits that the FRAND undertaking was intended to prevent.

48.    By agreeing in advance to accept a FRAND royalty for patents declared essential, Qualcomm has agreed that a FRAND royalty (as determined by a court in the event of a dispute) is adequate compensation for the use of its patents. Additionally, because the purpose of the FRAND commitment is to facilitate swift implementation of the standard for the benefit of consumers, a grant of injunctive relief barring practice of the standard would disserve the public interest.

49.    This controversy between Nokia and Qualcomm is real and adverse. In the Southern District of California case, ITC proceedings, and a proceeding in an English court, Qualcomm has sought injunctive relief against Nokia, which would bar Nokia from using patents on which Qualcomm, by virtue of its FRAND declaration, has already granted a license to Nokia. As noted above, upon information and belief, Qualcomm is likely soon to seek injunctive relief in lawsuits against Nokia in other European countries. Qualcomm's conduct in threatening injunctive relief

against the use of its GSM patents is in direct violation of ETSI policies and Qualcomm's own contractual commitment to FRAND.

50.    If Qualcomm is permitted to continue to wield the sword of an injunction threat, it may coerce Nokia into entering a license at a royalty rate that far exceeds the FRAND rate; Nokia would thereafter be contractually committed under a specific license agreement and would have no redress for Qualcomm's FRAND violation. Alternatively, if Nokia stands firm and refuses to pay a non-FRAND royalty, and if Qualcomm persuades some court in some jurisdiction to enjoin Nokia's manufacture of cell phones, Nokia's business will be substantially harmed.

51.    An additional problem arises from the fact that Qualcomm has filed, and is likely to file, injunctive actions in numerous jurisdictions in the United States and Europe. This multiplicity of actions poses a substantial risk that Nokia could be subject to inconsistent adjudications to the extent that some courts rule that Qualcomm's FRAND obligation precludes it from seeking injunctive relief, while other courts rule that Qualcomm is entitled to seek injunctive relief. This highlights the need for a single and prompt adjudication by this Court of the FRAND contractual obligations of Delaware citizen Qualcomm.

52.    Relatedly, if Qualcomm is permitted to pursue injunctions in multiple jurisdictions, and if Nokia is obligated to advance the FRAND defense in each such jurisdiction, Nokia will be forced to incur substantial litigation costs that, in jurisdictions following the American rule, are generally not compensable even if Nokia prevails. Again, a single and prompt adjudication of Qualcomm's right to seek injunctive relief avoids this problem.

53.    The issue involved in this controversy is ripe for judicial determination. Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by

the national courts of the member parties. Section 4.2 of ETSI's Guide on IPRs regarding Dispute

Resolution states:

> ETSI Members should attempt to resolve any dispute related to the
> application of the IPR Policy bilaterally in a friendly manner. Should
> this fail, the Members concerned are invited to inform the ETSI GA
> in case a friendly mediation can be offered by other ETSI Members
> and/or the ETSI Secretariat. However, it should be noted that once an
> IPR (patent) has been granted, <u>in the absence of an agreement
> between the parties involved, the national courts of law have the sole
> authority to resolve IPR disputes</u>.

In addition, Qualcomm's May 16, 2006 brief to the European Commission admits that "[i]n the case

of dispute [regarding FRAND], it would be for a Court or similar authoritative body to resolve the

particular disputes in the given situation."

54.    Accordingly, Nokia seeks a declaratory judgment that Qualcomm is not entitled to

injunctive or exclusionary relief for any alleged infringement of any GSM or UMTS patents that

Qualcomm has declared essential and agreed to license on FRAND terms. Nokia further seeks a

declaratory judgment that Qualcomm's sole remedy for any alleged infringement of such patents is

limited to payment of a royalty on FRAND terms, as determined by a court if the parties cannot

agree.

55.    Qualcomm's pursuit of injunctions in spite of its agreement that its only remedy is a

FRAND royalty constitutes a breach of its contractual obligation for which Nokia has no adequate

remedy at law. Accordingly, Nokia seeks an order enjoining Qualcomm from pursuing an injunction

or exclusionary order as a remedy for alleged infringement of any patent it has declared essential to

ETSI.

## SECOND CLAIM FOR RELIEF

**(Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*))**

56.    Nokia repeats and realleges the allegations set forth in paragraphs 1-55 above as if set forth fully herein.

57.    An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to the meaning of FRAND.

58.    Pursuant to its contracts with ETSI, Qualcomm has agreed to license on FRAND terms any patents that Qualcomm has declared are essential to the GSM or UMTS standards.

59.    Notwithstanding its FRAND commitments, Qualcomm has refused to offer a FRAND royalty rate to Nokia on any patents it has declared essential to the GSM standard. Further, Qualcomm has refused to offer Nokia a FRAND royalty rate for the use of its declared-essential UMTS patents after April 2007 (when Qualcomm's current agreement not to assert its UMTS patents against Nokia expires). Instead, Qualcomm has demanded that Nokia accept license terms that are neither fair, nor reasonable, nor non-discriminatory, backing its demands with the threat of injunction as discussed *supra*.

60.    Under French law, Qualcomm's agreement to license its essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members, including Nokia. Nokia is therefore entitled to enforce Qualcomm's contractual commitment to FRAND.

61.    Qualcomm contends that FRAND does not impose any specific and concrete obligations on the licensor with regard to the actual level of royalties (or any other terms and conditions for that matter). In its motion to dismiss claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its promise to license its patents on FRAND terms is not legally enforceable. Thus, according to Qualcomm, there

is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance.

62.    Qualcomm's empty characterization of FRAND cannot be correct. In any given situation, evidence will be available to show that the terms "fair, reasonable, and non-discriminatory" are sufficiently certain to be capable of judicial interpretation and enforcement, and impose substantive limits on Qualcomm's ability to impose excessive royalty rates or other onerous terms in its patent licenses. Qualcomm has violated these limits by refusing to license its patents to Nokia on FRAND terms.

63.    Qualcomm contends that, despite its FRAND obligation, it can charge a royalty as high as the fear of an injunction can create. Nokia, on the other hand, contends that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

64.    This controversy between Nokia and Qualcomm is real and adverse. Qualcomm has refused to offer Nokia a FRAND royalty rate for its declared-essential GSM patents, and has threatened to enjoin Nokia from using patents on which Nokia is contractually entitled to a FRAND license. Qualcomm has also refused to negotiate a FRAND royalty rate for declared-essential UMTS patents for the period after April 2007.

65.    The issue involved in this controversy is ripe for judicial determination. Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by the national courts of the member parties. Section 4.2 of ETSI's Guide on IPRs regarding Dispute Resolution states:

21

> ETSI Members should attempt to resolve any dispute related to the application of the IPR Policy bilaterally in a friendly manner. Should this fail, the Members concerned are invited to inform the ETSI GA in case a friendly mediation can be offered by other ETSI Members and/or the ETSI Secretariat. However, it should be noted that once an IPR (patent) has been granted, <u>in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes</u>.

In addition, Qualcomm's May 16, 2006 brief to the European Commission, in an attempt to avoid liability under Article 81 and 82, acknowledges that "[i]n the case of dispute [regarding FRAND], it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."

66.    Accordingly, Nokia seeks a declaratory judgment that Qualcomm's FRAND commitments constitute binding contractual obligations, and defining the principles by which a FRAND royalty must be calculated.

### THIRD CLAIM FOR RELIEF

### (Specific Performance)

67.    Nokia repeats and realleges the allegations set forth in paragraphs 1-66 above as if set forth fully herein.

68.    Qualcomm has declared numerous patents to be essential to the UMTS standard promulgated by ETSI.

69.    In connection with its declarations to ETSI, Qualcomm has agreed to license each of its essential UMTS patents to all members of ETSI, including Nokia, on FRAND terms.

70.    Under French law, Qualcomm's agreement to license its essential UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members, including Nokia. Nokia is therefore entitled to enforce Qualcomm's contractual commitment to FRAND.

71.    Notwithstanding its contractual obligations to ETSI and Nokia, Qualcomm has refused to negotiate a FRAND royalty rate for its UMTS patents for the period after April 2007.

72.    Nokia has no adequate remedy at law for Qualcomm's breach of its contractual obligation to license its essential patents on FRAND terms or to negotiate a FRAND royalty rate in good faith.

73.    Accordingly, Nokia is entitled to an order of specific performance ordering Qualcomm to participate in a good faith negotiation with Nokia for license of Qualcomm's essential UMTS patents on FRAND terms for the period after April 2007, in light of this Court's resolution of the dispute between the parties as to the method for determining a FRAND royalty.

## PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that this Court:

A.    Adjudge and decree that, by virtue of its express and implied FRAND commitments, Qualcomm has waived any right to seek, or is otherwise barred from seeking injunctive relief, including an exclusion or cease-and-desist order by the ITC, to prevent Nokia from using technology encompassed by any patents which Qualcomm has declared essential to the GSM or UMTS standards established by ETSI;

B.    Permanently enjoin Qualcomm worldwide from seeking such injunctive relief related to patents Qualcomm has declared essential to any standard;

C.    Adjudge and decree that Qualcomm's commitment to license its essential GSM and UMTS patents on FRAND terms is a binding contractual obligation, enforceable by Nokia;

D.    Order that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-

23

infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

      E.      Order that Qualcomm specifically perform its contractual obligation to negotiate a FRAND royalty rate with Nokia for the period after April 2007 for any patents Qualcomm has declared essential to UMTS, in light of this Court's determination of the method for calculating FRAND terms; and

      F.      That Nokia have such other and further relief as this Court may deem just and proper.

Of Counsel:

A. William Urquhart
Frederick A. Lorig
Patrick M. Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-254
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

Rick Werder
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Dated: August 8, 2006

Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Richards, Layton & Finger, P.A.        (#3188)
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701

Attorneys for Plaintiffs
Nokia Corporation and Nokia Inc.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NOKIA CORPORATION and<br>NOKIA, INC.,<br><br>        Plaintiffs,<br><br>v.<br><br>QUALCOMM INCORPORATED,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)   C. A. No. _____<br>)<br>)<br>)<br>) |

**NOTICE OF REMOVAL**

OF COUNSEL:

Evan R. Chesler
Richard J. Stark
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: August 16, 2006

Richard L. Horwitz (#2246)
Matthew E. Fischer (#3092)
Kenneth L. Dorsney (#3726)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street, P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
rhorwitz@potteranderson.com
mfischer@potteranderson.com
kdorsney@potteranderson.com

*Counsel for Defendant*

PLEASE TAKE NOTICE that defendant QUALCOMM Incorporated ("QUALCOMM"), by and through its undersigned counsel, and pursuant to Sections 1338, 1441, and 1446 of Title 28 of the United States Code, hereby removes this action presently pending in the Court of Chancery of the State of Delaware in and for New Castle County, to the United States District Court for the District of Delaware. As grounds for this removal, defendant states as follows:

1.    Plaintiffs Nokia Corporation and Nokia, Inc. (collectively, "plaintiffs") commenced this action on August 8, 2006, by the filing of a complaint in the Court of Chancery of the State of Delaware in and for New Castle County, under C.A. No. 2330-N. A copy of the complaint is attached hereto as Exhibit A.

2.    Plaintiffs purport to assert three claims against QUALCOMM related to alleged contractual obligations arising from QUALCOMM's agreement to "license its essential GSM and UMTS patents on FRAND terms". (See Compl. ¶¶ 46, 60, 70).

3.    Plaintiffs seek a declaration of the meaning of these alleged contractual obligations, an injunction against QUALCOMM's seeking certain relief in a prior-filed case for patent infringement currently pending in the United States District Court for the Southern District of California and in other actions, and specific performance.

4.    United States patent law is a necessary element of plaintiffs' claims. The alleged contractual obligations upon which plaintiffs rely allegedly arise out of QUALCOMM's commitments to the European Telecommunications Standardization

2

Institute ("ETSI") and that body's "IPR Policy". (See Compl. ¶¶ 19-25, 28.) That policy

provides – as quoted in the complaint – that:

> "When an ESSENTIAL IPR relating to a particular
> STANDARD or TECHNICAL SPECIFICATION is
> brought to the attention of ETSI, the Director-General of
> ETSI shall immediately request the owner to give within
> three months an undertaking in writing that it is prepared to
> grant irrevocable licenses on fair, reasonable and non-
> discriminatory terms and conditions under such IPR …."
> (Compl. ¶ 24 (quoting ETSI IPR Policy cl. 6.1).)

5.    Thus, on its face, the ETSI IPR policy seeks a commitment to offer

licenses on fair, reasonable and non-discriminatory terms only as to essential patents.

Indeed, the form ETSI uses to record licensing commitments related to patents confirms

that such commitments are limited to patents that are, in fact, essential:

> "The SIGNATORY has notified ETSI that it is the
> proprietor of the IPRs listed in Annex 2 and has informed
> ETSI that it believes that the IPRs may be considered
> ESSENTIAL to the Standards listed above.
>
> The SIGNATORY and/or its AFFILIATES hereby declare
> that they are prepared to grant irrevocable licenses under
> the IPRs on terms and conditions which are in accordance
> with Clause 6.1 of the ETSI IPR Policy, in respect of the
> STANDARD, to the extent that the IPRs remain
> ESSENTIAL." (ETSI IPR Information Statement and
> Licensing Declaration Forms, annex 1 (attached hereto as
> Exhibit E) (emphasis added).)

6.    Plaintiffs allege that, consistent with the ETSI IPR policy,

QUALCOMM provided a commitment to ETSI that was limited to essential patents:

> "On June 25, 1999, Qualcomm submitted a letter to ETSI
> stating: 'Qualcomm hereby commits . . . to license its
> essential patents for each single CDMA standard or any of
> its modes [including UMTS] on a fair and reasonable basis
> free from unfair discrimination.'" (Compl. ¶ 28 (alterations
> in original, emphasis added).)

3

7.    The ETSI IPR Policy contains the following definition of "essential":

> "'ESSENTIAL' as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR." (ETSI IPR Policy cl. 15.6 (quoted in Compl. ¶ 23) (emphasis added).)[1]

8.    Resolution of plaintiffs' claims necessarily requires a determination under U.S. patent law as to whether certain patents are "ESSENTIAL" – that is, whether practicing the relevant standard is "not possible . . . without infringing" (Compl. ¶ 23) QUALCOMM's U.S. patents.  Plaintiffs seek to enjoin QUALCOMM from seeking injunctive relief in the United States District Court for the Southern District of California, and from seeking relief from the United States International Trade Commission, for plaintiffs' infringement of United States patents.  Plaintiffs' claims are predicated on the theory that those patents are essential to ETSI standards and subject to an ETSI licensing commitment.  (Compl. ¶¶ 46, 49, 55.)  Those claims cannot be resolved without determining whether the U.S. patents at issue are in fact essential to the ETSI standards – that is, whether the equipment and methods that comply with the standards necessarily infringe the patents.  That question of infringement is indisputably a substantial question of patent law.

9.    Where, as here, a determination of a purported state law claim requires application of the patent laws, the claim "arises under" the patent laws within the

---

[1] "IPR" is defined as "any intellectual property right conferred by statute law including applications therefor other than trademarks".  (ETSI IPR Policy cl. 15.7.) (Attached here to as Exhibit F).

4

meaning of 28 U.S.C. § 1338(a).  U.S. Valves, Inc. v. Dray, 212 F.3d 1368, 1372 (Fed.

Cir. 2000); see also Highland Supply Co. v. Klerk's Flexible Packaging, B.V., No. 05-

CV-482, 2006 WL 278164, at *1-2 (S.D. Ill. Feb. 1, 2006).  Thus, this action is

removable to this Court pursuant to 28 U.S.C. § 1441(b) without regard to the citizenship

or residence of the parties.

        10.    QUALCOMM was served with the summons and complaint on

August 8, 2006.  Thus, this Notice of Removal is timely filed under 28 U.S.C. § 1446(b).

        11.    Because this District embraces the place where the action is

pending, removal to this Court is appropriate under 28 U.S.C. §§ 1441(a) and 1446(a).

        12.    Pursuant to 28 U.S.C. § 1446(d), a copy of this notice of removal

is being filed with the Register in Chancery of the Court of Chancery of the State of

Delaware in and for New Castle County.  Also pursuant to 28 U.S.C. § 1446(d), written

notice of removal is being served on plaintiffs.

        13.    Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all

process, pleadings, and orders served on QUALCOMM in this case are attached hereto as

Exhibits A through D.

        WHEREFORE, QUALCOMM hereby removes this action, now pending

in the Court of Chancery of the State of Delaware in and for New Castle County, to this

Court, pursuant to 28 U.S.C. Section 1441(b), and respectfully request that this Court

take cognizance, accept jurisdiction, and enter such orders or take such steps as may be

necessary to effect a true record of such proceedings as may have been had in the Court

of Chancery of the State of Delaware in and for New Castle County.

5

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Evan R. Chesler
Richard J. Stark
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated:  August 16, 2006

By: _____
    Richard L. Horwitz (#2246)
    Matthew E. Fischer (#3092)
    Kenneth L. Dorsney (#3726)
    Hercules Plaza, 6th Floor
    1313 N. Market Street, P.O. Box 951
    Wilmington, Delaware 19899
    (302) 984-6000
    rhorwitz@potteranderson.com
    mfischer@potteranderson.com
    kdorsney@potteranderson.com

*Counsel for Defendant*

746267

6

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on August 16, 2006, a true and correct

copy of the within document was caused to be served on the attorney of record at the following

addresses as indicated:

## VIA HAND DELIVERY

Lisa A. Schmidt
Jeffrey Moyer
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE  19899

By: _____
       Richard L. Horwitz
       Matthew E. Fischer
       Kenneth L. Dorsney
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       Wilmington, Delaware 19899-0951
       (302) 984-6000
       rhorwitz@potteranderson.com
       mfischer@potteranderson.com
       kdorsney@potteranderson.com

746355