## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NOKIA CORPORATION and NOKIA, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-509 |
| | ) | |
| QUALCOMM INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MOTION TO EXPEDITE PROCEEDINGS
## WITH RESPECT TO MOTION TO REMAND

Pursuant to Federal Rule of Civil Procedure 16 and Local District Court Rule 7.1.2,

Plaintiffs Nokia Corporation and Nokia Inc. (together, "Nokia") hereby move this Court for

entry of an Order expediting proceedings related to Nokia's Motion to Remand, which is being

filed and served contemporaneously herewith. In support of its Motion to Expedite Proceedings,

Nokia states as follows:

### INTRODUCTION

1.     Qualcomm Incorporated ("Qualcomm") has filed at least five separate lawsuits

against Nokia around the world, seeking injunctions that would irreparably harm Nokia's

business. In each case, Qualcomm seeks to enjoin Nokia from using patented technology that

Qualcomm has contractually agreed to license to Nokia.  Nokia filed the present action in

Delaware Chancery Court to enforce those contracts and, in particular, to enforce the

commitment of Qualcomm not to seek injunctive relief for alleged infringement of patents that it

has declared essential to wireless telecommunications standards.  Nokia's contract action would

eliminate the threat of inconsistent judgments around the world, and prevent Qualcomm from

obtaining an injunction that it is not entitled to pursue.

2.      Nokia sought an expedited trial in the Chancery Court because, in some of the jurisdictions where Qualcomm has filed or may file suit, injunctions may be issued without prior notice and without weighing the balance of equities. An injunction in any one of those jurisdictions would cause Nokia irreparable harm. Thus, an immediate resolution of the parties' contractual dispute is necessary.

3.      On August 11, the Chancery Court held a hearing on Nokia's request for an expedited trial, and indicated that it would be available to try the case in early 2007. Faced with the unfavorable prospect of a prompt ruling on the merits, Qualcomm removed the case to this Court, wrongly claiming that Nokia's contract claims would require the Chancery Court to construe and conduct infringement analysis of unspecified Qualcomm patents. Qualcomm's improper removal of this action threatens to delay the Chancery Court proceeding and deny Nokia the expedited relief it seeks. The longer Qualcomm can delay remand to the Chancery Court, the longer it can avoid justice on the merits. This Court should therefore hear Nokia's Motion to Remand on an expedited basis, to prevent Qualcomm from delaying this action any more than it already has.

## FACTUAL AND PROCEDURAL BACKGROUND

4.      On August 8, 2006, Nokia filed its Complaint in the Delaware Court of Chancery against Qualcomm for declaratory judgment, injunctive relief and specific performance arising from Qualcomm's breaches of binding contracts between the parties. *See* Ex. A. The Complaint alleges that Qualcomm has contractually agreed to license certain patents to Nokia on fair, reasonable, and non-discriminatory terms. *See id.* at ¶ 19. The Complaint further alleges that Qualcomm's contractual obligations bar it from seeking injunctive relief against Nokia for making use of the technology covered by those patents. *See id.* at ¶¶ 31-33. Rather, Qualcomm's sole remedy for the use of such patents is a fair and reasonable royalty. *Id.*

- 2 -

5.      Despite its contractual obligations, Qualcomm has refused to offer Nokia fair and reasonable license terms, instead insisting on plainly monopolistic royalty rates. *See* Ex. A. at ¶¶ 34, 40. In a transparent attempt to force Nokia to accept unfair terms, Qualcomm initiated lawsuits against Nokia in disparate *fora* around the world -- in the Southern District of California, the International Trade Commission, the United Kingdom, and (as Nokia subsequently learned) France and Germany -- seeking injunctions that would prevent Nokia from using the technologies Qualcomm has contractually agreed to license. *Id.* at ¶¶ 35-36. Qualcomm has also threatened to initiate additional injunction suits. *See id.* at ¶¶ 34-36, 39. In Germany and certain other foreign jurisdictions, courts may issue injunctions with little or no due process, without considering contractual defenses, and without weighing the balance of equities. *Id.* at ¶ 38. Qualcomm's actions pose an imminent threat to Nokia: if any one of Qualcomm's cases proceeds and an injunction issues, Nokia's business will be irreparably harmed. *See id.* at ¶¶ 36, 50.

6.      Because of this threat of imminent injunctive relief, Nokia filed with its Complaint a Motion to Expedite Proceedings (the "Motion to Expedite"), seeking a prompt trial on the merits within 6 months. *See* Ex. B. Qualcomm opposed the Motion to Expedite, arguing that the Court of Chancery is an improper forum. *See* Ex. C. Vice Chancellor Strine held a prompt hearing on the Motion to Expedite on August 11. It was not until the day before this hearing that Nokia learned Qualcomm had filed the action in Germany. *See* Ex. D at 10. At the hearing on the Motion to Expedite, the Vice Chancellor informed the parties that he had trial dates available in early 2007. *Id.* at 32. The Vice Chancellor also admonished Qualcomm that if it filed any further lawsuits, he would exercise his discretion to retain jurisdiction and set a trial date immediately: "I will say this to QUALCOMM. If I find out tomorrow there's an[other] action in Belgium and an action in the Netherlands, then I'm going to set a trial date." *Id.* at 9;

- 3 -

*see also id.* at 32 (". . . if QUALCOMM files an action anywhere else than it's already done, then I'm going to set a trial date."). The Vice Chancellor ordered expedited briefing on Qualcomm's objections to jurisdiction, with Qualcomm's opening brief to be due on August 25, 2006. *Id.* at 19, 31. He requested, in the interim, that the parties attempt to stipulate to jurisdiction. *See id.* at 18. Finally, he ordered that the parties submit a joint status update and a stipulated briefing schedule by August 16, 2006. *See id.* at 31.

7.      Shortly after the hearing, Qualcomm wrote to the Court admitting that yet another lawsuit (this time in France) "may have been commenced" against Nokia's European affiliates, and stating that Qualcomm would attempt to "intercept" this lawsuit but may be too late. *See* Ex. E.

8.      Nokia subsequently sent a letter asking if Qualcomm would stipulate to jurisdiction in the Court of Chancery, requesting copies of the pleadings in the new German and French lawsuits, and asking Qualcomm to identify any other jurisdictions where it had initiated lawsuits. *See* Ex. F. Qualcomm did not respond. Then, on the day the status update and briefing schedule were due to the Vice Chancellor, Qualcomm instead filed a Notice of Removal. Nokia has since filed its Motion to Remand, which demonstrates that this action does not raise any federal question. By this motion, Nokia respectfully requests expedited proceedings with respect to its Motion to Remand.

## ARGUMENT

9.      This Court may expedite proceedings with respect to the Motion to Remand pursuant to the Court's broad authority to schedule and manage its cases. *See* FED. R. CIV. P. 16; *see also* D. DEL. L.R. 7.1.2 ("*[u]nless otherwise ordered by the Court,* the briefing and affidavit schedule for presentation of all motions shall be....") (emphasis added). This Court has not hesitated to expedite briefing on remand motions where there was a threat that a party could be

denied expedited relief in state court. *See Atlantic Tele-Network, Inc. v. Prosser*, C.A. No. 95-507 (D. Del. Aug. 21, 1995) (ORDER) (Exhibit G).[1]  The Court should exercise its discretion to expedite briefing and argument on Nokia's Motion to Remand.

10.     As set forth in Nokia's Motion for Expedited Proceedings in the Court of Chancery, if Qualcomm is not forced to abide by the terms of its contractual obligations, Nokia's business will suffer irreparable harm. *See* Ex. B at ¶ 17 (citing numerous cases applying Delaware law and finding loss of market share constituted irreparable harm); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("We are satisfied that this loss of market share constitutes irreparable harm."). Qualcomm has now followed through on its threat to file injunction suits in jurisdictions that afford little or no process before granting an injunction. *See* Ex. A at ¶ 38 (noting that courts in Germany may grant *ex parte* relief in these circumstances).  Nokia may be subject to an injunction without having an opportunity to present any defense. *Id.* at ¶¶ 37-38.  Qualcomm may file additional injunction suits in other jurisdictions at any time.

11.     Further, Qualcomm's removal tactic threatens to prolong the time period during which Nokia will be forced to continue litigating in disparate *fora* under the threat of an injunction. Ex. A at ¶ 35. As discussed in Nokia's Motion for Expedited Proceedings in the Court of Chancery, the issue whether Qualcomm's contractual commitments preclude it from wielding the threat of injunction warrants expedited treatment. *See* Ex. B. at ¶ 16.  Thus, it is imperative that Nokia's Motion to Remand be considered promptly so that, if the Court so orders, this case can be remanded to the Vice Chancellor.

---

[1] Defendants in *Atlantic* did not object to prompt briefing.  Qualcomm should do the same here.

12.    Indeed, Vice Chancellor Strine ordered a prompt schedule to determine Qualcomm's objections to jurisdiction.    He further ordered that discovery proceed notwithstanding Qualcomm's objections to jurisdiction and stated that he is available for a trial of this dispute in early 2007. *See supra* pp. 3-4. The failure to expedite proceedings with respect to the Motion to Remand would allow Qualcomm to frustrate the Vice Chancellor's orders with respect to a prompt briefing schedule and discovery.  It may also jeopardize the parties' ability to bring this matter to trial within the time period contemplated by the Vice Chancellor and, consequently, place Nokia at even greater risk of irreparable harm.

13.    For the foregoing reasons, the Motion to Remand warrants expedited treatment. If this action is not promptly remanded back to the Court of Chancery, where it belongs, Qualcomm will have succeeded in disrupting Nokia's plainly justified request for expedited relief from that Court.

**WHEREFORE**, Nokia respectfully requests that this Court grant its Motion for Expedited Proceedings related to Nokia's Motion to Remand, and order a schedule as set forth on the attached form of order.

- 6 -

OF COUNSEL:

A. William Urquhart
Frederick A. Lorig
Patrick M. Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Richard I. Werder, Jr.
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Dated: August 18, 2006

Thomas A. Beck (#2086)
beck@rlf.com
Lisa A. Schmidt (#3019)
schmidt@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Steven J. Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19899
(302) 651-7700

Attorneys for Plaintiffs Nokia Corporation and Nokia Inc.

- 7 -

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2006, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and by hand

delivery to the following:

> Matthew E. Fischer, Esquire
> Potter Anderson & Corroon LLP
> 1313 North Market Street
> P.O. Box 951
> Wilmington, Delaware  19899

Steven J. Fineman (#4025)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

NOKIA CORPORATION and NOKIA, INC.,    )
                                      )
                   Plaintiffs,        )
                                      )
        v.                            )        C.A. No.
                                      )
QUALCOMM INCORPORATED,                )
                                      )
                   Defendant.         )
                                      )

## ORDER

The Court, having considered Nokia's Motion to Expedite Proceedings, and for good cause shown,

IT IS HEREBY ORDERED, this _____ day of August, 2006, that:

1.    Nokia's Motion to Expedite Proceedings is granted.

2.    Qualcomm shall file and serve its answering brief in response to Nokia's Motion to Remand on or before August 23, 2006.

3.    Nokia shall file and serve its reply brief, if any, on or before August 25, 2006.

4.    A hearing on the Motion to Remand shall be held on August _____, 2006 at ____ EDT.

_____
United States District Judge

## CERTIFICATION PURSUANT TO
## DISTRICT OF DELAWARE LOCAL RULE 7.1.1

Counsel for Plaintiffs has conferred with counsel for Defendant pursuant to District of Delaware Local Rule 7.1.1 and Defendant declined to consent to the relief sought in the attached motion.

Jeffrey L. Moyer (#3309)

# EXHIBIT A

**EFiled: Aug 9 2006 9:53AM EDT**
**Transaction ID 12021331**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**
**IN AND FOR NEW CASTLE COUNTY**

| | |
|---|---|
| NOKIA CORPORATION and NOKIA INC., | |
| Plaintiffs, | |
| v. | C.A. No. _____ |
| QUALCOMM INC., | |
| Defendant. | |

## COMPLAINT

Plaintiffs Nokia Corporation and Nokia Inc. (collectively, "Nokia"), by and through their undersigned counsel, allege the following as and for their Complaint against defendant Qualcomm Inc. ("Qualcomm"):

### NATURE OF THE ACTION

1.      Nokia seeks declaratory relief and specific performance to enforce the terms of contracts in which Qualcomm, a Delaware corporation, has licensed Nokia to practice Qualcomm essential patents on fair, reasonable, and non-discriminatory terms ("FRAND" terms).    As hereinafter alleged, Qualcomm has induced various standard-setting organizations ("SSOs"), including the European Telecommunications Standardization Institute ("ETSI"), to incorporate Qualcomm's patented technology into industry standards for cellular phone products and equipment by contractually agreeing to license those patents on FRAND terms.  However, Qualcomm has breached its contractual obligations by demanding a royalty rate that exceeds FRAND terms and by threatening to enjoin Nokia from manufacturing or selling products that Qualcomm alleges practice the licensed essential patents unless Qualcomm's demands for unfair and unreasonable royalties are

accepted. Qualcomm has further breached its contractual obligations by refusing to negotiate FRAND royalty rates in good faith.

2.      Nokia seeks a judicial declaration establishing that Qualcomm's FRAND commitments constitute binding and enforceable contractual obligations licensing its declared-essential patents to Nokia on FRAND terms, which includes a FRAND royalty, and setting forth the method by which the FRAND royalty is to be calculated.

3.      In addition, Nokia seeks a judicial declaration that, by contracting to license its declared-essential patents to Nokia on FRAND terms, Qualcomm has waived the right to seek injunctive relief to restrain the use of those declared-essential patents. In the event of a dispute between the parties (including the filing of any infringement action in any country), Qualcomm's remedy is limited to recovery of a FRAND royalty as determined by a court.

4.      Accordingly, Nokia seeks an order enjoining Qualcomm worldwide from seeking an injunction or an exclusionary order as a remedy for alleged infringement of any declared-essential patents which it has contractually agreed to license on FRAND terms.

5.      Finally, Nokia seeks an order compelling specific performance requiring that Qualcomm participate in a good faith negotiation on the amount of a FRAND royalty, recognizing the principles that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization, and such other factors as the court deems fair and proper under the circumstances.

RLF1-3046183-1

## PARTIES AND JURISDICTION

6.    Plaintiff Nokia Corporation is a corporation organized under the laws of Finland, with its principal place of business located in Espoo, Finland.

7.    Plaintiff Nokia Inc. is a United States subsidiary of Nokia Corporation. Nokia Inc. is a corporation organized under the laws of the State of Delaware, with its headquarters located in Irving, Texas. Nokia Corporation and Nokia Inc. are collectively referred to herein as "Nokia."

8.    Nokia is a world leader in the field of mobile communications. Nokia's primary line of business is the manufacture and sale of cellular telephone handsets. Nokia also manufactures and sells infrastructure used in cellular telephone networks, and owns substantial intellectual property rights in cellular telephone technologies.

9.    Defendant Qualcomm Inc. ("Qualcomm") is a corporation organized under the laws of Delaware. One of Qualcomm's business units, called the Technology Licensing Segment, or "QTL," licenses intellectual property rights in cellular telephone technology. Qualcomm also manufactures and sells chipsets for use in cellular telephones through a separate business unit called the CDMA Technologies Segment, or "QCT."

10.    Both Qualcomm and Nokia are members of a European SSO, ETSI, which has standardized the technology needed for cellular telephones. In accordance with the terms of their agreement with ETSI (described further below), each company has licensed, by means of declarations to ETSI, its essential patents to the other on FRAND terms.

11.    ETSI's Rules of Procedure provide that any dispute regarding the interpretation or application of ETSI policies must be resolved in the national courts of the member parties, applying French law. Under French law, Qualcomm's undertaking to license its essential patents on FRAND terms creates a binding and enforceable license agreement between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. Additionally, Qualcomm's contractual obligation

RLF1-3046183-1

includes a duty to negotiate in good faith to determine a FRAND royalty rate. Under ETSI rules, Nokia is entitled to enforce that contract against Qualcomm in this Court because Qualcomm is a Delaware corporation.

## DEVELOPMENT OF CELLULAR TELEPHONE TECHNOLOGY STANDARDS

12.    For a cellular telephone to work, it must be able to transmit and receive radio signals to and from cellular transmitting towers, and be able to maintain its signal as it is passed from one tower to the next. All components of a wireless system must be able to interact with each other seamlessly, regardless which company or companies manufacture the various components. This includes the transmitting towers, the switches, the telephones, the chipsets that allow the telephones to communicate with the towers, and the chipsets that allow the towers to receive and transmit data to the switches for retransmission to the landline network or other cellular networks and cellular telephones. To meet these requirements, all components in a single cellular system must be "interoperable" and work effectively and efficiently with all other components.

13.    In order to ensure that components from different companies can interact with one another and that products can be brought to the marketplace expeditiously, wireless carriers, telephone manufacturers, and chipset manufacturers must follow a common set of industry standards for wireless communication technology. Thus, for decades, cellular service providers and cellular product manufacturers have been members of SSOs that exist to create a common set of standards that all members can follow. In return, the SSOs demand that their members license patents that are essential to any standard on FRAND terms, rather than use the threat of injunction to exploit the existence of the standard to extort super-monopoly royalties.

14.    Once a given standard has been selected, the patents essential to that standard gain value because competing technologies are effectively eliminated from the marketplace. The technology monopoly granted to essential patent holders results in the establishment of a significant

base of royalty payers and insures a revenue stream to essential patent holders. Once capital investments (on the order of billions of dollars) are made to comply with the standard, cellular equipment manufacturers and network service providers are locked into the technology and into paying royalties to holders of essential patents. This lock-in confers upon patent holders the ability, if unrestrained, to extort super-monopoly royalties from prospective licensees using the threat of lawsuit and injunction. SSOs protect their members and the public from such opportunistic behavior by obligating patent holders to license their essential patents on FRAND terms. This obligation prevents the patent holder from appropriating for itself (rather than consumers) the value of having an industry standard.

15.    In simple terms, the standard-setting process involves:    (1) an evaluation of competing technologies to determine which best suits the market need; (2) a patent clearance process where the SSO's members unequivocally agree in writing that any patent that is essential to practice the standard is licensed to all on FRAND terms; and (3) the approval and adoption of the standard. The patent clearance process is always completed before the standard is adopted and implemented to insure that no member may use its patents to impede competition (*i.e.*, charge exorbitant royalty rates for patents that must be used by all market participants because they are essential to practice the standard) or exclude participants from the marketplace (*i.e.*, by using injunctions and exclusionary tactics to block a patent's use). If members do not agree to their license essential patents on FRAND terms, SSOs look to alternative technologies where patent clearance is available.

16.    Cellular telephone standards have evolved through distinct "generations" as consumers have demanded additional features and technology owners have developed new innovations. The earliest cellular telephones operated on analog technology and allowed only voice transmission and very slow transmission of data over analog cellular airwaves. These early analog

systems are typically referred to as first-generation ("1G") technology. 1G technology was characterized by inherent capacity limitations, minimal and slow data transfer capabilities, low security, inconsistent service levels, and significant power consumption.

17.    Consumers' increased demand for cellular service and for added performance drove the development of a second generation of cellular telephone technology ("2G"). 2G telephones, which are based on digital technology, provide significantly increased voice and data capacity and also support additional functions, such as paging and e-mail. 2G technology also offers greater privacy, greater fraud protection, and lower prices as compared to 1G technology. Most cellular telephones in use today are based on 2G technology standards.

18.    The three principal 2G standards in use today are called Global System for Mobility ("GSM"), Time Division Multiple Access ("TDMA"), and Code Division Multiple Access ("CDMA"). The technical parameters and specifications of each 2G technology were reviewed and approved by various SSOs. The three technologies are based on different underlying air interface and transmission regimes. Thus, as a general proposition, GSM-based hardware components will not work on a CDMA or TDMA system, TDMA components will not work on a GSM or CDMA system, and CDMA components will not work on a GSM or TDMA system. As more fully described below, a third generation of wireless technology ("3G"), which will allow significantly increased data speed and capacity, is currently being deployed and is one of the subjects of this action.

## THE FRAND CONTRACTS

19.    As set forth below, Qualcomm has entered into contractual agreements with ETSI and ETSI's members, including Nokia, that Qualcomm will license on FRAND terms any of its patents that are essential to the GSM standard or its third-generation successor, Universal Mobile Telephone System ("UMTS").

RLF1-3046183-1

20.     ETSI is a non-profit European SSO headquartered in France. It was under ETSI's auspices that the GSM technology standard was developed, reviewed, and approved.

21.     Qualcomm is a member of ETSI because its affiliates Qualcomm Europe S.A.R.L. and Qualcomm UK Ltd are members and ETSI defines "member" to include affiliates. Thus, as described below, Qualcomm itself filed FRAND undertakings with ETSI. Nokia is also a member of ETSI.

22.     Like other SSOs, ETSI requires its members to identify all patents they hold that may be essential to compliance with a proposed technology standard—referred to as "essential patents"— before the standard is adopted. ETSI's Intellectual Property Rights ("IPR") Policy provides that "each MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 4.1. The purpose of this disclosure requirement is obvious: to avoid a "patent ambush" situation where a party that holds essential patents sits on the sidelines during the standard-setting process and then holds up industry participants for unexpected and unanticipated royalties for technology that is essential to practice the standard.

23.     ETSI's IPR Policy specifically defines an IPR as "essential" where "it is not possible on technical but not commercial grounds, taking into account normal technical practice and the state of art generally available at the time of standardization, to make, sell, lease, otherwise dispose of,

7

repair, use or operate equipment or methods which comply with a standard without infringing that IPR." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 15.6.

24.    ETSI also requests that patent holders license their essential patents to other parties on fair, reasonable, and non-discriminatory terms ("FRAND" terms). Article 6.1 of ETSI's IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR . . . .

25.    In short, to avoid the problems of creating market power by adopting an industry standard, ETSI requires its members not only to disclose their essential patents, but agree to license those patents on FRAND terms. If a patent holder will not agree to license its declared patents on FRAND terms, ETSI can decide not to include that technology in an industry standard, and instead use a non-infringing alternative. See ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 8. If the patent holder does agree to license its essential patents on FRAND terms, other companies in the industry can invest in and deploy the standard without concern that they will be enjoined from using the technology or be forced to pay an unreasonably high royalty for a patent that is essential to practice the standard.

26.    Qualcomm violated its disclosure obligations to ETSI by waiting to declare certain Qualcomm patents as essential to GSM until the industry had made substantial investments in GSM technology. Indeed, Qualcomm did not declare any of its patents essential to GSM until many years after the standard had been set, and it has declared some as recently as this year. However, when Qualcomm did belatedly declare its patents essential to the GSM standard, it expressly agreed in writing to license those patents to all members of ETSI, including Nokia, on FRAND terms.

27.     In the late 1990s, ETSI began considering candidate technologies for the 3G UMTS standard that would have worldwide application. ETSI and its members considered a number of solutions, including WTDMA (which was based on TDMA technology that did not infringe any known Qualcomm patents), WCDMA (which Qualcomm claimed included some of its patents), and CDMA 2000 (which Qualcomm claimed relied almost completely on its patents). ETSI ultimately decided to adopt WCDMA technology as the 3G UMTS standard.

28.     At the outset of the ETSI standard-setting process, Qualcomm refused to license its patents on FRAND terms for 3G use. Subsequently, however, on March 25, 1999, as part of the settlement of a lawsuit between Ericsson and Qualcomm involving cross-claims of patent infringement, Qualcomm finally agreed to license its WCDMA patents that were allegedly essential to the ETSI-proposed UMTS standard on FRAND terms to the rest of the industry. On June 25, 1999, Qualcomm submitted a letter to ETSI stating: "Qualcomm hereby commits . . . to license its essential patents for each single CDMA standard or any of its of its modes [including UMTS] on a fair and reasonable basis free from unfair discrimination." This promise provided ETSI members with the patent clearance required to make the huge capital investment that would lock them into a UMTS standard that included Qualcomm's WCDMA technology.

29.     The ability to use standard-essential technology without threat of a technology "monopolist" royalty rate or the threat of an injunction that would stop sales or operations is an important characteristic of the cell phone industry: once a wireless carrier elects to deploy an SSO-approved standard, switching to another standard may cost hundreds of millions if not billions of dollars and cause substantial disruption to consumers. Thus, if Qualcomm had not agreed with ETSI to license its declared-essential WCDMA patents on FRAND terms, WTDMA or another technology

9

would have been selected in lieu of WCDMA. This underscores the importance of holding Qualcomm to its contractual FRAND obligation.

30. Under French law, Qualcomm's agreement to license its declared-essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. ETSI's Rules of Procedure provide that any dispute concerning the interpretation or application of ETSI policies must be resolved by the national courts of its members. Both Nokia Inc. and Qualcomm are Delaware corporations. Nokia is therefore entitled to apply to this Court to enforce and resolve the current dispute as to Qualcomm's contractual commitment to FRAND.

## A COMMITMENT TO FRAND NECESSARILY WAIVES ANY RIGHT TO INJUNCTIVE RELIEF

31. When Qualcomm contractually agreed in writing to license its declared-essential patents on FRAND terms, it granted irrevocable patent license rights to all other members of ETSI, and gave up the traditional patent holder's right to enjoin others from practicing the technology incorporated in those patents. The only remedy for the use of Qualcomm declared-essential patents is a FRAND royalty, to be determined *ex post* by a court in the event of a dispute between Qualcomm and the licensee.

32. Allowing a patent holder who has exchanged a FRAND commitment for the benefits of having patented technology included in a standard to seek injunctive relief would defeat the entire purpose of FRAND and the ETSI IPR Policy. As set forth above, the patent holder would be able to use the threat of injunction to extort royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would be forced to comply with unjustified royalty demands or risk losing their substantial investments in complying with the standard. If injunctions were to be allowed, essential patent users would be reluctant to invest in and deploy technologies until and

unless specific royalty terms were reached with every alleged essential patent holder. The public interest would also suffer because roll-out of standard-compliant products and new technologies would be delayed, defeating one of the key purposes of standard-setting (to promote swift implementation).

33.    The delays and impediments imposed on the industry by the threat of injunctions prohibiting use of technologies deemed essential for new services would also contravene Articles 81 and 82 of the European Community Treaty, which, as detailed below, are designed to assure that conduct that eliminates competition from the marketplace (such as an SSO's choice of one technology over other candidate technologies as the standard) has an overall public welfare benefit (*i.e.*, passing the network benefits on to consumers rather than allowing patent owners appropriate the benefit for themselves by demanding excessive royalties). ETSI imposes FRAND obligations on its members specifically to preclude this kind of unequal *ex post* bargaining power.

## QUALCOMM HAS BREACHED ITS CONTRACTUAL OBLIGATION TO LICENSE ITS DECLARED-ESSENTIAL GSM AND UMTS PATENTS ON FRAND TERMS AND IS USING THE THREAT OF INJUNCTIONS TO EXTORT UNJUSTIFIED ROYALTIES IN VIOLATION OF THE TERMS OF ITS ETSI COMMITMENT

34.    Despite having made numerous FRAND commitments to ETSI in connection with GSM and UMTS patents that Qualcomm has declared essential to those standards, Qualcomm has refused to honor its contract to license its patents on FRAND terms. Instead, it has used litigation and the threat of injunction to attempt to extort exorbitant royalty rates from cellular telephone manufacturers.

35.    To date, Qualcomm has filed three separate patent infringement suits against Nokia seeking injunctive or exclusionary relief for alleged infringement of patents allegedly essential for the GSM standard:  one in the United States District Court for the Southern District of California (San Diego division), one in the United Kingdom, and one in the United States International Trade

11

Commission (ITC). In the proceeding before the ITC the **only** relief requested is injunctive in nature, excluding Nokia from importing products that Qualcomm contends infringe on patents it has declared essential to the ETSI GSM standard. These requests for injunctive relief are wholly inconsistent with Qualcomm's unequivocal contractual commitment to ETSI to license these patents to Nokia on FRAND terms.

36.    Qualcomm has clearly indicated that additional injunction suits will follow. During Qualcomm's third-quarter 2006 earnings conference call with analysts, Qualcomm President Steve Altman asserted that in cases where Qualcomm patents are allegedly being infringed, "we would look and seek injunctions in a variety of markets . . . ." The current litigation and the assertions of future injunctive proceedings cause irreparable and immeasurable harm to Nokia by creating uncertainty regarding the ability of Nokia to continue to manufacture and sell GSM standard-compliant products.

37.    Nokia is also justifiably concerned about the potential that Qualcomm may leverage its standards-granted technology monopoly to obtain unjustified injunctive relief in violation of Qualcomm's ETSI commitments in jurisdictions that will not afford Nokia adequate due process. In a number of European jurisdictions there are procedures available to plaintiffs to seek preliminary injunctions without giving defendants (such as Nokia) an opportunity to be heard at the time the injunction is being sought. The plaintiff may not even be under a duty in certain jurisdictions to give the court full and frank information concerning the case at that initial stage. A preliminary injunction may be granted without there being any consideration of equities, or of whether the patentee could be adequately compensated by damages alone. Furthermore, a preliminary injunction may be granted without any bond or undertaking being required from the patentee to pay for the damage caused to Nokia by a preliminary injunction that is later determined to have been

12

erroneously granted. To the extent that Qualcomm is permitted to seek such relief in violation of its ETSI contract, Nokia would suffer irreparable and immeasurable harm because it would never be able to adequately determine in financial terms the extent of Nokia damage.

38.    These concerns are not merely a theoretical possibility. Certain European courts have granted preliminary injunctions even where the patent concerned was relevant to an industry standard and the defendant had indicated a willingness to enter into a license. In Germany, for example, the court is required, under section 139, paragraph 1 of the German Patents Act, to grant permanent injunctive relief where infringement is found. And even though the court must weigh the interests of the parties at the preliminary injunction stage, this can be conducted *ex parte* and therefore Nokia would not have any opportunity to be heard. Similarly, in the Netherlands, the court is not obligated to take the balance of convenience into account and it rarely does so.

39.    Qualcomm's injunction strategy, in contravention of its FRAND commitments, is an attempt to give it leverage to demand royalty rates wholly out of proportion to the number or value of its patents essential to a particular standard. For example, Qualcomm has generally demanded the same royalty rate for its patents essential to its initial proprietary Common Air Interface CDMA technology (where, in practice, it holds close to 100% of the essential patents), as it demands for its patents essential to the IS-95 CDMA standard (where it holds some 80% of the essential patents), as it demands for the CDMA2000 family of standards (where it holds less than 50% of the essential patents), and as it demands for UMTS (where studies show it holds at most 20% of the essential patents). Moreover, on information and belief, Qualcomm owns less than 3% of the essential patents for GSM. Nevertheless, Qualcomm demands that many of its licensees cross-license Qualcomm (giving rights to the licensee's intellectual property rights not only to Qualcomm but also to Qualcomm's chipset customers) for their declared-essential patents, even where the licensee holds a

13

much larger portfolio of essential patents for the standard. These positions by Qualcomm do not comply with their contractual FRAND commitment to ETSI.

## QUALCOMM'S CONTRADICTORY STATEMENTS AND ACTIONS CONCERNING FRAND

40.    Qualcomm has adopted multiple and conflicting views of its FRAND obligations. In a motion to dismiss antitrust and other claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its agreement to license its patents on FRAND terms is not legally enforceable.[1] Thus, according to Qualcomm, there is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance. In complaints filed before the International Trade Commission, the United States District Court for the Southern District of California, and an English court, Qualcomm has claimed that, despite its FRAND declarations (which constitute an irrevocable agreement to license its essential patents), it is entitled to an injunction if the initial terms it unilaterally offers are rejected. In negotiations with Nokia, Qualcomm has declared that, despite its contrary written commitments, unless it is paid a royalty that Nokia believes bears no relationship to a FRAND royalty, it will seek injunctions to bar Nokia from selling its products to consumers.

41.    Under French law, the terms and enforceability of Qualcomm's contractual commitments must be interpreted, as far as possible, in a manner consistent with Articles 81 and 82 of the European Community Treaty, which prohibit anticompetitive conduct. Specifically, even apart from its FRAND commitments, Article 81 imposes a duty on Qualcomm to license its patents essential to standards on FRAND terms. Article 81(3) provides that, in order to comply with Article

---

[1]    *See Broadcom Corp. v. Qualcomm Inc.*, Civ. A. No. 05-3350(MLC) (D.N.J.), Memorandum in Support of Defendant's Motion to Dismiss (filed Dec. 12, 2005), at 15 (arguing that Broadcom's action to enforce FRAND should be dismissed because FRAND is "susceptible of multiple interpretations" and does not have one universally accepted meaning).

81, an agreement of this kind must confer a fair share of resulting benefits on consumers and should not create the possibility of eliminating competition in respect of a substantial proportion of the products in question. SSO members would be able to deny a fair share of benefits to consumers, and substantially to eliminate competition in the instant context, if one or more of them could withhold licenses from downstream competitors, or make such licenses available only on excessively onerous terms. That is why, in order to comply with Article 81, the FRAND commitment must be effective to prevent such serious economic consequences. If an SSO member could retain all or most of the benefits of the standard and simultaneously refuse fair, reasonable, and non-discriminatory treatment to competitors that it particularly wanted to disadvantage (especially after prospective licensees had made large investments in the standard and were locked in), Article 81 would have no practical effect.

42.     In 2005, Ericsson, NEC, Texas Instruments, Broadcom, Panasonic, and Nokia asked the Commission of the European Communities Directorate-General Competition to investigate Qualcomm's anticompetitive conduct, under Articles 81 and 82, in the markets for CDMA and WCDMA cellular telephone technology and chipsets, including its failure to comply with FRAND obligations. In its May 16, 2006 brief to the European Commission, to attempt to avoid claims under Articles 81 and 82, Qualcomm made a number of critical admissions regarding FRAND, which contradict its public statements in the United States (including in the three patent infringement suits discussed above) that its FRAND commitments are unenforceable:

- "Fair Reasonable and Non-Discriminatory ('FRAND') obligations are part of a private agreement, a binding contract that is enforceable against each patent owner."

- "[T]he aim of FRAND is to ensure that whatever standard is developed remains available. A FRAND commitment is intended to prevent an outright refusal to license or the setting of royalty rates so high that they have the effect of preventing licensing . . . ."

- "In the case of dispute, it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."

- "A court procedure would involve an assessment of the number of truly essential patents necessary to practice a given standard or the appropriate royalty base or even the general business conditions prevailing for the given licensed technology."

43.     Qualcomm's selective interpretations of its FRAND obligation that appear to be dependent upon Qualcomm's purpose in specific litigation would render FRAND meaningless and defeat the entire purpose of the ETSI's FRAND requirement. Because of these shifting, self-serving definitions, Nokia asks this court for an order defining the terms and conditions surrounding Qualcomm's FRAND commitment and for an order upholding and affirming Qualcomm's agreement to license patents declared essential on FRAND terms pursuant to its contract with ETSI. This courts intervention is required to stop Qualcomm from charging monopolistic prices to license its declared-essential patents.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*), and Injunctive Relief)

44.     Nokia repeats and realleges the allegations set forth in paragraphs 1-43 above as if set forth fully herein.

45.     An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to whether Qualcomm can obtain injunctive relief in light of its contractual agreement to license its declared-essential patents on FRAND terms.

46.     By entering into contracts with ETSI and ETSI's members to license its essential GSM and UMTS patents on FRAND terms, Qualcomm gave up any right to enjoin Nokia from the use of those patents. Pursuant to its FRAND declarations, Qualcomm granted an irrevocable license on FRAND terms to Nokia and all other members of ETSI and waived any right to seek injunctive

relief or an exclusionary order, which would bar Nokia from practicing those of Qualcomm's patents that Qualcomm has declared are essential in FRAND declarations submitted to ETSI.

47.    Allowing Qualcomm to seek injunctive relief would defeat the purpose of the FRAND commitment. ETSI requests that patent holders agree to FRAND license terms to prevent them from using an SSO-enabled patent monopoly to extort excessive royalty rates after a technological standard has been approved.  However, if Qualcomm were allowed to enjoin companies from using its patents, it could ignore its FRAND obligations with impunity, using the threat of injunction to obtain royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would have no choice but to comply or risk losing their substantial investments in complying with the standard. Thus, injunctive relief would give patent holders exactly the kind of *ex post* bargaining power and super-monopoly profits that the FRAND undertaking was intended to prevent.

48.    By agreeing in advance to accept a FRAND royalty for patents declared essential, Qualcomm has agreed that a FRAND royalty (as determined by a court in the event of a dispute) is adequate compensation for the use of its patents. Additionally, because the purpose of the FRAND commitment is to facilitate swift implementation of the standard for the benefit of consumers, a grant of injunctive relief barring practice of the standard would disserve the public interest.

49.    This controversy between Nokia and Qualcomm is real and adverse. In the Southern District of California case, ITC proceedings, and a proceeding in an English court, Qualcomm has sought injunctive relief against Nokia, which would bar Nokia from using patents on which Qualcomm, by virtue of its FRAND declaration, has already granted a license to Nokia. As noted above, upon information and belief, Qualcomm is likely soon to seek injunctive relief in lawsuits against Nokia in other European countries. Qualcomm's conduct in threatening injunctive relief

17

against the use of its GSM patents is in direct violation of ETSI policies and Qualcomm's own contractual commitment to FRAND.

50.    If Qualcomm is permitted to continue to wield the sword of an injunction threat, it may coerce Nokia into entering a license at a royalty rate that far exceeds the FRAND rate; Nokia would thereafter be contractually committed under a specific license agreement and would have no redress for Qualcomm's FRAND violation. Alternatively, if Nokia stands firm and refuses to pay a non-FRAND royalty, and if Qualcomm persuades some court in some jurisdiction to enjoin Nokia's manufacture of cell phones, Nokia's business will be substantially harmed.

51.    An additional problem arises from the fact that Qualcomm has filed, and is likely to file, injunctive actions in numerous jurisdictions in the United States and Europe. This multiplicity of actions poses a substantial risk that Nokia could be subject to inconsistent adjudications to the extent that some courts rule that Qualcomm's FRAND obligation precludes it from seeking injunctive relief, while other courts rule that Qualcomm is entitled to seek injunctive relief. This highlights the need for a single and prompt adjudication by this Court of the FRAND contractual obligations of Delaware citizen Qualcomm.

52.    Relatedly, if Qualcomm is permitted to pursue injunctions in multiple jurisdictions, and if Nokia is obligated to advance the FRAND defense in each such jurisdiction, Nokia will be forced to incur substantial litigation costs that, in jurisdictions following the American rule, are generally not compensable even if Nokia prevails. Again, a single and prompt adjudication of Qualcomm's right to seek injunctive relief avoids this problem.

53.    The issue involved in this controversy is ripe for judicial determination. Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by

18

the national courts of the member parties. Section 4.2 of ETSI's Guide on IPRs regarding Dispute

Resolution states:

> ETSI Members should attempt to resolve any dispute related to the
> application of the IPR Policy bilaterally in a friendly manner. Should
> this fail, the Members concerned are invited to inform the ETSI GA
> in case a friendly mediation can be offered by other ETSI Members
> and/or the ETSI Secretariat. However, it should be noted that once an
> IPR (patent) has been granted, <u>in the absence of an agreement
> between the parties involved, the national courts of law have the sole
> authority to resolve IPR disputes</u>.

In addition, Qualcomm's May 16, 2006 brief to the European Commission admits that "[i]n the case

of dispute [regarding FRAND], it would be for a Court or similar authoritative body to resolve the

particular disputes in the given situation."

54.    Accordingly, Nokia seeks a declaratory judgment that Qualcomm is not entitled to

injunctive or exclusionary relief for any alleged infringement of any GSM or UMTS patents that

Qualcomm has declared essential and agreed to license on FRAND terms. Nokia further seeks a

declaratory judgment that Qualcomm's sole remedy for any alleged infringement of such patents is

limited to payment of a royalty on FRAND terms, as determined by a court if the parties cannot

agree.

55.    Qualcomm's pursuit of injunctions in spite of its agreement that its only remedy is a

FRAND royalty constitutes a breach of its contractual obligation for which Nokia has no adequate

remedy at law. Accordingly, Nokia seeks an order enjoining Qualcomm from pursuing an injunction

or exclusionary order as a remedy for alleged infringement of any patent it has declared essential to

ETSI.

## SECOND CLAIM FOR RELIEF

**(Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*))**

56.     Nokia repeats and realleges the allegations set forth in paragraphs 1-55 above as if set forth fully herein.

57.     An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to the meaning of FRAND.

58.     Pursuant to its contracts with ETSI, Qualcomm has agreed to license on FRAND terms any patents that Qualcomm has declared are essential to the GSM or UMTS standards.

59.     Notwithstanding its FRAND commitments, Qualcomm has refused to offer a FRAND royalty rate to Nokia on any patents it has declared essential to the GSM standard. Further, Qualcomm has refused to offer Nokia a FRAND royalty rate for the use of its declared-essential UMTS patents after April 2007 (when Qualcomm's current agreement not to assert its UMTS patents against Nokia expires). Instead, Qualcomm has demanded that Nokia accept license terms that are neither fair, nor reasonable, nor non-discriminatory, backing its demands with the threat of injunction as discussed *supra*.

60.     Under French law, Qualcomm's agreement to license its essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members, including Nokia. Nokia is therefore entitled to enforce Qualcomm's contractual commitment to FRAND.

61.     Qualcomm contends that FRAND does not impose any specific and concrete obligations on the licensor with regard to the actual level of royalties (or any other terms and conditions for that matter). In its motion to dismiss claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its promise to license its patents on FRAND terms is not legally enforceable. Thus, according to Qualcomm, there

is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance.

62.    Qualcomm's empty characterization of FRAND cannot be correct. In any given situation, evidence will be available to show that the terms "fair, reasonable, and non-discriminatory" are sufficiently certain to be capable of judicial interpretation and enforcement, and impose substantive limits on Qualcomm's ability to impose excessive royalty rates or other onerous terms in its patent licenses. Qualcomm has violated these limits by refusing to license its patents to Nokia on FRAND terms.

63.    Qualcomm contends that, despite its FRAND obligation, it can charge a royalty as high as the fear of an injunction can create. Nokia, on the other hand, contends that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

64.    This controversy between Nokia and Qualcomm is real and adverse. Qualcomm has refused to offer Nokia a FRAND royalty rate for its declared-essential GSM patents, and has threatened to enjoin Nokia from using patents on which Nokia is contractually entitled to a FRAND license. Qualcomm has also refused to negotiate a FRAND royalty rate for declared-essential UMTS patents for the period after April 2007.

65.    The issue involved in this controversy is ripe for judicial determination. Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by the national courts of the member parties. Section 4.2 of ETSI's Guide on IPRs regarding Dispute Resolution states:

> ETSI Members should attempt to resolve any dispute related to the application of the IPR Policy bilaterally in a friendly manner. Should this fail, the Members concerned are invited to inform the ETSI GA in case a friendly mediation can be offered by other ETSI Members and/or the ETSI Secretariat. However, it should be noted that once an IPR (patent) has been granted, <u>in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes</u>.

In addition, Qualcomm's May 16, 2006 brief to the European Commission, in an attempt to avoid liability under Article 81 and 82, acknowledges that "[i]n the case of dispute [regarding FRAND], it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."

66.     Accordingly, Nokia seeks a declaratory judgment that Qualcomm's FRAND commitments constitute binding contractual obligations, and defining the principles by which a FRAND royalty must be calculated.

### THIRD CLAIM FOR RELIEF

### (Specific Performance)

67.     Nokia repeats and realleges the allegations set forth in paragraphs 1-66 above as if set forth fully herein.

68.     Qualcomm has declared numerous patents to be essential to the UMTS standard promulgated by ETSI.

69.     In connection with its declarations to ETSI, Qualcomm has agreed to license each of its essential UMTS patents to all members of ETSI, including Nokia, on FRAND terms.

70.     Under French law, Qualcomm's agreement to license its essential UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members, including Nokia. Nokia is therefore entitled to enforce Qualcomm's contractual commitment to FRAND.

71.    Notwithstanding its contractual obligations to ETSI and Nokia, Qualcomm has refused to negotiate a FRAND royalty rate for its UMTS patents for the period after April 2007.

72.    Nokia has no adequate remedy at law for Qualcomm's breach of its contractual obligation to license its essential patents on FRAND terms or to negotiate a FRAND royalty rate in good faith.

73.    Accordingly, Nokia is entitled to an order of specific performance ordering Qualcomm to participate in a good faith negotiation with Nokia for license of Qualcomm's essential UMTS patents on FRAND terms for the period after April 2007, in light of this Court's resolution of the dispute between the parties as to the method for determining a FRAND royalty.

## **PRAYER FOR RELIEF**

WHEREFORE, Nokia respectfully requests that this Court:

A.    Adjudge and decree that, by virtue of its express and implied FRAND commitments, Qualcomm has waived any right to seek, or is otherwise barred from seeking injunctive relief, including an exclusion or cease-and-desist order by the ITC, to prevent Nokia from using technology encompassed by any patents which Qualcomm has declared essential to the GSM or UMTS standards established by ETSI;

B.    Permanently enjoin Qualcomm worldwide from seeking such injunctive relief related to patents Qualcomm has declared essential to any standard;

C.    Adjudge and decree that Qualcomm's commitment to license its essential GSM and UMTS patents on FRAND terms is a binding contractual obligation, enforceable by Nokia;

D.    Order that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-

23

infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

      E.      Order that Qualcomm specifically perform its contractual obligation to negotiate a FRAND royalty rate with Nokia for the period after April 2007 for any patents Qualcomm has declared essential to UMTS, in light of this Court's determination of the method for calculating FRAND terms; and

      F.      That Nokia have such other and further relief as this Court may deem just and proper.

Of Counsel:

A. William Urquhart
Frederick A. Lorig
Patrick M. Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-254
Telephone:    (213) 443-3000
Facsimile:     (213) 443-3100

Rick Werder
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:     (212) 849-7100

Dated: August 8, 2006

Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Richards, Layton & Finger, P.A.     (#3188)
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Telephone:    (302) 651-7700
Facsimile:     (302) 651-7701

Attorneys for Plaintiffs
Nokia Corporation and Nokia Inc.

# EXHIBIT B

**EFiled: Aug 9 2006 9:53AM EDT**
**Transaction ID 12021331**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**
**IN AND FOR NEW CASTLE COUNTY**

| | |
|---|---|
| NOKIA CORPORATION and NOKIA, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | C.A. No. |
| ) | |
| QUALCOMM INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

## MOTION TO EXPEDITE PROCEEDINGS

Plaintiffs Nokia Corporation and Nokia, Inc. (collectively, "Nokia"), by and through their undersigned counsel, hereby move pursuant to Court of Chancery Rules 4 and 12(a) for entry of an Order in the form attached hereto expediting discovery and scheduling an expedited trial on the merits within six months. The grounds for this motion are as follows:

### FACTUAL BACKGROUND

1.     As set forth more fully in the Complaint, this is an action brought to resolve a dispute between Defendant Qualcomm Incorporated ("Qualcomm") and Nokia related to the interpretation of a binding contract between the parties. Nokia respectfully requests that the Court enter a judgment: (1) enjoining Qualcomm, worldwide, from seeking an injunction against Nokia for alleged infringement of any patent Qualcomm has declared essential for any cellular telephone technology standard and agreed to license on fair, reasonable and non-discriminatory terms ("FRAND"); (2) finding that Qualcomm's FRAND declarations are enforceable contractual obligations; (3) declaring that for a FRAND royalty to be fair and reasonable it must be based on the following factors: the number of essential patents owned by the patent holder relative to all patents essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of

standardization; and (4) declaring the rights and obligations of the parties and requiring Qualcomm to comply with its obligations under the contract. If this Court does not grant Nokia the requested relief on an expedited basis, Nokia will be irreparably harmed by Qualcomm's oppressive and continued pursuit of injunctive relief in multiple venues throughout the world in violation of the parties' binding contract.

2.      Because a number of cellular telephone providers and manufacturers all use the same cellular transmitting towers to transmit and receive radio signals, wireless carriers, telephone manufacturers, and chipset manufacturers agree to follow a common set of industry standards for wireless communication technology. Compl. ¶ 14. The standards are developed, approved and monitored by a number of different standard-setting organizations. Compl. ¶ 15. As explained more fully in the Complaint, cellular telephone technology has progressed through a number of distinct generations. Compl. ¶¶ 16-17. Most current cellular technology is considered second-generation ("2G") technology and includes at least two distinct standards, Global Systems for Mobility ("GSM") and Code Division Multiple Access ("CDMA"). Compl. ¶ 18. The technologies underlying GSM and CDMA are not compatible and, therefore, once a wireless carrier chooses a particular standard, it invests substantial amounts of money in the technology and switching from one to the other is cost prohibitive. *Id.* Accordingly, the standard-setting organizations play an important role in regulating each technology and ensuring that all manufacturers and carriers can practice their chosen technology without fear of a lawsuit for infringement or the fear of an injunction.

3.      Qualcomm has filed declarations for the benefit of Nokia with various standard-setting organizations, including the European Telecommunications Standards Institution ("ETSI"). ETSI is a standard-setting organization based in France that developed the standard for GSM technology and its third-generation successor, Universal Mobile Telephone System

- 2 -

("UMTS"), to be followed by cellular technology companies, including all carriers and manufacturers. Compl. ¶ 19. ETSI has developed an Intellectual Property Rights ("IPR") Policy which is governed by French law and, pursuant to French law, constitutes a binding contract between ETSI and its members, enforceable in the national courts of its members, including this Court (since Qualcomm is a Delaware corporation). Compl. ¶ 30. It is the provisions of this binding contract that are at issue in this case.

4.      When an organization such as ETSI sets out to develop an industry standard for a certain technology, it requires that its members identify all patents they hold which are essential to compliance with a proposed technology standard before the standard is adopted. Compl. ¶ 22. The patents identified are considered "essential patents." *Id.* The designation of essential patents is significant because it allows ETSI's members to consider all the relevant technologies and to adopt a standard knowing which patents are implicated and with the ability to make determinations accordingly. Compl. ¶ 25. This early consideration of patents before adopting the technology is important to the ETSI member companies but also serves to protect the interests of consumers, who are then assured that they will be able to purchase cellular phones and related technologies at reasonable prices not driven by monopolistic pricing. Compl. ¶ 14.

5.      Once a party designates an essential patent, ETSI requires that the party agree to license its patents to other members of ETSI on terms that are fair, reasonable and non-discriminatory ("FRAND"). Compl. ¶ 24. Specifically, Article 6.1 of ETSI's IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR . . . .

Compl. ¶ 24. Under French law, this commitment by a party such as Qualcomm to license essential patents constitutes a binding contract among ETSI members and their affiliates.

- 3 -

Compl. ¶ 30. This obligation is extremely important to ETSI members because it allows members to invest in a given technology, such as GSM or UMTS, without having to fear that it will be subject to opportunistic royalty payments to those companies who hold patents essential to the operation of the technology. Compl. ¶¶ 25, 29. If a patent holder will not agree to license its declared patents on FRAND terms, ETSI can decide not to include that technology in an industry standard, and instead use a non-infringing alternative. Compl. ¶ 25.

6.     Qualcomm, who is a member of ETSI through its affiliates, has declared that a number of its patents related to GSM and UMTS technologies are "essential" to the ETSI-adopted standards. As a result, Qualcomm is bound by the terms of the ETSI policies and owes certain obligations to other members, including Nokia. Compl. ¶ ¶ 21, 26, 30.

7.     By declaring its patents as "essential" and agreeing to license them on FRAND terms, Qualcomm gave up the right to pursue an injunction against other member companies utilizing the standards set by ETSI. Compl. ¶ 31. The forfeit of the right to an injunction is one of the most important aspects of the ETSI policies and is necessary to further protect companies, and their customers, from the threat of unreasonably high monopolistic royalties. Compl. ¶ 32.

8.     Unfortunately, despite Qualcomm's clear declaration of certain patents as essential and agreement to license those patents on FRAND terms, Qualcomm has refused to offer Nokia a FRAND royalty rate and has commenced litigation against Nokia in the Southern District of California, England, and the International Trade Commission ("ITC") seeking injunctions against Nokia in violation of ETSI IPR policies. Compl. ¶¶ 34-35. In addition, Qualcomm has threatened to file additional lawsuits seeking injunctions in other countries. Compl. ¶ 36. In the Southern District of California, Qualcomm has sued Nokia alleging infringement of twelve patents related to GSM technology. In England, Qualcomm has sued Nokia alleging infringement of two patents related to GSM technology. In both of these

- 4 -

lawsuits, Qualcomm is seeking damages and an injunction in violation of binding obligations under the ETSI IPR policies. Finally, Qualcomm has commenced an action in the ITC against Nokia related to six GSM patents where the sole remedy is an exclusion order against Nokia. In addition to seeking injunctions in three different venues, Qualcomm has refused, in negotiations with Nokia, to offer a FRAND royalty rate for GSM or UMTS patents declared essential to ETSI.

9.    Despite its refusal to offer Nokia FRAND terms, Qualcomm has admitted in filings in the EU that the ETSI IPR policies constitute a binding contract. Compl. ¶ 42. Specifically, Qualcomm admitted that "Fair Reasonable and Non-Discriminatory ("FRAND") obligations are part of a private agreement, a binding contract that is enforceable against each patent owner." *Id.* However, Qualcomm has also argued that FRAND does not impose any specific obligations on the licensor with regard to the level of royalties or any other terms and conditions for that matter, and has told a federal judge in New Jersey that its FRAND declarations are unenforceable. Thus, while Qualcomm recognizes the binding contract, it has refused to adhere to the terms of the contract and instead is attempting to extort unreasonably high royalty rates from other members of ETSI, including Nokia.

10.    Nokia will be irreparably harmed if this Court does not act promptly to resolve the dispute between the parties and declare that Qualcomm is contractually precluded from seeking an injunction on patents it has declared as essential to ETSI. Qualcomm has already sought injunctions in three proceedings and, based on Qualcomm's public threats and other sources, plans to seek an injunction in additional venues. Compl. ¶¶ 35-36, 49. If any one of these cases proceeds and an injunction issues against Nokia on a sub-set of Qualcomm's alleged essential GSM patents, Nokia's business will be irreparably harmed and Nokia could lose valuable market share or be closed out of the GSM market completely. Compl. ¶¶ 36, 50. The ITC proceeding in

particular poses a risk of irreparable harm requiring expedited relief because, under the ITC's current scheduling order, the ITC's investigation must be completed by no later than September 12, 2007, and the only relief available in that proceeding is an exclusion order (*i.e.*, injunctive relief).

11.    Furthermore, the threat of irreparable harm to Nokia is clearly shown by the fact that Qualcomm will seek injunctions in foreign jurisdictions that allow little or no process before issuing an injunction. Compl. ¶ ¶ 37-38.

12.    Nokia is therefore asking this Court to issue a declaration that Qualcomm's agreement to license its declared-essential patents on FRAND terms constitutes a binding contract that prevents Qualcomm from pursuing injunctive relief against Nokia in any forum. In addition, Nokia seeks an order declaring that a FRAND royalty must be based on the number of essential patents owned by the patent holder relative to all patents essential to the standard, and must take into account the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization. Finally, Nokia requests that the Court order Qualcomm to specifically perform the terms of its FRAND contract, by negotiating a FRAND royalty with Nokia on terms set by the Court.

## ARGUMENT

13.    The standard for expedited proceedings is well-settled. Expedited proceedings will be ordered where "the plaintiff has articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened irreparable injury[.]" *Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994). In applying this standard, this Court "traditionally has acted with a certain solicitude for plaintiffs" and "has followed the practice of erring on the side of more [expedited] hearings rather than fewer." *Id.* As a result, "[a] party's

- 6 -

request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted. Exceptions to that norm are rare." *In re Int'l Jensen Inc. S'holders Litig.*, 1996 WL 422345, at *1 (Del. Ch. July 13, 1996). The Delaware Supreme Court has observed that "Delaware courts are always receptive to expediting any type of litigation in the interests of affording justice to the parties." *Box v. Box*, 697 A.2d 395, 299 (Del. 1997).

14.     Furthermore, Delaware courts frequently expedite proceedings in cases involving important contractual issues. *See, e.g.*, *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14 (Del. Ch. 2001); *US West, Inc. v. Time Warner, Inc.*, 1996 WL 307445, at *3 (Del. Ch. June 6, 1996) (expedited trial conducted in dispute involving claims for declaratory and injunctive relief respecting parties' rights and obligations pursuant to a contract); *Warner Communications Inc. v. Chris-Craft Indus., Inc.*, 1989 WL 51662, at *6 (Del. Ch. May 15, 1989) (granting plaintiff's motion for an expedited trial on claim for a declaratory judgment concerning the rights and obligations of the parties arising out of a stockholder agreement). This Court has ordered an expedited trial on the merits where resolution of the dispute affects the rights of the parties going forward pursuant to a contract. *Pfizer Inc. v. Warner-Lambert Co., et al.*, 1999 WL 33236245, at *1 (Del. Ch. Dec. 3, 1999). More specifically, this Court has previously expedited cases seeking specific performance of contracts. *See, e.g.*, *Gilmore Servs., Inc. v. Nichols*, 1994 WL 369528, at *1 (Del. Ch. June 23, 1994) (expediting trial in action seeking specific performance of a contract to sell a funeral home).

15.     The standard for expedition is clearly met in this circumstance. The Complaint sets forth colorable claims for both specific performance and declaratory judgment. Under Delaware law, a party seeking the equitable remedy of specific performance must prove the existence and terms of an enforceable contract by clear and convincing evidence and must

- 7 -

demonstrate that there is no adequate remedy at law. *See Minnesota Invco of RSA # 7, Inc. v. Midwest Wireless Holdings LLC*, 2006 WL 1596675, at *5 (Del. Ch. 2006). As set forth above and in more detail in the Complaint, Qualcomm's FRAND declarations pursuant to the ETSI IPR Policy constitute a binding contract under French law between, among others, Nokia and Qualcomm. While Qualcomm currently refuses to abide by its terms, Qualcomm has itself previously admitted that its FRAND declarations constitute a binding contract.

16.    It is also clear that no amount of monetary relief could repair the harm that Qualcomm's oppressive business practices could cause Nokia. If Qualcomm is not forced to abide by the terms of its contractual obligation under the ETSI IPR Policy and its FRAND declarations, Nokia will suffer irreparable harm. Specifically, Nokia will be forced to continue litigating in at least three venues under the threat of an injunction. Compl. ¶ 35. In addition, on information and belief, Qualcomm intends to file lawsuits in additional European jurisdictions where the standard for receiving an injunction is substantially lower and Nokia may be subject to an injunction without having an opportunity to present its FRAND-related defenses. Compl. ¶¶ 37-38. The Supreme Court has recognized that a plaintiff can demonstrate that it will be irreparably harmed if it can demonstrate it is exposed to a real danger of multiple suits. *See Chateau Apartments Co. v. The City of Wilmington*, 391 A.2d 205, 208 (Del. 1978). Here, the threat of multiple suits has already been realized, and there is a genuine threat of additional suits that will multiply the risk of irreparable harm to Nokia. In such a circumstance, the Court should exercise jurisdiction to "shield the plaintiff from a litigation which is evidently vexatious." 1 *Pomeroy's Equity Jurisprudence* § 254 (1941); *see also Tull v. Turek*, 147 A.2d 658, 664 (Del. 1958) ("[E]quity will give full relief to avoid a multiplicity of suits.").

17.    In addition to the irreparable harm Nokia will suffer because of the sheer number of suits instituted by Qualcomm, Nokia also faces the risk of inconsistent decisions and lost

- 8 -

market share. If Qualcomm were to succeed in being awarded an injunction in even one of the jurisdictions in which it has filed suit against Nokia, Nokia's business will be substantially harmed and Nokia may be closed out of certain markets or be forced to stop manufacturing certain products. Compl. ¶¶ 36, 50. In an ever-evolving market such as wireless communications, no amount of monetary damages could compensate Nokia if it is essentially closed out of certain markets or forced to shut down certain product lines. *See Instituform Tech., Inc. v. Insitu, Inc.*, 1999 WL 240347, at *15 (Del. Ch. Apr. 19, 1999) (finding irreparable harm posed by damage to "long-term marketing and customer relations" caused by defendant (citing *Roso-Lino Beverage Distrib., Inc. v. Coca Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124, 125-27 (2d Cir. 1984) (termination of plaintiffs' beverage distributorship after 11 years threatened irreparable harm which would not be fully remedied by monetary relief)); *Janmort Leasing, Inc. v. Econo-Car Int'l, Inc.*, 475 F. Supp. 1282, 1294 (E.D.N.Y. 1979) ("[L]oss or destruction of a going business constitutes irreparable harm."); *Dickinson Med. Group v. Foote*, 1984 WL 8208, at *3, (Del. Ch. May 10, 1984) (when former employee took customer list and could have caused her former employer to lose business, the former employer was threatened by immediate irreparable harm).

18.    In addition, Nokia's request for declaratory relief is an independent basis for expedition. Court of Chancery Rule 57, entitled "Declaratory Judgments," provides that "[t]he Court may order a speedy hearing of an action for a declaratory judgment." The purpose of a declaratory judgment action "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." 10 *Del. C.* § 6512. Section 6512 further provides that the Delaware Declaratory Judgment Act, 10 *Del. C.* §§ 6501-6513 (the "Act"), "is to be liberally construed and administered." This Court, in construing the Act, has observed that "the principal, salutary purpose of the declaratory judgment procedure is to provide a technique

- 9 -

for early resolution of disputes where a party is suffering practical consequences from uncertainty arising from the assertion by another of a legal claim." *Schick Inc.* v. *Amalgamated Clothing and Textile Workers Union*, 533 A.2d 1235, 1241 (Del. Ch. 1987).

19.    Nokia has demonstrated above, and in further detail in the Complaint, that it is entitled to declaratory relief. In order for the Court to exercise declaratory judgment jurisdiction, the following four factors must be present:

> (1) it must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; and (4) the issue involved in the controversy must be ripe for judicial determination.

*Korn v. New Castle County*, 2005 WL 2266590, at *5 (Del. Ch. Sept. 13, 2005). The dispute between Nokia and Qualcomm affects Nokia's rights and obligations and is ripe for judicial determination. Specifically, Qualcomm has, in certain instances, taken the position that its FRAND declarations constitute a binding contract (Compl. ¶ 42) and, in other circumstances, insisted that FRAND is not legally enforceable and that it is entitled to an injunction if Nokia refuses to pay even a non-FRAND royalty unilaterally set by Qualcomm (Compl. ¶ 40). If the rights and obligations of the parties are not determined by this Court on an expedited basis, Nokia will suffer irreparable harm by Qualcomm's continued breaches of its FRAND contract with Nokia.

20.    Accordingly, viewing the Complaint in the light most favorable to Nokia, it is clear that Nokia has asserted colorable claims for both declaratory judgment and specific performance.

21.    Finally, Nokia's proposed schedule is very reasonable in light of the important issues at stake. Specifically, Nokia is not seeking any preliminary relief but rather is requesting a

full trial on the merits within six months. Furthermore, the resolution of the entire dispute centers on the interpretation of only a few key contractual provisions between the parties and it is essential to Nokia's business that it have resolution on these important issues as soon as possible. The parties will have ample opportunity to develop the record for the Court in the time frame requested by Nokia. Nokia's proposed schedule, while accelerated, will not pose any undue burden on Qualcomm and any burden is certainly outweighed by the threat to Nokia's business if Qualcomm's abusive tactics are not promptly addressed by this Court.

## CONCLUSION

This case warrants expedited treatment. In light of the need for prompt relief, and subject to the convenience of the Court, Nokia respectfully requests that the Court enter an Order requiring Qualcomm to respond to the Complaint on an expedited basis, ordering the parties to engage in expedited discovery and ordering an expedited trial on the merits of Nokia's claims within six months.

OF COUNSEL:

A. William Urquhart
Frederick Lorig
Patrick Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Rick Werder
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Dated: August 8, 2006

Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Richards, Layton & Finger, P.A. (#3188)
920 North King Street
Wilmington, DE 19899
(302) 651-7700

Attorneys for Plaintiffs Nokia Corporation and Nokia, Inc.

- 11 -

# EXHIBIT C



EFiled: Aug 11 2006 10:50AM EDT
Transaction ID 12050366



**Potter
Anderson
Corroon** LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

Matthew E. F
Partner
Attorney at Law
mfischer@potteranderson.com
302 984-6153 Direct Phone
302 658-1192 Fax

August 10, 2006

## VIA EMAIL

The Honorable Vice Chancellor Leo E. Strine, Jr.
State of Delaware
Court of Chancery
500 King Street
Wilmington, DE    19801

Re:    *Nokia Corporation and Nokia, Inc., v.*
*QUALCOMM Incorporated,* C.A. No. 2330

Dear Vice Chancellor Strine:

We write on behalf of defendant QUALCOMM Incorporated in opposition to Nokia's motion to expedite this proceeding. We submit that not only should the motion be denied, but this case should not proceed at all in this Court. When the relevant background is disclosed, the reasons are quite clear.

In this case, Nokia essentially asks this Court to declare the validity of affirmative defenses it has raised or will raise in patent infringement suits filed against Nokia Corporation and Nokia Inc. (collectively, "Nokia") by QUALCOMM in the United States District Court for the Southern District of California (San Diego division), in the United Kingdom, and before the United States International Trade Commission.

The San Diego suit was filed against Nokia in November 2005, asserting 12 patents against Nokia products that practice only the GSM family of standards (several of those patents have been declared standards-essential to ETSI and several are not standards-essential and therefore not even subject to the "FRAND" commitment which is the centerpiece of Nokia's defense recast as an affirmative claim in this Court). In December 2005, Nokia moved to dismiss or stay the action pending arbitration of Nokia's affirmative defenses, claiming QUALCOMM's claims had to be arbitrated based on a 2001 agreement between Nokia and QUALCOMM. The federal district court denied Nokia's motion in March, and Nokia responded by requesting that the district court stay the litigation pending appeal of the denial of its stay motion. The federal district court entered a stay pending appeal, and the appeal was argued to the U.S. Court of Appeals for the Federal Circuit last month. A decision is expected soon. Despite the passage of over nine months since QUALCOMM filed suit, Nokia has not yet

August 10, 2006
Page 2

answered the complaint in the San Diego suit. Meanwhile, arbitration between Nokia and QUALCOMM has proceeded in California over QUALCOMM's objection to the arbitrability of Nokia's affirmative defenses. Through the arbitration, Nokia, despite its express admission that the parties' 2001 agreement does not extend to GSM products, is seeking to derail QUALCOMM's infringement claims by arguing, among other things, that QUALCOMM is estopped from asserting its patents against Nokia's GSM products, effectively entitling Nokia to a royalty free license. QUALCOMM has filed a motion before the arbitrator to dismiss Nokia's estoppel claim, and the parties are awaiting a hearing date on that motion.

QUALCOMM's U.K. suit was filed in May 2006, asserting two patents against Nokia's products that practice only the GSM family of standards. Shortly before Nokia's answer was due in this suit in mid-July (Nokia having secured from QUALCOMM an extension to answer), it moved to dismiss or stay the proceeding, again based on the same arbitrability theories it advanced in the San Diego action. Nokia requested a late November hearing date on its motion. Although it is anticipated that a hearing will be held sooner than Nokia has requested, the motion has essentially stalled the U.K. action for three to four months.

Third QUALCOMM filed a complaint with the U.S. International Trade Commission in June 2006, and the ITC instituted an investigation concerning Nokia's infringement of six Qualcomm patents by Nokia products that practice only the GSM family of standards. One patent at issue in the ITC is a U.S. counterpart to one of the patents asserted in the U.K. proceeding, and three patents asserted in the ITC are also asserted in the San Diego action. Nokia's answer was filed with the ITC yesterday. As the attached will demonstrate (Ex. A hereto), Nokia's SIXTEENTH affirmative defense is the same FRAND claim it is asking this Court to adjudicate, and several of its other affirmative defenses correspond to the issues it has raised in the California arbitration.

Asserting that this Court is a "national court"[1] under the ETSI Rules of Procedure, Nokia seeks to leap frog the QUALCOMM actions it has stalled by asking this Court to declare -- in advance of any of the pending infringement cases -- that its FRAND affirmative defense is valid and effective to prevent QUALCOMM from pursuing the injunctive relief it seeks in these earlier-filed actions.[2] Nokia cannot dispute that the relief it seeks from this Court can be (and is

---

[1]   This is a dubious assertion, considering that the ETSI's procedures deal with IPRs (intellectual property rights) and infringement issues. One would naturally think that ETSI's rules referencing "national courts" would refer to courts in the host country that have jurisdiction over patent infringement suits. These would be the federal courts in the U.S., not state courts.

[2]   Among the relief Nokia seeks is a declaration that QUALCOMM is "barred from seeking injunctive relief" and a permanent injunction "enjoin[ing] Qualcomm worldwide from seeking such injunctive relief related to patents Qualcomm has declared essential to any standard." (Comp., WHEREFORE clauses A and B). As Nokia should know, this Court is unable to grant such relief. *See General Atomic Co. v. Felter*, 434 U.S. 12, 16 (1977) ("[T]he rights conferred by Congress to bring *in personam* actions in federal court are not subject to

August 10, 2006
Page 3

being) pursued in these other actions. In effect, this is a typical "second-filed" action in which Nokia seeks to avoid application of *McWane*[3] by focusing the Court on an affirmative defense and Nokia's alleged fear of "unjustified injunctive relief" being issued against it in "jurisdictions that will not afford Nokia adequate due process." (Comp. ¶37). Nokia's purported concerns do nothing to justify its request that this Court run an unprecedented level of interference with a federal court, a federal agency, and a U.K. court. It is clear that this Court should at least dismiss this case in favor of the other, first-filed actions, and it is possible that this action raises issues arising under federal law, which would form a basis to remove this action.

      In any event, as Nokia's own dilatory efforts in the San Diego and U.K. actions demonstrate, there is no need for expedition here, and Nokia's motion to expedite must be denied. Indeed, it appears that Nokia's new-found supposed need for expedition results primarily from the fact that it is running out of options in the other suits, and now faces what it apparently sought to avoid: confronting QUALCOMM's infringement claims on the merits. While Nokia, putting the cart before the horse, would prefer an adjudication of its affirmative defense before having to confront QUALCOMM's infringement claims, this does not implicate threatened irreparable harm. *See Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994).

      For the foregoing reasons, defendant QUALCOMM respectfully submits that Nokia's motion to expedite should be denied. We look forward to discussing this matter more fully with Your Honor at the 11 a.m. hearing.

Respectfully,

Matthew E. Fischer (I.D. No. 3092)

rc/745643

cc:    Lisa A. Schmidt, Esq.
       Register in Chancery

---

abridgment by state-court injunctions, regardless of whether the federal litigation is pending or prospective."); *Donovan v. City of Dallas*, 377 U.S. 408 (1964); *Zeneca v. Monsanto*, 1996 WL 104254, at *4 n.3 (Del. Ch.) (V.C. Jacobs acknowledging the well established holding from *Donovan* that "a state court is without power to enjoin a litigant from litigating a claim in federal court."); *Paul N. Gardner Defined Plan Trust v. Draper*, 1993 WL 125517 (Del. Ch.); *cf. Maldonado v. Flynn*, 1979 WL 4632, at *3 (Del. Ch.) (holding that it was a violation of Court of Chancery Rule 11 to file a motion to enjoin a defendant from proceeding in federal court).

[3] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281 (Del. 1970).

# EXHIBIT D

81106scs.txt

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

```
NOKIA CORPORATION and NOKIA,        :
INC.                                :
                                    :
              Plaintiffs            :
                                    :
         vs.                        :   Civil Action
                                    :   No. 2330-N
QUALCOMM INCORPORATED,              :
                                    :
              Defendant             :
```

- - -

Chancery Court Chambers
New Castle County Courthouse
Wilmington, Delaware
Friday, August 11, 2005
11:00 a.m.

BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.

- - -

SCHEDULING CONFERENCE

- - -

---------------------------------------------------------

☐                                                          2

1  APPEARANCES:

2            LISA SCHMIDT, ESQ.
             JEFFREY L. MOYER, ESQ.
3            ELIZABETH C. TUCKER, ESQ.
             Richards, Layton & Finger
4                   -and-
             FREDERICK LORIG, ESQ.
5            A. WILLIAM URQUHART, ESQ.
             of the California Bar
                        Page 1

81106scs.txt
```
 6            Quinn Emanuel UrQuhart Oliver & Hedges, LLP
                            -and-
 7            JANE MUTIMEAR, ESQ.
              Of the United Kingdom Bar
 8            Bird & Bird
                for Plaintiffs Nokia Corporation and
 9              Nokia, Inc.

10
              MATTHEW E. FISCHER, ESQ.
11            RICHARD L. HORWITZ, ESQ.
              Potter, Anderson & Corroon LLP
12                          -and-
              RICHARD J. STARK, ESQ.
13            of the New York Bar
              Cravath Swaine & Moore
14                          -and-
              CHRISTIAN E. MAMMEM, ESQ.
15            of the California Bar
              Day Casebeer Madrid & Batchelder
16              for Defendant QUALCOMM Incorporated

17   ALSO PRESENT:

18            RICHARD W. STIMSON, ESQ.
              ARI LAAKKONEN, ESQ.
19              In-house counsel for Nokia

20
                        - - -
21

22

23

24
                                                        3
```

```
 1                    THE COURT:   We have someone on the

 2   phone?

 3                    MR. FISCHER:   Yes.   We have

 4   Chris Mammem from the Day Casebeer firm in California

 5   for QUALCOMM.   Richard Stark of Cravath for QUALCOMM,

 6   and Rich Horwitz of my firm.

 7                    MS. SCHMIDT:   Your Honor, this is

 8   Fred Lorig and William Urquhart from the

 9   Quinn Emmanuel Urquhart firm for Nokia, and

10   Elizabeth Tucker of Richards Layton, Jane Mutimear

11   from Bird & Bird, and Ari Laakkonen and

12   Richard Stimson of Nokia, Inc.
                        Page 2
```

81106scs.txt

13              THE COURT:  Good morning.

14              I've read all the papers.  I'm happy

15  to consider, you know, whether to -- this Court has a

16  role to play in this dispute.  But I do think the

17  first thing that needs to be done is essentially brief

18  up whether this is a proper place to bring this

19  dispute, especially given the pending actions.  And

20  I'm influenced by the fact that I don't gainsay the

21  importance of this to Nokia.  I'm sure this is a very

22  important thing and you've got multiple litigations

23  going on.  You have multiple litigation going on.  I

24  mean, it wasn't like it all popped up and you said we

                                                    4

1   got to get going on this and we're going to shut this

2   down entirely right away.

3               Now, I understand you've got sort of a

4   whack-a-mole situation going on, or you think that

5   there's proliferating injunction actions from QUALCOMM

6   everywhere.

7               The reality is, though, that doesn't

8   necessarily mean you don't have to put your marker

9   down somewhere where the cases are pending.  I'm not

10  prejudging that, but I'm at least interested in that

11  notion.  I'm at least interested in the notion in

12  whether or not this would be considered the national

13  court.

14              Delaware courts are rightly concerned

15  when Federal Court's intrude in issues of state law.

16  Frankly, Delaware doesn't particularly like it when

17  some states have gotten creative and dishonor the

18  contract rights of securities holders.  And the

Page 3

81106scs.txt
19   corporations sell securities by trying to intrude on
20   the internal affairs of corporations through all kinds
21   of interesting statutes, which don't seem to honor
22   those contracts or give full faith and credit to the
23   laws of other states.  What comes about consideringly
24   with that sort of concern to protect one less
                                                          5

1   legitimate territory is to also recognize that there
2   are areas in which we don't have the same legitimacy
3   as the federal courts.  I don't know if this is one.
4   I'm not prejudging it.  When I see something -- a
5   reference to national courts -- I have to say it
6   doesn't occur to me immediately that it's necessarily
7   the case that any court within a nation qualifies for
8   that.  It might have been rationally thought by
9   whatever the entity was.
10              What that means is that we're a bunch
11  of nations bringing together -- coming together.
12  We're trying to work together.  We're going to presume
13  on the part of the nations involved in this that the
14  judicial system in those nations will responsibly
15  adjudicate the disputes and that ultimately those
16  systems will culminate in some national court which
17  will bless whatever rulings are done at the lowest
18  level of the system.  It's not necessarily clear to
19  me -- it is true that you could possibly get a writ of
20  certiorari from the Delaware Supreme Court to the
21  United States Supreme Court.  It's not immediately
22  clear to me that that's what they meant.
23              I don't know anything about Germany.
24  I know more about soccer and beer from Germany than
                                                          6

81106scs.txt

1   the German courts, but some of them have federal
2   governments or different local governments where they
3   may have court systems that aren't part of the nation.
4   You know, I just don't know.
5                     What I also know is that this is
6   clearly no more a court -- a national court of the
7   United States than any of the federal district courts,
8   and it's not clear to me why the request for
9   injunctive relief that's sought here could not have
10  been sought in those other pending cases, which is not
11  only can, you know, QUALCOMM not get an injunction,
12  Your Honor, we are moving affirmatively for you to
13  issue an injunction against them because of what
14  they're trying to do to us worldwide by dishonoring
15  their obligations to us under this essentially -- this
16  contract that arises by virtue of this and present
17  that to a federal judge.
18                     I had not known the federal courts
19  were without authority to issue injunctions with
20  nationwide effect and perhaps international effect
21  with the party before it who's invoked their
22  jurisdiction.
23                     Without going on about it, I mean,
24  those are the things I'm going to be interested in.
                                                          7

1   We've got the first-filed doctrine, we've got the
2   notion of what this is.  When I first got the case and
3   I read -- this is a classic joint venture.  Somebody
4   has got to leave it in Delaware law.  What you've got
5   is a de facto contract by virtue of something going on
6   in France, and QUALCOMM happens to be a Delaware

81106scs.txt
7   corporation.  I'm happy to entertain a tighter
8   briefing schedule.  I would ask Nokia -- not Nokia --
9   I would ask QUALCOMM to commit to when they could file
10  its motion to dismiss.
11              When do you think, Mr. Fischer, you
12  could get a brief in, or something like that?
13              MR. FISCHER:  I think we'd like at
14  least a couple of weeks.  Is that asking for too much?
15              THE COURT:  They'll tell you that it
16  is.  I think a couple weeks is not too much.
17              MR. FISCHER:  Well, in light of what's
18  going on in the other litigations, I don't think two
19  weeks -- there's nothing immediately pending that we
20  need to -- I think two weeks is reasonable.
21              MR. LORIG:  If I can respond.  Two
22  weeks normally, I think, would be reasonable, even if
23  you're the other party.  The problem we have is we're
24  dealing with an injunction-case-of-the-day.  Yesterday
                                                        8

1   they filed another case in Germany asking for an
2   injunction.  If we're going to take time and brief
3   this matter for a couple of weeks, can we at least get
4   a stipulation from QUALCOMM that, until the courts
5   jurisdiction is decided, they won't file any more
6   patent infringement suits in foreign countries.  I'm
7   not talking about the United States.  That's already
8   done.  I'm talking about outside of the United States.
9               Will QUALCOMM agree, in return for a
10  civilized briefing schedule so we can air the issues,
11  not to file any further patent infringement actions in
12  countries outside of the United States?
13              MR. FISCHER:  I'd have to discuss that
                    Page 6

81106scs.txt

    14    with people, Your Honor.

    15                    THE COURT:  I do think it is -- one of
    16    the things -- if these suits are going to arise on the
    17    map, I assume they're like red dots and start looking
    18    like some global infection.  we'll get the guy from
    19    house to diagnose -- I mean, I think that is a
    20    problem, Mr. Fischer, that he we have to deal with
    21    here.  I hadn't known there was a suit filed
    22    yesterday.

    23                    MR. FISCHER:  I didn't know that
    24    either, Your Honor.
                                                              9

     1                    MR. LORIG:  we were notified by
     2    European counsel.

     3                    MR. URQUHART:  And by QUALCOMM.

     4                    MR. LORIG:  And by QUALCOMM.

     5                    Just to let Your Honor know what's
     6    going on beyond the surface.  Yesterday there was a
     7    meeting between QUALCOMM and Nokia.  As a Nokia
     8    representative walked into the room to discuss issues,
     9    they agreed to the news of another, we believe,
    10    vexatious lawsuit, this time filed to Germany.  That's
    11    the pattern we're in.  That's why we're seeking the
    12    Court's injunctive relief.

    13                    THE COURT:  Look, I'm a fairly direct
    14    person.  That kind of behavior is not going to aid
    15    QUALCOMM with any -- when I consider at least the
    16    McWane issue -- McWane being our first-filed case
    17    doctrine, which is, you know, if QUALCOMM wants to
    18    bring an injunction action and say, "Look, we want to
    19    have a fair fight.  It's basically the same issue all

                                Page 7

81106scs.txt
20  over the world.  We shouldn't litigate it in 17
21  different courts.  We should pick one good forum.  You
22  know, we want it in the Federal Court that we first
23  filed in.  Let's agree.  Let's get it done.  Let's
24  have a trial, and let's make this be the template."
                                                      10

1   You know, that's a fairly strong position to be in
2   when you've got a first-filed doctrine.
3                On the other hand, if QUALCOMM says,
4   "No, what we really do want is some sort of
5   international infection of lawsuits to afflict Nokia,
6   we want the possibility of inconsistent adjudications,
7   we want them to get lawyers and master all these
8   different intricacies, put aside civil code versus
9   common law.  Why don't we get a sampling of common law
10  nations?  Why don't we get Australia, UK, the United
11  States, and then we'll get, frankly, former
12  dictatorships, which are still arguably that way but
13  have court systems and we'll see, you know, how that
14  kind of goes."  And then, if that's the situation,
15  that really cuts very strongly against worrying about
16  first-filed doctrine.
17                MR. FISCHER:  Your Honor, I don't
18  think that's what's going on.  I think it's a matter
19  of taking protective actions in the areas where it's
20  appropriate to take it, in light of the nature of the
21  patents at issue and where they are and where the
22  patents are protected.
23                THE COURT:  Am I wrong to think that
24  this is essentially a European-wide dispute or is it
                                                      11

1   maybe even also extends to the continental United
                       Page 8

81106scs.txt

2    States?

3                    MR. LORIG:  Your Honor, it's really
4    worldwide.  They filed their action in San Diego the
5    end of last year.  It's stayed at the moment.  They
6    filed actions before our last settlement negotiation.
7    They greeted us with filing an action in the UK.  Now,
8    before this one, they greeted us with filing an action
9    in Germany.  If we have another settlement
10   negotiation, we'll probably have another patent action
11   in another European or Asian country.

12                   The idea that they're trying to
13   protect their interests, if you'll pardon me, is, I
14   think, based on the fact that perhaps counsel is not
15   aware of how old these patents are.  Most of them have
16   priority dates of 1990, 1994, 1995.  There's severe
17   laches on past damages.  QUALCOMM publicly announced
18   that the only reason they have filed these actions
19   under GSM patents is to try to pressure Nokia into
20   signing.  QUALCOMM's management publicly announced to
21   the investment community that they weren't pursuing
22   any other company on their GSM patents, that they're
23   only trying to enforce them against Nokia in order to
24   pressure Nokia to sign an agreement on third
                                                          12

1    generation, meaning nonGSM patents.  And they told the
2    rest of the industry they didn't have to worry about
3    these GSM patents.

4                    So I don't -- there's a lot of details
5    and facts.  I don't believe my opposing counsel is
6    familiar with them yet.  Certainly what he says on the
7    surface seems reasonable.  But the facts are quite

                          Page 9

81106scs.txt
8    different, and that's why we thought about where to
9    go.  QUALCOMM is a Delaware corporation.  Nokia Inc.
10   is a Delaware corporation.  This is pure
11   interpretation of contract issue.  It's a valuation of
12   patent rights -- how to value what a FRAND royalty is
13   as compared to a normal royalty.  What is fair?  Yes,
14   the obligation is interpreted under French law, but
15   the rule is you go to your national courts.
16                   In the United States we have a
17   different situation than we do in Europe.  In Europe
18   you have one unified court system.  Here, because we
19   are a federation of states, you have both a state
20   system and a federal system.  There is no federal
21   question here.  You've got two Delaware corporations,
22   you've got an issue of interpreting and enforcing a
23   contract, and there is not a federal question here.
24                   THE COURT:  It is an interesting -- I
                                                        13

1    mean, I understand what you're saying.  There's no
2    federal question of federal law what view the federal
3    courts would take of their jurisdiction, given the
4    terms of -- I forget the European entities.  What's
5    it's called?
6                   MR. LORIG:  ETSI.  E-T-S-I.
7                   THE COURT:  whatever ETSI says.  what
8    the federal courts would view their obligation as
9    being is it may not be -- intuitively it's not as
10   relevant to me for this reason, which is the reason
11   why Nokia is here is because QUALCOMM is filing patent
12   infringement actions which it believes are improper
13   and at a time when what Nokia says should be going on
14   is, frankly, we ought to be getting so-called FRAND
                        Page 10

81106scs.txt

15    rates and this should not be an issue at all.
16                    When they filed their patent
17    infringement action in the U.S. District Court in San
18    Diego -- it's clearly a defense. It may be even a
19    counterclaim, and it would seem to get around the
20    jurisdictional issues. From what I read in the letter
21    from Potter Anderson today, you were fighting about
22    going to arbitration. And no one teed up, you know,
23    this question. And it may have been because that was
24    the first of the actions.
                                                          14

1                     I also don't know what's before the
2     U.S. International Trade Commission, whether that is a
3     forum that would qualify under ETSI. I don't know
4     whether anybody has worked --
5                     MR. LORIG: May I respond, Your Honor?
6     The ITC, as Your Honor may know, only has the power to
7     grant injunctive relief. It doesn't have the power to
8     define a reasonable royalty or a fair and reasonable
9     royalty. Moreover, by law, it's determinations are
10    not -- don't give rise to collateral estoppel,
11    res judicata issues, preclusion issues because of the
12    nature of the Court system.
13                    To go back to Your Honor's point about
14    San Diego. As we understood the law, if somebody has
15    filed an action which triggers an arbitration right,
16    you waive that right. The first thing you don't do is
17    ask for arbitration. We asked for that. The judge
18    denied it. The arbitration went forward anyway. The
19    federal circuit has heard the appeal. But we have not
20    teed up in that case the right to an injunction or how

Page 11

81106scs.txt
```
21  to define fair, reasonable --
22                THE COURT:  what's happening with
23  arbitration?
24                MR. LORIG:  It's ongoing.
                                              15

 1  Mr. Casebeer is on the phone.  We both participated.
 2                MR. MAMMEM:  In the arbitration right
 3  now is pending QUALCOMM's motion to dismiss the main
 4  claim in the arbitration on Rule 12(b)(6) grounds.
 5  We're awaiting a hearing date on that motion.
 6                MR. LORIG:  Your Honor, the issues do
 7  not include a right to an injunction --
 8                THE COURT:  I guess what I'm saying
 9  is, who brought the action in the U.S. District Court
10  in California?
11                MR. MAMMEM:  QUALCOMM did.
12                THE COURT:  Right.  For patent
13  infringement?
14                MR. MAMMEM:  Yes.
15                THE COURT:  And why wouldn't Nokia say
16  that that was -- you know, that one of the reasons why
17  that action is not viable is because QUALCOMM is
18  acting in violation of ETSI?
19                MR. MAMMEM:  Your Honor, we think
20  that's exactly the right question.  As we've seen from
21  the response that Nokia filed yesterday, they appear
22  to have asserted both the issues that they raised --
23  that Nokia raised -- before the arbitrator, as well as
24  this ETSI issue as affirmative defenses in that
                                              16

 1  action.  In the district court action, Nokia has not
 2  yet been required to file an answer because of the
                        Page 12
```

81106scs.txt

3  procedural posture of that action. That would be the
4  appropriate forum for these issues to be aired.
5            MR. LORIG: One would have thought, as
6  Your Honor has said, that the reasonable thing to do
7  would be for QUALCOMM to have filed this action in
8  San Diego, which after all is its home base, tee up
9  the issues there.
10            What happened is, after the case was
11 stayed and the arbitration started going forward, they
12 didn't like some of the things that were happening in
13 the arbitration. They then filed an action in the ITC
14 on several of the same patents that were at issue in
15 San Diego. When they didn't like the way things were
16 going, they filed the UK action. You see the problem?
17            THE COURT: I understand that. As a
18 litigator will, you changed my words around to put the
19 onus on QUALCOMM.
20            I don't know what gave rise to the
21 arbitration right. Was it a contract between QUALCOMM
22 and Nokia?
23            MR. LORIG: Yes, it is a contract.
24 Unfortunately, because we don't have a protective
                                                    17

1  order, without permission of my opposing counsel I
2  can't discuss its contents because --
3            THE COURT: Would it sweep within it
4  arguably the ETSI claim?
5            MR. LORIG: I don't believe so, Your
6  Honor.
7            THE COURT: I'll give you my standard
8  pitch on American -- not American businesses in

Page 13

81106scs.txt
9    general.  No one whines more about the cost of
10   litigation than businesses and doctors.  In my
11   experience as a judge, no source of litigation delay
12   or complexity or a waste are more common than
13   businesses and doctors.  I say doctors because anybody
14   who has had a doctor practice break up, where people
15   go under tables and pull out plugs, steal records, do
16   things -- doctors love litigation when they're playing
17   offense; they hate it when they're playing defense.
18   Businesses whine all the time, you know, but they
19   spend a gazillion amount of dollars and human energy
20   every year fighting about what forum to be in.
21              You know, it may be you all think I
22   can do it well on both sides and that you can
23   stipulate that I'll do it.  You probably can't because
24   you know you just hate each other.  Your clients hate
                                                         18

1    each other and they're going to fight about anything.
2    You could have the best -- universally conceded --
3    best judge in the world by both sides in a blind taste
4    test.  If they happen to agree on that person, they
5    would then back away.
6              What I'm getting at and what we're
7    going to get to quickly -- I mean, I will say this to
8    QUALCOMM.  If I find out tomorrow there's an action in
9    Belgium and an action in the Netherlands, then I'm
10   going to set a trial date.  And we'll go, you know,
11   hell bent for leather with all the discovery in the
12   world to get this tried wherever it has to be,
13   including in my court, if I conclude that it's going
14   to be here.  But because it's going to be somewhere,
15   there will be no waste in the discovery.
                    Page 14

81106scs.txt

16                   What was done in Germany was done in
17   Germany.   We'll start with QUALCOMM having a brief in
18   two weeks.
19                   What would Nokia want in terms of
20   answering?
21                   MR. LORIG:   I think we'll get our
22   response in one week, Your Honor, since they are not
23   stipulating to stay their hand on filing future --
24                   THE COURT:   You only want a week?
                                                          19

1    Okay.   Get on the books quick.
2                    MR. STARK:   Your Honor, may I speak
3    briefly?
4                    THE COURT:   Yes.
5                    MR. STARK:   Your Honor, to your point
6    that a number of suits have been filed by QUALCOMM for
7    patent infringement, I just wanted to make clear for
8    the record that there are patents of different nations
9    involved in these different actions, and each patent
10   of a different nation gives rise to a separate and
11   completely distinct set of rights.   For example, the
12   U.S. patents that are at issue in the San Diego
13   litigation give rise to the right to potentially
14   exclude products from being offered, sold, made or
15   used in the United States, but do not extend
16   necessarily to other nations.   The same would be true
17   of patents of other nations that are at issue in other
18   litigation.
19                   So I just wanted to make the point,
20   Your Honor, that it's not a simple case of
21   proliferating litigation, but rather there are quite
                             Page 15

81106scs.txt
```
22    distinct rights at issue.  In order to protect those
23    rights, QUALCOMM may need to seek to bring cases in
24    different jurisdictions.
                                                        20

 1                     THE COURT:  As I understand your
 2    friend's point, that I guess in the territories
 3    governed by ETSI, which would be essentially the
 4    European union -- is that correct?
 5                     MR. LORIG:  Yes, Your Honor.
 6                     MR. STARK:  That's correct, Your
 7    Honor.
 8                     THE COURT:  -- that there is an
 9    overriding issue of whether essentially what QUALCOMM
10    is limited to is essentially making, you know, sure
11    that Nokia pays FRAND rights for the technologies in
12    all those territories, and that the overarching issue
13    that Nokia seeks is that essentially the European
14    unionwide -- instead of charging folks like Nokia
15    FRAND rights for these essential technologies, it's
16    essentially trying to create a hostage situation
17    where, instead of charging FRAND rights, it charges
18    something way too expensive or keeps people out of the
19    market all together.  That's what I understand is the
20    issue.
21                     MR. STARK:  That is potentially a
22    common issue.  Your Honor, we would submit that
23    Nokia's position is utterly without merit on that.  I
24    just wanted to make sure that the record was clear.
                                                        21

 1                     THE COURT:  Right.
 2                     What I'm saying is, if it is an
 3    overarching issue and I can't at this point judge
                         Page 16
```

81106scs.txt

4      whether it's just without merit, whether it's utterly

5      without merit -- you know, whatever adverbial tag line

6      we want to put on it -- I can't judge that.  But if

7      it's possibly a good defense and you all can't figure

8      out where to fight about it and it looks like the

9      infection is spreading throughout the European union,

10     then I am going to set a trial date and at least get

11     the issue -- get discovery going.

12                     What I would strongly advise that you

13     do -- one of the things I would say to Nokia, don't

14     be, you know, day foolish here and say we'll do our

15     brief in a week.  Let's just be careful about that.

16     All I'm saying is, maybe you can anticipate all the

17     arguments that they're going to have and you're going

18     to look -- maybe you're going to get the stuff in

19     ETSI.   I don't know if there's an official English

20     version of ETSI.

21                     MR. URQUHART:   The website.

22                     THE COURT:   The history of ETSI and

23     what it means.   I'll just -- why don't you figure out

24     a place to have this fight.

                                                           22

1                      MR. LORIG:   On behalf of Nokia, we

2      would stipulate that the Delaware Chancery Court can

3      resolve this dispute and each side stay their hand on

4      other litigations until this issue is resolved.

5      Because these are two large mature companies and there

6      is an honest dispute, apparently, between what the

7      FRAND obligation means, and it should be resolved.   We

8      would stipulate to jurisdiction here.   And I would

9      hope counsel would ask their clients before rejecting

81106scs.txt
10   it so that can be decided.  Because the problem that
11   we're going to get into is we can literally have
12   scores of lawsuits around the world, not just in
13   Europe, with differing interpretations of what the
14   FRAND obligation means.  Here, where there is
15   jurisdiction over QUALCOMM and there isn't
16   jurisdiction in the national courts in Europe, here's
17   the one place it can be decided.
18              THE COURT:  What I'm saying is, if
19   they had thought of this court first, you know, I
20   expect that what Nokia would be saying is, we're a
21   Finnish corporation.  And the fact that a few of our
22   cell phones come into Delaware doesn't mean why are we
23   the heck in the Delaware Court of Chancery.  Now,
24   Strine's got a great hairstyle and we dig that; but,
                                                    23

 1   you know, aside from that, you know, you just can't
 2   really get it.
 3              Now I understand there is a Nokia --
 4   that the U.S. subsidiary is here.  What I'm saying
 5   is -- I would say to both sides -- I realize -- and
 6   even in something just with the dispute -- the fact
 7   that one side or the other picked the forum first
 8   becomes, you know, some sort of psychological barrier
 9   to rationality.  I could as easily say to Nokia, "Why
10   not agree to go back to the U.S. District Court in
11   San Diego, lift the stay with respect to this issue
12   and have it out there."  I think your friends from
13   QUALCOMM would be in a very difficult position to say
14   that a U.S. District Court is not a national quorum.
15   That would deprive me and our Delaware friends of the
16   ability to participate in this.
                  Page 18

81106scs.txt

17              I'm happy to do the work.  This
18  court -- one of the advantages of Delaware is, you
19  know, we have to play fair.  That's the nature of our
20  business.  we can't play favorites and have it work
21  for our state.  It just doesn't work.
22              The Nokia subsidiary's a Delaware
23  subsidiary; QUALCOMM is a Delaware corporation.
24  Probably neither of your corporations have as many of
                                                        24

1   your operations here as my former boss and a U.S.
2   senator would like.  So it's not like we could favor
3   the headquarters versus anything.  Usually people --
4   we're indifferent to that.  we're trying to come with
5   a fair outcome.

6               If you can agree that I'm the place,
7   you know, that becomes easier.  Then you can enter
8   into a stipulation that's binding.

9               My concern about that is, again, the
10  psychic notion, which is that QUALCOMM has been
11  brought and it didn't choose this place.  You know, if
12  what Nokia's objective is is to get a decision, what
13  I'm saying to you, I am going to set a trial date and
14  I am going to make you all have your depositions taken
15  and do all that kind of stuff if these things keep
16  coming up.

17              It may that be what you can agree on,
18  even though it deprives me of the fun, is that the
19  forum that QUALCOMM chose as its first American court,
20  which might even be more convenient for some of the
21  litigators working for Nokia, since, you know, you're
22  out there in the land of Gwyneth and stuff, would be

81106scs.txt
23   that, you know, you do it in San Diego.
24                        MR. LORIG:  One of the problems is the
                                                                25

1   judge in San Diego -- Judge Brewster -- is a senior
2   judge, just had an operation for prostate cancer, has
3   announced he's going to retire in September of next
4   year.  Some of these European cases won't be tried and
5   decided by the middle of next summer.  The timing,
6   frankly, isn't good.
7                        You know, one of the reasons, as I
8   said we're here, is for exactly the reasons Your Honor
9   enunciated: this is a neutral court.
10                       MR. MAMMEM:  The response to that is
11  that, if we had started litigating the San Diego
12  action back in November when we filed, we would be
13  well-advanced in the San Diego forum at this point.
14                       THE COURT:  Well, Mr. Mammem, you
15  represent --
16                       MR. MAMMEM:  QUALCOMM.
17                       THE COURT:  You're at what firm?
18                       MR. MAMMEM:  The Day Casebeer firm.
19                       THE COURT:  I guess what I'm saying
20  is, you know, things like Judge Brewster -- if
21  Judge Brewster is genuinely retiring, he probably
22  knows that.  And I would assume that he -- you know,
23  as I would assume about most of my judicial
24  colleagues -- that he cares deeply about doing
                                                          26

1   justice.  And that to the extent that the time frame
2   that's involved here doesn't comport with his
3   retirement plans, that there is this thing called
4   reassignment.
                        Page 20

81106scs.txt

```
 5               I would say to Mr. Stark and
 6    Mr. Mammem, you know, this court is fair.  We do
 7    things pretty well.  I think I know that the Cravath
 8    firm has once in a while gotten a decent result here.
 9    And so -- certainly the Potter Anderson firm has.
10               So I think the question becomes
11    whether it's really like you just want to hurt each
12    other, and you just want to have this sort of
13    uncertainty.  That may be a business decision that
14    none of the lawyers have anything to do with.  It's
15    just simply we want to hurt each other, and nobody
16    needs to respond to that because each side is going to
17    say, "Of course we wouldn't do that.  We wouldn't have
18    just 17 lawsuits just because it gives us business
19    leverage."  And the other side say, "Of course we
20    wouldn't do the same either.  We wouldn't duck a
21    particular forum just to come here and make it" -- you
22    know, in Delaware we have that phrase, we don't -- we
23    say it about every other day -- we didn't just fall
24    off the turnip truck, which I think can also be
                                                        27

 1    interpreted to mean I didn't just fall off the turnip
 2    truck.  Everybody knows I fell off it five years ago,
 3    without a helmet, and I've suffered permanent damage
 4    ever since.  I have never fallen off the turnip truck.
 5    I know there's jousting going on.  I know this means a
 6    lot to your clients.
 7               What we're going to do is, I want a
 8    tight briefing schedule.  Think about that week.  I'm
 9    not going -- I want a briefing schedule to me by next
10    wednesday.
```

Page 21

81106scs.txt
11                  MR. FISCHER:  We'll do that, Your

12   Honor.

13                  THE COURT:  Think about your time

14   frame.  If there are other lawsuits, then discovery is

15   going to go forth and it's going to be on an expedited

16   basis.  So QUALCOMM, to some extent, is going to be in

17   control about whether expedited discovery begins;

18   otherwise discovery is not stayed but it will go under

19   the usual deadlines.  I would like a report back at

20   the same time I get a schedule about whether you've

21   conferred about whether there is a forum you could

22   agree on to go first about these threshold issues and,

23   frankly, to stay the other litigations.  There may be

24   some complexity there.

28

1                  I heard Mr. Stark say it's a good

2   point.  There may have to be some sort of tolling

3   agreement between QUALCOMM and Nokia to indicate that

4   QUALCOMM is not -- if its time has already lapsed,

5   it's lapsed.  But that during the nothing -- simply

6   the pendency of any stay to get done in the first

7   things won't be -- that part of the delay won't be

8   attributed as laches and that sort of thing.

9                  MR. LORIG:  Your Honor, we'd stipulate

10   to that on the record right now.  That's not a

11   problem.  The problem is, again, the fact that we're

12   getting an injunction action in a week.

13                  THE COURT:  Mr. Stark, can you take

14   that back to your client?

15                  MR. STARK:  Yes, Your Honor.

16                  THE COURT:  It also gives me a chance

17   and will create a little record here, which will help

Page 22

18    other courts to flesh out really whether this is --
19    these people are acting like children in a way that's
20    unfair or they simply, you know -- because I think if
21    you can get -- at some point, when you've got the idea
22    that QUALCOMM will be able to protect its interest in
23    all the jurisdictions, we'll get a fair shot in a good
24    forum of presenting its side in one of the national

                                                          29

1    controversies, but yet Nokia will get to advance this
2    overarching thing and it could be done in a good
3    quality forum that's neutral in a prompt way.
4                   If one side or the other is objecting,
5    then they suggested, frankly, this is a situation
6    where counsel have a duty to step into your clients
7    and say, "No, you can't act in a vexatious way."
8    Let's have a fair fight on the merits. We may win or
9    lose, but we have that opportunity, and we're not
10    going to afflict 13 different countries with a case.
11                   MR. LORIG:   May I respond, Your Honor?
12                   THE COURT:   Yes.
13                   MR. LORIG:   That's exactly what the
14    problem is and why we're here. They have asked for a
15    July 2007 trial date in England, but the FRAND issues
16    would not be decided until after that. You decide the
17    patent issues first, injunction first, the other
18    issues second.
19                   Same in Germany.   You're going to get
20    the patent issues decided within a year.   You're not
21    going to get to the other issues.
22                   THE COURT:   Right.
23                   What I'm saying is, I'm sensitive to

                          Page 23

81106scs.txt
24  the need -- I understand what Nokia is saying.  I
                                                          30

1   think the vulnerability that Nokia has is are we a
2   national court and the fact that could these -- this
3   defense be presented in prior pending actions.  That's
4   why I'm suggesting to QUALCOMM it ought to think very
5   hard about the other options it brings and whether
6   it's willing to stipulate in somewhere else.  If it
7   prefers -- San Diego is a lovely place.  I actually
8   never spent any time in the city.  I only spent my
9   time on Coronado.  It has sufficient proximity to the
10  ocean and to fish tack companies that I never
11  actually -- except driving to the airport -- spending
12  any time there, other than the Padres are an awesome
13  team.  You know, you've heard me on that.  I want to
14  hear about the fight and I want a briefing schedule.
15              MR. FISCHER:  By Wednesday?
16              THE COURT:  Yes.
17              MR. LORIG:  Should that briefing
18  schedule be for an expedited proceeding so that this
19  matter will be decided before these various midsummer
20  problems we're going to have?  We've got European
21  decisions by the middle of next year.
22              THE COURT:  No.  I think I've been
23  pretty clear.
24              What I've said is, I want a schedule
                                                          31

1   for the completion of briefing on a motion to dismiss
2   or stay, essentially on the forum issue writ large.  I
3   am not staying discovery in any case.  But if there
4   are actions -- if QUALCOMM files an action anywhere
5   else than it's already done, then I'm going to set a
                        Page 24

81106scs.txt

6     trial date.  And I will turn what is discovery that's
7     going to be ongoing and on a normal basis, I will turn
8     that into expedited discovery.
9                    I've got plenty of time to set a trial
10    date for early next year.  One thing we are capable of
11    doing in this court is I have no doubt in the first --
12    well, the first half of August 2006 -- that we can be
13    to trial in early 2007, you know, if we have to.
14                    I'm also assuming there's been some
15    discovery done between the parties somewhere.  Not
16    even in the arbitration?
17                    MR. LORIG:  Not on these issues, Your
18    Honor.
19                    THE COURT:  Not on FRAND?
20                    MR. LORIG:  Not on FRAND.  Not under
21    right to injunction.  Those aren't the issues in
22    arbitration.  There's four discrete issues and these
23    are not among them because the contract in question,
24    which I'm not allowed to discuss on pain of blowing a
                                                        32

1     confidentiality clause because QUALCOMM filed two
2     cases against TI saying they lost their license by
3     talking about the agreement --
4                    THE COURT:  Are you telling me that
5     this dispute is entirely -- that dispute is entirely
6     separate from ETSI?
7                    MR. LORIG:  Yes, Your Honor.  I'm
8     saying that that is entirely separate from ETSI and
9     FRAND.
10                    THE COURT:  Mr. Stark, would you --
11    who is handling that for --

81106scs.txt
12                    MR. MAMMEM:   This is Chris Mammem.

13                    Your Honor, as I believe I mentioned
14    earlier, the dispute that's currently pending in the
15    California arbitration does appear to be a separate
16    set of arguments from the ETSI argument.  However, as
17    we've seen in the ETSI action, where Nokia filed its
18    answer yesterday, they have raised both issues as
19    affirmative defenses.  Nokia has not yet filed its
20    answer in the San Diego action, and we would have
21    every reason to believe that they would in the due
22    exercise of care for their client to assert both sets
23    of issues as defenses in that action once they're
24    required to answer there as well.
                                                         33

1                    THE COURT:  Okay.  But that implies
2     that the ETSI provision will somehow extend to --
3                    MR. MAMMEM:  Several of the patents
4     that are asserted in the San Diego action have been
5     declared standards essential under ETSI.  That's the
6     triggering event, as I understand it, for Nokia to be
7     raising this issue.

8                    THE COURT:  Okay.  But is what's at
9     issue in San Diego have to deal with what happens in
10    the United States or in Europe, which is, the duty --
11    the so-called duty, if it exists under ETSI to allow
12    people to use your technology on a FRAND basis, does
13    that extend outside the European union?

14                    MR. MAMMEM:  That is an issue that I'm
15    not prepared to speak to today.

16                    THE COURT:  Is that Nokia's position?

17                    MR. LORIG:  Our position is the ETSI
18    obligation extends throughout the world, Your Honor.
                              Page 26

81106scs.txt

```
19                    THE COURT:  So that it would be a fair
20   response to the injunction action in California to say
21   ETSI says you can't do it.
22                    MR. LORIG:  Except it's not an
23   injunction action.  They're primarily seeking damages.
24                    THE COURT:  But they can't get damages
```
                                                    34

```
1   if they're breaching their ETSI rights; right?  Then
2   they're denying you the chance to use the technology
3   on the basis that they're supposed to; right?
4                    MR. LORIG:  No, Your Honor.  I think
5   that's the whole issue.
6                    Looking at the San Diego action apart
7   from an injunction, they sue and they say you're
8   infringing on our patent, we're entitled to damages.
9   And the response would be, yes, you're entitled to a
10   royalty, not as --
11                    MR. MAMMEM:  We pled in the San Diego
12   action seeking both damages and injunctive relief.
13                    MR. LORIG:  Yes, it could be teed up
14   there.
15                    THE COURT:  And it could also be teed
16   up more broadly, which is not only as a defense and
17   that the royalty -- whatever royalty you should pay is
18   a FRAND rate, but more generally as an affirmative --
19   as a counterclaim you could be seeking an injunction.
20   Is that right?
21                    MR. LORIG:  We could seek the same
22   injunction from the Federal Court we are seeking from
23   this court, except for the fact that it's again not a
24   federal question --
```
                                                    35

81106scs.txt

```
 1                      THE COURT:   It's not a Delaware law
 2   question either.
 3                      MR. LORIG:   It's a contract question,
 4   Your Honor.  It's strictly contract.
 5                      THE COURT:   What I'm saying is, you
 6   would have every right, given that they brought you
 7   into Federal Court, for you now to raise this as a
 8   counterclaim and an affirmative defense and seek an
 9   injunction.  It would not be a jurisdictional problem
10   on the part of the Federal Court.
11                      MR. LORIG:   It wouldn't be, except
12   that case is stayed pending arbitration.
13                      THE COURT:   That case is stayed.  This
14   case didn't exist; right?
15                      MR. LORIG:   Right.
16                      THE COURT:   The great thing about
17   stays is they can be lifted.
18                      MR. MAMMEM:   We will stipulate to the
19   lifting of that stay immediately, if Nokia would
20   agree.
21                      MR. FISCHER:   It was filed by Nokia.
22                      MR. LORIG:   The issue is, you can't --
23   are they stipulating that we can pursue the
24   arbitration issues in arbitration and that the
                                                      36

 1   San Diego case will be dismissed, we win in
 2   arbitration, and then we come back to Delaware and
 3   have this decided, because the issues in arbitration
 4   are such that no San Diego case could have been filed,
 5   would have been filed?  If we win the arbitration, the
 6   San Diego case must be dismissed with prejudice on all
                              Page 28
```

81106scs.txt

7   issues.

8                   MR. MAMMEM:   That's the nature of an
9   affirmative defense, and they ought to be litigated in
10  due course as affirmative defenses in the patent
11  infringement case.

12                   MR. LORIG:   Your Honor, with all
13  deference, I don't think I heard an answer to my
14  question.

15                   THE COURT:   I don't think I did
16  either.   What I'm hearing is the kind of jousting that
17  I'm going to stop, because it's one of my law clerk's
18  last day and I'm not going to miss lunch with her
19  over -- because it's not helpful.

20                   You all need to take a deep breath and
21  with a cool head and warm heart think about this
22  rationally, which is what I just heard Mr. Mammem.
23  It's a need answer.   But the fact is that Nokia is now
24  seeking to raise more than an affirmative defense.
                                                        37

1   It's seeking to obtain an injunction that goes further
2   to that.   The question is: are they going to get a
3   forum -- if you come to me and say you can do it in
4   the U.S. District Court for the District of San Diego
5   but not until this arbitration is completed, and then
6   you say that's not unfair to them because they're the
7   ones that raised the arbitration issue -- I haven't
8   seen the contract.   It sounds like you've got a lot
9   mixed up in there.   It sounds like you're suing in
10  Germany and the UK.   It's probably not under the same
11  contract that has the arbitration clause.

12                   MR. LORIG:   I would like to ask

Page 29

81106scs.txt
13    QUALCOMM's permission to submit to the Judge -- the
14    Court -- a copy of the -- the contract at issue.  We
15    have QUALCOMM's permission?
16                    MR. MAMMEM:  I believe that would be
17    fine to submit it under seal, or under whatever
18    confidentiality agreement.
19                    THE COURT:  Don't submit it to me
20    until next Wednesday in the context of something.
21                    How far along in the arbitration --
22    this will be the last line of questioning -- how far
23    along are you in this arbitration?
24                    MR. LORIG:  I would say we're halfway
                                                        38

1     along.  We've teed up a proffer on how we're going to
2     prove the issues that we've raised in arbitration.
3     They filed a motion to dismiss.  The arbitrator's
4     currently considering them.  We think the motions are
5     going to be denied and we'll tee up the arbitration
6     hearing.  It should be within the next couple three
7     months.
8                     THE COURT:  Then would you do some
9     discovery?
10                    MR. LORIG:  There's going to be a
11    little discovery.  One of the key witnesses is
12    unfortunately dying of cancer and we're having a
13    little difficulty getting opposing counsel to agree on
14    a way of taking his deposition -- a way that doesn't
15    aggravate his health.  There may be a little
16    additional discovery after that.
17                    MR. MAMMEM:  Mr. Lorig is correct.
18    The motion to dismiss is pending.  We believe that
19    motion will be granted, obviously.  If it's denied,
                        Page 30

81106scs.txt

20    then there will be some amount of discovery to be

21    taken before the merits issue is teed up.

22                    THE COURT:  Is the arbitrator somebody

23    really super special that Nokia loves?

24                    MR. LORIG:  No.  The arbitrator was
                                                        39

1    somebody jointly picked by both sides.  His name is

2    Les Weinstein.  He's a retired trial lawyer.  He

3    doesn't have Your Honor's economic background but he's

4    got a lot of common sense.

5                    THE COURT:  You may have to go over

6    what my economic background is.  Sort of lower middle

7    class.

8                    Good.  I'm glad to know that his folks

9    had some money.

10                    I guess what I'm wondering here is,

11    you know, it doesn't sound to me like you're all

12    that -- the arbitration is always a murky process.

13    You sit here about halfway through, struck me as

14    you're not -- I wouldn't call that halfway through.  I

15    wouldn't even call it halfway through the first phase

16    of anything.

17                    Part of what you all should be

18    thinking about is -- maybe it's this fellow with a

19    better economic background than I have, maybe he does

20    it all.  Maybe you get through the motion and say,

21    "Well, we'll live by what the dismissal thing is.  But

22    if the claims go forward, we'll go back to the judge,

23    lift the stay, and we'll do it all in the District

24    Court of San Diego.  But we'll do it promptly."  What
                                                        40

Page 31

81106scs.txt
```
 1   Nokia gets out of that is it gets a chance to present
 2   its FRAND-ETSI argument.  But you do it all in one
 3   expedited trial before someone, especially since you
 4   haven't really taken the discovery or anything.
 5                   That would involve Nokia obviously
 6   giving up something, which is it loves this judge or
 7   loves this arbitrator or loves arbitration.  More
 8   likely what it had is, it had -- it was sued by
 9   QUALCOMM.  And then the first thing you do is you
10   figure out how can you defeat the suit.  And if you
11   have a contract that says, "Well, we can decide or
12   dispute somewhere else," even if you don't even
13   necessarily think that somewhere else is better, you
14   tend to cling to that at that point in time.  I mean,
15   I hate to say it's that primitive, but I do think a
16   lot of times it's that primitive and that, you know,
17   it's there so we will use it.  If we can get a punter
18   over here, worrying about it delays them playing
19   offense.  Now Nokia wants to play offense.  And it
20   wants something that probably an arbitrator doesn't
21   have any prayer of being able to give it, which is an
22   injunction that would have a collateral effect in
23   other nations.
24                   And one of the responsible trade-offs
                                                        41

 1   might be to go to Judge Brewster and say, "We're going
 2   to put this all in the U S. District Court.  Your
 3   Honor, you're a great judge.  You had a great career.
 4   You're leaving next September.  Our time frame is
 5   something else.  Let's get it reassigned mutually to
 6   somebody who can handle it."  The parties stipulate to
 7   expedite this and have this be the case that goes
                         Page 32
```

81106scs.txt

8    forward, put all your claims before him and go.  That

9    sounds like a fairly -- you know, that sounds like you

10   would all look like pretty sensible business people

11   and lawyers if you did that.

12                MR. LORIG:  May I respond?  That would

13   be about as I think acceptable as a suggestion to

14   QUALCOMM.  We could litigate this in Helsinki court.

15   I think the whole advantage of being here is, one, you

16   can get something resolved quickly in the Delaware

17   Chancery Court; two, you have a neutral forum; three,

18   it's a place where companies from around the world

19   know they're going to get a fair, neutral --

20                THE COURT:  It's making us -- our head

21   is going to explode here in Chancery because we feel

22   so good and that you love us.  I don't know any reason

23   why a judge -- a federal district judge in

24   San Diego -- you know, is going to favor QUALCOMM over

                                                       42

1    Nokia.  I don't know if the stadium is named after

2    anybody out there.

3                MR. LORIG:  QUALCOMM Stadium.

4                MR. MAMMEM:  Not anymore.

5                THE COURT:  And it's a federal

6    district judge.  But you know, you may be just sort of

7    stuck with that.

8                I would say on the other hand to

9    Nokia -- as I said, I'm willing to do the work.  This

10   Court will do the work.  But again, I would say that

11   to QUALCOMM -- it may be QUALCOMM -- you sent them to

12   arbitration.  They may want to get all their claims

13   before one thing.  Maybe you agree it's the Southern

                        Page 33

81106scs.txt
14  District of New York.  There are courts -- there are
15  judges in federal courts who will take this very
16  seriously.  I'm not implying that the Court that it's
17  in isn't.  If it needs to be done within the next five
18  or six months, we'll do that.

19              I had the Oracle case and Judge Walker
20  had the Oracle antitrust thing.  He did that antitrust
21  trial just as promptly as any of us in Chancery would
22  and he pumped out a decision.

23              Again, I didn't realize -- you can see
24  how big a Padre fan I am.  I still -- the idea that a
                                                        43

1   federal judge is going to rule for QUALCOMM --
2               MR. LORIG:  Judge Brewster's fair, and
3   I wouldn't want to indicate anything other than that.
4   It's the difficulties when you have an international
5   problem like this.  You know, clients are
6   understandably hesitant to go into the other company's
7   home court.  It has nothing to do with individuals,
8   Your Honor.

9               THE COURT:  I understand.  Part of the
10  problem is, you all picked this court now.  As a
11  result, if you had gone to them and said, "why don't
12  we have Chancery" -- "why don't we think about
13  Chancery?  Our operations are Delaware, you're
14  Delaware.  Why don't we have Chancery do it."  You
15  might not have a reflex.  But now they chose a forum,
16  you chose a forum.  And what it tends to mean is it's
17  got to be some other forum.

18              You know, you all need to read the
19  transcript.  Think about whether what I'm saying is
20  true or not.  I think it is about psychologically how
                        Page 34

81106scs.txt

21    you deal with it.  Talk to your clients rationally and

22    think about, you know, what you're going to do.  If

23    you can't, we'll finish the motion practice and we'll

24    worry about that then.  Okay?

                                                    44

 1                    So I'll hear from you next Wednesday.

 2                    (Court adjourned at 1:22:50 p.m.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                                                    45

 1                        CERTIFICATE

81106scs.txt
2        I, DIANE G. MCGRELLIS, Official Court

3   Reporter of the Chancery Court, State of Delaware, do

4   hereby certify that the foregoing pages numbered 3

5   through 44 contain a true and correct transcription of

6   the proceedings as stenographically reported by me at

7   the hearing in the above cause before the Vice

8   Chancellor of the State of Delaware, on the date

9   therein indicated.

10              IN WITNESS WHEREOF I have hereunto set

11   my hand at Wilmington, this 14th day of August, 2006.

12

13

14        ----------------------------
                Official Court Reporter
15                of the Chancery Court
                   State of Delaware
16

17
     Certification Number: 108-PS
18   Expiration:   Permanent

19

20

21

22

23

24

# EXHIBIT E



1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

**EFiled: Aug 11 2006 4:44PM EDT
Transaction ID 12058243**



**Matthew E. Fis**
Partner
Attorney at Law
mfischer@potteranderson.com
302 984-6153 Direct Phone
302 658-1192 Fax

August 11, 2006

**VIA EFILE AND HAND DELIVERY**

The Honorable Vice Chancellor Leo E. Strine, Jr.
State of Delaware
Court of Chancery
500 King Street
Wilmington, DE    19801

> Re:    *Nokia Corporation and Nokia, Inc., v.*
> *QUALCOMM Incorporated,* C.A. No. 2330

Dear Vice Chancellor Strine:

We write on behalf of defendant QUALCOMM Incorporated to disclose that after the conference this morning with Your Honor in the referenced matter, we immediately made inquiries of European counsel for QUALCOMM and learned that proceedings in France against Nokia's European affiliates may have been commenced earlier this week. Further to Your Honor's admonitions during the conference, we immediately attempted to intercept the commencement of that proceeding, but since it was already late Friday evening in Europe when this morning's conference concluded, we have been unable to get final confirmation regarding the status of the proceeding. We presume that this notification to Your Honor and effort to intercept the French proceedings will not be used by Nokia to seek some tactical advantage, for example, by rushing out to file a declaratory relief action (or procedural equivalent) in France.

The Honorable Vice Chancellor Leo E. Strine, Jr.
August 11, 2006
Page 2

       We are available at the Court's convenience should Your Honor have any questions regarding this matter.

Respectfully,

Matthew E. Fischer (I.D. No. 3092)

MEF/bls

cc:    Lisa A. Schmidt, Esq.
       Register in Chancery

745827

# EXHIBIT F

# RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

LISA A. SCHMIDT
DIRECTOR

DIRECT DIAL NUMBER
302-651-7763
SCHMIDT@RLF.COM

August 15, 2006

**VIA E-MAIL AND HAND DELIVERY**

Matthew E. Fischer, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19899

> Re:  **Nokia Corporation and Nokia, Inc. v. Qualcomm, Inc., Del. Ch., C.A. No. 2330-N**

Dear Matt:

I write to follow-up on the hearing held before Vice Chancellor Strine on Friday. As you know, Vice Chancellor Strine encouraged the parties to agree on a forum to resolve the disputes related to the ETSI IPR Policies. Consistent with these instructions, I write to inquire whether your client would be willing to enter into a stipulation designating the Court of Chancery as the sole forum to resolve these disputes between Nokia and Qualcomm. As you know, the Vice Chancellor has indicated his willingness to set a trial date for early 2007. It is in both parties' interest to resolve these global disputes promptly and efficiently.

We would also propose that the parties agree to stay all pending actions. Nokia is open to considering an appropriate tolling agreement with respect to the matters at issue in those actions, as well as addressing any additional issues that Qualcomm raises about these matters .

In light of the fact that we are required to report to the Court tomorrow, I would appreciate it if you could let me know Qualcomm's position on this proposal by the close of business today. In addition, we are available to discuss this on a conference call if you believe that would be productive.

Last, would you please send us courtesy copies of the pleadings Qualcomm filed in Germany and France, as well as any other countries about which we have not yet been informed, if there are any such additional pleadings at this time. By requesting these copies, we are not agreeing to accept service on behalf of Nokia and expect the copies will be provided with the understanding that we are not accepting service.

Matthew E. Fischer, Esquire
August 14, 2006
Page 2

Very truly yours,

*Lisa*

Lisa A. Schmidt

LAS:lgw
cc:   A. William Urquhart, Esquire (via electronic mail)
      Frederick Lorig, Esquire (via electronic mail)

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
ATLANTIC TELE-NETWORK, INC. and :
CORNELIUS B. PRIOR JR.,          :
         Plaintiff,              :
                                 :
         v.                      :  Civil Action No. 95-507
                                 :
JEFFEREY J. PROSSER, SHRIDATH S. :
RAMPHAL  and JOHN P. RAYNOR,     :
         Defendants.             :
```

## O R D E R

WHEREAS, Defendants have filed a Notice of Removal in this matter pursuant to 28 U.S.C. § 1441;

WHEREAS, Plaintiffs, Atlantic-Network Inc., et al. have filed a Motion To Remand Proceedings with an Opening Brief;

WHEREAS, this matter has been scheduled for trial in the Court of Chancery of the State of Delaware for September 28 and 29, 1995 by the Honorable Myron T. Steele;

WHEREAS, Plaintiffs have requested an expedited decision of their Motion To Remand and Defendants, by letter dated August 18, 1995 have indicated they do not object to an expedited briefing schedule;

NOW THEREFORE, IT IS HEREBY ORDERED this ____ day of August, 1995:

1) Defendants shall file their Answering Brief on Plaintiffs' Motion To Remand no later than Thursday, August 24, 1995 at 2:00 p.m.;

2) Plaintiffs may file a Reply Brief by 9:30 a.m. on Friday, August 25, 1995;

3) A hearing by teleconference on Plaintiffs' Motion To Remand will be held on Friday, August 25, 1995 at Noon. Each side is allotted a total of fifteen (15) minutes to argue the Motion. Plaintiffs shall arrange the teleconference.

UNITED STATES DISTRICT JUDGE