**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NOKIA CORPORATION and NOKIA, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-509 (JJF) |
| | ) | |
| QUALCOMM INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS NOKIA CORPORATION AND NOKIA INC.'S**
**MEMORANDUM IN OPPOSITION TO QUALCOMM INCORPORATED'S**
**MOTION TO CONSOLIDATE BRIEFING AND HEARING SCHEDULES**

Plaintiffs Nokia Corporation and Nokia Inc. (together, "Nokia") hereby respond as follows to Qualcomm Incorporated's ("Qualcomm") Motion to Consolidate Briefing and Hearing Schedules (the "Motion to Consolidate"):

**INTRODUCTION**

Qualcomm is trying to put the cart before the horse. It asks the Court to decide whether this case should be transferred to San Diego before there has been any decision on whether there is federal subject matter jurisdiction. Moreover, Qualcomm cannot demonstrate any rush to have the case transferred to San Diego. Only one week ago, Qualcomm itself represented to Vice Chancellor Strine that expedited treatment of such a motion was not necessary in light of the procedural posture of the parties' other litigation. Indeed, if the case is transferred, it will be consolidated with another action that is stayed indefinitely. Thus, Qualcomm's Motion to Consolidate, and the underlying Motion to Transfer, would serve only to delay any ruling on the

merits of Nokia's claims.[1]   The Court should deny Qualcomm's Motion to Consolidate and determine first whether remand to the Chancery Court is appropriate.

## PROCEDURAL BACKGROUND

On August 8, 2006, Nokia commenced the present action in the Delaware Court of Chancery and contemporaneously moved the Court to expedite the proceedings. The Motion to Expedite sought a prompt trial date in early 2007 on the ground that Qualcomm's actions threatened Nokia with irreparable harm. Qualcomm responded on August 10, raising objections to venue and jurisdiction but arguing that "there is no need for expedition here[.]" Ex. A at 3.

Vice Chancellor Strine held a scheduling conference on August 11. The Vice Chancellor addressed Qualcomm's venue and jurisdiction objections, and asked Qualcomm to commit to a filing date for its motion to dismiss based on those objections. Ex. B at 6-7. Qualcomm did not suggest there was any urgency in resolving its venue and jurisdiction objections.   To the contrary, Qualcomm represented that it "would like at least a couple of weeks" to file its opening brief, and stated that "in light of what's going on in the other litigations, I don't think two weeks - - there's nothing immediately pending that we need to -- I think two weeks is reasonable." Ex. B at 7. The Vice Chancellor ordered, among other things, that the parties attempt to stipulate to jurisdiction and, absent such a stipulation, that they submit to the Court by August 16 a briefing

---

[1] Nokia will not burden the Court with a recitation of the facts underscoring the need for prompt resolution of the merits of this action, which have been fully set forth in the Complaint, Nokia's Opening Brief in Support of its Motion to Remand, and Nokia's Motion to Expedite Proceedings With Respect to Motion to Remand.

- 2 -

schedule on Qualcomm's objections to venue and jurisdiction, with Qualcomm having the two weeks it requested to submit its opening brief.[2]  Ex. B at 18, 27-28.  In lieu of filing the Court-ordered briefing schedule, Qualcomm filed a Notice of Removal on August 16.  The same day, Qualcomm also filed in this Court a Motion to Transfer and a sixteen-page Opening Brief setting forth its positions on venue and jurisdiction.  At that time, Qualcomm did not claim there was any need for an expedited ruling on its Motion to Transfer.

On August 18, Nokia filed a Motion to Remand and an Opening Brief in support thereof. Nokia simultaneously filed a Motion to Expedite with respect to the Motion to Remand -- relief that was opposed by Qualcomm.  This Court granted Nokia's Motion to Expedite later that day. Apparently concerned that the case will be promptly remanded to the Court of Chancery, Qualcomm now seeks to expedite briefing and scheduling for its Motion to Transfer to have it heard at the same time as Nokia's Motion to Remand.[3]

---

[2] In the Court of Chancery, Nokia was concerned that it would be irreparably harmed while Qualcomm's motion to dismiss or stay was pending. Nokia was, and remains, concerned that Qualcomm is continuing its campaign of commencing new patent infringement actions worldwide. Vice Chancellor Strine alleviated that concern to a degree by informing Qualcomm that he would immediately set a trial date if such behavior continued, and by ordering discovery to proceed pending resolution of the motion to dismiss or stay.

[3] Although styled as a motion to consolidate, Qualcomm's motion is actually a motion to expedite. Qualcomm cannot piggy-back on the rationale of Nokia's Motion to Expedite because the issues raised by Nokia' Motion to Remand are completely unrelated to those raised by Qualcomm's Motion to Transfer.

RLF1-3050055-1

## ARGUMENT

### A.    Qualcomm Has Not Presented Any Basis For Expedition.

Qualcomm's two-page Motion to Consolidate does not set forth any reasoned basis supporting the relief sought.  This fact alone is fatal to the request.[4]  Instead, Qualcomm selectively recites some of the procedural posture of the present action and vaguely states that it moves for such relief "in the interests of fairness and judicial efficiency."  Qualcomm's understanding of judicial economy is misguided.

Judicial economy would be served if the Court denied Qualcomm's Motion to Consolidate, and decided Nokia's Motion to Remand before the Court and the parties are obligated to expend resources on the potentially moot issue of venue.  The Motion to Remand raises a threshold question of subject matter jurisdiction.  If the Court concludes, as Nokia believes it must, that it lacks subject matter jurisdiction and grants Nokia's Motion to Remand, no further action will be necessary on Qualcomm's Motion to Transfer.  *See, e.g., LJM2 Co-Investment, L.P. v. LJM2 Capital Mgmt., L.P.*, 2003 WL 431684, at *6 (D. Del. Feb. 24, 2003). In contrast, if the Court grants the Motion to Transfer, the District Court in San Diego will still have to resolve the issue of subject matter jurisdiction on Nokia's Motion to Remand. Obviously, following that procedure would waste judicial resources, unnecessarily involve a second federal court in this matter, and further delay the underlying proceedings.

Promptly resolving the Motion to Remand is likely to advance proceedings on the underlying merits and prevent irreparable harm to Nokia.  Conversely, resolving Qualcomm's

---

[4] Qualcomm's failure to state a basis for the relief sought cannot be cured by a more detailed reply brief. *See* D. DEL. L. R. 7.1.4(G)(2) ("The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief.").

Motion to Transfer will have no effect on the merits. For example, as Vice Chancellor Strine recognized, Qualcomm's venue and jurisdiction objections should not delay discovery, as discovery on the merits will be necessary regardless of the venue. *See* Ex. B at 19, 32.

Finally, and most importantly, the alleged need for expedited treatment of Qualcomm's Motion to Transfer is belied by Qualcomm's representation to Vice Chancellor Strine that there was no need to resolve promptly its objections to venue and jurisdiction "in light of what's happening in the other litigations[.]" Ex. B at 8. Indeed, the Motion to Transfer seeks to have this case transferred to the Southern District of California for consolidation with another action (the "San Diego Action") that has been stayed since March 14, 2006. That action will remain stayed until the Federal Circuit rules whether the San Diego Action must be further stayed, under Section 3 of the Federal Arbitration Act, pending resolution of an ongoing arbitration between the parties. *See* Ex. C. If the Federal Circuit orders a stay, the San Diego Action will remain stayed until the arbitration is completed, which will likely be sometime in early 2007 (by which time Vice Chancellor Strine could have presided over a trial on the merits of Nokia's claims).

The San Diego Action is also subject to another stay pending the completion of a United States International Trade Commission ("ITC") investigation that has been initiated pursuant to a complaint Qualcomm recently filed against Nokia alleging infringement of three of the same patents at issue in the San Diego Action. The District Court must stay the San Diego Action, at least as to the three common patents, until the completion of the ITC investigation, currently scheduled for September 2007. *See* 28 U.S.C. § 1659(a). The District Court has scheduled a hearing for October 16, 2006 to decide whether the other claims in the San Diego Action should also be stayed pending the ITC investigation, to avoid splitting the case in two.

- 5 -

Given the status of the San Diego Action, there is no urgency whatsoever to Qualcomm's Motion to Transfer. If Qualcomm's Motion to Transfer is granted, Nokia's contract claims will be merged into an action that is currently stayed, and that is likely to remain stayed for many months. Qualcomm's Motion to Consolidate thus asks the Court and Nokia to "hurry up and wait," as it seeks to expedite proceedings with respect to a Motion that, if granted, will delay the case substantially. In these circumstances, Qualcomm's motion should be summarily denied.

**B.     The Court Should Make The Threshold Determination As To Whether It Has Subject Matter Jurisdiction Before Adjudicating Qualcomm's Motion to Transfer.**

Notwithstanding Vice Chancellor Strine's offer to set a briefing schedule to address Qualcomm's venue and jurisdiction objections, Qualcomm improperly removed the instant action to this Court. Now, the Court must address the threshold issue of subject matter jurisdiction before it can address Qualcomm's Motion to Transfer.

The issue of subject-matter jurisdiction is "fundamentally preliminary," unlike issues concerning proper venue, which involve mere "personal privileges of the defendant, rather than absolute strictures on the court[.]" *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979). Without subject matter jurisdiction, a court lacks the authority to transfer a case. *See, e.g., Shendock v. Director, Office of Workers' Comp. Programs*, 893 F.2d 1458, 1467 (3rd Cir. 1990); *Tifa Ltd. v. Republic of Ghana*, 692 F. Supp. 393, 398 (D.N.J. 1988) ("[T]he issue of venue cannot be decided prior to a determination that the court has subject matter jurisdiction over the action."). The Motion to Remand must therefore be considered before the Motion to Transfer. *See, e.g., Penn. v. Tap Pharm. Prods., Inc.*, 415 F. Supp. 2d 516, 521 (E.D. Pa. 2005) (reasoning remand motion should be resolved before venue because "[i]f this Court is to adjudicate any pretrial matters, it must satisfy itself that it has the power to do so"); *Polak v. Kobayashi*, 2005 WL 2008306, at *1 (D. Del. Aug. 22, 2005) (deciding motion to remand first, despite the fact

that it was filed thirteen days after motion to transfer); *Testquest, Inc. v. LaFrance*, 2002 WL

539071, at *2 (D. Minn. Apr. 6, 2002) ("[B]ecause the arguments about remand implicate the

Court's jurisdiction, the Court must consider the remand issue first."); *Neely v. Union Nat'l Ins.*

*Co.*, 2002 WL 32397266, at *6 (S.D. Miss. Sept. 18, 2002) (reasoning "[i]f a case is not properly

removed, then it is not pending before the court" and concluding the Court should therefore

decide a motion to remand before a motion to transfer). Thus, there is no reason to consolidate

the briefing schedules for the two motions.

WHEREFORE, Nokia respectfully requests that the Court deny Qualcomm's Motion to

Consolidate.


OF COUNSEL:

A. William Urquhart
Frederick A. Lorig
Patrick M. Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Richard I. Werder, Jr.
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Dated: August 21, 2006

Thomas A. Beck (#2086)
beck@rlf.com
Lisa A. Schmidt (#3019)
schmidt@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Steven J. Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19899
(302) 651-7700

Attorneys for Plaintiffs Nokia Corporation
and Nokia Inc.

- 7 -

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2006, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and by hand

delivery to the following:

> Matthew E. Fischer, Esquire
> Potter Anderson & Corroon LLP
> 1313 North Market Street
> P.O. Box 951
> Wilmington, Delaware  19899

Steven J. Finenfan (#4025)

# EXHIBIT A

EFiled: Aug 11 2006 10:50AM EDT
Transaction ID 12050366



**Potter**
**Anderson**
**&Corroon** LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com



Matthew E. F
Partner
Attorney at Law
mfischer@potteranderson com
302 984-6153 Direct Phone
302 658-1192 Fax

August 10, 2006

## VIA EMAIL

The Honorable Vice Chancellor Leo E. Strine, Jr.
State of Delaware
Court of Chancery
500 King Street
Wilmington, DE   19801

> Re:   *Nokia Corporation and Nokia, Inc , v*
> *QUALCOMM Incorporated,* C.A. No. 2330

Dear Vice Chancellor Strine:

We write on behalf of defendant QUALCOMM Incorporated in opposition to Nokia's motion to expedite this proceeding. We submit that not only should the motion be denied, but this case should not proceed at all in this Court. When the relevant background is disclosed, the reasons are quite clear.

In this case, Nokia essentially asks this Court to declare the validity of affirmative defenses it has raised or will raise in patent infringement suits filed against Nokia Corporation and Nokia Inc. (collectively, "Nokia") by QUALCOMM in the United States District Court for the Southern District of California (San Diego division), in the United Kingdom, and before the United States International Trade Commission.

The San Diego suit was filed against Nokia in November 2005, asserting 12 patents against Nokia products that practice only the GSM family of standards (several of those patents have been declared standards-essential to ETSI and several are not standards-essential and therefore not even subject to the "FRAND" commitment which is the centerpiece of Nokia's defense recast as an affirmative claim in this Court). In December 2005, Nokia moved to dismiss or stay the action pending arbitration of Nokia's affirmative defenses, claiming QUALCOMM's claims had to be arbitrated based on a 2001 agreement between Nokia and QUALCOMM. The federal district court denied Nokia's motion in March, and Nokia responded by requesting that the district court stay the litigation pending appeal of the denial of its stay motion. The federal district court entered a stay pending appeal, and the appeal was argued to the U S. Court of Appeals for the Federal Circuit last month. A decision is expected soon. Despite the passage of over nine months since QUALCOMM filed suit, Nokia has not yet

August 10, 2006
Page 2

answered the complaint in the San Diego suit. Meanwhile, arbitration between Nokia and QUALCOMM has proceeded in California over QUALCOMM's objection to the arbitrability of Nokia's affirmative defenses. Through the arbitration, Nokia, despite its express admission that the parties' 2001 agreement does not extend to GSM products, is seeking to derail QUALCOMM's infringement claims by arguing, among other things, that QUALCOMM is estopped from asserting its patents against Nokia's GSM products, effectively entitling Nokia to a royalty free license. QUALCOMM has filed a motion before the arbitrator to dismiss Nokia's estoppel claim, and the parties are awaiting a hearing date on that motion.

QUALCOMM's U.K. suit was filed in May 2006, asserting two patents against Nokia's products that practice only the GSM family of standards. Shortly before Nokia's answer was due in this suit in mid-July (Nokia having secured from QUALCOMM an extension to answer), it moved to dismiss or stay the proceeding, again based on the same arbitrability theories it advanced in the San Diego action. Nokia requested a late November hearing date on its motion. Although it is anticipated that a hearing will be held sooner than Nokia has requested, the motion has essentially stalled the U.K. action for three to four months.

Third QUALCOMM filed a complaint with the U.S. International Trade Commission in June 2006, and the ITC instituted an investigation concerning Nokia's infringement of six Qualcomm patents by Nokia products that practice only the GSM family of standards. One patent at issue in the ITC is a U.S. counterpart to one of the patents asserted in the U.K. proceeding, and three patents asserted in the ITC are also asserted in the San Diego action. Nokia's answer was filed with the ITC yesterday. As the attached will demonstrate (Ex. A hereto), Nokia's SIXTEENTH affirmative defense is the same FRAND claim it is asking this Court to adjudicate, and several of its other affirmative defenses correspond to the issues it has raised in the California arbitration.

Asserting that this Court is a "national court"[1] under the ETSI Rules of Procedure, Nokia seeks to leap frog the QUALCOMM actions it has stalled by asking this Court to declare -- in advance of any of the pending infringement cases -- that its FRAND affirmative defense is valid and effective to prevent QUALCOMM from pursuing the injunctive relief it seeks in these earlier-filed actions.[2] Nokia cannot dispute that the relief it seeks from this Court can be (and is

---

[1]     This is a dubious assertion, considering that the ETSI's procedures deal with IPRs (intellectual property rights) and infringement issues. One would naturally think that ETSI's rules referencing "national courts" would refer to courts in the host country that have jurisdiction over patent infringement suits. These would be the federal courts in the U.S., not state courts.

[2]     Among the relief Nokia seeks is a declaration that QUALCOMM is "barred from seeking injunctive relief" and a permanent injunction "enjoin[ing] Qualcomm worldwide from seeking such injunctive relief related to patents Qualcomm has declared essential to any standard." (Comp., WHEREFORE clauses A and B). As Nokia should know, this Court is unable to grant such relief. *See General Atomic Co v Felter*, 434 U.S. 12, 16 (1977) ("[T]he rights conferred by Congress to bring *in personam* actions in federal court are not subject to

August 10, 2006
Page 3

being) pursued in these other actions. In effect, this is a typical "second-filed" action in which Nokia seeks to avoid application of *McWane*[3] by focusing the Court on an affirmative defense and Nokia's alleged fear of "unjustified injunctive relief" being issued against it in "jurisdictions that will not afford Nokia adequate due process." (Comp. ¶37). Nokia's purported concerns do nothing to justify its request that this Court run an unprecedented level of interference with a federal court, a federal agency, and a U.K. court. It is clear that this Court should at least dismiss this case in favor of the other, first-filed actions, and it is possible that this action raises issues arising under federal law, which would form a basis to remove this action.

In any event, as Nokia's own dilatory efforts in the San Diego and U.K. actions demonstrate, there is no need for expedition here, and Nokia's motion to expedite must be denied. Indeed, it appears that Nokia's new-found supposed need for expedition results primarily from the fact that it is running out of options in the other suits, and now faces what it apparently sought to avoid: confronting QUALCOMM's infringement claims on the merits While Nokia, putting the cart before the horse, would prefer an adjudication of its affirmative defense before having to confront QUALCOMM's infringement claims, this does not implicate threatened irreparable harm. *See Giammargo v Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994).

For the foregoing reasons, defendant QUALCOMM respectfully submits that Nokia's motion to expedite should be denied. We look forward to discussing this matter more fully with Your Honor at the 11 a.m. hearing.

Respectfully,

Matthew E. Fischer (I.D. No. 3092)

rc/745643

cc:    Lisa A. Schmidt, Esq
       Register in Chancery

---

abridgment by state-court injunctions, regardless of whether the federal litigation is pending or prospective."); *Donovan v. City of Dallas*, 377 U.S. 408 (1964); *Zeneca v Monsanto*, 1996 WL 104254, at *4 n.3 (Del. Ch.) (V.C. Jacobs acknowledging the well established holding from *Donovan* that "a state court is without power to enjoin a litigant from litigating a claim in federal court."); *Paul N Gardner Defined Plan Trust v Draper*, 1993 WL 125517 (Del Ch.); *cf. Maldonado v Flynn*, 1979 WL 4632, at *3 (Del. Ch.) (holding that it was a violation of Court of Chancery Rule 11 to file a motion to enjoin a defendant from proceeding in federal court)

[3] *McWane Cast Iron Pipe Corp v McDowell-Wellman Eng'g Co*, 263 A.2d 281 (Del. 1970).

EFiled: Aug 11 2006 10:50AM EDT
Transaction ID 12050366

# EXHIBIT A

➢ PUBLIC VERSION ◄

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

### Before the Honorable Robert L. Barton, Jr.

|  |  |
|---|---|
| IN THE MATTER OF<br><br>CERTAIN MOBILE TELEPHONE<br>HANDSETS, WIRELESS<br>COMMUNICATION DEVICES, AND<br>COMPONENTS THEREOF | Investigation No. 337-TA-578 |

## RESPONSE OF NOKIA CORPORATION AND NOKIA INCORPORATED
## TO THE COMPLAINT, AS SUPPLEMENTED, OF QUALCOMM
## INCORPORATED AND NOTICE OF INVESTIGATION

Pursuant to Commission Rule of Practice 210.13 (19 C.F.R. § 210.13), Respondents

Nokia Corporation and Nokia Inc. ("Nokia" or "Respondent") hereby respond to the Complaint

under Section 337 of the Tariff Act of 1930 filed by Qualcomm Incorporated ("Qualcomm" or

"Complainant") on June 9, 2006, and supplemented on June 27, 2006, pursuant to which an

investigation was instituted by the Commission on July 12, 2006.

It is Nokia's position that, among other things, Qualcomm is estopped from asserting the

claims set forth in the Complaint and that the issue of estoppel is subject to arbitration under the

arbitration clause of the Subscriber Unit and Infrastructure Equipment License Agreement dated

July 2, 2001 between Qualcomm and Nokia. Nokia contends, therefore, that the ITC lacks

subject matter jurisdiction to conduct this investigation. Nokia's response to the Complaint and

the Notice of Investigation is made pursuant to the Commission Rules of Practice without

waiving or intending to waive Nokia's right to arbitrate its estoppel defense and to seek dismissal

of this investigation pursuant to 19 U.S.C. § 1337(c).

Nokia denies it has engaged in acts of unfair competition or violated Section 337 by

importing, selling for importation, and/or selling within the United States after importation any

products that infringe, directly, contributorily, and/or by inducement, any valid claim of United

States Patent Nos. 5,452,473 ("the '473 patent"), 5,590,408 ("the '408 patent"), 5,655,220 ("the

➢ PUBLIC VERSION ◄

'220 patent"), 5,576,767 ("the '767 patent"), 5,452,104 ("the '104 patent"), 6,453,182 B1 ("the '182 patent") (collectively the "Qualcomm Patents-In-Suit"). Nokia further denies that the patents are valid. Except as specifically admitted herein, Nokia denies all allegations of the Complaint, as supplemented.

Nokia has not had sufficient time and opportunity to collect and review all of the information that may be relevant and necessary to respond to the matters raised in Qualcomm's Complaint. Specifically, Nokia has not received all of the information requested in its discovery requests to Qualcomm. To the extent that any allegations of the Complaint refer to or rely upon such information not previously supplied to Nokia, Nokia is without information sufficient to admit or deny such allegations, and therefore denies same. Moreover, Nokia reserves the right to take such further positions and raise additional defenses as may become apparent as a result of further information which may be discovered subsequent to the filing of this Response.

## ADMISSIONS AND DENIALS OF QUALCOMM'S SPECIFIC ALLEGATIONS

### I.    INTRODUCTION

1.1    Nokia admits that Qualcomm has requested that the United States International Trade Commission (the "ITC") commence an investigation pursuant to section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337.

1.2    Nokia denies each and every allegation to the extent that it alleges, directly or by implication, that any acts of Nokia constitute unfair acts and/or infringement of Qualcomm's patents. Nokia further denies that any of the Qualcomm Patents-In-Suit are valid. Nokia admits that it entered into a Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 with Qualcomm. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph 1.2, and therefore denies the same.

➢ PUBLIC VERSION ◁

1.3    Nokia denies that any of the Qualcomm patents are valid. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph 1.3, and therefore denies the same.

1.4    Nokia denies that a domestic industry exists in the United States relating to any products covered by the Qualcomm patents. Nokia denies that Qualcomm United States' investments and expenditures in the engineering, research and development directed to the utilization and exploitation of the inventions claimed in the asserted patents exist as required by Section 337(a). Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph 1.4, and therefore denies the same.

1.5    Nokia admits that Qualcomm seeks relief from the ITC in the form of a limited exclusion order concerning the importation into the United States of all handsets and components thereof which Qualcomm alleges violate the Qualcomm Patents-In-Suit. Nokia also admits that Qualcomm seeks from the ITC a cease and desist order prohibiting the importation, marketing, advertising, demonstration, warehousing of inventory for distribution, sale and use of handsets in the United States pursuant to section 337(f) that Qualcomm alleges infringe the Qualcomm Patents-In-Suit. Nokia admits that it entered into a Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 with Qualcomm. Except as expressly admitted herein, Nokia denies each and every allegation contained in paragraph 1.5

## II.    COMPLAINANT

2.1    Nokia admits that Qualcomm Incorporated is a Delaware corporation. Nokia is without sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations contained in paragraph 2.1, and therefore denies the same.

3

➢ PUBLIC VERSION ◄

2.2    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 2.2, and therefore denies the same.

2.3    Nokia denies that any of the Qualcomm patents are valid. Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 2.3, and therefore denies the same.

## III.   PROPOSED RESPONDENTS

3.1    Nokia admits that the contact address for its head office is at Keilalahdentie 2-4, P.O. Box 226, FIN-00045 Nokia Group, Finland. Nokia further admits that its mobile phone business group is involved in the design, development and manufacture of handsets.

3.2    Nokia admits the allegations of paragraph 3.2 of the Complaint.

3.3    Nokia admits that it provides its customers with equipment, services and solutions for network operators. Nokia admits that it does not have a mobile phone manufacturing facility in the United States, although it does have a customization and logistics centre in the United States. Nokia further admits that the United States is one of Nokia's largest markets in terms of net sales, and that the United States was Nokia's largest market in terms of net sales in 2004. Except as expressly admitted above, Nokia denies the remaining allegations of paragraph 3.3.

## IV.   THE PRODUCTS AT ISSUE

4.1    Nokia admits that Qualcomm's complaint concerns certain wireless communication devices, and components thereof.

4.2    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 4.2, and therefore denies the same.

4.3    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 4.3, and therefore denies the same.

4

➢ PUBLIC VERSION ◁

4.4     Nokia denies the allegations in paragraph 4.4, including the allegation that Nokia infringes any valid claim of the asserted patents.

## V.     THE PATENTS-IN-SUIT

### A.     The '473 Patent

#### 1.     Identification of the Patent and Ownership by Qualcomm

5.1     Nokia admits that the '473 patent entitled "Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System," was issued on September 19, 1995, to Qualcomm as assignee, naming Ana L. Weiland, Richard K. Kornfeld, Richard J. Kerr, John E. Maloney and Nathaniel B. Wilson as inventors. Nokia further admits that Exhibit 1 attached to the Complaint appears to be a copy of the '473 patent. Nokia further admits that Exhibit 7 attached to the Complaint appears to be copy of the assignment of the '473 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.2     Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.2, and therefore denies the same

#### 2.     Non-Technical Description of the Patented Invention

5.3     Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.3, and therefore denies the same.

5.4     Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.4, and therefore denies the same.

#### 3.     Foreign Counterparts to the '473 Patent

5.5     Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.5, and therefore denies the same.

**B.    The '408 Patent**

      **1.    Identification of the Patent and Ownership by Qualcomm**

      5.6   Nokia admits that the '408 patent, entitled "Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System," was issued on December 31, 1996, to Qualcomm as assignee, naming Ana L. Weiland, Richard K. Kornfeld and John E. Maloney as inventors. Nokia further admits that Exhibit 2 appears to be copy of the '408 patent. Nokia further admits that Exhibit 8 appears to be a copy of the assignment of the '408 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

      5.7   Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.7, and therefore denies the same.

      **2.    Non-Technical Description of the Patented Invention**

      5.8   Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.8, and therefore denies the same.

      5.9   Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.9, and therefore denies the same.

      **3.    Foreign Counterparts to the '408 Patent**

      5.10   Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.10, and therefore denies the same.

**C.    The '220 Patent**

      **1.    Identification of the Patent and Ownership by Qualcomm**

      5.11   Nokia admits that the '220 patent, entitled "Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System," was issued on August 5, 1997, to Qualcomm as assignee, naming Ana L. Weiland, Richard K. Kornfeld and John E. Maloney as inventors. Nokia further admits that Exhibit 3 appears to be a copy of the '220 patent. Nokia further admits that Exhibit 9 appears to be a copy of the assignment of the '220 patent to

➢ PUBLIC VERSION ◁

Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.12    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.12, and therefore denies the same.

### 2.    Non-Technical Description of the Patented Invention

5.13    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.13, and therefore denies the same.

5.14    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.14, and therefore denies the same.

### 3.    Foreign Counterparts to the '220 Patent

5.15    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.15, and therefore denies the same.

### D.    The '767 Patent

#### 1.    Identification of the Patent and Ownership by Qualcomm

5.16    Nokia admits that the '767 patent, entitled "Interframe Video Encoding and Decoding System," was issued on November 19, 1996, to Qualcomm as assignee, naming Chong U. Lee and Donald Pian as inventors. Nokia further admits that Exhibit 4 appears to be a copy of the '767 patent. Nokia further admits that Exhibit 10 appears to be a copy of the assignment of the '767 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.17    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.17, and therefore denies the same.

#### 2.    Non-Technical Description of the Patented Invention

5.18    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.18, and therefore denies the same.

7

➤ PUBLIC VERSION ◄

5.19    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.19, and therefore denies the same.

5.20    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.20, and therefore denies the same.

### 3.    Foreign Counterparts to the '767 Patent

5.21    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.21, and therefore denies the same.

## E.    The '104 Patent

### 1.    Identification of the Patent and Ownership by Qualcomm

5.22    Nokia admits that the '104 patent, entitled "Adaptive Block Size Image Compression Method and System," was issued on September 19, 1995, to Qualcomm as assignee, naming Chong U. Lee as the inventor. Nokia further admits that Exhibit 5 appears to be a copy of the '104 patent. Nokia further admits that Exhibit 11 appears to be a copy of the assignment of the '104 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.23    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.23, and therefore denies the same

### 2.    Non-Technical Description of the Patented Invention

5.24    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.24, and therefore denies the same.

5.25    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.25, and therefore denies the same.

5.26    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.26, and therefore denies the same.

➢ PUBLIC VERSION ◄

### 3.    Foreign Counterparts to the '104 Patent

5.27    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.27, and therefore denies the same.

### F.    The '182 Patent

#### 1.    Identification of the Patent and Ownership by Qualcomm

5.28    Nokia admits that the '182 patent, entitled "Wireless Telephone Airplane and Alarm Clock Modes," was issued on September 17, 2002, to Qualcomm as assignee, naming Stephen A. Sprigg and James A. Hutchison, IV as inventors. Nokia further admits that Exhibit 6 appears to be a copy of the '182 patent. Nokia further admits that Exhibit 12 appears to be a copy of the assignment of the '182 patent to Qualcomm. As to the balance of the allegations contained therein, Nokia, is without sufficient knowledge or information to form a belief as to the truth thereof, and therefore denies same.

5.29    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.29, and therefore denies the same.

#### 2.    Non-Technical Description of the Patented Invention

5.30    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.30, and therefore denies the same.

5.31    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.31, and therefore denies the same.

#### 3.    Foreign Counterparts to the '182 Patent

5.32    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 5.32, and therefore denies the same.

## VI.    UNFAIR ACTS OF THE RESPONDENTS

6.1    Nokia denies each and every allegation contained in paragraph 6.1, except Nokia admits that it entered into a Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 with Qualcomm.

9

➢ PUBLIC VERSION ◄

6.2     Nokia denies that it directly or through its affiliates or third-parties exports to and imports into the United States handsets and components thereof that are covered by any of the claims of the Qualcomm Patents-In-Suit. Nokia denies each and every allegation to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit. Nokia admits that on September 9, 2005 Qualcomm provided Nokia with a list of certain patents and that on November 4, 2005 Qualcomm filed the complaint in Case No. 05 CV 2063 B(BLM) in the United States District Court for the Southern District of California. Except as expressly admitted above, Nokia denies the remaining allegations of paragraph 6.2.

6.3     Nokia denies each and every allegation contained in paragraph 6.3, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '473 patent.

6.4     Nokia denies each and every allegation contained in paragraph 6.4, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '408 patent.

6.5     Nokia denies each and every allegation contained in paragraph 6.5, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '220 patent.

6.6     Nokia denies each and every allegation contained in paragraph 6.6, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '767 patent.

6.7     Nokia denies each and every allegation contained in paragraph 6.7, including the referenced claim charts, to the extent that it alleges, directly or by implication, that

10

➢ PUBLIC VERSION ❖

any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '104 patent.

   6.8  Nokia denies each and every allegation contained in paragraph 6.8, including the referenced claim charts, to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit, including the '182 patent.

## VII. SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

   7.1  Nokia admits that a subset of its handsets and components thereof are sold for importation into the United States, imported into the United States or sold after importation into the United States. Nokia denies that it directly or through its affiliates or third-parties exports to and imports into the United States any handsets and components thereof that are covered by any of the claims of the Qualcomm Patents-In-Suit.

   7.2  Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 41 and therefore denies the same. Nokia admits that Exhibit 42 appears to be a photograph of the packaging for the Nokia 6101 phone.

   7.3  Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 43 and therefore denies the same. Nokia admits that Exhibit 44 appears to be a photograph of the packaging for the Nokia 6682 phone.

   7.4  Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 45 and therefore denies the same. Nokia admits that Exhibit 46 appears to be a photograph of the packaging for the Nokia 9300 phone.

   7.5  Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 47 and therefore denies the same. Nokia admits that Exhibit 48 appears to be a photograph of the packaging for the Nokia 6010 phone. Nokia admits that Exhibit 49 appears to be a photograph of the packaging for the Nokia 6102 phone. Nokia admits

➢ PUBLIC VERSION ◄

that Exhibit 50 appears to be a photograph of the packaging for the Nokia 6061 phone. Nokia admits that Exhibit 51 appears to be a photograph of the packaging for the Nokia 6030 phone.

      7.6    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 52 and therefore denies the same. Nokia admits that Exhibit 53 appears to be a photograph of the packaging for the Nokia 3220 phone. Nokia admits that Exhibit 54 appears to be a photograph of the packaging for the Nokia 3120 phone.

      7.7    Nokia is without sufficient knowledge or information to form a belief as to the authenticity of Exhibit 55 and therefore denies the same. Nokia admits that Exhibit 56 appears to be a photograph of the packaging for the Nokia 6111 phone. Nokia admits that it does not have any manufacturing facilities for mobile phones in the United States. Except as expressly admitted herein, Nokia denies each and every allegation contained in paragraph 7.7.

## VIII. CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

      8.1    Nokia denies each and every allegation of paragraph 8.1, including to the extent that it alleges, directly or by implication, that any acts of Nokia constitute infringement of the Qualcomm Patents-In-Suit. Nokia also denies that cell phone products covered by the investigation are classified under the headings set forth in paragraph 8.1. See Additional information, paragraph 2, infra.

## IX. LICENSEES

      9.1    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in paragraph 9.1, and therefore denies the same.

      9.2    Nokia admits that it has entered into a license agreement with Qualcomm. Nokia further admits that Qualcomm has, in paragraph 1.2 of its Complaint, defined the products at issue in its Complaint as excluding those products allegedly licensed under the 2001 license agreement between Qualcomm and Nokia. Except as expressly admitted herein, Nokia denies each and every allegation contained in paragraph 9.2.

▷ PUBLIC VERSION ◁

## X.    THE DOMESTIC INDUSTRY

      10.1    Nokia denies that Qualcomm satisfies any or all of the statutory criteria for finding a domestic industry under section 337(a)(2) and (3) or otherwise  As to the balance of the allegations contained in paragraph 10.1, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations, and therefore denies same.  Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

### A.    Qualcomm's Engineering, Research and Development is Directed toUtilization/Exploitation of the Asserted Patents

      10.2    Nokia denies that Qualcomm satisfies any or all of the statutory criteria for finding a domestic industry under section 337(a)(2) and (3) or otherwise.  As to the balance of the allegations contained in paragraph 10.2, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations, and therefore denies same.  Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

      10.3    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.3, and therefore denies the same.  Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

13

10.4    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.4, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.5    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.5, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.6    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.6, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.7    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.7, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.8    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.8, and therefore denies the same. Further,

14

with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

**B.    Qualcomm has Significant U.S. Investment in Engineering, Research and Development**

10.9    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.9, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

10.10    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 10.10, and therefore denies the same. Further, with respect to Qualcomm's letter of June 27, 2006 which purports to supplement Qualcomm's Complaint, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained therein relating to Qualcomm's activities in the United States with respect to the creation of a domestic industry, and therefore denies the same.

## XI.    RELATED LITIGATION

11.1    Nokia admits the allegations in paragraph 11.1 concerning the pending lawsuit among Qualcomm and Snaptrack, Inc., as plaintiffs, and Nokia Corp. and Nokia Inc., as defendants, including the fact that three of the patents being asserted in that case are also being asserted by Qualcomm in the present investigation. Except as expressly admitted above, Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 11.1, and therefore denies same.

11.2    Nokia admits the allegations set forth in paragraph 11.2 of the Complaint.

➢ PUBLIC VERSION ◄

11.3    Nokia admits that it is currently arbitrating issues relating to the Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001, including whether Qualcomm is estopped from asserting patents that Qualcomm now claims relate to GSM technology, including the patents in suit in this investigation. There is no hearing on the merits scheduled. Except as expressly admitted above, Nokia denies the allegations contained in paragraph 11.3.

11.4    Nokia is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 11.4, and therefore denies the same.

## XII.    RELIEF REQUESTED

12.1    In its Complaint, Qualcomm requests certain relief from the ITC. Nokia does not believe that any response to this prayer for relief is required. If a response is required, however, Nokia specifically denies that it currently infringes or has ever infringed any valid claim of any Qualcomm patent and further denies that Qualcomm is entitled to any relief from the ITC whether or not requested. Nokia further denies each and every factual allegation in this prayer for relief, including subparagraphs thereof.

### RESPONSE TO THE NOTICE OF INVESTIGATION

Nokia denies that there is a violation of Section 337 by reason of the alleged infringement of any asserted claim of the '473 patent, the '408 patent, the '220 patent, the '767 patent, the '104 patent, and the '182 patent ("the patents-in-suit") insofar as these allegations pertain to the importation or sale of any products manufactured by or on behalf of Nokia. Nokia denies that there is a protectable domestic industry, as required by Section 337(a)(2) and defined by Section 337(a)(3), with respect to any of the patents-in-suit. Nokia further denies that it is in the public interest to grant any relief to Qualcomm in connection with this Investigation. Nokia denies that Qualcomm is entitled to the specific relief it requests. Except as expressly admitted herein, Nokia denies the allegations contained in the Notice of Investigation.

16

➢ PUBLIC VERSION ◁

## ADDITIONAL INFORMATION REQUIRED UNDER RULE 210.13(b)

By providing the following information, Nokia intends only to supply data required by 19 C.F.R. § 210.13(b). Nokia specifically denies that any of the information or data supplied below relates to or supports any allegations of infringement against Nokia or any violation of 19 U.S.C. § 1337.

Pursuant to Rule 210.13(b), Nokia provides the following additional information:

1. The quantity and value of Nokia's products accused of infringement imported into the United States in calendar year 2005 is provided in Confidential Exhibit 1 to this response.

2. Between 1989-1996, the Harmonized Tariff Schedule item numbers for the Nokia products accused of infringement were 8525.20.6060 and 8525.20.6070. During 1997, the Harmonized Tariff Schedule item number for a Nokia product accused of infringement was 8525.20.9070. Since 1998, the Harmonized Tariff Schedule item numbers for the Nokia products accused of infringement are 8525.20.9070 and 9504.90.4000.

3. Nokia's capacity to manufacture the products identified by Qualcomm in its Complaint is provided in Confidential Exhibit 1 to this response. In calendar year 2005, the United States constituted a substantial market for Nokia.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

### (Invalidity)

1. The patents-in-suit are invalid because they each fail to comply with the requirements of 35 U.S.C. § 101 et seq., including, without limitation §§ 102,103 and/or 112.

17

➢ PUBLIC VERSION ➤

## SECOND AFFIRMATIVE DEFENSE

### (Noninfringement)

2.　　Nokia has not directly infringed, indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the patents-in-suit, and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

## THIRD AFFIRMATIVE DEFENSE

### (Lack of Unfair Act)

3.　　Nokia has committed no unfair acts.

## FOURTH AFFIRMATIVE DEFENSE

### (Lack of Domestic Industry)

4.　　Qualcomm has not adequately alleged and cannot prove the existence of a domestic industry, as required by Section 337(a)(2) and defined by Section 337(a)(3), in connection with any of the patents-in-suit, or that a such domestic industry is in the process of being established.

## FIFTH AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

5.　　Qualcomm's complaint fails to state a claim upon which relief can be granted.

## SIXTH AFFIRMATIVE DEFENSE

### (Express or Implied License)

6.　　Qualcomm's claims are barred in whole or in part pursuant to an actual license or under the doctrine of implied license. Nokia's assertion of this defense is made without waiving or intending to waive its right to arbitrate this issue.

18

➢ PUBLIC VERSION ◄

## SEVENTH AFFIRMATIVE DEFENSE

### (Unenforceability – Estoppel, Acquiescence, Waiver, and In Pari Delicto)

7.    Qualcomm is barred in whole or in part by the doctrines of estoppel, acquiescence, waiver, and/or in pari delicto from enforcing the patents-in-suit against Nokia. Nokia's assertion of this defense is made without waiving or intending to waive its right to arbitrate this issue.

## EIGHTH AFFIRMATIVE DEFENSE

### (Equitable Estoppel)

8.    Qualcomm is barred in whole or in part by the doctrine of equitable estoppel based, among other things, on its failure to mention any of the patents-in-suit during development and approval of certain standards related to GSM, its failure to mention the patents-in-suit during negotiations and execution of the parties' Subscriber Unit and Infrastructure Equipment License Agreement, its failure to promptly declare any patents-in-suit to the relevant standard setting organizations, and its commitment to make some or all of the patents-in-suit available to Nokia and others for a fair, reasonable, and non-discriminatory royalty rate. Nokia's assertion of this defense is made without waiving or intending to waive its right to arbitrate this issue.

## NINTH AFFIRMATIVE DEFENSE

### (Unenforceability - Patent Exhaustion/First Sale Doctrine)

9.    Qualcomm is barred in whole or in part by the doctrine of patent exhaustion/first-sale doctrine from enforcing the patents-in-suit against Nokia.

## TENTH AFFIRMATIVE DEFENSE

### (Unenforceability - Prosecution Laches)

10.    Qualcomm is barred in whole or in part by delay in prosecuting the patent applications resulting in the patents-in-suit.

19

➢ PUBLIC VERSION ◄

## ELEVENTH AFFIRMATIVE DEFENSE

### (Prosecution History Estoppel)

11.    By reason of the prosecution before the United States Patent and Trademark Office ("USPTO") leading to the patents-in-suit and any applications or patents related to the patents-in-suit, and by reason of admissions made by or on behalf of the applicant for these patents and related applications and patents, Qualcomm is estopped from claiming infringement by Nokia of one or more of the claims of such patents-in-suit.

## TWELFTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

12.    The patents-in-suit are void and unenforceable by reason of the equitable doctrine of unclean hands.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Patent Misuse)

13.    Qualcomm is barred from asserting the patents-in-suit by the equitable doctrine of patent misuse.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Lack of Jurisdiction)

14.    The Commission lacks jurisdiction pursuant to § 337.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Relief Not in the Public Interest)

15.    The relief sought by Qualcomm does not and would not further the public interest and there are strong public policy reasons for denying Qualcomm the relief sought.

20

➢ PUBLIC VERSION ◄

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Breach of Contract)

16.    The relief sought by Qualcomm breaches Qualcomm's commitments and enforceable contracts with the relevant Standard Setting Organizations and their members, including Nokia, which license all or some of the patents-in-suit for a fair, reasonable and non-discriminatory royalty.

Respectfully submitted,

Louis S. Mastriani
Michael G. McManus
Tali L. Alban
ADDUCI MASTRIANI & SCHAUMBERG LLP
1200 Seventeenth Street, N.W., Fifth Floor
Washington, D.C. 20036
(202) 467-6300

Frederick A. Lorig
Bruce R. Zisser
Patrick M. Shields
Erica P. Taggart
QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Keith E. Broyles
John D. Haynes
Matthew J. Urbanawiz
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000

*Counsel for Nokia Corporation and Nokia, Inc.*

Dated:  August 10, 2006

NOK701706-PUB.DOC

21

## VERIFICATION OF RESPONSE TO THE COMPLAINT AND
## NOTICE OF INVESTIGATION INCLUDING AFFIRMATIVE DEFENSES

I, Richard W. Stimson, declare, in accordance with 19 C.F.R. §§ 210.4 and 210.13, under penalty of perjury under the laws of the United States of America, that the following statements are true:

1.      I am legal counsel for Nokia, Inc. and am duly authorized to sign this Response on behalf of Nokia Corporation and Nokia, Inc.;

2.      I have read the foregoing Response;

3.      To the best of my knowledge, information and belief, based upon reasonably inquiry, the foregoing is well founded in fact and is warranted by existing law or a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; and

4.      The foregoing Response is not being filed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of August 2006

Richard W. Stimson

20148/1935834.1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **RESPONSE OF NOKIA CORPORATION AND NOKIA INCORPORATED TO THE COMPLAINT, AS SUPPLEMENTED, OF QUALCOMM INCORPORATED AND NOTICE OF INVESTIGATION (PUBLIC)** was served as indicated, to the parties listed below, this 10th day of August 2006:

The Honorable Marilyn R. Abbott
SECRETARY
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W., Room 112A
Washington, DC 20436
**(VIA HAND DELIVERY – Original + 6 copies)**

The Honorable Robert L. Barton, Jr.
ADMINISTRATIVE LAW JUDGE
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W., Room 317
Washington, DC 20436
**(VIA HAND DELIVERY – 2 copies)**

David Lloyd, Esq.
INVESTIGATIVE ATTORNEY
OFFICE OF UNFAIR IMPORT INVESTIGATIONS
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W., Room 401
Washington, DC 20436
**(VIA HAND DELIVERY)**

ON BEHALF OF COMPLAINANTS
QUALCOMM INCORPORATED

James R. Batchelder, Esq.
DAY CASEBEER MADRID & BATCHELDER LLP
20300 Stevens Creek Boulevard, Suite 400
Cupertino, California 95014
**(VIA ELECTRONIC MAIL AND FEDERAL EXPRESS)**

Cecilia H. Gonzalez, Esq.
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
**(VIA ELECTRONIC MAIL AND HAND DELIVERY)**

David Dolkas, Esq.
MCDERMOTT, WILL & EMERY LLP
3150 Porter Drive
Palo Alto, California 94304
**(VIA ELECTRONIC MAIL AND FEDERAL EXPRESS)**

ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, DC 20036

NO100006.doc

# EXHIBIT B

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

NOKIA CORPORATION and NOKIA,      :
INC.                              :
                                  :
            Plaintiffs            :
                                  :
         vs.                      :    Civil Action
                                  :    No. 2330-N
QUALCOMM INCORPORATED,            :
                                  :
            Defendant             :

                        - - -

                        Chancery Court Chambers
                        New Castle County Courthouse
                        Wilmington, Delaware
                        Friday, August 11, 2006
                        11:00 a.m.

BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.

                        - - -


                   SCHEDULING CONFERENCE


                        - - -


------------------------------------------------------------
                  CHANCERY COURT REPORTERS
            500 North King Street - Suite 11400
              Wilmington, Delaware 19801-3759
                     (302) 255-0525

```
 1   APPEARANCES:

 2           LISA SCHMIDT, ESQ.
             JEFFREY L. MOYER, ESQ.
 3           ELIZABETH C. TUCKER, ESQ.
             Richards, Layton & Finger
 4                   -and-
             FREDERICK LORIG, ESQ.
 5           A. WILLIAM URQUHART, ESQ.
             of the California Bar
 6           Quinn Emanuel Urquhart Oliver & Hedges, LLP
                     -and-
 7           JANE MUTIMEAR, ESQ.
             Of the United Kingdom Bar
 8           Bird & Bird
               for Plaintiffs Nokia Corporation and
 9             Nokia, Inc.

10
             MATTHEW E. FISCHER, ESQ.
11           RICHARD L. HORWITZ, ESQ.
             Potter, Anderson & Corroon LLP
12                   -and-
             RICHARD J. STARK, ESQ.
13           of the New York Bar
             Cravath Swaine & Moore
14                   -and-
             CHRISTIAN E. MAMMEM, ESQ.
15           of the California Bar
             Day Casebeer Madrid & Batchelder
16             for Defendant QUALCOMM Incorporated

17   ALSO PRESENT:

18           RICHARD W. STIMSON, ESQ.
             ARI LAAKKONEN, ESQ.
19             In-house counsel for Nokia

20
                     - - -
21

22

23

24
```

```
 1                    THE COURT:  We have someone on the
 2  phone?
 3                    MR. FISCHER:  Yes.  We have
 4  Chris Mammem from the Day Casebeer firm in California
 5  for QUALCOMM.  Richard Stark of Cravath for QUALCOMM,
 6  and Rich Horowitz of my firm.
 7                    MS. SCHMIDT:  Your Honor, this is
 8  Fred Lorig and William Urquhart from the
 9  Quinn Emmanuel Urquhart firm for Nokia, and
10  Elizabeth Tucker of Richards Layton, Jane Mutimear
11  from Bird & Bird, and Ari Laakkonen and
12  Richard Stimson of Nokia, Inc.
13                    THE COURT:  Good morning.
14                    I've read all the papers.  I'm happy
15  to consider, you know, whether to -- this Court has a
16  role to play in this dispute.  But I do think the
17  first thing that needs to be done is essentially brief
18  up whether this is a proper place to bring this
19  dispute, especially given the pending actions.  And
20  I'm influenced by the fact that I don't gainsay the
21  importance of this to Nokia.  I'm sure this is a very
22  important thing and you've got multiple litigations
23  going on.  You have multiple litigation going on.  I
24  mean, it wasn't like it all popped up and you said we
```

1    got to get going on this and we're going to shut this

2    down entirely right away.

3                    Now, I understand you've got sort of a

4    whack-a-mole situation going on, or you think that

5    there's proliferating injunction actions from QUALCOMM

6    everywhere.

7                    The reality is, though, that doesn't

8    necessarily mean you don't have to put your marker

9    down somewhere where the cases are pending.  I'm not

10   prejudging that, but I'm at least interested in that

11   notion.  I'm at least interested in the notion in

12   whether or not this would be considered the national

13   court.

14                   Delaware courts are rightly concerned

15   when Federal Court's intrude in issues of state law.

16   Frankly, Delaware doesn't particularly like it when

17   some states have gotten creative and dishonor the

18   contract rights of securities holders.  And the

19   corporations sell securities by trying to intrude on

20   the internal affairs of corporations through all kinds

21   of interesting statutes, which don't seem to honor

22   those contracts or give full faith and credit to the

23   laws of other states.  What comes about consideringly

24   with that sort of concern to protect one less

1    legitimate territory is to also recognize that there
2    are areas in which we don't have the same legitimacy
3    as the federal courts.  I don't know if this is one.
4    I'm not prejudging it.  When I see something -- a
5    reference to national courts -- I have to say it
6    doesn't occur to me immediately that it's necessarily
7    the case that any court within a nation qualifies for
8    that.  It might have been rationally thought by
9    whatever the entity was.

10                   What that means is that we're a bunch
11   of nations bringing together -- coming together.
12   We're trying to work together.  We're going to presume
13   on the part of the nations involved in this that the
14   judicial system in those nations will responsibly
15   adjudicate the disputes and that ultimately those
16   systems will culminate in some national court which
17   will bless whatever rulings are done at the lowest
18   level of the system.  It's not necessarily clear to
19   me -- it is true that you could possibly get a writ of
20   certiorari from the Delaware Supreme Court to the
21   United States Supreme Court.  It's not immediately
22   clear to me that that's what they meant.

23                   I don't know anything about Germany.
24   I know more about soccer and beer from Germany than

1   the German courts, but some of them have federal

2   governments or different local governments where they

3   may have court systems that aren't part of the nation.

4   You know, I just don't know.

5                   What I also know is that this is

6   clearly no more a court -- a national court of the

7   United States than any of the federal district courts,

8   and it's not clear to me why the request for

9   injunctive relief that's sought here could not have

10  been sought in those other pending cases, which is not

11  only can, you know, QUALCOMM not get an injunction,

12  Your Honor, we are moving affirmatively for you to

13  issue an injunction against them because of what

14  they're trying to do to us worldwide by dishonoring

15  their obligations to us under this essentially -- this

16  contract that arises by virtue of this and present

17  that to a federal judge.

18                  I had not known the federal courts

19  were without authority to issue injunctions with

20  nationwide effect and perhaps international effect

21  with the party before it who's invoked their

22  jurisdiction.

23                  Without going on about it, I mean,

24  those are the things I'm going to be interested in.

CHANCERY COURT REPORTERS

1    We've got the first-filed doctrine, we've got the

2    notion of what this is.  When I first got the case and

3    I read -- this is a classic joint venture.  Somebody

4    has got to leave it in Delaware law.  What you've got

5    is a de facto contract by virtue of something going on

6    in France, and QUALCOMM happens to be a Delaware

7    corporation.  I'm happy to entertain a tighter

8    briefing schedule.  I would ask Nokia -- not Nokia --

9    I would ask QUALCOMM to commit to when they could file

10   its motion to dismiss.

11                    When do you think, Mr. Fischer, you

12   could get a brief in, or something like that?

13                    MR. FISCHER:  I think we'd like at

14   least a couple of weeks.  Is that asking for too much?

15                    THE COURT:  They'll tell you that it

16   is.  I think a couple weeks is not too much.

17                    MR. FISCHER:  Well, in light of what's

18   going on in the other litigations, I don't think two

19   weeks -- there's nothing immediately pending that we

20   need to -- I think two weeks is reasonable.

21                    MR. LORIG:  If I can respond.  Two

22   weeks normally, I think, would be reasonable, even if

23   you're the other party.  The problem we have is we're

24   dealing with an injunction-case-of-the-day.  Yesterday

CHANCERY COURT REPORTERS

1    they filed another case in Germany asking for an

2    injunction.  If we're going to take time and brief

3    this matter for a couple of weeks, can we at least get

4    a stipulation from QUALCOMM that, until the courts

5    jurisdiction is decided, they won't file any more

6    patent infringement suits in foreign countries.  I'm

7    not talking about the United States.  That's already

8    done.  I'm talking about outside of the United States.

9                     Will QUALCOMM agree, in return for a

10   civilized briefing schedule so we can air the issues,

11   not to file any further patent infringement actions in

12   countries outside of the United States?

13                     MR. FISCHER:  I'd have to discuss that

14   with people, Your Honor.

15                     THE COURT:  I do think it is -- one of

16   the things -- if these suits are going to arise on the

17   map, I assume they're like red dots and start looking

18   like some global infection.  We'll get the guy from

19   house to diagnose -- I mean, I think that is a

20   problem, Mr. Fischer, that he we have to deal with

21   here.  I hadn't known there was a suit filed

22   yesterday.

23                     MR. FISCHER:  I didn't know that

24   either, Your Honor.

1        MR. LORIG:  We were notified by
2   European counsel.
3        MR. URQUHART:  And by QUALCOMM.
4        MR. LORIG:  And by QUALCOMM.
5        Just to let Your Honor know what's
6   going on beyond the surface.  Yesterday there was a
7   meeting between QUALCOMM and Nokia.  As a Nokia
8   representative walked into the room to discuss issues,
9   they agreed to the news of another, we believe,
10  vexatious lawsuit, this time filed to Germany.  That's
11  the pattern we're in.  That's why we're seeking the
12  Court's injunctive relief.
13        THE COURT:  Look, I'm a fairly direct
14  person.  That kind of behavior is not going to aid
15  QUALCOMM with any -- when I consider at least the
16  McWane issue -- McWane being our first-filed case
17  doctrine, which is, you know, if QUALCOMM wants to
18  bring an injunction action and say, "Look, we want to
19  have a fair fight.  It's basically the same issue all
20  over the world.  We shouldn't litigate it in 17
21  different courts.  We should pick one good forum.  You
22  know, we want it in the Federal Court that we first
23  filed in.  Let's agree.  Let's get it done.  Let's
24  have a trial, and let's make this be the template."

1   You know, that's a fairly strong position to be in

2   when you've got a first-filed doctrine.

3                  On the other hand, if QUALCOMM says,

4   "No, what we really do want is some sort of

5   international infection of lawsuits to afflict Nokia,

6   we want the possibility of inconsistent adjudications,

7   we want them to get lawyers and master all these

8   different intricacies, put aside civil code versus

9   common law.  Why don't we get a sampling of common law

10  nations?  Why don't we get Australia, UK, the United

11  States, and then we'll get, frankly, former

12  dictatorships, which are still arguably that way but

13  have court systems and we'll see, you know, how that

14  kind of goes."  And then, if that's the situation,

15  that really cuts very strongly against worrying about

16  first-filed doctrine.

17                  MR. FISCHER:  Your Honor, I don't

18  think that's what's going on.  I think it's a matter

19  of taking protective actions in the areas where it's

20  appropriate to take it, in light of the nature of the

21  patents at issue and where they are and where the

22  patents are protected.

23                  THE COURT:  Am I wrong to think that

24  this is essentially a European-wide dispute or is it

1    maybe even also extends to the continental United
2    States?

3                    MR. LORIG:  Your Honor, it's really
4    worldwide.  They filed their action in San Diego the
5    end of last year.  It's stayed at the moment.  They
6    filed actions before our last settlement negotiation.
7    They greeted us with filing an action in the UK.  Now,
8    before this one, they greeted us with filing an action
9    in Germany.  If we have another settlement
10   negotiation, we'll probably have another patent action
11   in another European or Asian country.

12                   The idea that they're trying to
13   protect their interests, if you'll pardon me, is, I
14   think, based on the fact that perhaps counsel is not
15   aware of how old these patents are.  Most of them have
16   priority dates of 1990, 1994, 1995.  There's severe
17   laches on past damages.  QUALCOMM publicly announced
18   that the only reason they have filed these actions
19   under GSM patents is to try to pressure Nokia into
20   signing.  QUALCOMM's management publicly announced to
21   the investment community that they weren't pursuing
22   any other company on their GSM patents, that they're
23   only trying to enforce them against Nokia in order to
24   pressure Nokia to sign an agreement on third

1  generation, meaning nonGSM patents.  And they told the
2  rest of the industry they didn't have to worry about
3  these GSM patents.

4                    So I don't -- there's a lot of details
5  and facts.  I don't believe my opposing counsel is
6  familiar with them yet.  Certainly what he says on the
7  surface seems reasonable.  But the facts are quite
8  different, and that's why we thought about where to
9  go.  QUALCOMM is a Delaware corporation.  Nokia Inc.
10 is a Delaware corporation.  This is pure
11 interpretation of contract issue.  It's a valuation of
12 patent rights -- how to value what a FRAND royalty is
13 as compared to a normal royalty.  What is fair?  Yes,
14 the obligation is interpreted under French law, but
15 the rule is you go to your national courts.

16                    In the United States we have a
17 different situation than we do in Europe.  In Europe
18 you have one unified court system.  Here, because we
19 are a federation of states, you have both a state
20 system and a federal system.  There is no federal
21 question here.  You've got two Delaware corporations,
22 you've got an issue of interpreting and enforcing a
23 contract, and there is not a federal question here.
24                    THE COURT:  It is an interesting -- I

1   mean, I understand what you're saying.  There's no

2   federal question of federal law what view the federal

3   courts would take of their jurisdiction, given the

4   terms of -- I forget the European entities.  What's

5   it's called?

6                   MR. LORIG:  ETSI.  E-T-S-I.

7                   THE COURT:  Whatever ETSI says.  What

8   the federal courts would view their obligation as

9   being is it may not be -- intuitively it's not as

10  relevant to me for this reason, which is the reason

11  why Nokia is here is because QUALCOMM is filing patent

12  infringement actions which it believes are improper

13  and at a time when what Nokia says should be going on

14  is, frankly, we ought to be getting so-called FRAND

15  rates and this should not be an issue at all.

16                   When they filed their patent

17  infringement action in the U.S. District Court in San

18  Diego -- it's clearly a defense.  It may be even a

19  counterclaim, and it would seem to get around the

20  jurisdictional issues.  From what I read in the letter

21  from Potter Anderson today, you were fighting about

22  going to arbitration.  And no one teed up, you know,

23  this question.  And it may have been because that was

24  the first of the actions.

CHANCERY COURT REPORTERS

14

1           I also don't know what's before the

2   U.S. International Trade Commission, whether that is a

3   forum that would qualify under ETSI.  I don't know

4   whether anybody has worked --

5           MR. LORIG:  May I respond, Your Honor?

6   The ITC, as Your Honor may know, only has the power to

7   grant injunctive relief.  It doesn't have the power to

8   define a reasonable royalty or a fair and reasonable

9   royalty.  Moreover, by law, it's determinations are

10  not -- don't give rise to collateral estoppel,

11  res judicata issues, preclusion issues because of the

12  nature of the Court system.

13          To go back to Your Honor's point about

14  San Diego.  As we understood the law, if somebody has

15  filed an action which triggers an arbitration right,

16  you waive that right.  The first thing you don't do is

17  ask for arbitration.  We asked for that.  The judge

18  denied it.  The arbitration went forward anyway.  The

19  federal circuit has heard the appeal.  But we have not

20  teed up in that case the right to an injunction or how

21  to define fair, reasonable --

22          THE COURT:  What's happening with

23  arbitration?

24          MR. LORIG:  It's ongoing.

CHANCERY COURT REPORTERS

1   Mr. Casebeer is on the phone. We both participated.

2                   MR. MAMMEM: In the arbitration right

3   now is pending QUALCOMM's motion to dismiss the main

4   claim in the arbitration on Rule 12(b)(6) grounds.

5   We're awaiting a hearing date on that motion.

6                   MR. LORIG: Your Honor, the issues do

7   not include a right to an injunction --

8                   THE COURT: I guess what I'm saying

9   is, who brought the action in the U.S. District Court

10  in California?

11                  MR. MAMMEM: QUALCOMM did.

12                  THE COURT: Right. For patent

13  infringement?

14                  MR. MAMMEM: Yes.

15                  THE COURT: And why wouldn't Nokia say

16  that that was -- you know, that one of the reasons why

17  that action is not viable is because QUALCOMM is

18  acting in violation of ETSI?

19                  MR. MAMMEM: Your Honor, we think

20  that's exactly the right question. As we've seen from

21  the response that Nokia filed yesterday, they appear

22  to have asserted both the issues that they raised --

23  that Nokia raised -- before the arbitrator, as well as

24  this ETSI issue as affirmative defenses in that

CHANCERY COURT REPORTERS

1    action.  In the district court action, Nokia has not

2    yet been required to file an answer because of the

3    procedural posture of that action.  That would be the

4    appropriate forum for these issues to be aired.

5              MR. LORIG:  One would have thought, as

6    Your Honor has said, that the reasonable thing to do

7    would be for QUALCOMM to have filed this action in

8    San Diego, which after all is its home base, tee up

9    the issues there.

10             What happened is, after the case was

11   stayed and the arbitration started going forward, they

12   didn't like some of the things that were happening in

13   the arbitration.  They then filed an action in the ITC

14   on several of the same patents that were at issue in

15   San Diego.  When they didn't like the way things were

16   going, they filed the UK action.  You see the problem?

17             THE COURT:  I understand that.  As a

18   litigator will, you changed my words around to put the

19   onus on QUALCOMM.

20             I don't know what gave rise to the

21   arbitration right.  Was it a contract between QUALCOMM

22   and Nokia?

23             MR. LORIG:  Yes, it is a contract.

24   Unfortunately, because we don't have a protective

CHANCERY COURT REPORTERS

1    order, without permission of my opposing counsel I

2    can't discuss its contents because --

3                    THE COURT:  Would it sweep within it

4    arguably the ETSI claim?

5                    MR. LORIG:  I don't believe so, Your

6    Honor.

7                    THE COURT:  I'll give you my standard

8    pitch on American -- not American businesses in

9    general.  No one whines more about the cost of

10   litigation than businesses and doctors.  In my

11   experience as a judge, no source of litigation delay

12   or complexity or a waste are more common than

13   businesses and doctors.  I say doctors because anybody

14   who has had a doctor practice break up, where people

15   go under tables and pull out plugs, steal records, do

16   things -- doctors love litigation when they're playing

17   offense; they hate it when they're playing defense.

18   Businesses whine all the time, you know, but they

19   spend a gazillion amount of dollars and human energy

20   every year fighting about what forum to be in.

21                   You know, it may be you all think I

22   can do it well on both sides and that you can

23   stipulate that I'll do it.  You probably can't because

24   you know you just hate each other.  Your clients hate

1   each other and they're going to fight about anything.

2   You could have the best -- universally conceded --

3   best judge in the world by both sides in a blind taste

4   test.  If they happen to agree on that person, they

5   would then back away.

6                  What I'm getting at and what we're

7   going to get to quickly -- I mean, I will say this to

8   QUALCOMM.  If I find out tomorrow there's an action in

9   Belgium and an action in the Netherlands, then I'm

10  going to set a trial date.  And we'll go, you know,

11  hell bent for leather with all the discovery in the

12  world to get this tried wherever it has to be,

13  including in my court, if I conclude that it's going

14  to be here.  But because it's going to be somewhere,

15  there will be no waste in the discovery.

16                 What was done in Germany was done in

17  Germany.  We'll start with QUALCOMM having a brief in

18  two weeks.

19                 What would Nokia want in terms of

20  answering?

21                 MR. LORIG:  I think we'll get our

22  response in one week, Your Honor, since they are not

23  stipulating to stay their hand on filing future --

24                 THE COURT:  You only want a week?

CHANCERY COURT REPORTERS

19

1    Okay.  Get on the books quick.

2                    MR. STARK:  Your Honor, may I speak

3    briefly?

4                    THE COURT:  Yes.

5                    MR. STARK:  Your Honor, to your point

6    that a number of suits have been filed by QUALCOMM for

7    patent infringement, I just wanted to make clear for

8    the record that there are patents of different nations

9    involved in these different actions, and each patent

10   of a different nation gives rise to a separate and

11   completely distinct set of rights.  For example, the

12   U.S. patents that are at issue in the San Diego

13   litigation give rise to the right to potentially

14   exclude products from being offered, sold, made or

15   used in the United States, but do not extend

16   necessarily to other nations.  The same would be true

17   of patents of other nations that are at issue in other

18   litigation.

19                    So I just wanted to make the point,

20   Your Honor, that it's not a simple case of

21   proliferating litigation, but rather there are quite

22   distinct rights at issue.  In order to protect those

23   rights, QUALCOMM may need to seek to bring cases in

24   different jurisdictions.

20

1          THE COURT:  As I understand your
2   friend's point, that I guess in the territories
3   governed by ETSI, which would be essentially the
4   European union -- is that correct?
5          MR. LORIG:  Yes, Your Honor.
6          MR. STARK:  That's correct, Your
7   Honor.
8          THE COURT:  -- that there is an
9   overriding issue of whether essentially what QUALCOMM
10  is limited to is essentially making, you know, sure
11  that Nokia pays FRAND rights for the technologies in
12  all those territories, and that the overarching issue
13  that Nokia seeks is that essentially the European
14  unionwide -- instead of charging folks like Nokia
15  FRAND rights for these essential technologies, it's
16  essentially trying to create a hostage situation
17  where, instead of charging FRAND rights, it charges
18  something way too expensive or keeps people out of the
19  market all together.  That's what I understand is the
20  issue.
21          MR. STARK:  That is potentially a
22  common issue.  Your Honor, we would submit that
23  Nokia's position is utterly without merit on that.  I
24  just wanted to make sure that the record was clear.

CHANCERY COURT REPORTERS

1           THE COURT:  Right.

2                   What I'm saying is, if it is an

3    overarching issue and I can't at this point judge

4    whether it's just without merit, whether it's utterly

5    without merit -- you know, whatever adverbial tag line

6    we want to put on it -- I can't judge that.  But if

7    it's possibly a good defense and you all can't figure

8    out where to fight about it and it looks like the

9    infection is spreading throughout the European union,

10   then I am going to set a trial date and at least get

11   the issue -- get discovery going.

12                  What I would strongly advise that you

13   do -- one of the things I would say to Nokia, don't

14   be, you know, day foolish here and say we'll do our

15   brief in a week.  Let's just be careful about that.

16   All I'm saying is, maybe you can anticipate all the

17   arguments that they're going to have and you're going

18   to look -- maybe you're going to get the stuff in

19   ETSI.  I don't know if there's an official English

20   version of ETSI.

21                  MR. URQUHART:  The website.

22                  THE COURT:  The history of ETSI and

23   what it means.  I'll just -- why don't you figure out

24   a place to have this fight.

CHANCERY COURT REPORTERS

1          MR. LORIG:  On behalf of Nokia, we
2   would stipulate that the Delaware Chancery Court can
3   resolve this dispute and each side stay their hand on
4   other litigations until this issue is resolved.
5   Because these are two large mature companies and there
6   is an honest dispute, apparently, between what the
7   FRAND obligation means, and it should be resolved.  We
8   would stipulate to jurisdiction here.  And I would
9   hope counsel would ask their clients before rejecting
10  it so that can be decided.  Because the problem that
11  we're going to get into is we can literally have
12  scores of lawsuits around the world, not just in
13  Europe, with differing interpretations of what the
14  FRAND obligation means.  Here, where there is
15  jurisdiction over QUALCOMM and there isn't
16  jurisdiction in the national courts in Europe, here's
17  the one place it can be decided.
18          THE COURT:  What I'm saying is, if
19  they had thought of this court first, you know, I
20  expect that what Nokia would be saying is, we're a
21  Finnish corporation.  And the fact that a few of our
22  cell phones come into Delaware doesn't mean why are we
23  the heck in the Delaware Court of Chancery.  Now,
24  Strine's got a great hairstyle and we dig that; but,

1  you know, aside from that, you know, you just can't
2  really get it.

3  Now I understand there is a Nokia --
4  that the U.S. subsidiary is here.  What I'm saying
5  is -- I would say to both sides -- I realize -- and
6  even in something just with the dispute -- the fact
7  that one side or the other picked the forum first
8  becomes, you know, some sort of psychological barrier
9  to rationality.  I could as easily say to Nokia, "Why
10 not agree to go back to the U.S. District Court in
11 San Diego, lift the stay with respect to this issue
12 and have it out there."  I think your friends from
13 QUALCOMM would be in a very difficult position to say
14 that a U.S. District Court is not a national quorum.
15 That would deprive me and our Delaware friends of the
16 ability to participate in this.

17 I'm happy to do the work.  This
18 court -- one of the advantages of Delaware is, you
19 know, we have to play fair.  That's the nature of our
20 business.  We can't play favorites and have it work
21 for our state.  It just doesn't work.

22 The Nokia subsidiary's a Delaware
23 subsidiary; QUALCOMM is a Delaware corporation.
24 Probably neither of your corporations have as many of

CHANCERY COURT REPORTERS

1   your operations here as my former boss and a U.S.

2   senator would like.  So it's not like we could favor

3   the headquarters versus anything.  Usually people --

4   we're indifferent to that.  We're trying to come with

5   a fair outcome.

6              If you can agree that I'm the place,

7   you know, that becomes easier.  Then you can enter

8   into a stipulation that's binding.

9              My concern about that is, again, the

10  psychic notion, which is that QUALCOMM has been

11  brought and it didn't choose this place.  You know, if

12  what Nokia's objective is is to get a decision, what

13  I'm saying to you, I am going to set a trial date and

14  I am going to make you all have your depositions taken

15  and do all that kind of stuff if these things keep

16  coming up.

17             It may that be what you can agree on,

18  even though it deprives me of the fun, is that the

19  forum that QUALCOMM chose as its first American court,

20  which might even be more convenient for some of the

21  litigators working for Nokia, since, you know, you're

22  out there in the land of Gwyneth and stuff, would be

23  that, you know, you do it in San Diego.

24             MR. LORIG:  One of the problems is the

1   judge in San Diego -- Judge Brewster -- is a senior

2   judge, just had an operation for prostate cancer, has

3   announced he's going to retire in September of next

4   year.  Some of these European cases won't be tried and

5   decided by the middle of next summer.  The timing,

6   frankly, isn't good.

7                    You know, one of the reasons, as I

8   said we're here, is for exactly the reasons Your Honor

9   enunciated: this is a neutral court.

10                   MR. MAMMEM:  The response to that is

11  that, if we had started litigating the San Diego

12  action back in November when we filed, we would be

13  well-advanced in the San Diego forum at this point.

14                   THE COURT:  Well, Mr. Mammem, you

15  represent --

16                   MR. MAMMEM:  QUALCOMM.

17                   THE COURT:  You're at what firm?

18                   MR. MAMMEM:  The Day Casebeer firm.

19                   THE COURT:  I guess what I'm saying

20  is, you know, things like Judge Brewster -- if

21  Judge Brewster is genuinely retiring, he probably

22  knows that.  And I would assume that he -- you know,

23  as I would assume about most of my judicial

24  colleagues -- that he cares deeply about doing

1   justice.  And that to the extent that the time frame
2   that's involved here doesn't comport with his
3   retirement plans, that there is this thing called
4   reassignment.
5               I would say to Mr. Stark and
6   Mr. Mammem, you know, this court is fair.  We do
7   things pretty well.  I think I know that the Cravath
8   firm has once in a while gotten a decent result here.
9   And so -- certainly the Potter Anderson firm has.
10              So I think the question becomes
11  whether it's really like you just want to hurt each
12  other, and you just want to have this sort of
13  uncertainty.  That may be a business decision that
14  none of the lawyers have anything to do with.  It's
15  just simply we want to hurt each other, and nobody
16  needs to respond to that because each side is going to
17  say, "Of course we wouldn't do that.  We wouldn't have
18  just 17 lawsuits just because it gives us business
19  leverage."  And the other side say, "Of course we
20  wouldn't do the same either.  We wouldn't duck a
21  particular forum just to come here and make it" -- you
22  know, in Delaware we have that phrase, we don't -- we
23  say it about every other day -- we didn't just fall
24  off the turnip truck, which I think can also be

1    interpreted to mean I didn't just fall off the turnip

2    truck.  Everybody knows I fell off it five years ago,

3    without a helmet, and I've suffered permanent damage

4    ever since.  I have never fallen off the turnip truck.

5    I know there's jousting going on.  I know this means a

6    lot to your clients.

7              What we're going to do is, I want a

8    tight briefing schedule.  Think about that week.  I'm

9    not going -- I want a briefing schedule to me by next

10   Wednesday.

11             MR. FISCHER:  We'll do that, Your

12   Honor.

13             THE COURT:  Think about your time

14   frame.  If there are other lawsuits, then discovery is

15   going to go forth and it's going to be on an expedited

16   basis.  So QUALCOMM, to some extent, is going to be in

17   control about whether expedited discovery begins;

18   otherwise discovery is not stayed but it will go under

19   the usual deadlines.  I would like a report back at

20   the same time I get a schedule about whether you've

21   conferred about whether there is a forum you could

22   agree on to go first about these threshold issues and,

23   frankly, to stay the other litigations.  There may be

24   some complexity there.

```
 1                        I heard Mr. Stark say it's a good
 2   point.  There may have to be some sort of tolling
 3   agreement between QUALCOMM and Nokia to indicate that
 4   QUALCOMM is not -- if its time has already lapsed,
 5   it's lapsed.  But that during the nothing -- simply
 6   the pendency of any stay to get done in the first
 7   things won't be -- that part of the delay won't be
 8   attributed as laches and that sort of thing.
 9                        MR. LORIG:  Your Honor, we'd stipulate
10   to that on the record right now.  That's not a
11   problem.  The problem is, again, the fact that we're
12   getting an injunction action in a week.
13                        THE COURT:  Mr. Stark, can you take
14   that back to your client?
15                        MR. STARK:  Yes, Your Honor.
16                        THE COURT:  It also gives me a chance
17   and will create a little record here, which will help
18   other courts to flesh out really whether this is --
19   these people are acting like children in a way that's
20   unfair or they simply, you know -- because I think if
21   you can get -- at some point, when you've got the idea
22   that QUALCOMM will be able to protect its interest in
23   all the jurisdictions, we'll get a fair shot in a good
24   forum of presenting its side in one of the national
```

```
 1   controversies, but yet Nokia will get to advance this
 2   overarching thing and it could be done in a good
 3   quality forum that's neutral in a prompt way.
 4                   If one side or the other is objecting,
 5   then they suggested, frankly, this is a situation
 6   where counsel have a duty to step into your clients
 7   and say, "No, you can't act in a vexatious way."
 8   Let's have a fair fight on the merits. We may win or
 9   lose, but we have that opportunity, and we're not
10   going to afflict 13 different countries with a case.
11                   MR. LORIG:  May I respond, Your Honor?
12                   THE COURT:  Yes.
13                   MR. LORIG:  That's exactly what the
14   problem is and why we're here. They have asked for a
15   July 2007 trial date in England, but the FRAND issues
16   would not be decided until after that. You decide the
17   patent issues first, injunction first, the other
18   issues second.
19                   Same in Germany. You're going to get
20   the patent issues decided within a year. You're not
21   going to get to the other issues.
22                   THE COURT:  Right.
23                   What I'm saying is, I'm sensitive to
24   the need -- I understand what Nokia is saying.  I
```

CHANCERY COURT REPORTERS

1  think the vulnerability that Nokia has is are we a

2  national court and the fact that could these -- this

3  defense be presented in prior pending actions.  That's

4  why I'm suggesting to QUALCOMM it ought to think very

5  hard about the other options it brings and whether

6  it's willing to stipulate in somewhere else.  If it

7  prefers -- San Diego is a lovely place.  I actually

8  never spent any time in the city.  I only spent my

9  time on Coronado.  It has sufficient proximity to the

10 ocean and to fish tack companies that I never

11 actually -- except driving to the airport -- spending

12 any time there, other than the Padres are an awesome

13 team.  You know, you've heard me on that.  I want to

14 hear about the fight and I want a briefing schedule.

15               MR. FISCHER:  By Wednesday?

16               THE COURT:  Yes.

17               MR. LORIG:  Should that briefing

18 schedule be for an expedited proceeding so that this

19 matter will be decided before these various midsummer

20 problems we're going to have?  We've got European

21 decisions by the middle of next year.

22               THE COURT:  No.  I think I've been

23 pretty clear.

24               What I've said is, I want a schedule

1  for the completion of briefing on a motion to dismiss

2  or stay, essentially on the forum issue writ large.  I

3  am not staying discovery in any case.  But if there

4  are actions -- if QUALCOMM files an action anywhere

5  else than it's already done, then I'm going to set a

6  trial date.  And I will turn what is discovery that's

7  going to be ongoing and on a normal basis, I will turn

8  that into expedited discovery.

9                  I've got plenty of time to set a trial

10 date for early next year.  One thing we are capable of

11 doing in this court is I have no doubt in the first --

12 well, the first half of August 2006 -- that we can be

13 to trial in early 2007, you know, if we have to.

14                 I'm also assuming there's been some

15 discovery done between the parties somewhere.  Not

16 even in the arbitration?

17                 MR. LORIG:  Not on these issues, Your

18 Honor.

19                 THE COURT:  Not on FRAND?

20                 MR. LORIG:  Not on FRAND.  Not under

21 right to injunction.  Those aren't the issues in

22 arbitration.  There's four discrete issues and these

23 are not among them because the contract in question,

24 which I'm not allowed to discuss on pain of blowing a

CHANCERY COURT REPORTERS

1    confidentiality clause because QUALCOMM filed two

2    cases against TI saying they lost their license by

3    talking about the agreement --

4                    THE COURT:   Are you telling me that

5    this dispute is entirely -- that dispute is entirely

6    separate from ETSI?

7                    MR. LORIG:   Yes, Your Honor.   I'm

8    saying that that is entirely separate from ETSI and

9    FRAND.

10                   THE COURT:   Mr. Stark, would you --

11   who is handling that for --

12                   MR. MAMMEM:   This is Chris Mammem.

13                   Your Honor, as I believe I mentioned

14   earlier, the dispute that's currently pending in the

15   California arbitration does appear to be a separate

16   set of arguments from the ETSI argument.   However, as

17   we've seen in the ETSI action, where Nokia filed its

18   answer yesterday, they have raised both issues as

19   affirmative defenses.   Nokia has not yet filed its

20   answer in the San Diego action, and we would have

21   every reason to believe that they would in the due

22   exercise of care for their client to assert both sets

23   of issues as defenses in that action once they're

24   required to answer there as well.

1              THE COURT:  Okay.  But that implies

2    that the ETSI provision will somehow extend to --

3              MR. MAMMEM:  Several of the patents

4    that are asserted in the San Diego action have been

5    declared standards essential under ETSI.  That's the

6    triggering event, as I understand it, for Nokia to be

7    raising this issue.

8              THE COURT:  Okay.  But is what's at

9    issue in San Diego have to deal with what happens in

10   the United States or in Europe, which is, the duty --

11   the so-called duty, if it exists under ETSI to allow

12   people to use your technology on a FRAND basis, does

13   that extend outside the European union?

14             MR. MAMMEM:  That is an issue that I'm

15   not prepared to speak to today.

16             THE COURT:  Is that Nokia's position?

17             MR. LORIG:  Our position is the ETSI

18   obligation extends throughout the world, Your Honor.

19             THE COURT:  So that it would be a fair

20   response to the injunction action in California to say

21   ETSI says you can't do it.

22             MR. LORIG:  Except it's not an

23   injunction action.  They're primarily seeking damages.

24             THE COURT:  But they can't get damages

1   if they're breaching their ETSI rights; right?  Then

2   they're denying you the chance to use the technology

3   on the basis that they're supposed to; right?

4                MR. LORIG:  No, Your Honor.  I think

5   that's the whole issue.

6                Looking at the San Diego action apart

7   from an injunction, they sue and they say you're

8   infringing on our patent, we're entitled to damages.

9   And the response would be, yes, you're entitled to a

10  royalty, not as --

11               MR. MAMMEM:  We pled in the San Diego

12  action seeking both damages and injunctive relief.

13               MR. LORIG:  Yes, it could be teed up

14  there.

15               THE COURT:  And it could also be teed

16  up more broadly, which is not only as a defense and

17  that the royalty -- whatever royalty you should pay is

18  a FRAND rate, but more generally as an affirmative --

19  as a counterclaim you could be seeking an injunction.

20  Is that right?

21               MR. LORIG:  We could seek the same

22  injunction from the Federal Court we are seeking from

23  this court, except for the fact that it's again not a

24  federal question --

35

1           THE COURT:   It's not a Delaware law

2   question either.

3           MR. LORIG:   It's a contract question,

4   Your Honor.   It's strictly contract.

5           THE COURT:   What I'm saying is, you

6   would have every right, given that they brought you

7   into Federal Court, for you now to raise this as a

8   counterclaim and an affirmative defense and seek an

9   injunction.   It would not be a jurisdictional problem

10  on the part of the Federal Court.

11          MR. LORIG:   It wouldn't be, except

12  that case is stayed pending arbitration.

13          THE COURT:   That case is stayed.   This

14  case didn't exist; right?

15          MR. LORIG:   Right.

16          THE COURT:   The great thing about

17  stays is they can be lifted.

18          MR. MAMMEM:   We will stipulate to the

19  lifting of that stay immediately, if Nokia would

20  agree.

21          MR. FISCHER:   It was filed by Nokia.

22          MR. LORIG:   The issue is, you can't --

23  are they stipulating that we can pursue the

24  arbitration issues in arbitration and that the

1    San Diego case will be dismissed, we win in

2    arbitration, and then we come back to Delaware and

3    have this decided, because the issues in arbitration

4    are such that no San Diego case could have been filed,

5    would have been filed?  If we win the arbitration, the

6    San Diego case must be dismissed with prejudice on all

7    issues.

8                    MR. MAMMEM:  That's the nature of an

9    affirmative defense, and they ought to be litigated in

10   due course as affirmative defenses in the patent

11   infringement case.

12                   MR. LORIG:  Your Honor, with all

13   deference, I don't think I heard an answer to my

14   question.

15                   THE COURT:  I don't think I did

16   either.  What I'm hearing is the kind of jousting that

17   I'm going to stop, because it's one of my law clerk's

18   last day and I'm not going to miss lunch with her

19   over -- because it's not helpful.

20                   You all need to take a deep breath and

21   with a cool head and warm heart think about this

22   rationally, which is what I just heard Mr. Mammem.

23   It's a need answer.  But the fact is that Nokia is now

24   seeking to raise more than an affirmative defense.

CHANCERY COURT REPORTERS

1    It's seeking to obtain an injunction that goes further

2    to that.   The question is: are they going to get a

3    forum -- if you come to me and say you can do it in

4    the U.S. District Court for the District of San Diego

5    but not until this arbitration is completed, and then

6    you say that's not unfair to them because they're the

7    ones that raised the arbitration issue -- I haven't

8    seen the contract.   It sounds like you've got a lot

9    mixed up in there.   It sounds like you're suing in

10   Germany and the UK.   It's probably not under the same

11   contract that has the arbitration clause.

12                    MR. LORIG:   I would like to ask

13   QUALCOMM's permission to submit to the Judge -- the

14   Court -- a copy of the -- the contract at issue.   We

15   have QUALCOMM's permission?

16                    MR. MAMMEM:   I believe that would be

17   fine to submit it under seal, or under whatever

18   confidentiality agreement.

19                    THE COURT:   Don't submit it to me

20   until next Wednesday in the context of something.

21                    How far along in the arbitration --

22   this will be the last line of questioning -- how far

23   along are you in this arbitration?

24                    MR. LORIG:   I would say we're halfway

1   along.  We've teed up a proffer on how we're going to

2   prove the issues that we've raised in arbitration.

3   They filed a motion to dismiss.  The arbitrator's

4   currently considering them.  We think the motions are

5   going to be denied and we'll tee up the arbitration

6   hearing.  It should be within the next couple three

7   months.

8                   THE COURT:  Then would you do some

9   discovery?

10                  MR. LORIG:  There's going to be a

11  little discovery.  One of the key witnesses is

12  unfortunately dying of cancer and we're having a

13  little difficulty getting opposing counsel to agree on

14  a way of taking his deposition -- a way that doesn't

15  aggravate his health.  There may be a little

16  additional discovery after that.

17                  MR. MAMMEM:  Mr. Lorig is correct.

18  The motion to dismiss is pending.  We believe that

19  motion will be granted, obviously.  If it's denied,

20  then there will be some amount of discovery to be

21  taken before the merits issue is teed up.

22                  THE COURT:  Is the arbitrator somebody

23  really super special that Nokia loves?

24                  MR. LORIG:  No.  The arbitrator was

somebody jointly picked by both sides. His name is Les Weinstein. He's a retired trial lawyer. He doesn't have Your Honor's economic background but he's got a lot of common sense.

THE COURT: You may have to go over what my economic background is. Sort of lower middle class.

Good. I'm glad to know that his folks had some money.

I guess what I'm wondering here is, you know, it doesn't sound to me like you're all that -- the arbitration is always a murky process. You sit here about halfway through, struck me as you're not -- I wouldn't call that halfway through. I wouldn't even call it halfway through the first phase of anything.

Part of what you all should be thinking about is -- maybe it's this fellow with a better economic background than I have, maybe he does it all. Maybe you get through the motion and say, "Well, we'll live by what the dismissal thing is. But if the claims go forward, we'll go back to the judge, lift the stay, and we'll do it all in the District Court of San Diego. But we'll do it promptly." What

1   Nokia gets out of that is it gets a chance to present

2   its FRAND-ETSI argument.  But you do it all in one

3   expedited trial before someone, especially since you

4   haven't really taken the discovery or anything.

5              That would involve Nokia obviously

6   giving up something, which is it loves this judge or

7   loves this arbitrator or loves arbitration.  More

8   likely what it had is, it had -- it was sued by

9   QUALCOMM.  And then the first thing you do is you

10  figure out how can you defeat the suit.  And if you

11  have a contract that says, "Well, we can decide or

12  dispute somewhere else," even if you don't even

13  necessarily think that somewhere else is better, you

14  tend to cling to that at that point in time.  I mean,

15  I hate to say it's that primitive, but I do think a

16  lot of times it's that primitive and that, you know,

17  it's there so we will use it.  If we can get a punter

18  over here, worrying about it delays them playing

19  offense.  Now Nokia wants to play offense.  And it

20  wants something that probably an arbitrator doesn't

21  have any prayer of being able to give it, which is an

22  injunction that would have a collateral effect in

23  other nations.

24              And one of the responsible trade-offs

CHANCERY COURT REPORTERS

| | |
|---|---|
| 1 | might be to go to Judge Brewster and say, "We're going |
| 2 | to put this all in the U S. District Court. Your |
| 3 | Honor, you're a great judge. You had a great career. |
| 4 | You're leaving next September. Our time frame is |
| 5 | something else. Let's get it reassigned mutually to |
| 6 | somebody who can handle it." The parties stipulate to |
| 7 | expedite this and have this be the case that goes |
| 8 | forward, put all your claims before him and go. That |
| 9 | sounds like a fairly -- you know, that sounds like you |
| 10 | would all look like pretty sensible business people |
| 11 | and lawyers if you did that. |
| 12 | MR. LORIG: May I respond? That would |
| 13 | be about as I think acceptable as a suggestion to |
| 14 | QUALCOMM. We could litigate this in Helsinki court. |
| 15 | I think the whole advantage of being here is, one, you |
| 16 | can get something resolved quickly in the Delaware |
| 17 | Chancery Court; two, you have a neutral forum; three, |
| 18 | it's a place where companies from around the world |
| 19 | know they're going to get a fair, neutral -- |
| 20 | THE COURT: It's making us -- our head |
| 21 | is going to explode here in Chancery because we feel |
| 22 | so good and that you love us. I don't know any reason |
| 23 | why a judge -- a federal district judge in |
| 24 | San Diego -- you know, is going to favor QUALCOMM over |

```
 1   Nokia.  I don't know if the stadium is named after
 2   anybody out there.
 3                 MR. LORIG:  QUALCOMM Stadium.
 4                 MR. MAMMEM:  Not anymore.
 5                 THE COURT:  And it's a federal
 6   district judge.  But you know, you may be just sort of
 7   stuck with that.
 8                 I would say on the other hand to
 9   Nokia -- as I said, I'm willing to do the work.  This
10   Court will do the work.  But again, I would say that
11   to QUALCOMM -- it may be QUALCOMM -- you sent them to
12   arbitration.  They may want to get all their claims
13   before one thing.  Maybe you agree it's the Southern
14   District of New York.  There are courts -- there are
15   judges in federal courts who will take this very
16   seriously.  I'm not implying that the Court that it's
17   in isn't.  If it needs to be done within the next five
18   or six months, we'll do that.
19                 I had the Oracle case and Judge Walker
20   had the Oracle antitrust thing.  He did that antitrust
21   trial just as promptly as any of us in Chancery would
22   and he pumped out a decision.
23                 Again, I didn't realize -- you can see
24   how big a Padre fan I am.  I still -- the idea that a
```

1    federal judge is going to rule for QUALCOMM --

2                   MR. LORIG:  Judge Brewster's fair, and

3    I wouldn't want to indicate anything other than that.

4    It's the difficulties when you have an international

5    problem like this.  You know, clients are

6    understandably hesitant to go into the other company's

7    home court.  It has nothing to do with individuals,

8    Your Honor.

9                   THE COURT:  I understand.  Part of the

10   problem is, you all picked this court now.  As a

11   result, if you had gone to them and said, "Why don't

12   we have Chancery" -- "why don't we think about

13   Chancery?  Our operations are Delaware, you're

14   Delaware.  Why don't we have Chancery do it."  You

15   might not have a reflex.  But now they chose a forum,

16   you chose a forum.  And what it tends to mean is it's

17   got to be some other forum.

18                   You know, you all need to read the

19   transcript.  Think about whether what I'm saying is

20   true or not.  I think it is about psychologically how

21   you deal with it.  Talk to your clients rationally and

22   think about, you know, what you're going to do.  If

23   you can't, we'll finish the motion practice and we'll

24   worry about that then.  Okay?

44

1                    So I'll hear from you next Wednesday.

2                    (Court adjourned at 1:22:50 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

45

```
 1                    CERTIFICATE

 2              I, DIANE G. McGRELLIS, Official Court

 3   Reporter of the Chancery Court, State of Delaware, do

 4   hereby certify that the foregoing pages numbered 3

 5   through 44 contain a true and correct transcription of

 6   the proceedings as stenographically reported by me at

 7   the hearing in the above cause before the Vice

 8   Chancellor of the State of Delaware, on the date

 9   therein indicated.

10              IN WITNESS WHEREOF I have hereunto set

11   my hand at Wilmington, this 14th day of August, 2006.

12

13
                    Diane G. Mc Grellis
14              -------------------------------

15              Official Court Reporter
                  of the Chancery Court
16                  State of Delaware

17
     Certification Number: 108-PS
18   Expiration:  Permanent

19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

**EXHIBIT C**

FILED

2006 MAR 16  PM 2: 58

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

QUALCOMM INCORPORATED AND
SNAPTRACK, INC.,

                    Plaintiffs,

v.

NOKIA CORPORATION AND
NOKIA, INC.,

                    Defendants,

Civil No.: 05CV2063-B(BLM)

**ORDER DENYING DEFENDANTS'
MOTION TO DISMISS, GRANTING
DEFENDANTS' MOTION FOR A
MORE DEFINITE STATEMENT
WITH LEAVE TO AMEND, DENYING
DEFENDANTS' MOTION TO STAY
PENDING ARBITRATION, AND
GRANTING DEFENDANTS' MOTION
TO STAY PENDING APPEAL [13-1 TO
13-3]**

## I.    INTRODUCTION

Before the Court are Defendants Nokia Corporation and Nokia Inc.'s (collectively "Nokia") Motion to Stay the instant litigation pending the outcome of an arbitration proceeding and Motions (1) to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and (2) for a more definite statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure against Plaintiffs Qualcomm Incorporated

1   ("Qualcomm") and SnapTrack, Inc. ("SnapTrack"), a subsidiary of Qualcomm. For the

2   reasons discussed below, the Court **DENIES** Defendants' Motion to Dismiss, **GRANTS**

3   Defendants' Motion for a More Definite Statement and **GRANTS** Plaintiffs ten days leave

4   to amend, **DENIES** Defendants' Motion to Stay pending arbitration, and **GRANTS**

5   Defendants' Motion to Stay Pending Appeal.

6   **II.    BACKGROUND**

7          In July 2001, Qualcomm and Nokia entered into a "Subscriber Unit and

8   Infrastructure Equipment License Agreement" ("the CDMA Agreement") whereby

9   Qualcomm granted Nokia a non-exclusive license to use certain of Qualcomm's patents to

10  make/sell products that incorporated CDMA[1] technology. The CDMA Agreement contains

11  an arbitration clause that requires arbitration of all disputes arising out of or relating to the

12  CDMA Agreement.

13         On November 4, 2005, Plaintiffs filed a patent infringement suit against Nokia

14  alleging that Nokia infringed eleven patents assigned to Qualcomm and one patent assigned

15  to Snap Track. After Qualcomm filed its complaint, Nokia initiated an arbitration

16  proceeding against Qualcomm on December 20, 2005, in Los Angeles, California. In its

17  demand for arbitration, Nokia seeks declarations that (1) Qualcomm engaged in misconduct

18  concerning the CDMA Agreement that bars it from asserting any of the patents in the

19  instant suit and (2) under Section 14 of the CDMA Agreement, Nokia is free to challenge

20  the validity of the six Pre-1994 Qualcomm patents in the instant action.

21         Nokia responded to the complaint on January 4, 2006, by filing the instant motions

22  for a stay, for dismissal, and for a more definite statement. In its motion to stay, Nokia

23  argues that because the instant patent infringement suits fall within the purview of an

24  arbitration clause in the CDMA agreement, the Court should stay the instant case pending

25  arbitration. Qualcomm opposes these motions. The motions came on for hearing on

26

27         [1]CDMA refers to Code Division Multiple Access, _i.e._ a wireless telecommunications standard.

28                                          2                              05cv2063

1  February 13, 2006 and March 13, 2006.

2  **III.    DISCUSSION**

3      **A.    Nokia's Motion for a Stay under Federal Arbitration Act**

4      Nokia moves for a mandatory stay of the instant suit under 9 U.S.C. § 3 of the

5  Federal Arbitration Act. Section 3 provides in pertinent part:

6         If any suit or proceeding be brought in any of the courts of the United States upon
       any issue referable to arbitration under an agreement in writing for such arbitration,

7         the court in which such suit is pending, upon being satisfied that the issue involved
       in such suit or proceeding is referable to arbitration under such an agreement, shall

8         on application of one of the parties stay the trial of the action until such arbitration

9         has been had in accordance with the terms of the agreement, providing the applicant
       for the stay is not in default in proceeding with such arbitration. 9 U.S.C. § 3

10        (2005).

11 Thus, according to Section 3, the instant litigation must address an issue that is "referable"

12 to arbitration. Nokia argues that because the issues of (1) whether Qualcomm engaged in

13 misconduct concerning the CDMA Agreement that bars it from asserting any of the patents

14 in the instant suit and (2) whether Section 14 in the CDMA Agreement limits Nokia's

15 ability to challenge the validity of the patents in suit are arbitrable, the instant litigation

16 addresses issues that are "referable" to arbitration.  However, there is a difference between

17 Nokia's proving that it initiated an arbitration action on these issues and proving that the

18 instant patent infringement suit is in fact referable to arbitration.

19     The estoppel and Section 14 defenses are not in the instant case. The instant case

20 involves allegations that Nokia infringed twelve patents in suit. The products that are listed

21 in the complaint are non-CDMA products. As such, the Court finds that the patent

22 infringement issues in the instant case are not even remotely connected to the 2001 Agreement

23 that deals with CDMA products and are not referable to arbitration. Therefore, the Court is not

24 satisfied under 9 U.S.C. § 3 that the issues involved in the instant case are referable to

25 arbitration and accordingly **DENIES** Nokia's Motion to Stay arbitration under the Federal

26 Arbitration Act.

27

1    **B.    Court's Discretion to Stay the Action**

2    Alternatively, Nokia moves the Court to exercise its broad discretion to stay the

3    instant action pending arbitration. Factors that courts consider in granting a stay include (1)

4    the harm a stay might cause, (2) the hardship or inequity a non-stay will cause, and (3) the

5    judicial efficiency and economy a stay may cause. CMAX, Inc. v. M. Hall, 300 F.2d 265,

6    268 (9th Cir. 1962). Nokia asserts a stay will result in judicial economy because the

7    arbitration may be dispositive if Qualcomm is estopped from bringing the instant action.

8    Nokia further argues that it will suffer prejudice if a stay is not granted because it will

9    needlessly have to spend millions of dollars in litigation in this Court.

10   The Court has inherent power to manage its docket. Here, the Court does not

11   consider the issues before the arbitrator dispositive for the instant suit because the

12   infringement issues in the instant case are not arbitrable, as discussed above. Additionally,

13   judicial efficiency counsels in favor of the Court's not staying the action because six of the

14   patents that are in suit in this action are also in suit in a related case: Qualcomm v.

15   Broadcom (Case No. 05CV1392). As such, a stay would also impede that case as well.

16   Therefore, the Court **DECLINES** to exercise its discretion to stay this case pending

17   arbitration.

18   **C.    Nokia's Motion to Stay the Case Pending Appeal**

19   During oral argument, Nokia moved for the Court to stay the case pending Nokia's

20   appeal of the Court's order denying Nokia's motion for a stay pending arbitration. The

21   Court hereby **GRANTS** Nokia's motion to stay pending appeal and **STAYS** the case for

22   ten (10) days to provide Nokia the opportunity to file an appeal with the Federal Circuit. If

23   Nokia does not file an interlocutory appeal within ten days (i.e. by **March 24, 2006**), the

24   litigation in the instant case will continue. If Nokia does file an appeal by **March 24, 2006**,

25   the case shall be stayed pending a decision by the Federal Circuit.

26   **D.    Nokia's Motion to Dismiss the Complaint**

27   Nokia has filed an alternative motion to dismiss Qualcomm's complaint for failure

28                                          4                              05cv2063

1   to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A

2   motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) tests the

3   legal sufficiency of the claims in the complaint. A claim can only be dismissed with

4   prejudice if "it appears beyond doubt that the plaintiff can prove no set of facts in support

5   of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46

6   (1957). The court must accept as true all material allegations in the complaint, as well as

7   reasonable inferences to be drawn from them, and must construe the complaint in the light

8   most favorable to plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986);

9   Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).

10      Furthermore, a court should not grant a Rule 12(b)(6) motion without leave to

11  amend unless "it appears beyond doubt that the plaintiff can prove no set of facts in support

12  of his claim which would entitle him to relief." Parks Sch. of Bus., Inc., 51 F.3d at 1484;

13  see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Gilligan v. Jamco Development

14  Corp., 108 F.3d 246, 248 (9th Cir. 1997). Nokia argues that because Plaintiffs (1) have not

15  identified a single product or service offered by Defendants that allegedly infringes the

16  patents in suit, (2) have not alleged the knowledge or intent elements of contributory or

17  inducing infringement, and (3) have not specified which causes of action are asserted

18  against which Defendants, the complaint should be dismissed for failure to state a cause of

19  action under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

20      Claims for patent infringement are subject to the liberal notice pleading standard of

21  Rule 8 of the Federal Rules of Civil Procedure, which requires, *inter alia*, "a short and

22  plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8

23  (2005). Here, the complaint alleges one cause of action for patent infringement (i.e. literal

24  infringement, infringement under doctrine of equivalents, and indirect infringement), gives

25  the statutory basis for the alleged types infringement, describes the twelve patents that are

26  allegedly infringed, and adequately names the Defendants. The Court finds that the

27  complaint states a cause of action and accordingly **DENIES** Defendants' Rule 12(b)(6)

28                                    5                                    05cv2063

1   Motion to Dismiss.

2   **C.   Nokia's Motion for a More Definite Statement**

3   Nokia argues that because the complaint is too vague to give them notice of what

4   products or services are accused, the Court should order Plaintiffs to make a more definite

5   statement identifying (1) the accused devices, (2) which causes of actions relates to each

6   Defendant, (3) which theories of infringement relate to each Defendant, (4) which

7   allegations relate to each Defendant, (5) which patent(s) and patent claims relate to each

8   Defendant, and (6) which part of which version of the GSM standard do plaintiffs allege

9   are covered by the claims in suit. Nokia P/A, 16-17 (Doc. No. 12).

10   The test in evaluating a motion under Rule 12(e) is whether the complaint provides

11   the defendant with a sufficient basis to frame a responsive pleading. Federal Sav. and Loan

12   Ins. Corp. v. Musacchio, 695 F.Supp. 1053, 1060 (N.D. Cal. 1988) (internal citations

13   omitted). Generally, the court will require a more definite statement only when the

14   pleading is "so vague or ambiguous that the opposing party cannot respond, even with a

15   simple denial, in good faith or without prejudice to himself." Delta Educ., Inc. v. Langlois,

16   719 F.Supp. 42, 50 (D.N.H. 1989); Bureerong v. Uvawas, 922 F.Supp. 1450, 1461 (C.D.

17   Cal. 1996) ("[A] motion for a more definite statement should not be granted unless the

18   defendant literally cannot frame a responsive pleading."). Motions for a more definite

19   statement are generally viewed with disfavor and are rarely granted. Cellars v. Pacific

20   Coast Packaging, Inc., 189 F.R.D. 575, 577-8 (N.D. Cal. 1999).

21   Paragraph 23 of the Complaint alleges that Nokia manufactures GSM and 3GPP

22   products but does not state that this manufacture is an infringing act. Therefore, the Court

23   **GRANTS** Nokia's Rule 12(e) Motion for a More Definite Statement because there is no

24   nexus between the manufacture of the listed products and infringement. Contrary to

25   Nokia's arguments, Qualcomm does not have to identify all of the products that contain

26   GSM or 3GPP standards or tell which products apply to which Defendants because this

27   information can be obtained by Nokia during the discovery process. Accordingly, the

28   6                                                                      05cv2063

1 | Court **GRANTS** Qualcomm ten (10) days leave to amend the complaint to allege that the

2 | manufacture of Nokia's alleged products constitutes infringement of the patents in suit.

3 | **IV.    CONCLUSION**

4 | For the reasons discussed above, the Court

5 | (1) **DENIES** Defendants' Motion to Dismiss,

6 | (2) **GRANTS** Defendants' Motion for a More Definite Statement and **GRANTS**

7 | Plaintiffs ten days leave to amend the complaint,

8 | (3) **DENIES** Defendants' Motion to Stay pending arbitration, and

9 | (4) **GRANTS** Defendants' Motion to Stay Pending Appeal.

10 |

11 | **IT IS SO ORDERED.**

12 |

13 | DATED: ___03-14-06___    _(signature)_

14 | HON. RUDI M. BREWSTER
United States Senior District Judge

15 |

16 | cc:    Hon. Barbara L. Major
United States Magistrate Judge

17 | All parties

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

7

05cv2063