**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NOKIA CORPORATION and NOKIA, INC., | ) | |
| Plaintiffs, | ) | C. A. No. 06-509-JJF |
| v. | ) | |
| QUALCOMM INCORPORATED, | ) | |
| Defendant. | ) | |

**QUALCOMM'S MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION TO REMAND**

Richard L. Horwitz (#2246)
Mathew E. Fischer (#3092)
Kenneth L. Dorsney (#3726)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000

Attorneys for Defendant
*QUALCOMM Incorporated*

OF COUNSEL:
Evan R. Chesler
Richard J. Stark
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: August 23, 2006
747442 / 30592

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

I. PRELIMINARY STATEMENT ..... 1

II. NATURE AND STAGE OF PROCEEDINGS ..... 2

III. STATEMENT OF FACTS ..... 6

IV. ARGUMENT ..... 9

V. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ballard Med. Prods. v. Wright*,
823 F.2d 527 (Fed. Cir. 1987) .......... 14

*Beghin-Say Int'l, Inc. v. Ole-Bendt Rasmussen*,
733 F.2d 1568 (Fed. Cir. 1984) .......... 13

*Christianson v. Colt Indus. Operating Co.*,
486 U.S. 800 (1988) .......... 1

*Christie v. Public Serv. Elec. and Gas Co.*,
No. 04-5978, 2006 WL 462588 (D.N.J. Feb. 24, 2006) .......... 13

*Commercial Sales Network v. Sadler-Cisar, Inc.*,
755 F. Supp. 756 (N.D. Oh. 1991) .......... 14

*Consol. World Housewares, Inc. v. Finkle*,
831 F.2d 261 (Fed. Cir. 1987) .......... 14

*DML Assocs., Inc. v. Mattel, Inc.*,
C.A. No. 03-128, 2003 WL 1798559 (D. Del. Apr. 7, 2003) .......... 13

*Donovan v. City of Dallas*,
377 U.S. 408 (1964) .......... 4

*Gen. Atomic Co. v. Feller*,
434 U.S. 12 (1977) .......... 4

*Gupta v. Avanta Orthopaedics, Inc.*,
No. 03CV-617-S, 2005 WL 1711970 (W.D. Ky. July 20, 2005) .......... 14

*Highland Supply Co. v. Klerk's Flexible Packaging, B.V.*,
No. 05-CV-482, 2006 WL 278164 (S.D. Ill. Feb. 1, 2006) .......... 10, 11

*Kleinerman v. Luxtron Corp.*,
107 F. Supp. 2d 122 (D. Mass. 2000) .......... 12, 13

*Licursi v. Jamison Plastic Corp.*,
No. 98-5262, 1998 WL 808542 (E.D. Pa. Nov. 20, 1998) .......... 14

*Maldonado v. Flynn*,
C.A. No. 4800, 1979 WL 4632 (Del. Ch. Dec. 14, 1979) .......... 4

*Midland Food Servs., LLC v. Castle Hill Holdings V, LLC*,
792 A.2d 920 (Del. Ch. 1999) ........ 13

*Paul N. Gardner Defined Plan Trust v. Draper*,
C.A. No. 12825-NC, 1993 WL 125517 (Del. Ch. Apr. 8, 1993) ........ 4

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
998 F.2d 1192 (3d Cir. 1993) ........ 12

*Regents of the Univ. of Minn. v. Glaxo Wellcome, Inc.*,
58 F. Supp. 2d 1036 (D. Minn. 1999) ........ 12

*U.S. Valves, Inc. v. Dray*,
212 F.3d 1368 (Fed. Cir. 2000) ........ *passim*

*United Nat'l Ins. Co. v. R&D Latex Corp.*,
242 F.3d 1102 (9th Cir. 2001) ........ 15

*Uncommon USA, Inc. v. Wiese*,
No. 05-975, 2005 WL 2000178 (D. Minn. Aug. 19, 2005) ........ 14

*Zeneca v. Monsanto*,
C.A. No. 14683, 1996 WL 104254 (Del. Ch. Mar. 7, 1996) ........ 4

**Statutes & Administrative Codes**

28 U.S.C. § 1338(a) ........ 11

## I.    PRELIMINARY STATEMENT

Plaintiffs claim that QUALCOMM has breached a "contractual obligation" by seeking exclusion of plaintiffs' infringing products in the International Trade Commission and by seeking an injunction prohibiting plaintiffs from further willful infringement in the United States District Court for the Southern District of California (San Diego Division.) (Compl. ¶ 55[1]; *see also* Pls. Br. at 4[2].) Plaintiffs admit – as they must – that the foundation of their claims is "the ETSI IPR Policies" and the written commitments QUALCOMM has given the European Telecommunications Standardization Institute ("ETSI"). (*See* Pls. Br. at 4; Compl. ¶¶ 22-24, 28.) Those documents unequivocally provide that a commitment to license on fair, reasonable, and non-discriminatory ("FRAND") terms applies only to patents that are, in fact, essential to the relevant standard. Accordingly, resolution of plaintiffs' claims necessarily will require a determination of whether the United States patents at issue in those cases are, in fact, essential – that is, whether practicing the relevant standard necessarily infringes the patents at issue. This case therefore arises under the United States patent laws per well-settled Supreme Court and Federal Circuit precedent. *See Christianson v. Colt Indus. Operating Co.*, 486 U.S. 800 (1988); *U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1372 (Fed. Cir. 2000).[3]

---

[1] Citations in the form "Compl. ¶ __" are to the Complaint in this action, dated August 8, 2006, and attached hereto as Exhibit 1.

[2] Citations in the form "Pls. Br. at __" are to Plaintiffs Nokia Corporation's and Nokia Inc.'s Opening Brief in Support of their Motion to Remand.

[3] The cases cited by plaintiffs are readily distinguishable, as discussed *infra* at 13-14.

Seeking to evade federal jurisdiction, plaintiffs attempt to replead the claims in their remand motion by pretending that the relevant commitments apply to patents that QUALCOMM declared may be essential, rather than only to those patents that are essential. In doing so, plaintiffs ignore not only the plain language of the ETSI Policy and QUALCOMM written commitments upon which their claims are based, but also their own repeated statements to the contrary in their own Complaint. This Court should reject plaintiffs' attempt to recast their claims and deny their motion to remand.

## II. NATURE AND STAGE OF PROCEEDINGS

This case is a naked exercise in forum shopping. Plaintiffs essentially ask the Chancery Court to declare the validity of affirmative defenses they have raised or will raise in patent infringement suits filed against them by QUALCOMM in the United States District Court for the Southern District of California (San Diego Division), in the United Kingdom, and before the United States International Trade Commission. Plaintiffs ironically claim that their filing of another lawsuit covering issues already raised or to be raised in other cases somehow achieves judicial economy. Plaintiffs also boldly acknowledge that this lawsuit is also an attempt to avoid the laws of other countries – including European Union member states – in which they do business.

Over 9 months ago, in November 2005, QUALCOMM filed suit against plaintiffs in the United States District Court for the Southern District of California, seeking damages and injunctive relief for their willful infringement of 12 United States patents. Rather than seek expedited determination in that forum of their defenses based on their revisionist reading of QUALCOMM's FRAND obligations, plaintiffs immediately moved to dismiss or stay the action pending arbitration of their affirmative defenses, claiming QUALCOMM's claims had to be arbitrated based on a 2001 agreement between

Nokia and QUALCOMM. The district court denied that motion from the bench following a hearing in March 2006. Instead of moving ahead to obtain an adjudication of their FRAND-based defenses, plaintiffs again delayed, requesting that the district court stay the litigation pending appeal of the denial of their stay motion. The district court entered a stay pending appeal, and plaintiffs' appeal was argued to the U.S. Court of Appeals for the Federal Circuit last month.

Over 3 months ago, in May 2006, QUALCOMM filed a suit against plaintiff Nokia Corporation in the United Kingdom, seeking damages and injunctive relief for Nokia's infringement of two U.K. patents. In that jurisdiction, too, Nokia has pursued a strategy of delay rather than seeking adjudication of the merits, including its FRAND-based defenses. Shortly before its answer was due in the U.K. in mid-July (and after having secured from QUALCOMM an extension to answer), Nokia Corporation moved to dismiss or stay the proceeding, again based on the same arbitrability theories it advanced in the San Diego action. Nokia requested a late November hearing date on its July-filed motion. Although it is anticipated that a hearing will be held sooner than Nokia has requested, the motion has essentially stalled the U.K. action for three to four months.

Over two months ago, in June 2006, QUALCOMM filed a complaint with the U.S. International Trade Commission, and the ITC instituted an investigation concerning plaintiffs' infringement of six QUALCOMM United States patents by plaintiffs' products. Plaintiffs' answer in the ITC asserts the same affirmative defense they have asserted as their claims in this case – *i.e.*, that QUALCOMM's FRAND commitments to ETSI bar QUALCOMM from seeking exclusion of plaintiffs' infringing products.

Rather than seek a resolution of the matter, plaintiffs have sought to suspend or terminate the ITC proceeding – again on the basis of alleged arbitrability – as well.

By this action, plaintiffs seek to leapfrog the QUALCOMM actions they have stalled by asking the Delaware Court of Chancery to declare – in advance of any of the pending infringement cases – that plaintiffs' FRAND-based affirmative defense is valid and effective to prevent QUALCOMM from pursuing the injunctive relief it seeks in these earlier-filed actions. Plaintiffs cannot dispute that the relief they seek in this action is available from the Federal Court in San Diego.[4] To the contrary, plaintiffs conceded that such relief is available in the San Diego action before Vice Chancellor Strine during the August 11, 2006, hearing:

> MR. LORIG [counsel for plaintiffs]: We could seek the same injunction from the Federal Court we are seeking from this court, except for the fact that it's again not a federal question -
>
> THE COURT: It's not a Delaware law question either.
>
> MR. LORIG: It's a contract question, Your Honor. It's strictly contract.

---

[4] In contrast, at least some of the relief plaintiffs seek cannot issue from the Chancery Court. Among the relief plaintiffs seek is a declaration that QUALCOMM is "barred from seeking injunctive relief" and a permanent injunction "enjoin[ing] Qualcomm worldwide from seeking such injunctive relief related to patents Qualcomm has declared essential to any standard." (Compl., WHEREFORE clauses A and B). As plaintiffs should know, the Chancery Court is unable to grant such relief. *See Gen. Atomic Co. v. Feller*, 434 U.S. 12, 16 (1977) ("[T]he rights conferred by Congress to bring in personam actions in federal courts are not subject to abridgment by state-court injunctions, regardless of whether the federal litigation is pending or prospective."); *Donovan v. City of Dallas*, 377 U.S. 408 (1964); *Zeneca v. Monsanto*, C.A. No. 14683, 1996 WL 104254, at *4 n.3 (Del. Ch. Mar. 7, 1996) (Ex. 2) (V.C. Jacobs acknowledging the well-established holding from *Donovan* that "a state court is without power to enjoin a litigant from litigating a claim in federal court" and noting that "[t]he same reasoning would also arguably prohibit a state court from depriving a litigant of its right to pursue federal administrative remedies conferred by Congress."); *Paul N. Gardner Defined Plan Trust v. Draper*, C.A. No. 12825-NC, 1993 WL 125517, at *4 (Del. Ch. Apr. 8, 1993) (Ex. 3); *cf. Maldonado v. Flynn*, C.A. No. 4800, 1979 WL 4632, at *3 (Del. Ch. Dec. 14, 1979) (Ex. 4) (holding that it was a violation of Court of Chancery Rule 11 to file a motion to enjoin a defendant from proceeding in federal court).

THE COURT: What I'm saying is, you would have every right, given that they brought you into Federal Court, for you now to raise this as a counterclaim and an affirmative defense and seek an injunction. It would not be a jurisdictional problem on the part of the Federal Court.

MR. LORIG: It wouldn't be, except that the case is stayed pending arbitration. (Court of Chancery Hr. Tr. at 34:21 to 35:12.[5])[6]

Nokia's counsel then suggested that San Diego was not a suitable forum because

the presiding judge there (the Honorable Rudi M. Brewster) had announced his

retirement. When pressed by Vice Chancellor Strine, however, plaintiffs were forced to

candidly admit that this action was brought in Delaware because they prefer this forum to

San Diego:

THE COURT: ... And one of the responsible trade-offs might be to go to Judge Brewster and say, "We're going to put all this in the U.S. District Court. Your Honor, you're a great judge. You had a great career. You're leaving next September. Our time frame is something else. Let's get it reassigned mutually to somebody who can handle it." The parties stipulate to expedite this and have this be the case that goes forward, put all your claims before him and go. That sounds like a fairly – you know, that sounds like you would all look like pretty sensible business people and lawyers if you did that.

MR. LORIG: May I respond? That would be as acceptable I think as a suggestion to QUALCOMM. We could litigate this in a Helsinki court. I think the whole advantage of being here is, one, you can get something resolved quickly in the Delaware Chancery Court; two, you have a neutral forum; three, it's a place where companies from around the world know they're going to get a fair, neutral -- . (Court of Chancery Hr. Tr. at 40:24 to 42:19.)

---

[5] Citations in the form "Court of Chancery Hr. Tr. at __" are to the transcript of the Scheduling Conference in this case held before Vice Chancellor Strine on August 11, 2006, attached hereto as Exhibit 5.

[6] Plaintiffs' reference to the stay is ironic at best. The San Diego court entered the stay at plaintiffs' request, and plaintiffs can seek its lifting immediately if they so choose.

There is no basis for plaintiffs' implication that the Delaware Chancery Court would be somehow more "fair" or "neutral," and this is simply an illegitimate basis for evading the jurisdiction of the San Diego federal court.

QUALCOMM timely removed this case to this Court on August 16, 2006. That same day, QUALCOMM filed a motion to transfer this case to San Diego, where it properly belongs.

## III. STATEMENT OF FACTS

Plaintiffs claim that QUALCOMM has breached alleged contractual obligations by seeking injunctive relief against plaintiffs' further willful infringement of QUALCOMM's patents. (Pls. Br. at 4.) The source of these alleged contractual commitments is the ETSI IPR[7] Policy and QUALCOMM's written commitments to ETSI. (*See* Pls. Br. at 4; Compl. ¶¶ 22-24, 28.)

Tellingly, plaintiffs avoid reciting in their brief the terms of the policy and written commitments upon which their claims are based. Clause 6.1 of the ETSI IPR policy provides that:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR .... (Compl. ¶ 24 (quoting ETSI IPR Policy cl. 6.1) (ellipses in original).)[8]

---

[7] "IPR" is defined as "any intellectual property right conferred by statute law including applications therefor other than trademarks." (ETSI IPR Policy cl. 15.7, available at http:www.etsi.org/legal/documents/ETSI_IPRPolicy.pdf (visited Aug. 23, 2006).)

[8] Terms in the policy that are written in capital letters are defined in clause 15. (*See* ETSI IPR Policy cl. 2.)

Thus, on its face, the ETSI IPR policy addresses a commitment to offer licenses on fair, reasonable and non-discriminatory terms only as to essential patents.

In contrast, the ETSI IPR Policy requires members to make "reasonable endeavors" to disclose not only patents that are essential to a standard, but also those patents that "might be" essential:

> [E]ach MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted. (Compl. ¶ 22 (quoting ETSI IPR Policy cl. 4.1) (emphasis added).)

Consistent with these distinct requirements, the form ETSI uses to record licensing commitments related to patents provides that the declarant is identifying patents that "may be considered" essential, but commits to provide licenses on FRAND terms as to only those patents that actually are essential:

> The SIGNATORY has notified ETSI that it is the proprietor of the IPRs listed in Annex 2 and has informed ETSI that it believes that the IPRs may be considered ESSENTIAL to the Standards listed above.
>
> The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL. (ETSI IPR Information Statement and Licensing Declaration Forms, annex 1, available at http://www.etsi.org/legal/IPR_database/IPRforms-V4.doc (visited Aug. 22, 2006) (emphasis added).)

Plaintiffs concede throughout their complaint that the ETSI FRAND commitment applies only to essential patents. In the very first paragraph, plaintiffs explain that QUALCOMM induced ETSI "to incorporate Qualcomm's patented technology into industry standards for cellular phone products and equipment by contractually agreeing to

license those patents on FRAND terms." (Compl. ¶ 1 (emphasis added).) Only essential patents are "incorporated" into a standard. Moreover, plaintiffs repeatedly identify the patents that have been "licensed" as the patents essential to the relevant standard. (*See id* ¶ 10 ("each company has licensed, by means of declarations to ETSI, its essential patents"); ¶ 11 (referring to "Qualcomm's undertaking to license its essential patents"); ¶ 13 ("SSOs demand that their members license patents that are essential to any standard on FRAND terms"); ¶ 14 (stating that SSOs obligate "patent holders to license their essential patents on FRAND terms"); ¶ 15 ("If members do not agree to license their essential patents on FRAND terms, SSOs look to alternative technologies where patent clearance is available.") (emphases added).) Indeed, under the heading "The FRAND Contracts" on page 6 of the Complaint, plaintiffs describe the alleged contracts at issue in this case as follows:

> As set forth below, Qualcomm has entered into contractual agreements with ETSI and ETSI's members, including Nokia, that QUALCOMM will license on FRAND terms any of its patents that are essential to the GSM standard or its third-generation successor, Universal Mobile Telephone System ("UMTS"). (Compl. ¶ 19 (emphasis added).)

With respect to QUALCOMM's written commitments, plaintiffs allege that, consistent with the ETSI IPR policy, QUALCOMM provided a commitment to ETSI that was limited to essential patents:

> On June 25, 1999, Qualcomm submitted a letter to ETSI stating: 'Qualcomm hereby commits . . . to license its essential patents for each single CDMA standard or any of its modes [including UMTS] on a fair and reasonable basis free from unfair discrimination.' (Compl. ¶ 28 (alterations in original, emphasis added).)

Further, although plaintiffs refer to QUALCOMM's other relevant declarations without quoting them (*see* Compl. ¶¶ 21, 26), plaintiffs submitted the declarations relevant to the

San Diego action to the San Diego court. (*See* Danzig Decl. at Ex. D[9] (Ex. 6).) Those declarations all contain the language from the ETSI declaration form providing that QUALCOMM's FRAND commitment applies only "to the extent that the IPRs remain ESSENTIAL." (*Id.*)

The ETSI IPR Policy contains the following definition of "essential":

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. (ETSI IPR Policy cl. 15.6 (quoted in Compl. ¶ 23) (emphasis added).)[10]

Thus, a determination of whether a particular patent is essential to a particular standard necessarily requires an analysis of whether it is possible to practice the standard without infringing the patent.

## IV. ARGUMENT

Plaintiffs claim that "Qualcomm's pursuit of injunctions in spite of its agreement that its only remedy is a FRAND royalty constitutes a breach of its contractual obligation." (Compl. ¶ 55; *see also* Pls. Br. at 4.) To prove this claim with respect to the San Diego and ITC actions, plaintiffs must show, among other things, that the patents in those actions are patents as to which QUALCOMM has given a FRAND commitment. As shown above, however, QUALCOMM has given such commitments only "to the

---

[9] Citations in the form "Danzig Decl. at Ex. __" are to the exhibits to the Declaration of Micha Sanzig in Support of Defendants' Motion to Stay Pursuant to 28 U.S.C. § 1659(a), filed in QUALCOMM Inc. v. Nokia Corp., No. 05-CV-2063B (BLM) (S.D. Cal.) and dated August 11, 2006, attached hereto in excerpted form as Exhibit 6.

[10] As mentioned, "IPR" is defined as "any intellectual property right conferred by statute law including applications therefor other than trademarks." (ETSI IPR Policy cl. 15.7.)

extent the IPRs remain ESSENTIAL." Thus, plaintiffs will have to show that the patents at issue are essential to the relevant standard – that is, that it is not possible to practice the relevant standard without infringing the patents. For this reason, patent law is a necessary element of plaintiffs' breach of contract action.

This case is on all fours with *U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1372 (Fed. Cir. 2000). In that case, as here, plaintiffs asserted a state-law breach of contract claim. The contract at issue was an exclusive license, and the licensee claimed that the licensor sold products covered by the licensed patents in contravention of the license's exclusivity provision. *Id.* at 1372. The Federal Circuit held that to establish a breach of the exclusivity provision, the plaintiff-licensee would have to show that products sold by the defendant-licensor were covered by the licensed patents. *Id.* at 1372. That determination necessarily required an inquiry into whether defendant's products infringed the patents at issue. *See id.* Thus, the court held that "patent law is a necessary element of U.S. Valve's breach of contract action," and therefore the case arose under the patent laws. *Id.* In so holding, the court agreed with the Court of Appeals for the Seventh Circuit, which had transferred the appeal to the Federal Circuit. *See id.* at 1371.

A district court applied *U.S. Valves* in the context of a motion to remand in *Highland Supply Co. v. Klerk's Flexible Packaging, B.V.*, No. 05-CV-482-DRL, 2005 WL 3534211 (S.D. Ill. Dec. 21, 2005). (Ex. 7) *Highland Supply* involved the removal of a case that, like this one, involved a claim for breach of contract and no diversity. *Id.* at *2. The plaintiffs argued – just as plaintiffs argue here – that removal was improper. *Id.* The defendant argued that resolution of the breach of contract claim required an inquiry

under the patent laws, because liability turned on whether its products were "covered" by a U.S. patent. *Id.* at 3.

The *Highland Supply* court agreed with the defendant and denied the motion to remand. The court reasoned that:

> Here, as in *U.S. Valves*, Plaintiffs' state-law breach-of-contract claims have necessary patent-law components. That is, in order to prevail on their theory that Defendant breached the 1998 Agreement by manufacturing, selling, developing, and/or improving products "covered" by the '938 patent, Plaintiffs will need to show that the products in question relate to — or were "covered" by — that patent. Further, in determining whether Plaintiffs have made the requisite showings, a court will need to closely scrutinize both the '938 patent and the products manufactured by Defendant to determine, through a potentially fact-intensive and technical inquiry, whether these products constitute developments, innovations, or improvements on the patent. This inquiry – necessary to the success of Plaintiffs' claims – raises a substantial issue of federal patent law under *U.S. Valves*. *Id.* at *4.

Notably, the court also held that the fact that plaintiffs were seeking injunctive relief that could be granted only upon a finding of breach, where the determination of breach involved deciding whether a patent covered the relevant products, also invoked federal jurisdiction under *U.S. Valves* and 28 U.S.C. § 1338(a). *Id.*

This case falls squarely within the rule of *U.S. Valves* and *Highland Supply*. To prove that QUALCOMM's requests for exclusion in the ITC and for an injunction in San Diego constituted a breach of contract, plaintiffs must show that the patents in those actions are essential patents. That will require a "fact-intensive and technical inquiry," to construe the patents' claims, determine their scope, and then determine whether it is possible to practice the relevant standard without infringing those patents. *See id.* Moreover, the only way for the court to grant the injunctive relief sought by plaintiffs – an order prohibiting QUALCOMM from seeking an injunction in San Diego or from proceeding in the ITC – is for the court to first find that breach. Thus, an inquiry under

the patent laws – construction and application of QUALCOMM's patents to the relevant standard – is "necessary to the success of" plaintiffs' claims, and the claims therefore arise under those laws. *Id.*; *see also Kleinerman v. Luxtron Corp.*, 107 F. Supp. 2d 122, 124 (D. Mass. 2000) (denying motion to remand because determination of breach of license agreement required inquiry into infringement); *Regents of the Univ. of Minn. v. Glaxo Wellcome, Inc.*, 58 F. Supp. 2d 1036, 1038 (D. Minn. 1999) (denying motion to remand because "[d]etermining whether declaratory relief is warranted in this case requires an analysis of whether defendant infringed the Vince patents, as infringement is a necessary precursor to a finding that defendant has breached the parties' license agreement").

Plaintiffs' attempt to evade the rule of *U.S. Valves* by pretending that the relevant QUALCOMM commitments apply to declared patents, rather than essential patents, fails. As shown in Part III, *supra*, plaintiffs admit repeatedly in their complaint that the relevant commitments pertain only to <u>essential</u> patents. (*See* Compl. ¶¶ 1, 10, 11, 13, 14, 15, 19, 22, 24, 25, 28, 29, 32, 33, 39, 46, 60, 70). This Court should not permit plaintiffs to run away from these admissions simply because they now find them inconvenient.

Moreover, although plaintiffs attempted to obscure the language of QUALCOMM's actual commitments with respect to patents at issue in San Diego by failing to quote those commitments in the complaint, this Court may consider that language on this motion. It is well-settled that, on a motion to dismiss, courts are not bound by the descriptions of the contractual terms asserted by the plaintiff. To the contrary, courts may consider the clear terms of the documents allegedly forming the contract as part of plaintiffs' well-pleaded claims. *See Pension Benefit Guar. Corp. v.*

*White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993); *Midland Food Servs., LLC v. Castle Hill Holdings V, LLC*, 792 A.2d 920, 925 n.5 (Del. Ch. 1999) (Strine, V.C.). As Vice Chancellor Strine put it, "[t]o hold otherwise would be to encourage the filing of misleading complaints that strategically omit crucial information." *Id.* A fortiori, in deciding a motion to remand where jurisdiction depends on the terms of a contract, the Court may properly consider the terms of the contract even if it was not attached to the complaint. *See, e.g.*, *Christie v. Public Serv. Elec. and Gas Co.*, No. 04-5978, 2006 WL 462588 , at *6 n.2 (D. N.J. Feb. 24, 2006). (Ex. 8) As shown in Part III, *supra*, the terms of the ETSI IPR policy and written QUALCOMM commitments upon which plaintiffs' claims depend unambiguously provide that a FRAND commitment applies only to those patents that are actually essential. *Cf. Kleinerman*, 107 F. Supp. at 123-24 ("[A] plaintiff may not, by the expedient of artful pleading, defeat a defendant's legitimate right to a federal forum.")

All of plaintiffs' arguments depend on the false premise that the commitments at issue apply to declared, rather than essential, patents. Arguing from this false premise, plaintiffs attempt to analogize this case to cases where the subject matter of a relevant contract involved patents, but resolution of the claims did not involve any issue of patent law. For example, in *DML Assocs., Inc. v. Mattel, Inc.*, C.A. No. 03-128, 2003 WL 1798559 (D. Del. Apr. 7, 2003) (Ex. 9) (cited in Pls. Br. at 9), the court found that "patent infringement is not a necessary element to the plaintiffs' claims because the License Agreement applies even in the event no patents issued." *Id.* at *3. In *Beghin-Say Int'l, Inc. v. Ole-Bendt Rasmussen*, 733 F.2d 1568 (Fed. Cir. 1984) (cited in Pls. Br. at 1, 7, 10), the Federal Circuit found no federal jurisdiction because "[t]he sole question raised

by the present complaint is whether the involved contracts should be interpreted as having conveyed title to two then non-existent U.S. patent applications" and "[n]o Act of Congress relating to patents within the meaning of 28 U.S.C. § 1338(a) spells out criteria for determining what does or does not constitute a conveyance by contract." *Id* at 1571. These cases, and the other, similar cases cited by plaintiffs are inapposite.[11]

Here, contrary to plaintiffs' suggestion, the issues of patent law are hardly "ancillary" (Pls. Br. at 9), but rather go to the very core of plaintiffs' claims. The patent infringement actions brought by QUALCOMM in San Diego and in the ITC cannot possibly be breaches of the alleged contracts unless the patents at issue in those cases are, in fact, essential to the relevant ETSI standard – that is, unless non-infringing alternatives do not exist. This determination cannot be made without an in-depth application of patent law. Moreover, the issue here is infringement (of the relevant patents by

---

[11] *See Ballard Med. Prods. v. Wright*, 823 F.2d 527, 530 (Fed. Cir. 1987) (appeal of decision confirming arbitration award did not arise under the patent laws where alleged patent issues were not "raised in the pleadings," but were "injected during the course of" the arbitration); *Consol. World Housewares, Inc. v. Finkle*, 831 F.2d 261, 265 (Fed. Cir. 1987) (no jurisdiction to determine the relevant patent issue – inventorship – because PTO has exclusive jurisdiction to conduct interferences; no other patent issue relevant to potential contract dispute); *Uncommon USA, Inc. v. Wiese*, No. 05-975, 2005 WL 2000178, at *3 (D. Minn. Aug. 19, 2005) (Ex. 10) (finding that patent law was not "essential" to the interpretation of the contractual terms "related" and "arising from" as applied to patents because the meaning of those terms was "an issue of ordinary state law contract interpretation"); *Gupta v. Avanta Orthopaedics, Inc.*, No. 03CV-617-S, 2005 WL 1711970, at *3 (W.D. Ky. July 20, 2005) (Ex. 11) (remanding case because the sole alleged issue of patent law – inventorship – was not in issue; the issue instead was whether the defendant has the contractual right to seek a patent that named the plaintiff as an inventor); *Commercial Sales Network v. Sadler-Cisar, Inc.*, 755 F. Supp. 756, 758-69 (N.D. Oh. 1991) (case remanded where defendants "failed to make any meaningful showing that patent law issues are more than incidentally implicated by Plaintiff's complaint"); *Licursi v. Jamison Plastic Corp.*, No. 98-5262, 1998 WL 808542, at *4 (E.D. Pa. Nov. 20, 1998) (Ex. 12) (remanding replevin action where "the precise conclusion reached by the state court will determine only who is legally entitled to possess certain items of personal property" which would not "necessarily resolve a substantial question of federal patent law").

practicing the relevant standard), and infringement, unlike ownership, conveyance and other similar issues in the cases cited by plaintiffs, has been expressly held to be a "substantial issue of federal patent law." *U.S. Valves*, 212 F.3d at 1372.

Plaintiffs have misused a stay granted by a federal district court in San Diego to attempt to put the cart before the horse by having their defenses heard before QUALCOMM's pre-existing claims, in what they believe will be a more favorable forum. This misuse of a declaratory judgment action to engage in blatant forum shopping is itself "a consideration favoring retention of federal jurisdiction." *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1114-15 (9th Cir. 2001). This Court should promptly deny plaintiffs' motion, take up the issue of transfer, and send this case to San Diego, where these issues first arose.

## V. CONCLUSION

For all the foregoing reasons, plaintiffs' motion to remand should be denied.

POTTER ANDERSON & CORROON LLP

By: /s/ *Richard L. Horwitz*
Richard L. Horwitz (#2246)
Matthew E. Fischer (#3092)
Kenneth L. Dorsney (#3726)
Hercules Plaza, 6th Floor
1313 N. Market Street, P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
rhorwitz@potteranderson.com
mfischer@potteranderson.com
kdorsney@potteranderson.com

Attorneys for Defendant
*QUALCOMM Incorporated*

OF COUNSEL:

Evan R. Chesler
Richard J. Stark
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: August 23, 2006
747442/30592

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, Richard L. Horwitz, hereby certify that on August 23, 2006, the foregoing document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading:

Lisa A. Schmidt
Jeffrey Moyer
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE 19899

By: */s/ Richard L. Horwitz*

Richard L. Horwitz
Matthew E. Fischer
Kenneth L. Dorsney
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
mfischer@potteranderson.com
kdorsney@potteranderson.com

746337

# EXHIBIT 1

EFiled: Aug 9 2006 9:53AM EDT
Transaction ID 12021331

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

NOKIA CORPORATION and NOKIA INC.,

Plaintiffs,

v.

QUALCOMM INC.,

Defendant.

C.A. No. 2330

## COMPLAINT

Plaintiffs Nokia Corporation and Nokia Inc. (collectively, "Nokia"), by and through their undersigned counsel, allege the following as and for their Complaint against defendant Qualcomm Inc. ("Qualcomm"):

## NATURE OF THE ACTION

1. Nokia seeks declaratory relief and specific performance to enforce the terms of contracts in which Qualcomm, a Delaware corporation, has licensed Nokia to practice Qualcomm essential patents on fair, reasonable, and non-discriminatory terms ("FRAND" terms). As hereinafter alleged, Qualcomm has induced various standard-setting organizations ("SSOs"), including the European Telecommunications Standardization Institute ("ETSI"), to incorporate Qualcomm's patented technology into industry standards for cellular phone products and equipment by contractually agreeing to license those patents on FRAND terms. However, Qualcomm has breached its contractual obligations by demanding a royalty rate that exceeds FRAND terms and by threatening to enjoin Nokia from manufacturing or selling products that Qualcomm alleges practice the licensed essential patents unless Qualcomm's demands for unfair and unreasonable royalties are

accepted. Qualcomm has further breached its contractual obligations by refusing to negotiate FRAND royalty rates in good faith.

2.     Nokia seeks a judicial declaration establishing that Qualcomm's FRAND commitments constitute binding and enforceable contractual obligations licensing its declared-essential patents to Nokia on FRAND terms, which includes a FRAND royalty, and setting forth the method by which the FRAND royalty is to be calculated.

3.     In addition, Nokia seeks a judicial declaration that, by contracting to license its declared-essential patents to Nokia on FRAND terms, Qualcomm has waived the right to seek injunctive relief to restrain the use of those declared-essential patents. In the event of a dispute between the parties (including the filing of any infringement action in any country), Qualcomm's remedy is limited to recovery of a FRAND royalty as determined by a court.

4.     Accordingly, Nokia seeks an order enjoining Qualcomm worldwide from seeking an injunction or an exclusionary order as a remedy for alleged infringement of any declared-essential patents which it has contractually agreed to license on FRAND terms.

5.     Finally, Nokia seeks an order compelling specific performance requiring that Qualcomm participate in a good faith negotiation on the amount of a FRAND royalty, recognizing the principles that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization, and such other factors as the court deems fair and proper under the circumstances.

PARTIES AND JURISDICTION

6. Plaintiff Nokia Corporation is a corporation organized under the laws of Finland, with its principal place of business located in Espoo, Finland.

7. Plaintiff Nokia Inc. is a United States subsidiary of Nokia Corporation. Nokia Inc. is a corporation organized under the laws of the State of Delaware, with its headquarters located in Irving, Texas. Nokia Corporation and Nokia Inc. are collectively referred to herein as "Nokia."

8. Nokia is a world leader in the field of mobile communications. Nokia's primary line of business is the manufacture and sale of cellular telephone handsets. Nokia also manufactures and sells infrastructure used in cellular telephone networks, and owns substantial intellectual property rights in cellular telephone technologies.

9. Defendant Qualcomm Inc. ("Qualcomm") is a corporation organized under the laws of Delaware. One of Qualcomm's business units, called the Technology Licensing Segment, or "QTL," licenses intellectual property rights in cellular telephone technology. Qualcomm also manufactures and sells chipsets for use in cellular telephones through a separate business unit called the CDMA Technologies Segment, or "QCT."

10. Both Qualcomm and Nokia are members of a European SSO, ETSI, which has standardized the technology needed for cellular telephones. In accordance with the terms of their agreement with ETSI (described further below), each company has licensed, by means of declarations to ETSI, its essential patents to the other on FRAND terms

11. ETSI's Rules of Procedure provide that any dispute regarding the interpretation or application of ETSI policies must be resolved in the national courts of the member parties, applying French law. Under French law, Qualcomm's undertaking to license its essential patents on FRAND terms creates a binding and enforceable license agreement between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. Additionally, Qualcomm's contractual obligation

includes a duty to negotiate in good faith to determine a FRAND royalty rate. Under ETSI rules, Nokia is entitled to enforce that contract against Qualcomm in this Court because Qualcomm is a Delaware corporation.

## DEVELOPMENT OF CELLULAR TELEPHONE TECHNOLOGY STANDARDS

12. For a cellular telephone to work, it must be able to transmit and receive radio signals to and from cellular transmitting towers, and be able to maintain its signal as it is passed from one tower to the next. All components of a wireless system must be able to interact with each other seamlessly, regardless which company or companies manufacture the various components. This includes the transmitting towers, the switches, the telephones, the chipsets that allow the telephones to communicate with the towers, and the chipsets that allow the towers to receive and transmit data to the switches for retransmission to the landline network or other cellular networks and cellular telephones. To meet these requirements, all components in a single cellular system must be "interoperable" and work effectively and efficiently with all other components.

13. In order to ensure that components from different companies can interact with one another and that products can be brought to the marketplace expeditiously, wireless carriers, telephone manufacturers, and chipset manufacturers must follow a common set of industry standards for wireless communication technology. Thus, for decades, cellular service providers and cellular product manufacturers have been members of SSOs that exist to create a common set of standards that all members can follow. In return, the SSOs demand that their members license patents that are essential to any standard on FRAND terms, rather than use the threat of injunction to exploit the existence of the standard to extort super-monopoly royalties.

14. Once a given standard has been selected, the patents essential to that standard gain value because competing technologies are effectively eliminated from the marketplace. The technology monopoly granted to essential patent holders results in the establishment of a significant

base of royalty payers and insures a revenue stream to essential patent holders. Once capital investments (on the order of billions of dollars) are made to comply with the standard, cellular equipment manufacturers and network service providers are locked into the technology and into paying royalties to holders of essential patents. This lock-in confers upon patent holders the ability, if unrestrained, to extort super-monopoly royalties from prospective licensees using the threat of lawsuit and injunction. SSOs protect their members and the public from such opportunistic behavior by obligating patent holders to license their essential patents on FRAND terms. This obligation prevents the patent holder from appropriating for itself (rather than consumers) the value of having an industry standard.

15.    In simple terms, the standard-setting process involves: (1) an evaluation of competing technologies to determine which best suits the market need; (2) a patent clearance process where the SSO's members unequivocally agree in writing that any patent that is essential to practice the standard is licensed to all on FRAND terms; and (3) the approval and adoption of the standard. The patent clearance process is always completed before the standard is adopted and implemented to insure that no member may use its patents to impede competition (*i.e.*, charge exorbitant royalty rates for patents that must be used by all market participants because they are essential to practice the standard) or exclude participants from the marketplace (*i.e.*, by using injunctions and exclusionary tactics to block a patent's use). If members do not agree to their license essential patents on FRAND terms, SSOs look to alternative technologies where patent clearance is available.

16.    Cellular telephone standards have evolved through distinct "generations" as consumers have demanded additional features and technology owners have developed new innovations. The earliest cellular telephones operated on analog technology and allowed only voice transmission and very slow transmission of data over analog cellular airwaves. These early analog

systems are typically referred to as first-generation ("1G") technology. 1G technology was characterized by inherent capacity limitations, minimal and slow data transfer capabilities, low security, inconsistent service levels, and significant power consumption.

17.    Consumers' increased demand for cellular service and for added performance drove the development of a second generation of cellular telephone technology ("2G"). 2G telephones, which are based on digital technology, provide significantly increased voice and data capacity and also support additional functions, such as paging and e-mail. 2G technology also offers greater privacy, greater fraud protection, and lower prices as compared to 1G technology. Most cellular telephones in use today are based on 2G technology standards.

18.    The three principal 2G standards in use today are called Global System for Mobility ("GSM"), Time Division Multiple Access ("TDMA"), and Code Division Multiple Access ("CDMA"). The technical parameters and specifications of each 2G technology were reviewed and approved by various SSOs. The three technologies are based on different underlying air interface and transmission regimes. Thus, as a general proposition, GSM-based hardware components will not work on a CDMA or TDMA system, TDMA components will not work on a GSM or CDMA system, and CDMA components will not work on a GSM or TDMA system. As more fully described below, a third generation of wireless technology ("3G"), which will allow significantly increased data speed and capacity, is currently being deployed and is one of the subjects of this action.

## THE FRAND CONTRACTS

19.    As set forth below, Qualcomm has entered into contractual agreements with ETSI and ETSI's members, including Nokia, that Qualcomm will license on FRAND terms any of its patents that are essential to the GSM standard or its third-generation successor, Universal Mobile Telephone System ("UMTS").

20.     ETSI is a non-profit European SSO headquartered in France. It was under ETSI's auspices that the GSM technology standard was developed, reviewed, and approved.

21.     Qualcomm is a member of ETSI because its affiliates Qualcomm Europe S.A.R.L. and Qualcomm UK Ltd are members and ETSI defines "member" to include affiliates. Thus, as described below, Qualcomm itself filed FRAND undertakings with ETSI. Nokia is also a member of ETSI.

22.     Like other SSOs, ETSI requires its members to identify all patents they hold that may be essential to compliance with a proposed technology standard—referred to as "essential patents"—before the standard is adopted. ETSI's Intellectual Property Rights ("IPR") Policy provides that "each MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 4.1. The purpose of this disclosure requirement is obvious: to avoid a "patent ambush" situation where a party that holds essential patents sits on the sidelines during the standard-setting process and then holds up industry participants for unexpected and unanticipated royalties for technology that is essential to practice the standard.

23.     ETSI's IPR Policy specifically defines an IPR as "essential" where "it is not possible on technical but not commercial grounds, taking into account normal technical practice and the state of art generally available at the time of standardization, to make, sell, lease, otherwise dispose of,

repair, use or operate equipment or methods which comply with a standard without infringing that IPR." ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 15.6.

24. ETSI also requests that patent holders license their essential patents to other parties on fair, reasonable, and non-discriminatory terms ("FRAND" terms). Article 6.1 of ETSI's IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR . . . .

25. In short, to avoid the problems of creating market power by adopting an industry standard, ETSI requires its members not only to disclose their essential patents, but agree to license those patents on FRAND terms. If a patent holder will not agree to license its declared patents on FRAND terms, ETSI can decide not to include that technology in an industry standard, and instead use a non-infringing alternative. See ETSI Rules of Procedure, Annex 6 (ETSI IPR Policy), ¶ 8. If the patent holder does agree to license its essential patents on FRAND terms, other companies in the industry can invest in and deploy the standard without concern that they will be enjoined from using the technology or be forced to pay an unreasonably high royalty for a patent that is essential to practice the standard.

26. Qualcomm violated its disclosure obligations to ETSI by waiting to declare certain Qualcomm patents as essential to GSM until the industry had made substantial investments in GSM technology. Indeed, Qualcomm did not declare any of its patents essential to GSM until many years after the standard had been set, and it has declared some as recently as this year. However, when Qualcomm did belatedly declare its patents essential to the GSM standard, it expressly agreed in writing to license those patents to all members of ETSI, including Nokia, on FRAND terms.

27.     In the late 1990s, ETSI began considering candidate technologies for the 3G UMTS standard that would have worldwide application.  ETSI and its members considered a number of solutions, including WTDMA (which was based on TDMA technology that did not infringe any known Qualcomm patents), WCDMA (which Qualcomm claimed included some of its patents), and CDMA 2000 (which Qualcomm claimed relied almost completely on its patents).  ETSI ultimately decided to adopt WCDMA technology as the 3G UMTS standard.

28.     At the outset of the ETSI standard-setting process, Qualcomm refused to license its patents on FRAND terms for 3G use.  Subsequently, however, on March 25, 1999, as part of the settlement of a lawsuit between Ericsson and Qualcomm involving cross-claims of patent infringement, Qualcomm finally agreed to license its WCDMA patents that were allegedly essential to the ETSI-proposed UMTS standard on FRAND terms to the rest of the industry.  On June 25, 1999, Qualcomm submitted a letter to ETSI stating: "Qualcomm hereby commits . . . to license its essential patents for each single CDMA standard or any of its of its modes [including UMTS] on a fair and reasonable basis free from unfair discrimination."  This promise provided ETSI members with the patent clearance required to make the huge capital investment that would lock them into a UMTS standard that included Qualcomm's WCDMA technology.

29.     The ability to use standard-essential technology without threat of a technology "monopolist" royalty rate or the threat of an injunction that would stop sales or operations is an important characteristic of the cell phone industry: once a wireless carrier elects to deploy an SSO-approved standard, switching to another standard may cost hundreds of millions if not billions of dollars and cause substantial disruption to consumers.  Thus, if Qualcomm had not agreed with ETSI to license its declared-essential WCDMA patents on FRAND terms, WTDMA or another technology

would have been selected in lieu of WCDMA. This underscores the importance of holding Qualcomm to its contractual FRAND obligation.

30. Under French law, Qualcomm's agreement to license its declared-essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members who use such patents, including Nokia. ETSI's Rules of Procedure provide that any dispute concerning the interpretation or application of ETSI policies must be resolved by the national courts of its members. Both Nokia Inc. and Qualcomm are Delaware corporations. Nokia is therefore entitled to apply to this Court to enforce and resolve the current dispute as to Qualcomm's contractual commitment to FRAND.

## A COMMITMENT TO FRAND NECESSARILY WAIVES ANY RIGHT TO INJUNCTIVE RELIEF

31. When Qualcomm contractually agreed in writing to license its declared-essential patents on FRAND terms, it granted irrevocable patent license rights to all other members of ETSI, and gave up the traditional patent holder's right to enjoin others from practicing the technology incorporated in those patents. The only remedy for the use of Qualcomm declared-essential patents is a FRAND royalty, to be determined *ex post* by a court in the event of a dispute between Qualcomm and the licensee.

32. Allowing a patent holder who has exchanged a FRAND commitment for the benefits of having patented technology included in a standard to seek injunctive relief would defeat the entire purpose of FRAND and the ETSI IPR Policy. As set forth above, the patent holder would be able to use the threat of injunction to extort royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would be forced to comply with unjustified royalty demands or risk losing their substantial investments in complying with the standard. If injunctions were to be allowed, essential patent users would be reluctant to invest in and deploy technologies until and

unless specific royalty terms were reached with every alleged essential patent holder. The public interest would also suffer because roll-out of standard-compliant products and new technologies would be delayed, defeating one of the key purposes of standard-setting (to promote swift implementation).

33. The delays and impediments imposed on the industry by the threat of injunctions prohibiting use of technologies deemed essential for new services would also contravene Articles 81 and 82 of the European Community Treaty, which, as detailed below, are designed to assure that conduct that eliminates competition from the marketplace (such as an SSO's choice of one technology over other candidate technologies as the standard) has an overall public welfare benefit (*i.e.*, passing the network benefits on to consumers rather than allowing patent owners appropriate the benefit for themselves by demanding excessive royalties). ETSI imposes FRAND obligations on its members specifically to preclude this kind of unequal *ex post* bargaining power.

**QUALCOMM HAS BREACHED ITS CONTRACTUAL OBLIGATION TO LICENSE ITS DECLARED-ESSENTIAL GSM AND UMTS PATENTS ON FRAND TERMS AND IS USING THE THREAT OF INJUNCTIONS TO EXTORT UNJUSTIFIED ROYALTIES IN VIOLATION OF THE TERMS OF ITS ETSI COMMITMENT**

34. Despite having made numerous FRAND commitments to ETSI in connection with GSM and UMTS patents that Qualcomm has declared essential to those standards, Qualcomm has refused to honor its contract to license its patents on FRAND terms. Instead, it has used litigation and the threat of injunction to attempt to extort exorbitant royalty rates from cellular telephone manufacturers.

35. To date, Qualcomm has filed three separate patent infringement suits against Nokia seeking injunctive or exclusionary relief for alleged infringement of patents allegedly essential for the GSM standard: one in the United States District Court for the Southern District of California (San Diego division), one in the United Kingdom, and one in the United States International Trade

Commission (ITC). In the proceeding before the ITC the only relief requested is injunctive in nature, excluding Nokia from importing products that Qualcomm contends infringe on patents it has declared essential to the ETSI GSM standard. These requests for injunctive relief are wholly inconsistent with Qualcomm's unequivocal contractual commitment to ETSI to license these patents to Nokia on FRAND terms.

36. Qualcomm has clearly indicated that additional injunction suits will follow. During Qualcomm's third-quarter 2006 earnings conference call with analysts, Qualcomm President Steve Altman asserted that in cases where Qualcomm patents are allegedly being infringed, "we would look and seek injunctions in a variety of markets . . . ." The current litigation and the assertions of future injunctive proceedings cause irreparable and immeasurable harm to Nokia by creating uncertainty regarding the ability of Nokia to continue to manufacture and sell GSM standard-compliant products.

37. Nokia is also justifiably concerned about the potential that Qualcomm may leverage its standards-granted technology monopoly to obtain unjustified injunctive relief in violation of Qualcomm's ETSI commitments in jurisdictions that will not afford Nokia adequate due process. In a number of European jurisdictions there are procedures available to plaintiffs to seek preliminary injunctions without giving defendants (such as Nokia) an opportunity to be heard at the time the injunction is being sought. The plaintiff may not even be under a duty in certain jurisdictions to give the court full and frank information concerning the case at that initial stage. A preliminary injunction may be granted without there being any consideration of equities, or of whether the patentee could be adequately compensated by damages alone. Furthermore, a preliminary injunction may be granted without any bond or undertaking being required from the patentee to pay for the damage caused to Nokia by a preliminary injunction that is later determined to have been

erroneously granted. To the extent that Qualcomm is permitted to seek such relief in violation of its ETSI contract, Nokia would suffer irreparable and immeasurable harm because it would never be able to adequately determine in financial terms the extent of Nokia damage.

38.    These concerns are not merely a theoretical possibility. Certain European courts have granted preliminary injunctions even where the patent concerned was relevant to an industry standard and the defendant had indicated a willingness to enter into a license. In Germany, for example, the court is required, under section 139, paragraph 1 of the German Patents Act, to grant permanent injunctive relief where infringement is found. And even though the court must weigh the interests of the parties at the preliminary injunction stage, this can be conducted *ex parte* and therefore Nokia would not have any opportunity to be heard. Similarly, in the Netherlands, the court is not obligated to take the balance of convenience into account and it rarely does so.

39.    Qualcomm's injunction strategy, in contravention of its FRAND commitments, is an attempt to give it leverage to demand royalty rates wholly out of proportion to the number or value of its patents essential to a particular standard. For example, Qualcomm has generally demanded the same royalty rate for its patents essential to its initial proprietary Common Air Interface CDMA technology (where, in practice, it holds close to 100% of the essential patents), as it demands for its patents essential to the IS-95 CDMA standard (where it holds some 80% of the essential patents), as it demands for the CDMA2000 family of standards (where it holds less than 50% of the essential patents), and as it demands for UMTS (where studies show it holds at most 20% of the essential patents). Moreover, on information and belief, Qualcomm owns less than 3% of the essential patents for GSM. Nevertheless, Qualcomm demands that many of its licensees cross-license Qualcomm (giving rights to the licensee's intellectual property rights not only to Qualcomm but also to Qualcomm's chipset customers) for their declared-essential patents, even where the licensee holds a

much larger portfolio of essential patents for the standard. These positions by Qualcomm do not comply with their contractual FRAND commitment to ETSI.

## QUALCOMM'S CONTRADICTORY STATEMENTS AND ACTIONS CONCERNING FRAND

40. Qualcomm has adopted multiple and conflicting views of its FRAND obligations. In a motion to dismiss antitrust and other claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its agreement to license its patents on FRAND terms is not legally enforceable.[1] Thus, according to Qualcomm, there is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance. In complaints filed before the International Trade Commission, the United States District Court for the Southern District of California, and an English court, Qualcomm has claimed that, despite its FRAND declarations (which constitute an irrevocable agreement to license its essential patents), it is entitled to an injunction if the initial terms it unilaterally offers are rejected. In negotiations with Nokia, Qualcomm has declared that, despite its contrary written commitments, unless it is paid a royalty that Nokia believes bears no relationship to a FRAND royalty, it will seek injunctions to bar Nokia from selling its products to consumers.

41. Under French law, the terms and enforceability of Qualcomm's contractual commitments must be interpreted, as far as possible, in a manner consistent with Articles 81 and 82 of the European Community Treaty, which prohibit anticompetitive conduct. Specifically, even apart from its FRAND commitments, Article 81 imposes a duty on Qualcomm to license its patents essential to standards on FRAND terms. Article 81(3) provides that, in order to comply with Article

[1] *See Broadcom Corp. v. Qualcomm Inc.*, Civ. A. No. 05-3350(MLC) (D.N.J.), Memorandum in Support of Defendant's Motion to Dismiss (filed Dec. 12, 2005), at 15 (arguing that Broadcom's action to enforce FRAND should be dismissed because FRAND is "susceptible of multiple interpretations" and does not have one universally accepted meaning).

81, an agreement of this kind must confer a fair share of resulting benefits on consumers and should not create the possibility of eliminating competition in respect of a substantial proportion of the products in question. SSO members would be able to deny a fair share of benefits to consumers, and substantially to eliminate competition in the instant context, if one or more of them could withhold licenses from downstream competitors, or make such licenses available only on excessively onerous terms. That is why, in order to comply with Article 81, the FRAND commitment must be effective to prevent such serious economic consequences. If an SSO member could retain all or most of the benefits of the standard and simultaneously refuse fair, reasonable, and non-discriminatory treatment to competitors that it particularly wanted to disadvantage (especially after prospective licensees had made large investments in the standard and were locked in), Article 81 would have no practical effect.

42.    In 2005, Ericsson, NEC, Texas Instruments, Broadcom, Panasonic, and Nokia asked the Commission of the European Communities Directorate-General Competition to investigate Qualcomm's anticompetitive conduct, under Articles 81 and 82, in the markets for CDMA and WCDMA cellular telephone technology and chipsets, including its failure to comply with FRAND obligations. In its May 16, 2006 brief to the European Commission, to attempt to avoid claims under Articles 81 and 82, Qualcomm made a number of critical admissions regarding FRAND, which contradict its public statements in the United States (including in the three patent infringement suits discussed above) that its FRAND commitments are unenforceable:

- "Fair Reasonable and Non-Discriminatory ('FRAND') obligations are part of a private agreement, a binding contract that is enforceable against each patent owner."

- "[T]he aim of FRAND is to ensure that whatever standard is developed remains available. A FRAND commitment is intended to prevent an outright refusal to license or the setting of royalty rates so high that they have the effect of preventing licensing . . . ."

- "In the case of dispute, it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."
- "A court procedure would involve an assessment of the number of truly essential patents necessary to practice a given standard or the appropriate royalty base or even the general business conditions prevailing for the given licensed technology."

43. Qualcomm's selective interpretations of its FRAND obligation that appear to be dependent upon Qualcomm's purpose in specific litigation would render FRAND meaningless and defeat the entire purpose of the ETSI's FRAND requirement. Because of these shifting, self-serving definitions, Nokia asks this court for an order defining the terms and conditions surrounding Qualcomm's FRAND commitment and for an order upholding and affirming Qualcomm's agreement to license patents declared essential on FRAND terms pursuant to its contract with ETSI. This courts intervention is required to stop Qualcomm from charging monopolistic prices to license its declared-essential patents.

**FIRST CLAIM FOR RELIEF**

**(Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*), and Injunctive Relief)**

44. Nokia repeats and realleges the allegations set forth in paragraphs 1-43 above as if set forth fully herein.

45. An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to whether Qualcomm can obtain injunctive relief in light of its contractual agreement to license its declared-essential patents on FRAND terms.

46. By entering into contracts with ETSI and ETSI's members to license its essential GSM and UMTS patents on FRAND terms, Qualcomm gave up any right to enjoin Nokia from the use of those patents. Pursuant to its FRAND declarations, Qualcomm granted an irrevocable license on FRAND terms to Nokia and all other members of ETSI and waived any right to seek injunctive

relief or an exclusionary order, which would bar Nokia from practicing those of Qualcomm's patents that Qualcomm has declared are essential in FRAND declarations submitted to ETSI.

47. Allowing Qualcomm to seek injunctive relief would defeat the purpose of the FRAND commitment. ETSI requests that patent holders agree to FRAND license terms to prevent them from using an SSO-enabled patent monopoly to extort excessive royalty rates after a technological standard has been approved. However, if Qualcomm were allowed to enjoin companies from using its patents, it could ignore its FRAND obligations with impunity, using the threat of injunction to obtain royalties that are neither fair, nor reasonable, nor non-discriminatory. Licensees would have no choice but to comply or risk losing their substantial investments in complying with the standard. Thus, injunctive relief would give patent holders exactly the kind of *ex post* bargaining power and super-monopoly profits that the FRAND undertaking was intended to prevent.

48. By agreeing in advance to accept a FRAND royalty for patents declared essential, Qualcomm has agreed that a FRAND royalty (as determined by a court in the event of a dispute) is adequate compensation for the use of its patents. Additionally, because the purpose of the FRAND commitment is to facilitate swift implementation of the standard for the benefit of consumers, a grant of injunctive relief barring practice of the standard would disserve the public interest

49. This controversy between Nokia and Qualcomm is real and adverse. In the Southern District of California case, ITC proceedings, and a proceeding in an English court, Qualcomm has sought injunctive relief against Nokia, which would bar Nokia from using patents on which Qualcomm, by virtue of its FRAND declaration, has already granted a license to Nokia. As noted above, upon information and belief, Qualcomm is likely soon to seek injunctive relief in lawsuits against Nokia in other European countries. Qualcomm's conduct in threatening injunctive relief

against the use of its GSM patents is in direct violation of ETSI policies and Qualcomm's own contractual commitment to FRAND.

50.    If Qualcomm is permitted to continue to wield the sword of an injunction threat, it may coerce Nokia into entering a license at a royalty rate that far exceeds the FRAND rate; Nokia would thereafter be contractually committed under a specific license agreement and would have no redress for Qualcomm's FRAND violation. Alternatively, if Nokia stands firm and refuses to pay a non-FRAND royalty, and if Qualcomm persuades some court in some jurisdiction to enjoin Nokia's manufacture of cell phones, Nokia's business will be substantially harmed.

51.    An additional problem arises from the fact that Qualcomm has filed, and is likely to file, injunctive actions in numerous jurisdictions in the United States and Europe. This multiplicity of actions poses a substantial risk that Nokia could be subject to inconsistent adjudications to the extent that some courts rule that Qualcomm's FRAND obligation precludes it from seeking injunctive relief, while other courts rule that Qualcomm is entitled to seek injunctive relief. This highlights the need for a single and prompt adjudication by this Court of the FRAND contractual obligations of Delaware citizen Qualcomm.

52.    Relatedly, if Qualcomm is permitted to pursue injunctions in multiple jurisdictions, and if Nokia is obligated to advance the FRAND defense in each such jurisdiction, Nokia will be forced to incur substantial litigation costs that, in jurisdictions following the American rule, are generally not compensable even if Nokia prevails. Again, a single and prompt adjudication of Qualcomm's right to seek injunctive relief avoids this problem.

53.    The issue involved in this controversy is ripe for judicial determination. Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by

the national courts of the member parties. Section 4.2 of ETSI's Guide on IPRs regarding Dispute Resolution states:

> ETSI Members should attempt to resolve any dispute related to the application of the IPR Policy bilaterally in a friendly manner. Should this fail, the Members concerned are invited to inform the ETSI GA in case a friendly mediation can be offered by other ETSI Members and/or the ETSI Secretariat. However, it should be noted that once an IPR (patent) has been granted, <u>in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes.</u>

In addition, Qualcomm's May 16, 2006 brief to the European Commission admits that "[i]n the case of dispute [regarding FRAND], it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."

54. Accordingly, Nokia seeks a declaratory judgment that Qualcomm is not entitled to injunctive or exclusionary relief for any alleged infringement of any GSM or UMTS patents that Qualcomm has declared essential and agreed to license on FRAND terms. Nokia further seeks a declaratory judgment that Qualcomm's sole remedy for any alleged infringement of such patents is limited to payment of a royalty on FRAND terms, as determined by a court if the parties cannot agree.

55. Qualcomm's pursuit of injunctions in spite of its agreement that its only remedy is a FRAND royalty constitutes a breach of its contractual obligation for which Nokia has no adequate remedy at law. Accordingly, Nokia seeks an order enjoining Qualcomm from pursuing an injunction or exclusionary order as a remedy for alleged infringement of any patent it has declared essential to ETSI.

## SECOND CLAIM FOR RELIEF

**(Declaratory Relief, under Delaware Declaratory Judgment Act (10 *Del. C.* § 6501 *et seq.*))**

56. Nokia repeats and realleges the allegations set forth in paragraphs 1-55 above as if set forth fully herein.

57. An actual and justiciable controversy has arisen and now exists between Nokia and Qualcomm with respect to the meaning of FRAND.

58. Pursuant to its contracts with ETSI, Qualcomm has agreed to license on FRAND terms any patents that Qualcomm has declared are essential to the GSM or UMTS standards.

59. Notwithstanding its FRAND commitments, Qualcomm has refused to offer a FRAND royalty rate to Nokia on any patents it has declared essential to the GSM standard. Further, Qualcomm has refused to offer Nokia a FRAND royalty rate for the use of its declared-essential UMTS patents after April 2007 (when Qualcomm's current agreement not to assert its UMTS patents against Nokia expires). Instead, Qualcomm has demanded that Nokia accept license terms that are neither fair, nor reasonable, nor non-discriminatory, backing its demands with the threat of injunction as discussed *supra*.

60. Under French law, Qualcomm's agreement to license its essential GSM and UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members, including Nokia. Nokia is therefore entitled to enforce Qualcomm's contractual commitment to FRAND.

61. Qualcomm contends that FRAND does not impose any specific and concrete obligations on the licensor with regard to the actual level of royalties (or any other terms and conditions for that matter). In its motion to dismiss claims filed against it by rival chipmaker Broadcom, Qualcomm has argued that the meaning of FRAND is so indefinite that its promise to license its patents on FRAND terms is not legally enforceable. Thus, according to Qualcomm, there

is no royalty rate high enough or license term onerous enough to violate FRAND because FRAND has no real substance.

62.    Qualcomm's empty characterization of FRAND cannot be correct.   In any given situation, evidence will be available to show that the terms "fair, reasonable, and non-discriminatory" are sufficiently certain to be capable of judicial interpretation and enforcement, and impose substantive limits on Qualcomm's ability to impose excessive royalty rates or other onerous terms in its patent licenses.  Qualcomm has violated these limits by refusing to license its patents to Nokia on FRAND terms.

63.    Qualcomm contends that, despite its FRAND obligation, it can charge a royalty as high as the fear of an injunction can create.  Nokia, on the other hand, contends that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

64.    This controversy between Nokia and Qualcomm is real and adverse.  Qualcomm has refused to offer Nokia a FRAND royalty rate for its declared-essential GSM patents, and has threatened to enjoin Nokia from using patents on which Nokia is contractually entitled to a FRAND license.  Qualcomm has also refused to negotiate a FRAND royalty rate for declared-essential UMTS patents for the period after April 2007.

65.    The issue involved in this controversy is ripe for judicial determination. Under ETSI rules, disputes regarding the application of ETSI's intellectual property policies must be resolved by the national courts of the member parties.  Section 4.2 of ETSI's Guide on IPRs regarding Dispute Resolution states:

> ETSI Members should attempt to resolve any dispute related to the application of the IPR Policy bilaterally in a friendly manner. Should this fail, the Members concerned are invited to inform the ETSI GA in case a friendly mediation can be offered by other ETSI Members and/or the ETSI Secretariat. However, it should be noted that once an IPR (patent) has been granted, <u>in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes</u>.

In addition, Qualcomm's May 16, 2006 brief to the European Commission, in an attempt to avoid liability under Article 81 and 82, acknowledges that "[i]n the case of dispute [regarding FRAND], it would be for a Court or similar authoritative body to resolve the particular disputes in the given situation."

66. Accordingly, Nokia seeks a declaratory judgment that Qualcomm's FRAND commitments constitute binding contractual obligations, and defining the principles by which a FRAND royalty must be calculated.

**THIRD CLAIM FOR RELIEF**

(Specific Performance)

67. Nokia repeats and realleges the allegations set forth in paragraphs 1-66 above as if set forth fully herein.

68. Qualcomm has declared numerous patents to be essential to the UMTS standard promulgated by ETSI.

69. In connection with its declarations to ETSI, Qualcomm has agreed to license each of its essential UMTS patents to all members of ETSI, including Nokia, on FRAND terms.

70. Under French law, Qualcomm's agreement to license its essential UMTS patents on FRAND terms is a binding and enforceable contract between Qualcomm, ETSI, and all ETSI members, including Nokia. Nokia is therefore entitled to enforce Qualcomm's contractual commitment to FRAND.

71. Notwithstanding its contractual obligations to ETSI and Nokia, Qualcomm has refused to negotiate a FRAND royalty rate for its UMTS patents for the period after April 2007.

72. Nokia has no adequate remedy at law for Qualcomm's breach of its contractual obligation to license its essential patents on FRAND terms or to negotiate a FRAND royalty rate in good faith.

73. Accordingly, Nokia is entitled to an order of specific performance ordering Qualcomm to participate in a good faith negotiation with Nokia for license of Qualcomm's essential UMTS patents on FRAND terms for the period after April 2007, in light of this Court's resolution of the dispute between the parties as to the method for determining a FRAND royalty.

## PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that this Court:

A. Adjudge and decree that, by virtue of its express and implied FRAND commitments, Qualcomm has waived any right to seek, or is otherwise barred from seeking injunctive relief, including an exclusion or cease-and-desist order by the ITC, to prevent Nokia from using technology encompassed by any patents which Qualcomm has declared essential to the GSM or UMTS standards established by ETSI;

B. Permanently enjoin Qualcomm worldwide from seeking such injunctive relief related to patents Qualcomm has declared essential to any standard;

C. Adjudge and decree that Qualcomm's commitment to license its essential GSM and UMTS patents on FRAND terms is a binding contractual obligation, enforceable by Nokia;

D. Order that a FRAND royalty must be based on the following factors: the number of actual essential patents owned by the patent holder relative to all patents actually essential to the standard, the cumulative royalty charged by all holders of essential patents, the existence of non-

infringing alternatives at the time a standard is adopted, the extent to which the patents could be exploited in the absence of standardization.

E. Order that Qualcomm specifically perform its contractual obligation to negotiate a FRAND royalty rate with Nokia for the period after April 2007 for any patents Qualcomm has declared essential to UMTS, in light of this Court's determination of the method for calculating FRAND terms; and

F. That Nokia have such other and further relief as this Court may deem just and proper.

Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

Attorneys for Plaintiffs
Nokia Corporation and Nokia Inc.

Of Counsel:

A. William Urquhart
Frederick A. Lorig
Patrick M. Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-254
Telephone: (213) 443-3000
Facsimile: (213) 443 3100

Rick Werder
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Dated: August 8, 2006

# EXHIBIT 2

Westlaw.

Not Reported in A.2d Page 1
Not Reported in A.2d, 1996 WL 104254 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
ZENECA, INC., a Delaware Corporation, Plaintiff,
v.
MONSANTO COMPANY, a Delaware Corporation, Defendant
**No. Civ. A. 14683.**

Submitted: March 4, 1996.
Decided: March 7, 1996.
Revised March 15, 1996.

Thomas P. Preston, David C. Weiss, and Linda J. Jennings of Duane, Morris & Heckscher, Wilmington, and Susan B. Schaffer of Zeneca Inc., Wilmington, for Plaintiff.
Charles S. Crompton Jr., Richard L. Horwitz, and John E. James of Potter, Anderson & Corroon, Wilmington, and David F. Snively of Monsanto Company, St. Louis, Missouri, for Defendant.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.

*1 Pending are two motions in this action for declaratory and injunctive relief brought by plaintiff Zeneca Inc. ("Zeneca") against the defendant, Monsanto Company ("Monsanto"). The action was commenced on November 3, 1995. Monsanto moved to dismiss the complaint (which sought only declaratory relief) on the grounds that (i) the complaint did not invoke this Court's equitable subject matter jurisdiction, and (ii) Zeneca's filing this action in this Court violated the "forum selection" clause of a 1988 settlement agreement between Monsanto and Zeneca's corporate predecessor. In response, Zeneca moved for leave to amend its complaint to assert a claim for injunctive relief. Monsanto opposes that motion on several grounds.

For the reasons now discussed, Zeneca's motion for leave to amend will be denied and Monsanto's motion to dismiss this action will be granted.

I. *FACTUAL BACKGROUND*

A. *The Settlement Agreement*

Zeneca's complaint is based upon a contract, dated March 31, 1988, and entitled "U.S. Settlement Agreement between Monsanto Company and Imperial Chemical Industries PLC and ICI Americas, Inc., Concerning Glyphosate Patent Litigation." That contract will be referred to as the "Settlement Agreement". FN1

FN1. Zeneca is the corporate successor to ICI Americas, Inc. ("ICI Inc."), a Delaware corporation. In 1993, ICI Inc.'s British corporate parent, Imperial Chemical Industries PLC ("ICI PLC"), reorganized its bioscience and agricultural chemicals businesses into a British company called Zeneca Limited ("Zeneca, Ltd."). ICI Inc. became a subsidiary of Zeneca, Ltd. and changed its name to Zeneca Inc., the plaintiff in this action (herein referred to as "Zeneca"). Zeneca now seeks to enforce the Settlement Agreement as a substitute party to the agreement in place of ICI, Inc. In addition, Zeneca acknowledges that Zeneca, Ltd. now stands in place of ICI PLC as a party to the Settlement Agreement. (Plaintiff's Reply Brief at pp. 20-21). Throughout this Opinion, references to the parties to the Settlement Agreement, reflect these substitutions.

The Settlement Agreement is a complex contractual undertaking that resolved various disputes, including pending patent infringement litigation that concerned whether certain glyphosate compounds and glyphosate pesticides (produced by a firm that Zeneca had acquired) infringed Monsanto's patented interests relating to the use of glyphosate in Monsanto's patented products. As part of the settlement, the parties contracted that Zeneca would be obligated to purchase from Monsanto its total requirements of glyphosate acid for "all Glyphosate pesticides produced or procured for use or sale in the U.S....from Monsanto." (Complaint, at ¶ 9).

Two provisions of the Settlement Agreement are implicated on these motions. Article 4.8 prohibits Zeneca, Ltd. or any of its subsidiaries from (a) utilizing or referencing any registration data or information of Monsanto relating to certain

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d Page 2
Not Reported in A.2d, 1996 WL 104254 (Del Ch.)
**(Cite as: Not Reported in A.2d)**

of Monsanto's glyphosate pesticides, or (b) applying to the Environmental Protection Agency ("EPA") for the right to use or refer to any registration data or information submitted by or on behalf of Monsanto relating to Monsanto's glyphosate pesticides.FN2 The second relevant Settlement Agreement provision is Article 11, the so-called "forum selection" clause, which pertinently states:

FN2. The complete text of Article 4.8 reads as follows:
The grant of rights to [ZENECA, LTD.] pursuant to this Settlement Agreement does not, either expressly or otherwise, include any right or authorization from MONSANTO for [ZENECA, LTD.] to utilize or reference any registration data or information of MONSANTO relating to MONSANTO's Glyphosate pesticides excluding any data or information relating to Sulfosate pesticides. [ZENECA, LTD.] expressly agrees that neither [ZENECA, LTD.] nor any of [ZENECA, LTD.'s] Subsidiaries shall during the period of the license granted under Article 4.2 hereof apply to the Administrator of the EPA or any U.S. State authority for the right to use or refer to any registration data or information submitted by or on behalf of MONSANTO relating to MONSANTO's Glyphosate pesticides.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ALL RESPECTS IN ACCORDANCE WITH THE LAWS OF THE UNITED STATES OF AMERICA AND THE LAWS OF THE STATE OF MISSOURI, U.S.A. [ZENECA, LTD.] and MONSANTO hereby agree that any suit to enforce or compel the performance of any provision of this Agreement, to obtain a remedy for any breach or violation of this Agreement, to obtain the construction of any provision of this Agreement, or otherwise to determine the legal effect of this Agreement, shall be brought in the United States District Court for the Northern District of Illinois, Eastern Division. [ZENECA, LTD.] and MONSANTO hereby submit to the personal jurisdiction of such court for the purpose of any such suit....

B. *The Dispute Giving Rise to This Action*

*2 After the Settlement Agreement was executed, Zeneca decided to produce a new product called "Dynasty." Before that product can be marketed, it must be registered with the EPA as a pesticide, pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136, *et seq.* ("FIFRA"). As part of the registration process, an applicant must normally satisfy certain data requirements, either by submitting studies or citing studies already in the EPA's possession. Zeneca's difficulty, however, was that Article 4.8 of the Settlement Agreement appears to prohibit that use of such data, which presumably is Monsanto proprietary information. Zeneca's position is that under an exemption carved out by FIFRA (the "formulator's exemption"), it is not required to submit or cite that data as a condition to registering "Dynasty."

In August, 1995, Zeneca submitted a "Dynasty" registration application to the EPA, seeking a "formulator's exemption" registration for the proposed new product. Zeneca listed Monsanto as its registered source of glyphosate in its application.

By letter dated October 19, 1995, Monsanto notified Zeneca that it considered Zeneca's application to the EPA for the "Dynasty" registration to be in breach of Article 4.8 of the Settlement Agreement. Monsanto demanded that Zeneca immediately withdraw its registration application by no later than October 30, 1995, and threatened to notify the EPA of its opposition if that were not done. Zeneca refused to comply, taking the position that its registration application did not breach Article 4.8. Thereafter, on or about November 21, Monsanto wrote to the EPA, claiming that Zeneca's registration application was in violation of Section 4.8, and requesting the EPA to cease any review of Zeneca's application.

Before Monsanto had even written its November 21 letter to the EPA, Zeneca filed this action on November 3, 1995, for a declaration that Zeneca's "Dynasty" registration application does not breach Article 4.8 of the Settlement Agreement. Thereafter, Zeneca moved for leave to amend the complaint to add a claim for injunctive relief, specifically

...to enjoin Monsanto from interfering or attempting to interfere with Zeneca's efforts to register ["Dynasty"] with the EPA or any other governmental agency and to require

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 104254 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 3

Monsanto to withdraw any objections to Zeneca's [[["Dynasty"] registration application and/or Zeneca's ["Dynasty"] registration.

(Zeneca Proposed Amended Complaint at ¶ 2).

By letter dated February 21 1996, the EPA advised Monsanto that the EPA currently intends to review Zeneca's application without taking into account any of the issues raised in Monsanto's November 21, 1995 letter. The EPA took that position because Monsanto's letter, which raised breach of contract claims, did "not seem to involve any violations of FIFRA" and did not assert that any grant of any "application Zeneca may submit would be in violation of FIFRA..." (EPA Letter to Monsanto's Counsel Dated February 21, 1996).

II. *ANALYSIS OF ISSUES*

A. *The Parties' Contentions*

*3 Monsanto contends that this action should be dismissed because (a) Zeneca has not stated a claim that implicates this Court's equity jurisdiction, and (b) this action violates the forum selection clause of the Settlement Agreement, which requires that Zeneca's claims be litigated in the United States District Court for the Northern District of Illinois ("the Illinois Federal Court").

Monsanto's equity jurisdiction argument runs as follows: the original complaint seeks only declaratory relief with no accompanying request for equitable relief. Accordingly, the original complaint is jurisdictionally defective because declaratory relief can be granted by a court of law, which would afford Zeneca an adequate legal remedy. Zeneca's proposed amendment to add a claim for injunctive relief does not cure the jurisdictional problem (for which reason leave to amend should be denied), because (i) if Zeneca prevails on its declaratory claim it would have no need for injunctive relief, and (ii) in any event, this Court lacks the power under the Supremacy Clause of the U.S. Constitution to enjoin a party litigant from pursuing federal administrative remedies.

Second, Monsanto argues that by bringing this action in this Court Zeneca flagrantly violated the forum selection clause of the Settlement Agreement. That is because Zeneca's claim requires an interpretation of that Agreement and the parties expressly determined that all such claims would be submitted to the Illinois Federal Court.

Zeneca's response is multifold. First, Zeneca contends that it has properly invoked this Court's subject matter jurisdiction, because it claims a genuine need for injunctive relief. Zeneca insists that time is of the essence in bringing the "Dynasty" product to market, and Monsanto's "interference" with Zeneca's registration efforts will, unless enjoined, significantly reduce the narrow window of time in which that goal can be accomplished. Accordingly, Zeneca argues, it has no adequate remedy at law. Moreover (Zeneca insists) the Supremacy Clause does not bar the injunctive relief it requests.

Zeneca further argues that it has not violated the forum selection clause because the Illinois Federal Court would not have subject matter jurisdiction over its claim. Specifically, Zeneca urges, that court would not have diversity jurisdiction because Zeneca and Monsanto are both Delaware corporations and, hence, are not citizens of different states. Moreover, there would be no federal question jurisdiction, because Zeneca's state law contract claim does not require for its resolution the determination of any federal law issue.

It is unnecessary to address all these questions, because, as discussed below, the availability of an adequate legal remedy and the legal effect of the forum selection clause amply and dispositively justify dismissing this action.

B. *Subject Matter Jurisdiction*

Having described at some length the factual and procedural background of this dispute, it is useful to step back and view in practical terms what this case is really about. Zeneca is asking this Court to declare that its registration application before the EPA does not violate Article 4.8 of the Settlement Agreement. If nothing more than that were involved, this Court would lack jurisdiction, because there is nothing distinctively equitable about such an adjudication: a court of law is equally competent to render it. Therefore, some added element is needed for this Court to possess subject matter jurisdiction.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 104254 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 4

*4 Zeneca contends that such an added element is present here. Zeneca relies upon authorities such as *Diebold Leasing, Inc v Commercial Credit Corp.*, Del. Supr., 276 A.2d 586, 591 (1970), which hold that in a declaratory judgment context, equity jurisdiction is based on whether the issues raised would be presented in a legal or equitable action if coercive relief were being sought. Applying that test, Zeneca argues that its claim is inherently equitable, because any relief Monsanto would seek in a breach of contract action would include an injunction to prevent Zeneca from proceeding with its registration and marketing of "Dynasty". Moreover, Zeneca claims, the proposed amended complaint clearly invokes this Court's equity jurisdiction, by specifically requesting an injunction against Monsanto's "interference" with the registration process.

In determining whether it has subject matter jurisdiction, this Court must examine the pleadings to determine the true substance of the relief Zeneca actually seeks, and will not be bound by the form of relief as described in the complaint. McMahon v. New Castle Associates, Del. Ch., 532 A.2d 601, 603 (1987); *N.S.N. International Industries, N.V. v. E.I. DuPont de Nemours and Co.*, Del. Ch., C.A. No. 12902, Chandler, V.C. (Mar. 31, 1994), Mem. Op. at 8. Looking through the form to the substance, it is clear that Zeneca is asking this Court to prevent Monsanto from making a particular argument to the EPA, namely, that Zeneca's registration application violates the Settlement Agreement. Apart from being an improvident use of this Court's scarce resources, the suggestion that its injunctive powers should be deployed in this fashion strikes the Court as plain silly. This injunctive claim merits rejection on its face because Zeneca has a perfectly adequate remedy at law.

Both traditional equity doctrine and Delaware statutory law command that this Court of equity must not exercise jurisdiction where there exists a complete and adequate remedy at law. Glanding v. Industrial Trust Co., Del. Supr., 45 A.2d 553 (1945); 8 *Del. C.* § 342. Here there is no need for this Court to exercise its coercive power to stop Monsanto from making arguments to the EPA. Zeneca itself is perfectly capable of advocating to the EPA that Monsanto's breach of contract argument should not be entertained, and the EPA is fully capable of determining for itself what weight, if any, to accord Monsanto's contentions. It does not need this Court's help. If any demonstration of that self-evident proposition were needed, it is found in the EPA's recent advice to Monsanto that the EPA will not consider Monsanto's breach of contract claims and that Monsanto should pursue those claims in another forum. In these circumstances, Zeneca's claimed need for injunctive assistance from this Court does not pass the blush test. Not only does Zeneca have an adequate remedy at law, namely, advocating its position before the EPA, but also it now appears that Zeneca has successfully invoked that remedy. FN3

FN3. Even if Zeneca could persuasively claim a genuine need for injunctive relief, this Court's power to grant that relief is open to serious question. It is well established that under the Supremacy Clause of the United States Constitution, a state court is without power to enjoin a litigant from litigating a claim in a federal court. *Donovan v. City of Dallas*, 377 U.S. 408 (1964). That is because the right to litigate in a federal court is granted by Congress and cannot be taken away by the states. *General Atomic Co. v. Felter*, 434 U.S. 12, 16 (1977). That same reasoning would also arguably prohibit a state court from depriving a litigant of its right to pursue federal administrative remedies conferred by Congress. At least one court has so held. *In Re Marriage of Giordano*, Wash. Ct. App., 787 P.2d 51, 54 (1990). However, it is unnecessary for this Court to decide that constitutional issue on this record.

*5 This is not to say that Zeneca is not entitled to an adjudication of its "no-breach-of-contract" claim. What it does mean is that that adjudication must be rendered by a court of law. For the reasons next discussed, the proper court of law is the Illinois Federal Court.

C. *The Forum Selection Clause*

This Court has concluded that it lacks subject matter jurisdiction. Assuming *arguendo* that that determination were incorrect, however, this action must nonetheless be dismissed on the alternative ground that to allow its continuation would violate the forum selection clause for which the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 104254 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 5

parties bargained in good faith. Zeneca concedes that its claim is covered by the forum selection clause. Its sole argument is that the clause does not apply in these circumstances because no federal court (including the Illinois Federal Court) would have subject matter jurisdiction over its claim.

The briefs dispute at great length whether or not a federal court would have diversity and/or federal question jurisdiction over Zeneca's claim. Those arguments seem to place this Court in the awkward position of having to opine on a matter that only a federal court can definitively decide. The awkwardness is significantly reduced, however, by the undisputed proposition that if the proper party in interest with standing to bring this claim is Zeneca, Ltd., which is a British corporation, then the Northern District of Illinois would have subject matter jurisdiction over an action by Zeneca, Ltd. against Monsanto. That is because such an action would be between citizens of different states, and therefore would invoke federal "diversity of citizenship" jurisdiction. Under this view of the matter, the question becomes whether under the Settlement Agreement Zeneca, Ltd. is the party having standing to bring this action. That question is one that this Court is jurisdictionally competent to decide.

I conclude that under Article 11 of the Settlement Agreement, Zeneca, Ltd. is the only party vested with the contractual authority to pursue an action, on behalf of the Zeneca, Ltd. family of interests, relating to the interpretation or application of the Settlement Agreement. Article 11 specifically applies to "[ZENECA, LTD.] and MONSANTO." It does not specifically authorize enforcement actions by any subsidiary of those parties, in contrast to other provisions of the Settlement Agreement which do specifically empower the parties' subsidiaries to take specified actions. This construction of Article 11 is consistent with Article 12.1, which provides that if any subsidiary of Zeneca, Ltd. exercises any rights of Zeneca, Ltd. or acts on its behalf under this Agreement, "[Zeneca, Ltd.] undertakes to ensure that such Subsidiary shall fully comply with all the provisions of this Agreement...."

In this case, Zeneca, Ltd. has caused or permitted a subsidiary to exercise its rights in a manner that would defeat Monsanto's right -- and Zeneca, Ltd.'s contractual obligation -- to conduct all litigation involving interpretation or enforcement of the Settlement Agreement in the Illinois Federal Court. Zeneca, Ltd. could have brought this action in that federal forum. Only because it selected as the plaintiff a subsidiary (Zeneca) whose Delaware "citizenship" would defeat federal diversity jurisdiction, is the defendant able to argue that the Northern District of Illinois would lack subject matter jurisdiction.

*6 Because the Zeneca, Ltd. family of interests could have structured this lawsuit so as to make it cognizable in federal court, it cannot be permitted to evade the forum selection clause to which it agreed. Accordingly, this action will be dismissed on this ground as well.

## III. *CONCLUSION*

For the reasons discussed above, the plaintiff's motion for leave to amend its complaint is denied, and the defendant's motion to dismiss this action is granted. IT IS SO ORDERED.

Del.Ch.,1996.
Zeneca, Inc. v. Monsanto Co.
Not Reported in A.2d, 1996 WL 104254 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

# EXHIBIT 3

Westlaw.

Not Reported in A.2d Page 1
Not Reported in A.2d, 1993 WL 125517 (Del.Ch.), 19 Del. J. Corp. L. 282
**(Cite as: Not Reported in A.2d)**

**H**

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
PAUL N. GARDNER DEFINED PLAN TRUST
v.
DRAPER et al.
Erik BALLAN
v.
Robert E. DRAPER, et al.
David JAROSLAWICZ
v.
Robert E. DRAPER, et al.
**Civ. A. Nos. 12825-NC, 12827-NC and 12828-NC.**

Submitted: March 4, 1993.
Decided: April 8, 1993.

**285 Joseph A. Rosenthal, Kevin Gross, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington
Stephen E. Jenkins, Ashby & Geddes, Wilmington
Rodman Ward, Jr., Jay W. Eisenhofer, Skadden, Arps, Slate, Meagher & Flom, Wilmington

ON PLAINTIFFS' JOINT MOTION TO VOLUNTARILY DISMISS OR TO STAY: GRANTED
HARTNETT, Vice Chancellor.
*1 Gentlemen:

These three stockholder shareholder derivative suits were brought in this Court by certain shareholders of National Health Laboratories ("NHL"), a Delaware corporation. The suits allege breaches of fiduciary duties by the directors of NHL in connection with criminal and civil fines paid by NHL arising out of illegal charges to federal and state medical programs. Plaintiffs now seek to voluntarily dismiss the suits pursuant to Chancery Rule 41(a)(2) or, alternatively, to have these actions stayed because of other pending actions challenging the same conduct in state and federal courts in California.

Defendants oppose the motion to dismiss on the basis that they will be prejudiced by the dismissal and oppose the motion to stay on the basis that Delaware is the appropriate forum to resolve the controversy. Because defendants have not shown that they will be unfairly prejudiced by the dismissal and because it is in the interest of justice and judicial economy, plaintiffs' motion to dismiss must be granted.

**286 I

NHL operates clinical laboratories in the United States. On December 18, 1992, it was announced that NHL had agreed to plead guilty to federal criminal charges in connection with false claims submitted to a federal medical program and that Robert Draper, NHL's President and CEO, would plead guilty to federal criminal charges in connection with false claims submitted to a federal and a state medical program. NHL simultaneously agreed to pay civil penalties totalling over $110 million.

Three days after the announcement, plaintiffs filed these three actions ("the Delaware Actions"). Later that same day, three similar shareholder derivative actions were filed in state court in California. Within two weeks of the announcement, a total of six shareholder derivative actions had been filed in state court in California ("the California State Actions").

In addition, a total of thirteen federal securities fraud class action suits were filed in the United States District Court for the Southern District of California ("the California Federal Action"). Plaintiffs in the Delaware Actions aver that the claims stated in the federal suits are within the exclusive jurisdiction of the federal courts. Finally, one shareholder derivative action alleging violations of the Federal Racketeer-Influenced and Corrupt Organization Act was brought in the United States District Court for the Southern District of California ("the RICO Action").

Plaintiffs in the Delaware Actions assert that all of the plaintiffs' counsel in the actions pending in federal and state courts in California have reached agreement among themselves as to the organization of plaintiffs' counsel in those actions. The thirteen California Federal Actions have been consolidated into a single suit and a single judge has been assigned those actions and the RICO Action. Likewise, the six California State Actions have been consolidated.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Page 2
Not Reported in A.2d, 1993 WL 125517 (Del.Ch.), 19 Del. J. Corp. L. 282
**(Cite as: Not Reported in A.2d)**

Plaintiffs' counsel in the Delaware Actions state that they have agreed to become a part of and participate in the prosecution of the California Federal Actions and the California State Actions.

***2** On January 19, 1993, defendants in the Delaware Actions moved for summary judgment alleging that plaintiffs had not complied with the pre-suit demand requirement of Chancery Rule 23.1. One week later, plaintiffs in the Delaware Actions filed their motions to voluntarily dismiss or, alternatively, to stay the Delaware Actions. Because defendants had previously filed a motion for summary judgment, ****287** leave of this court is required for plaintiffs to voluntarily dismiss their suits. *Ch.Ct.R.* 41(a).

II

A voluntary dismissal under Chancery Rule 41(a)(2) is at the sound discretion of this Court. *See In re Signal Cos., Inc. Litigation,* Del.Ch., C.A. Nos. 8121, 8122, 8123, 8133, 8136 & 8138-NC, Hartnett, V.C. (Oct. 31, 1985), *app. refused,* Del.Supr., 502 A.2d 979 (1985); WRIGHT & MILLER, *Federal Practice and Procedure: Civil 2d* § 2364.

A plaintiff is ordinarily allowed to try his claims in a forum of his own choosing. *Signal,* slip op. at 4-5. A voluntary dismissal by a plaintiff will therefore be permitted by the Court unless the defendant will suffer some plain legal prejudice, other than defending a second lawsuit. *Signal,* slip op. at 4; WRIGHT & MILLER, *Civil 2d* § 2364.

Defendants argue that the pendency of their motions for summary judgment is sufficient to constitute prejudice if the Delaware Actions are dismissed without disposing of those motions. *Cf.* *Saviour v. Revco Discount Drug Centers, Inc.,* D.Kan., 126 F.R.D. 569, 571 (1989); *Klintworth v. Atlantic Coast Line R. Co.,* D.S.C., 39 F.R.D. 330, 332 (1966).

There is no hard and fast rule as to when the timing of a voluntary dismissal constitutes prejudice to a defendant. *See, e.g.,* *Tyco Laboratories v. Koppers Co., Inc.,* 7th Cir., 627 F.2d 54 (1980) (voluntary dismissal granted although motion for partial summary judgment had been made).

While the existence of a filed motion for summary judgment is relevant, a court may also consider other factors in determining whether a defendant would suffer prejudice from a voluntary dismissal. *Id.* at 56. These include the extent of defendant's effort and expense in preparation, excessive delay and lack of diligence on the part of plaintiff in prosecuting the action, or whether there has been sufficient explanation of the reason for a plaintiff to voluntarily dismiss his case. *Id.; see also* WRIGHT & MILLER, *supra,* § 2364, p. 169 ("If the motion [to dismiss] is made at an early stage of the case, before much has happened, it is more likely to be granted.").

Defendants have not expended significant effort in defending the Delaware Actions and their motions for summary judgment were filed within five weeks of the filing of the complaints, before any discovery had taken place.

A defense that no pre-suit demand had been made is usually raised as a motion to dismiss because it is a challenge to the sufficiency ****288** of the complaint. Plaintiffs' counsel aver that on January 8, 1993, as a matter of professional courtesy, they notified defendants that they would be moving to voluntarily dismiss the Delaware Actions. Because no answer or motion for summary judgment had been filed as of that time, plaintiffs could have voluntarily dismissed their suits as a matter of right. *See Ch.Ct.R.* 41(a)(1). Defendants' conduct in filing their motions for summary judgment shortly after being advised that the suits would be voluntarily dismissed leads to the inference that the motions for summary judgment were interposed merely as a regrettable attempt to show a basis for asserting prejudice where no actual prejudice existed.

***3** Plaintiffs cannot be charged with excessive delay or lack of diligence because their motions to voluntarily dismiss the Delaware Actions were made within five weeks of the filing of the complaints. Furthermore, plaintiffs have offered a valid reason for voluntarily dismissing the Delaware Actions: that related litigation is being vigorously pursued in California federal and state courts by a coordinated group of attorneys to whom plaintiffs desire to entrust the prosecution of their claims.

If this suit is not dismissed, the federal suits (at least) will continue. *Donovan v. City of Dallas,* 377 U.S. 408 (1964). There will therefore be simultaneous suits proceeding in this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d Page 3

Not Reported in A.2d, 1993 WL 125517 (Del.Ch.), 19 Del. J. Corp. L. 282

**(Cite as: Not Reported in A.2d)**

Court and in the California Federal Court, thereby leading to an undesirable and inevitable waste of judicial resources and the real possibility of inconsistent rulings between the courts. *See* Maldonado v. Flynn, Del.Ch., 417 A.2d 378 (1980).

These factors strongly weigh in favor of permitting plaintiffs to voluntarily dismiss the Delaware Actions without prejudice.

III

Defendants argue, however, that the complaint in the Consolidated California State Action shows that the plaintiffs in that suit intend to seek the application of California substantive law and that this constitutes legal prejudice to defendants because NHL, by incorporating in Delaware, sought to have Delaware law applied to matters involving its internal corporate affairs.

A corporation's internal affairs involve matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders. McDermott Inc. v. Lewis, Del.Supr., 531 A.2d 206, 214 (1987). A conflict of laws principle known as the internal affairs doctrine requires that the law of the state of **289 incorporation should determine issues relating to those internal corporate affairs. Id. at 215.

In at least one instance, California courts have ignored the internal affairs doctrine when determining matters relating to the internal corporate affairs of a so-called "pseudo-foreign" corporation, that is, a corporation that is incorporated outside California but which has major contacts with California. *See* Western Air Lines, Inc. v. Sobieski, Cal.App., 191 Cal.App.2d 399, 12 Cal.Rptr. 719 (1961).

The courts of Delaware have emphatically rejected *Western Air*. This rejection is partially because the traditional conflicts of law rule is preferable because it "serves the vital need for a single, constant and equal law to avoid the fragmentation of continuing, interdependent internal relationships." McDermott, 531 A.2d at 216 (quoting Kozyris, *Corporate Wars and Choice of Law*, 1985 Duke L.J. 1, 98). Indeed, the Delaware Supreme Court has held that the application of the internal affairs doctrine is mandated by constitutional principles under the due process, commerce and full faith and credit clauses. McDermott, 531 A.2d at 216-19.

Under the principles set forth in *McDermott*, it is clear that Delaware substantive law should be applied as to the presuit demand and the breach of fiduciary duty issues raised in the California litigation.

*4 Defendants' argument, therefore, appears to be that this Court should deny plaintiffs their right to litigate the action in a forum of their choosing based on the possibility that the California courts may err by not applying Delaware substantive law in these matters.

Principles of comity and respect for sister state courts require, however, that this Court not act on the assumption that a sister court will misapply the law. *See Stepak v. Tracinda Corp.*, Del.Ch., C.A. No. 8457-NC, Allen, C. (Aug. 18, 1989), slip op. at 18-19.

Furthermore, even if this Court was convinced that the California courts would apply California substantive law instead of Delaware law, denying the motion to dismiss would not ensure that Delaware substantive law would be applied to the issues raised in this litigation.

The named plaintiffs in the Delaware Actions are not named plaintiffs in the California Federal or State Actions. The plaintiffs in the Delaware Actions could defeat any attempts by this Court to retain jurisdiction over the Delaware Actions by selling their NHL shares. *See* 8 *Del.C.* 327; Harff v. Kerkorian, Del.Ch., 324 A.2d 215 (1974); *modified*, Del.Supr., 347 A.2d 133 (1975).

**290 Because the plaintiffs in the California Federal and State Actions are not plaintiffs in the Delaware Actions, this Court lacks jurisdiction over them and cannot enjoin them from proceeding with their actions in California. Even if this Court had jurisdiction over the plaintiffs in the California Federal Actions, this Court does not have the power to enjoin a litigant from prosecuting an action *in personam* in a federal court that has jurisdiction over both the parties and the subject matter. Donovan v. City of Dallas, 377 U.S. 408

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1993 WL 125517 (Del.Ch.), 19 Del. J. Corp. L. 282
**(Cite as: Not Reported in A.2d)**

Page 4

(1964).

IV

Plaintiffs are therefore granted leave to voluntarily dismiss their suits in this Court, without prejudice, upon payment of the costs.

IT IS SO ORDERED.

Del.Ch.,1993.
Paul N. Gardner Defined Plan Trust v. Draper
Not Reported in A.2d, 1993 WL 125517 (Del.Ch.), 19 Del. J. Corp. L. 282

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1979 WL 4632 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 1

**H**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

MALDONADO

v.

FLYNN.

**CIVIL ACTION No. 4800.**

Submitted Dec. 13, 1979.
Decided Dec. 14, 1979.

Joseph Rosenthal, Morris and Rosenthal, P.A., Wilmington.
Robert K. Payson, Potter, Anderson & Corroon, Wilmington.
Charles F. Richards, Jr., Richards, Layton & Finger, Wilmington.

On Motion for Stay: Denied.

HARTNETT, III, Vice-Chancellor.

***1** This action was filed in this Court on June 3, 1975 as a stockholders derivative action. Subsequently the plaintiff also filed actions in the United States District Court for the Southern District of Texas and in the United States District Court for the Southern District of New York. The actions filed in the United States District Courts seek similar relief to that requested in this Court but also seek additional relief. In at least one of the federal actions there are additional defendants.

In June 1979 the directors of ZABPATA Corporation, the corporate defendant on behalf of which all the suits were brought, established an investigation committee of alleged independent directors. The investigation committee then issued a report which concluded, in the exercise of the business judgment of the committee, that the maintenance of these three stockholder derivative actions was not justified. Relying on that finding, ZABPATA moved to dismiss and alternatively for summary judgment in each of the three pending actions. ZABPATA, a Delaware corporation, argues that the Delaware General Corporate Law mandates the dismissal of a stockholders' derivative action if independent directors of the corporation on whose behalf the suit is brought, determines, in its business judgment, that the suit is not warranted. See *Abbey v. Control Data Corporation*, 8th Cir., Fed.Sec.L.Rep. § 96, 969 (1979). Plaintiffs, of course, argue that Delaware law does not so provide. The issue has never been decided by any Delaware Court and is now before me in this case.

The Motion To Dismiss of ZABPATA has been argued and is before the Court in the Texas litigation. The Motion To Dismiss has been briefed but not argued in the New York litigation. The Motion To Dismiss has not been briefed and is not ready for argument in this Delaware litigation.

On November 29, 1979 plaintiff moved this Court to enjoin ZABPATA Corp. from maintaining its Motions in the federal district courts or in the alternative to order ZABPATA to withdraw the Motions in the federal courts. Because plaintiff urged that his Motion must be presented in this Court immediately to protect his interests, the matter was expedited for a prompt resolution.

It is abundantly clear that this Court does not have jurisdiction to entertain such a motion. The law has been clearly settled since 1964 when the Supreme Court in Donovan v. Dallas, 377 U.S. 408, held that a State Court cannot enjoin litigants from proceeding in a pending federal *in personam* action. It is therefore crystal clear that this Motion is without legal foundation, is therefore improper, and never should have been filed in this Court. Court of Chancery Rule 11.

At oral argument the attorney for the plaintiff made no effort to challenge the holding in *Donovan v. Dallas*, nor did he offer any explanation why this Motion was filed in this Court when it obviously lacked merit. What he did was to shift his position and request this Court to expedite the hearing on plaintiff's Motion For Summary Judgment and hold oral argument prior to Christmas, even though such an expedited hearing was not requested in plaintiff's Motion and has not been requested by any Motions filed in this Court.

***2** Plaintiff cited no legal authority for his claim that his Motion For Summary Judgment should be considered on an expedited basis. He merely stated that if the federal district courts proceeded to deny the Motions before them he might

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1979 WL 4632 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 2

be barred in this Court under the doctrine of *res judicata* or collateral estoppel. Plaintiff, however, cited no law for that proposition and failed to show how a ruling by a federal district court construing the Delaware Corporation Law can be binding on this Court. See *State v Phillips*, Del.Ch., 400 A.2d 299 (1979).

For this Court to schedule a hearing on plaintiff's Motion For Summary Judgment within the next week would necessarily require this Court to push aside matters already long scheduled to the detriment of other litigants who have patiently waited their turn to be heard. With many matters awaiting many weeks and months for scheduling, it is no longer possible for this Court to schedule arguments and hearings at the whim of counsel. Plaintiff has shown no basis to justify any expedited action by this Court. Plaintiff's Motion is therefore dismissed. So ordered.

Del.Ch.,1979.
Maldonado v. Flynn
Not Reported in A.2d, 1979 WL 4632 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| NOKIA CORPORATION and NOKIA, INC. | : | |
| Plaintiffs | : | |
| vs. | : | Civil Action No. 2330-N |
| QUALCOMM INCORPORATED, | : | |
| Defendant | : | |

\- - -

Chancery Court Chambers
New Castle County Courthouse
Wilmington, Delaware
Friday, August 11, 2006
11:00 a.m.

BEFORE: HON. LEO E. STRINE, JR., Vice Chancellor.

\- - -

SCHEDULING CONFERENCE

\- - -

---

CHANCERY COURT REPORTERS
500 North King Street - Suite 11400
Wilmington, Delaware 19801-3759
(302) 255-0525

APPEARANCES:

LISA SCHMIDT, ESQ.
JEFFREY L. MOYER, ESQ.
ELIZABETH C. TUCKER, ESQ.
Richards, Layton & Finger
-and-
FREDERICK LORIG, ESQ.
A. WILLIAM URQUHART, ESQ.
of the California Bar
Quinn Emanuel Urquhart Oliver & Hedges, LLP
-and-
JANE MUTIMEAR, ESQ.
Of the United Kingdom Bar
Bird & Bird
for Plaintiffs Nokia Corporation and Nokia, Inc.

MATTHEW E. FISCHER, ESQ.
RICHARD L. HORWITZ, ESQ.
Potter, Anderson & Corroon LLP
-and-
RICHARD J. STARK, ESQ.
of the New York Bar
Cravath Swaine & Moore
-and-
CHRISTIAN E. MAMMEM, ESQ.
of the California Bar
Day Casebeer Madrid & Batchelder
for Defendant QUALCOMM Incorporated

ALSO PRESENT:

RICHARD W. STIMSON, ESQ.
ARI LAAKKONEN, ESQ.
In-house counsel for Nokia

- - -

THE COURT: We have someone on the phone?

MR. FISCHER: Yes. We have Chris Mammem from the Day Casebeer firm in California for QUALCOMM. Richard Stark of Cravath for QUALCOMM, and Rich Horowitz of my firm.

MS. SCHMIDT: Your Honor, this is Fred Lorig and William Urquhart from the Quinn Emmanuel Urquhart firm for Nokia, and Elizabeth Tucker of Richards Layton, Jane Mutimear from Bird & Bird, and Ari Laakkonen and Richard Stimson of Nokia, Inc.

THE COURT: Good morning.

I've read all the papers. I'm happy to consider, you know, whether to -- this Court has a role to play in this dispute. But I do think the first thing that needs to be done is essentially brief up whether this is a proper place to bring this dispute, especially given the pending actions. And I'm influenced by the fact that I don't gainsay the importance of this to Nokia. I'm sure this is a very important thing and you've got multiple litigations going on. You have multiple litigation going on. I mean, it wasn't like it all popped up and you said we

got to get going on this and we're going to shut this down entirely right away.

Now, I understand you've got sort of a whack-a-mole situation going on, or you think that there's proliferating injunction actions from QUALCOMM everywhere.

The reality is, though, that doesn't necessarily mean you don't have to put your marker down somewhere where the cases are pending. I'm not prejudging that, but I'm at least interested in that notion. I'm at least interested in the notion in whether or not this would be considered the national court.

Delaware courts are rightly concerned when Federal Court's intrude in issues of state law. Frankly, Delaware doesn't particularly like it when some states have gotten creative and dishonor the contract rights of securities holders. And the corporations sell securities by trying to intrude on the internal affairs of corporations through all kinds of interesting statutes, which don't seem to honor those contracts or give full faith and credit to the laws of other states. What comes about consideringly with that sort of concern to protect one less

legitimate territory is to also recognize that there are areas in which we don't have the same legitimacy as the federal courts. I don't know if this is one. I'm not prejudging it. When I see something -- a reference to national courts -- I have to say it doesn't occur to me immediately that it's necessarily the case that any court within a nation qualifies for that. It might have been rationally thought by whatever the entity was.

What that means is that we're a bunch of nations bringing together -- coming together. We're trying to work together. We're going to presume on the part of the nations involved in this that the judicial system in those nations will responsibly adjudicate the disputes and that ultimately those systems will culminate in some national court which will bless whatever rulings are done at the lowest level of the system. It's not necessarily clear to me -- it is true that you could possibly get a writ of certiorari from the Delaware Supreme Court to the United States Supreme Court. It's not immediately clear to me that that's what they meant.

I don't know anything about Germany. I know more about soccer and beer from Germany than

the German courts, but some of them have federal governments or different local governments where they may have court systems that aren't part of the nation. You know, I just don't know.

What I also know is that this is clearly no more a court -- a national court of the United States than any of the federal district courts, and it's not clear to me why the request for injunctive relief that's sought here could not have been sought in those other pending cases, which is not only can, you know, QUALCOMM not get an injunction, Your Honor, we are moving affirmatively for you to issue an injunction against them because of what they're trying to do to us worldwide by dishonoring their obligations to us under this essentially -- this contract that arises by virtue of this and present that to a federal judge.

I had not known the federal courts were without authority to issue injunctions with nationwide effect and perhaps international effect with the party before it who's invoked their jurisdiction.

Without going on about it, I mean, those are the things I'm going to be interested in.

We've got the first-filed doctrine, we've got the notion of what this is. When I first got the case and I read -- this is a classic joint venture. Somebody has got to leave it in Delaware law. What you've got is a de facto contract by virtue of something going on in France, and QUALCOMM happens to be a Delaware corporation. I'm happy to entertain a tighter briefing schedule. I would ask Nokia -- not Nokia -- I would ask QUALCOMM to commit to when they could file its motion to dismiss.

When do you think, Mr. Fischer, you could get a brief in, or something like that?

MR. FISCHER: I think we'd like at least a couple of weeks. Is that asking for too much?

THE COURT: They'll tell you that it is. I think a couple weeks is not too much.

MR. FISCHER: Well, in light of what's going on in the other litigations, I don't think two weeks -- there's nothing immediately pending that we need to -- I think two weeks is reasonable.

MR. LORIG: If I can respond. Two weeks normally, I think, would be reasonable, even if you're the other party. The problem we have is we're dealing with an injunction-case-of-the-day. Yesterday

they filed another case in Germany asking for an injunction. If we're going to take time and brief this matter for a couple of weeks, can we at least get a stipulation from QUALCOMM that, until the courts jurisdiction is decided, they won't file any more patent infringement suits in foreign countries. I'm not talking about the United States. That's already done. I'm talking about outside of the United States.

Will QUALCOMM agree, in return for a civilized briefing schedule so we can air the issues, not to file any further patent infringement actions in countries outside of the United States?

MR. FISCHER: I'd have to discuss that with people, Your Honor.

THE COURT: I do think it is -- one of the things -- if these suits are going to arise on the map, I assume they're like red dots and start looking like some global infection. We'll get the guy from house to diagnose -- I mean, I think that is a problem, Mr. Fischer, that he we have to deal with here. I hadn't known there was a suit filed yesterday.

MR. FISCHER: I didn't know that either, Your Honor.

MR. LORIG: We were notified by European counsel.

MR. URQUHART: And by QUALCOMM.

MR. LORIG: And by QUALCOMM.

Just to let Your Honor know what's going on beyond the surface. Yesterday there was a meeting between QUALCOMM and Nokia. As a Nokia representative walked into the room to discuss issues, they agreed to the news of another, we believe, vexatious lawsuit, this time filed to Germany. That's the pattern we're in. That's why we're seeking the Court's injunctive relief.

THE COURT: Look, I'm a fairly direct person. That kind of behavior is not going to aid QUALCOMM with any -- when I consider at least the McWane issue -- McWane being our first-filed case doctrine, which is, you know, if QUALCOMM wants to bring an injunction action and say, "Look, we want to have a fair fight. It's basically the same issue all over the world. We shouldn't litigate it in 17 different courts. We should pick one good forum. You know, we want it in the Federal Court that we first filed in. Let's agree. Let's get it done. Let's have a trial, and let's make this be the template."

You know, that's a fairly strong position to be in when you've got a first-filed doctrine.

On the other hand, if QUALCOMM says, "No, what we really do want is some sort of international infection of lawsuits to afflict Nokia, we want the possibility of inconsistent adjudications, we want them to get lawyers and master all these different intricacies, put aside civil code versus common law. Why don't we get a sampling of common law nations? Why don't we get Australia, UK, the United States, and then we'll get, frankly, former dictatorships, which are still arguably that way but have court systems and we'll see, you know, how that kind of goes." And then, if that's the situation, that really cuts very strongly against worrying about first-filed doctrine.

MR. FISCHER: Your Honor, I don't think that's what's going on. I think it's a matter of taking protective actions in the areas where it's appropriate to take it, in light of the nature of the patents at issue and where they are and where the patents are protected.

THE COURT: Am I wrong to think that this is essentially a European-wide dispute or is it

maybe even also extends to the continental United States?

MR. LORIG: Your Honor, it's really worldwide. They filed their action in San Diego the end of last year. It's stayed at the moment. They filed actions before our last settlement negotiation. They greeted us with filing an action in the UK. Now, before this one, they greeted us with filing an action in Germany. If we have another settlement negotiation, we'll probably have another patent action in another European or Asian country.

The idea that they're trying to protect their interests, if you'll pardon me, is, I think, based on the fact that perhaps counsel is not aware of how old these patents are. Most of them have priority dates of 1990, 1994, 1995. There's severe laches on past damages. QUALCOMM publicly announced that the only reason they have filed these actions under GSM patents is to try to pressure Nokia into signing. QUALCOMM's management publicly announced to the investment community that they weren't pursuing any other company on their GSM patents, that they're only trying to enforce them against Nokia in order to pressure Nokia to sign an agreement on third

generation, meaning nonGSM patents. And they told the rest of the industry they didn't have to worry about these GSM patents.

So I don't -- there's a lot of details and facts. I don't believe my opposing counsel is familiar with them yet. Certainly what he says on the surface seems reasonable. But the facts are quite different, and that's why we thought about where to go. QUALCOMM is a Delaware corporation. Nokia Inc. is a Delaware corporation. This is pure interpretation of contract issue. It's a valuation of patent rights -- how to value what a FRAND royalty is as compared to a normal royalty. What is fair? Yes, the obligation is interpreted under French law, but the rule is you go to your national courts.

In the United States we have a different situation than we do in Europe. In Europe you have one unified court system. Here, because we are a federation of states, you have both a state system and a federal system. There is no federal question here. You've got two Delaware corporations, you've got an issue of interpreting and enforcing a contract, and there is not a federal question here.

THE COURT: It is an interesting -- I

mean, I understand what you're saying. There's no federal question of federal law what view the federal courts would take of their jurisdiction, given the terms of -- I forget the European entities. What's it's called?

MR. LORIG: ETSI. E-T-S-I.

THE COURT: Whatever ETSI says. What the federal courts would view their obligation as being is it may not be -- intuitively it's not as relevant to me for this reason, which is the reason why Nokia is here is because QUALCOMM is filing patent infringement actions which it believes are improper and at a time when what Nokia says should be going on is, frankly, we ought to be getting so-called FRAND rates and this should not be an issue at all.

When they filed their patent infringement action in the U.S. District Court in San Diego -- it's clearly a defense. It may be even a counterclaim, and it would seem to get around the jurisdictional issues. From what I read in the letter from Potter Anderson today, you were fighting about going to arbitration. And no one teed up, you know, this question. And it may have been because that was the first of the actions.

I also don't know what's before the U.S. International Trade Commission, whether that is a forum that would qualify under ETSI. I don't know whether anybody has worked --

MR. LORIG: May I respond, Your Honor? The ITC, as Your Honor may know, only has the power to grant injunctive relief. It doesn't have the power to define a reasonable royalty or a fair and reasonable royalty. Moreover, by law, it's determinations are not -- don't give rise to collateral estoppel, res judicata issues, preclusion issues because of the nature of the Court system.

To go back to Your Honor's point about San Diego. As we understood the law, if somebody has filed an action which triggers an arbitration right, you waive that right. The first thing you don't do is ask for arbitration. We asked for that. The judge denied it. The arbitration went forward anyway. The federal circuit has heard the appeal. But we have not teed up in that case the right to an injunction or how to define fair, reasonable --

THE COURT: What's happening with arbitration?

MR. LORIG: It's ongoing.

Mr. Casebeer is on the phone. We both participated.

MR. MAMMEM: In the arbitration right now is pending QUALCOMM's motion to dismiss the main claim in the arbitration on Rule 12(b)(6) grounds. We're awaiting a hearing date on that motion.

MR. LORIG: Your Honor, the issues do not include a right to an injunction --

THE COURT: I guess what I'm saying is, who brought the action in the U.S. District Court in California?

MR. MAMMEM: QUALCOMM did.

THE COURT: Right. For patent infringement?

MR. MAMMEM: Yes.

THE COURT: And why wouldn't Nokia say that that was -- you know, that one of the reasons why that action is not viable is because QUALCOMM is acting in violation of ETSI?

MR. MAMMEM: Your Honor, we think that's exactly the right question. As we've seen from the response that Nokia filed yesterday, they appear to have asserted both the issues that they raised -- that Nokia raised -- before the arbitrator, as well as this ETSI issue as affirmative defenses in that

action. In the district court action, Nokia has not yet been required to file an answer because of the procedural posture of that action. That would be the appropriate forum for these issues to be aired.

MR. LORIG: One would have thought, as Your Honor has said, that the reasonable thing to do would be for QUALCOMM to have filed this action in San Diego, which after all is its home base, tee up the issues there.

What happened is, after the case was stayed and the arbitration started going forward, they didn't like some of the things that were happening in the arbitration. They then filed an action in the ITC on several of the same patents that were at issue in San Diego. When they didn't like the way things were going, they filed the UK action. You see the problem?

THE COURT: I understand that. As a litigator will, you changed my words around to put the onus on QUALCOMM.

I don't know what gave rise to the arbitration right. Was it a contract between QUALCOMM and Nokia?

MR. LORIG: Yes, it is a contract. Unfortunately, because we don't have a protective

order, without permission of my opposing counsel I can't discuss its contents because --

THE COURT: Would it sweep within it arguably the ETSI claim?

MR. LORIG: I don't believe so, Your Honor.

THE COURT: I'll give you my standard pitch on American -- not American businesses in general. No one whines more about the cost of litigation than businesses and doctors. In my experience as a judge, no source of litigation delay or complexity or a waste are more common than businesses and doctors. I say doctors because anybody who has had a doctor practice break up, where people go under tables and pull out plugs, steal records, do things -- doctors love litigation when they're playing offense; they hate it when they're playing defense. Businesses whine all the time, you know, but they spend a gazillion amount of dollars and human energy every year fighting about what forum to be in.

You know, it may be you all think I can do it well on both sides and that you can stipulate that I'll do it. You probably can't because you know you just hate each other. Your clients hate

each other and they're going to fight about anything. You could have the best -- universally conceded -- best judge in the world by both sides in a blind taste test. If they happen to agree on that person, they would then back away.

What I'm getting at and what we're going to get to quickly -- I mean, I will say this to QUALCOMM. If I find out tomorrow there's an action in Belgium and an action in the Netherlands, then I'm going to set a trial date. And we'll go, you know, hell bent for leather with all the discovery in the world to get this tried wherever it has to be, including in my court, if I conclude that it's going to be here. But because it's going to be somewhere, there will be no waste in the discovery.

What was done in Germany was done in Germany. We'll start with QUALCOMM having a brief in two weeks.

What would Nokia want in terms of answering?

MR. LORIG: I think we'll get our response in one week, Your Honor, since they are not stipulating to stay their hand on filing future --

THE COURT: You only want a week?

Okay. Get on the books quick.

MR. STARK: Your Honor, may I speak briefly?

THE COURT: Yes.

MR. STARK: Your Honor, to your point that a number of suits have been filed by QUALCOMM for patent infringement, I just wanted to make clear for the record that there are patents of different nations involved in these different actions, and each patent of a different nation gives rise to a separate and completely distinct set of rights. For example, the U.S. patents that are at issue in the San Diego litigation give rise to the right to potentially exclude products from being offered, sold, made or used in the United States, but do not extend necessarily to other nations. The same would be true of patents of other nations that are at issue in other litigation.

So I just wanted to make the point, Your Honor, that it's not a simple case of proliferating litigation, but rather there are quite distinct rights at issue. In order to protect those rights, QUALCOMM may need to seek to bring cases in different jurisdictions.

THE COURT: As I understand your friend's point, that I guess in the territories governed by ETSI, which would be essentially the European union -- is that correct?

MR. LORIG: Yes, Your Honor.

MR. STARK: That's correct, Your Honor.

THE COURT: -- that there is an overriding issue of whether essentially what QUALCOMM is limited to is essentially making, you know, sure that Nokia pays FRAND rights for the technologies in all those territories, and that the overarching issue that Nokia seeks is that essentially the European unionwide -- instead of charging folks like Nokia FRAND rights for these essential technologies, it's essentially trying to create a hostage situation where, instead of charging FRAND rights, it charges something way too expensive or keeps people out of the market all together. That's what I understand is the issue.

MR. STARK: That is potentially a common issue. Your Honor, we would submit that Nokia's position is utterly without merit on that. I just wanted to make sure that the record was clear.

THE COURT: Right.

What I'm saying is, if it is an overarching issue and I can't at this point judge whether it's just without merit, whether it's utterly without merit -- you know, whatever adverbial tag line we want to put on it -- I can't judge that. But if it's possibly a good defense and you all can't figure out where to fight about it and it looks like the infection is spreading throughout the European union, then I am going to set a trial date and at least get the issue -- get discovery going.

What I would strongly advise that you do -- one of the things I would say to Nokia, don't be, you know, day foolish here and say we'll do our brief in a week. Let's just be careful about that. All I'm saying is, maybe you can anticipate all the arguments that they're going to have and you're going to look -- maybe you're going to get the stuff in ETSI. I don't know if there's an official English version of ETSI.

MR. URQUHART: The website.

THE COURT: The history of ETSI and what it means. I'll just -- why don't you figure out a place to have this fight.

MR. LORIG: On behalf of Nokia, we would stipulate that the Delaware Chancery Court can resolve this dispute and each side stay their hand on other litigations until this issue is resolved. Because these are two large mature companies and there is an honest dispute, apparently, between what the FRAND obligation means, and it should be resolved. We would stipulate to jurisdiction here. And I would hope counsel would ask their clients before rejecting it so that can be decided. Because the problem that we're going to get into is we can literally have scores of lawsuits around the world, not just in Europe, with differing interpretations of what the FRAND obligation means. Here, where there is jurisdiction over QUALCOMM and there isn't jurisdiction in the national courts in Europe, here's the one place it can be decided.

THE COURT: What I'm saying is, if they had thought of this court first, you know, I expect that what Nokia would be saying is, we're a Finnish corporation. And the fact that a few of our cell phones come into Delaware doesn't mean why are we the heck in the Delaware Court of Chancery. Now, Strine's got a great hairstyle and we dig that; but,

you know, aside from that, you know, you just can't really get it.

Now I understand there is a Nokia -- that the U.S. subsidiary is here. What I'm saying is -- I would say to both sides -- I realize -- and even in something just with the dispute -- the fact that one side or the other picked the forum first becomes, you know, some sort of psychological barrier to rationality. I could as easily say to Nokia, "Why not agree to go back to the U.S. District Court in San Diego, lift the stay with respect to this issue and have it out there." I think your friends from QUALCOMM would be in a very difficult position to say that a U.S. District Court is not a national quorum. That would deprive me and our Delaware friends of the ability to participate in this.

I'm happy to do the work. This court -- one of the advantages of Delaware is, you know, we have to play fair. That's the nature of our business. We can't play favorites and have it work for our state. It just doesn't work.

The Nokia subsidiary's a Delaware subsidiary; QUALCOMM is a Delaware corporation. Probably neither of your corporations have as many of

your operations here as my former boss and a U.S. senator would like. So it's not like we could favor the headquarters versus anything. Usually people -- we're indifferent to that. We're trying to come with a fair outcome.

If you can agree that I'm the place, you know, that becomes easier. Then you can enter into a stipulation that's binding.

My concern about that is, again, the psychic notion, which is that QUALCOMM has been brought and it didn't choose this place. You know, if what Nokia's objective is is to get a decision, what I'm saying to you, I am going to set a trial date and I am going to make you all have your depositions taken and do all that kind of stuff if these things keep coming up.

It may that be what you can agree on, even though it deprives me of the fun, is that the forum that QUALCOMM chose as its first American court, which might even be more convenient for some of the litigators working for Nokia, since, you know, you're out there in the land of Gwyneth and stuff, would be that, you know, you do it in San Diego.

MR. LORIG: One of the problems is the

judge in San Diego -- Judge Brewster -- is a senior judge, just had an operation for prostate cancer, has announced he's going to retire in September of next year. Some of these European cases won't be tried and decided by the middle of next summer. The timing, frankly, isn't good.

You know, one of the reasons, as I said we're here, is for exactly the reasons Your Honor enunciated: this is a neutral court.

MR. MAMMEM: The response to that is that, if we had started litigating the San Diego action back in November when we filed, we would be well-advanced in the San Diego forum at this point.

THE COURT: Well, Mr. Mammem, you represent --

MR. MAMMEM: QUALCOMM.

THE COURT: You're at what firm?

MR. MAMMEM: The Day Casebeer firm.

THE COURT: I guess what I'm saying is, you know, things like Judge Brewster -- if Judge Brewster is genuinely retiring, he probably knows that. And I would assume that he -- you know, as I would assume about most of my judicial colleagues -- that he cares deeply about doing

justice. And that to the extent that the time frame that's involved here doesn't comport with his retirement plans, that there is this thing called reassignment.

I would say to Mr. Stark and Mr. Mammem, you know, this court is fair. We do things pretty well. I think I know that the Cravath firm has once in a while gotten a decent result here. And so -- certainly the Potter Anderson firm has.

So I think the question becomes whether it's really like you just want to hurt each other, and you just want to have this sort of uncertainty. That may be a business decision that none of the lawyers have anything to do with. It's just simply we want to hurt each other, and nobody needs to respond to that because each side is going to say, "Of course we wouldn't do that. We wouldn't have just 17 lawsuits just because it gives us business leverage." And the other side say, "Of course we wouldn't do the same either. We wouldn't duck a particular forum just to come here and make it" -- you know, in Delaware we have that phrase, we don't -- we say it about every other day -- we didn't just fall off the turnip truck, which I think can also be

interpreted to mean I didn't just fall off the turnip truck. Everybody knows I fell off it five years ago, without a helmet, and I've suffered permanent damage ever since. I have never fallen off the turnip truck. I know there's jousting going on. I know this means a lot to your clients.

What we're going to do is, I want a tight briefing schedule. Think about that week. I'm not going -- I want a briefing schedule to me by next Wednesday.

MR. FISCHER: We'll do that, Your Honor.

THE COURT: Think about your time frame. If there are other lawsuits, then discovery is going to go forth and it's going to be on an expedited basis. So QUALCOMM, to some extent, is going to be in control about whether expedited discovery begins; otherwise discovery is not stayed but it will go under the usual deadlines. I would like a report back at the same time I get a schedule about whether you've conferred about whether there is a forum you could agree on to go first about these threshold issues and, frankly, to stay the other litigations. There may be some complexity there.

I heard Mr. Stark say it's a good point. There may have to be some sort of tolling agreement between QUALCOMM and Nokia to indicate that QUALCOMM is not -- if its time has already lapsed, it's lapsed. But that during the nothing -- simply the pendency of any stay to get done in the first things won't be -- that part of the delay won't be attributed as laches and that sort of thing.

MR. LORIG: Your Honor, we'd stipulate to that on the record right now. That's not a problem. The problem is, again, the fact that we're getting an injunction action in a week.

THE COURT: Mr. Stark, can you take that back to your client?

MR. STARK: Yes, Your Honor.

THE COURT: It also gives me a chance and will create a little record here, which will help other courts to flesh out really whether this is -- these people are acting like children in a way that's unfair or they simply, you know -- because I think if you can get -- at some point, when you've got the idea that QUALCOMM will be able to protect its interest in all the jurisdictions, we'll get a fair shot in a good forum of presenting its side in one of the national

controversies, but yet Nokia will get to advance this overarching thing and it could be done in a good quality forum that's neutral in a prompt way.

If one side or the other is objecting, then they suggested, frankly, this is a situation where counsel have a duty to step into your clients and say, "No, you can't act in a vexatious way." Let's have a fair fight on the merits. We may win or lose, but we have that opportunity, and we're not going to afflict 13 different countries with a case.

MR. LORIG: May I respond, Your Honor?

THE COURT: Yes.

MR. LORIG: That's exactly what the problem is and why we're here. They have asked for a July 2007 trial date in England, but the FRAND issues would not be decided until after that. You decide the patent issues first, injunction first, the other issues second.

Same in Germany. You're going to get the patent issues decided within a year. You're not going to get to the other issues.

THE COURT: Right.

What I'm saying is, I'm sensitive to the need -- I understand what Nokia is saying. I

think the vulnerability that Nokia has is are we a national court and the fact that could these -- this defense be presented in prior pending actions. That's why I'm suggesting to QUALCOMM it ought to think very hard about the other options it brings and whether it's willing to stipulate in somewhere else. If it prefers -- San Diego is a lovely place. I actually never spent any time in the city. I only spent my time on Coronado. It has sufficient proximity to the ocean and to fish tack companies that I never actually -- except driving to the airport -- spending any time there, other than the Padres are an awesome team. You know, you've heard me on that. I want to hear about the fight and I want a briefing schedule.

MR. FISCHER: By Wednesday?

THE COURT: Yes.

MR. LORIG: Should that briefing schedule be for an expedited proceeding so that this matter will be decided before these various midsummer problems we're going to have? We've got European decisions by the middle of next year.

THE COURT: No. I think I've been pretty clear.

What I've said is, I want a schedule

for the completion of briefing on a motion to dismiss or stay, essentially on the forum issue writ large. I am not staying discovery in any case. But if there are actions -- if QUALCOMM files an action anywhere else than it's already done, then I'm going to set a trial date. And I will turn what is discovery that's going to be ongoing and on a normal basis, I will turn that into expedited discovery.

I've got plenty of time to set a trial date for early next year. One thing we are capable of doing in this court is I have no doubt in the first -- well, the first half of August 2006 -- that we can be to trial in early 2007, you know, if we have to.

I'm also assuming there's been some discovery done between the parties somewhere. Not even in the arbitration?

MR. LORIG: Not on these issues, Your Honor.

THE COURT: Not on FRAND?

MR. LORIG: Not on FRAND. Not under right to injunction. Those aren't the issues in arbitration. There's four discrete issues and these are not among them because the contract in question, which I'm not allowed to discuss on pain of blowing a

confidentiality clause because QUALCOMM filed two cases against TI saying they lost their license by talking about the agreement --

THE COURT: Are you telling me that this dispute is entirely -- that dispute is entirely separate from ETSI?

MR. LORIG: Yes, Your Honor. I'm saying that that is entirely separate from ETSI and FRAND.

THE COURT: Mr. Stark, would you -- who is handling that for --

MR. MAMMEM: This is Chris Mammem.

Your Honor, as I believe I mentioned earlier, the dispute that's currently pending in the California arbitration does appear to be a separate set of arguments from the ETSI argument. However, as we've seen in the ETSI action, where Nokia filed its answer yesterday, they have raised both issues as affirmative defenses. Nokia has not yet filed its answer in the San Diego action, and we would have every reason to believe that they would in the due exercise of care for their client to assert both sets of issues as defenses in that action once they're required to answer there as well.

THE COURT: Okay. But that implies that the ETSI provision will somehow extend to --

MR. MAMMEM: Several of the patents that are asserted in the San Diego action have been declared standards essential under ETSI. That's the triggering event, as I understand it, for Nokia to be raising this issue.

THE COURT: Okay. But is what's at issue in San Diego have to deal with what happens in the United States or in Europe, which is, the duty -- the so-called duty, if it exists under ETSI to allow people to use your technology on a FRAND basis, does that extend outside the European union?

MR. MAMMEM: That is an issue that I'm not prepared to speak to today.

THE COURT: Is that Nokia's position?

MR. LORIG: Our position is the ETSI obligation extends throughout the world, Your Honor.

THE COURT: So that it would be a fair response to the injunction action in California to say ETSI says you can't do it.

MR. LORIG: Except it's not an injunction action. They're primarily seeking damages.

THE COURT: But they can't get damages

if they're breaching their ETSI rights; right? Then they're denying you the chance to use the technology on the basis that they're supposed to; right?

MR. LORIG: No, Your Honor. I think that's the whole issue.

Looking at the San Diego action apart from an injunction, they sue and they say you're infringing on our patent, we're entitled to damages. And the response would be, yes, you're entitled to a royalty, not as --

MR. MAMMEM: We pled in the San Diego action seeking both damages and injunctive relief.

MR. LORIG: Yes, it could be teed up there.

THE COURT: And it could also be teed up more broadly, which is not only as a defense and that the royalty -- whatever royalty you should pay is a FRAND rate, but more generally as an affirmative -- as a counterclaim you could be seeking an injunction. Is that right?

MR. LORIG: We could seek the same injunction from the Federal Court we are seeking from this court, except for the fact that it's again not a federal question --

THE COURT: It's not a Delaware law question either.

MR. LORIG: It's a contract question, Your Honor. It's strictly contract.

THE COURT: What I'm saying is, you would have every right, given that they brought you into Federal Court, for you now to raise this as a counterclaim and an affirmative defense and seek an injunction. It would not be a jurisdictional problem on the part of the Federal Court.

MR. LORIG: It wouldn't be, except that case is stayed pending arbitration.

THE COURT: That case is stayed. This case didn't exist; right?

MR. LORIG: Right.

THE COURT: The great thing about stays is they can be lifted.

MR. MAMMEM: We will stipulate to the lifting of that stay immediately, if Nokia would agree.

MR. FISCHER: It was filed by Nokia.

MR. LORIG: The issue is, you can't -- are they stipulating that we can pursue the arbitration issues in arbitration and that the

San Diego case will be dismissed, we win in arbitration, and then we come back to Delaware and have this decided, because the issues in arbitration are such that no San Diego case could have been filed, would have been filed? If we win the arbitration, the San Diego case must be dismissed with prejudice on all issues.

MR. MAMMEM: That's the nature of an affirmative defense, and they ought to be litigated in due course as affirmative defenses in the patent infringement case.

MR. LORIG: Your Honor, with all deference, I don't think I heard an answer to my question.

THE COURT: I don't think I did either. What I'm hearing is the kind of jousting that I'm going to stop, because it's one of my law clerk's last day and I'm not going to miss lunch with her over -- because it's not helpful.

You all need to take a deep breath and with a cool head and warm heart think about this rationally, which is what I just heard Mr. Mammem. It's a need answer. But the fact is that Nokia is now seeking to raise more than an affirmative defense.

It's seeking to obtain an injunction that goes further to that. The question is: are they going to get a forum -- if you come to me and say you can do it in the U.S. District Court for the District of San Diego but not until this arbitration is completed, and then you say that's not unfair to them because they're the ones that raised the arbitration issue -- I haven't seen the contract. It sounds like you've got a lot mixed up in there. It sounds like you're suing in Germany and the UK. It's probably not under the same contract that has the arbitration clause.

MR. LORIG: I would like to ask QUALCOMM's permission to submit to the Judge -- the Court -- a copy of the -- the contract at issue. We have QUALCOMM's permission?

MR. MAMMEM: I believe that would be fine to submit it under seal, or under whatever confidentiality agreement.

THE COURT: Don't submit it to me until next Wednesday in the context of something.

How far along in the arbitration -- this will be the last line of questioning -- how far along are you in this arbitration?

MR. LORIG: I would say we're halfway

along. We've teed up a proffer on how we're going to prove the issues that we've raised in arbitration. They filed a motion to dismiss. The arbitrator's currently considering them. We think the motions are going to be denied and we'll tee up the arbitration hearing. It should be within the next couple three months.

THE COURT: Then would you do some discovery?

MR. LORIG: There's going to be a little discovery. One of the key witnesses is unfortunately dying of cancer and we're having a little difficulty getting opposing counsel to agree on a way of taking his deposition -- a way that doesn't aggravate his health. There may be a little additional discovery after that.

MR. MAMMEM: Mr. Lorig is correct. The motion to dismiss is pending. We believe that motion will be granted, obviously. If it's denied, then there will be some amount of discovery to be taken before the merits issue is teed up.

THE COURT: Is the arbitrator somebody really super special that Nokia loves?

MR. LORIG: No. The arbitrator was

somebody jointly picked by both sides. His name is Les Weinstein. He's a retired trial lawyer. He doesn't have Your Honor's economic background but he's got a lot of common sense.

THE COURT: You may have to go over what my economic background is. Sort of lower middle class.

Good. I'm glad to know that his folks had some money.

I guess what I'm wondering here is, you know, it doesn't sound to me like you're all that -- the arbitration is always a murky process. You sit here about halfway through, struck me as you're not -- I wouldn't call that halfway through. I wouldn't even call it halfway through the first phase of anything.

Part of what you all should be thinking about is -- maybe it's this fellow with a better economic background than I have, maybe he does it all. Maybe you get through the motion and say, "Well, we'll live by what the dismissal thing is. But if the claims go forward, we'll go back to the judge, lift the stay, and we'll do it all in the District Court of San Diego. But we'll do it promptly." What

Nokia gets out of that is it gets a chance to present its FRAND-ETSI argument. But you do it all in one expedited trial before someone, especially since you haven't really taken the discovery or anything.

That would involve Nokia obviously giving up something, which is it loves this judge or loves this arbitrator or loves arbitration. More likely what it had is, it had -- it was sued by QUALCOMM. And then the first thing you do is you figure out how can you defeat the suit. And if you have a contract that says, "Well, we can decide or dispute somewhere else," even if you don't even necessarily think that somewhere else is better, you tend to cling to that at that point in time. I mean, I hate to say it's that primitive, but I do think a lot of times it's that primitive and that, you know, it's there so we will use it. If we can get a punter over here, worrying about it delays them playing offense. Now Nokia wants to play offense. And it wants something that probably an arbitrator doesn't have any prayer of being able to give it, which is an injunction that would have a collateral effect in other nations.

And one of the responsible trade-offs

might be to go to Judge Brewster and say, "We're going to put this all in the U S. District Court. Your Honor, you're a great judge. You had a great career. You're leaving next September. Our time frame is something else. Let's get it reassigned mutually to somebody who can handle it." The parties stipulate to expedite this and have this be the case that goes forward, put all your claims before him and go. That sounds like a fairly -- you know, that sounds like you would all look like pretty sensible business people and lawyers if you did that.

MR. LORIG: May I respond? That would be about as I think acceptable as a suggestion to QUALCOMM. We could litigate this in Helsinki court. I think the whole advantage of being here is, one, you can get something resolved quickly in the Delaware Chancery Court; two, you have a neutral forum; three, it's a place where companies from around the world know they're going to get a fair, neutral --

THE COURT: It's making us -- our head is going to explode here in Chancery because we feel so good and that you love us. I don't know any reason why a judge -- a federal district judge in San Diego -- you know, is going to favor QUALCOMM over

Nokia. I don't know if the stadium is named after anybody out there.

MR. LORIG: QUALCOMM Stadium.

MR. MAMMEM: Not anymore.

THE COURT: And it's a federal district judge. But you know, you may be just sort of stuck with that.

I would say on the other hand to Nokia -- as I said, I'm willing to do the work. This Court will do the work. But again, I would say that to QUALCOMM -- it may be QUALCOMM -- you sent them to arbitration. They may want to get all their claims before one thing. Maybe you agree it's the Southern District of New York. There are courts -- there are judges in federal courts who will take this very seriously. I'm not implying that the Court that it's in isn't. If it needs to be done within the next five or six months, we'll do that.

I had the Oracle case and Judge Walker had the Oracle antitrust thing. He did that antitrust trial just as promptly as any of us in Chancery would and he pumped out a decision.

Again, I didn't realize -- you can see how big a Padre fan I am. I still -- the idea that a

federal judge is going to rule for QUALCOMM --

MR. LORIG: Judge Brewster's fair, and I wouldn't want to indicate anything other than that. It's the difficulties when you have an international problem like this. You know, clients are understandably hesitant to go into the other company's home court. It has nothing to do with individuals, Your Honor.

THE COURT: I understand. Part of the problem is, you all picked this court now. As a result, if you had gone to them and said, "Why don't we have Chancery" -- "why don't we think about Chancery? Our operations are Delaware, you're Delaware. Why don't we have Chancery do it." You might not have a reflex. But now they chose a forum, you chose a forum. And what it tends to mean is it's got to be some other forum.

You know, you all need to read the transcript. Think about whether what I'm saying is true or not. I think it is about psychologically how you deal with it. Talk to your clients rationally and think about, you know, what you're going to do. If you can't, we'll finish the motion practice and we'll worry about that then. Okay?

So I'll hear from you next Wednesday.

(Court adjourned at 1:22:50 p.m.)

CERTIFICATE

I, DIANE G. McGRELLIS, Official Court Reporter of the Chancery Court, State of Delaware, do hereby certify that the foregoing pages numbered 3 through 44 contain a true and correct transcription of the proceedings as stenographically reported by me at the hearing in the above cause before the Vice Chancellor of the State of Delaware, on the date therein indicated.

IN WITNESS WHEREOF I have hereunto set my hand at Wilmington, this 14th day of August, 2006.

Diane G. McGrellis
-----------------------------
Official Court Reporter
of the Chancery Court
State of Delaware

Certification Number: 108-PS
Expiration: Permanent

# EXHIBIT 6

ORIGINAL

Michael J. Neil (Bar No. 40057)
Hugh A. McCabe (Bar No. 131828)
David P. Hall (Bar No. 196891)
NEIL, DYMOTT, FRANK, HARRISON & MCFALL
A Professional Law Corporation
1010 Second Avenue, Suite 2500
San Diego, California 92101-4959
Telephone: (619) 238-1712
Facsimile: (619) 238-1562

FILED
06 AUG 11 PM 3:44
CLERK, U.S. DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
A. William Urquhart (Bar No. 140996)
Frederick A. Lorig (Bar No. 057645)
Bruce R. Zisser (Bar No. 180607)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Micha Danzig (Bar No. 177923)
4445 Eastgate Mall, Suite 200
San Diego, California 92121-1979
Telephone: (858) 812-3107
Facsimile: (858) 812-3336

[ADDITIONAL COUNSEL LISTED ON NEXT PAGE]

Attorneys for Defendants
NOKIA CORPORATION and NOKIA INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

QUALCOMM INCORPORATED and SNAPTRACK, INC.,

Plaintiffs,

vs.

NOKIA CORPORATION and NOKIA INC.,

Defendants.

CASE NO. 05-CV-2063B (BLM)

DECLARATION OF MICHA DANZIG IN SUPPORT OF DEFENDANTS' MOTION TO STAY PURSUANT TO 28 U.S.C. § 1659(a)

Date: October 16, 2006
Time: 2:00 p.m.
Ctrm: 2
Judge: Honorable Rudi Brewster

73



Additional Counsel for Defendants NOKIA Corporation and NOKIA Inc.:

Patrick J. Flinn (Bar No. 104423)
Peter Kontio, Pro Hac Vice
S. Gardner Culpepper, Pro Hac Vice
Keith E. Broyles, Pro Hac Vice
John D. Haynes, Pro Hac Vice
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

Michael J. Newton (Bar No. 156225)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201-1515
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

DECLARATION OF MICHA DANZIG

I, Micha Danzig, declare as follows:

1. I am an attorney duly licensed to practice in California and admitted to practice before this Court, and a partner of Quinn Emanuel Urquhart Oliver & Hedges, LLP, counsel of record for defendants Nokia Corporation and Nokia Inc. The facts set forth herein are personally known to me, and if called and sworn as a witness I would testify competently to them.

2. Attached as Exhibit A is a true and correct copy of Qualcomm's Complaint Under Section 337 of the Tariff Act of 1930, as Amended, which was filed with the United States International Trade Commission ("ITC") on June 9, 2006 (without exhibits).

3. Attached as Exhibit B is a true and correct copy of the ITC's Notice of Investigation in the matter of Certain Mobile Telephone Handsets, Wireless Communication Devices, and Components Thereof, Inv. No. 337-TA-578 ("the ITC action"), 71 Fed. Reg. 39,362 (July 12, 2006).

4. Attached as Exhibit C is a true and correct copy of the administrative law judge's Order No. 2: Setting Target Date and Issuing Ground Rules for Conduct of Investigation, dated July 12, 2006, in the ITC action (without attachment).

5. Attached as Exhibit D are true and correct copies of declarations obtained from the European Telecommunications Standardization Institute's online intellectual property rights database.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of August 2006, at San Diego, California.

Micha Danzig

 

## Search IPR Declarations

THE ETSI IPR DATABASE contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards. Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Article 6.1 of the ETSI IPR POLICY (Annex 6 of the Rules of Procedure).

The present database provides data that is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI Standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation, or IPR searches, have been carried out by ETSI and therefore no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

Please note that when using the work item/projects field for your search you might obtain duplicate entries. This results from the fact that IPR declarations made to ETSI may be relevant to one and/or several projects/work item.

Selected by
- Patent No.: 5,257,283

Sorted by Project (ascending)

2 IPR Declarations found View 10

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,257,283 | 3GPP TS 45.002<br>ETSI TS 145 002 | | | GERAN | 2005-10-14 |

Patent title
Spread Spectrum Transmitter Power Control Method and System

Country of registration
UNITED STATES

Countries applicables to App./Patent

Other Patents / Applications in same family

| | |
|---|---|
| 050689 | AUSTRIA |
| 646001 | AUSTRALIA |
| 0500689 | BELGIUM, SWITZERLAND, European Patent Office, SPAIN, FRANCE, GREECE, ITALY, LUXEMBOURG, NETHERLANDS, SWEDEN |
| PI9007826-8 | BRAZIL |
| 2072989 | CANADA |
| 48018 | SINGAPORE |
| UA42677 | UKRAINE |
| 187674 | INDIA |
| 187564 | INDIA |
| ZL96120301.3 | CHINA |
| MY-110833-A | MALAYSIA |
| ZL93119710.4 | CHINA |
| FI109495 | FINLAND |
| HK1010077 | HONG KONG |
| 178942 | INDIA |
| 96218 | ISRAEL |
| 2776632 | JAPAN |
| 215947 | KOREA (REPUBLIC OF) |
| MY-104785-A | MALAYSIA |
| 172367 | MEXICO |
| 304206 | NORWAY |

Exhibit D Page 39

 

| | |
|---|---|
| ZL90109758.6 | CHINA |
| NI-050434 | TAIWAN, PROVINCE OF CHINA |
| 90/8859 | SOUTH AFRICA |
| 48360 | SINGAPORE |

Notes

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,257,283 | 3GPP TS 45.008<br>ETSI TS 145 008 | | | GERAN | 2005-10-14 |

Patent title

Spread Spectrum Transmitter Power Control Method and System

Country of registration — Countries applicables to App./Patent

UNITED STATES

Other Patents / Applications in same family

| | |
|---|---|
| 050689 | AUSTRIA |
| 646001 | AUSTRALIA |
| 0500689 | BELGIUM |
| PI9007826-8 | BRAZIL |
| 2072989 | CANADA |
| 0500689 | SWITZERLAND, DENMARK, European Patent Office, SPAIN, FRANCE, GREECE, ITALY, LUXEMBOURG, NETHERLANDS, SWEDEN |
| 48018 | SINGAPORE |
| UA42677 | UKRAINE |
| 187674 | INDIA |
| 187564 | INDIA |
| ZL96120301.3 | CHINA |
| MY-110833-A | MALAYSIA |
| ZL93119710.4 | CHINA |
| FI109495 | FINLAND |
| HK1010077 | HONG KONG |
| 178942 | INDIA |
| 96218 | ISRAEL |
| 2776632 | JAPAN |
| 215947 | KOREA (REPUBLIC OF) |
| MY-104785-A | MALAYSIA |
| 172357 | MEXICO |
| 304206 | NORWAY |
| ZL90109758.6 | CHINA |
| NI-050434 | TAIWAN, PROVINCE OF CHINA |
| 90/8859 | SOUTH AFRICA |
| 48360 | SINGAPORE |

Notes

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

DOWNLOAD TO CSV COPY URLS

Exhibit D Page 40

 

## Search IPR Declarations

THE ETSI IPR DATABASE contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards. Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Article 6.1 of the ETSI IPR POLICY (Annex 6 of the Rules of Procedure).

The present database provides data that is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI Standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation, or IPR searches, have been carried out by ETSI and therefore no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

Please note that when using the work item/projects field for your search you might obtain duplicate entries. This results from the fact that IPR declarations made to ETSI may be relevant to one and/or several projects/work item.

Selected by

- Patent No.: 5,568,483

Sorted by Project (ascending)

5 IPR Declarations found View 10

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,568,483 | 3GPP TS 26.090<br>ETSI TS 126 090 | | | AMR | 2005-10-14 |

Patent title
Method and Apparatus for the Formatting of Data for Transmission

Country of registration
UNITED STATES

Countries applicables to App./Patent

Other Patents / Applications in same family

| | |
|---|---|
| 000456 | ARMENIA, European Patent Office, AZERBAIJAN, BELARUS, KAZAKHSTAN, KYRGYZSTAN, MOLDOVA, REPUBLIC OF, TAJIKISTAN, TURKMENISTAN, RUSSIAN FEDERATION |
| 694612 | AUSTRALIA |
| 2210657 | CANADA |
| 40.874 | CHILE |
| ID0009161 | INDONESIA |
| 116790 | ISRAEL |
| 3323509 | JAPAN |
| 338406 | KOREA (REPUBLIC OF) |
| MY-113574-A | MALAYSIA |
| 194649 | MEXICO |
| 302029 | NEW ZEALAND |
| ZL96192583.3 | CHINA |
| NI-085103 | TAIWAN, PROVINCE OF CHINA |
| 96/0161 | SOUTH AFRICA |
| 50056 | SINGAPORE |
| UA46751 | UKRAINE |
| 2033 | VIET NAM |

Notes
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

Exhibit D Page 41

 

| Company | Patent No. Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,568,483 | 3GPP TS 45.001<br>ETSI TS 145 001 | | | GERAN | 2005-10-14 |

Patent title
Method and Apparatus for the Formatting of Data for Transmission

Country of registration — Countries applicables to App./Patent
UNITED STATES

Other Patents / Applications in same family

| | |
|---|---|
| 000456 | ARMENIA, AZERBAIJAN, BELARUS, European Patent Office, KYRGYZSTAN, KAZAKHSTAN, MOLDOVA, REPUBLIC OF, TAJIKISTAN, MONGOLIA |
| 694612 | AUSTRALIA |
| 2210657 | CANADA |
| 40.874 | CHILE |
| ID0009161 | INDONESIA |
| 116790 | ISRAEL |
| 3323509 | JAPAN |
| 338406 | KOREA (REPUBLIC OF) |
| MY-113574-A | MALAYSIA |
| 194649 | MEXICO |
| 302029 | NEW ZEALAND |
| ZL96192583.3 | CHINA |
| NI-085103 | TAIWAN, PROVINCE OF CHINA |
| 00456 | RUSSIAN FEDERATION |
| 96/0181 | SOUTH AFRICA |
| 50056 | SINGAPORE |
| UA46751 | UKRAINE |
| 2033 | VIET NAM |

Notes
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,568,483 | 3GPP TS 45.002<br>ETSI TS 145 002 | | | GERAN | 2005-10-14 |

Patent title
Method and Apparatus for the Formatting of Data for Transmission

Country of registration — Countries applicables to App./Patent
UNITED STATES

Other Patents / Applications in same family

| | |
|---|---|
| 000456 | ARMENIA, AZERBAIJAN, BELARUS, European Patent Office, KYRGYZSTAN, KAZAKHSTAN, MOLDOVA, REPUBLIC OF, TAJIKISTAN, TURKMENISTAN |
| 694612 | AUSTRALIA |
| 2210657 | CANADA |
| 40.874 | CHILE |
| ID0009161 | INDONESIA |
| 116790 | ISRAEL |
| 3323509 | JAPAN |
| 338406 | KOREA (REPUBLIC OF) |
| MY-113574-A | MALAYSIA |
| 194649 | MEXICO |

Exhibit D Page 42

 

| | |
|---|---|
| 302029 | NEW ZEALAND |
| ZL96192583.3 | CHINA |
| NI-085103 | TAIWAN, PROVINCE OF CHINA |
| 00456 | RUSSIAN FEDERATION |
| 96/0181 | SOUTH AFRICA |
| 50056 | SINGAPORE |
| UA46751 | UKRAINE |
| 2033 | VIET NAM |

**Notes**

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,568,483 | 3GPP TS 45.003<br>ETSI TS 145 003 | | | GERAN | 2005-10-14 |

**Patent title**
Method and Apparatus for the Formatting of Data for Transmission

**Country of registration** — **Countries applicables to App./Patent**
UNITED STATES

*Other Patents / Applications in same family*

| | |
|---|---|
| 96/0181 | SOUTH AFRICA |
| 50056 | SINGAPORE |
| UA46751 | UKRAINE |
| 2033 | VIET NAM |
| 000456 | ARMENIA, AZERBAIJAN, BELARUS, KYRGYZSTAN, KAZAKHSTAN, MOLDOVA, REPUBLIC OF, RUSSIAN FEDERATION, TAJIKISTAN, TURKMENISTAN, European Patent Office |
| 694612 | AUSTRALIA |
| 2210657 | CANADA |
| 40.874 | CHILE |
| ID0009161 | INDONESIA |
| 116790 | ISRAEL |
| 3323509 | ISRAEL |
| 338406 | KOREA (REPUBLIC OF) |
| MY-113574-A | MALAYSIA |
| 194649 | MEXICO |
| 302029 | NEW ZEALAND |
| ZL96192583.3 | CHINA |
| NI-085103 | TAIWAN, PROVINCE OF CHINA |

**Notes**

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,568,483 | 3GPP TS 44.060<br>ETSI TS 144 060 | | | GPRS | 2005-10-14 |

**Patent title**
Method and Apparatus for the Formatting of Data for Transmission

**Country of registration** — **Countries applicables to App./Patent**
UNITED STATES

Exhibit D Page 43

 

**Other Patents / Applications in same family**

| | |
|---|---|
| 000456 | ARMENIA, AZERBAIJAN, BELARUS, European Patent Office, KYRGYZSTAN, KAZAKHSTAN, MOLDOVA, REPUBLIC OF, TAJIKISTAN, TURKMENISTAN |
| 694612 | AUSTRALIA |
| 2210657 | CANADA |
| 40,874 | CHILE |
| ID0009161 | INDONESIA |
| 116790 | ISRAEL |
| 3323509 | JAPAN |
| 338406 | KOREA (REPUBLIC OF) |
| MY-113574-A | MALAYSIA |
| 194649 | MEXICO |
| 302029 | NEW ZEALAND |
| ZL96192583.3 | CHINA |
| NI-085103 | TAIWAN, PROVINCE OF CHINA |
| 00456 | RUSSIAN FEDERATION |
| 96/0181 | SOUTH AFRICA |
| 50056 | SINGAPORE |
| UA46751 | UKRAINE |
| 2033 | VIET NAM |

**Notes**

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

Exhibit D Page 44

 

## Search IPR Declarations

THE ETSI IPR DATABASE contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards. Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Article 6.1 of the ETSI IPR POLICY (Annex 6 of the Rules of Procedure).

The present database provides data that is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI Standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation, or IPR searches, have been carried out by ETSI and therefore no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

Please note that when using the work item/projects field for your search you might obtain duplicate entries. This results from the fact that IPR declarations made to ETSI may be relevant to one and/or several projects/work item.

Selected by
- Patent No.: 5,778,338

Sorted by Project (ascending)

2 IPR Declarations found View 10

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,778,338 | 3GPP TS 26.194 | | | 3GPP/AMR-WB | 2004-04-08 |
| | | ETSI TS 126 194 | | | | |
| | | 3GPP TS 46.061 | | 4.0.0 | | |
| | | ETSI TS 146 061 | | 4.0.0 | | |
| | | 3GPP TS 26.091 | | 3.1.0 | | |
| | | ETSI TS 126 091 | | 3.1.0 | | |
| | | 3GPP TS 26.191 | | | | |
| | | ETSI TS 126 191 | | | | |
| | | 3GPP TS 26.094 | | 3.0.0 | | |
| | | ETSI TS 126 094 | | 3.0.0 | | |

Patent title
Variable Rate Vocoder

Country of registration
UNITED STATES

Countries applicables to App./Patent
UNITED STATES

Notes
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,778,338 | 3GPP TS 26.091 | | | AMR | 2005-10-14 |
| | | ETSI TS 126 091 | | | | |

Patent title
Vocoder

Country of registration
UNITED STATES

Countries applicables to App./Patent

Other Patents / Applications in same family

| | |
|---|---|
| 0588932 | AUSTRIA, BELGIUM, SWITZERLAND, GERMANY, European Patent Office, SPAIN, FRANCE, UNITED KINGDOM, GREECE, ITALY, SWEDEN |

Exhibit D Page 45

 

| | |
|---|---|
| 1107231 | AUSTRIA, SWITZERLAND, GERMANY, European Patent Office, SPAIN, FRANCE, UNITED KINGDOM |
| 1126437 | AUSTRIA, BELGIUM, SWITZERLAND, GERMANY, European Patent Office, SPAIN, FRANCE, UNITED KINGDOM, GREECE |
| 671952 | AUSTRALIA |
| 711484 | AUSTRALIA |
| PI9205143-5 | BRAZIL |
| 693374 | AUSTRALIA |
| 69232202.2-08 | GERMANY |
| 69233397.5-08 | GERMANY |
| ZL96123201.3 | CHINA |
| ZL96118597.X | CHINA |
| ZL01122965.9 | CHINA |
| 1014796 | HONG KONG |
| 1064785 | HONG KONG |
| 215861 | HUNGARY |
| 102146 | ISRAEL |
| 113986 | ISRAEL |
| 113987 | ISRAEL |
| 113988 | ISRAEL |
| 1107231 | ITALY |
| 1126437 | JAPAN |
| 3432822 | JAPAN |
| 3566669 | JAPAN |
| 1126437 | LUXEMBOURG, MONACO |
| 179172 | MEXICO |
| 1107231 | NETHERLANDS |
| 11264237 | NETHERLANDS |
| WO1992/02289 | Patent Cooperation Treaty |
| ZL92104516.9 | CHINA |
| 2107951 | RUSSIAN FEDERATION |
| 92/4082 | SOUTH AFRICA |

Notes

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

DOWNLOAD TO CSV CONTINUE

Exhibit D Page 46

 

## Search IPR Declarations

THE ETSI IPR DATABASE contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards. Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Article 6.1 of the *ETSI IPR POLICY (Annex 6 of the Rules of Procedure).*

The present database provides data that is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI Standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation, or IPR searches, have been carried out by ETSI and therefore no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

Please note that when using the work item/projects field for your search you might obtain duplicate entries. This results from the fact that IPR declarations made to ETSI may be relevant to one and/or several projects/work item.

Selected by
- Patent No.: 5,638,412

Sorted by Project (ascending)

4 IPR Declarations found View 10

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,638,412 | 3GPP TS 03.60<br>ETSI TS 101 344 | | | GPRS | 2005-10-14 |

**Patent title**
Method for Providing Service and Rate Negotiation in a Mobile Communication System

**Country of registration** Countries applicables to App./Patent
UNITED STATES

**Other Patents / Applications in same family**

| | |
|---|---|
| 685648 | AUSTRALIA |
| PI9505489-8 | BRAZIL |
| CL42.164 | CHILE |
| ZL01119741.2 | CHINA |
| 69516382.5-08 | GERMANY |
| 69534085.9-08 | GERMANY |
| *0719491* | *European Patent Office* |
| 0969683 | European Patent Office, SPAIN, FRANCE, UNITED KINGDOM, ITALY |
| 0969684 | European Patent Office, GERMANY, SPAIN, FRANCE, UNITED KINGDOM, ITALY, SWEDEN |
| 0719491 | FRANCE, UNITED KINGDOM, ITALY, SWEDEN |
| HK1011133 | HONG KONG |
| HK1028663 | HONG KONG |
| 3043420 | JAPAN |
| 396265 | KOREA (REPUBLIC OF) |
| MY114771-A | MALAYSIA |
| ZL95190554.5 | CHINA |
| NI-078085 | TAIWAN, PROVINCE OF CHINA |
| 2159990 | RUSSIAN FEDERATION |
| 28667 | SINGAPORE |
| 754 | VIET NAM |

**Notes**
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the

Exhibit D Page 47

  

IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,638,412 | 3GPP TS 43.064 ETSI TS 143 064 | | | GPRS | 2005-10-14 |

**Patent title**
Method for Providing Service and Rate Negotiation in a Mobile Communication System

**Country of registration** UNITED STATES

**Countries applicables to App./Patent**

**Other Patents / Applications in same family**

| | |
|---|---|
| 2159990 | RUSSIAN FEDERATION |
| 28667 | SINGAPORE |
| 754 | VIET NAM |
| 685648 | AUSTRIA |
| PI9505489-8 | BRAZIL |
| CL42.164 | CHILE |
| ZL01119741.2 | CHINA |
| 69516382.5-08 | GERMANY |
| 69534085.9-08 | GERMANY |
| 0969684 | GERMANY, European Patent Office, SPAIN, FRANCE, UNITED KINGDOM, ITALY, SWEDEN |
| 0719491 | European Patent Office, FRANCE, UNITED KINGDOM, ITALY, SWEDEN |
| 0969683 | European Patent Office, SPAIN, FRANCE, UNITED KINGDOM, ITALY |
| HK1011133 | HONG KONG |
| HK1028863 | HONG KONG |
| 3043420 | JAPAN |
| 396255 | KOREA (REPUBLIC OF) |
| MY114771-A | MALAYSIA |
| ZL95190554.5 | CHINA |
| NI-076085 | TAIWAN, PROVINCE OF CHINA |

**Notes**
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,638,412 | 3GPP TS 44.060 ETSI TS 144 060 | | | GPRS | 2005-10-14 |

**Patent title**
Method for Providing Service and Rate Negotiation in a Mobile Communication System

**Country of registration** UNITED STATES

**Countries applicables to App./Patent**

**Other Patents / Applications in same family**

| | |
|---|---|
| 685648 | AUSTRALIA |
| PI9505489-8 | BRAZIL |
| CL42.164 | CHILE |
| ZL01119741 2 | CHINA |
| 69516382.5-08 | GERMANY |
| 69534085.9-08 | GERMANY |
| 0969684 | GERMANY, European Patent Office, SPAIN, FRANCE, UNITED KINGDOM, ITALY, SWEDEN |

Exhibit D Page 48

 

| | |
|---|---|
| 0719491 | European Patent Office, FRANCE, UNITED KINGDOM, ITALY, SWEDEN |
| 0969683 | European Patent Office, SPAIN, FRANCE, UNITED KINGDOM, ITALY |
| HK1011133 | HONG KONG |
| HK1028863 | HONG KONG |
| 3043420 | JAPAN |
| 396255 | KOREA (REPUBLIC OF) |
| MY114771-A | MALAYSIA |
| ZL95190554.5 | CHINA |
| NI-078085 | TAIWAN, PROVINCE OF CHINA |
| 2159990 | RUSSIAN FEDERATION |
| 28667 | SINGAPORE |
| 754 | VIET NAM |

**Notes**

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. / Application No. | Work item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,638,412 | 3GPP TS 24.008<br>ETSI TS 124 008 | | | UMTS | 2005-10-14 |

**Patent title**

Method for Providing Service and Rate Negotiation in a Mobile Communication System

**Country of registration** | **Countries applicables to App./Patent**

UNITED STATES

**Other Patents / Applications in same family**

| | |
|---|---|
| 685648 | AUSTRALIA |
| PI9505489-8 | BRAZIL |
| CL42.164 | CHILE |
| ZL01119741.2 | CHINA |
| 69516382.5-08 | GERMANY |
| 69534085.9-08 | GERMANY |
| 0719491 | European Patent Office, FRANCE, UNITED KINGDOM, ITALY, SWEDEN |
| 0969683 | European Patent Office, SPAIN, FRANCE, UNITED KINGDOM, ITALY |
| 0969684 | European Patent Office, GERMANY, SPAIN, FRANCE, UNITED KINGDOM, ITALY, SWEDEN |
| HK1011133 | HONG KONG |
| HK1028863 | HONG KONG |
| 3043420 | JAPAN |
| 396255 | KOREA (REPUBLIC OF) |
| MY114771-A | MALAYSIA |
| ZL95190554.5 | CHINA |
| NI-078085 | TAIWAN, PROVINCE OF CHINA |
| 2159990 | RUSSIAN FEDERATION |
| 28667 | SINGAPORE |
| 754 | VIET NAM |

**Notes**

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

DOWNLOAD TO CSV | COPY URL

Exhibit D Page 49

 

## Search IPR Declarations

THE ETSI IPR DATABASE contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards. Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Article 6.1 of the ETSI IPR POLICY (Annex 6 of the Rules of Procedure).

The present database provides data that is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI Standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation, or IPR searches, have been carried out by ETSI and therefore no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

Please note that when using the work item/projects field for your search you might obtain duplicate entries. This results from the fact that IPR declarations made to ETSI may be relevant to one and/or several projects/work item.

Selected by
- Patent No.: 6,496,543

Sorted by Project (ascending)

3 IPR Declarations found View 10

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 6,496,543 | 3GPP TS 45.003<br>ETSI TS 145 003 | | | GERAN | 2005-10-14 |

**Patent title**
Method and Apparatus for Providing High Speed Data Communications in a Cellular Environment

**Country of registration** UNITED STATES

**Countries applicables to App./Patent**

**Other Patents / Applications in same family**

| | |
|---|---|
| 722340 | AUSTRALIA |
| ID0010355 | INDONESIA |
| 129306 | ISRAEL |
| 228363 | MEXICO |
| 318282 | NORWAY |
| 335018 | NEW ZEALAND |
| ZL97199169.3 | CHINA |
| NI-121459 | TAIWAN, PROVINCE OF CHINA |
| 2193291 | RUSSIAN FEDERATION |
| 64724 | SINGAPORE |
| 57041 | UNITED KINGDOM |
| 2849 | VIET NAM |

**Notes**
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 6,496,543 | 3GPP TS 45.008<br>ETSI TS 145 008 | | | GERAN | 2005-10-14 |

Exhibit D Page 50

 

Patent title
Method and Apparatus for Providing High Speed Data Communications in a Cellular Environment

Country of registration: UNITED STATES
Countries applicables to App./Patent

Other Patents / Applications in same family

| | |
|---|---|
| 722340 | AUSTRALIA |
| ID0010355 | INDONESIA |
| 228363 | MEXICO |
| 318282 | NORWAY |
| 335018 | NEW ZEALAND |
| ZL97199169.3 | CHINA |
| NI-121459 | TAIWAN, PROVINCE OF CHINA |
| 2193291 | RUSSIAN FEDERATION |
| 64724 | SINGAPORE |
| 57041 | UKRAINE |
| 2849 | VIET NAM |

Notes
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 6,496,543 | 3GPP TS 43.064<br>ETSI TS 143 064 | | | GPRS | 2005-10-14 |

Patent title
Method and Apparatus for Providing High Speed Data Communications in a Cellular Environment

Country of registration: UNITED STATES
Countries applicables to App./Patent

Other Patents / Applications in same family

| | |
|---|---|
| 722340 | AUSTRALIA |
| 129306 | ISRAEL |
| ID0010355 | INDONESIA |
| 228363 | MEXICO |
| 318282 | NORWAY |
| 335018 | NEW ZEALAND |
| ZL97199169.3 | CHINA |
| NI-121459 | TAIWAN, PROVINCE OF CHINA |
| 2193291 | RUSSIAN FEDERATION |
| 64724 | SINGAPORE |
| 57041 | UKRAINE |
| 2849 | VIET NAM |

Notes
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

DOWNLOAD TO CSV   COPY URL

Exhibit D Page 51

 

## Search IPR Declarations

THE ETSI IPR DATABASE contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards. Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Article 6.1 of the ETSI IPR POLICY (Annex 6 of the Rules of Procedure).

The present database provides data that is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI Standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation, or IPR searches, have been carried out by ETSI and therefore no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

Please note that when using the work item/projects field for your search you might obtain duplicate entries. This results from the fact that IPR declarations made to ETSI may be relevant to one and/or several projects/work item.

Selected by

- Patent No.: 6,574,211

Sorted by Project (ascending)

2 IPR Declarations found View 10

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 6,574,211 | 3GPP TS 04.18<br>ETSI TS 101 503 | | | GERAN | 2005-10-14 |

Patent title
Method and Apparatus for High Rate Packet Data Transmission

Country of registration: UNITED STATES

Countries applicables to Appl./Patent

Other Patents / Applications in same family

| | |
|---|---|
| 750154 | AUSTRALIA |
| 519543 | NEW ZEALAND |
| 520681 | NEW ZEALAND |
| 1033063 | HONG KONG |
| 221264 | MEXICO |
| 503841 | NEW ZEALAND |
| ZL98810951.4 | CHINA |
| 2233045 | RUSSIAN FEDERATION |
| 98/10003 | SOUTH AFRICA |
| 72266 | SINGAPORE |
| UA55482 | UKRAINE |
| 3351 | VIET NAM |

Notes
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 6,574,211 | 3GPP TS 45.008<br>ETSI TS 145 008 | | | GERAN | 2005-10-14 |

Exhibit D Page 52

 

Patent title
Method and Apparatus for High Rate Packet Data Transmission

| Country of registration | Countries applicables to App./Patent |
|---|---|
| UNITED STATES | |

Other Patents / Applications in same family

| | |
|---|---|
| 750154 | AUSTRALIA |
| 129308 | ISRAEL |
| 519543 | NEW ZEALAND |
| 520681 | NEW ZEALAND |
| 1033083 | HONG KONG |
| 221264 | MEXICO |
| 503841 | NEW ZEALAND |
| ZL98810951.4 | CHINA |
| 2233045 | RUSSIAN FEDERATION |
| 98/10003 | SOUTH AFRICA |
| 72266 | SINGAPORE |
| UA55482 | UKRAINE |
| 3351 | VIET NAM |

Notes

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

DOWNLOAD TO CSV COPY URL

 

## Search IPR Declarations

THE ETSI IPR DATABASE contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards. Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Article 6.1 of the ETSI IPR POLICY (Annex 6 of the Rules of Procedure).

The present database provides data that is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI Standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation, or IPR searches, have been carried out by ETSI and therefore no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

Please note that when using the work item/projects field for your search you might obtain duplicate entries. This results from the fact that IPR declarations made to ETSI may be relevant to one and/or several projects/work item.

Selected by

- *Patent No.: 5,742,734*

Sorted by Project (ascending)

2 IPR Declarations found View 10

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,742,734 | 3GPP TS 26.194<br>ETSI TS 126 194<br>3GPP TS 26.094<br>ETSI TS 126 094 | | <br><br>3.0.0<br>3.0.0 | 3GPP/AMR-WB | 2004-04-08 |

**Patent title**
Encoding Rate Selection in a Variable Rate Vocoder

*Country of registration*: UNITED STATES

*Countries applicables to App./Patent*: UNITED STATES

**Notes**
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 5,742,734 | 3GPP TS 26.094<br>ETSI TS 126 094 | | | AMR | 2005-10-14 |

**Patent title**
Encoding Rate Selection in a Variable Rate Vocoder

**Country of registration**: UNITED STATES

**Countries applicables to App./Patent**

**Other Patents / Applications in same family**

| | |
|---|---|
| 0728350 | AUSTRIA |
| 711401 | AUSTRALIA |
| 0728350 | SWITZERLAND, IRELAND, LIECHTENSTEIN, LUXEMBOURG, SWEDEN |
| CL41.250 | CHILE |
| 455225 | KOREA (REPUBLIC OF) |
| 1239465 | AUSTRIA, SWITZERLAND, GERMANY, SPAIN, FRANCE, UNITED KINGDOM, GREECE, IRELAND, ITALY, NETHERLANDS, PORTUGAL, SWEDEN |

Exhibit D Page 54

| | |
|---|---|
| 69534285.1-08 | GERMANY |
| 69533881.1-08 | GERMANY |
| 1233408 | AUSTRIA, SWITZERLAND, DENMARK, European Patent Office, SPAIN, FRANCE, UNITED KINGDOM, GREECE, IRELAND, ITALY, NETHERLANDS, PORTUGAL, SWEDEN |
| 0728350 | SPAIN, European Patent Office, FRANCE, UNITED KINGDOM, GREECE, ITALY, NETHERLANDS |
| HK1015185 | HONG KONG |
| 192881 | INDIA |
| 114874 | ISRAEL |
| 3502101 | JAPAN |
| 455828 | KOREA (REPUBLIC OF) |
| MY-113084-A | MALAYSIA |
| 190444 | MEXICO |
| CN1158071C | CHINA |
| NI-078214 | TAIWAN, PROVINCE OF CHINA |
| 95/8081 | SOUTH AFRICA |
| 32650 | SINGAPORE |
| 822 | VIET NAM |

**Notes**

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

DOWNLOAD TO CSV COPY URL

Exhibit D Page 55

 

## Search IPR Declarations

THE ETSI IPR DATABASE contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards. Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Article 6.1 of the ETSI IPR POLICY (Annex 6 of the Rules of Procedure).

The present database provides data that is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI Standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation, or IPR searches, have been carried out by ETSI and therefore no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

Please note that when using the work item/projects field for your search you might obtain duplicate entries. This results from the fact that IPR declarations made to ETSI may be relevant to one and/or several projects/work item.

Selected by
- Patent No.: 6,677,894

Sorted by Project (ascending)

4 IPR Declarations found View 10

Some data are duplicated. This results from the fact that IPR licensing declarations made to ETSI may be relevant to one and/or sev-
The actual number of IPR licensing declarations found is: 2

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 6,677,894 | 3GPP TS 22.071<br>3GPP TS 24.008<br>3GPP TS 25.331<br>3GPP TS 25.413<br>3GPP TS 25.430<br>3GPP TS 25.453<br>3GPP TS 23.171<br>ETSI TS 125 331<br>ETSI TS 125 413<br>ETSI TS 125 430<br>ETSI TS 125 453<br>ETSI TS 123 171 | | 6.6.0<br>6.3.0<br>6.0.1<br>6.0.0<br>6.0.0<br>6.3.0<br>3.10.0<br>6.0.1<br>6.0.0<br>6.0.0<br>6.3.0<br>3.10.0. | 3GPP<br>GPRS<br>GSM | 2004-06-04 |

**Patent title**
Method and Apparatus for Providing Location-Based Information Via a Computer Network

**Country of registration** UNITED STATES
**Countries applicables to App./Patent**

**Notes**
On 24 SEPTEMBER 2004, Qualcomm Inc. appended their information statement and licensing declaration of essential IPRs of 4 June 2004, for project 3GPP, by adding the projects GSM and GPRS to their above-mentioned declaration.

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESS

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 6,677,894 | 3GPP TS 43.059<br>ETSI TS 143 059 | | | GERAN | 2005-10-14 |

**Patent title**

Exhibit D Page 56

 

Method and Apparatus for Providing Location-Based Information Via a Computer Network

**Country of registration** **Countries applicables to App./Patent**

UNITED STATES

**Notes**

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 6,677,894 | 3GPP TS 22.071 | | 6.6.0 | 3GPP | 2004-06-04 |
| | | 3GPP TS 24.008 | | 6.3.0 | GPRS | |
| | | 3GPP TS 25.331 | | 6.0.1 | GSM | |
| | | 3GPP TS 25.413 | | 6.0.0 | | |
| | | 3GPP TS 25.430 | | 6.0.0 | | |
| | | 3GPP TS 25.453 | | 6.3.0 | | |
| | | 3GPP TS 23.171 | | 3.10.0 | | |
| | | ETSI TS 125 331 | | 6.0.1 | | |
| | | ETSI TS 125 413 | | 6.0.0 | | |
| | | ETSI TS 125 430 | | 6.0.0 | | |
| | | ETSI TS 125 453 | | 6.3.0 | | |
| | | ETSI TS 123 171 | | 3.10.0. | | |

**Patent title**

Method and Apparatus for Providing Location-Based Information Via a Computer Network

**Country of registration** **Countries applicables to App./Patent**

UNITED STATES

**Notes**

On 24 SEPTEMBER 2004, Qualcomm Inc. appended their information statement and licensing declaration of essential IPRs of 4 June 2004, for project 3GPP, by adding the projects GSM and GPRS to their above-mentioned declaration.

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESS

| Company | Patent No. / Application No. | Work Item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date |
|---|---|---|---|---|---|---|
| Qualcomm Inc. | 6,677,894 | 3GPP TS 22.071 | | 6.6.0 | 3GPP | 2004-06-04 |
| | | 3GPP TS 24.008 | | 6.3.0 | GPRS | |
| | | 3GPP TS 25.331 | | 6.0.1 | GSM | |
| | | 3GPP TS 25.413 | | 6.0.0 | | |
| | | 3GPP TS 25.430 | | 6.0.0 | | |
| | | 3GPP TS 25.453 | | 6.3.0 | | |
| | | 3GPP TS 23.171 | | 3.10.0 | | |
| | | ETSI TS 125 331 | | 6.0.1 | | |
| | | ETSI TS 125 413 | | 6.0.0 | | |
| | | ETSI TS 125 430 | | 6.0.0 | | |
| | | ETSI TS 125 453 | | 6.3.0 | | |
| | | ETSI TS 123 171 | | 3.10.0. | | |

**Patent title**

Method and Apparatus for Providing Location-Based Information Via a Computer Network

**Country of registration** **Countries applicables to App./Patent**

UNITED STATES

**Notes**

On 24 SEPTEMBER 2004, Qualcomm Inc. appended their information statement and licensing declaration of essential IPRs of 4 June 2004, for project 3GPP, by adding the projects GSM and GPRS to their above-mentioned declaration.

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the

Exhibit D Page 57

IPR in ETSI Deliverables

Page 3 of 3

STANDARD, to the extent that the IPRs remain ESS

DOWNLOAD TO CSV COPY URL

Exhibit D Page 58

http://webapp.etsi.org/ipr/IPRList.asp?standAlone=false&Company=&Country=&Project... 8/10/2006

# EXHIBIT 7

Westlaw.

Slip Copy
Slip Copy, 2006 WL 278164 (S.D.Ill.)
(Cite as: Slip Copy)

Page 1

H

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,S.D. Illinois.

HIGHLAND SUPPLY COMPANY, an Illinois Corporation, and Prima Tek II, L.L.C., an Illinois Limited Liability Company, Plaintiffs,

v.

KLERK'S FLEXIBLE PACKAGING, B.V., a Netherlands Corporation, f/k/a Klerk's Plastic Industrie, B.V., Defendant.

**No. 05-CV-482-DRH.**

Feb. 1, 2006.

Bruce N. Cook, Cook, Ysursa, et al., Belleville, IL, Joseph P. Titterington, Dunlap, Codding, et al., Oklahoma City, OK, J. William Lucco, Joseph R. Brown, Jr., Christopher P. Threlkeld, Debra K. Zahalsky, Lucco, Brown, et al., Edwardsville, IL, for Plaintiffs.

Dawn A. Sallerson, John E. Sabo, Hinshaw & Culbertson, Belleville, IL, Jami M. Jackson, Michael G. Adams, Parker, Poe, et al., W. Thad Adams, III, Adams Evans, Charlotte, NC, for Defendant.

MEMORANDUM AND ORDER

HERNDON, J.

I. *Introduction and Background*

*1 Before the Court is Plaintiffs' motion to reconsider this Court's ruling denying remand in this case (Doc. 26), or, in the alternative, grant certification for interlocutory appeal. (Doc. 29.) Plaintiffs argue that this Court's December 21, 2005 order denying remand was wrongly decided, and that the holding of *U.S. Valves, Inc. v. Dray,* 212 F.3d 1368 (Fed.Cir.2000) was improperly applied to the facts of this case. They argue that because the 1998 agreement between the parties (the "Agreement") "does not extend just to patentable inventions," the *U.S. Valves* decision is inapposite. (Doc. 30, p. 2.) For the reasons below, the Court denies Plaintiffs' motion to reconsider and declines to issue a certificate of appealability.

II. *Analysis*

A. Reconsideration

Motions to reconsider interlocutory orders "are left subject to the complete power of the court rendering them," should be granted "as justice requires," Fed. R. Civ. P. 60 advisory committee's notes, and must be "consonant with equity." *John Simmons Co. v. Grier Brothers,* 258 U.S. 82, 90-91, 42 S.Ct. 196, 66 L.Ed. 475 (1922). *See also* 12 James Wm. Moore et al., Moore's Federal Practice ¶ 60App.108[2] (3d ed.2004). Such motions "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.,* 90 F.3d 1264, 1269 (7th Cir.1996) (quoting *Keene Corp. v. Int'l Fidelity Ins. Co.,* 561 F.Supp. 656, 665 (N.D.Ill.1982), *aff'd,* 736 F.2d 388 (7th Cir.1984)). "Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole,* 90 F.3d at 1270.

Plaintiffs' current motion offers little in the way of fresh reasoning and presents no new factual issues or evidence. Instead, Plaintiffs focus on two areas of argument that their motion to remand has, in detail, already addressed (*see* Doc. 18, pp. 6-11):(1) how this case differs from *U.S. Valves*, and (2) how the facts of two other cases-*Board of Regents v. Nippon Telephone & Telegraph Corp.,* 414 F.3d 1358 (Fed.Cir.2005) and *American Telephone & Telegraph Co. v. Integrated Network Corp.,* 972 F.3d 1321 (Fed.Cir.1992)-more closely resemble the facts of this case. These arguments are not new, and the Court remains unpersuaded.

As this Court has previously noted, the relevant question here is whether the facts of this case require a court to interpret a federal patent, thus causing the entire matter to arise under 28 U.S.C. § 1338(a). (*See* Doc. 26, pp. 5-6.) Plaintiffs sue for breach of contract. They claim that Defendant breached the Agreement by (1) conceiving and developing certain products; (2) failing to disclose such conception and development; (3) manufacturing and/or selling products constituting developments, inventions, and or improvements on Plaintiffs' patented technology; and (4) failing to return the materials associated with its conception and development. (Doc. 2.) The Agreement, in pertinent part, provides

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

that "Defendant may conceive of new developments and/or innovations and/or improvements and/or works of authorship ... *in products covered by the LISENCED PATENT,*" and that such products are the property of Plaintiff. (Doc. 20 (italics added).)

*2 As the above language implies, before a court determines whether Defendant breached the agreement by manufacturing, using, or selling certain products, it must first decide the predicate issue of whether the developments, inventions, or improvements in question are "covered" by the patent. That is, the relevant language in the Agreement limits Defendant's behavior only as to "covered" products; if a product is not "covered" by Plaintiffs' patent, then Defendant's use, manufacture, sale, or failure to disclose does not amount to breach of the Agreement. This fact brings this matter within *U.S. Valves'* s holding. *See* U.S. Valves, 212 F.3d at 1372.

Despite Plaintiffs' argument to the contrary, it does not matter, for the purposes of the remand question, whether Defendant's developments, innovations, or improvements are themselves patentable. What matters is that they relate to products "covered" by the licensed patent. If such products are "covered," then, under the language of the Agreement, Defendant's use, manufacture, sale, or failure to disclose can give rise to a breach-of-contract suit. If they are not, it cannot. (*See* Doc. 20.) That is why, as this Court has held (Doc. 26), this case presents necessary patent-law issues: in order to determine if Defendant's products are, in fact, developments, innovations, or improvements on the product described in Plaintiff's patent, a determination will need to be made whether or not these products derive from Plaintiff's patent. This raises a substantial question of federal patent law under 28 U.S.C. § 1338(a). *See* U.S. Valves, 212 F.3d at 1372. Accordingly, Defendant's removal was proper.

B. Certificate of Appealabiltiy

Pursuant to 28 U.S.C. § 1292(b),

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order....

Certificates of appealability are "disfavored" because they "frequently cause unnecessary delays in lower court proceedings and waste the resources of an already overburdened judicial system. For these reasons, the preferred practice is to defer appellate review until the entry of a final judgment...." *Herdrich v. Pegram,* 154 F.3d 362, 368 (7th Cir.1998) (citing *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 473-74, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)) (citation omitted). Interlocutory appeal is available only when "(1) an appeal presents an question of law; (2) it is controlling; (3) it is contestable; (4) its resolution will expedite the resolution of the litigation; and (5) the petition to appeal is filed in the district court within a reasonable amount of time after entry of the order sought to be appealed." *Boim v. Quranic Literacy Inst.,* 291 F.3d 1000, 10007 (7th Cir.2002) (citing *Ahrenholz v. Board of Trustees,* 219 F.3d 674, 675 (7th Cir.2000)).

*3 The Court declines to issue a certificate of appealability here because resolution of the remand issue turns on a question of contract interpretation, not a question of law. Plaintiffs' contention in its motion to remand is that the parties' agreement does not require this Court to interpret a federal patent. (Docs.18, 30.) Defendant argues to the contrary. (Docs.25, 31.) After considering the parties' arguments, the Court sided with Defendant. (Doc. 26.) Though Plaintiffs apparently disagree with this conclusion, their disagreement centers exclusively on the manner in which the Court interpreted the parties' agreement, not on a legal issue.FN1 (*See* Doc. 30.) The question Plaintiffs propose to submit, via appeal, to the Federal Circuit makes this clear; as they put it, this Court "should allow the Federal Circuit to consider if a non-patent theory of recovery exists upon which plaintiffs may rely." Plaintiffs, in other words, seek to have the Federal Circuit examine the parties' Agreement and determine whether, contrary to the decision of this Court, it gives rise to a nonpatent theory of recovery. That is a con-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

tract-interpretation question, not a question of law. *See Ahrenholz,* 219 F.3d at 676-77.[FN2] The relevant question of law has already been resolved by the Federal Circuit. *See U.S. Valves,* 212 F.3d 1368. Accordingly, the Court declines to issue a certificate of appealability.

FN1. The legal issue this case presents-whether a suit for breach of contract requiring a court to interpret a federal patent raises a question of federal patent law under 28 U.S.C. § 1338(a)-is settled by *U.S. Valves.*

FN2. "[T]he question of the meaning of a contract, though technically a question of law when there is no other evidence but the written contract itself, is not what the framers of section 1292(b) had in mind either. We think they used 'question of law in much the same way a lay person might, as referring to a 'pure' question of law rather than merely to an issue that might be free from a factual contest. The idea was that if a case turned on a pure question of law, something the court of appeals could decide quickly and cleanly without having to study the record, the court should be enabled to do so without having to wait till the end of the case." *Ahrenholz,* 219 F.3d at 676-77 (citations omitted).

III. *Conclusion*

Therefore, the Court DENIES Plaintiffs' motion to reconsider and DECLINES to issue a certificate of appealability. (Doc. 29.)

IT IS SO ORDERED.

S.D.Ill.,2006.
Highland Supply Co. v. Klerk's Flexible Packaging, B.V.
Slip Copy, 2006 WL 278164 (S.D.Ill.)

Briefs and Other Related Documents (Back to top)

- 2006 WL 465209 (Trial Motion, Memorandum and Affidavit) Defendant's Opposition to Plaintiffs' Motion to Reconsider Order Denying Remand or, in the Alternative, Motion to Certify Order for Appeal (Jan. 19, 2006) Original Image of this Document (PDF)
- 2006 WL 465208 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of its Motion to Reconsider Order Denying Remand or, in the alternative, Motion to Certify Order for Appeal (Jan. 5, 2006) Original Image of this Document (PDF)
- 2005 WL 2840155 (Trial Motion, Memorandum and Affidavit) Defendant's Opposition to Plaintiffs' Motion to Remand (Sep. 6, 2005) Original Image of this Document (PDF)
- 2005 WL 2385132 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Motion to Remand (Aug. 5, 2005) Original Image of this Document (PDF)
- 2005 WL 2385131 (Trial Pleading) Answer (Jul. 15, 2005) Original Image of this Document (PDF)
- 2005 WL 2385130 (Trial Pleading) Complaint (Jul. 8, 2005) Original Image of this Document (PDF)
- 3:05cv00482 (Docket) (Jul. 08, 2005)
- 2005 WL 3783065 (Trial Pleading) Complaint (Jun. 9, 2005) Original Image of this Document (PDF)
- 2005 WL 3783066 (Trial Pleading) Complaint (Jun. 9, 2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

# EXHIBIT 8

Briefs and Other Related Documents
Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,D. New Jersey.
Andre B. CHRISTIE and Rosalind Christie, his wife, Plaintiffs,
v.
PUBLIC SERVICE ELECTRIC AND GAS COMPANY, Hugh D. Sweeney, Jeff Hila, Local Union 94 of the International Brotherhood of Electrical Workers, Tom Maguire, Chip Gerrity, and International Brotherhood of Electrical Workers, Defendants.
**No. Civ. 04-5978(HAA).**

Feb. 24, 2006.

Anthony J. Riposta, North Arlington, New Jersey, for Plaintiffs.
Patrick R. Westerkamp, Newark, New Jersey, for Defendant, Public Service Electric and Gas Company.
Paul A. Montalbano, Cohen, Leder, Montalbano & Grossman, Kenilworth, New Jersey, for Defendants Hugh D. Sweeney, Jeff Hila, Local Union 94, Tom Maguire, Chip Gerrity, and International Brotherhood of Electrical Workers.

*OPINION & ORDER*

ACKERMAN, Senior District Judge:
***1** This matter comes before the Court on three separate motions: a motion by Plaintiff,[FN1] Andre B. Christie ("Christie"), to remand this matter to state court (Docket No. 5); a motion by Defendants Local Union 94 of the International Brotherhood of Electrical Workers ("Local 94"), Tom Maguire and Chip Gerrity (the "Local 94 Defendants") to dismiss Christie's claims against such defendants (Docket No. 12); and a motion filed by Defendant Public Service Electric and Gas ("PSE & G") to dismiss Christie's claims against PSE & G (Docket No. 11). For the following reasons, Christie's motion to remand is DENIED. The Local 94 Defendants' motion to dismiss is deferred for further consideration, as the Court will convert the motion to dismiss into a motion for summary judgment and will provide the parties an opportunity to submit any additional briefs, affidavits or other filings that the parties deem necessary for the summary judgment motion. PSE & G's motion to dismiss the claims against it is DENIED.

FN1. As noted below, Christie's wife, Rosalind Christie, withdrew her claims in this action shortly after removal to this Court. Accordingly, this Court will refer to Christie as a singular "Plaintiff."

*Background*

In this action, Christie, a former PSE & G employee, asserts claims against PSE & G, the International Brotherhood of Electrical Workers ("IBEW") and Local 94 of the IBEW, the collective bargaining agent for Christie. PSE & G and Local 94 are parties to a collective bargaining agreement that governs the terms and conditions of employment for PSE & G employees. Christie was terminated from his position as a Grade I Lineman on November 12, 2002, allegedly for evading a random drug test on November 6, 2002. Several months before, in late August 2002, Christie had received inpatient treatment for drug addiction. Christie completed treatment and was discharged and authorized to return to work on or about September 26, 2002.

According to Christie, upon his return to employment on or about October 3, 2002, PSE & G and Christie entered into what Christie alleges to be a "written employment agreement," which according to Christie, "provided in essence that Christie's employment as a Grade I Lineman was secure but subject to drug and alcohol testing during the ensuing three year period." (Am.Compl.¶ 33.) The nature of this document is in some dispute, as Defendants counter that the October 3, 2002 letter was not a separate employment agreement, as Christie insists, but rather was a "three year letter." According to the Defendants, a "three year letter" is a notification to an employee who has tested positive for drugs or alcohol in violation of company policy that they are subject to the terms of a collectively-bargained-for "Agreement on Alcohol and Drug Testing for IBEW Represented Employees" (the "Drug Testing Agreement"), and may avoid termination by abiding by the terms of the Drug Testing Agreement. Under the Drug Testing Agreement, employees are required to successfully complete drug addiction treatment and submit to random drug testing for a three-year period after completion of treatment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



On November 6, 2002, Christie alleges that his supervisors, Hugh D. Sweeney ("Sweeney") and Jeff Hila ("Hila") requested that he submit to a drug test. Christie alleges that his son was ill and in need of medical attention on that day, and that his son's illness constituted a family medical emergency. Christie asserts that he was forced to make a "moral choice" between taking the drug test and providing his son with access to medical attention. Christie chose to take his son to a doctor on November 6, 2002, and did not submit to the drug test. On November 7, 2002, Christie returned to PSE & G and brought Sweeney and Hila a doctor's note confirming that his son was treated on November 6, 2002. Christie alleges that Sweeney and Hila told him to go home and take care of his son and return to work when his son was feeling better. Christie did not return to work until November 12, 2002. On that day, Sweeney and Hila advised him that he was being terminated because he evaded the drug test.

*2 Christie commenced an action in the Superior Court, State of New Jersey, Essex County on November 10, 2004 by way of a Complaint and Jury Demand asserting claims against PSE & G, Sweeney and Hila (the "Employer Defendants"), the IBEW and the Local 94 Defendants. Two days after filing the original Complaint, Christie filed a First Amended Complaint as of right, adding an additional claim against the Employer Defendants for breach of the alleged "written employment agreement" of October 3, 2002.

In his pleadings, Christie asserts claims against the Employer Defendants alleging that: 1) his discharge was discriminatory in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. §§ 10:5-1 to 10:5-42, because he was allegedly discharged due to his status as a recovering drug addict; 2) the discharge was in violation of the New Jersey Family Medical Leave Act ("NJFMLA"), N.J. Stat. Ann. §§ 34:11B-1 to 34:11B-16, because the discharge occurred despite the fact that Christie's son's illness allegedly caused Christie's failure to take the drug test; and 3) the discharge was in breach of the "written employment agreement" of October 3, 2002 because the Employer Defendants discharged Christie "premised on the incorrect, inaccurate, false and misleading allegation that Christie deliberately evaded the drug test." (Am Compl ¶ 38.)

Christie also asserts claims against the IBEW and certain individual representatives, as well as the Local 94 Defendants, alleging violations of the NJLAD and the NJFMLA, as well as violation of the IBEW Constitution and the Local 94 bylaws. Christie's Complaint also asserted *per quod* claims on behalf of Christie's wife, but those claims have been withdrawn, as indicated by Christie's counsel. (Pl.'s Br. Opp'n Mot. Dismiss 2.) Likewise, Christie has dropped his claims against the IBEW, although his claims against the Local 94 Defendants remain. *Id.*

The Local 94 Defendants, joined by PSE & G, removed Christie's action to this Court on or about December 6, 2004, asserting that Christie's claims against IBEW and the Local 94 Defendants constituted claims for breach of the duty of fair representation governed by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Moreover, the Local 94 Defendants also argue that the LMRA completely preempts Christie's NJLAD and NJFMLA claims against them, and point out that Christie's duty of fair representation claims against them, coupled with Christie's wrongful discharge claims against PSE & G, constitute a "classic hybrid duty of fair representation/wrongful discharge claim" under 29 U.S.C. § 185(a). (Local 94 Defs.' Br. Opp'n Mot. Remand 8.)

On December 16, 2004, Christie moved for remand of the action to state court. The defendants opposed remand, and the Local 94 Defendants simultaneously moved to dismiss Christie's claims against them on the grounds that Christie's duty of fair representation claims are subject to a six-month statute of limitations and are consequently time-barred. PSE & G has also moved to dismiss Christie's claims against the Employer Defendants on the grounds that Christie has not stated a claim under the NJLAD, the NJFMLA, or for breach of what Christie characterizes as the "written employment agreement" of October 3, 2002.

*Analysis*

I. Christie's Motion for Remand

*3 It is axiomatic that federal district courts are courts of limited jurisdiction. Various statutes define bases for federal jurisdiction in particular circumstances. Of particular relev-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



ance to this case, Section 1331 of Title 28 of the U.S.Code defines a district court's original jurisdiction over claims arising under federal laws, and Section 1367(a) permits a district court with original jurisdiction over one or more claims in an action to exercise supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy...." Subsection (c) of 28 U.S.C. § 1367 describes four situations in which a district court may nevertheless decline to adjudicate supplemental claims: 1) the supplemental claims present novel or complex issues of state law; 2) the supplemental claims substantially predominate over "original jurisdiction" claims; 3) the court has dismissed all "original jurisdiction" claims; and 4) in certain "exceptional circumstances." 28 U.S.C. § 1367(c).

In addition, in cases removed to federal court from state court pursuant to 29 U.S.C. § 1441, a district court has discretion to retain jurisdiction over supplemental claims, or remand such claims to state court, pursuant to 29 U.S.C. § 1441(c). That section provides:

[w]henever a separate and independent claim or cause of action within the jurisdiction of 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which state law predominates

29 U.S.C. § 1441(c).

### A. The Parties' Arguments on the Remand Motion

Christie has moved for remand under 29 U.S.C. 1441(c). Christie asserts that this Court has discretion to remand this entire case to state court because the Complaint pleads violations of New Jersey statutory and common law against PSE & G and the Local 94 Defendants, even though Christie simultaneously acknowledges that his claims against the IBEW and Local 94 for breach of the IBEW Constitution and Local 94 bylaws are federally based. The Local 94 Defendants counter that Christie's Complaint alleges that the IBEW and the Local 94 Defendants "violated the IBEW Constitution and the Local 94 bylaws by willfully and intentionally failing to prosecute Christie's discharge to arbitration" (Compl.¶ 27), and that Christie's pleading thus states a claim for breach of the duty of fair representation owed by a Union to a represented employee. The Local 94 Defendants assert that a claim against a union for breach of the duty of fair representation arises under Section 301 of the LMRA, and that the United States Supreme Court has established that the duty of fair representation imposed by the LMRA completely preempts and displaces state law. (*See* Defs.' Br. Opp'n Remand 9 (citing *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)).)

*4 PSE & G also opposes Christie's motion to remand on the additional ground that Christie's claims against the Employer Defendants for wrongful discharge necessarily implicate the collective bargaining agreement that PSE & G entered into with Local 94, in particular, the Drug Testing Agreement. PSE & G asserts that "[b]y pleading that his termination as a recovering drug addict is discriminatory, Andre Christie has intertwined his statutory handicap claim with the [Drug Testing Agreement]." (PSE & G Br. Opp'n Remand 5.) PSE & G argues that, in order to resolve the "statutory question" of wrongful discharge under the NJLAD, Christie's claim "depends on an interpretation, applying federal common law, of Local 94's contract" with PSE & G. (*Id.* at 5-6.) Thus, PSE & G argues that Christie's discriminatory discharge claim is, in actuality, a claim for breach of the collective bargaining agreement, and is also completely preempted by federal law.

### B. This Court's Authority to Remand under 28 U.S.C. § 1441(c)

The Third Circuit has stated that 28 U.S.C. § 1441(c) grants "the district court only a limited authority to remand a case." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 786 (3d Cir.1995). The Third Circuit has interpreted the discretionary remand provision of § 1441(c) to authorize a district court, upon a determination that at least one "separate and independent" claim in the action establishes federal question jurisdiction justifying removal of that claim to federal court, to either: 1) determine all issues connected with the case; or 2) remand *only those claims in which state law predominates. Id.* at 786-87. Moreover, when state claims arise from "an interrelated series of events or transactions" or "derive from a common nucleus of operative fact" as do the claims over which independent federal jurisdiction exists, they do

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



not constitute "separate and independent" claims that may be remanded to state court under § 1441(c). *Id.* at 786.

Contrary to Christie's assertions, Section 1441(c) does not provide authority for remanding an *entire case,* because the application of Section 1441(c) presupposes that the case contains at least one "separate and independent" federal claim that has been properly removed to federal court; consequently, any such properly-removed federal claim cannot be remanded. *Id.* at 787 (rejecting theory that district court could remand entire case, including federal question claims, under § 1441(c); holding that "the district court's discretion to remand under § 1441(c) can pertain only to those *state law claims* which the district court could decline to hear under 28 U.S.C. § 1367"). Thus, a discretionary remand under Section 1441(c) necessarily requires the district court to retain jurisdiction over federal claims, while remanding predominantly state-based claims, resulting in the splitting of an action into separate federal and state actions.

C. Christie's Motion for Remand Is Meritless Because Several of the Claims Are Federal in Nature and Federal Jurisdiction Properly Exists for this Action

*5 In the case before the Court, several of the claims warrant federal question jurisdiction, thereby precluding remand of this case in its entirety. Christie's claim against the Local 94 Defendants for violation of the IBEW Constitution and Local 94 bylaws is governed by federal law. *See Lewis v. Int'l Bhd. of Teamsters Local No. 771,* 826 F.2d 1310, 1314 (3d Cir.1987) (holding that "a federal court has jurisdiction under section 301(a) [of the LMRA] over suits brought by an individual union member against his or her local union or the international union for *violation of a union constitution*" ) (emphasis added). Even Christie's counsel acknowledges the federal nature of the claim. (*See* Certif. of Anthony Riposta, Esq. Supp. Remand ¶ 10 ("The only claim that arguably comes within the purview of the [LMRA], 29 U.S.C. § 185(a), is the claim against Local 94 for failing to abide by the [IBEW] Constitution and Local 94's bylaws.").) Consequently, this Court's review of Christie's claim for violation of the IBEW Constitution and Local 94 bylaws is valid because the federal statutory authority that governs the claim, 29 U.S.C. § 185(a), provides a basis for federal question jurisdiction under 28 U.S.C. § 1331.

Furthermore, Christie's claims against the Local 94 Defendants for violation of the NJLAD and the NJFMLA are also subject to federal jurisdiction, due to the preemptive effect of the LMRA. Christie's claims against the Local 94 Defendants rest upon Christie's assertion that Local 94 failed to prosecute his grievance to arbitration for discriminatory reasons. (*See* Compl. ¶ 27.) This contention is a classic expression of a claim for breach of the duty of fair representation. In *Vaca v. Sipes,* 386 U.S. 171, 186 (1967), the Supreme Court held that a discharged employee's complaint, filed in state court, alleging that a union has arbitrarily, capriciously and unreasonably failed to take his grievance to arbitration, alleges a breach by the union of a duty grounded in federal statutes and as such is governed by federal law. As noted by the Supreme Court in *Vaca,* a union's "authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." 386 U.S. at 177. Accordingly, the Supreme Court held that a breach of the statutory duty of fair representation occurs "when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190. The Supreme Court made clear that the employee's right to bring suit against the union in federal court arises under Section 301 of the LMRA. *Id.*

Despite Christie's attempt to frame his claims against the Local 94 Defendants under the rubric of New Jersey statutory law, the preemptive effect of the LMRA supplants any state-law bases for these claims, and mandates that Christie's claims are governed by Section 301 of the LMRA, 29 U.S.C. § 185. As noted by the Third Circuit,

*6 [t]he Supreme Court has made it clear that one cannot avoid federal preemption of alleged state law claims by artfully phrasing the language in the complaint. "It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern."

*Johnson v. United Food & Commercial Workers,* 828 F.2d 961, 967 (3d Cir.1987) (quoting *Amalgamated Ass'n of Street Elec. Ry. & Motor Coach Employees of Am. v. Lockridge,* 403 U.S. 274, 292 (1971)). Accordingly, Christie's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims against the Local 94 Defendants are governed by federal law, and are properly before this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331.

Finally, with regard to Christie's Amended Complaint against PSE & G for breach of what Christie characterizes as a "written employment agreement" dated October 3, 2002, this claim also implicates federal law. PSE & G challenges Christie's description of the October 3, 2002 document as a "written employment agreement." PSE & G asserts that the October 3 document is in fact a "three year letter"-a notification pursuant to the Drug Testing Policy that was a product of collective bargaining between IBEW and PSE & G.

Christie did not attach the alleged "written employment agreement" to his pleadings, despite his reliance thereon, but the Amended Complaint described it as making Christie "subject to drug and alcohol testing during [a] three year period." (Am.Compl.¶ 33.) However, PSE & G's counsel, in papers submitted in opposition to remand, has included a copy of an October 3, 2002 document addressed to Andre Christie which states, in its entirety:

Dear Mr. Christie,

Because you have used a controlled substance in violation of Company policy, you will be tested for drugs and alcohol at any time during the following three year period (with a minimum of six unannounced follow-up tests during the first 12 months for CDL holders). Any positive test for drugs or alcohol (.04% B.A.C. or higher) during this period will result in immediate discharge. Any positive finding for alcohol (.02%-.39% B.A.C.) during this period will result in the action outlined in the Agreement on Alcohol and Drug Testing for IBEW Represented Employees.

We are very concerned about your health and safety and that of your co-workers. We hope you realize the seriousness of this matter so you may contribute positively to the Company in the future.

(Certif. of Paul Westerkamp, Esq. Opp'n Mot. Remand, Ex. C.) Even a cursory review of the above document reveals that it is not a "written employment agreement" in and of itself, but is obviously a notification pursuant to the Drug Testing Policy, notably because the letter itself actually refers to and appears to incorporate "actions outlined in the 'Agreement on Alcohol and Drug Testing for IBEW Represented Employees' [the Drug Testing Policy]." FN2 *Id.* Thus, to the extent that Christie asserts a claim for "breach" of the October 3, 2002 document, which itself refers to a collectively-bargained agreement, Christie's putative "breach of contract" claim constitutes a claim for breach of the collective bargaining agreement between PSE & G and IBEW. Accordingly, this claim, as a classic expression of the "wrongful discharge" component of an employee's "hybrid action" for wrongful discharge/breach of a collective bargaining agreement against the employer and breach of the duty of fair representation against a union, is likewise subject to the jurisdiction of the federal courts by virtue of the preemptive effect of Section 301 of the LMRA. *See Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 589 n. 5 (3d Cir.2005) (noting that "[a] hybrid section 301 action is one in which a union member sues his or her employer for breaching its contractual obligations under the collective bargaining agreement and the union for breaching the duty of fair representation").

> FN2. This Court has the authority to review the October 3, 2002 document, even though it is not part of the pleadings, because Christie's remand motion presents a challenge to this Court's jurisdiction, and as such, under the procedures for jurisdictional challenges under Rule 12(b)(1), the Court may look to documents outside the pleadings in order to assess jurisdictional facts sufficient to assure the Court of the propriety of its adjudication of a particular claim. *See Biase v. Kaplan,* 852 F.Supp. 268, 277 (D.N.J.1994) (noting that consideration of a motion challenging subject matter jurisdiction need not be limited to the pleadings; "conflicting written and oral evidence may be considered and a court may decide for itself the factual issues which determine jurisdiction").

Because Christie's Amended Complaint for "breach" of the October 3, 2002 document may implicate state or federal law, depending on the interpretation of the October 3, 2002 document as either a written employment agreement or a notice pursuant to a collective bargaining agreement, it is appropriate for this Court to analyze the October 3,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 document in order to determine facts regarding the propriety of this Court's jurisdiction over Christie's Amended Complaint.
Moreover, this Court can properly consider the October 3, 2002 document in the context of a motion to dismiss because, although it was not attached as an exhibit to Christie's pleadings, it is integral to Christie's Amended Complaint, and Christie has not denied its authenticity. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196-1197 (3d Cir.1993) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document")

*7 In light of the foregoing, it is clear that despite his efforts to avoid invoking federal jurisdiction, Christie has nevertheless advanced several claims that arise under or otherwise implicate federal law. The remaining state law claims are properly before this Court as supplemental claims under 28 U.S.C. § 1367. Because all of Christie's claims (including the putative state-law claims under the NJLAD and NJFMLA) arise out of a "common nucleus of operative facts" and an "interrelated series of events or transactions" (i.e., Christie's failure to submit to drug testing, which resulted in subsequent discharge by PSE & G and the union's failure to advance Christie's grievance to arbitration), this Court lacks the authority to remand any of Christie's state-law claims. *See Borough of W. Mifflin*, 45 F.3d at 786. Furthermore, even if this Court had authority to split this action into simultaneous federal and state proceedings, principles of judicial efficiency and economy and the risk of inconsistent results would militate against such a result. Accordingly, Christie's motion for remand is denied.

II. The Local 94 Defendants' Motion to Dismiss

The Local 94 Defendants have moved to dismiss Christie's claims under Rule 12(b)(6), asserting that the claims against them are barred on statute of limitations grounds. A court may dismiss a complaint under Rule 12(b)(6) for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "A court may dismiss a complaint for failure to state a claim, based on a time-bar, where 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.' " *Bieregu v. Ashcroft*, 259 F.Supp.2d 342, 355 n. 11 (D.N.J.2003) (quoting *Bethel v. Jendoco Constr. Co.*, 570 F.2d 1168, 1174 (3d Cir.1978)). The Court looks to the allegations of the Complaint when reviewing the Complaint for dismissal on statute of limitations grounds: "When reviewing a Rule 12(b)(6) dismissal on statute of limitations grounds, we must determine whether the time alleged *in the statement of a claim* shows that the cause of action has not been brought within the statute of limitations." *Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir.1989) (emphasis in original).

The Local 94 Defendants assert that Christie's claims against them, which include claims pleaded under the NJLAD and NJFMLA, are duty of fair representation claims either directly governed by or subject to the preemptive effect of Section 301 of the LMRA. Thus, the Local 94 Defendants assert that Christie's claims against them are subject to the six-month statute of limitations for duty of fair representation claims under the LMRA. However, Christie's Complaint does not state on its face a date or event from which this Court can measure the running of the statute of limitations. Indeed, Christie's Complaint simply indicates that the Local 94 Defendants "violated the IBEW Constitution and the Local 94 bylaws by willfully and intentionally failing to prosecute Christie's discharge to arbitration." (Am.Compl.¶ 27.) This indicates that the statute of limitations issue cannot be properly resolved on a motion to dismiss, because there is no time or triggering event alleged in the Complaint, and the Court may not rely on matters outside the pleadings to decide such a motion. *See Beverly Enters. v. Trump*, 182 F.3d 183, 190 (3d Cir.1999) (noting that "[i]t is well-settled that in deciding a motion to dismiss, courts generally may consider only the allegations contained in the complaint, exhibits attached thereto, and matters of public record"); *see also Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 475 (D.N.J.1998) ( "[U]nless a Court converts a Rule 12(b)(6) motion into a motion for summary judgment pursuant to Fed.R.Civ.P. 56, the Court cannot

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works



consider material outside the pleadings (i.e. facts presented in briefs, affidavits or exhibits)").

*8 This Court notes that the Local 94 Defendants premise their statute of limitations arguments on the theory that the statute commenced running when Christie allegedly received a notice informing him that Local 94 was taking no further action on his grievance. A copy of this notice, dated December 3, 2002, was provided as an exhibit to the Affidavit of Chip Gerrity, which was submitted in the context of the Local 94 Defendants' papers in opposition to Christie's motion for remand and in support of the motion to dismiss. (*See* Gerrity Aff., Ex. 8.) While this Court has reviewed the document in the context of the remand motion, this Court does not have the authority to consider that extrinsic document on a motion to dismiss. *See Beverly Enters.,* 182 F.3d at 190; *see also Franklin v. Nat'l Mar. Union,* No. 91-480, 1992 U.S. Dist. LEXIS 14167, at *3 (D.N.J. Jan. 15, 1992) (refusing to grant motion to dismiss, though noting that document submitted on motion appeared to support running of limitations period, reasoning that "on a motion to dismiss the Court could not consider any evidence outside plaintiff's complaint").

While the Court cannot resolve the motion by considering the document proffered by the Local 94 Defendants, the Court does note that Christie does not appear to challenge the authenticity of the notice from Local 94; moreover, in opposition to the motion, Christie asserts only that his claims are not preempted by the duty of fair representation under the LMRA, and are thus not subject to the six-month limitation period for fair representation claims. Significantly, Christie has not indicated that resolution the statute of limitations issue requires further discovery.

Based on the foregoing, it appears that the Local 94 defendants have advanced a time-bar argument that, while inappropriate for resolution on a motion to dismiss, may be appropriate for resolution on summary judgment if the evidence therefor is properly submitted to the Court. This Court has discretion to convert the motion to dismiss under Rule 12(b)(6) into a motion for summary judgment under Rule 56 "by considering materials extrinsic to the pleadings." *Kurdyla v. Pinkerton Sec.,* 197 F.R.D. 128, 131 (D.N.J.2000) (citing Fed.R.Civ.P. 12(b); *Kulwicki v. Dawson,* 969 F.2d 1454, 463 (3d Cir.1992); and *Childs v. Meadowlands Basketball Assocs.,* 954 F.Supp. 994, 997 (D.N.J.1997)). In the Third Circuit, "[w]hen a District Court decides to convert a motion to dismiss into a motion for summary judgment, it must provide the parties 'reasonable opportunity' to present all material relevant to a summary judgment motion." *In re Rockefeller Ctr. Props. Sec. Litig.,* 184 F.3d 280, 287-88 (3d Cir.1999) (citing Fed.R.Civ.P. 12(b)). "The parties can take advantage of this opportunity only if they have "notice of the conversion." *Id.* (citing *Rose v. Bartle,* 871 F.2d 331, 340 (3d Cir.1989)). In accordance with the above precedent, the parties are hereby notified that this Court intends to convert the Local 94 Defendants' motion to dismiss under Rule 12(b)(6) into a summary judgment motion under Rule 56.

*9 Pursuant to this conversion, the Local 94 Defendants will have 15 days from the entry of this order to submit a statement pursuant to Local Civil Rule 56.1, a supplemental brief not to exceed ten pages, and any affidavits, documents or other materials that they deem relevant to any statute of limitations defense against Christie's claims. In response, Christie will have 15 days thereafter to submit any responsive briefs, affidavits, documents or other materials in opposition to the converted motion. There shall be no reply papers submitted. Accordingly, this Court will defer analysis of the arguments presented in the Local 94 Defendants' motion to dismiss, and will address those arguments in the context of a summary judgment analysis upon completion of the parties' submission of any additional materials on the statute of limitations issue.

III. PSE & G's Motion to Dismiss

PSE & G has moved to dismiss Christie's claims against it under the NJLAD and NJFMLA, arguing that Christie's NJLAD claim is deficient because Christie "failed to plead sufficient facts from which it may be concluded that he was handicapped" and that Christie's NJFMLA claim fails because Christie did not provide 15 days' notice of his absence from work to care for his son, and has not provided sufficient specifics regarding an "emergent circumstance" which would exempt his absence from work from the 15-day notice requirement. (*See* PSE & G's Br. Supp. Mot. Dismiss 3.) These arguments are premised on factual, as opposed to legal, deficiencies in pleading. The burden of persuasion on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a Rule 12(b)(6) motion to dismiss is a heavy one, and factual deficiencies such as those cited by PSE & G are not sufficient to justify dismissal of a claim before discovery has commenced.

The pleading requirements of the Federal Rules "are based on notice pleading rather than fact pleading." *Universe Tankships, Inc. v. United States,* 528 F.2d 73, 75 (3d Cir.1975). It is well-settled that a plaintiff need not plead evidence, and a simple statement of the claim is sufficient to put a defendant on notice of the nature of the claims. *See Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446 (3d Cir.1977) (holding that a plaintiff need not plead evidence, and need not plead the facts that serve as the basis for the claim); *see also Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996) (holding that a "complaint will be deemed to have alleged sufficient facts if it adequately puts the defendants on notice of the essential elements of the plaintiffs' cause of action"). Christie's pleadings, while somewhat lacking in specifics regarding the NJLAD and NJFMLA claims, nevertheless meet this minimum requirement. PSE & G's arguments in support of the motion to dismiss are therefore unavailing, as they rely upon factually-undeveloped issues in a case in which discovery has, to the Court's knowledge, not even begun.

Perhaps sensing that its motion to dismiss stood on shaky legal grounds, PSE & G seizes in its reply papers upon Christie's submission of extrinsic materials in opposition to the motion to imply that conversion of the motion to dismiss into a summary judgment motion is a *fait accompli* (PSE & G Reply Br. Supp. Mot. Dismiss 1 ("Inasmuch as plaintiffs have submitted affidavits as part of their opposition papers, defendant understands that the Court will now treat its motion to dismiss as one for summary judgment.").) However, conversion of a Rule 12(b)(6) motion into a Rule 56 motion is a matter within the Court's discretion, and cannot be compelled by mere concession or agreement of the parties, nor is it mandated by the parties' mutual submission of extrinsic materials. *See Kurdyla,* 197 F.R.D. at 131.

***10** PSE & G's request to convert its motion to dismiss into a motion for summary judgment motion is premature. PSE & G's arguments in favor of summary judgment, as reflected in its reply brief, are premised on complex factual analyses that this Court is unwilling to undertake in a case in which discovery has not even commenced. As noted by the district court in *Kurdyla,* where the arguments on summary judgment involve complex facts, conversion to summary judgment is inappropriate where discovery has not yet taken place. *Id.* Unlike the statute of limitations argument raised by the Local 94 Defendants, which this Court has decided is appropriate for conversion to summary judgment because it is premised on the single factual question of when the statue of limitations began to run on the claims against the Local 94 Defendants, PSE & G's opposition to Christie's NJLAD and NJFMLA claims is based on multifarious, complicated factual disputes that warrant discovery before resolution. Indeed, the only case that PSE & G relies upon in apparent support for its motion to dismiss the NJLAD claim was itself resolved on a factual basis on a summary judgment motion after completion of full discovery. *See Bosshard v. Hackensack Univ. Med. Ctr.,* 345 N.J.Super. 78, 90 (App.Div.2001). Moreover, Christie has indicated that fuller expression of his claims under the NJLAD and NJFMLA may be not be possible at this stage because discovery has not commenced and relevant facts may be in the hands of PSE & G. (*See* Pl.'s Br. Opp'n Mot. Dismiss 12.) Accordingly, even if this Court were to consider converting PSE & G's motion to dismiss into one for summary judgment, the Court would be obligated to provide the parties with an opportunity for discovery of relevant facts. *See Bogosian,* 561 F.2d at 444 (noting that "where facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course"). Such a continuance would no doubt be lengthy, owing to the factual complexity of the issues as framed, and the absence of discovery in this case to date. Thus conversion of the motion to dismiss would result in extensive delay that militates against conversion to summary judgment at this time. Accordingly, this Court declines PSE & G's invitation to convert the motion to dismiss into a motion for summary judgment, and further denies PSE & G's motion to dismiss as lacking merit.

*Conclusion*

For the foregoing reasons, it is hereby ORDERED on this __ th day of February 2006 that Plaintiff's motion for re-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mand (Docket No. 5) is DENIED. It is FURTHER ORDERED that the Local 94 Defendants' motion to dismiss (Docket No. 12) will be converted into a motion for summary judgment, and this Court will address the arguments raised in the Local 94 Defendants' motion after the parties submit additional materials appropriate to a motion for summary judgment. The Local 94 Defendants will have 15 days from the date of the entry of this Opinion and Order to submit any additional materials regarding the statute of limitations issue, and Christie will have 15 days thereafter to submit any responsive materials. It is FURTHER ORDERED that PSE & G's motion to dismiss (Docket No. 11) is DENIED.

D.N.J.,2006.
Christie v. Public Service Elec. and Gas Co.
Slip Copy, 2006 WL 462588 (D.N.J.)

Briefs and Other Related Documents (Back to top)

• 2:04cv05978 (Docket) (Dec. 06, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1798559 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
DML ASSOCIATES, INC., and CJ Associates, Ltd.,
Plaintiffs,
v.
MATTEL, INC., Defendant.
**No. Civ.A. 03-128 GMS.**

April 7, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

***1** On December 13, 2002, the plaintiffs, DML Associates, Inc. ("DML") and CJ Associates Ltd. ("CJ") filed the above-captioned action against Mattel, Inc. ("Mattel") in the Superior Court of the State of Delaware. The complaint alleges that Mattel has breached a license agreement it entered into with DML and CJ

On January 27, 2003, Mattel filed a Notice of Removal of this case to the present court. On February 6, 2003, Mattel filed a motion to stay the litigation pending reexamination of one of the five patents mentioned in the complaint.

DML and CJ have now moved to remand this case to the Superior Court. For the following reasons, the court will grant this motion and dismiss Mattel's motion to stay as moot.

II. STANDARD OF REVIEW

The removal of an action from state court is only permissible for "actions that originally could have been filed in federal court." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392 (1987). Where removal is based on federal question jurisdiction, the propriety of the removal turns on whether the case "arises under" the Constitution, laws, or treaties of the United States. *See Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 8 (1983). Furthermore,

the presence or absence of federal question jurisdiction is governed by the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.

*Caterpillar,* 482 U.S. at 392.

III. BACKGROUND

According to their complaint, DML and CJ developed novel toy figure joints, joint systems, and molding techniques to make such systems. These developments resulted in the relatively low-cost manufacture of durable toy action figures having articulating limbs and torso parts. At meetings in May and June 1998, and after Mattel signed a confidentiality agreement, DML and CJ disclosed these developments to Mattel, showed Mattel a working prototype toy action figure, and gave Mattel a patent application filed by CJ with the United States Patent and Trademark Office.

Shortly thereafter, Mattel entered into an agreement (the "License Agreement") with DML and CJ. The License Agreement gave Mattel the exclusive worldwide right to manufacture, have manufactured, use, and sell "the ITEM." The ITEM was generally defined as the toy figure with articulating joints described in CJ's patent application. The License Agreement requires DML and CJ to use their best efforts to obtain patent protection for the licensed technology. According to DML and CJ, however, the terms of the License Agreement covered all material in the patent application, whether or not any patents actually issued from that application. To date, five patents have been issued to CJ from the application given to Mattel.

In order to retain its rights under the License Agreement, by February 1999, Mattel was required to offer for sale a product using the licensed technology. Mattel developed a line of toy action figures using the licensed technology and began selling those figures in 1999 and 2000.

***2** Mattel initially paid royalties to DML and CJ on all toy figures in this line. Later, however, Mattel took the position that royalties were not required on many of these figures. It thereafter ceased paying royalties on them and recouped

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1798559 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

past royalty payments on such figures through deduction from royalties it owed on other figures.

After the parties were unable to resolve the dispute as to the products on which royalties must be paid, DML and CJ filed this action. The complaint alleges that "Mattel has breached and continues to breach the express and implied terms of the License Agreement by failing to make the royalty payments required by the License Agreement." It further seeks compensatory damages and related relief. As Mattel is licensed to use the technology at issue, DML and CJ concede that they are not seeking damages for patent infringement.

IV. DISCUSSION

A. Remand

In its notice of removal, Mattel asserts that removal is proper because "plaintiffs have pleaded as state law claims, causes of action that are for patent infringement." The court must disagree, however, that removal was proper.

The fact that the License Agreement relates in part to patents, or that patent issues could arise, does not make the case removable. More than seventy-five years ago the Supreme Court stated that:

[i]t is a general rule that a suit by a patentee for royalties under a license or assignment granted by him, or for any remedy in respect of a contract permitting use of the patent is not a suit under the patent laws of the United States and cannot be maintained in a federal court as such.

Luckett v. Delpark, Inc., 270 U.S. 496, 502 (1926); *accord* Ballard Medical Products v. Wright, 823 F.2d 527, 530 (Fed.Cir.1987) (holding that, "the scope of a licensed patent may control the scope of a license agreement, but that rule of contract law cannot possibly convert a suit for breach of contract into one 'arising under' the patent laws...."); 8 Chisum on Patents § 21.02[1][c] at pp. 21-33 (stating that, "a patent owner's claim for breach of a patent license or assignment agreement arises under state contract law rather than under the patent laws-even though the existence of contract liability requires resolution of patent issues such as validity and infringement.").

Similarly, the fact that Mattel's Answer and Counterclaims raise patent-related defenses and assert a counterclaim that CJ's patents are invalid and unenforceable does not make the case removable. It is settled law that a case may not be removed to a federal court based upon a federal defense, even if the defense is anticipated in the plaintiff's complaint. *See e.g.* Caterpillar, Inc. v. Williams, 482 U.S. 386, 393 (1987). Thus, "a case raising a federal patent-law defense does not, for that reason alone, 'arise under' patent law 'even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case.' " Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 809 (1988).

*3 Additionally, the fact that patent law issues might arise in the state court provides no basis for removal because state courts may decide patent questions that bear on claims in those courts. As the Federal Circuit has recognized, "the statutory limitations on the jurisdiction of this court and the federal district courts, in conjunction with the well-pleaded complaint rule, can and do result in state courts resolving patent issues." Speedco, Inc. v. Estes, 853 F.2d 909, 913 (Fed.Cir.1988).

In the face of this settled law, Mattel makes two arguments in defense of its removal. First, it contends that federal courts have exercised jurisdiction over patent licensing disputes. *See e.g.* Kleinerman v. Luxtron Corp., 107 F.Supp.2d 122, 124 (D.Mass.2000) (noting that infringement must be found before the license agreement issue could be decided); Regents of the Univ. of Minn. v. Glaxo Wellcome, Inc., 58 F.Supp.2d 1036, 1038 (D.Minn.1999) (recognizing that infringement was a necessary precursor to a finding that the defendant breached the license agreement); *Robertson v. Baker Oil Tools, Inc.*, 2002 U.S. Dist. LEXIS 9368, at *15 (N.D.Tex. May 23, 2002) (requiring the fact-finder to determine whether the plaintiff's patents were infringed before deciding the licensing agreement issue). Here, however, unlike in the cases cited by Mattel, patent infringement is not a necessary element to the plaintiffs' claims because the License Agreement applies even in the event no patents issued.

Mattel alternatively argues that, because the License Agreement uses terms such as "unique" and "novel," which are also used in patent law, substantial issues of federal patent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1798559 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

law are raised. Mattel cites no case law for this proposition. Moreover, the parties themselves agreed that state law, not federal law, would govern the License Agreement.

For these reasons, the court concludes that Mattel's assertion that the plaintiffs invoked federal law in their complaint cannot withstand scrutiny.

B. Attorneys' Fees

In ordering a case to be remanded, the court "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). The court has broad discretion in making such a determination, however, and may be flexible in its approach. *See Mints v. Educational Testing Serv.,* 99 F.3d 1253, 1260 (3d Cir.1996).

In the present case, the court concludes that the removal of this action was not so "implausible, insubstantial or frivolous as to warrant the imposition of costs and attorney fees." *Robinson v. Computer Learning Centers,* 1999 WL 817745, *3 (E.D. Pa. Oct. 12 1999). In its discretion then, the court will decline to award DML and CJ attorneys' fees.

V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:
1. The Plaintiffs' Motion to Remand (D.I.6) is GRANTED.
2. The Plaintiffs' Request for Attorneys' Fees is DENIED.
*4 3. The Defendant's Motion for Stay Pending Reexamination (D.I.4) is DISMISSED AS MOOT; and
4. The above-captioned action is hereby REMANDED to the Superior Court for the State of Delaware in and for New Castle County pursuant to 28 U.S.C. § 1447(c).

D.Del.,2003.
DML Associates, Inc. v. Mattel, Inc.
Not Reported in F.Supp.2d, 2003 WL 1798559 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 24229532 (Trial Pleading) Defendant Mattel's Notice of Removal of Civil Action No. 02c-12-111-Cht from Delaware State Court (Jan. 27, 2003) Original Image of this Document (PDF)

• 1:03CV00128 (Docket) (Jan. 27, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

**C**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,D. Minnesota.

UNCOMMON USA, INC, Plaintiff,

v.

Michael WIESE individually, and as President of American Engineered Products, LLC, Defendant.

**No. Civ. 05-975(RHK/AJB).**

Aug. 19, 2005.

Donald H. Burgett, Anderson & Burgett, Wilmar, MN, for Plaintiff.

Grant D. Fairbaim, Fredrikson & Byron, P.A., Minneapolis, MN, for Defendant.

MEMORANDUM OPINION AND ORDER

KYLE, J.

Introduction

*1 This case arises out of a series of contracts between Uncommon USA, Inc. ("Uncommon") and Harold Wiese and his descendants and heirs, one of whom is Defendant Michael Wiese, regarding the sale of a patent for telescopic flagpoles. Uncommon brought suit against Wiese in state court, alleging breach of contract and patent infringement. Wiese removed the action to this Court based on the patent infringement claim. Uncommon thereafter dropped the patent infringement claim, and has now moved to remand the case to state court. For the reasons set forth below, the Court will grant Uncommon's Motion.

Background

Defendant Michael Wiese resides in Minnesota and is the son and heir of Harold Wiese and the president of American Engineered Products, LLC ("AEP"). (Am.Compl.¶¶ IX-X.) Uncommon is a Minnesota corporation. (*Id.* ¶ II.)

On December 14, 1988, Uncommon and Harold Wiese entered into an agreement by which Harold Wiese sold to Uncommon his interest as owner of a patent for telescopic flagpoles ("the 1988 Agreement"). (*Id.* ¶ III.) The 1988 Agreement provided that Harold Wiese was to receive royalty payments from Uncommon based on sales of the flagpoles. (*Id.*) Further, the parties agreed that "any modifications or improvements resulting from additional research and development undertaken by [Harold Wiese] shall be transferred hereunder and shall go with the product to the benefit of [Uncommon] ." (O'Hanlan Aff. Ex. A.)

On March 3, 1997, Uncommon and Harold Wiese entered into an additional agreement ("the 1997 Agreement"). (*Id.* Ex. B.) The 1997 agreement modified the royalty payments under the 1988 Agreement and provided that "the rights under this Agreement and the preceding Agreement and any preceding Amendments between the parties shall be subject to assignment by either of the parties and as so shall be controlling upon any successors, heirs, or assigns." (*Id.*) Michael Wiese was not a signatory to either the 1988 or the 1997 Agreement. (Wiese Decl. ¶ 2.)

Harold Wiese passed away on August 2, 1997. (*Id.* ¶ 3.) On May 26, 1999, Uncommon entered into an agreement with the Estate of Harold A. Wiese, the Harold Wiese Revocable Living Trust, and the heirs and beneficiaries of the Estate and Trust individually, which included Michael Wiese FN1 ("the 1999 Agreement"). (Am.Compl.¶ VII.) Paragraph 8 of the 1999 Agreement provides

FN1. Hereinafter, the Court will refer to Defendant Michael Wiese as "Wiese."

[t]his Agreement resolves any issues between the parties regarding patent ownership and other than completing patent registration and transfer, [Michael] Wiese shall not be involved in Research and Development molds, parts, production, manufacture, or marketing in any way beyond the date hereof on the original patent or any related patents arising therefrom.

(Wiese Decl. Ex. A.) The 1999 Agreement further provides that it "constitutes the entire agreement between [the parties] respecting the subject matter hereof...." (*Id.*)

In spring 2002, Wiese began developing a new flagpole. (Wiese Decl. ¶ 4.) In October 2002 and December 2003, Wiese approached Uncommon to discuss his ideas. (*Id.*) Although Uncommon did not ultimately purchase the ideas, it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

did sign a confidentiality agreement before both meetings. (*Id.*) After failing to find a purchaser, Wiese and a co-investor formed AEP to market the product. (*Id.* ¶ 5.) Wiese recently received a patent on aspects of the new flagpole. (*Id.*)

*2 In August 2004, AEP sent Uncommon an offer to buy parts for the new flagpole. (*Id.* ¶ 6.) Uncommon sent a counteroffer, which AEP accepted. (*Id.*) Uncommon filled the first order and two additional orders in January and March 2005. (*Id.*) However, in late March 2005, Uncommon sent AEP a letter demanding that AEP stop marketing and selling the new flagpole. (*Id.* ¶ 7.) Uncommon also ceased sending AEP parts for the new flagpole and claimed that it was either (1) a breach of the 1999 Agreement or (2) an infringement on Harold Wiese's patent which was owned by Uncommon. (*Id.*)

On April 26, 2005, Uncommon filed a Complaint in Kandiyohi County District Court. (*See* Notice of Removal, Ex. A. ("Compl.").) Uncommon claimed that Wiese (1) breached "the various agreements" the parties entered into by engaging in the manufacturing, distribution, and sale of telescoping flagpoles; (2) infringed upon a patent owned by Uncommon by doing the same; and (3) "published or caused others to publish incorrect, false, and slanderous communications regarding [Uncommon]." (Compl.¶¶ XI-XIII.) The Complaint quoted Paragraph 8 of the 1999 Agreement. (*Id.* ¶ VII.)

On May 20, 2005, Wiese removed the action to this Court asserting that, because Uncommon asserted a claim for patent infringement, this Court has exclusive jurisdiction over the matter under 35 U.S.C. § 1338(a).[FN2] (Notice of Removal at 2.) On May 23, 2005, before Wiese had served a responsive pleading to the Complaint, Uncommon served and filed an Amended Complaint (Doc. No. 4). The Amended Complaint eliminated the claim for patent infringement, retaining only the breach of contract and slander claims against Wiese. (Am.Compl.¶¶ XI-XII.) On May 24, 2005, Uncommon moved to remand the case to state court on the ground that, with the elimination of the patent infringement claim, the Court no longer has subject matter jurisdiction. (Mem. in Supp. at 2.)

FN2. Section 1338(a) provides that the "district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents.... Such jurisdiction shall be exclusive of the courts of the states in patent ... cases."

Standard of Review

A defendant may remove a matter from state court if that matter could have originally been brought in federal court, 28 U.S.C. § 1441(a), or if the federal court has original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States, 28 U.S.C. § 1441(b).[FN3] The district court must, however, remand the case to state court "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction...." 28 U.S.C. § 1447(c). The party seeking removal and opposing remand has the burden of establishing federal subject matter jurisdiction. *In re Bus. Men's Assurance Co.,* 992 F.2d 181, 183 (8th Cir.1993). When reviewing a motion to remand, a court must resolve all doubts concerning federal jurisdiction in favor of remand. *Id.* However, "[a] district court has no discretion to remand a claim that states a federal question" and the existence of a federal question is an issue of law. *Gaming Corp. of America v. Dorsey & Whitney,* 88 F.3d 536, 542 (8th Cir.1996) (citations omitted).

FN3. Section 1441(a) provides, in relevant part:
Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending....
Section 1441(b) provides, in relevant part:
Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties....

Analysis

*3 The issue presented in Uncommon's Motion for Remand

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is whether this Court has federal question jurisdiction based upon the allegations in Uncommon's Amended Complaint. Federal district courts have "original jurisdiction of any civil action arising under any Act of Congress relating to patents.... Such jurisdiction shall be exclusive of the courts of the states in patent ... cases." 28 U.S.C. § 1338(a). The Court must determine whether, pursuant to the well-pleaded complaint rule, Uncommon's claims constitute a suit "arising under" the patent laws of the United States. Because the Amended Complaint does not raise a substantial question of patent law, the Court determines that it lacks subject matter jurisdiction and will grant Uncommon's Motion to Remand.

The " 'well-pleaded complaint rule,' ... provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392 (1987) (citations omitted). Federal jurisdiction under 28 U.S.C. § 1338(a) exists only when "a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 808-09 (1988). However, "a case raising a federal patent-law defense does not, for that reason alone, arise under patent law, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Id.* at 809 (internal quotations omitted).

Here, there can be no question that the claims framed in the Amended Complaint assert only causes of action created by state law and not the federal patent laws. Wiese argues, however, that the resolution of Uncommon's breach of contract claim depends on resolving a substantial question of patent law. Wiese bases this argument on Paragraph 8 of the 1999 Agreement, which states, in relevant part, "Wiese shall not be involved in Research and Development molds, parts, production, manufacture, or marketing in any way beyond the date hereof *on the original patent or any related patents arising therefrom.*" (Mem. in Opp'n at 5 (quoting the Am. Compl. ¶ VII (emphasis added)).) According to Wiese, because "the terms 'related' and 'arising therefrom' are terms of art" in the context of patent law, the Court has subject matter jurisdiction over Uncommon's claims.FN4 (*Id.* at 5-6.)

FN4. Wiese's only other argument regarding why this Court has subject matter jurisdiction over Uncommon's claims (as opposed to supplemental jurisdiction over the remaining state law claims) relates to Wiese's apparent perceptions of the relative abilities of state courts in these matters. According to Wiese, a "state court judge totally unfamiliar with patents and patent law is not in a position to determine the 'relatedness' of two patents or to apply Federal Circuit Law." (Mem. in Opp'n at 6.) The Court does not share Wiese's scepticism regarding the ability of the state court judges to apply the law. *See generally Speedco, Inc. v. Estes,* 853 F.2d 909, 914-15 (Fed.Cir.1988) (holding that plaintiff did not establish federal jurisdiction under patent law, and noting that "[the plaintiff] will have to share Congress's trust in the abilities of the state courts to interpret and apply federal law in order to resolve patent issues necessary to the decision of the case before them").

The Court determines that Wiese has not met his burden of establishing that the relief Uncommon seeks is dependant on the resolution of a "substantial question of federal patent law." *Christianson,* 486 U.S. at 808-09; *see also In re Bus Men's Assurance Co.,* 992 F.2d at 183 (noting that the "party seeking removal and opposing remand, has the burden of establishing federal subject matter jurisdiction" (citation omitted)). Wiese has not presented sufficient support for the argument that the consideration of whether the new flagpoles arise from or are related to the original patent constitutes a substantial question of federal patent law. The Federal Circuit has made clear that not "all breach of contract actions involving patents require" a determination of patent infringement. *Board of Regents, the University of Texas System v. Nippon Telephone and Telegraph Corp.,* 414 F.3d 1358, 1363-64 (Fed.Cir.2005). It is not clear to the Court that this action will necessarily involve such a determination or any other substantial question of patent law,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which is dispositive on a motion to remand. *See, e g*, id. at 1363 (noting that "issues of inventorship, infringement, validity and enforceability present sufficiently substantial questions of federal patent law to support jurisdiction under section 1338(a)" (citation omitted)).

*4 Nor has Wiese established that the resolution of a substantial patent issue is *necessary* to Uncommon's breach of contract claim. In *Nippon Telephone and Telegraph Corporation*, 414 F.3d at 1363-64, the Federal Circuit determined that, in part "because the patent law issues identified by [the defendant were] not essential to the resolution of Plaintiffs' claim," federal jurisdiction under § 1338(a) was not established. The authority relied upon by Wiese FN5 does not establish that the patent law issues identified by Wiese will be essential to the determination of whether his alleged actions breached the 1999 Agreement. That, in some circumstances, the terms "related" and "arising therefrom" may be used as terms of art in the context of patent law, does not mean that the terms have those meanings in relation to the 1999 Agreement, nor that the terms raise *substantial questions* of patent law. The meaning of the 1999 Agreement, and by extension the terms "related" and "arising therefrom," is an issue of ordinary state law contract interpretation.

FN5. In support of its argument that the terms "related" and "arising therefrom" are terms of art under patent law, Wiese cites two cases, *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls*, 340 F.3d 1298, 1301 (Fed.Cir.2003) and *Preformed Line Products v. Fanner Mfg. Co.*, 328 F.2d 265, 267 (6th Cir.1964), and the United States Patent and Trademark Office's website (Mem in Opp'n at 5-6.)

Furthermore, although Wiese's theory of defense may ultimately rest on patent law, a federal patent-law defense is not sufficient to retain federal jurisdiction. *Christianson*, 486 U.S. at 809; *see also* *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1574 (Fed.Cir.1997) (holding that a complaint alleging breach of a patent assignment and royalty agreement does not state a claim arising under patent laws even though a consequence of finding such a breach may lead to allegations of infringement). Accordingly, because the Amended Complaint does not raise a substantial question of federal patent law, the Court will grant Uncommon's Motion to Remand. FN6

FN6. Wiese requests that the Court award him costs and expenses "because Uncommon decided to change its pleading after Mr. Wiese properly removed to the appropriate Court and incurred expenses in connection with the removal." (Mem. in Opp'n at 8.) Wiese does not, however, provide the Court with an accounting of the costs and expenses he seeks. Regardless, the Court determines that the circumstances of the instant action do not warrant an award of costs and expenses to Wiese.

Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, IT IS ORDERED that Uncommon's Motion to Remand (Doc. No. 6) is GRANTED. Uncommon's Amended Complaint (Doc. No. 4) is REMANDED to the Kandiyohi County District Court pursuant to 28 U.S.C. § 1447(c); the Clerk of this Court shall mail to the Clerk of the Kandiyohi County District Court a certified copy of this Memorandum Opinion and Order.

D.Minn.,2005.
Uncommon USA, Inc. v. Wiese
Slip Copy, 2005 WL 2000178 (D.Minn.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 1539379 (Trial Pleading) Amended Complaint (May 23, 2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 11

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1711970 (W.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**C**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,W.D. Kentucky.

Amitava GUPTA, M.D. Plaintiff

v.

AVANTA ORTHOPAEDICS, INC. Defendant

**No. Civ.A. 3:03CV-617-S.**

July 20, 2005.

Kenneth L. Sales, Sales, Tillman & Wallbaum, Louisville, KY, for Plaintiff.

Eric H. Chadwick, James H. Patterson, Randall T. Skaar, Tye Biasco, Patterson, Thuente, Skaar & Christensen PA, Minneapolis, MN, Trevor L. Earl, Reed, Weitkamp, Schell, Cox & Vice, Louisville, KY, for Defendant.

*MEMORANDUM OPINION*

SIMPSON, J.

***1** This matter is before the court on motion of the defendant, Avanta Orthopaedics, Inc., for summary judgment in this action alleging fraud and misappropriation of trade secrets.

The plaintiff, Amitava Gupta, M.D., brought this action in the Jefferson Circuit Court, Division Ten. Gupta is a physician and partner in the medical practice of Kleinert, Kutz & Associates Hand Care Center, PLLC. He claims invention of a total wrist prosthesis which he refers to as the "Gupta Wrist," prior to 1992. He began negotiations in 1992 with Sutter Corporation for the commercial development of his invention. To this end, Gupta entered into a nondisclosure agreement with Sutter in April, 1992. The small joint orthopaedic division of Sutter was sold and formed as Avanta Orthopaedics, Inc. which was registered in 1996. Gupta states that he engaged in extensive development work with engineers and other associates of Avanta. He contends that in 1997 Avanta proposed transfer of the Gupta Wrist technology to it in exchange for royalties to be paid to Gupta. Gupta alleges that he was dissatisfied with the terms over which they were negotiations and that the parties did not resolve the matter. In any event, Avanta sent a Technology Transfer Agreement ("TTA") in August of 1999 proposing terms to Gupta for his review. Gupta signed the agreement and returned it to Avanta, but allegedly never received a copy executed by Avanta. After Gupta returned the agreement, Avanta began testing the Gupta Wrist at the Mayo Clinic. It applied for a patent in 2003 on the invention. Gupta alleges that Avanta did not respond to his inquiries concerning the status of the agreement and did not inform him of its intent to seek a patent on the invention. Gupta contends that in November of 2002, Avanta informed him by letter that no fully executed copy of the agreement apparently existed, that there were problems with the terms contained in it, and that it was Avanta's position that others were materially involved in the development of the invention such that royalties and credit for inventorship should be shared among them. Gupta alleges that Avanta has given unauthorized public demonstrations of his invention and has refused to return proprietary information to him.

Unable to resolve these matters, Gupta filed suit alleging that Avanta defrauded him, breached its confidentiality agreement with him, and unlawfully disclosed, misappropriated and used his trade secrets and patent rights.

Avanta removed the action to this court on the ground that Plaintiff's Complaint asserts claims arising under the patent laws of the United States ... The specific grounds for removal are as follows:

... 2. Gupta alleges claims arising under the patent laws of the United States. Specifically, on pages 6 and 7 of his Complaint, Gupta alleges:

29. Further, *Avanta has applied for a patent* to the product, and further, through its demonstrations of the product, and other actions unknown to Dr. Gupta, has violated Dr. Gupta's right to the invention and for its own purposes has misappropriated the invention for its own use, without proper compensation or recognition of Dr. Gupta's role in inventing and developing the Gupta Wrist Prosthesis now titled the "Avanta Wrist."

***2** 34. The aforesaid wrongful acts of the Defendant constitutes [sic] a misappropriation and conversion of *the patent rights of Dr. Gupta,* all of which has caused him considerable and permanent irreparable harm and damage, for which he has not complete and adequate legal relief.

... 6. The federal courts have exclusive jurisdiction over Gupta's claim that he is an inventor of the invention claimed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1711970 (W.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

by the provisional patent application, as they have exclusive jurisdiction over all claims arising under the federal patent laws. 28 U.S.C. § 1338(a) ...

Notice of Removal, ¶¶ 2,6 (emphasis in removal petition).

Upon addressing the summary judgment motion in this case, the court has determined *sua sponte* that subject matter jurisdiction is lacking and the matter was improvidently removed from the Jefferson Circuit Court. As the court lacks jurisdiction, it does not have authority to decide the summary judgment motion. The matter must be remanded to the court from which it was removed.

28 U.S.C. § 1447(c) states that "... [i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." The district court is charged with the duty of continually reexamining its jurisdiction and must *sua sponte* remand cases in which subject matter jurisdiction is lacking. *See, Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Anushigian v. Trugreen/Chemlawn, Inc.* 72 F.3d 1253, 1254 (6th Cir.1996). Because lack of jurisdiction would make any decree in the case void and the continuation of the litigation in federal court futile, the removal statute should be strictly construed and all doubts should be resolved in favor of remand. *Abels v. State Farm Fire & Casualty Co.*, 770 F.2d 26, 29 (3d Cir.1985), *citing,* 14 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3642, at 149 (2d ed.1985).

The well-pleaded-complaint rule has long governed whether a case "arises under" federal law for purposes of § 1331. See, *e.g.*, *Phillips Petroleum Co. v. Texaco Inc.*, 415 U.S. 125, 127-128, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974)(*per curiam*). As "appropriately adapted to § 1338(a)," the well-pleaded complaint rule provides that whether a case "arises under" patent law "must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration ...." *Christianson*, 486 U.S., at 809, 108 S.Ct. 2166, 100 L.Ed.2d 811 (internal quotation marks omitted). The plaintiff's well-pleaded complaint must "establis[h] either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law ...." *Ibid.* Here, it is undisputed that petitioner's well-pleaded complaint did not assert any claim arising under federal patent law.

***3** *Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.*, 535 U.S. 826, 830, 122 S.Ct. 1889, 1893, 153 L.Ed.2d 13 (2002). We find that the same conclusion is required in this case.

The only connection to patent law alleged in the complaint is Gupta's allegation that Avanta applied for a patent on Gupta's invention. Gupta contends that this act and others constitutes misappropriation and fraud. Avanta premises federal court jurisdiction on the fact that Gupta claims to be the inventor of the Gupta Wrist. It contends that inventorship is a question of who actually invented the subject matter claimed in a patent, and therefore Gupta's claims necessarily arises under federal patent law. We disagree.

First, it does not appear that the fact of Gupta's inventorship is in issue. Gupta is identified in Avanta's patent application as an inventor. Rather it a matter of whether Avanta had the right to seek a patent on the invention. The claims asserted by Gupta arise from the business relationship between Gupta and Avanta. The reference to Avanta's patent application and it's alleged misappropriation of Gupta's rights in his invention do not convert the case into one arising under federal law. *See, ie.*, *R.F. Shinn Contractors, Inc. v. Shinn,* 2002 WL 31942135 (M.D.N.C. Nov.8, 2002)(unlike a question regarding the validity of patents or a determination of infringement, a declaration of equitable title to patents at issue does not require resolution of a question of federal law. Claims that involve a contract or license relating to a patent do not make the case a patent suit for purposes of federal question jurisdiction), *citing Barnhart v. Western Maryland Ry. Co.* ., 128 F.2d 709, 714 (4th Cir.1941); C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction 2d*, § 3582, p. 303-04 (1984).

The complaint reveals that Gupta is a physician licensed to practice medicine in Kentucky and that his partnership's primary office is located in Louisville. Avanta is a corporation whose principal place of business is San Diego, California. Beyond the fact that the parties conduct business in different states, no further allegations of citizenship or jurisdictional amount are alleged in the complaint in satisfaction of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1711970 (W.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

the requirements for diversity jurisdiction. The defendant's right to remove is to be determined according to the plaintiff's pleading at the time of the filing of the notice of removal, and the burden rests with the defendant to show the existence of federal jurisdiction. *Pullman Company v. Jenkins*, 305 U.S. 534, 537, 59 S.Ct. 347, 348, 83 L.Ed. 334 (1939). Diversity jurisdiction was neither alleged by the defendant in its notice of removal nor was it evident from the face of the complaint at the time of removal.

The case must be remanded to the Jefferson Circuit Court. A separate order will be entered this date in accordance with this opinion.

None of Gupta's claims arise under federal law.[FN1] The complaint must therefore be remanded to the Jefferson Circuit Court for lack of subject matter jurisdiction. A separate order will be entered herein this date in accordance with this opinion.

FN1. Although not mentioned in the notice of removal, Gupta states at ¶ 32 that the acts of Avanta constitute the crime of theft of trade secrets set forth in 18 U.S.C. § 1832. Despite this statement, Gupta does not make a claim for redress of any such alleged criminal act other than the relief he seeks under various state civil law claims.

W.D.Ky.,2005.
Gupta v. Avanta Orthopaedics, Inc.
Not Reported in F.Supp.2d, 2005 WL 1711970 (W.D.Ky.)

Briefs and Other Related Documents (Back to top)

- 2005 WL 4044859 () Declaration (Dec. 23, 2005) Original Image of this Document (PDF)
- 2004 WL 2056144 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Alter the Trial Preparation Schedule (Jun. 2, 2004) Original Image of this Document (PDF)
- 2003 WL 23780217 (Trial Pleading) Answer (Oct. 20, 2003) Original Image of this Document (PDF)
- 2003 WL 24192790 (Trial Pleading) Notice of Removal (Oct. 10, 2003) Original Image of this Document (PDF)
- 3:03cv00617 (Docket) (Oct. 10, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

Westlaw.

Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1998 WL 808542 (E.D.Pa.), 49 U.S.P.Q.2d 1212
**(Cite as: Not Reported in F.Supp.)**

**C**
Briefs and Other Related Documents

United States District Court, E.D. Pennsylvania.
Frank LICURSI, III and Millenium Hockey, Plaintiffs,
v.
JAMISON PLASTIC CORP. and Mark Solda, Defendants.
**No. CIV. A. 98-5262.**

Nov. 20, 1998.

*MEMORANDUM*

BUCKWALTER.
*1 This action for breach of contract and replevin comes before the Court by way of a Notice of Removal from the Court of Common Pleas of Lehigh County, Pennsylvania. For the reasons discussed below, the Court finds that Plaintiffs' claim does not arise under the federal patent statutes, Title 35 of the United States Code, and thus, the Court may not exercise subject matter jurisdiction over this action. Accordingly, Plaintiffs' motion to remand the case to state court is GRANTED.

I. BACKGROUND

Plaintiffs Frank Licursi, III and Millenium Hockey ("Millenium") filed a replevin action in the Court of Common Pleas of Lehigh County, Pennsylvania on September 30, 1998, alleging a breach of an agreement by Defendants Jamison Plastic Corporation ("Jamison") and Mark Solda, and requesting an order for the seizure of certain items. On or about October 20, 1997, the parties entered into an agreement whereby Defendants would manufacture for Plaintiffs a tool and a plastic product made by the tool. *See* Compl. ¶ 5 (attached as Exhibit A to Pls. Mem.). Over the course of April through May of 1998, Defendants advised Plaintiffs through written correspondence the total fee and balance owed for the production of the tool. *See id.* ¶¶ 6-7. On or about September 9, 1998, Mr. Licursi personally presented a certified check for the final amount of monies due at the offices of Mr. Solda. *See id.* ¶ 8. Although the check was refused, the "property" of Plaintiffs was not returned, which was apparently required under the agreement. *Id.* ¶ 10. On the next day or so, Plaintiffs' attorney sent a letter containing the certified check to Defendants by certified mail, threatening legal action should Defendants fail to contact Plaintiffs within forty-eight hours. *See id.* ¶ 11 and Compl. (Exhibit F thereto). A few days later, Mr. Solda advised Plaintiffs' attorney "that part of the property of the plaintiffs was to be returned, by UPS mail, however; as of [the date of the complaint] this event [had] not yet occurred." *Id.* ¶ 12.

Plaintiffs allege that pursuant to the agreement between the parties, "the tool to be produced and the product to be produced was the property of the plaintiff." *Id.* ¶ 13. Moreover, Plaintiffs assert that Defendants' actions did not grant them "any equitable title or any other title regarding the tool and also the product to be produced by the tool," *id.* ¶ 14, thus rendering Defendants in breach of the agreement, *see id.* ¶ 15. Although not entirely clear from the complaint, Defendants' alleged refusal to return Plaintiffs' property, apparently implicates a third-party as "the tool and rubber parts [were] produced by another manufacturer." *Id.* ¶ 16. In addition, the property in dispute also includes "rubber molded parts" and "tool drawings." *Id.* ¶ 18. Plaintiffs note that they have applied for a patent on the tool and the product made by the tool, which is currently pending. *Id.* ¶ 20.

*2 Defendants timely removed this action to federal court on October 2, 1998, alleging that federal statutes governed "in whole or in part" the disposition of the case. Notice of Removal ¶ 1. Specifically, they allege that because "it must be determined whether plaintiffs or defendants were the inventors of a patentable mold," the federal patent laws are implicated in such a way as to confer on this Court original subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a). *Id.* ¶ 5. Plaintiffs then filed a Motion for Immediate Hearing and Remand on October 20, which was dismissed by this Court the next day for failing to attach a written statement as to the date and manner of service pursuant to Local Civil Rule 7.1(d). *See Licursi v. Jamison Plastic Corp.*, Civ. A. No. 98-5262 (E.D.Pa. Oct.21, 1998). Plaintiffs correctly re-filed the present motion on October 26, requesting a remand to state court, an evidentiary hearing, and the costs associated with the removal.

II. DISCUSSION

Defendants removed this action under the authority and pro-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp. Page 2

Not Reported in F.Supp., 1998 WL 808542 (E.D.Pa.), 49 U.S.P.Q.2d 1212

**(Cite as: Not Reported in F.Supp.)**

cedures found in 28 U.S.C. §§ 1441 and 1446. Plaintiffs' motion is properly before this Court pursuant to 28 U.S.C. § 1447(c), which provides, in relevant part, that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."

In ruling on a motion for remand, "the district court must focus on the plaintiff's complaint at the time the petition for removal was filed ... [and] must assume as true all factual allegations of the complaint." *Steel Valley Auth. v. Union Switch and Signal Div.*, 809 F.2d 1006, 1010 (3d Cir.1987) (citation omitted), *cert. dismissed sub nom American Standard, Inc. v. Steel Valley Auth.*, 484 U.S. 1021, 108 S.Ct. 739, 98 L.Ed.2d 756 (1988); *accord Pullman Co. v. Jenkins*, 305 U.S. 534, 537, 59 S.Ct. 347, 83 L.Ed. 334 (1939). The burden is on the removing defendant to show the existence and continuance of federal jurisdiction. *See Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350, 359 (3d Cir.), *cert. denied*, 516 U.S. 1009, 116 S.Ct. 564, 133 L.Ed.2d 489 (1995). "The removal statutes 'are to be strictly construed against removal and all doubts should be resolved in favor of remand.' " *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir.1990) (quoting *Steel Valley*, 809 F.2d at 1010), *cert. denied*, 498 U.S. 1085 (1991). These principles have developed "[b]ecause lack of jurisdiction would make any decree in the case void and the continuation of the litigation in federal court futile." *Brown v. Francis*, 75 F.3d 860, 864 (3d Cir.1996) (quoting *Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 29 (3d Cir.1985)). Removal under § 1441(a) "is proper only if the federal district court would have had original jurisdiction if the case was filed in federal court." *Id.*

*3 This Court has original subject matter jurisdiction over civil actions arising under federal laws. *See* 28 U.S.C. § 1331. Generally, under the well-pleaded complaint rule, *see generally Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908), a claim is said to "arise under" federal law only where the federal question appears on the face of the well-pleaded complaint, *see Dukes*, 57 F.3d at 353. Since Plaintiffs' complaint does not state any federal claims on its face, remand would clearly be proper under the dictates of the well-pleaded complaint rule. However, Defendants contend that the state court would need to "determine whether Millenium or Jamison was the inventor of a patentable tool (i.e., mold) which is a federal patent law question." Defs. Mem. at 2. Specifically, they argue that "were the state court to make a determination as to who has property rights to the tool, it would also be asked to consider and decide who has patent rights, if any." *Id.* According to Defendants, the parties have contrary positions on this issue: Defendant Jamison Plastic Corporation has apparently "begun the patent process and will be seeking to patent the second tool it created, and it believes it has the right to patent this tool," while Plaintiffs have indicated in the complaint that their patent is currently pending. *Id.* Consequently, Defendants argue that, pursuant to this Court's original and exclusive jurisdiction over patent cases in 28 U.S.C. § 1338(a), this action was properly removed to federal court. *See id.* The Court agrees with Defendants that "the issue of patent rights of the parties to the tool are intertwined with any rights to replevin that Millenium claims," *id.* at 3, but reaches a different conclusion concerning its continued exercise of subject matter jurisdiction over the action.

For a case to "arise under" the federal patent laws, " 'the plaintiff must set up some right, title or interest under the patent laws, or at least make it appear that some right or privilege will be defeated by one construction, or sustained by the opposite construction or these laws.' " *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 807-08, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting *Pratt v. Paris Gas Light & Coke Co.*, 168 U.S. 255, 259, 18 S.Ct. 62, 42 L.Ed. 458 (1897)). Thus, § 1338(a) jurisdiction only extends "to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Id.* at 809. However, if " 'on the face of a well-pleaded complaint there are ... reasons completely unrelated to the provisions and purposes of [the patent laws] why the [plaintiff] may or may not be entitled to the relief it seeks,' then the claim does not 'arise under' those laws." *Id.* at 810 (quoting *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 26, 103 S.Ct. 2841, 77

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 808542 (E.D.Pa.), 49 U.S.P.Q.2d 1212
**(Cite as: Not Reported in F.Supp.)**

Page 3

L.Ed.2d 420 (1983)) (alteration in original).

*4 It is well settled that an action based on a contract, which involves underlying patent rights, does not arise under the patent law. *See* Beghin-Say Int'l, Inc. v. Ole-Bendt Rasmussen, 733 F.2d 1568, 1570-71 (Fed.Cir.1984). In *Beghin-Say*, a written contract allegedly assigned patent rights from one party to another, thereby creating a dispute when both parties filed patent applications before the Patent and Trademark Office. *See id.* at 1569-70. The Federal Circuit analyzed that action as one sounding exclusively in contract because, absent those contracts, the plaintiff "would have no claim whatever to ownership in the patent applications in dispute or otherwise." *Id.* at 1570. The court stated: "That the involved contracts may or may not constitute agreements to assign future patent applications does not convert a contract dispute cognizable in state courts to a federal question appropriate for determination in a federal court." *Id.* at 1571.

Defendants paint with too broad a brush in asserting that the state court, in deciding which party should physically retain possession of the property at issue, would necessarily resolve a substantial question of federal patent law. To be sure, the analysis the state court undertakes to reach that holding may very well involve the resolution of factual disputes concerning the originator of the mold. This might imply that some reference to the federal patent laws may be necessary.

However, the precise conclusion reached by the state court will determine only who is legally entitled to possess certain items of *personal property*. As the Federal Circuit has repeatedly stated, "the mere presence of a patent issue cannot of itself create a cause of action arising under the patent laws.... That a contract action may involve a determination of the true inventor does not convert that action into one 'arising under' the patent laws." Consolidated World Housewares, Inc. v. Finkle, 831 F.2d 261, 265 (Fed.Cir.1987). The Court of Common Pleas is free to look for guidance to the law on inventorship as federal patent jurisprudence has explained it, but "[b]ecause a court will look to federal law, however, does not confer federal jurisdiction." American Tel. and Tel. Co. v. Integrated Network Corp., 972 F.2d 1321, 1325 (Fed.Cir.1992).

Finally, while "[a]t the heart of any ownership analysis lies the question of who first invented the subject matter at issue," MCV, Inc. v. King-Seeley Thermos Co., 870 F.2d 1568, 1570 (Fed.Cir.1989), the provision in the federal patent law concerning co-inventorship disputes, 35 U.S.C. § 256, is inapposite to the instant situation. That provision "explicitly authorizes judicial resolution of co-inventorship contests over *issued patents*." *Id.* at 1570 (emphasis added). Here, both patent applications are currently pending and thus, a cause of action arising under this provision is premature.

III. CONCLUSION

*5 For the foregoing reasons, Plaintiffs' motion is GRANTED and the case is remanded to the Court of Common Pleas of Lehigh County, Pennsylvania. Plaintiffs have also asked for a hearing on their motion, as well as reimbursement for the costs associated with the removal. In light of the analysis above, the Court deems a hearing on this matter unnecessary. The Court will deny the request for costs as well.

An appropriate order follows.

*ORDER*

AND NOW, this 20th day of November 1998, upon consideration of Plaintiffs' Motion for Immediate Hearing and Motion to Remand (Docket No. 5) and Defendants' response thereto (Docket Nos. 6 and 7), it is hereby ORDERED that Plaintiffs' motion is GRANTED, in accordance with the accompanying memorandum. The request for an evidentiary hearing and the costs associated with the removal are DENIED.

The Clerk of Court shall return this case to the Court of Common Pleas of Lehigh County, Pennsylvania.

This case shall be marked CLOSED.

E.D.Pa.,1998.
Licursi v. Jamison Plastic Corp.
Not Reported in F.Supp., 1998 WL 808542 (E.D.Pa.), 49 U.S.P.Q.2d 1212

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                Page 4
Not Reported in F.Supp., 1998 WL 808542 (E.D.Pa.), 49 U.S.P.Q.2d 1212
**(Cite as: Not Reported in F.Supp.)**


Briefs and Other Related Documents (Back to top)

• 2:98cv05262 (Docket) (Oct. 02, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.